UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

------------------------------------------------------------- x
                                                          :

NAVIENT SOLUTIONS, LLC                        :
13865 Sunrise Valley Drive.                        :
Herndon, VA 20171                                     :
                                                          :
                     Plaintiff,              :
       v.                                          :
                                                          :  **Civil Action No.**
DEPARTMENT OF EDUCATION                  :
Lyndon Baines Johnson                           :  **JURY TRIAL DEMANDED**
Department of Education Bldg.                :
400 Maryland Ave., S.W.                        :
Washington, D.C. 20202                       :
                                                          :
-and-                                                         :
                                                          :
DR. MIGUEL CARDONA                       :
Secretary of Education                            :
in His Official Capacity                           :
Lyndon Baines Johnson                           :
Department of Education Bldg.                :
400 Maryland Ave., S.W.                        :
Washington, D.C. 20202                       :
                                                          :
                    Defendants.           :
------------------------------------------------------------- x

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

      1.      Plaintiff Navient Solutions, LLC ("**Plaintiff**")[1] by its undersigned counsel hereby seeks declaratory and injunctive relief against defendants the United States Department of

---

[1] The final audit determination giving rise to the administrative challenge discussed herein was issued against Sallie Mae, Inc., then a subsidiary of SLM Corporation, and another SLM Corporation subsidiary, Nellie Mae Corporation ("**Nellie Mae**"), for alleged overpayments made to Nellie Mae. "Nellie Mae" refers to Nellie Mae Holdings LLC

Education and Secretary of the Department of Education Dr. Miguel Cardona, in his official capacity ("**Department**" or "**Defendants**").  Plaintiff alleges as follows:

## INTRODUCTION

2.  As the landscape of higher education dramatically evolved in the 1970s, the Department sought the assistance of private entities to act as lenders and secondary-market purchasers to make it possible for students to achieve their higher education goals.  In order to accomplish that shared goal, the Department very often issued various rules, regulations and guidance documents including Dear Colleague Letters.  Lenders relied in good faith on this guidance provided by the Department about how to operate in compliance with a complex regulatory structure and in the face of constantly changing economic conditions.  In this instance, however, the Department failed to honor both its own guidance and its agreements, resulting in a finding of liability that is arbitrary, capricious, and fundamentally unfair.

3.  This action has a long procedural history, but the overarching narrative is simple. Nearly thirty years ago, as part of its participation in the Department's program to encourage

---

(formerly Nellie Mae Corporation, then Nellie Mae Holdings Corporation), Nellie Mae Education Loan LLC (formerly Nellie Mae Education Loan Corporation), and Nellie Mae Loan Finance, LLC.  Nellie Mae in 1998 divided into Nellie Mae Education Foundation and a taxable loan-servicing entity, Nellie Mae Corporation.

Nellie Mae and certain of its affiliates were acquired as part of the SLM Corporation corporate family in 1999.  In 2014, as part of a corporate separation transaction that occurred during the course of the appeal of the final audit determination, SLM Corporation became Navient Corporation and Sallie Mae, Inc. became Navient Solutions, Inc., and later Navient Solutions, LLC.

References to the subject of the audit determination refer to the entity alleged to have received overpayments at that time, Nellie Mae.  "Plaintiff" refers to Navient Solutions, LLC or one or more of its affiliated or predecessor entities at various stages of the audit appeal.  Navient Corporation is the parent company of Navient Solutions, LLC.

funding for student loans, Plaintiff, through various affiliated entities, issued a series of bonds to raise funds for student-loan purchases. At the same time, Congress changed the rules of the program in a way that created ambiguity about how tax-exempt bond issuers should treat student loans purchased or funded with those bonds. Plaintiff therefore asked the Department—the agency with expertise in and authority over the program—how to proceed in light of the new law. The Department responded by adding specific language to interpretive guidance, which Plaintiff and its successors followed. Fifteen years later, however, the Department disavowed its guidance, declared that Plaintiff had erred in relying on it, and sought millions in recovery. Even then, however, the Department agreed not to collect on past amounts allegedly owed if its revised interpretation was followed prospectively.

4. Despite this agreement, the Department, through its Office of Inspector General ("**OIG**"), continued to pursue Plaintiff for how it had acted in reliance on the Department's guidance. After nearly 15 more years in that administrative process, the Department issued a final decision in January 2021 ("the **Decision**") (**Exhibit A**). In the Decision, which Plaintiff challenges here, the Department rejected its own guidance as contrary to the controlling statutes, faulted Plaintiff for relying on it, arbitrarily singled out Plaintiff among other industry participants who had also relied on the same guidance, and ignored the existence of a binding agreement between Plaintiff and the Department's office of Federal Student Aid (**"FSA"**) on the very matter at hand. The Decision creates a troubling precedent for an administrative agency to impose decades-old liability upon a determination, made years after the fact, that its guidance on which private-sector partners relied was erroneous and that those partners bear the risk of predicting which of its guidance the Department will stand behind. The Department's conduct is

paradigmatic arbitrary and capricious action in violation of the law and the Administrative Procedures Act.

## THE PARTIES

5. Plaintiff Navient Solutions, LLC is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located in Herndon, Virginia.

6. Defendant Department of Education is a department of the executive branch of the United States government headquartered in Washington, D.C. and an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1). The Department of Education oversees the administration of federal student loans, including the Federal Family Education Loan ("**FFEL**") program. Defendant Secretary of Education Dr. Miguel Cardona is the official who currently oversees the Department of Education.

## JURISDICTION AND VENUE

7. This action arises under the federal Administrative Procedure Act ("**APA**"), 5 U.S.C. §§ 701-706. Subject matter jurisdiction is proper pursuant to 28 U.S.C. § 1331, as this dispute arises under federal law. The Higher Education Act ("**HEA**"), at 20 U.S.C. § 1082(a)(2), also permits the Secretary of Education to be sued in any district court. The Court has the authority to order a remedy pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 706.

8. Venue is proper in the Eastern District of Virginia under 28 U.S.C. §§ 1391(b)(2) and (e)(1)(C), as Plaintiff Navient Solutions, LLC maintains its principal place of business in Virginia, and no real property is involved in this action.

## FACTUAL ALLEGATIONS

### STATUTORY AND REGULATORY BACKGROUND

9. In 1972, Congress chartered the Student Loan Marketing Association, commonly known as "Sallie Mae," as a government-sponsored enterprise to provide a secondary market for student loans. In that role and to increase the amount of private capital committed to making student loans, Sallie Mae purchased loans made under the FFEL program from private lenders. In 1997, as permitted by an amendment to the Higher Education Act, Sallie Mae became a subsidiary of a publicly-traded corporation, which was then known as SLM Corporation and is now known as Navient Corporation. In 1999, certain subsidiaries of SLM Corporation acquired Nellie Mae and SLM Education Credit Finance Corporation ("**ECFC**"), which issued the bonds underlying this dispute. In 2004, Sallie Mae relinquished its Congressionally-granted charter, no longer was a government-sponsored entity, and was dissolved.

10. As a holder of FFEL loans, Nellie Mae received special allowance payments ("**SAP**"), which are payments made by the federal government to the holder of a loan when the yield on a FFEL loan is less than the rate prescribed in the HEA, as amended. SAP payments were implemented to ensure that FFEL lenders received a market rate of return to encourage loan originations and help create liquidity that would assure a ready supply of lending capacity for those seeking support for their educational goals. The amount or rate of SAP paid on an FFEL loan is based on formulas that differ according to the type of FFEL loan, the date the loan was originally made, and the type of funds used to finance the loan (*i.e.,* taxable or tax-exempt). The dispute here concerns FFEL loans purchased with funds obtained from tax-exempt debt issued before October 1, 1993. Because lenders can issue tax-exempt debt at more favorable interest

rates, the federal government pays a reduced SAP rate to holders of loans purchased with such funds. In particular, when the transactions at issue in this dispute occurred, loans purchased with tax-exempt debt were subject to what is known as the 1/2 SAP Rate, which was only half the SAP that would otherwise be paid, subject to a minimum yield, or "floor," of 9.5 percent, divided by 4 for a rate paid on a quarterly basis. This 1/2 SAP Rate also applied to loans funded with the proceeds of other loans financed by eligible tax-exempt debt. The current funding source of a loan determined whether it would be eligible to receive the full SAP or 1/2 SAP Rate.

11. In 1992, in response to historically high interest rates, the Department sought to increase the number of loans subject to the 1/2 SAP Rate by changing the "current funding source" policy. The Department promulgated new regulations, which provided that loans had to be billed at the 1/2 SAP Rate even after the loan was transferred to a taxable source, for so long as the prior tax-exempt source of funding remained outstanding. A Dear Colleague Letter ("**DCL**") issued by the Department in 1996 clarified that the purpose of the 1992 regulations was, in fact, to increase the number of loans subject to the 1/2 SAP Rate by applying the 1/2 SAP Rate to loans that had undergone refinancing. At the time, industry participants, including Nellie Mae executive Sheila M. Ryan-Macie, warned the Department that this change would not make sense in a lower interest rate environment, because the loans now subject to the 1/2 SAP Rate would still receive the benefit of the 9.5 percent floor, but the Department nevertheless proceeded with these amendments.

12. The Omnibus Budget Reconciliation Act of 1993 ("**OBRA 1993**") changed the SAP for loans made or acquired with the proceeds of tax-exempt financing originally issued after October 1, 1993. Nellie Mae needed guidance about the application of this statute because, as

OBRA 1993 was being enacted, Nellie Mae was in the process of creating a unique pooled structure for certain loans and it needed to know how the law would apply.

13. More specifically, Nellie Mae had acquired loans financed by the 1993 Nellie Mae Trust (the "**1993 Trust**"), which was comprised of a series of unsecured tax-exempt bonds issued between March 1993 and November 1993 by the New England Education Loan Marketing Corporation pursuant to a master trust indenture totaling $458,095,000 (the "**1993 Bonds**").  The five series comprising the 1993 Bonds refunded previously issued tax-exempt bonds, and Nellie Mae combined the proceeds from the bonds to a common funding pool (the "**1993 Bond Pool**") to continue to finance the existing student loans and, as permitted by the transaction documents and applicable rules and regulations, to acquire additional student loans. Such pooling was permissible because, unlike typical student-loan bond financing where a trust would own the loans which would then be collateral for the loans financed or acquired with the proceeds of the bonds, the 1993 Trust was unsecured, instead relying upon the general corporate debt rating of Nellie Mae.  Deposits made into sub-pools of the 1993 Bond Pool were fungible within the respective sub-pools, and new loans were acquired with comingled funds.  Thus, all loans held by the 1993 Trust were financed or acquired, in part, with proceeds of each of the tax-exempt 1993 Bonds within the sub-pools.

14. After OBRA 1993 was enacted, the Department's then-Policy Division Director shared a draft DCL with Ryan-Macie, who was also Nellie Mae's delegate to the National Council of Higher Education Loan Programs, for her review with other members of the Council. Ryan-Macie asked the Policy Division Director to clarify how the new special allowance rules would apply to the 1993 Trust.  The Department's existing guidance did not address structures

7

where all bond and loan proceeds were pooled and used to acquire loans, and specific loans were not pledged as collateral for specific bonds. That guidance instead addressed only more straightforward trust structures in which loans were 'pledged' as collateral for a particular trust indenture.

15. After requesting and receiving Nellie Mae's comments, and after Nellie Mae specifically asked for guidance on pooled proceeds, the Department issued a Dear Colleague Letter (or DCL) (the "**1993 DCL**"), which noted in the course of explaining the new changes that the 1/2 SAP Rate applied to loans "made or purchased, *in whole or in part*, with funds derived from tax-exempt obligations."[2] The 1993 DCL explained that, as a result of OBRA 1993, "loans made or purchased with funds obtained by the holder from the issuance of obligations *originally* issued **on or after October 1, 1993** . . . no longer qualify to receive the minimum special allowance."[3] But "'[r]efinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance."[4]

16. All parties agree that the loans at issue here were originally issued before October 1, 1993, within the meaning of this guidance. Thus, in the 1993 DCL, the Department added language specifically to answer Nellie Mae's questions about how the statutory changes affected its funding structure. That language made clear not only that a single loan could be financed

---

[2] Dear Colleague Letter 93-L-161 ("DCL 93-L-161") at 13, U.S. Dep't of Educ., Letter About the Major Changes Made to the Federal Family Education Loan Program by the Omnibus Budget Reconciliation Act (Pub. L. 103-66) (Nov. 1993) (emphasis added).

[3] *Id.*

[4] *Id.*

with more than one source of funds but also that if a loan was financed "in whole or in part" with an eligible tax-exempt source of funds, a lender was required to bill at the 1/2 SAP Rate. Accordingly, Nellie Mae appropriately and in good faith determined that it should bill at the 1/2 SAP Rate until all of the 1993 Bonds were retired or defeased. SLM Corporation continued that practice after acquiring Nellie Mae in 1999.

17. In 2007, the Department realized that its shifting approach to the 1/2 SAP Rate had failed to protect the Department against fluctuating interest rates, despite repeated warnings from industry participants, including Nellie Mae, that this might occur. To address the wide-ranging 1/2 SAP Rate billing practices of tax-exempt debt issuers, the Department decided to re-interpret its earlier statements through a 2007 DCL, which reversed the Department's position as set forth in the 1993 DCL. The Department announced that it would pay special allowance at the 1/2 SAP Rate only to lenders that undertook certain independent audit procedures and, for the first time, classified loans into "first" and "second" generations to limit the loans eligible for the 1/2 SAP Rate.

18. The Department also offered on January 24, 2007 to forgo an enforcement action with respect to billing practices before September 30, 2006, if its new policy was adopted prospectively. In a February 15, 2007 reply, the Department's offer was accepted.

## OIG AUDIT AND ADMINISTRATIVE PROCEEDINGS

19. On September 11, 2007, the OIG informed Plaintiff that it would undertake an audit of its SAP practices, despite the existence of the agreement between Plaintiff and the Department on the matter. The OIG sought to determine (*i*) whether Nellie Mae had claimed and received payments from the Department of FFELs at the 1/2 SAP Rate in compliance with

9

relevant law, and (*ii*) whether Nellie Mae continued to claim and receive SAP at that rate on the 1993 Trust Loans after the 1993 Bonds matured and were retired.  On August 3, 2009 the OIG issued a Final Audit Report ("**FAR**").  Sallie Mae, Inc. filed a response to the FAR on October 2, 2009, and replied to questions from the FSA in March 2010 and March 2011.  On September 25, 2013, the FSA issued a Final Audit Determination ("**FAD**").  The FAD found that Nellie Mae had improperly received 1/2 SAP Rate payments on the 1993 Trust Loans after a portion of the loans had matured.  The FAD also determined that certain loans were ineligible for payments because of the manner in which they had been transferred from a Nellie Mae subsidiary to its corporate parent, before being sold and transferred to ECFC.

20. On July 27, 2016, Navient Corporation requested a review of the FAD on behalf of its subsidiary entities.  On March 7, 2019 a hearing official issued an initial decision affirming the FAD.  The official found that (*i*) the 1993 DCL's "in whole or in part" language contradicted the language of the governing statute; (*ii*) ECFC did not meet the relevant criteria for tax-exempt loans; and (*iii*) no statute of limitations applies to FSA's forfeiture claim.

21. On April 8, 2019 Navient Corporation, on behalf of its subsidiary entities, appealed the hearing official's decision.  Acting Secretary of Education Mitchell M. Zais issued a final Decision on January 15, 2021.[5]  The Decision failed to adequately address many of Navient's arguments, and instead found that:

  1. The 1993 DCL was, "at most, an interpretive rule" that was not binding on third parties and could not have legal effect because it purportedly "conflicts with the

---

[5] **Exhibit A**: *In re Navient Corp.* Dkt. No. 16-42-SA, U.S. Dep't of Educ. (Decision of the Secretary) (Jan. 15, 2021).

   statutory language, the Department's associated regulations, past departmental decisions, and Congressional intent."[6]

2. The 1993 Bond Pool was an aggregate of multiple individual bonds, "issued under separate instruments and are separate obligations."[7]

3. With respect to the ECFC transfer, the "structure of the sale of the loans and legal status of the successor in interest are rendered moot" because the underlying bond at issue was retired, supposedly losing eligibility for the 9.5 percent floor when it matured.[8]

4. The January 24, 2007 and February 15, 2007 letters between Sallie Mae and the Department had no "force or authority" and referred to the Department's intent to forego collection only on a "narrow set of overpayments."[9]

5. The statute of limitations under 28 U.S.C. § 2462 did not apply, because the collection of overpayments was not "punitive or discretionary" but rather "corrects the original overpayment," and does not deny Navient the right to due process because it "has had the benefit of a full and extensive administrative process."[10]

## CAUSE OF ACTION

**COUNT I:  VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT**

22. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

23. The APA provides a right of review for parties that are adversely affected by a final agency action.  5 U.S.C. §§ 702, 704.  A reviewing court can "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "contrary to constitutional right, power, privilege,

---

[6] *Id.* at 11-13.
[7] *Id.* at 14.
[8] *Id.*
[9] *Id.* at 15.
[10] *Id.* at 15-16.

or immunity" or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. §§ 706(2)(A)(B)(C)(D).

24. Under 28 U.S.C. § 2201, this Court may declare the rights of Plaintiff regarding the issues presented in this Complaint.

25. Accordingly, Plaintiff seeks a determination that the Department violated the APA by making an improper final agency determination that Nellie Mae erroneously charged the Department for SAP on ineligible loans.

26. *First*, the Decision rejects the clear language of the 1993 DCL and justifies this disavowal on the ground that the Department—not Plaintiff—had erred in promulgating this guidance. As a result, the Decision creates an absurd situation where industry participants must read any Department instruction with skepticism and mistrust, out of concern that the Department might one day revisit its interpretation and find that participant liable and attempt to impose penalties or recoup funds where that participant previously believe they acted appropriately and in reliance on published guidance. Under the Decision's reasoning, a government agency is free to issue official guidance, expect industry participants to follow it, and then later, if it decides that its advice was incorrect, punish industry participants for that reliance. Basic fairness—as well as the requirements of reasoned decisionmaking under the APA—prohibit an agency from pulling the rug out from under regulated entities in this arbitrary way.

27. *Second*, the Decision relies on an inappropriately broad definition to determine that each of the individual bonds within the 1993 Bond Pool are capable of being viewed as separate instruments and separate "obligations." This simplistic reading ignores the complex

structure and unique context of the 1993 Bonds that together operated as a single "obligation," and presumes that any financial instrument can be reduced to, and defined by, its disaggregated parts. This is not the case. Because the loans purchased with the 1993 Bonds proceeds were not pledged as collateral in support of repayment, the 1993 Trust Agreement opened all unencumbered loans of Nellie Mae as the source of repayment for all of the 1993 Bonds, linking the bonds in a manner effectively doing away with the separate obligations that previously characterized the original bonds. By deconstructing the 1993 Bonds instrument to its constituent parts, the Decision arbitrarily and capriciously deprives the legal and practical characteristics of the 1993 Bonds of their meaning.

28. *Third*, the Decision declines to address Plaintiff's factual and legal arguments for why the transferred loans maintained their tax-exempt status and were still eligible for the 1/2 SAP Rate after the fact. Instead, the Decision again seeks to boil the issue down to one of individual loans with individual legal obligations and asserts that, because the underlying bonds that rendered the loan eligible for the 1/2 SAP Rate had matured by the time of the transfer, all of the loans that had been transferred were no longer eligible for the rate. The Department abused its discretion by depriving Navient of its right to be heard on the issue and it arbitrarily dismissed the issues based on its own flawed conclusion on an entirely separate point.

29. *Fourth*, the Decision fails to engage with Plaintiff's argument that the 2007 exchange of letters between Plaintiff and the Department constituted a binding settlement agreement. Instead, the Decision compounds its flawed conclusion that industry participants should not rely on the Department's DCLs, even when, as here, the DCL resulted in a resolution of the dispute between the parties. In stark contrast to Plaintiff's experience, the Department has

not required any repayment by its similarly situated industry peers, such as Nelnet, under the terms of their settlement agreements. There, the Department declined to enforce a recommendation of an OIG audit that Nelnet repay $278 million in alleged "excess" special allowance, and instead it agreed to allow Nelnet to change its practices on a prospective basis. By endorsing the Department's decision to demand that Plaintiff repay these alleged overpayments, the Decision singled out Plaintiff, among other industry participants, for arbitrary and abusive treatment.

30. *Fifth*, the Decision holds that there is no time limit on the Department's ability to seek liability that arose decades ago, and, in particular, that the statute of limitations does not apply to this case because the recoupment of the overpayments is not punitive. The Decision, however, fails to explain how such repayment does not constitute a forfeiture and does not identify *any* limitation, in the absence of 28 U.S.C. § 2462, to the Department's ability to demand repayment. The Decision also ignores the crux of Plaintiff's due process claim. While the decision attempts to dismiss due process concerns on the ground that these are administrative proceedings, the due process violation here stems from the Department's attempt to eliminate the statute of limitations as a constraint on bringing a time-barred action in the first instance. The determination that the Department is not bound by any time limitation to demand forfeiture of alleged overpayments is contrary to the Constitution's due process guarantees and cannot stand.

31. As a whole, the Decision is an arbitrary and capricious exercise of authority and an abuse of discretion, and is in excess of the Secretary's authority. The Decision results in a fundamental unfairness to a regulated entity that strove in good faith to rely on guidance promulgated by the Department, that reached a binding agreement with the Department to

resolve these issues, and that is now told, decades after the fact, that it must pay a substantial liability because the guidance on which it relied was a mistake by the Department and the Department does not honor its agreements. The APA prohibits such agency action.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests this Court to enter judgment in Plaintiff's favor, and:

a) Declare that the Decision of the Defendants was arbitrary, capricious, or otherwise unlawful and a violation of the APA;

b) Preliminarily enjoin the Defendants from enforcing the Decision and from proceeding with the calculation and collection of alleged damages;

c) Award Plaintiff their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

d) Order such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 16, 2021

Respectfully submitted,

/s/ Ada Fernandez Johnson

DEBEVOISE & PLIMPTON LLP
Ada Fernandez Johnson
Virginia Bar No. 42751
Katherine R. Seifert*
801 Pennsylvania Avenue NW
Washington, DC 20004
(202) 383-8000
afjohnson@debevoise.com

Matthew Specht*
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Plaintiff Navient Solutions, LLC*

*Pro hac vice* application forthcoming