**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

------------------------------------------------------------- x
                                     :

NAVIENT SOLUTIONS, LLC          :
13865 Sunrise Valley Drive.        :
Herndon, VA 20171             :
                                       :

                    Plaintiff,      :
             v.                  :
                                       :  **Civil Action No.**

DEPARTMENT OF EDUCATION    :
Lyndon Baines Johnson         :  **JURY TRIAL DEMANDED**
Department of Education Bldg.   :
400 Maryland Ave., S.W.       :
Washington, D.C. 20202       :
                                       :

-and-                                :
                                       :

DR. MIGUEL CARDONA        :
Secretary of Education         :
in His Official Capacity        :
Lyndon Baines Johnson         :
Department of Education Bldg.   :
400 Maryland Ave., S.W.       :
Washington, D.C. 20202       :
                                       :

                  Defendants.
------------------------------------------------------------- x

**EXHIBIT A**



**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON, D.C. 20202

January 15, 2021

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
VIA EMAIL TO natasha.varnovitsky@ed.gov, casmith@debevoise.com,
afjohnson@debevoise.com

Colby A. Smith, Esq.
Ada Fernandez Johnson, Esq.
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, NW, Suite 500
Washington, DC  20004

Natasha Varnovitsky, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC  20202-2110

RE:      ***In the Matter of*** **Navient Corporation,** Docket No. 16-42-SA , Federal Student Aid
Proceeding, CAN: ED-OIG/A0310006

Dear Counsel:

Enclosed please find a copy of a procedural order issued today in the case, ***In the Matter of***
**Navient Corporation,** Docket No.16-42-SA.  This decision will be uploaded to the electronic
docket system maintained by the Department's Office of Hearings and Appeals.

Sincerely,

Brandon S. Sherman
Office of the Secretary



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE SECRETARY

---

*In the Matter of*

**NAVIENT CORPORATION**

**Docket No. 16-42-SA**

Federal Student Aid Proceeding

CAN:  ED-OIG/A0310006

Respondent.

---

### DECISION OF THE SECRETARY[1]

Navient Corporation (Navient) has appealed the March 7, 2019, decision (Decision) by Administrative Judge Robert G. Layton of the U.S. Department of Education (Department) Office of Hearings and Appeals (OHA).  At issue in this case is the eligibility of student loans for "special allowance payment" (SAP)—payment made by the Department to lenders of certain student loans under the Federal Family Educational Loan (FFEL) Program.  In the Decision, the administrative judge affirmed in part a September 25, 2013, final audit determination (FAD) issued by the office of Federal Student Aid (FSA).[2]  The FAD relied on the Department's Office of Inspector General audit report issued on August 3, 2009 (OIG Report), finding that Navient erroneously charged the Department approximately $22.3 million for SAP on loans that were not eligible for it.[3]

Based on the following analysis, I affirm the administrative judge's Decision.

---

[1] Secretary of Education Betsy DeVos resigned as Secretary effective January 8, 2020.  In accordance with 20 U.S.C. § 3412(a)(1), which states in pertinent part ". . . in the event of a vacancy in the office of the Secretary, the Deputy Secretary shall act as Secretary," Deputy Secretary Mitchell M. Zais began his service as the Acting Secretary upon the vacancy.

[2] Through the FAD, FSA bifurcated this matter into two parts.  First, FSA determined that Navient collected overpayments from the Department through misapplication of the rules discussed later in this opinion.  This part of the controversy became the subject of this appeal to OHA.  Second, FSA required Navient to conduct an audit to determine the actual amount of its liability to the Department.  This second matter is neither final nor ripe for appeal. Therefore, the second matter was not before OHA and will not be resolved in this Decision.

[3] The FAD was issued to Sallie Mae, Inc., but in the interest of simplicity, I refer to Navient, which is Sallie Mae's successor and the party appealing the FAD.  The FAD was based on the OIG Report, Navient's response to the OIG Report, Navient's responses to questions posed by FSA, additional material included with the OIG Report, and relevant public filings.  FAD Cover Letter at 1.

<u>Applicable Law</u>

The terms of SAP as they pertain to this case are explained in the OIG Report:

> A lender participating in the FFEL Program is entitled to a quarterly SAP for loans in its portfolio.  In general, the amount of a special allowance payment is the difference between the amount of interest the lender receives from a borrower or the government and the amount that is provided under requirements in the [Higher Education Act].
>
> …
>
> The Education Amendments of 1980 (Pub. L. 96-374) created a separate special allowance calculation for FFEL Program loans made or purchased with proceeds of tax-exempt obligations, and the Higher Education Amendments of 1992 (Pub. L. 102-325) continued this separate calculation for loans with variable interest rates.[4]

Congress created the SAP to subsidize affordable student loans during a period of high inflation.  However, Congress did not intend for lenders to receive a windfall, and limited the SAP rates to one-half of the normal rate (with a 9.5 percent floor) in 1980.[5]

The 9.5 percent floor was established "for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation . . . ."[6]  Congress sought to balance the need for an equitable return to lenders with the danger of a windfall of SAP for lenders who financed loans with tax exempt obligations.[7]  In a Senate report from 1980, Congress stated:

> The past few years have seen a substantial increase in the issuance of tax-exempt bonds for student loan purposes.  These bonds are often issued at interest rates significantly lower than commercial rates, since they are State obligations or otherwise qualified for tax-exempt status.  However, the special allowance paid on such bonds has been identical with that paid commercial lenders . . . .  [U]nforeseen amounts of special allowances have been paid to holders of loans which resulted from tax-exempt issuances, providing a return far in excess of the cost of administration or the cost of obtaining the capital.  The Committee bill seeks to prevent this windfall by limiting the special allowance on loans made or purchased by tax-exempt funds.[8]

As long-term interest rates on the open market continued to drop, Congress further sought to limit the potential for a windfall.  In the Student Loan Reform Act of 1993, Congress repealed

---

[4] OIG Report at 3–4.

[5] This half-SAP rate with a 9.5 percent floor is hereafter referred to as the "9.5 percent floor."

[6] 20 U.S.C. § 1087-1(b)(2)(D)(i).

[7] *Compare* 20 U.S.C. § 1087-1(a) ("assure (1) that the limitation on interest payments or other conditions (or both) on loans made or insured under this part, do not impede or threaten to impede the carrying out of the purposes of this part . . . or do not cause the return to holders of loans to be less than equitable . . . ."), *with* Sen. Rep. No. 96-733, 96th Cong. 2d Sess. 36 (May 25, 1980).

[8] Sen. Rep. No. 96-733, 96th Cong. 2d Sess. 36–37 (May 25, 1980).

the 9.5 percent floor for tax-exempt obligations in a statutory section entitled "Elimination of Tax-Exempt Floor."[9]  Thus, the 9.5 percent floor did not apply to loans "which are financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993 . . . [or loans] which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interest or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds."[10]

Over the years, the Department has issued several Dear Colleague Letters (DCL) addressing the 9.5 percent floor as it pertains to this case.[11]  In 1993, the Department issued DCL 93-L-161.[12]  In that letter, the Department described the major changes to the FFEL Program made by the Student Loan Reform Act of 1993:  "The minimum special allowance rate 'floor' on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed.  Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations *originally* issued **on or after October 1, 1993** . . . no longer qualify to receive the minimum special allowance."

On March 1, 1996, the Department issued DCL 96-L-186,[13] which stated:

Under the regulations, if a loan made or acquired with the proceeds of a[n] [eligible] tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.  If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

In January 2007, the Department issued DCL FP-07-01, defining two categories of FFELP loans:  "first-generation loans" and "second-generation loans."  First-generation loans are those acquired using proceeds of tax-exempt obligations (funds obtained directly from the issuance of the tax-exempt obligation).[14]  Second-generation loans are those acquired using funds obtained directly from first-generation loans.[15]  The letter went on to explain:

Funds obtained as collections on second-generation loans, interest and special allowance payments on second-generation loans, or sales of second-generation loans, or those same kinds of funds obtained from later generation loans, are not eligible sources of funds under the statute or regulation.  Therefore, loans acquired with funds from second-generation loans or later generations of loans are not eligible for SAP at the 9.5 percent minimum return rate.[16]

---

[9] Omnibus Reconciliation Act of 1993, Pub. L. No. 103-66, Sec. 4105 codified at 20 U.S.C. § 1087-1(b)(2)(B)(iv).
[10] 20 U.S.C. § 1087-1(b)(2)(B)(iv).
[11] A DCL is a guidance document issued by the Department to potentially affected parties.
[12] DCL 93-L-161 (Nov. 1993).
[13] DCL 96-L-186 (Mar. 1996).
[14] DCL FP-07-01 at unpaginated (unp.) 2.
[15] *Id*.
[16] *Id*.

On January 24, 2007, the Department sent a letter specifically to Navient similarly describing first-generation and second-generation loans.[17]  That letter explains the Department's intent to only pay SAP at the 9.5 percent floor after review of Navient's holdings by an independent accounting firm and an accompanying certification from Navient executives certifying that the 9.5 percent floor is being charged only for first-generation or second-generation loans.  The letter also indicates that the Department "will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with" FSA's requirements as described in the letter.

With the applicable legal foundation established, I now review the factual background of this case.

<u>Background</u>

This appeal presents a history of financial institutions and their transactions which is recounted in the Decision under appeal and in the parties' briefs.  Because this background is germane to the legal issues presented, I repeat it here in relevant part.

Navient's involvement in this matter derives from its acquisition of various subsidiary entities, in particular, the Student Loan Marketing Association (Sallie Mae, or SLMA).[18] Congress chartered Sallie Mae in 1972, as a government-sponsored enterprise, to provide a secondary market for student loans at a time when students had difficulty finding banks to lend.[19] Sallie Mae loans were originated from the FFEL Program.[20]

Over the years, Sallie Mae moved towards privatization.[21]  In 1983, Sallie Mae became a publicly-owned corporation with shares listed on the New York Stock Exchange.[22]  In 1992, Congress allowed Sallie Mae to convert all of its stock to voting stock.[23]  By 1996, Sallie Mae received permission for its shareholders to choose to either reorganize into a private company or liquidate the company.[24]  The shareholders chose to reorganize.[25]  In 2004, Sallie Mae became

---

[17] *Compare* FSA Ex. ED-08 (Blank Form Letter dated Jan. 24, 2007 (specifically addressing the content of DCL FP-07-01 for an individual entity)) *with* Respondent Ex. R-11 (Letter from Sallie Mae to U.S. Dep't of Educ. dated Feb. 15, 2007 (acknowledging the content of the Jan. 24, 2007 letter and purporting to reserve Sallie Mae's rights to contest the terms of the letter in the future) *and* Navient Brief at 28–34 (asserting that Navient received a copy of the Jan. 24, 2007 letter and "accepted it" by submitting its Feb. 15, 2007 letter).

[18] Navient Brief at 1.

[19] Lessons Learned from the Privatization of Sallie Mae, Office of Sallie Mae Oversight, U.S. Department of the Treasury, March 2006 (Treasury Sallie Mae Report) at 2; Decision at 1; OIG Report at 3.

[20] OIG Report at 3.

[21] According to Department of the Treasury, "SLMA wanted to privatize because of (1) uncontrolled political risk, (2) a desire for more freedom to adapt to changing technology and business realities, which included a diminished GSE funding advantage and (3) SLMA's opportunistic spirit and its view that privatization was now feasible." Treasury Sallie Mae Report at 18.

[22] Id. at 2, 7.

[23] *Id*.

[24] *Id*. at 8–9.

[25] *Id*. at 7, 9.

an entirely private corporate entity, with the primary business of originating and holding student loans.[26]

By the time OIG issued its report in 2009, it referred to the entity in question as "Sallie Mae, Inc. (SLMA)."[27]  Meanwhile, Navient indicated that SLM Corporation, also described as "Old SLM," constituted various consolidated subsidiaries, which eventually changed its name to "Navient, LLC" and then was merged into Navient, "with Navient as the surviving corporation."[28]  In its fiscal year 2014 Form 10-K filing with the Securities and Exchange Commission, Navient indicated that it became an independent, publicly traded company on the NASDAQ on May 1, 2014.[29]  At that time, Navient asserted that it held "the largest portfolio of education loans insured or guaranteed under the [FFELP], as well as the largest portfolio of Private Education Loans."[30]  Among other ongoing concerns, Navient listed the OIG Audit "related to our billing practices for SAP" and the FAD.[31]

Over the years, Sallie Mae acquired other companies and sub-entities in the student loan industry.  The transactions of two subsidiaries, Nellie Mae[32] and the SLM Education Credit Finance Corporation (ECFC), are the basis of the controversy under appeal as described below.

**Nellie Mae**

Nellie Mae began as a not-for-profit, state-chartered entity acting as a secondary market for student loans originating with banks.  By 1992, Nellie Mae had begun originating student loans.  Of particular relevance to this appeal, in 1993, Nellie Mae created the 1993 Nellie Mae Trust (1993 Trust), which financed five series of unsecured tax-exempt bonds (1993 Bonds) during the period of March 1993 through November 1993.[33]  The 1993 Bonds were issued by the New England Education Loan Marketing Corporation (NEELMC), with a maturity amount totaling $458,095,000.

To acquire loans, Nellie Mae established a common funding pool (1993 Bond Pool) to aggregate proceeds from all the 1993 Bonds.  Within the 1993 Bond Pool, Nellie Mae established two sub-pools:  Sub-pool #1 (related to Bond 1993A) and Sub-pool #2 (related to Bonds 1993B through 1993H).[34]  Nellie Mae used each sub-pool to separately deposit bond

---

[26] OIG Report at 3.

[27] *Id.* at 1.

[28] Navient Corporation, Annual Report (Form 10-K), at 3 (Jan. 31, 2015), available at https://www.sec.gov/Archives/edgar/data/1593538/000119312515070145/d832950d10k.htm.

[29] *Id.*

[30] *Id.*

[31] *Id.* at 34.

[32] The parties in this appeal and the administrative judge refer to "Nellie Mae" as the collective entities titled Nellie Mae Holdings LLC (formerly Nellie Mae Corporation, then Nellie Mae Holdings Corporation), Nellie Mae Education Loan LLC (formerly Nellie Mae Education Loan Corporation), and Nellie Mae Loan Finance, LLC.  In 1998, Nellie Mae divided into the Nellie Mae Education Foundation (an institution making grants and conducting studies regarding education) and the taxable loan-servicing entity called Nellie Mae Corporation.

[33] Navient Brief at 8–9.

[34] *Id.* at 9–10.  As previously mentioned, Nellie Mae established five series of bonds.  Bond 1993A constituted Series #1, Bond 1993B constituted Series #2, Bonds 1993C through 1993F constituted Series #3, Bond 1993G constituted Series #4, and Bond 1993H constituted Series #5.  *Id.* at 9.

proceeds as well as monthly principal and interest payments, guarantor payments, interest benefits and special allowance, and other income from the loans financed by that particular sub-pool.[35]

**ECFC**

Nellie Mae incorporated NM Education Loan Corporation on July 27, 1999, which was renamed SLM Education Credit Management Corporation on July 22, 2002, then later renamed to ECFC on November 10, 2003.[36]  ECFC was wholly owned by Sallie Mae.[37]

As of 2004, Nellie Mae held a certain bundle of loans with a principal value of approximately $688.6 million.[38]  Nellie Mae identified these loans as eligible for the 9.5 percent floor because they were funded through Bond 1993F.[39]  In July of 2004, Sallie Mae sold these loans from its subsidiary Nellie Mae to its other subsidiary, ECFC.[40]  After the sale, ECFC reclassified the loans as eligible for the full SAP without the 9.5 percent floor.[41]  Later, Sallie Mae considered "the July 2004 sale" to be "an erroneous early liquidation of bond series 93F."[42]  Between January and June 2005, Sallie Mae revised its billings with regard to these loans to instead charge SAP at the 9.5 percent floor.[43]

<u>OIG Report</u>

I now turn to the OIG Report to determine whether the foregoing activities of Navient's subsidiaries complied with the applicable law.  OIG issued its final audit report on August 3, 2009.  Navient's liability stems from the overbilling of loans held by Nellie Mae and ECFC, each separately discussed below.

**Nellie Mae Overpayments**

OIG found that Sallie Mae's subsidiary, Nellie Mae, erroneously billed certain 1993 Bonds (collectively referred to as Nellie Mae's 93A Indenture) at the 9.5 percent floor "after the eligible tax-exempt bonds, from which the loans derived their eligibility for the 9.5 percent floor, had matured and been retired, and after the loans were refinanced with funds derived from ineligible sources."[44]  Specifically, Bond 1993B matured on June 1, 2002, Bond 1993F matured on July 1, 2004, Bond 1993G matured on August 1, 2002, and Bond 1993H matured on December 1, 2002.[45]  Nevertheless, OIG found:

---

[35] *Id*. at 9–10.
[36] OIG Report at 3.
[37] *Id*.
[38] *Id*. at 10.
[39] *Id*.
[40] *Id*.
[41] Decision at 6.
[42] OIG Report at 40.
[43] *Id*.
[44] *Id*. at 1, 8.
[45] *Id*. at 8.

SLMA had a long-standing practice of continuing to bill loans under the 9.5 percent floor calculation until the last bond associated with the indenture matured.  In this instance, SLMA treated loans made eligible for the 9.5 percent floor calculation by each of the bonds, issued under the 93A Indenture, as remaining eligible for the 9.5 percent floor calculation until Bond 93A matured on July 1, 2005.

…

SLMA explained that all of the individual bonds issued under the 93A Indenture shared common characteristics.  For example, all of the bonds had identical terms and were payable from the same source of funds.  SLMA considered it reasonable to treat all of the bonds issued under the 93A Indenture as a single "obligation," and to consider that obligation to mature only when its last bond matured.[46]

OIG determined that Sallie Mae's usage of the 9.5 percent floor in this case did not comport with the Higher Education Act (HEA) and Department regulations.[47]  OIG pointed out that the "date the obligation is refunded" and "[t]he date the obligation matures, is retired or defeased" are characteristics of an obligation that are material to determine the obligation's eligibility for the 9.5 percent floor calculation.[48]  OIG pointed out that the various bonds in the 93A Indenture have different maturity dates.[49]  OIG asserted that the term "obligation" in the HEA, regulations and other guidance "plainly refers to a bond, not the bond's indenture."[50]  Thus, the eligibility of each bond for the 9.5 percent floor must be separately determined, regardless of the fact that the bonds were aggregated into a single pool of bonds.[51]  OIG estimated that Sallie Mae overcharged approximately $10 million in interest in the form of erroneous SAP calculations.[52]

Sallie Mae provided responses in the form of comments to OIG, and FSA posed questions which Sallie Mae answered in 2010 and 2011.  Sallie Mae contended that OIG erroneously interpreted the word "obligation" as used in 34 C.F.R. § 682.302(e)(2).  That regulation reads as follows:

(2) Effect of Refinancing on Special Allowance Payments. Except as provided in paragraphs (e)(3) through (e)(5) of this section -

(i) The Secretary pays a special allowance at the rate prescribed in paragraph (c)(3) of this section to an Authority that holds a legal or equitable interest in the loan that is pledged or otherwise transferred in consideration of -

(A) Funds listed in paragraph (c)(3)(i) of this section;

(B) Proceeds of a tax-exempt refunding obligation that refinances a debt that -

---

[46] *Id*. at 9.
[47] *Id*. at 10 (citing HEA § 438(b)(2)(B)(v)).
[48] *Id*. (citing Section 438(b)(2)(B)(iv) of the Higher Education Act).
[49] *Id*.
[50] *Id*.
[51] *Id*.
[52] *Id*. at 9.

(1) Was first incurred pursuant to a tax-exempt obligation originally issued prior to October 1, 1993;

(2) Has been financed continuously by tax-exempt obligation.

(ii) The Secretary pays a special allowance to an Authority that holds a legal or equitable interest in the loan that is pledged or otherwise transferred in consideration of funds other than those specified in paragraph (e)(2)(i) of this section either -

(A) At the rate prescribed in paragraph (c)(1) of this section, if_

(1) The prior tax-exempt obligation is retired; or

(2) The prior tax-exempt obligation is defeased by means of obligations that the Authority certifies in writing to the Secretary bears a yield that does not exceed the yield restrictions of section 148 of the Internal Revenue Code and the regulations thereunder, or

(B) At the rate prescribed in paragraph (c)(3) of this section.

Sallie Mae argued an "obligation" under 34 C.F.R. § 682.302(e)(2)(ii)(A) should collectively refer to "all bonds subject to a single indenture (or, here, a single Trust Agreement)," which would allow them all to remain eligible for the 9.5 percent floor while any of the associated bonds remain outstanding.[53]

### ECFC Overpayments

For the purposes of its audit, OIG presumed that the loans sold by Nellie Mae to ECFC qualified for the 9.5 percent floor because of Bond 1993F's tax-exempt eligibility.[54] According to OIG, Nellie Mae sold the loans "in consideration of funds derived from ineligible sources" and, thereafter, "ceased billing the loans under the 9.5 percent floor calculation."[55] Bond 1993F matured on July 1, 2004, at which time it was repaid and retired.[56] In February of 2005, Sallie Mae recoded the loans held by ECFC as eligible for the 9.5 percent floor. Sallie Mae retroactively adjusted billing for the last two quarters of calendar year 2004 and adjusted its billing in the first two quarters of 2005 to utilize the 9.5 percent floor calculation.[57]

OIG questioned Sallie Mae's recoding and billing for these loans. Sallie Mae subsequently provided additional material—761 pages of documentary evidence and responses to questions posed by FSA—defending the billing related to the loans sold by Nellie Mae to

---

[53] FSA Determination at 5.
[54] OIG assumed the original eligibility of the loans for the 9.5 percent floor for the purposes of this proceeding. However, OIG did not actually perform an audit to make such a determination. OIG Report at 10, n.6.
[55] *Id*. at 10.
[56] *Id*. at 11.
[57] *Id*.

ECFC in July 2004.[58]  However, OIG found that Sallie Mae erroneously overbilled for these loans, resulting in an estimated $12.3 million of overpayments for which Navient is liable.[59]

## FSA Final Audit Determination

On September 25, 2013, FSA issued the FAD to Navient.  FSA agreed with OIG's interpretation of the amendment to the HEA removing the 9.5 percent floor.[60]  FSA determined that the "obligation" cited by the law is each particular bond, not an aggregate bond pool.  FSA pointed to language used in the *Federal Register* in 1985 publishing regulations at 34 C.F.R. § 682.302(e) as evidence that an obligation means "the 'source of funds' used to acquire or maintain the Authority's interest in 'a loan.'"[61]  FSA held that Sallie Mae's interpretation of an "obligation" as a group "of bonds that share certain characteristics" would have "frustrated the stated purpose of § 682.302(e)."[62]

FSA reiterated that proceeds from each bond lose their tax-exempt status as the bonds become retired.[63]  Therefore, FSA concluded that Sallie Mae erroneously charged SAP at the 9.5 percent floor associated with Bonds 1993B, 1993G, and 1993H.  Also, FSA found that ECFC did not satisfy the definition of an "Authority" under the HEA such that it was eligible to charge the 9.5 percent floor for loans associated with Bond 1993F.[64]  ECFC failed to qualify as an Authority because it "never had power to issue tax-exempt bonds" and was not a qualifying "successor" to "a qualified student loan funding corporation."[65]  Thus, ECFC's SAP billings for loans associated with Bond 1993F from September 30, 2004, to June 30, 2005, were erroneous overpayments.[66]

The effect of the FAD was to require Sallie Mae to identify loans associated with Bonds 1993B, 1993F, 1993G, and 1993H to determine the adjusted billings made for each loan during periods after which the bonds became ineligible for SAP payments.[67]  FSA also required Sallie Mae to disclose other instances of its subsidiaries billing SAP at the 9.5 percent floor for ineligible loans.[68]  The FAD bifurcated the matter between the question of liability and the amount of liability.[69]  The FAD became an appealable ruling on the question of liability, as FSA held Sallie Mae liable for overpayments based on its interpretation of the rules governing SAP.

---

[58] FSA Determination at 6.

[59] OIG Report at 11.

[60] FSA Determination at 3, 12–19.

[61] *Id*. at 14.

[62] *Id*. at 15.

[63] *Id*. at 19.

[64] *Id*.

[65] *Id*.

[66] *Id*. at 19–23.

[67] *Id*. at 23.

[68] *Id*.

[69] Under 34 C.F.R. 668 Subpart H, third party servicers may appeal a "final audit determination or a final program review determination arising from an audit or program review of the institution's participation in any Title IV, HEA program or of the servicer's administration of any aspect of an institution's participation in any Title IV, HEA program."  34 C.F.R. § 668.111.

However, as stated earlier, the precise amount of liability remained unresolved pending the further accounting required of Sallie Mae by FSA.[70]

OHA Appeal

On July 27, 2016, Sallie Mae's parent entity Navient Corporation filed an appeal of the FAD with OHA.[71]  The scope of the appeal was limited to the question of whether Navient was liable for overpayments of SAP on loans funded by the bonds reviewed in the OIG report for the period following June 1, 2002.[72]

The administrative judge considered three questions on appeal[73]:

1. Was Navient's financing, with loans acquired in whole or in part with tax-exempt funds, entitled to receive payments at the 1/2 SAP rate during the periods of the audit?

2. Was Navient's treatment by FSA notably inconsistent with other industry participants?

3. Is Navient liable in this proceeding for other potentially similar overbillings pertaining to 1/2 SAP rate claims for the period before June 1, 2002?

On the first question, the administrative judge agreed with OIG and FSA that Navient was not entitled to the 9.5 percent floor, making it liable for the overpayment of SAP.  The administrative judge found Navient's theory that it correctly charged the 9.5 percent floor for loans partly funded from taxable sources "stems solely from DCL 93-L-161."[74]  Despite the language "in whole or in part" in the DCL, the administrative judge found the language of the statute "clear and unambiguous" in limiting the 9.5 percent floor to loans made solely with tax-exempt funds.[75]  The administrative judge considered Navient's interpretation of the legal authority to create a "nearly unlimited exception" that "turned upside down" Congress's purpose and "negates the entire statute."[76]

On the second question, the administrative judge rejected Navient's argument that it was treated unfairly and disparately from its industry competitors.  Navient claimed that FSA's actions sought to punish it while FSA chose not to enforce the same rules against competitors. Citing a lack of evidence presented by Navient to support its arguments, the administrative judge found that "Navient has not shown other similarly-situated industry participants who received

---

[70] "'FSA will issue a separate determination solely on the amount of overpayments and the adequacy of any other actions taken to implement the directions in this letter.'"  Decision at 2 (quoting September 25, 2013 Letter from Department of Education to Sallie Mae, Inc. at 3).

[71] Decision at 2.

[72] *Id*. at 4, 19.

[73] *Id*. at 4.

[74] *Id*. at 12.

[75] *Id*. at 13.

[76] *Id*.

different treatment" and "Navient has not met its threshold showing that FSA singled it out."[77] Thus, Navient did not meet the "'rigorous threshold standard'" to overcome the presumption of regularity that an administrative body has discharged its duties correctly.[78]

On the third question, the administrative judge found his decision to be limited to the scope of the issues from the FAD, which itself was limited to the period following June 1, 2002—thus, he made no ruling on any overbillings made prior to June 1, 2002.[79]

The administrative judge affirmed the FAD, finding Navient liable to repay all amounts covered by the scope of the OIG Audit.[80]  Navient's subsequent appeal of the administrative judge's Decision is now before me.

<u>Analysis</u>

On appeal, Navient argues several issues.  First, Navient asserts that it correctly charged SAP for the Nellie Mae loans, both because it followed binding departmental guidance and because its entire 1993 Bond Pool constituted a single obligation.  Second, it argues it correctly charged SAP for the ECFC loans.  Third, it argues that DCL FP-07-01 constituted a binding settlement agreement between Navient and the Department which shields Navient from any liability for overcharging SAP in this matter.  Fourth, it argues that the findings of liability in the FAD are barred by the statute of limitations.  Finally, it argues that it is prejudiced by the bifurcation of these proceedings at a lower level and urges me to reach beyond the administrative judge's Decision by creating a final calculation of its liability.  Below I address each of these arguments in turn.

**Nellie Mae Overpayments – The Dear Colleague Letter**

Navient argues that the Department made a binding legal determination when it issued DCL 93-L-161.  Navient contends that the language "in whole or in part" means that loans funded in any part with tax-exempt obligations are entirely subject to the 9.5 percent floor.  Furthermore, Navient asserts it was required to charge SAP for all such loans at the 9.5 percent floor because DCL 93-L-161 constituted the Department's official interpretation of the statute.[81]

First, I reject Navient's argument that DCL 93-L-161 created new, controlling legal authority.  A DCL is, at most, an interpretive rule, not a regulation subject to the notice-and-comment rulemaking process under the Administrative Procedure Act.  The Supreme Court has held:

---

[77] *Id*. at 16.
[78] *Id*. (quoting *In the Matter of Microcomputer Tech. Inst. (On Remand)*, Dkt. No. 94-88-SA, U.S. Dep't of Educ. (May 20, 2002) at 4).
[79] *Id*. at 18–19 ("The regulations have been recognized to require that 'a Subpart H proceeding is a necessarily limited administrative forum wherein an institution may challenge a final audit or program review determination that finds that an institution fails to meet a statutory and regulatory requirement and, as a result, owes a liability to the federal government.'") (citing *In re Int'l Junior Coll.*, Dkt. No. 07-52-SA, U.S. Dep't of Educ. (Decision of the Secretary) (Nov. 19, 2010); *In re Microcomputer Tech. Inst.*, Dkt. No. 94-88-SA).
[80] *Id*. at 19.
[81] Navient Brief at 7–8, 19–20.

The absence of a notice-and-comment obligation makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules. But that convenience comes at a price:  Interpretive rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process."[82]

The Department previously considered the question of whether pronouncements in a DCL constitute binding legal rules.  *MBTI Business Training Institute of Puerto Rico* presented the case of an institution found liable to the Department for overstating the total clock hours of instruction for its programs.[83]  The appellant and the Department disagreed on the issue of how many minutes constitute a clock hour under the regulation in effect at the time, 34 C.F.R. § 668.2 (1991).[84]  While the institution relied only on the definition in that regulation, "ED relie[d] upon a June 1985 Dear Colleague Letter (Gen-85-12) as authority for the proposition that an institution cannot divide the total number of minutes of instruction in a day by 50 minutes to determine the number of clock hours in that day."[85]  The presiding administrative law judge applied to this case the same legal analysis used in a previous case, *Denver Paralegal Institute*,[86] to establish the non-binding nature of the Student Financial Aid Handbook.  The administrative law judge held that because a DCL is not subject to the notice and comment procedures of the Administrative Procedure Act, it is not binding on third parties, and where departmental policies conflict with the language of a regulation, the policies may be disregarded.[87]  The decision was certified on appeal by then-Secretary of Education Richard Riley on June 9, 1995.[88]

The analysis essential to Navient's case is the language of the controlling statute and duly promulgated regulations.  Policy guidance in the form of a DCL may be helpful in implementing new rules, but such guidance cannot conflict with laws established by Congress or regulations enacted through the rulemaking process.

DCL 93-L-161 states that its purpose is "to provide the student loan community with information on the major program changes mandated by [the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66)."[89]  It contains brief sections spanning 14 pages summarizing "[n]umerous changes affecting the [FFEL] Program" and the newly "established requirements for the transition of the FFEL Program to the Federal Direct Student Loan (FDSL) Program."[90]  The letter does not purport to offer a detailed summary of the pre-amendment statutory

---

[82] *Perez v. Mortgage Bankers' Ass'n*, 575 U.S. 92, 97 (2015) (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

[83] *In the Matter of MBTI Bus. Training Inst. of Puerto Rico*, Dkt. No. 93-147-SA, U.S. Dep't of Educ. (Apr. 15, 1994) at 1.

[84] *Id.* at 2–3.

[85] *Id.* at 3.

[86] *In re Denver Paralegal Inst.*, Dkt. Nos. 92-86-SP and 92-87-SA, U.S. Dep't. of Educ. (Mar. 14, 1994).

[87] *In the Matter of MBTI Bus. Training Inst. of Puerto Rico*, Dkt. No. 93-147-SA at 3–4.

[88] *See Southeastern Univ.*, Dkt. No. 93-40-ST, U.S. Dep't of Educ. (Sept. 20, 1996) at 4–5 (holding that an Institutional Review Branch policy memorandum, like a Dear Colleague Letter or the preamble to a regulation published in the *Federal Register*, "are not binding since these pronouncements have not been subject to the notice and comment procedures of the Administrative Procedure Act."); *see also In re Denver Paralegal Inst.*, Dkt. Nos. 92-86-SP and 92-87-SA.

[89] DCL 93-L-161.

[90] *Id.*

framework and does not show any intent by the Department to offer a new and unique interpretation of how the Department must apply the 9.5 percent floor. Rather, it indicates it "provide[s] . . . information on the major program changes" and states that "some changes are self-implementing and supersede current regulations" while "other changes will require that new regulations be published."[91]

The sentence at issue appears on page 13. Navient asserts that this sentence constitutes the Department's new and binding interpretation of the law allowing the 9.5 percent floor to be billed on obligations funded partially with tax-exempt and partially with taxable funds. I am unpersuaded that the Department had any intention of hiding a new legal interpretation in a clause in the middle of an otherwise innocuous sentence on the thirteenth page of DCL 93-L-161. I agree with FSA's position and the administrative judge's holding that DCL 93-L-161 did not and could not establish a binding legal position of the Department that conflicts with the existing statute and regulations.

Therefore, my analysis turns to the applicable statute and regulations. As Congress evolved the language in the HEA, it consistently described loans qualifying for the 9.5 percent floor as funded by tax exempt obligations, without any provision for loans to be funded "in part" by tax exempt obligations.[92]

I find that allowing loans funded "in part" by tax exempt obligations to qualify for the 9.5 percent floor is improper on multiple grounds. First, Congress eliminated the 9.5 percent floor in 1993 based on the lending environment and available interest rates at the time. Allowing comingled loan pools to incorporate a small number of loans funded by tax exempt obligations to qualify all of the loans for the 9.5 percent floor would provide an enormous windfall at the expense of the government and contrary to the intent of Congress. Second, Congress set an October 1, 1993, end-date for the issuance of obligations that would generate tax exempt revenue. Allowing comingled loan pools to incorporate a small number of loans issued just prior to that end date would allow loans originally funded by defeased bonds to continue receiving SAP at the 9.5 percent floor for months or years after they ceased to qualify, also contrary to the intent of Congress. Finally, the DCL suggests no intent by the Department to offer a new, unique interpretation of the statute or regulations, nor offers any reasoning for such an interpretation. Even if it purported to do so, a DCL does not have the force and effect of law. Under past departmental precedent discussed above, a DCL is properly disregarded when it conflicts with a statute or regulation.

Navient's theory on this issue rests solely on the cited clause in DCL 93-L-161, but its theory conflicts with the statutory language, the Department's associated regulations, past departmental decisions, and Congressional intent. Accordingly, I reject Navient's argument regarding the legal effect of DCL 93-L-161.

---

[91] *Id.*

[92] 20 U.S.C. § 1087-1(b)(2)(B)(i) (applying the 9.5 percent floor to loans "made or purchased with funds obtained by the holder from the issuance of obligations, *the income from which is exempt from taxation*") (emphasis added).

### Nellie Mae Overpayments – The Definition of Obligation

Navient also argues that the 1993 Bond Pool's "structure was unique," which justified treating all the aggregated bonds as a single obligation.[93]  This structure "*required* Nellie Mae to claim special allowance at the 1/2 SAP Rate as long as any bond within its 1993 tax-exempt financing remained outstanding."[94]  FSA argues that the plain meaning of obligation is the smallest unit of debt, in this case each individual bond.[95]  The 1985 version of the regulations defined obligation as "'any interest-bearing debt . . . issued to acquire funds for . . . making or purchasing of student loans.'"[96]

The common legal definition of a bond is "An obligation; a promise."[97]  The terms bond and obligation are effectively synonymous under the law, which is reinforced in this context by the 1985 regulatory definition of an "interest-bearing debt" cited by FSA above.  Regardless of the commonalities cited by Navient, the bonds in the 1993 Bond Pool are not a singular bond, which means they do not constitute a singular obligation.  The 1993 Bond Pool is an aggregate of multiple bonds, each issued under its own terms and with separate maturity dates, securing repayment of separate debts.  No matter how similar—even identical—these terms are, the bonds are issued under separate instruments and are separate obligations.  Therefore, I reject Navient's argument and affirm the administrative judge's Decision regarding the Nellie Mae overpayments.

### ECFC Overpayments

Navient argues that it correctly charged SAP at the 9.5 percent floor for loans transferred from Nellie Mae to ECFC in 2004.  Navient's theory is based on its interpretation of the Internal Revenue Code at I.R.C. § 150(d)(3)(B), specifically that the administrative judge erred in applying this provision to the case before him.  Instead, Navient asserts that the transferor Nellie Mae and transferee ECFC were not separate entities for federal income tax purposes.[98]

Navient's arguments regarding the transfer to ECFC are undercut by the fact that the underlying Bond 1993F matured on July 1, 2004.  As discussed above, the eligibility for the 9.5 percent floor is determined for each obligation, in this case Bond 1993F.  The continued existence of the larger bond pool is irrelevant to the fact that Bond 1993F was retired.  If Bond 1993F was retired, the structure of the sale of the loans and legal status of the successor in interest are rendered moot.  Because the loans lost eligibility for the 9.5 percent floor in July 2004 when the bond matured, any billing of SAP at the 9.5 percent floor after July 2004 would be an overbilling, regardless of which entity owned them or how they were transferred.  Navient makes no argument to contradict this conclusion.  Based on this fact alone, I affirm the administrative judge's Decision on the loans transferred to ECFC.

---

[93] Navient Brief at 24.

[94] *Id*.

[95] FSA Brief at 19.

[96] *Id*. (quoting 34 C.F.R. § 682.801 (1985)).

[97] Bond, *Black's Law Dictionary* (11th ed. 2019).

[98] Navient Brief at 35 (indicating that the loans were held by NMELC, the obligor on the 1993 Bonds, which transferred them past Nellie Mae Holdings, its sole member, to the sole member of Nellie Mae Holdings, ECFC, and that each of these entities were single member limited liability companies).

**The 2007 Dear Colleague Letter**

Navient alternatively argues that its liability in the matter is barred by a binding settlement agreement it made with the Department in 2007.[99]  Navient construes the January 24, 2007, letter as a binding contractual offer to "broadly forego enforcement action . . . if a lender adopted the Department's new standard policy on a prospective basis."[100]  On February 15, 2007, Navient sent a letter back to the Department expressing its intent to cease prospective billing at the 9.5 percent floor.[101]  Navient construes its response letter as a binding contractual acceptance.[102]

The Department refutes Navient's argument, stating that DCL FP-07-01 only served to withhold collections for overpayments on loans that were neither first-generation loans nor second-generation loans.[103]  This stated intent by the Department to withhold certain collections for overpayments does not apply to overpayments on first-generation loans or second-generation loans made after the tax-exempt bond expired and the loans no longer qualified for the 9.5 percent floor.[104]

I agree with FSA.  As discussed at length above, a Dear Colleague letter is a mechanism to provide guidance on existing laws and regulations, not to establish new rules.  DCL FP-07-01 does not have the force or authority of a statute or regulation, it has no power to obviate the enforcement of such laws, and it does not establish a binding and enforceable contract between the Department and Navient to waive the liability established in the OIG Audit.[105]  Furthermore, DCL FP-07-01 and the follow up letter of January 24, 2007, specifically indicate the Department's intent to forego collection on a narrow set of overpayments.  The overpayments at issue in the present appeal are on first-generation and second-generation loans, so the Department's stated intent to not collect does not apply to these overpayments.  Accordingly, I reject Navient's argument that FSA's decision is barred by an existing settlement agreement.

**The Statute of Limitations**

Next, Navient argues that the statute of limitations at 28 U.S.C. § 2462 bars collection of the overpayments at issue in this case.[106]  That statute bars assessment of civil fines and forfeitures after 5 years from the date the basis of the violation accrued, meaning the date when the fineable activity first took place.[107]  Navient asserts that collection of the overpayment in this

---

[99] Navient Brief at 28.
[100] *Id*.
[101] *Id*. at 30.
[102] *Id*.
[103] FSA Brief at 30.
[104] *Id*. at 31.
[105] *Supra* at 11–13 and cases cited.
[106] Navient Brief at 40.
[107] *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("'In common parlance a right accrues when it comes into existence....' *United States v. Lindsay*, 346 U.S. 568, 569, 74 S.Ct. 287, 98 L.Ed. 300 (1954).  Thus the 'standard rule' is that a claim accrues 'when the plaintiff has a complete and present cause of action.' *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) (internal quotation marks omitted); *see also*, *e.g.*, *Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201, 118 S.Ct. 542, 139 L.Ed.2d 553 (1997); *Clark v. Iowa City*, 20 Wall. 583, 589, 22 L.Ed. 427 (1875).").

case would be a "stale claim" that could be pursued for "money disbursed fifty years ago or more."[108]  Without enforcement of a time limit here, Navient argues that its right to due process is violated.[109]  Navient asserts that this case invokes the statute of limitations because collection of the overpayment constitutes a forfeiture, which "'occurs when a person is forced to turn over money or property' due to alleged wrongdoing."[110]

The administrative judge rejected this argument by Navient.  Counsel for FSA supports the administrative judge's ruling, arguing that "recoupment of public funds" does not constitute a "fine, forfeit, or punishment" that would invoke 28 U.S.C. § 2462.[111]  I agree.  The essential component of civil penalty to which 28 U.S.C. § 2462 applies is the punitive nature of the financial sanction.  In this case, repayment merely corrects the original overpayment and is not punitive or discretionary.[112]  Therefore, the statute of limitations at 28 U.S.C. § 2462 that applies to civil fines does not apply to recoupment of the overpaid funds for which Navient is liable.

I also reject Navient's claim that the lack of a statutory time limit for these proceedings denies its right to due process.  The requirement of due process is flexible and calls for such procedural protections as a particular situation demands.[113]  Due process in an administrative proceeding is distinct from due process in a judicial proceeding because courts have recognized that administrative and judicial proceedings are inherently different.[114]  Each administrative proceeding must be carefully assessed to determine what process is due based on the circumstances.[115]  The key provision is some form of hearing that allows the individual a meaningful opportunity to be heard.[116]

In this case, Navient has had the benefit of a full and extensive administrative process through which it had the opportunity to present evidence and argumentation.  The administrative process included OIG's audit, Navient's opportunity to provide comments, issuance of the FAD, the hearing before OHA with the presentation of legal briefs and evidence, and now my review of the OHA decision on appeal.  I find no basis to invent a specific deadline for conclusion of this process where none is provided for in statute or regulation.[117]  Therefore, I reject Navient's arguments related to due process.

### Bifurcation of the Proceedings

---

[108] Navient Brief at 41.

[109] *Id*.

[110] *Id*. (quoting *SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016)).

[111] ED Brief at 33.

[112] The Department has well-established precedent that recovery of liability does not constitute a fine and is not punitive in nature.  *In re Salinas Beauty Coll.*, Dkt. No. 18-67-SP, U.S. Dep't of Educ. (Feb. 14, 2020) at 7; *In re Salon and Spa Inst. (TX)*, Dkt. No. 16-23-SP, U.S. Dep't of Educ. (Jan. 18, 2018) at 2; *In re Lincoln Univ.*, Dkt. No. 13-68-SF, U.S. Dep't of Educ. (Decision of the Secretary) (Apr. 25, 2016) at 3, n.3 ("actions to recover funds . . . are purely remedial and not punitive (and therefore not subject to § 2462)").

[113] *Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013).

[114] *Id*.

[115] *Id*.

[116] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1975).

[117] *In the Matter of The Salon and Spa Inst. (TX)*, Dkt. No. 16-23-SP at 5 (declining to impose a time limit for recovering financial liability from an institution of higher education where no time limit is established by law).

Finally, Navient argues that the bifurcated nature of these proceedings prejudices it, causing unnecessary delay without serving any valid goal.[118]  In the event that I affirm the Decision, Navient asks that I dismantle the bifurcation of these proceedings and concurrently decide liability and damages, presumably to accelerate the completion of this controversy in its entirety.[119]

I disagree with Navient that the bifurcation of these proceedings serves no valid goal.  In the FAD, FSA clearly indicates that determining a final calculation of Navient's overpayment will depend upon Navient completing an audit of its records.  In the meantime, this administrative process has addressed the legal conclusions FSA reached in the FAD as to whether Navient is liable at all.  Separating the legal question from the calculation of liability, which would not be necessary if Navient were to prevail, is a valid reason for bifurcation of these proceedings.

Furthermore, I disagree that it would be prudent now to disrupt the bifurcated nature of these proceedings.  To do so would require me to order the parties to submit evidence and briefs on the question of the final liability calculation which, as I stated above, would only be material if I resolved the case before me by issuing a ruling to uphold the Decision.  Additionally, Navient would lose the due process protection of having an initial decision by an administrative judge which is appealable to me within the Department's hearing framework.

Conclusion

Having considered and rejected each of Navient's arguments, I find the administrative judge's Decision well-reasoned and correct in scope.  Therefore, I affirm the administrative judge's Decision on the limited questions of law which he decided.  I also decline Navient's request that I upend the bifurcated nature of the proceedings.

**ORDER**

ACCORDINGLY, the Decision of the administrative judge is AFFIRMED.  Navient is liable to repay FSA for overpayments for the liabilities cited by the administrative judge in his Decision, in which Navient improperly received SAP on loans that were not eligible for the 9.5 percent floor.

Consistent with the language of the FAD, FSA will issue a separate determination on the amount of Navient's liability.  FSA will make such final determination of liability following Navient's compliance with Section VI of the FAD, wherein Navient must—as successor in interest to Sallie Mae—identify loans held by Navient and its subsidiaries for which SAP was overpaid.

---

[118] Navient Brief at 43–45.
[119] *Id*. at 43.

So ordered this 15th day of January 2021.

                                                Mitchell M. Zais, Ph.D.

                                                Acting Secretary

Washington, DC

18

**<u>Service List</u>**

Colby A. Smith, Esq.
Ada Fernandez Johnson, Esq.
Jil Simon, Esq.
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, NW, Suite 500
Washington, DC  20004

Joshua N. Cohen, Esq.
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY  10022

Natasha Varnovitsky, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC  20202-2110