**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

NAVIENT SOLUTIONS, LLC,

     Plaintiff,

     v.

DEPARTMENT OF EDUCATION and DR.
MIGUEL CARDONA, Secretary of
Education, in His Official Capacity,

     Defendants.

**Case No.: 1:21-cv-324-TSE-MSN**

**SUPPLEMENTAL ADMINISTRATIVE RECORD**

**VOLUME 2 (Pages 1393-485)**

**NAVIENT V. DEPARTMENT OF EDUCATION**
**Case No. 21-CV-00324**
**SUPPLEMENTAL ADMINISTRATIVE RECORD**

| Document Description | Bates No. |
|---|---|
| Final Audit Determination of Federal Student Aid Letter from Patricia Trubia, Director, Financial Institution Oversight Service, Federal Student Aid, to John Remondi, President and Chief Operating Officer, Sallie Mae, Inc., dated September 25, 2013 | 1345-71 |
| Affidavit of Jason Wheeler dated November 24, 2015 | 1372-78 |
| Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 | 1379-476 |
| Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 | 1477-78 |
| Affidavit of John (Jack) Remondi, dated September 22, 2016 | 1479-81 |
| NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates | 1482-85 |
| 1993 Trust Agreement | 1486-517 |
| Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) | 1518-94 |
| Affidavit of Mark L. Heleen dated September 23, 2016 | 1595-97 |
| Navient Responses to OIG Questions of December 14, 2007 | 1598-600 |
| Letter from Robert S. Lavet, General Counsel, Sallie Mae, to Theresa Shaw, U.S. Department of Education, dated February 15, 2007 | 1601 |
| Affidavit of Jane Roig dated November 11, 2016 | 1602-03 |
| Emails concerning Freedom of Information Act dated April 26, 2017 and May 15, 2017 | 1604-07 |
| Letter from Theresa Shaw to Thomas J. Fitzpatrick dated January 24, 2007 | 1608-11 |
| Final Audit Report, Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations, dated August 2009 | 1612-75 |
| Respondent Navient Corporation's Request for Review of Final Audit Determination, dated July 27, 2016 | 1676-737 |
| Brief in Support of Navient Corporation's Appeal of the Final Audit Determination Issued by the Office of the Inspector General of the Department of Education, dated September 27, 2016 | 1738-83 |
| Navient Corporation's Reply Brief in Support of Appeal of Final Audit Determination, dated November 23, 2016 | 1784-816 |

Transcript of March 30, 2017, Oral Argument                                          1817-2018

Navient Corporation's Supplemental Brief, dated May 19, 2017                          2019-40

Hearing Official's Initial Decision, dated March 7, 2019                              2041-60

DCL 93-L-161                                                                          2061-77

DCL 93-L-163                                                                          2078-81

DCL 96-L-186                                                                          2082-87

DCL FP-06-15                                                                          2088-93

DCL FP-07-01                                                                          2094-99

DCL FP-07-06                                                                          2100-38

Brief in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision,   2139-91
dated April 8, 2019

Motion for Leave To File a Reply in Support of Navient Corporation's Appeal of the    2192-201
Hearing Official's Initial Decision

Navient Visuals from Oral Argument before the Department of                           2202-09
Education Office of Hearings and Appeals, dated March 30 2017

Brief in Support of Federal Student Aid's Final Audit Determination, dated October 28,   2210-54
2016

Supplemental Brief in Support of Federal Student Aid's Final Audit Determination, dated   2255-76
May 19, 2017

Brief in Response to Navient Corporation's Appeal of Hearing Official's Initial Decision,   2277-318
dated May 3, 2018

Motion for Leave To File a Sur-Reply Brief in Response to Reply Brief in Support of   2319-35
Navient Corporation's Appeal of Hearing Official's Initial Decision), dated May 31, 2019

# Exhibit 2

l Council of Higher Education Loan Programs, Inc.          Washington, DC 20003 • (202)547-1571
                                                                       FAX (202)546-8745

January 29, 1993

Mr. William Moran
Acting Deputy Assistant Secretary for
      Student Financial Assistance
U.S. Department of Education
400 Maryland Avenue, S.W.
Room 5102, ROB # 3
Washington, D.C. 20202

Dear Mr. Moran:

Attached is a preliminary analysis regarding the December 18, 1992, final regulations, as
discussed during our meeting earlier this week. The document is a draft discussion piece and
is subject to change following further analysis of the final regulations.

Throughout our review, we have identified the following general types of concerns:

   1.   The effective date of the regulations violates the Master Calendar provisions
        found in Section 484 of the Act.

   2.   The regulations and HEA 1992 are in conflict thus creating confusion among the
        participants and will require vast ED resources to resolve these issues.

   3.   Section of the regulations conflict with HEA 1992 standardization and
        simplification initiatives and therefore should be subject to negotiated
        rulemaking.

   4.   Changes have been made to the regulations without affording the community the
        opportunity for public review and comment. Many of the HEA 1992 changes are
        in error and will require further amendments by ED.

   5.   There are several provisions within the regulation that are inconsistent, causing
        ambiguity and confusion.

We would be happy to meet with you to discuss the document.  Please let me know of any
questions you may have on the details of the document.

                                          Sincerely yours,

                                          Jean S. Frohlicher
                                          President

1394

Analysis of December 18, 1992
Final FFELP Regulations
682.100-682.103

**General Comment:** This section of the regulation provides a general overview of the FFELP and does not include major policy initiatives. Our concerns, therefore, are limited and are technical in nature.

**SECTION 682.100**

**682.100(a)(1) - (a)(4):** The final regulations incorporate the HEA 1992 program name changes of FFELP, Federal Stafford, Federal PLUS, Federal SLS, and Federal Consolidation.

    **Issues:**

    1. The program name changes are part of HEA 1992 thus are subject to negotiated rulemaking.

    2. The changes have been incorporated without the opportunity for public review or comment.

**682.100(a)(1):** The regulation describes the Federal Stafford Loan.

    **Issue:**

    1. The partial inclusion of HEA 1992 changes to this section adds unnecessary confusion to the regulation. HEA 1992 includes the Unsubsidized Federal Stafford Loan Program. The regulation fails to clarify the applicability of the regulations for this program. This section should be amended through negotiated rulemaking.

**682.100(a)(3):** The regulation describes the Federal PLUS program.

    **Issue:**

    1. The partial inclusion of HEA 1992 changes to this section adds unnecessary confusion to this process. HEA 1992 changed the definition of independent student to include all graduate and professional students, therefore, for clarity purposes the regulation should be revised to state that PLUS loans are limited to <u>dependent</u> <u>undergraduate</u> students. This section should be amended through negotiated rulemaking.

**682.100(a)(4):** The regulation incorporates the HEA 1992 inclusion of PLUS loans for eligibility for Loan Consolidation.

    **Issues:**

    1. The change is part of HEA 1992 thus is subject to negotiated rulemaking.

    2. The change has been incorporated without the opportunity for public review or comment.



Page two
682.100
2/1/93

3. The change is in error. HEA 1992 provides for eligibility for PLUS consolidation for PLUS loans <u>made</u> <u>on</u> <u>or</u> <u>after</u> 10/17/86 -- the regulation reads 'loans <u>made</u> after 10/17/86'.

**SECTION 682.101**

<u>682.101(b)</u>: The regulation includes correspondence school eligibility in the FFELP.

Issue:

1. This conflicts with HEA 1992 and the promulgation of the regulation after HEA 1992 will create confusion. HEA 1992 eliminates correspondence school eligibility for institutions that offer more than 50% of its courses through correspondence thus this section of the regulation must be amended through negotiated rulemaking.

<u>682.101(c)</u>: The regulation describes student participation in the Stafford Loan Program.

Issue:

1. The partial inclusion of changes to this section adds confusion to the regulations. HEA 1992 includes the Unsubsidized Federal Stafford Loan Program. The regulation fails to clarify the applicability of the regulations for this program. This section should be amended through negotiated rulemaking.

<u>682.101(c)</u>: The regulations have been amended to describe the 1992 HEA consolidation changes.

Issues:

1. The changes are part of HEA 1992 thus are subject to negotiated rulemaking.

2. The changes have been made without the opportunity for public comment or review.

3. The regulation does not address married couple eligibility for loan consolidation.

4. The regulation states PLUS loans made after 10/16/86 are eligible for consolidation. This statement is accurate yet conflicts with section 682.100(a)(4).

Analysis of December 18, 1992
Final FFELP Regulations
682.200-682.214

SECTION 682.200

**Definitions of eligible program, eligible student, and institution of higher education:** These definitions are listed in the final regulations as being included in the general provision regulations.

Issue:

1. HEA 1992 changes the above definitions thus the general provision regulations conflict with HEA 1992. These definitions should be amended through negotiated rulemaking.

**Definition of Co-maker:** The regulation defines co-maker in the context of the PLUS program.

Issue:

1. The regulation conflicts with HEA 1992. HEA 1992 authorizes co-makers under the consolidation program. This definition should be amended through negotiated rulemaking.

**Definition of Default:** The regulation describes default as the failure of a borrower or joint borrowers on a PLUS loan to repay the loan.

Issue:

1. The regulation conflicts with HEA 1992. HEA 1992 authorizes co-makers under the consolidation program thus the definition of default should be expanded to include default of co-consolidated borrowers. The regulations should be amended through negotiated rulemaking.

**Definition of Endorser:** The regulations provide a new definition of endorser.

Issue:

1. Insufficient implementation time has been provided to implement this change. To the extent that promissory notes include a definition of endorser, changes must be made to these notes. Given the effort to develop the common application and cosigner addendum, the change in definition should have a delayed implementation date. In addition, the common application process uses the term cosigner whereas the regulation refers to endorser. The use of different terms adds unnecessary confusion.

Page two
682.200
2/1/93

**Definition of Estimated Cost of Attendance:** The regulation has been amended to provide for a revised definition.

    **Issues:**

    1. This definition conflicts with the HEA 1992 definition which takes effect on 7/1/93. The definition should be amended through negotiated rulemaking.

    2. The revised definition goes into effect on 2/1/93. Applications which are in process may be affected by the change.

**Definition of Estimated Financial Assistance:** A revised definition of estimated financial assistance has been incorporated into the regulations.

    **Issues:**

    1. The definition of estimated financial assistance is being revised through negotiated rulemaking therefore the definition included in the final regulation is temporary.

    2. The final regulation conflicts with HEA 1992 definition which is effective on July 1, 1993.

    3. The amended regulation takes effect on 2/1/93 thus applications in process may be affected by this change.

**Definition of Grace Period:** The definition of grace period has been revised to be day versus month specific.

    **Issues:**

    1. The change incorporates HEA 1992 thus is subject to negotiated rulemaking.

    2. The change was made without the opportunity for review or comment by the public.

    3. The regulation does not clarify the effective date for the provision. Is this effective date for loans made on/after 7/23/92, new borrowers on/after 7/23/92, or loans entering repayment on/after 7/23/92?

    4. The definition conflicts with HEA 1992. Clarification needs to be provided as to the special six month period offered to SLS borrowers to bridge the repayment start dates of SLS and Stafford loans for borrowers with six and nine month grace periods. This definition should be amended through negotiated rulemaking.

④

682.200
2/1/93

5. To comply with this provision, schools must provide the lender with the date in which the student left the institution. The standard SSCR which requires that data element for the first time is not, however, effective until 120 days following the publication of the regulation.

**Definition of Lender:** A revised definition of lender is included in the regulation.

   Issues:

   1. The definition conflicts with the HEA 1992 definition of lender.

   2. The definition is included in the draft regulations for negotiated rulemaking thus is subject to change. The definition in the regulation would be implemented on a temporary basis thus adds further confusion.

   3. Insufficient implementation time has been provided for ED to determine and advise guaranty agencies of lenders now ineligible for FFELP participation.

**Definition of National Credit Bureau:** A change in the definition has been made.

   Issues:

   1. Insufficient implementation time has been provided. Lenders reporting to regional credit bureaus will need to establish reporting relationships with national bureaus.

**Definition of Origination Fee:** A new definition of origination fee has been included in the regulations.

   Issues:

   1. The regulation conflicts with HEA 1992 as it does not include the application of this fee for PLUS or SLS loans. The regulation should be amended through negotiated rulemaking.

   2. The regulation does not include a definition of the origination fee/insurance premium authorized for the Unsubsidized Stafford Loan Program. The regulation should be amended through negotiated rulemaking.

**Definition of Origination Relationship:** The definition needs to be expanded.

   Issue:

   1. Include elements in the Preamble for Section 682.215.



Page four
682.200
2/1/93

**Definition of Period of Enrollment**: A new definition of period of enrollment has been included in the regulations.

   Issues:

   1. The definition conflicts with the definition included in section 682.603. In addition, this term is defined in the general provision and need analysis sections of the regulations. A single definition should be used in the regulation.

   2. The change in definition is effective on 2/1/93 yet applications which are in process may be impacted by this change in definition.

**Definition of Repayment Period**: A definition of repayment period has been added to the regulations.

   Issues:

   1. Clarification needs to be provided as to the repayment period on an Unsubsidized Stafford Loan. The definition should be amended through negotiated rulemaking.

   2. The regulation conflicts with ED's recent guidance which states that PLUS loans cannot be multiply disbursed.

   3. The definition of repayment period under the consolidation program was amended to reflect the HEA 1992 repayment term yet all HEA 1992 program changes are subject to negotiated rulemaking.

**Definition of School** (5): The definition has been revised to permit eligible, non-participating schools to certify loan applications.

   Issues:

   1. Insufficient implementation time has been provided as ED will need to publish a list of eligible non-participating institutions to support deferment processing.

   2. With the development of the standard deferment form as required by HEA, consideration should be provided as to whether implementation of this provision should be deferred until following ED approval of the form.



Page three
682.100
2/1/93

SECTION 682.102

**682.102(a):** The regulation describes the application process for Stafford Loans.

Issue:

1. The regulation fails to address the application process for Unsubsidized Stafford Loans. The regulations must be amended through negotiated rulemaking.

**682.102(d):** The regulation describes the application process for loan consolidation.

Issue:

1. The regulation conflicts with HEA 1992. The loan application process for married couples only requires that one of the applicants seek a loan from the current holder(s). This section should be amended through negotiated rulemaking.

**682.102(e)(1):** This section generally describes cancellation provisions for the FFELP.

Issue:

1. The regulation conflicts with HEA 1992 as it does not include the cancellation provisions available for students enrolled in institutions that close or whose loan has been falsely certified. In addition, the regulation does not include the HEA 1992 provision for cancellation of a PLUS loan if the student dies. This section of the regulation must be amended through negotiated rulemaking.

**682.102(e)(2):** This section describes the repayment requirements for Stafford Loans.

Issue:

1. This section conflicts with HEA 1992. The regulation does not address the Unsubsidized Stafford Loan Repayment provisions. This section should be amended through negotiated rulemaking.

**682.102(e)(3):** The regulation has been amended to include the option for a SLS borrower to begin repayment on a SLS loan at the same time the borrower begins repayment on his/her Stafford Loan.



Page four
682.100
2/1/93

Issues:

1. The change is part of HEA 1992 thus is subject to negotiated rulemaking.

2. The change has been made without the opportunity for public comment or review.

3. The regulation does not clarify the effective date for this provision.

**682.102(e)(4):** This section states that the first payment of principal and interest is due on a PLUS loan 60 days following full disbursement.

Issues:

1. This section conflicts with HEA 1992. HEA 1992 states that the repayment period for PLUS begins on the date of disbursement. The regulation should be amended to clarify the first payment due date on PLUS loans.

2. This section conflicts with ED's recent guidance which states PLUS loans may not be disbursed in more than one installment.

Page five
682.200
2/1/93

<u>Definition of Stafford Loan Program:</u> A definition of the Stafford Loan Program has been added to the regulations.

    Issue:

    1. The definition is inconsistent as it describes the Stafford Loan <u>Program</u> and the unsubsidized Stafford <u>loan.</u> A definition of subsidized Stafford or nonsubsidized Stafford is not, however, included in the regulation. This definition should be amended through regulation.

SECTION 682.201

<u>682.201(a)(2):</u>   The regulation states that a student applying for an SLS who is determined to have need in excess of $200, must apply for a Stafford loan.

    Issue:

    1. Clarification needs to be provided as to the applicability of the $200 tolerance on the unsubsidized Stafford loan program. This definition should be amended through regulation.

<u>682.201(a)(4):</u>   The regulations require a borrower to reaffirm an FFELP loan that previously was canceled due to disability or bankruptcy.

    Issues:

    1. Insufficient implementation time was provided as guaranty systems must be amended to track this provision.

    2. Clarification must be provided as to the 2/1/93 effective date. Does this apply to loans made on/after 2/1/93, loans guaranteed on/after 2/1/93, or loans certified on/after 2/1/93?

    3. We continue to believe that the bankruptcy reaffirmation conflicts with the bankruptcy code and subjects the guaranty agency and the Secretary to litigation.

<u>682.201(b):</u>   The regulation defines borrower eligibility under the PLUS program.

    Issues:

    1. HEA 1992 changes this section and limits eligibility for borrowing to dependent undergraduate students. This section should be amended through negotiated rulemaking.

(9)

Page six
682.200
2/1/93

2. This section is part of the negotiated rulemaking process to incorporate the HEA 1992 changes; thus the section will change. The temporary nature of the final regulation will add further unnecessary confusion.

3. This section conflicts with HEA 1992 as defaulted borrowers are now eligible for PLUS if the borrower has made six payments to the holder.

**682.201(c):**  Several changes have been made to the consolidation borrower eligibility requirements.

Issues:

1. The section incorporates HEA 1992 thus is subject to negotiated rulemaking.

2. The section was changed without the opportunity for public review or comment.

3. The section is in error thus creates enormous confusion.  Section 682.201(c)(1)  should include the requirement for  (i) the borrower to seek a loan from his/her current lender; (ii) for the borrower to notify his/her lender of a change in address; (iii) for the borrower to certify that he/she does not have another application pending; and (iv) the borrower can only consolidate new loans made on/after the date the consolidation loan is made except that loans may be added on within 180 days.

Married couples must also (i) have a combined debt of at least $7500, (ii) be in grace or repayment; (iii) have made satisfactory repayment arrangements on a defaulted loan; (iv) one spouse needs to have sought a loan from his/her current lender; and (v) the 180 day add-on provisions outlined above.

**SECTION 682.202**

**682.202(a):**  Changes have been made to this section to reflect the 1986 and 1992 HEA changes.

Issues:

1. Section 682.202(a)(1)(i)(C) is in error.  The fixed 8% loans should have an end date.



Page seven
682.200
2/1/93

2. The HEA 1992 interest rate changes have been incorporated into the regulation, however, should be subject to negotiated rulemaking.

3. Section 682.202(a)(1)(iii) and (iv) conflict with existing ED guidance. In addition, these sections are subject to negotiated rulemaking and may change.

4. The section has been amended without the opportunity for public review and comment.

**682.202(b):** The section defines capitalization of interest.

**Issues:**

1. This section conflicts with HEA 1992 which states that all payments shall be suspended and interest capitalized during deferment or forbearance.

2. Clarification needs to be provided as to the treatment of interest which accrues on an unsubsidized Stafford loan. This section should be amended through negotiated rulemaking.

3. Clarification needs to be provided as to the applicability of (b)(5) for the 20% debt-to-income ratio mandatory forbearance. This section should be amended through negotiated rulemaking.

4. This section refers to "nonsubsidized loans." This term is not defined in 682.200.

**682.202(c):** The section states that the lender may, except in the case of an unsubsidized Stafford loan, charge an origination fee and may deduct it from the borrower's loan proceeds.

**Issues:**

1. The HEA changes have been incorporated without public review or comment.

2. The regulation is in error. The regulations state that a lender <u>may</u> deduct the origination fee whereas HEA 1992 states the lender must deduct the origination fee for PLUS and SLS loans.

3. The regulation does not describe the mandatory 6.5% origination/insurance fee for unsubsidized loans. This section should be amended through negotiated rulemaking.

(11)

1405

Page eight
682.200
2/1/93

    4. **Regulation and preamble conflict.** Regulation requires refund of origination fee for partial cancellation yet preamble states that this is not required.

    5. **Section .202(c)(5)(iii) states the lender must refund the origination fee if the check is not delivered within 120 days of disbursement.** Lenders do not know the delivery date thus cannot implement this provision.

**682.202(d):** This section describes the payment of insurance premiums.

    **Issue:**

    1. This section conflicts with HEA 1992. Guaranty agencies cannot charge an insurance premium on an unsubsidized Stafford loan -- the regulation does not state this exception. The regulation should be amended through negotiated rulemaking.

**682.202(g):** This section describes a pre-emption of state law in the area of late fees.

    **Issues:**

    1. The regulation and the preamble conflict. The preamble lists specific areas of the regulation that pre-empt state law. This section is not included as part of that discussion calling into question whether the Secretary fully intends to pre-empt state law in this area.

    2. Promissory notes changes will be required to comply with this section. Given the development of the common application, note revisions are not practicable at this time.

**SECTION 682.204**

**682.204:** The regulations have been amended to include to HEA 1992 pro-rated Stafford loan limits.

    **Issues:**

    1. The change is subject to negotiated rulemaking.

    2. The change was made without public review or comment.

    3. Proration of loan limits has caused significant confusion -- the inclusion of year one limits and not the limits to years 2-5 adds further to this confusion.

(12)

Page nine
682.200
2/1/93

4. Clarification needs to be provided as to the applicability of the HEA 1992 definition of academic year within the context of this discussion.

5. This section conflicts with HEA 1992 and will change through the negotiated rulemaking effort.

SECTION 682.205

682.205(a)(2)(i) and (a)(2)(xiii): This section requires the lender to disclose additional information in the initial disclosure regarding the consequences of default.

Issues:

1. Insufficient time has been provided to implement the changes as forms must be revised to implement the provision; changes will impact applications in process.

2. Changes to the initial disclosure are also included in the draft HEA regulation (negotiated rulemaking) which will result in lenders making several changes to this form over a short period.

3. These changes conflict with the initiative to develop common forms as it will require temporary revisions to agency forms rather than the industry focusing its attention on the development of national forms.

682.205(c)&(d): Changes have been made to the disclosure prior to repayment.

Issues:

1. The regulation incorporates HEA 1992 changes which are subject to negotiated rulemaking.

2. The regulation was amended without public review or comment.

SECTION 682.206

682.206(c)(3): This section states that the lender may not approve a loan more than the unmet need.

Issue:

1. This section conflicts with the HEA which authorizes a borrower to use an SLS, unsubsidized Stafford or PLUS loan to pay the EFC.

13

Page ten
682.200
2/1/93

**682.206(f)(6):**  This section incorporates the HEA 1986 changes regarding loan consolidation.

Issue:

1. The regulations are internally inconsistent. In this section, the lender may rely in good faith on the certification provided by the holder of a consolidation loan whereas in section .413(c)(6) reinsurance is at risk if the certification in this section is in error.

SECTION 682.207

**682.207(b)(1)(v)(B):**  This section of the regulation has been amended to include the HEA 1992 requirement for co-payable PLUS checks or EFT to the institution.

Issues:

1. This change is part of HEA 1992 thus is subject to negotiated rulemaking.

2. This section was revised without public review or comment.

3. This regulation conflicts with ED Dear Colleague guidance which requires that the loan check be sent to the institution. Given that the regulation was published after the DCL guidance, it may be assumed that the ED guidance was rescinded.

**682.207(b)(1)(v)(C):**  This section includes the HEA 1992 provision for checks for students enrolled in a program of study abroad to be sent to the student or signed via power of attorney.

Issues:

1. This change is part of HEA 1992, thus the change is subject to negotiated rulemaking.

2. The restriction regarding power of attorney (not associated with the institution) goes beyond the scope of HEA 1992 and is an ED policy decision subject to an NPRM process.

14

Page eleven
682.200
2/1/93

**682.207(d):** This section describes the late disbursement procedures.

Issues:

1. This section was changed in response to the burden reduction initiatives. While the community provided input to this process, the community was not afforded the opportunity to respond to a proposed regulation on this issue. Had we been provided the opportunity to respond, we would have conveyed our concern with the 60 day limitation and the impact this limitation will have on students.

2. This section conflicts with 682.604. Section 682.207 states a lender may disburse a late disbursement within 60 days whereas .604 states a school may process a disbursement received within 60 days. A lender making a late disbursement on or near the 60th day would have the check returned as the school could not process the loan.

3. Insufficient time has been provided to implement the change.

4. Clarification needs to be provided on the effective date. Does this provision apply to late disbursements made on/after 2/1/93 or late disbursements received on/after 2/1/93?

**SECTION 682.208**

**682.208(b)(1)&(2):** This section outlines new requirements for reporting to a credit bureau.

Issues:

1. Insufficient implementation time has been provided.

2. Clarification needs to be provided on the effective date. Does this apply to loans made on/after 2/1/93 or reports made on/after 2/1/93?

**682.208(c)(2):** This section requires lenders to set repayment dates for borrowers no longer enrolled at eligible institutions (was participating).

Issue:

1. Insufficient implementation time as ED must publish a list of eligible nonparticipating schools. In addition, the SSCR process must be updated to permit tracking of enrollment at eligible non-participating institutions.



Page twelve
682.200
2/1/93

2. Currently guaranty agencies have agreements with schools which require the processing of an SSCR within a specified period of time. If a school is eligible but not participating, there is not a mechanism in place today to ensure timely reporting of this data. This issue should be addressed through negotiated rulemaking.

**682.208(e):** This section describes the borrower notification process for loan sales.

Issues:

1. Some aspects of HEA 1992 have been incorporated into the regulation although should be subject to negotiated rulemaking.

2. The inclusion of only part of HEA 1992 makes this section very confusing.

SECTION 682.209

**682.209(a)(1):** This section describes repayment periods for PLUS loans.

Issue:

1. This section conflicts with ED's recent guidance regarding PLUS disbursement.

**682.209(a)(3)(iii):** This section describes the option available to SLS borrowers to postpone repayment until the date the repayment of the Stafford loan begins.

Issues:

1. The changes are part of HEA 1992 which are subject to negotiated rulemaking.

2. Clarification needs to be provided as to the applicability of this provision for borrowers with nine month grace periods.

**682.209(a)(3)(i)(B):** Repayment dates on Stafford loans. See comments for grace period.

**682.209(a)(5):** This section requires the borrower to request a waiver of his/her grace period in writing.

16

Page thirteen
682.200
2/1/93

Issues:

1. The change was made without public review or comment.

2. The changes frustrate HEA 1992 initiatives to simplify the conversion to repayment process.

3. Insufficient implementation time has been provided.

4. Clarification needs to be provided on the effective date. Does this apply to loans made on/after, repayment beginning on/after, or waivers made on/after 2/1/93.

682.209(a)(7)(iv): The regulation requires the borrower to request in writing a term of less than five years.

Issues: See issues for 682.209(a)(5).

682.209(b): This section describes the lender's responsibilities for prepayments.

Issues:

1. Insufficient implementation time has been provided.

2. Clarification on the effective date must be provided.

3. The regulation is in error. The regulation states that if the borrower requests the lender to apply a prepayment to future installments, the lender may not credit the payment first to prior late charges then prior accrued interest or prior collection costs. Whether or not a borrower makes a prepayment, a lender's application of the payment should not change.

682.209(f)(3), .209(g)(2), .209(h)(6) and .209(i): These sections require (i) the lender to apply the refinance payment within five days and to send the refinanced lender the borrower's promissory note; (ii) requires holders to complete the refinance or consolidation certification within 10 days.

Issues:

1. Insufficient implementation time has been provided to permit lenders to comply with these procedures.

2. The provisions conflict with HEA 1992 simplification provisions.

Page fourteen
682.200
2/1/93

**682.209(h):**  Several changes impacting consolidation loans  have been made to this section.

Issues:

1. Provisions  of  HEA  have  been  incorporated  without  negotiated rulemaking or public comment.

2. 682.209(h)(4)(ii) is inconsistent with HEA 1992.  The statute does not address  the  status  of  the  'other'  student  loans  for  purposes  of consolidation.

3. The  regulation does  not  address the special  provisions for married couples.

## SECTION 682.210

**General Comments:**  This section makes substantial changes to the certification and  documentation requirements for existing deferments.  Given the changes to deferments  in HEA 1992, these  deferments will begin to  phase—out over time. Changing the requirements for these deferments seems unnecessarily burdensome, as  the community implemented the  prior guidance in 1986.   Implementation of these  changes frustrates the simplification of deferment mandate of HEA 1992, and  will make it  more  difficult for borrowers to  obtain the deferments for which they are entitled.

**682.210(a)(3)(ii):**  The eligibility  for  subsidized consolidation deferments has been added to this section.

Issues:

1. The  provision  is  part  of  HEA 1992  thus  is  subject to  Negotiated Rulemaking.

2. The  regulation is in error.  The eligibility  for benefits is tied to consolidation applications received on or after January 1, 1993.

**682.210(a)(5):**  The section states that an authorized deferment period begins on  the  date  the  condition  entitling  the  borrower  to  the  deferment  first exists,  but not more than  six months before the  date the lender receives  a request  and the  information and  documentation required  for the  deferment. .402(k)  applicable suspension of .the  repayment  period  (with respect  to bankruptcies),  states  that  the  suspension  of  the  repayment  period  for deferments  begins  on  the  date  on  which  the  borrower  qualifies  for  the requested  deferment, but does not include the  restrictions for the six month backdate or the receipt of the request and documentation.



**Page fifteen**
**682.200**
**2/1/93**

**Issues:**

1. The deferment period for computing the applicable suspension of the repayment period will not be the actual deferment begin date indicated in the borrower's record.

2. The change to .402(k) was not in the NPRM and did not receive public comment.

3. The inconsistencies in the regulations frustrate the HEA 92 mandate for simplification of deferments.

4. The six month backdate restriction frustrates the concept of deferments as entitlement as authorized by statute.

5. There is no guidance for the transition to the ability to backdate unemployment deferments for six months. For example, as written, unemployment deferments granted on 1/31/93 may only be backdated 60 days, but unemployment deferments granted the following day may be backdated six months.

**682.210(a)(6)(iv):** This section states that lenders may use the anticipated graduation date on the loan application for deferment purposes if the guaranty agency includes student deferments on its student status confirmation report. The regulation also indicates that this is permissible for PLUS and Stafford Loans, but may only be used in the case of an SLS loan made to a borrower for a period of enrollment that commences at the same time as the deferment. However, the preamble suggests that Stafford, SLS and PLUS are all treated the same (without the SLS restriction). Further, 682.210(c)(3) states that in the case of an SLS or PLUS borrower (but not Stafford), the lender shall treat the certified loan application as sufficient documentation for a student deferment for any outstanding SLS or PLUS loan previously made to the borrower that is held by the lender. The HEA 92 amended Section 485 C of the Act to require that eligible lenders must consider any deferment on one such loan as a deferment on the total amount of all such loans. The Department's Dear Colleague Letter (page 28) uses the term "a lender" rather than "eligible lenders."

**Issues:**

1. The regulation is confusing and inconsistent. 682.210(a)(6)(iv), the preamble, 682.210(c)(3), and the Dear Colleague Letter are inconsistent with the language in the Act on the same issue, and each has different meaning.

2. Applicability of deferments is part of HEA 1992 and is subject to negotiated rulemaking. These regulations would be temporary at best.



Page sixteen
682.200
2/1/93

3. The regulation is not simplified in accordance with HEA 1992 and would work to the detriment of the borrower by creating unnecessary defaults.

682.210(a)(8): This section states that a borrower whose loan is in default is not eligible for a deferment as to that loan, unless the borrower has made satisfactory repayment arrangements with the holder of the loan. While this language is the same as current regulation, a recent private letter argued that the Department's long standing policy was that the applicability of deferment eligibility related to the borrower rather than the loan or type of loan.

Issues:

1. Does this regulation supersede this policy since the Department has again, by regulation, specified that the deferment applicability is by loan?

2. The Department needs to clarify the confusion resulting from the use of the term "after default." Does this include periods after the 180th day of delinquency but prior to claim payment, periods after claim payment or both?

General Comment: The following ED policy initiatives necessitate changes to existing deferment forms, systems and procedures by February 1.

682.210(d): This section expands the graduate fellowship certification requirements to include that the borrower holds at least a baccalaureate degree, is accepted or recommended by an institution of higher education for acceptance on a full-time basis into an eligible program, and requires the anticipated program completion date. It also expands the definition of an eligible graduate fellowship program to require that, in the case of study at a foreign university, the program accepts the course of study for completion of the fellowship program.

682.210(e): This section restricts the rehabilitation training deferment by expanding the definition of full-time employment to be expected to last at least three months.

682.210(f): This section imposes a new restriction on temporary total disability deferments prohibiting the granting of a deferment based on a single certification beyond six months after the date of certification. Re-certification would be required beyond the six months.

Page seventeen
682.200
2/1/93

682.210(g): This section adds additional certification requirements for dependent temporary disability that the physician's statement must substantiate the fact that the spouse or dependent requires continuous care for at least 90 days, changes the definition of full-time employment and restricts granting the deferment for more than six months after the date of the certification.

682.210(h): This section changes the frequency of recertification for unemployment deferments from three to six months and requires documentation of six conscientious searches for full-time employment (formerly three). Current forms and systems cannot immediately accommodate these changes.

682.210(i): This section expands the documentation necessary to grant a military deferment.

682.210(j), (k) and (l): This section for Public Health Service, Peace Corp., and ACTION Programs deferments changes the certification requirements from borrower certified to certified by an official.

682.210(m): This section changes the compensation standards for eligibility for full-time service in a tax-exempt organization.

682.210(n): This section changes the certification requirements for internship/residency deferments.

682.210(o): This section substantially expands the certification and documentation requirements for parental leave deferments from formally self-certified by the borrower to required certifications from the school, borrower and a physician's statement or a statement from an adoption agency official.

682.210(p): This section requires a change in certification procedures for NOAA deferments.

682.210(r): This section changes the eligibility requirements (now requires full-time employment) for working mother deferments, and requires additional documentation such as birth certificates and pay stubs. The regulation also imposes a definition of full time employment.

Issues:

1. HEA 1992 created new deferment categories which will phase out the existing deferments. Changes to existing documentation and certification requirements for these deferments is unnecessarily burdensome.

21

Page eighteen
682.200
2/1/93

2. The documentation requirement in this section (birth certificate) verifies the age of the child whereas the deferment applies to a child who has not yet enrolled in first grade.

3. The magnitude of these changes frustrate the simplification and standardization efforts mandated by HEA 92.

4. Immediate implementation of these provisions may result in the inadvertent delay or denial of deferment benefits to students who are otherwise entitled to these benefits due to the inability of the community to comply with the February 1 implementation date.

5. The Secretary was advised by NCHELP in its 2/14/92 comments on the second clearance draft that this section would necessitate a delayed implementation date.

SECTION 682.211

682.211: The provisions in 682.211 permit forbearances to endorsers, require a new signed repayment obligation if forbearance is granted after default, change the file documentation necessary for a lender to document the approval rationale for the forbearance and define periods of "administrative forbearance", but require notice to the borrower.

Issues:

1. The requirement for a signed repayment obligation was not in the NPRM and did not receive public review and comment. What is a "repayment obligation?"

2. The Department needs to clarify the use of the term "after default" in 682.211(d). Does this include periods after the 180th day of delinquency but prior to claim payment, periods after claim payment or both?

3. 682.211(h) is part of HEA 1992 and is subject to negotiated rulemaking.

(22)

1416

Analysis of December 18, 1992
Final FFELP Regulations
682.300 - 682.305

**SECTION 682.300**

<u>682.300:</u>  This  section  describes  changes  in  the  eligibility  for  interest
benefits on Stafford loans.

Issue:

1. HEA  1992  changes  this  section.  Effective  for  applications  made
on/after  January  1,  1993,  consolidation  loans  are  eligible  for
interest  benefits  during  deferment  periods.  In  addition,  HEA  changes
the  interest  billing  requirements  with  respect  to  unconsummated  loans
and  restricts  a  lender's  authority  to  bill  for  interest  prior  to
disbursement.  The  regulation  should  be  amended  to  address  these
changes through negotiated rulemaking.

<u>682.300(b)(2):</u>  The  section  states  that  a  lender  must terminate  interest
billing  if  the  loan  check  has  not  been  negotiated  (was  cashed)  within  120
days.

Issues:

1. The change was made without the opportunity for review and comment.

2. Lenders  do  not  know  if  the  loan  check  is  <u>negotiated</u>  by  the  120th  day
thus cannot implement this change.

3. This  section  conflicts  with  section  .406(a)(2)  which  states  'cashed'
for purposes of reinsurance.

**SECTION 682.301**

<u>682.301:</u>  This  section  describes  the  borrower  eligibility  for  interest
benefits.

Issue:

1. Significant  confusion  exits  within  the  community  regarding  the
treatment  of  an  Unsubsidized  Stafford  loan  within  the  context  of  the
EFC.  The  final  regulations  do  not  address  this  issue.  The  regulations
should be amended through negotiated rulemaking.

<u>682.301(a)(2):</u>  Section  682.301(a)(2)  states  that  a  borrower  may  not  receive
subsidy if the student is serving in a religious order.

23

Page two
682.300
2/1/93

1. Clarification needs to be provided on the effective date of this provision. Does this apply to loans certified on/after 2/1/93, loans made on/after 2/1/93, new borrowers on/after 2/1/93.

2. The introduction of the Unsubsidized Stafford Loan complicates this change. ED has not indicated how the financial aid officer is to certify the loan application if the borrower is ineligible for a subsidized Stafford Loan. This section should be amended through negotiated rulemaking.

682.301(c): This section refers to the nonsubsidized Stafford Loan.

Issues:

1. A definition of nonsubsidized Stafford loan is not included in the regulation.

2. The use of this undefined term is complex given the HEA introduction of the Unsubsidized Stafford Loan.

SECTION 682.302

682.302: Several significant changes have been made to this section regarding a lender's billing for special allowance including (i) special allowance ceases 60 days after default unless a claim has been filed with the guarantor and (ii) special allowance ceases on a returned claim unless the claim is refiled with the agency within 30 days.

Issues:

1. These changes represent major system changes. While a delayed implementation date of 4/17/93 has been provided, this delay is insufficient. The mechanism for billing for special allowance is the 799 report. This report is going through a major revision due to HEA 1992. ED has yet to issue a revised report for lenders to begin programming the changes in reporting requirements. We strongly encourage all issues regarding the 799 be deferred until a revised report has been developed by ED.

2. There are details about these provisions included in the preamble that have not been incorporated into the regulations. For example, the preamble states that if the lender files after the 60th day, SAP is not reinstated. If the details of the preamble are binding, these provisions should be incorporated into the body of the regulation.



Page three
682.300
2/1/93

3. The regulation conflicts with HEA 1992. Many changes have been made in the area of special allowance including changes in the rates and new provisions for loans funded with tax-exempt debt. These changes should be amended through negotiated rulemaking.

4. The inclusion of the new filing deadlines has a significant impact on lender risk. Section 682.406 does not provide for a cure for violations of these deadlines.

**682.302(e):** The regulation states that the 1/2 special allowance provision for loans funded with tax-exempt debt applies to a loan unless the debt is retired or defeased.

Issue:

1. The regulation is in error. A loan funded with tax-exempt debt may be transferred and pledged to a taxable financing. Given, ED interpretation on this issue, a loan is always at 1/2 SAP and therefore at the 9.5% floor regardless of the current financing used to fund the loan.

**SECTION 682.304**

**682.304:** Two key changes have been made to this section which impact lender billing for SAP including the removal of the 365.25 leap year option for billing for SAP for the average daily method and to require rounding to the nearest whole dollar. These changes are effective on 2/1/93.

Issues:

1. The 365.25 will require major system changes and no delay has been provided. The mechanism for billing for interest benefits is the 799 report. This report is going through a major revision due to HEA 1992. ED has yet to issue a revised report for lenders to begin programming the changes in reporting requirements. We strongly encourage all issues regarding the 799 be deferred until a revised report has been developed by ED.

2. The effective date needs clarification. Does this apply to government billing submitted on/after 2/1/93 or reports due on/after 2/1/93.

**SECTION 682.305**

**682.305(a)(4):** The regulations change the liability structure for the payment of origination fees.



Page four
682.300
2/1/93

Issues:

1. The preamble includes comments regarding this section that are rather critical and impact holder liability. These comments have not been incorporated into the body of the regulation.

2. Clarification needs to be provided on the effective date. Does this provision take place for loans made on/after 2/1//93, loans transferred on/after 2/1/93, or billings filed with ED on/after 2/1/93.

682.305(c): The HEA 1992 annual lender audit has been incorporated into the regulation.

Issues:

1. The change is subject to negotiated rulemaking.

2. The change was made without the opportunity for public review and comment.

3. HEA 1992 requires the Secretary to consider alternatives for this requirement. No alternatives (i.e. guaranty agency review) have been incorporated and as such this requirement is particularly burdensome for small lenders.

4. The provisions of OMB Circular A-133 require that a single audit be provided for nonprofit entities. Within the context of the regulation, ED requires the .305(c) audit, lender reviews in .410, and an audit in .830. In addition, periodic audits are performed by ED and the various reviewing entities. These audits conflict with A-133 thus clarification should be addressed within the context of the regulation.



Analysis of December 18, 1992
Final FFELP Regulations
682.400-682.414

## SECTION 682.400

**682.400:** Regulations reflect 1986 changes to the agreement between a guaranty agency and the Secretary.

Issues:

1. This section is the subject of negotiated rulemaking because of Reauthorization changes requiring an additional agreement (Rehabilitation) with the Secretary.

2. Prior to the publication of the 1992 Regulations, the Department issued a Dear Colleague Letter requiring guaranty agencies to sign and return a Rehabilitation Agreement attached as Appendix B to the Dear Colleague Letter. Then the 1992 Regulations were published without mention of the Rehabilitation Agreement causing unnecessary confusion as to implementation (Final Regulations are binding on program participants, Dear Colleague Letters in conflict with regulations are not).

## SECTION 682.401

**682.401:** Outlines Contents of Insurance Program Agreement.

Issue:

1. HEA 1992 requires additional terms for Agreement, some of which have been added in this regulation. Negotiated rulemaking required for this section.

**682.401(b)(2)(ii):** Establishes parameters for guaranty agency loan limit policies (minimum seven month academic year all loan types; grade level progression not an exception to the 7 month loan period).

Issues:

1. Use of term 'academic year' in this section is affected by HEA 1992 and therefore subject to negotiated rulemaking.

2. This is a major shift in guarantor policy that requires additional time to implement (training, system changes, etc.).

3. 2/1/93 implementation will affect applications in process.



Page two
682.400
2/1/93

<u>682.401(b)(4)(i)</u>:   Borrower must indicate preferred lender.

Issue:

1. HEA 1992 requirement for one lender/one holder/one guaranty agency/one
   servicer potentially conflicts and should be addressed as part of
   negotiated rulemaking.

<u>682.401(b)(4)(iv)(A)</u>:   Borrower shall notify holder or guaranty agency of any
changes in employer or employer's address.

Issues:

1. Subject to negotiated rulemaking because HEA 1992 added requirement
   that schools must collect this data and forward it to guaranty agency.

2. Need additional time to change reporting format and system.

3. What is the effective date – first report after 2/1/93, first change
   in address, etc?

4. This regulation conflicts with .610 which applies to 'enrolled
   student' only.

5. Confusion arises because Dear Colleague prior to Final Regulation has
   different requirements than final regulations.

<u>682.401(b)(5)</u>:   Adds criteria which allows guaranty agency to limit or deny
participation with an eligible school.

Issues:

1. HEA 1992 changes require this to be subject to negotiated rulemaking.
   ED has submitted proposed changes to negotiators.

2. Partial incorporation of HEA 1992 is confusing and misleading.

<u>682.401(b)(7-8)</u>:   Adds area of service regulations reflecting policy stated in
DCL 88-G-153.

Issue:

1. Error in citation:   682.404(i)(2) should be .404(h)(2).   This was
   pointed out to ED in previous comments on regulations but continues to
   be ignored.



Page three
682.400
2/1/93

**682.401(b)(9):**  Insurance fee may be charged on each Stafford, PLUS, SLS loan.

    Issue:

    1. HEA 1992 changes add unsubsidized loan program and precludes insurance
       fee on unsubsidized loans.  This section is therefore wrong and should
       be subject to negotiated rulemaking.

**682.401(b)(15)(i):**  Restricts loan assignment to loans 'fully disbursed'.

    Issue:

    1. This  is  a  partial  incorporation  of  HEA  1992  without  allowing
       exceptions  outlined  in  statute.   Provision  subject  to  negotiated
       rulemaking.

**682.401(b)(16):**  Requires  approval  of  Secretary  for  guaranty  agency  to
transfer guarantee.

    Issue:

    1. This  important  restriction  in  guaranty  agency  management  of  its
       portfolio  was  not  included  in NPRM and  therefore there has  been no
       opportunity for comment by public.

**682.401(b)(17):**  Outlines  areas  requiring  guaranty  agency  standards  and
procedures.

    Issues:

    1. 'Eligible  Lender' in (A) changed in HEA 1992 and therefore is subject
       to negotiated rulemaking.

    2. Subsection  (A) is delayed here by 120  days; definition in 682.200 is
       not delayed causing confusion in implementation.

    2. Section  .401(b)(17)(L)(F)  affected  by  HEA  1992  and subject  to
       negotiated rulemaking (closed school, etc.).

**682.401(b)(18):**  Requires guaranty agency to track  enrollment status through
SSCR  process by means of Appendix  B (format and data elements).  The use of
Appendix B is delayed but the requirement for gathering information is not.

    Issues:

    1. Confusion in implementation because of split effective dates.



Page four
682.400
2/1/93

    2. Deferment provisions in 682.210 do not recognize use of SSCR for
       deferment justification.

    3. Standard SSCR is being developed - why not wait of its use instead of
       forcing a temporary fix?

**682.401(b)(22):** Outlines information guaranty agency must supply to schools
concerning defaulted borrower.

    Issues:

    1. This section is subject to negotiated rulemaking because of HEA 1992
       changes.

    2. There has been partial incorporation of HEA 1992 changes which result
       in confusion as to requirements.

**682.401(c):** Regulates lender of last resort.

    Issues:

    1. Section obsolete because of HEA 1992 changes.

    2. The section has been provided to negotiators as part of negotiated
       rulemaking process.

**682.401(d)(2):** Allows guaranty agency to use own regulations, agreements,
etc. prior to ED approval, requires guaranty agency use of common application,
promissory note and other common forms.

    Issues:

    1. Confused regulation because it is, in part, the product of Burden
       Reduction Initiative last year that is now folded into final
       regulation without public comment.

    2. HEA 1992 changes incorporated without public comment.

    3. Negotiated rulemaking required to outline schedule and procedures for
       using common forms required by HEA 1992.

**682.401(e):** Outlines prohibited inducements.



Page five
682.400
2/1/93

Issues:

1. HEA 1992 conflicts with this section and it is therefore subject to negotiated rulemaking.

2. Dear Colleague implementing HEA 1992 was published 11/92 prior to the 12/18/92 Final Regulations publication and conflicts with section. This causes confusion about implementation.

SECTION 682.402

682.402(b): Outlines treatment of death benefits.

Issue:

1. HEA 1992 changes this section (PLUS and Consolidation death benefits) and therefore it is subject to negotiated rulemaking.

682.402(c): Outlines total and permanent disability benefits.

Issue:

1. Includes requirement for tracking borrower medical condition of underlying loans in conflict with HEA 1992 which allows tracking only for aggregate loan limits.

682.402(d) and (g): Set new procedures for bankruptcy claim filing and treatment of loans in bankruptcy by lender and guaranty agency.

Issues:

1. Direct conflict with HEA 1992 - subject to negotiated rulemaking.

2. This section is extremely confusing as written. Contemplates guaranty agency as servicer on loan without describing how this is to be accomplished.

3. Department has stated publicly that this section would not be put into effect because of conflict with HEA 1992 and yet the implementation date has not been delayed.

4. Errors in reference in 682.401(g)(3). The reference should be to paragraph (g)(2) not (h)(2).



Page six
682.400
2/1/93

**682.402(e)(2)(ii)(B):** Establishes 15 day limit for lenders filing bankruptcy claims with guaranty agency after being served with complaint or motion to have loan determined to be dischargeable (undue hardship).

    Issues:

      1. Tracking, system changes and claim forms required to change filing deadlines and therefore additional time is needed to implement.

      2. What is the effective date -- loans with first day of delinquency on or after 2/1/93? Bankruptcies filed on or after 2/1/93, etc.?

**682.402(h):** Requires mandatory repurchase of loan by lender at conclusion of bankruptcy proceeding if loan is not discharged.

    Issue:

      1. What is the statutory basis for requiring repurchase?

**682.401(i)(2)(iii):** Outlines requirements for reimbursement by Secretary to guaranty agency for total and permanent disability of consolidation loan borrower. Guaranty agency must determine that borrower became totally and permanently disabled "since applying for the consolidation loan."

    Issue:

      1. This section conflicts with 682.402(c) which states that the condition must not have existed prior to the time the borrower applied for each of the underlying loans.

**682.402(k):** Defines suspension of repayment period for purposes of bankruptcy proceedings and for interpreting loan cancellation provisions in 682.402.

    Issue:

      1. This section conflicts with 682.210 in that there is no allowance for six month backdating.

**SECTION 682.403**

**682.403:** Regulates federal advance to guaranty agencies.

    Issue:

      1. HEA 1992 added certain adjustments therefore this section is subject to negotiated rulemaking.

32

Page seven
682.400
2/1/93

**682.403(f):** Requires guaranty agency to return advances to Secretary.

    Issue:

      1. As we have pointed out in previous comments on these regulations, there is no statutory basis for this regulation.

**SECTION 682.404**

**682.404(a)(2)(ii):** Codifies for first time the required activities for guaranty agency preclaims assistance.

    Issue:

      1. Guaranty agencies need time to make the system changes and training required to implement this section but no delay was allowed.

      2. Which loans are affected? Those for which requests for preclaims assistance were filed on or after 2/1/93? First date of delinquency on or after 2/1/93?

      3. Dear Colleague advice differs from regulation. Was this intentional?

**682.404(a)(2)(iii):** Requires for first time two collection activities in supplemental preclaims.

    Issue:

      1. Guaranty agencies need adequate time to change system and training to implement this section.

**682.404(a)(3)(i):** Restricts $50 payment for supplemental preclaims work to an "account," not loan.

    Issue:

      1. This interpretation conflicts with 1990 Omnibus Budget Act.

      2. This change has not been subject to public comment.

**682.404(a)(5):** Requires guaranty agency to notify school of preclaims request.

    Issue:

      1. This is a partial incorporation of HEA 92 change and is subject to negotiated rulemaking. (HEA 1992 requires notification only if requested by school.)

83

Page eight
682.400
2/1/93

## SECTION 682.406

__682.406:__   Establishes conditions of reinsurance coverage.  Specifically outlines loss of reinsurance on loan for failure to meet substantive and minor ED requirements.  Very punitive.  Read together with 682.411 and Appendix D, 682.406 changes represent a major shift in policy regarding claims documentation and examination, as well as increased risk for lenders and guaranty agencies.  It is also very confusing since 406, 411 and Appendix D are cross referenced but do not share common definitions, etc.

Issues:

1. Subject to negotiated rulemaking because of Reauthorization changes in reinsurance based on completion of skiptracing.

2. Confusing  section since waiver policy is not in regulation but tacked on in an appendix as restatement of existing Dear Colleague advice.

3. ED continues to require unreasonable penalty for minor errors.

4. The shift in position on claims examination beyond the most recent 180 day  period was adopted without public review or comment.  This change requires further clarification to be implemented.

5. The  waiver policy is  restricted to relief  for violations of  (a)(3) (payment  and collection  history demonstrating  .411 compliance)  and (a)(5) (90 day default filing deadline) only.  We believe that this is a mistake.

6. HEA  1992 requires standard claims procedures and forms.  This section conflicts with that requirement.

7. Section   682.406(a)(2)(i)  conflicts   with   682.302  ("cashed"  vs. "negotiated") causing confusion as to intent.

8. Section 682.406(a)(12) requires as a condition of reinsurance that the lender has paid the origination fees.  The Preamble allows a "cure" by a subsequent holder but .406 does not.  Why not?  This is confusing.

9. The applicability of the Appendix D waiver does not incorporate all of the  sections in .406 that  prescribe due diligence and  timely filing requirements.

84

Page nine
682.400
2/1/93

SECTION 682.408

**682.408:**  Outlines loan disbursement through an escrow agent.

    Issue:

      1. HEA 1992 requires standardization of escrow processing and therefore this section is subject to negotiated rulemaking.

SECTION 682.409

**682.409:**  Modifies mandatory assignment of defaulted loans to Secretary; significant administrative burden, penalties for noncompliance (as determined by ED) and outlining documentation required.

    Issue:

      1. HEA 1992 amendments made significant changes, this entire section is therefore subject to negotiated rulemaking.

SECTION 682.410

**682.410(b)(1)(ii):**  Requires compliance with A-133.

    Issues:

      1. HEA 1992 has changed audit requirements and therefore this section is subject to negotiated rulemaking.

      2. There is confusion regarding single audit requirement of A-133 and its application to this section.

**682.410(b)(2):**  Collection charges – This section requires a guaranty agency to charge a borrower collection costs on a loan in which default or bankruptcy claim is paid.  The amount to be charged is the lesser of the costs determined using the formula 34CFR 30.60 or the rate charged by USDE in collecting loans.

    Issues:

      1. The Department has refused to provide the official rate charged by the Department, therefore making implementation impossible.

      2. This regulation frustrates purpose of Rehabilitation program that is subject to negotiated rulemaking.



Page ten
682.400
2/1/93

3. What is effective date – claims paid on or after 2/1/93, etc.?

4. This is a major implementation problem but insufficient time has been given.

**682.410(b)(4):** Requires guaranty agency to capitalize any unpaid interest.

Issue:

1. This is a major implementation problem because of required system changes, training, etc. Community has consistently argued for at least 180 days to implement.

**682.410(b)(5):** Requires a new due process cycle for every default claim paid and prior to reporting default to credit bureau. This is a major, new policy initiative with substantial system changes required although only 45 days was given for implementation.

Issues:

1. The Preamble discusses community objection to this new initiative by pointing out that guaranty agencies already do similar cycles prior to IRS offset. However, the new additional due process cycle must be offered to every defaulted borrower, not just to the approximately 20%-40% of the default portfolio subject to IRS offset.

2. The requirements force the guaranty agency into a dilemma. The agency has just paid the claim by determining, among other requirements in 682.406, that the loan is legally enforceable, and yet must supply to the borrower in the subsequent 682.410(b)(5) notice the grounds upon which the borrower may argue that the loan is not legally enforceable.

3. The 45 day implementation period was rigorously opposed throughout comment period and a six month period was requested. Examples of the extensive programming changes required include:

   A. Requires new fields for maintaining information relative to requests for information and administrative review in order to accurately document timely requests, responses, completion of activities and timely credit reporting.

   B. The timing of due diligence activities must be redesigned to allow for delays in activities pending requests for records and administrative review not currently built into a guaranty agency's due diligence program.



Page eleven
682.400
2/1/93

    C. Potential programming changes in order to perform timely due
       diligence on the borrower while the endorser is in an
       administrative review status and vice versa if only one party has
       requested a review.

    D. New tracking programs to verify that accounts are reported timely
       after completion of 410(b)(5) since initial reporting will occur at
       various times rather than on a set date after default as is the
       current practice.

    E. Loss of program standardization by allowing arrangements to be made
       to avoid credit reporting and loss or program integrity by not
       accurately reporting a default status.

4. We continue to contest the legal necessity of imposing this onerous
   cycle.

5. Requires new forms which many agencies must purchase through
   competitive procurement process. Need additional time to implement.

**682.410(b)(6):** Outlines guaranty agency post-default due diligence.

   Issues:

1. This codifies for first time the requirement for at least two
   unsuccessful attempts to reach borrower as a diligent effort for
   telephone contact. Training and system changes require longer than
   45 days to implement.

2. What is implementation criteria: loans defaulting on or after 2/1/93?
   default claims paid on or after 2/1/93?

**682.410(b)(8):** Permits guaranty agency to establish policy for payment of
closed school claim to lender and subsequent collection on the loan.

   Issues:

1. Direct conflict with HEA 1992 closed school provisions. This section
   no longer applies and is subject to negotiated rulemaking.

2. Confusing as written: Is this the closed school policy set previously
   by Dear Colleague? What about the new teachout regulations?

Page twelve
682.400
2/1/93

3. This section, published after Reauthorization and its initial implementation by the Secretary through Dear Colleague letters, could be read to allow additional options for borrowers in closed school situations who do not meet total discharge requirements of statute. This is very confusing as written.

4. What is the implementation date - school closed on or after 2/1/93, etc.?

**682.410(b)(9):** Mandates certain Federal pre-emption of state law in collection of post-default collections.

Issue:

1. This limited pre-emption conflicts with Reauthorization requirements of standardization and simplification. (See also Preamble to Final Regulation p. 5 RE 682.215 where Secretary refuses to regulate pre-emption necessary to standardize the loan program.)

**682.410(c):** Sets new procedures for guaranty agency enforcement, liability assessment, etc.

Issue:

1. Regulation deleted prior guidance of review of lenders and schools with highest volume and raises confusion regarding how reviews are to be prioritized.

2. What is implementation date? Could affect reviews in program or current fiscal year review cycle.

**SECTION 682.411**

**682.411:** Due diligence by lenders in the collection of guaranty agency loans.

**General Comments:** The preamble discussion of 682.411, due diligence by lenders, states that lenders and servicers that made substantial investments in systems to meet existing collection requirements should be able to meet the new requirements without making substantial modifications to their systems. We strongly disagree with this assessment. This section requires a new notice in the 1-10 day category, implements a requirement that no more than 45 days may occur between collection activities, significantly increases skip tracing requirements by increasing the number of steps and implementing 'diligent effort' requirements for skiptracing (which means at least two attempts or one contact for each activity), and imposes requirements for due diligence for endorsers, including skiptracing endorsers. Overall, this section has substantially increased lender risk by imposing additional prescriptive requirements.

Page thirteen
682.400
2/1/93

Issues:

1. Although the regulations provide a delayed implementation date for loans on which the first day of delinquency is on or after April-17, 1993, additional system development time will be necessary to implement these procedures.

2. Several changes to this section were not in the NPRM and did not provide opportunity for public review and comment.

3. The community has continuing concerns with the retroactive regulatory changes resulting in unanticipated lender liabilities.

4. This entire section conflicts with HEA simplification concepts.

682.411:   The definition of gap in 682.411(i) is significantly different than the definition of gap in Appendix D (cure procedures). Both are different than the current definition of gap as defined in Bulletin 88-G-138.

Issues:

1. Immediate clarification will be necessary to avoid confusion and implementation errors.

2. The definition of gap in the 682.411 final regulations has been changed since the NPRM, but was not identified as a change in response to comments. Therefore, it must be assumed that the Secretary initiated this change without public review and comment.

682.411(f):   The reference in 682.411(f) to paragraph (f)(1) is an error. Paragraph (f)(1) does not exist. Further, the reference in 682.411(g)(4) to paragraphs (1)(1)(A) or (B) is an error. These paragraphs do not exist.

Issue:

1. Immediate clarification is necessary.

682.411(m):   See comments for 682.410(b)(9).

SECTION 682.412

682.412:   This section implements new standards for identifying borrowers in this category and requires lenders to charge borrowers for special allowance paid by the Secretary.



Page fourteen
682.400
2/1/93

Issues:

1. This is not identified in 682.202 as a permissible charge.

2. Charges to this section were initiated by the Department in negotiated rulemaking. Temporary implementation of this section is unnecessarily burdensome.

SECTION 682.413

682.413: This section increases financial risks for violations.

Issues:

1. 682.413(c)(6) is inconsistent with .207(f). The statute permits lenders to rely on certification. There is no statutory authority to impose liability on the guaranty agency.

2. New remedial actions should not apply to outstanding obligations.

3. 682.413(d)(2) refers to changes in HEA 1992 which are subject to negotiated rulemaking.

SECTION 682.414

682.414: Records, reports and inspection requirements for guaranty agency programs.

General Comment: Describes recordkeeping requirements.

Issue:

1. Standardization and simplification of documentation requirements is part of HEA 1992 and subject to negotiated rulemaking.



Analysis of December 18, 1992
Final FFELP Regulations
682.600-682.610

**SECTION 682.601**

**682.601:** Deletes the 50% rule for school lenders.

Issue:

1. The 50% rule is statutory.

**SECTION 682.603**

**682.603:** This section sets minimum and maximum periods of enrollment for which a school may certify an application.

Issues:

1. Certification requirements were part of HEA 1992 and subject to negotiated rulemaking.

2. 682.603(f)(2) is inconsistent with .401(b)(2)(ii).

3. The change in 682.413(d)(2) refers to changes which are subject to negotiated rulemaking.

**SECTION 682.604**

**682.604(c)(2):** Fails to address PLUS co-payable disbursement requirements.

Issue:

1. The changes made to this section are impacted by HEA 1992 and are subject to negotiated rulemaking.

**682.604(c)(3)(ii):** This section requires schools to notify the student or parent borrower in writing that the student's account has been credited with loan proceeds through electronic funds transfer.

Issues:

1. Procedural change in the middle of an academic year causes complexity.

2. Provisions affecting PLUS borrowers are part of HEA 1992 and subject to negotiated rulemaking.

41

1435

Page two
682.600
2/1/93

**682.604(d)(1)(B):**   This section requires schools to deposit additional loan proceeds retained by the school, after written authorization from the student, in a designated trust account and prohibits commingling these funds with other funds.

Issues:

1. The concept of weekly/monthly disbursements is part of HEA 1992 and subject to negotiated rulemaking.

2. This is a major change to operating procedures in the middle of an academic year.

**682.604(d)(4):**   This section requires schools to notify the lender and return funds within 30 days of a date that is not clear.

Issue:

1. Ambiguity will result in differing interpretations and will detract from ED resources resulting from clarification requests.

**682.604(e)(4):**   This section defines a disbursement as late if it is received by the school after the end of the period of enrollment or after the date the student ceased to be enrolled at least half time and sets forth specific guidelines under which late disbursements may be made. This conflicts with .207, which defines a disbursement as late if the lender disburses after the period of enrollment or after the date the student ceased to be enrolled at least half time.

Issues:

1. Conflicting regulations create confusion.

2. Conflicting regulations require ED clarification and detract from ED resources. Participants are left to guess implementation procedures until guidance is provided.

**682.604(h):**   This section implements new procedures for the treatment of excess loan proceeds.

Issues:

1. The section excludes students attending foreign schools from overawards but does not address students in study abroad programs.

2. The use of term non-subsidized does not reflect unsubsidized loans.

42

Page three
682.600
2/1/93


**SECTION 682.605**

**682.605(b)(4):**  This section requires new timelines for the determination of the student's date of withdrawal.  Schools must report the student's day of withdrawal.

   Issues:

   1. This is a major change for many institutions which typically maintain and report only the month and year only. Additional implementation time will be necessary.

   2. This change is also included in the model SSCR format in Appendix B. Appendix B is not effective until April 17, 1993. The effective dates are inconsistent.

   3. This change will increase the frequency of data exchanges resulting from incremental (i.e. June 5th to June 6th) changes in dates which have no significant impact.

**SECTION 682.606**

**682.606:**  This section prescribes refund policies and imposes a 10% minimum for prorata refunds.

   Issues:

   1. This conflicts with the HEA 1992 pro-rata and allocation requirements in 484B of the Act and is subject to negotiated rulemaking.

   2. Appendix A reflects refund policy standards developed by a national association of post-secondary institutions and approved by the Secretary, but is not referenced within the regulations.

**SECTION 682.610**

**General Comments:**  This entire section is subject to negotiated rulemaking due to the changes in HEA 1992 relating to simplification of document retention.

**682.610(b)(5):**  This section expands the loan record requirements for schools.

**682.610(b)(9)(iv):**  This section requires schools to maintain a copy of the Borrower's Authorization Statement for electronic fund transfers. .207(b)(1)(ii)(B) requires the school to secure and retain the Borrower Authorization Statement. This suggests the original copy.



Page four
682.600
2/1/93

Issue:

1. The regulations are inconsistent.  Clarification must be provided.

682.610(c)(2):  This section requires schools to report student withdrawals to
the lender within 30 days of its discovery unless the school expects to submit
its next student status confirmation report within the next 60 days.

Issue:

1. Insufficient  implementation  time  has  been  provided given  the new
   reporting requirements.

682.610(d):  This section requires  the school to  keep required records  for
five years following the last day of attendance.

Issue:

1. Section   432(1)(3)   of   HEA   1992   requires   standardization   of
   documentation of records.

682.610(f):  This section requires  schools to report  a change of  permanent
address for enrolled students who received a Stafford or SLS loan to holder or
guaranty agencies within 30 days.

Issue:

1. Insufficient implementation time has been provided.

44

Analysis of December 18, 1992
Final FFELP Regulations
682.800-682.840

**General Comment:** The HEA of 1986 transferred the authority for approval of the plan for doing business from the Secretary to the Governor of each state. Congress took this action because of its displeasure with ED's activity in this area. Despite this action by Congress, the final regulations continue to involve the Secretary in virtually all aspects of the plan for doing business. Such intrusion by the Secretary is entirely inconsistent with the statute and congressional intent.

In addition, ED continues to hold tax-exempt entities bound by the specific provisions of the plan for doing business for all program activities. Authorities issue taxable and tax-exempt debt thus the provisions of the plan should only apply to loans funded with tax-exempt sources of financing.

**SECTION 682.801**

**682.801(c):** The final regulation incorporates the HEA 1992 provision that removed the discount restriction for loans funded with tax-exempt debt.

    Issues:

    1. The change is part of HEA 1992 thus subject to negotiated rulemaking.

    2. The change was made without the opportunity for public review or comment.

    3. The change is in error. HEA 1992 removed the 1% discount restriction. ED, however, deleted the discount as well as the 1% premium limitation.

**SECTION 682.830**

**682.830(b)(1):** See comment and issues for 682.305(c).

**SECTION 682.840**

**682.840(b):** This section of the regulation has been amended to hold an authority responsible (thus loss of all special allowance) if the authority does business with a guaranty agency that discriminates.

    Issues:

    1. The inclusion of the provision conflicts with statute and is entirely beyond the scope of ED authority. The statute does include nondiscrimination language for lenders, authorities, Sallie Mae, and guaranty agencies. ED has only elected, however, to regulate authorities. To make an authority responsible for agency action will have serious implications in the capital markets and would, if enforced, impose a huge and bankrupting penalty on an authority which itself violated no rule or principal.

45

Analysis of December 18, 1992
Final FFELP Regulations

APPENDICES

**APPENDIX A:** Standards for acceptable refund policies are set forth in this section.

Issues:

1. Refund policies are part of HEA 1992 and subject to negotiated rulemaking.

**APPENDIX B:** In this section ED sets for the model format and data elements for the Student Status Confirmation Report Process. Agencies must use this unless the Secretary approves a revised format or other data elements.

Issues:

1. The delayed implementation date of April 17, 1993 is insufficient for system changes of this magnitude.

2. Section 485B of the Act requires standardization in consultation with guaranty agencies, lenders, institutions of higher education and other organizations. Therefore, this Appendix is subject to negotiated rulemaking.

**APPENDIX C:** This appendix outlines procedures for curing violations of the due diligence in collection and timely filing of claims requirements applicable to FISLP and Federal PLUS program loans. The revised document requires changes to be made on ED 799.

Issue:

1. Insufficient Implementation time has been provided.

**APPENDIX D:** This appendix formerly 88-G-138 (cure procedures), contains a number of errors which need immediate correction.

Issues:

1. The introduction refers to .413(b)(1) which does not exist.

2. Provides a 45 day filing deadline for default claims found in .406(a)(4) which is a 90 day filing deadline and is not included in .406(a)(4) but is referenced elsewhere in .406.

3. This section contains references to .406(a)(5) and (6) which do not make sense in its current context. It is believed that many of these errors were made as a result of changes made to the regulations but not the Appendix.

460

Page two
Appendices
2/1/93

4. A new definition of gap includes the period between the last collection activity and default. The definition is inconsistent with the definition identified in .411.

5. A major change to the waiver policy was imposed which states that reinsurance terminates if a gap of more than 45 days occurs during the delinquency period. Under current regulations, it is possible for a lender to satisfy all due diligence requirements within each 30 day bucket and have more than 45 days expire between activities. The new requirement requires additional system changes.

6. Appendix D suggests that an examination of the activity that occurred with respect to the account before it began the 180-day delinquency period may be necessary to verify the repayment status of the loan at the beginning of the delinquency period. This is a major shift from current policy.

7. The excuse of timely filing violations section for cures commenced prior to May 1, 1988, was changed from a 90 day filing deadline to a 45 day filing deadline. These timeframes have expired; what is the purpose of changing the filing deadlines retrospectively?

8. The beginning dates for limited interest and special allowance in the event of at least three violations have been changed. This is additional system and procedural changes for lenders and guaranty agencies.

9. The dates for deeming borrowers current or in default under certain cure circumstances have been expanded. This represents system and procedural changes for lenders and guaranty agencies.

10. The timeframe for the postal receipt requirement for acceptable evidence of location was narrowed from 25 days to 15 days prior to the date on which the lender sent the new repayment agreement.

11. The effective date of the changes to Appendix D is unclear and needs clarification. Additional implementation time may be necessary for system changes.

12. A number of changes were made to this Appendix without the opportunity for public review or comment.



Nochange. ED now states once ½-SAP always ½ SAP therefore always 9.5%.

3. The regulation conflicts with HEA 1992. Many changes have been made in the area of special allowance including changes in the rates and new provisions for loans funded with tax-exempt debt. These changes should be amended through negotiated rulemaking.

will attempt to clarify

4. The inclusion of the new filing deadlines has a significant impact on lender risk. Section 682.406 does not provide for a cure for violations of these deadlines.

* 682.302(e): The regulation states that the 1/2 special allowance provision for loans funded with tax-exempt debt applies to a loan unless the debt is retired or defeased.

Issue:

ED basically agrees this results in huge windfalls in low int. rate periods.

1. The regulation is in error. A loan funded with tax-exempt debt may be transferred and pledged to a taxable financing. Given, ED interpretation on this issue, a loan is always at 1/2 SAP and therefore at the 9.5% floor regardless of the current financing used to fund the loan.

NCHELP Comments provided to ED in 2/93 in response to Riley letter requesting list of issues.

SECTION 682.304

682.304: Two key changes have been made to this section which impact lender billing for SAP including the removal of the 365.25 leap year option for billing for SAP for the average daily method and to require rounding to the nearest whole dollar. These changes are effective on 2/1/93.

1443

Issues:

DCL to clarify if this is a system change or ED payment change.

1. The 365.25 will require major system changes and no delay has been provided. The mechanism for billing for interest benefits is the 799 report. This report is going through a major revision due to HEA 1992. ED has yet to issue a revised report for lenders to begin programming the changes in reporting requirements. We strongly encourage all issues regarding the 799 be deferred until a revised report has been developed by ED.

2. The effective date needs clarification. Does this apply to government billing submitted on/after 2/1/93 or reports due on/after 2/1/93.

SECTION 682.305

682.305(a)(4): The regulations change the liability structure for the payment of origination fees.

*The handwritten notes are my notes from meeting

# Exhibit 3

App. 5, Ex. 3

SENT BY:NCHELP          ; 3-26-93 ;11:35AM ;          2025468745→          217 703 9047;#10

## Response to Comments of NCHELP Regulations Committee

**SECTION 682.100**

**682.100(a)(1)-(a)(4)**

1.& 2.   The Secretary considers the program name changes to be self-implementing.   *DCL to provide for uniform style.*

**682.100(a)(1)**

1. The Secretary did not incorporate the unsubsidized Stafford program authorized under section 428H of the HEA. — *no provision for 428H*

TC 2.   A technical correction will be made inserting "undergraduate" after dependent.   *7/1/93*

*all refs to read "not-sub"*

**682.100(a)(4)**

1.& 2.   The Secretary considers this change to be self-implementing.

TC 3.   Will make technical change to read "made on or after 10/17/86."

**682.101**

DCL-1.  This area of the regulations has been superseded by the '92 Amendments.  This will be explained in the "Dear Colleague" letter.

**682.101(c)** See comment on 682.100(a)1-4.

**682.101(c)**

1.& 2. Self-implementing provision of the '92 Amendments.

TC 3. A technical change will be made to mention married couples borrowing jointly to correspond to changes made in 682.201.

TC 4. Technical change will be made to correspond to change in 682.100(a)(4).

**682.102(a)**

1.   The Department did not intend to incorporate the Unsubsidized Stafford Loan program authorized under section 428H of the HEA.

**682.102(d)**

**682.102(e)(1)**

1.   The Department did not intend to include these cancellation

SENT BY:NCHELP        ; 3-26-93 ;11:38AM ;        2023406746→                          ;#13

provisions from the '92 Amendments because they are not self-implementing. This was not listed in the preamble as a change.

682.102(e)(2)

1. The Department did not intend to incorporate section 428H of the HEA into these regulations.

682.102(e)(3)

1.& 2. The Department considers this to be a self-implementing change.

TC 3. A change will be made in the regulations or the preamble to specify the borrowers to which this applies. (Effective upon enactment of the '92 Amendments (July 23, 1992) but applies to borrowers who, at the time of their request, had not yet entered payment on their Stafford Loan on/after July 23, 1992.

682.102(e)(4)

TC 1. Technical change will be made to clarify the first payment due date for PLUS.

TC 2. Technical change will be made to correct this. The Department's recent guidance in this area stands.

682.200

## DEFINITIONS OF ELIGIBLE PROGRAM, ELIGIBLE STUDENT, AND INSTITUTION OF HIGHER EDUCATION

DCL-1. Will mention in the DCL how these definitions may have changed and refer to GEN 92-21 (October 1992). These definitions will be revised as part of negotiated rulemaking in Part G.

## DEFINITION OF CO-MAKER

TC 1. Since §682.201 has been revised to reflect Consolidation Loan changes, we will make a technical correction to include reference to Consolidation borrowers.

## DEFINITION OF DEFAULT

TC 1. Will revise to include reference to Consolidation co-makers.
## DEFINITION OF ENDORSER

1. There is no change. The term has been revised but is not defined differently. The term "secondary liability," a somewhat confusing and nonlegal term has been replaced with a clearer explanation of the common understanding of that term ...i.e., that it is someone who has a legal responsibility to pay in the event the borrower does not. (See Comment and Discussion p. 60285.) An endorser is the same as a co-signer and is the term used

historically in the FFEL program.

## DEFINITION OF ESTIMATED COST OF ATTENDANCE

DCL 1. The regulations were not revised to incorporate any changes made by the '92 Amendments. The regulations will be revised through negotiated rulemaking and the DCL will clarify the effective date for the new definition. Guidance was provided on the changes made by the '92 Amendments on page 92 of GEN-92-21.

2. The regulatory definition in the December 18 regulations merely reflects the cost of attendance definition that has been in effect since the 1986 Amendments and will be in effect until the new statutory definition becomes effective on July 1, 1993. It is likely that we will say this is effective for loans certified on/after July 1, 1993 because the school is responsible for determining the cost of attendance and the lender can rely on the information the school has provided.

## DEFINITION OF ESTIMATED FINANCIAL ASSISTANCE

TC 1. The definition is final regulation and in effect, except for the statutory change to the treatment of veterans' benefits which has a later effective date. Any proposed changes to the definition beyond the mandated statutory change are at the option of the Secretary and are not subject to negotiated rulemaking. Through TC or DCL interpretative guidance we will clarify that estimated campus based aid in (1)(v) is to be included to the degree those funds are available and based on the school's award packaging policy because that has been the intent all along. The only other issue presented in negotiated rulemaking discussions related to the certification of PLUS applications. The Department is considering whether it is will propose a change in determining estimated financial assistance for purposes of PLUS loan certification.

2. GEN-92-21 and the Comment and Discussion in the regulations explains how the Secretary proposes to implement the statutorily mandated change in the treatment of veterans benefits.

3. To the extent this definition differs from the earlier regulatory definition or the guidance provided to schools to implement the 1986 Amendments to the HEA, (and we don't believe it does), the definition would apply to loans certified on/after 2/1/93 because it is a school loan certification responsibility.

## DEFINITION OF GRACE PERIOD

1.& 2. The Department views this as a self-implementing change required by the statutory definition of repayment.

3. See attached letter for Department's implementation plan for day specificity. Technically, the six-month "grace period" for SLS

3

borrowers applies to all SLS borrowers whose Stafford loans had not yet entered repayment on/after July 23, 1992.  We may need to discuss whether that is realistic.

4.  The Department had not considered this concurrent period to be a grace period because of the implication that the Secretary would pay interest.  Therefore the definition was not revised to include reference to it.  However, we have decided to revise the definition in the Reauthorization NPRM because we now believe that is the only practical term to use.    The eligibility of an SLS borrower for the six-month period is reflected in §682.209(a)(2)(ii) & (iii) in the final regulations.  The regulations say that this period is "consistent with the grace period."  We think this language does not prevent the lender from recognizing any applicable grace period the a Stafford borrower may have.

PDI 5.   The SSCR implementation process is provided a delayed effective date in the regulations that would make use of the SSCR format not required until June 19, 1993.  However, for status changes outside of the SSCR process, required under 34CFR 682.610(c)(2), the school would be expected to report month/day/year. We do not believe schools should have difficulty doing that.

## DEFINITION OF LENDER

1. The definition was not revised in any way to reflect the '92 Amendments changes.  Those changes, however, were effective upon enactment and the guidance in GEN-92-21 should be followed.

DCL-2.  The changes made to the definition by the '92 Amendments are minor.   The DCL will clarify how the definition has been changed by the Amendments and refer them to the applicable DCL guidance.

DCL-3.   The DCL will clarify when it will implement the cohort default rate provisions.  The other changes to the definition were minor and effective upon enactment.

## DEFINITION OF NATIONAL CREDIT BUREAU

PDI 1. The Department does not believe that this is at all complicated and merits additional implementation time.   The reporting requirement involving national credit bureaus came out of the '86 Amendments, so isn't everyone already doing this?

## DEFINITION OF ORIGINATION FEE

TC 1.    The regulations contain this requirement in 34CFR 682.202(c).  Therefore, we will add this to the definition through a technical correction.

4

2. This is correct. The Unsubsidized Stafford Loan program under section 428H was not incorporated into the regulations.

## DEFINITION OF ORIGINATION RELATIONSHIP

1. No. The Department made it clear in the preamble that it was not going to regulate in this area at this time.

## DEFINITION OF PERIOD OF ENROLLMENT

1. 34CFR 682.603(f)(1) specifies the <u>minimum</u> period for certification and does not conflict with the definition. We will consider whether one definition is possible for all Title IV, and if it is, make the change as part of the '92 Amendments NPRMs under development.

2. The change included in the definition merely codifies existing policy.

## DEFINITION OF REPAYMENT PERIOD

1. The Unsubsidized Stafford Loan Program was not included in the regulations. The definition will be amended through negotiated rulemaking.

TC 2. A technical correction will be made. ED's guidance continues to apply.

3. The Department considers these statutory changes self-implementing.

## DEFINITION OF SCHOOL

DCL 1. We do not think that this is a problem as it relates to the large majority of schools. This is a statutory as well as a regulatory provision and was effective upon enactment. ED determines a school's eligibility as part of the application process. If the lender can verify through ED (Division of Eligibility and Certification) or documentation that the school provides that the school has been determined previously by ED to be an eligible institution, has not been terminated by ED (which is information already provided to lenders and guaranty agencies), and is simply not participating in the FFEL program currently, the lender should already be approving deferments for students at the school. However, we do agree that there needs to be a change to our application/reporting system to include schools that wish to have a determination of eligibility made but do not want to sign a participation agreement with the Secretary. Currently you can't do one of these without doing the other. ED anticipates that this would include a small number of schools.

2. We do not see what the development of standard deferment forms

5

has to do with implementing this provision.

## DEFINITION OF STAFFORD LOAN PROGRAM

TC-DCL 1. A technical correction will be made to change the reference in the definition from "unsubsidized" to "nonsubsidized" because there was no intent to include the new section 428H program. With that change, we believe the definition coupled with an explanation in the DCL will suffice.

## SECTION 682.201

### 682.201(a)(2)

DCL 1. We will explain the use of the tolerance and the certification process (post '92 Amendments) in the DCL. The $200 tolerance applies only to subsidized Stafford.

### 682.201(a)(4)

PDI 1. What systems changes are involved in this regulatory requirement??

2. Since this will be borrower initiated and the agency will have records on the prior loan's discharge, the Department believes it should apply to loans guaranteed on/after 2/1/93.

3. The Department's OGC does not agree.

### 682.201(b)

TC 1. Technical correction will be made to insert "undergraduate" after dependent to limit PLUS eligibility to parents of undergraduate dependent students.

2. This is a self-implementing provision of the '92 Amendments.

3. There is nothing inaccurate about this provision because 668.7 would indicate that a defaulted borrower can regain eligibility if they make satisfactory payment arrangements to repay. GEN-92-21 provides guidance on the fact that those arrangements in the FFEL program now constitute 6 consecutive reasonable and affordable monthly payments.

### 682.201(c) *loan consolidation*

1.& 2. The Department believes this is self-implementing.

TC 3. We do not see any statutory requirement that requires the borrower to first approach the current lender. (iii) requires a technical correction ...will be redesignated (D)... because it applies to individual and married borrowers. The reference to

6

inclusion of additional eligible loans within 180 days is in 682.209(h)(4)(iii).

TC4. Will insert reference that the eligibility criteria for the individual borrower in (c)(1) also applies to the married couple borrower situation and that the $7,500 is combined indebtedness in the case of a married couple.

SECTION 682.202

682.202(a)

TC 1. The end date was removed in this provision because of the cross-reference from (a)(1)(v). However, there are technical changes to be in this section.

2. The Department views interest rate changes in the program as self-implementing changes and as such, do not require further regulations.

3. We will make whatever technical corrections that are necessary.

4. See response to 2. above.

682.202(b)

DCL- 1. The Department will clarify in the DCL what the mandated terms of capitalization must be and how this section must be modified to reflect post-'92 Amendments reality. The Department believes the statutory provisions governing the terms of capitalization as self-implementing but did not include it in these regulations.

2. Unsubsidized Stafford Loans will be handled in the negotiated rulemaking NPRMs.

3. This piece of the new statutory provisions will require to be implemented through regulations and therefore is subject to negotiated rulemaking.

TC 4. Technical correction that must be made to the definition of Stafford Loan program previously noted.

682.202(c)

1. Self-implementing provision of the statute.

2. Department does not believe there is an error and that the regulatory language tracks the statute accurately. 682.202(c)(2) related to PLUS and SLS says "shall."

7

SENT BY:NCHELP          ; 3-26-93 ;11:39AM ;          2025466745→          ;# 2

3. The regulations do not reflect any of section 428H of the HEA.

TC 4.  (c)(5) needs technical correction. (c)(6)(i) will be deleted and (ii) and (iii) will be renumbered.

5. See Comment and Response on this issue.

### 682.202(d)

1. Section 428H of the HEA not reflected in the regulations.

### 682.202(g)

1. The Department does not agree that there is a conflict.  The preamble discussion indicates that the Secretary has decided not to prescribe in regulations a uniform federal rule on borrower defenses to repayment of a loan and thereby preempt state laws in the borrower defense area.  This has nothing to do with preemption provided in the collections area, specifically in .202(g) and in .411(n).

2. Changes will be made in the development of the common application as necessary.

### SECTION 682.204

1.& 2.  The Department considers changes in annual loan limits self-implementing  statutory changes.

DCL 3.  The Department believes that inclusion of two sets of annual loan limits...those in effect at the time the regulation became effective and those that become effective in the future for levels 2-5 ... would have been even more confusing.  The DCL will clarify what is included in the regulations and where to go for guidance on limits that become effective in July, 1993 and for periods of enrollment beginning on/after October 1, 1993.

DCL 4. This will be clarified in the DCL.

5. Don't understand the comment.. what are the conflicts?

### SECTION 682.205

PDI 1.  These additional disclosures will be included as various addanda and common applications are developed.

PDI 2.  Same response as 1. above.

PDI 3. Same response as 1. above.

### 682.205(c)&(d)

8

1.& 2. Self-implementing statutory change. The information to be disclosed has not changed appreciably. The change is a statutory one that mandates timeframes for providing the required disclosures.

682.206(c)(3)

1. There is no conflict. The aid administrator determines whether a student is borrowing to meet EFC and adjusts the loan certification accordingly (by documenting this in the student's file and reducing the amount of estimated financial aid or the EFC by the amount being offset). The lender follows the school's certification and is not involved in this decision.. nor would the lender be aware that such an offset is in effect.

682.206(f) -- there is no (f)(6)

DCL 1. 682.413(c)(6) cross references this provision. We are saying that the failure to secure the certification(s) may result in a loss of reinsurance. It does not mean that the consolidating lender cannot rely upon the certifications received

682.207(b)(1)(v)(B)

1.& 2. The Department incorporated only the self-implementing pieces of the co-payable PLUS statutory change. We did not address where co-payable PLUS checks should go. We will clarify in the DCL that the interim guidance in GEN-92-21 will apply until this area in regulated through negotiated rulemaking.

3. There is no conflict. We do not address where co-payable PLUS checks go in the regulation. The DCL guidance continues to apply.

682.207(b)(1)(v)(C)

1. Self-implementing statutory change.

2. Department disagrees. This reflects the statutory change.

682.207(d)

1. The public comment on the NPRM proposal from all sectors was that it was too complex. In preparing the final, we greatly streamlined the process that had been proposed and accepted lenders' comments on automatic late disbursement through day 60. (See comments and discussion for this provision.) The identification of this item as a burden reduction provision came after the drafting of this provision.

TC 2. Technical correction will be made to reconcile the conflicting provisions.

9

PDI 3. The Department does not understand the comment. Other than informing schools and lenders of the new procedures and timeframe (once the Department has resolved the conflict), what else is involved in implementing this regulatory change.

PDI-DCL 4. We will clarify this in the DCL. How we resolve the technical conflict will determine the effective date.

## SECTION 682.208

### 682.208(b)(1)&(2)

PDI 1. The reporting requirements have been in effect since the 1986 Amendments. The new piece is the time frame for accomplishing this. We don't believe this should involve extensive implementation time.

2. Effective loans made on/after 2/1/93.

### 682.208(c)(2)

1. The comment has no bearing on converting borrowers to repayment. The use of eligible rather than participating in this context makes no difference to conversion procedures.

2. The eligibility of a student to receive a deferment at an eligible, non-participating school is now statutory and self-implementing in our view. This was a major concern of the Department (when discussing doing this through regulation before the '92 Amendments) and the reason that we maintained the "participation" requirement for so long. However, as a result of the default initiative and concern over default rates, schools wanted to withdraw from the FFEL program but not lose this benefit for their students (current and incoming). We did not want to discourage this. Further, the Department retains leverage over schools that continue to participate in the other Title IV programs even if they voluntarily withdraw from FFEL. We also decided that totally non-participating schools would view this as a benefit to their students and would be more than willing to provide status information. If we find that this is not the case, we may want to recommend a technical amendment to revoke this privilege if the school does not provide this information on a timely basis. We can discuss developing procedures to require such a totally nonparticipating school to sign a letter of understanding in which we would outline the reporting requirements they are under.

### 682.208(e)

1.& 2. The only change made to the regulation to incorporate this self-implementing statutory change was to require both parties to the transaction to provide the required notice.

DCL 3. The Department believes that the statutory changes made in section 428G(g) and the remaining changes in section 428(b)(2)(F) should be regulated through negotiated rulemaking.

## SECTION 682.209

### 682.209(a)(1)

TC 1. A technical correction will be made.   ED's most recent guidance on this subject continues to apply.

### 682.209(a)(2)(iii)

1.   The Department believes this statutory change to be self-implementing.

2.   The regulations reads "consistent with the grace period."  It does not specify that the period is 6 months.

### 682.209(a)(5)

1.   The provision to waive the grace period was in the 11/20/90 NPRM.  This change to the NPRM proposal was in response to public comment that said an important decision like waiving the grace period should be in writing.  This also codifies existing policy as it relates to the parental leave deferment, the only situation in which we are aware borrowers have waived a portion of their grace period.

2.  The Department believes that protecting the borrower's is what should be of paramount interest here.  They are waiving a statutory benefit.

PDI 3.  We do not see that there is anything to implement.  It simply involves a change in procedure.

4.  It would seem logical that it would be requests for waiver made on or after 2/1/93.

### 682.209(a)(7)(iv)

This is identical to the proposal in the NPRM of 11/20/90 with the exception of the cross reference.

### 682.209(b)

PDI 1.  What requires additional time?

DCL 2.  The Department believes it should apply to prepayments made on/after 2/19/20.

TC 3.  This affect was not intended.  To clarify, we will delete

11

the phrase "Except as provided in paragraph (b)(2) of this section.." in 682.209 (b)(1) and in (b)(2) insert after "prepayment" the phrase "as specified in (b)(1)" and delete the phrase "to future installments." In the next sentence, after the phrase "to future installment," insert the phrase" by advancing the next payment due date..." The regulations presume that if a significant payment was received from the borrower with no instructions and the borrower had outstanding late/collection charges when the funds were applied, the lender would cover those charges when applying the first payment before determining how far in the future it could extend the due date.

### 682.209(f)(3), .209(g)(2), .209(h)(6), and .209(i)

PDI 1. Other than providing lenders instruction as to the new timeframes for accomplishing these activities, what is there to do??? The certification process and application of payment remain unchanged.

2. The Department does not agree. Also, this benefits the borrower by expediting the process.

### 682.209(h)

1. Department believes these changes are self-implementing.

2. For establishing the borrower's repayment schedule, it does. See section 428(c)(2).

3. There are special provisions for married couples as it relates to establishing the repayment schedule. Special provisions related to borrower eligibility are in 682.201(c).

### SECTION 682.210

The Department believes these are reasonable documentation standards for a borrower's receipt of federal benefits and reflect the 11/20/90 NPRM proposals. Lenders and agencies were operating on the Department's "interim guidance" in advance of regulations for the past few years. These deferments will apply to old borrowers for the life of their loans and will be with us for many years to come.

### 682.210(a)(3)(ii)

1. Department believes this is self-implementing.

TC 2. Technical correction inserting "for which the application was received by an eligible lender on or after January 1, 1993" will be made.

12

SENT BY:NCHELP         ; 3-26-93 ;11:41AM ;         2025488745→         217 783 3641;# 14

## 682.210(a)(5)

TC 1.  This was unintended.  We can add a reference in .406(k) to .210(b)(5).

2.   It was proposed in the 11/20/90 NPRM in much more general language.   An Departmental commenter recommended that the regulations be more specific regarding beginning and ending dates. The language is consistent with that in the deferment/forbearance sections and addresses the period between end of grace and first payment due.

3.  See response to 1. above.

4.  The time frames for retroactivity were in the November 10, 1986.  NCHELP comments for this proposed provision were "NCHELP commends the Secretary for standardizing the time frames for backdating the deferments."

5.   This is correct and is the inevitable result of such a regulatory change.

## 682.210(a)(6)(iv)

The intent of the presentation was to underscore the necessity of the SSCR process to granting the deferments in two of these programs.  It does not mean that the lender can't use anticipated graduation date for all three programs.  The Stafford borrower deferment (which must be a prior loan) and a PLUS parent borrower deferment (granted on the basis of a dependent's status) are reliant upon the SSCR process to verify eligibility for the deferment.  In Stafford, you are not deferring the loan that you are processing but all prior loans that might be in repayment.  In PLUS, you are deferring based on the dependent's status....and the dependent's status must be reflected on the SSCR (which may not be the case unless the dependent is also a borrower for attendance at that school).  Only in the case of the SLS are you using the application to actively defer the loan you are processing as well as any prior loans held by the same lender.  The presentation was not intended as a restriction... it was intended to underscore distinctions.   TC for 682.210(c)(3) to include Stafford.   With regard to section 485C of the Act, any eligible lender holding one or more loans of the borrower can defer all the loans it holds provided the borrower meets the eligibility criteria.

1.  See discussion above.

2.   These regulations will be in effect for years to come. The new borrower deferments will be regulated under negotiated rulemaking.

3.   The process for granting in-school deferments, the most frequently used deferment category, has been simplified to a great

13

extent.   The Department believes that the documentation and certification requirements for the other deferment categories are reasonable and necessary to protect the integrity of the process. The Department and OMB will not approve a self-certification approach on a long-term basis for the receipt of a substantial federal benefit.

682.210(a)(8)

TC 1.  We will delete "as to that loan."  No, the regulations do not change the policy.

DCL 2.  The Department does not agree that clarification is needed. The definition of default is clear and applies to a period post-180 days in which the lender may still hold the loan.

General Comments on Individual Deferments

682.210(d) through 682.210(r)

PDI - The Department understands that existing deferment forms outlining eligibility and documentation requirements must be developed.  The Department will work with the NCHELP Servicing Committee to develop the forms needed to implement these regulations and the new borrower deferments on an interim basis in advance of the negotiated rulemaking final regulations.

SECTION 682.211

TC 1.  The requirement for a "signed" acknowledgement of the debt was in response to public comment.  A technical correction will be made to delete "repayment obligation" and insert in its place "a new signed agreement to repay the debt."

DCL 2.  The Department does not believe that clarification in the regulations is necessary.  Given the definition of default, it would seem to be clear that it applies to the post-180 day period prior to default claim payment.

3.  The Department considers this provision of the statute to be self-implementing.

SECTION  682.300

682.300

TC. A technical correction is necessary to include a reference to Consolidation borrowers.

DCL - The Department understands that other important changes were made by the '92 Amendments in the area of restricting lenders' interest on first disbursements and unconsummated loans.  However,

14

they require regulations to be developed through negotiated rulemaking to be implemented on other than an interim basis. The guidance in GEN-92-21 will apply until these areas are regulated.

## 682.300(b)(2)

TC 1.  This change in the regulations was in the NPRM.  The change from cashed to negotiated was based on public comment. A technical correction will be made to delete "negotiated" and replace it with the term use in the NPRM, "cashed" to eliminate the conflict with .406(a)(2).

2.  See comment and discussion to this item in the regulations. The Secretary's view remains unchanged.

TC 3.  We will make a technical correction to clean up conflict.

## 682.301

1.  The comment is unclear and may be a '92 Amendment issue that will be addressed in the second DCL on the Amendments.  Section 428H of the Act is not included in the regulations.

## 682.301(a)(2)

DCL - 1.  Since this is an eligibility made by the school, it would apply to loans certified on/after 2/1/93.

2.  Section 428H of the HEA was not introduced in these regulations.  The order of loan certification post-92' Amendments will be covered in the second DCL on '92 Amendments.  It will also be clear from the format and instructions of the common app/note.

## 682.301(c)

1.  A definition was intended in 682.200.  However, a technical correction in 682.200 is necessary because it currently mentions unsubsidized rather than nonsubsidized.

2.  See response above.  The '92 Amendment NPRM will define all three types of Stafford loans.

## Section 682.302

## 682.302

PDI 1.  The revised form 799 has been completed and is being mailed.  The Department is aware that systems changes will be required.

TC 2.  A technical correction will be made.  (d)(1)(vii) will be revised ... after the word claim we will insert "submitted by the

15

deadline specified in (v) of this section."

DCL 3. The interim guidance provided on the '92 Amendments in GEN-92-21 will be used in conjunction with the final regulations. The DCL will provide additional guidance on the use of this section in light of the statutory changes. The '92 Amendment changes will be regulated as part of negotiated rulemaking NPRM.

682.302(e)(2)

1. That is correct and it remains the Department's position on this issue.

SECTION 682.304

PDI 1. Form 799 has been completed and is being mailed. The Department understands that systems must be revised to comply with the provision.

DCL 2. The DCL will clarify that this will apply to bills submitted to the Department on/after 2/1/93 unless a further delay in implementation is decided upon.

Section 682.305

1. Unclear what the commenter is referring to. The comment and discussion do not appear to add anything not included in the regulations except to discuss some of the operational implications.

DCL 2. The Department would consider this to be effective for loans transferred on/after 2/19/93.

682.305(c)

PDI 1.& 2.The Department considers the statutory audit requirement to be self-implementing and plans to implement the audit requirement when the audit guide under development is available. The regulatory requirement, which was subjected to public comment and revised as a result, was also revised to remove any conflicts between the regulatory and statutory requirement.

3. The provisions of the statutory requirement will be addressed in developing the negotiated rulemaking NPRM. The Department does not interpret "an audit for other purposes" to mean an alternative to the audit.

4. Lender reviews are different than audits in the same way that school reviews are different than independent audits for schools. We believe that .305(c) acknowledges the ability of nonprofits to do a single audit and the applicability of 31 U.S.C. 7502 and OMB Circular A-133. See the last comment and discussion under .305(c).

16

SENT BY:NCHELP          : 3-26-93 :11:44AM :          2025468745→          217 765 5647;#34

## SECTION 682.400

### 682.400

1.  Regulations governing the mandated loan rehabilitation program will be developed under negotiated rulemaking.

2.  The DCL and the regulations do not conflict.  The fact that provisions governing the rehabilitation program were not included in the regulations does not negate the DCL guidance to implement the '92 Amendments.

### SECTION 682.401

The Department did not incorporate '92 Amendment provisions into 682.401.  The provision in 682.401(d)(3) was a regulatory, burden reduction item before the common application/promissory note and other forms was required in statute.

### SECTION 682.401(b)(2)(ii)

1.  Although academic year is a term defined and subject to revision in the General Provisions regulations, guaranty agencies do not have anything to do with defining the term and must use the definition provided in statute and resulting regulations.

PDI 2.  The Department understands that guaranty systems must be revised to track borrowers against a new 7-month standard for Stafford.  However, the Department does not believe it is a major shift since agencies have been dealing with the 7-month standard in the SLS program.

3.  This will apply to loans certified on/after February 1, 1993.

### 682.401(b)(4)(i)

Section 485C(b) reads "to the extent practicable, and with the cooperation of the borrower...."  It is clearly not a requirement.  Additionally, the requirement that the borrower have a choice of lender is also statutory. See ......

### 682.401(b)(4)(iv)(A)

1.  The comment is not applicable because this area of the regulations governs borrower responsibility.  The school responsibility in section 485(b) is subject to negotiated rulemaking, but that does not include this provision governing a borrower's responsibility.

2. - 5.  The comments reflect the view that the provision is a

17

SENT BY:NCHELP                    ; 3-26-93 ;11:44AM ;          2025468745→          217 785 5847TWEET

school reporting responsibility, which it is not.

## 682.401(b)(5)

TC 1.& 2.  The new limitation provisions of the '92 Amendments are not reflected in the regulations.  The reference to section 432(h)(3) [which should be 432(h)(2)] was implemented as a result of earlier legislation that provided for default sanctions.  The newest legislation allowing guaranty agencies to limit the participation of schools will be regulated through negotiated rulemaking.

## 682.401(b)(7-8)

TC 1.  The Department agrees the correct citation is 682.404(h)(2).

## 682.401(b)(9)

1.  The comment is not correct.  Section 428H permits lenders to charge combined insurance premium/origination fee, but the agency is prohibited from charging one.  However, it is irrelevant to this discussion because section 428H is not reflected in the regulations.

## 682.401(b)(15)(i)

DCL-1.  No. This does not represent an incorporation of the '92 Amendments.  It was a regulatory initiative in response to particular situations that predated the statutory change.  That is why there is no reference to the exceptions provided in the '92 Amendments.  We will clarify in the DCL that the regulations apply with the addition of the exceptions now provided in statute until the provision can be revised under negotiated rulemaking.

## 682.401(b)(16)

1.  This restriction was added in response to the HEAF situation after the Secretary of Education, in testimony before the Congress, stated that transfers of guarantee would not take place without the Department's approval.  OMB requested that we modify the provision to allow for routine borrower requests for transfer to consolidate their loans with one guarantor.

## 682.401 (b)(17)

1.  No.  Referencing the statutory provision does not make it subject to negotiated rulemaking.

2.  The Department does not agree there is a problem.  One is simply the definition; the other is a requirement to have an agreement with the entity defined in the definition.

3.   This is just inclusion in a list and is not subject to negotiated rulemaking.

682.401(b)(18)

1.   The requirement to track borrower status through the use of an SSCR was a requirement long before 12/92.   There is no conflict between this requirement and the later implementation of a new SSCR format.

2.     The SSCR is used to update status, not to report "justification."

3.   Appendix B is a standardized SSCR and the Department intends to use it until revisions are necessary.

682.401(b)(22)

1.& 2.   The Department disagrees.   Section 428K was not changed by the '92 Amendments.

682.401(c)

DCL 1.& 2. The Department disagrees.   The requirement to provide lender-of-last-resort services is still applicable.   The DCL will clarify that the '92 Amendments have changed the section and refer them to the interim guidance on the amendments in GEN-92-21.

682.401(d)(3)

1.& 2. & 3.

The Department considers the requirement to develop a common application/note to be self-implementing.   The regulation simply says it must be used.

682.401(e)

1.   The HEA added a new restriction to the ones already present. The new restriction (lender inducements) is subject to negotiated rulemaking but doesn't mean the old ones will confuse people.

2.   There is no conflict.

SECTION 682.402

1.   There is no Consolidation Loan death benefit.   HEA added something for PLUS, but nothing specific for Consolidation. The new benefit will be regulated under negotiated rulemaking.

19

SENT BY:NCHELP                  : 3-26-93 ;11:45AM ;              2025468745→              217 785 5647;#37

### 682.402(c)

1. We do not understand the comment.

### 682.402(d) and (g)

DCL 1.,2, & 3.    The DCL will clarify which portions of the regulations have been superseded.  In review of the regulations for the purpose of revising them for negotiated rulemaking, it was determined that most of the provisions have not been superseded by the changes made in the HEA.

TC 4.    The Department agrees that the reference should be to (g)(2), not (h)(2).

### 682.402(e)(2)(ii)(B)

PDI 1.  The Department does not believe the changes required by the 15-day deadline are major and that they could be handled manually until system changes are made.

2.  Effective date is 2/19/93 for any instance in which the lender "is served" with a complaint or motion.

### 682.402(h)

1.  If the loan is not discharged, what is "the basis" of claim payment and the agency remaining the holder?  Also, the agencies are not in a position to provide pre-default loan servicing.

### 682.402(i)(2)(iii)

- ASK! GEORGE ABOUT HIS COMMENT HERE.

### 682.402(k)

1. We disagree that this section conflicts with 682.210.  The date on which the borrower qualifies for a deferment can be a back-dated date.

### SECTION 682.403

### 682.403(f)

1.   The Department obviously disagrees.   There is no basis to believe that an agency can keep an "advance" forever.   There doesn't seem to be the same objection to 682.410(a)(2)(v).

### SECTION 682.404

PDI 1.  The Department doesn't understand the necessity of delaying for something that we presume agencies are doing on an ongoing

20

SENT BY:NCHELP          ; 3-26-93 ;11:46AM ;          2025466745→          217 785 5647;#38

basis.   This isn't like training with schools where outreach activities are involved.

2.  The requirement is to provide preclaims assistance to lenders who request it on or after 2/19/93.

3.  We do not understand the comment.  There is no reference in the DCL to 682.404(a)(2)(ii).

682.404(a)(3)(i).

1.  This codifies the Department's interpretation of the statute.

682.404(a)(5)

TC 2.   The Department believes that the change in section 428(c)(2)(H) replacing the lender with the guaranty agency as the entity that reports to the school is self-implementing.  The provision of the statute that allows the guaranty agency to charge a reasonable fee for this service will be regulated under negotiated rulemaking.  The commenter is correct that this reporting requirement is contingent upon the request of the school and a technical correction will be made to the regulations to reflect this.

SECTION 682.406

1. The additional requirement required by the '92 Amendments will be regulated under negotiated rulemaking.  That change does not invalidate the regulations as published.

2.  We do not agree this is confusing.

3.  No comment.

4.  Proposed 682.406(a)(2) in the 11/20/90 NPRM provided for the submission of the payment and collection history to ensure that the lender serviced the loan properly pursuant to 682.411.  Implicit in this is that the claims examination process extends beyond the most recent 180 day.  The Department does not believe that the agency can determine whether the loan is enforceable.  We do not see that this requires further clarification for the purposes of implementation.

5.   The Department disagrees that this is a mistake.  Waivers provided under the Appendix D cure policy only apply to violations of .411 and the timely filing requirement.

6.  There is no conflict.  The requirement for standardized forms and procedures will be regulated under negotiated rulemaking. Until that time, these regulations will continue to govern.

21

SENT BY:NCHELP          ; 3-26-83 ;11:46AM ;          2025468745→          217 785 5647;#39

TC~7.  See earlier comment to 682.302.  We will use consistent terms in both places.

8.  We do not agree that the preamble provides any "cure" for a failure to pay required origination fees.

9.  Appendix D is for .406(a)(3) and (a)(5) only.  The possibility of any other waivers is covered in .406(b).

SECTION 682.408

1. The Department does not find anything in sections 428(i) or 432(l) that requires "standardization of escrow processing."  If NCHELP is referring to the general requirement for standardization of forms and procedure, this will be handled under negotiated rulemaking.  Until final regulations are published as part of that process, these regulatory requirements will apply.

SECTION 682.409

DCL 1.  The final regulations apply until such time as revised final regulations reflecting the '92 Amendment changes are published and in effect.  However, during this interim period for purposes of this process, the aged loans the Department will require guarantors to assign will be the unresolved loans with claims paid to lenders prior to April 15, 1989.   The loans considered "unresolved" are those loans without judgments and with no payments in the last year.

SECTION 682.410

SECTION 682.410(b)(1)(ii)

1.   The regulatory requirement for guaranty agency audits is applicable with the statutory change made in the frequency of the audit self-implementing.

2.  We don't understand the comment.  The provisions addresses the applicability of A-133.

SECTION 682.410(b)(2)

1.   This is untrue.   Please see response to inquiry on this subject.

2.   This provision is the result of a statutory requirement. See section 484A(b) of the Act.  Besides, a borrower's rehabilitation payment must be reasonable and affordable.  So, even if the charges include collection charges, the payment amount that the borrower is expected to make to rehabilitate the loan cannot exceed what is reasonable and affordable.

22

SENT BY:NCHELP           : 3-26-93 :11:47AM :           2025468745→         ZTT 705 5047T#40

3.  The effective date is claims paid on or after February 19, 1993.

PDI 4.  The Department does not understand why this is a major implementation item.  This is an additional charge that can be passed along to the borrower and against which payments can be applied.

## Section 682.410(b)(4)

PDI 1.  It appears that everything is a major implementation problem...which calls into questions some of these comments.  What is major about adding interest to principal and billing the debtor for what he or she owes the agency.  We are not inclined toward providing 180 days to implement this.

## SECTION 682.410(b)(5)

1.  Correct, it must be offered to every borrower.

2.  The Department does not understand what the dilemma is. Presumably, the agency paid the claim in good faith based on the information provided by the lender and the agency's own records. Perhaps the lender provided incorrect information.  Wouldn't the guaranty agency want to provide the borrower the opportunity to correct the information before his life is significantly damaged?

PDI 3. The Department does not view this as a reasonable delayed implementation period.

4. The Department doesn't consider this a topic of further discussion because the Department considered and responded to comments in developing the final regulations.

5. What new forms are necessary to implement this?  The Department believes it only involves a written notice advising the debtor of hid or her options as outlined in this provision.  This could be a word processed letter to the debtor.  Department would be happy to assist in drafting the notice.

## SECTION 682.410(b)(6)

PDI 1. Prior regulations required the agency to diligently attempt to call the borrower. Additionally, this has been the Department's long-standing policy on what constitutes diligent telephone attempts.  Therefore, despite the fact that this is codified in regulations for the first time, the Department sees no reason to provide an extended implementation period.

2.  Claims paid on or after 2/19/93.

## 682.410(b)(8)

23

SENT BY:NCHELP         ; 3-26-93 ;11:47AM ;          2025400745+         211 103 50411#4+

DCL 1. - 4. This provision refers to the optional guaranty agency closed school policy in existence prior to the '92 Amendments. The Department views this provision as having been superseded by the '92 Amendments and expects lenders and guaranty agencies to follow the guidance that will be provided shortly in a Dear Colleague letter to implement the closed school statutory provision on an interim basis in advance of final regulations.

682.410(b)(9)

1.   There is no conflict.  The regulatory provision is narrowly drawn and is not intended to include everything.  You are correct. The Department, in the preamble to the regulations, indicated it was declining to issue a regulations preempting state law in instances in which borrowers could raise school-related defenses to repaying loans.

682.410(c)

DCL 1.  Please note that the dollar volume criterion for lender reviews has not been deleted.  The school volume criterion was proposed for deletion in the 11/20/90 NPRM to refocus such reviews on high default institutions and preclude a repetitive cycle of review of the same schools.  Agencies are free to submit their proposed alternative review plan to the Secretary for approval.

2.   The effective date is 2/19/93, but the review requirement is a biennial one.

SECTION 682.411

682.411

PDI 1. The Department understands there will be some additional systems development necessitated by the changes to this section.

2.   There was significant consultation with the community of the development of the final regulations in this section.

3.   So noted.

4.    The Department believes the collection requirements are necessary to prevent defaults and maintain the integrity of the FFEL program.  Those lenders and servicers doing an exceptional job will be recognized through the regulations being developed as a result of the '92 Amendments. This mechanism should decrease the potential for lender liability.

682.411(i)

TC 1.& 2.  We will make a technical correction in the definition of

24

SENT BY:NCHELP           ; 3-20-99 ;11:40AM ;

gap in Appendix D to clarify that the term gap, as it appears in Appendix D, applies to a loan for which the first day of delinquency occurred on or before the effective date of the new .411 due diligence provisions, which is 120 days after the date of publication of the regulations.  The definition of gap in .411 states that it is "for purposes of this section" and is effective for loans on which the first day of delinquency is on or after 120 days after the date of publication of the regulations.

## 682.411(f)

TC 1.  Agree. Technical corrections are necessary. The reference to (f)(1) should be to .411 (l)(1).  The reference in 682.411(g)(4) to (l)(1)(A) and (B) should be to (l)(1)(ii) and (iii).

## 682.411(m)

See response to 682.410(b)(9).

## SECTION 682.412

TC 1.  Agree that special allowance charges to the borrower under the requirements of 682.412 should be included in the list of permissible charges in 682.202.

2.  We believe that the commenter is confusing the loan cancellation provisions for false certification by a school included in the '92 Amendments with 682.412, which addresses false information provided by the borrower and/or his parents on which eligibility was based.

## SECTION 682.413

1.  682.413(c) talks about liability against a guaranty agency that makes an incomplete or incorrect statement ...or violates federal requirements.  Liabilities seem appropriate but rare for these types of transgressions.

2.  The Department disagrees.  If an agency owes a liability for a violation in 1990, we should use any available remedial action to resolve it.

3.  The regulations merely cross-reference the statute, which is applicable.

## SECTION 682.414

1.  The statutory provisions do no, prevent the Department from implementing these regulatory requirements.  Any revisions to this section as a result of the '92 Amendments will be proposed in the negotiated rulemaking.NPRM.

25

SENT BY:NCHELP            ; 3-26-93 ;11:48AM ;            2025468745→        211 785 5647;#43

## SECTION 682.600

### 682.601

1. 682.601(A)(3) contains 50% restriction for school lenders.

### SECTION 682.603

1. This codifies existing policy. The Department understands that there have been changes in the certification process as a result of the '92 Amendments. This regulatory provision does not conflict with the statutory changes which will be regulated through negotiated rulemaking.

2. We do not see the conflict. The period of enrollment does not have to directly correspond to the period selected by the agency for annual loan limits.

3. The change in 682.413(d)(2) had nothing to do with the '92 Amendments. The provision was proposed in the NPRM and modified to include landers because 432(g) of the Act applies equally to lenders.

### SECTION 682.604

### 682.604(c)(2)

DCL 1. The regulations reflect the self-implementing aspects of the co-payable PLUS provisions. The disbursement provisions for EFT are covered in 682.604(c)(3). The handling of checks was not included because it must be regulated as' under negotiated rulemaking. The interim guidance in GEN-92-21 on the handling of checks will continue to apply until final regulations are published.

### 682.604(c)(3)(ii)

PDI 1. The common application/promissory note will contain this requirement. Therefore, we will phase this requirement in as we phase in the use of the application.

2. Except for the disbursement of co-payable PLUS checks, the Department views the PLUS changes as self-implementing.

### 682.604(d)(1)(B)

1. The regulatory provisions regarding the school's retention of excess loan proceeds predates the statute and has not been superseded. Further, the manner in which the proceeds are maintained has nothing to do with the frequency of delivery to the borrower.

26

2.   The Department does not agree that the changes made in this area are major changes.

**682.604(d)(4)**

TC 1.   A technical correction is required to clarify the timeframes.   (4)(a) should be within 30 days of the period of enrollment for a registered student who withdraws or is expelled before the first day of the period of enrollment.   (4)(b) should be according to the refund deadlines in 682.607 based on a withdrawal date determined under 682.605.

DCL 2. Clarification will be provided in the DCL.

**682.604(e)(4)**

1.& 2.   See comments to 682.207(d).

**682.604(h)**

DCL 1.   The statute does not address students in study-abroad programs.   However, for consistency of interpretation, the Department will consider it as applying if the loan proceeds are delivered directly to the borrower.   If disbursed to the school and delivered using a power-of-attorney, overaward provisions would apply.

2.   Correct.   There was no intention to include unsubsidized Stafford.

**682.605(b)(4)**

PDI 1.   Schools have this information even if some of the SSCR formats don't request it.   The Department does not believe this should involve delayed implementation.   Status changes reported on the SSCR will be implemented when the SSCR is implemented.   Status changes reported outside the scope of the SSCR should be implemented according to the effective date of the regulations.

2.   The Department doesn't believe the effective dates need to be consistent.

3.   Do not understand the comment.

**SECTION 682.606**

DCL 1. The regulatory provisions of 682.606 have been superseded by the Part G statutory requirements.

2.   This relates to the requirement in .606 that a school have a "fair and equitable refund policy."   This provides for developing

27

such a policy is there is not an accrediting agency standard to follow, which is rare. This is still considered interim guidance until it can be revised and moved to General Provisions regulations under negotiated rulemaking.

### SECTION 682.610

### 682.610(B)(5)

The section now includes what was missing through oversight previously in this section and is not subject to negotiated rulemaking. Previously, schools were required to retain documentation that supported need determination/loan certification. However, estimated financial assistance was not included. The change in retention time was based on public comment.

### 682.610(b)(9)(iv)

TC-DCL 1. The Department agrees that 682.207(b)(1)(ii)(B) suggests that the school retains the original while .610 says copy. As a matter of policy guidance, we have said the original/copy could be maintained by either party.

### 682.610(c)(2)

PDI 1. We do not understand what requires additional time for implementation.

### 682.610(d)

1. This change was made in response to public comment (specifically from guaranty agencies) and is consistent with what is done in the Perkins Loan Program. The statutory provision addresses the standardization of documentation, not the retention period.

### 682.610(f)

PDI 1. The Department does not believe this requires additional time to implement and is important to default reduction.

### SECTION 682.800

### GENERAL COMMENTS

These comments are a reiteration of the comment received on the NPRM. See the comments and discussion.

### SECTION 682.801

1.& 2. The Department views this as a self-implementing statutory change.

28

TC 3. Correct.   A change will be made to include the deleted provision correctly reflecting the statutory change.

## SECTION 682.830

### 682.830(b)(1)

See comments on 682.305(c).

## SECTION 682.840

### 682.840(b)

See comment and response to the regulations.

## APPENDICES

## APPENDIX A

Appendix A remains in effect as interim guidance for the development of a "fair and equitable" refund policy if the school does not have an accrediting agency mandated standard under which to develop such a policy.  This Appendix will be revised and moved into the General Provisions regulations as part of the Part G negotiated rulemaking.

## APPENDIX B

PDI 1.  The current delayed effective date would require use of the new SSCR format by June 19, 1993.  What must be done in addition to revising forms and screen formats, revising accompanying instructions, and modifying systems to accept day-specific data.

2.  The Department followed the recommendations of the community, particularly NCHELP, in the development of the SSCR format and identification of required data.   The Department intends to implement APPENDIX B and will monitor its use for possible future revision.

## APPENDIX C

No changes were made to Appendix C, which is Bulletin L-77a first printed in January 1983 as the cure policy for FISL loans.  It remains in effect for FISL loans.

## Appendix D

TC - 1.  (1) of 682.413(b)(1) will be deleted.

TC - 2.  Technical correction to replace 45 days with 90 days.

29

TC - 3.   Technical correction to revise references to (a)(5) and (a)(6) to (a)(6) and (a)(7).

4. See earlier response to question 682.411 on the definition of gap.

PDI-5. The opinion of the lending community, as expressed to the Department during a meeting on .411 after their review of the second clearance draft, was that revised .411 would allow a lender to continue to use the 30-day standard of the old regulations and comply with the new regulations.  We find it difficult to believe that any organization would set up its system to purposely have a 45-day period between required activities.... routinely walking on the edge of violation.  We don't believe this is a responsible position for a program participant to take in setting up their system, and if they do, it calls into question their administrative capability.  However, the Department does understand that the new timeframe for the first delinquency notice, endorser due diligence, and additional skiptracing requirements will involve systems changes.

6.  This is correct.  See comment and discussion to 682.406(a)(2). The Department disagrees that this represents a major shift from policy.  Policy guidance has consistently indicated that an agency must check conversion date and repayment status of a loan to ensure the delinquency status of the loan is correct.  This has been a major issue in implementing the default initiative with schools.

7.  There has never been an excusal of timely filing violations. They have always led to abbreviated cures.

8.  Please clarify.  C.2.c.& d. are the same.

9.  What type of systems and procedural changes?

10.  The Department disagrees.  The NPRM contained 15 days, we received no comments on this item, and we believe this codifies policy that predates even the NPRM.

11. The effective date would appear to parallel the effective date for changes to 682.411, which is 120 days after the publication date of the regulations.

12. The changes made were necessitated by changes made to 682.411. and following a meeting with the lending/guaranty agency/servicing industry after their review of the second clearance draft of the final regulations.

30

deadline specified in (v) of this section."

DCL 3. The interim guidance provided on the '92 Amendments in GEN-92-21 will be used in conjunction with the final regulations. The DCL will provide additional guidance on the use of this section in light of the statutory changes. The '92 Amendment changes will be regulated as part of negotiated rulemaking NPRM.

682.302(e)(2)

1.   That is correct and it remains the Department's position on this issue.

↳ ED passed out comments at March 1993 on NCHELP's

SECTION 682.304   position - unofficial comments -- no date.

PDI 1. Form 799 has been completed and is being mailed. The Department understands that systems must be revised to comply with the provision.

DCL 2. The DCL will clarify that this will apply to bills submitted to the Department on/after 2/1/93 unless a further delay in implementation is decided upon.

Section 682.305

1.   Unclear what the commenter is referring to. The comment and discussion do not appear to add anything not included in the regulations except to discuss some of the operational implications.

DCL 2.   The Department would consider this to be effective for loans transferred on/after 2/19/93.

682.305(c)

PDI 1.& 2. The Department considers the statutory audit requirement to be self-implementing and plans to implement the audit requirement when the audit guide under development is available. The regulatory requirement, which was subjected to public comment and revised as a result, was also revised to remove any conflicts between the regulatory and statutory requirement.

3.   The provisions of the statutory requirement will be addressed in developing the negotiated rulemaking NPRM. The Department does not interpret "an audit for other purposes" to mean an alternative to the audit.

4.   Lender reviews are different than audits in the same way that school reviews are different than independent audits for schools. We believe that .305(c) acknowledges the ability of nonprofits to do a single audit and the applicability of 31 U.S.C. 7502 and OMB Circular A-133. See the last comment and discussion under .305(c).

16


Assumed Date 3/93



**The Evans Consulting Group, Inc.**
202-465-4766
888-454-3101
FAX: 443-638-0238
www.evansconsulting.org

March 18, 2014

Sheila M. Ryan-Macie
Senior Vice President, Operations Administration
Sallie Mae
300 Continental Drive
Newark, DE 19713

Dear Sheila:

I am writing about your request for background information on a Dear Colleague Letter (DCL) issued by the U.S. Department of Education in November of 1993. That DCL addressed changes made by the Omnibus Reconciliation Act (OBRA) of 1993 and, in particular, changes to the payment of special allowance on loans financed with tax-exempt financings. At the time the letter was issued, I was the director of policy and development for the Department.

<u>Summary of Events Taking Place</u>

I recall that 1993 was a very active period within the policy division at the Department. In July of 1992, the Higher Education Act was reauthorized and the Department was required to establish committees to develop proposed regulations to address the changes in law. In addition, in December of 1992, the Department issued final regulations implementing the 1986 reauthorization as well as other changes in law. The issuance of the 1992 regulations following the 1992 reauthorization created some confusion for the higher education community. Given the number of questions that were being asking of the Department, the Secretary made a decision to delay the enforcement of the regulations. The policy division was directed to gather concerns and questions from the community, and thereafter provide clarifying guidance. A third event during this period was the Omnibus Reconciliation Act of 1993, a change in law which also required administrative guidance to be issued by the Department.

Due to these various events, in the course of 1993 there were numerous meetings with the higher education community – as I recall we met monthly over the course of five to six months. As chairperson of the National Council Higher Education Loan Programs (NCHELP)  Regulations Committee and an NCHELP designee for negotiated rulemaking, you were actively engaged in the policy discussions and, in particular, on matters relating to the unique billing requirements for tax-exempt financing. I very much recall you being the industry expert on the topic.

<u>Department Policy Changes</u>

As I recall, the Department's final regulations changed its historical policy on special allowance requirements for tax-exempt financing. This topic was one of the areas of confusion created by the 1992 regulations. The confusion was not created by the then-recent change in law, but rather was due to

changes in regulations which were not discussed in any commentary to the final regulation. I recall you making numerous requests for clarification on this provision as it substantially changed the requirements for entities subject to these rules. You were also vocal in your objection to the policy change given its potential to be costly for nonprofit entities or the government, depending on swings in interest rates.

In the midst of these discussions, OBRA 1993 was enacted. That law also changed the requirements for special allowance for tax-exempt loans. In particular, the new law eliminated the unique special allowance provisions for loans financed with newly issued tax-exempt obligations; such loans would be billed like others loans. Again, I recall you asking for specific guidance to ensure that entities established the correct billing rules for special allowance.

The November 1993 DCL

While I don't recall the specific questions you raised during this time period, I do recall (as noted above) your numerous requests for guidance to ensure accurate billing. I recently reviewed the referenced Dear Colleague Letter and have the following observations:

- Entities were engaging in different types of financing programs and were no longer relying solely on secured tax-exempt bond financings.
- The inclusion of the phrase "in whole or part" was consistent with the policy direction being taken at the time by the Department to expand the one-half SAP limitations.
- The DCL did not include the term "In general" or a similar phrase, which we used at the Department to create policy flexibility. This indicates to me that the Department wanted a bright line in this policy decision – if a loan was financed in part with tax-exempt obligations, it was subject to the restriction.
- It's highly probable the words "in whole or part" were inserted to address a specific question or activity the Department was seeking to address – I don't believe we would have inserted the phrase if, in fact, it had no meaning.

Please let me know if I can be of further assistance.

Sincerely yours,

**Robert W. (Bob) Evans**
**President & CEO**

*In re Audit Control No. ED-OIG/A03I0006*

*Special Allowance Payments to Navient's Subsidiary,*
*Nellie Mae, for Loans Funded by Tax Exempt Obligations*

**AFFIDAVIT OF JOHN (JACK) REMONDI**

JOHN (JACK) REMONDI, being duly sworn, deposes and says:

1.      I am President and Chief Executive Office of Navient Corporation (formerly

known as Sallie Mae, "Navient"). From 1988 to 2000, I was employed by Nellie Mae, Inc.

("Nellie Mae"), first in the position of Treasurer, then as Treasurer and Chief Financial Officer.

In 2000, upon Nellie Mae's acquisition by Sallie Mae, I became an employee of Sallie Mae and

its Treasurer.  I served in that position until August, 2005 at which time I left the Company.  I

became re-employed by Sallie Mae in 2008, serving as Chief Financial Officer and then, in 2011,

as President and Chief Operating Officer until 2013 when I assumed my current position.

2.      I am submitting this Affidavit in connection with Navient's request for review of

the final audit determination ("FAD") dated as of September 25, 2013, of the U.S. Department of

Education ("Department"), Federal Student Aid ("FSA"), concerning the final audit report issued

to Sallie Mae, Inc. by the Department's Office of Inspector General ("OIG") on August 3, 2009.

3.      I certify that, based on my personal knowledge of and participation in the

activities detailed below, the below statements are true and accurate to the best of my

NAV_000135

recollection.  Further, I am prepared to make such statements and certification if called upon to do so in a court of law or other administrative proceeding.

4.      In 1993, when the 1993 Trust bonds that are the subject of the FAD were issued, I was Nellie Mae's Treasurer and Chief Financial Officer.  In early 1993, I asked Sheila Ryan-Macie (Nellie Mae's Director of Strategy and Development at the time, and its primary liaison to the Department) to solicit clarification from the Department as to how the special allowance billing rules would apply to loans in the 1993 Trust, which was the first unsecured tax-exempt financing completed by Nellie Mae.  This clarification was necessary not only because of the unique character of the 1993 financing, but also because the Department had recently promulgated new special allowance regulations in December of 1992 that appeared to change the Department's prior policy on billing for loans financed with tax-exempt obligations and we were not sure how the changes would apply to the 1993 financing.

5.      While I did not participate directly in any conversations with the Department, I believe that the phrase "in whole or part" was included in a Dear Colleague Letter based on Nellie Mae's inquiry to clarify the billing rules for loans financed by multiple sources of financing or with proceeds pooled, such as the 1993 Trust, because of the timing of Sheila Ryan-Macie's conversations with the Department and the publication of the 1993 DCL shortly after those conversations.   Based on the guidance in the 1993 Dear Colleague Letter, Nellie Mae established its billing procedures for loans financed by the Trust.  We understood that the procedures could have two potential outcomes – in high interest rate environments the ½ SAP restrictions would apply to all the loans and in low environments the 9.5% minimum yield would apply to all the loans.

NAV_000136

6.      Upon receipt of the FAD, I asked Sheila Ryan-Macie, my Chief of Staff and Senior Vice President, Operations Administration to lead Navient's review of the FAD given her expertise on the items included on the letter. I asked Sheila to secure copies of the guidance where the phrase *in whole or part* was included, as I specifically recalled that phrase as being important to Nellie Mae's billing practices with respect to the 1993 Trust bonds.

7.      To the best of my recollection, when Bond 1993B was issued, a new sub-pool was created within the 1993 Trust loan pool into which the 1993B proceeds and receipts were deposited, along with those of subsequent series of the 1993 Bonds. No provision of the indenture governing the 1993 Bonds or any related agreement would have required the maintenance of separate pools for these bond proceeds and receipts. The separate sub-pool was maintained for historic administrative reasons relating to the bonds that Bond 1993B and later series refinanced.

FURTHER AFFIANT SAYETH NOT.

_____
John (Jack) Remondi

Sworn to before me this 22st day of September, 2016:



Kathleen Marie Miller

NAV_000137



Print Page  |  Contact Us  |  Sign Out

**COMMUNITY SEARCH**

Enter search criteria...

Search »

HOME

ABOUT US

BLOG SEARCH

COMMONLINE

CONFERENCES

E-LIBRARY

INITIATIVES

LOAN REPAYMENT INFO

NEWS

MEMBER COMMITTEES

MEMBER ORGANIZATIONS

MEMBER DIRECTORY

SERVICEMEMBER INFO

# Interest & Special Allowance Rate Information

More in this Section...

Share  |

**Current FFELP Interest Rates**
2008-09 through 2011-12: Legislated cut subsidized Stafford loan interest rates for undergraduate students to 6.0%, 5.6%, 4.5% and 3.4%, with a return to 6.8% in 2012-13. These cuts are available only to undergraduate students, not graduate students, and only for subsidized Stafford loans, not unsubsidized Stafford loans. Those loans remain at 6.8%.

The following are the current interest rates for Federal Stafford and PLUS loans first disbursed on or after 7/01/06:

**Stafford:**

- Subsidized Undergraduate: 6.0%
- Unsubsidized and all graduate: 6.8%

**PLUS:**

- Federal Family Eduation Loan Program 8.5%
- Direct Loan Program 7.9%

## Interest Rate Information Charts

| ITEM NAME | POSTED BY | DATE POSTED |
|---|---|---|
| 2012-2013 Interest Rates PDF (23.79 KB) [ more ] | Administration | 11/27/2012 |
| 2011-2012 Interest Rates PDF (23.72 KB) [ more ] | Administration | 7/6/2011 |
| 2010-2011 Interest Rates PDF (56.57 KB) [ more ] | Administration | 7/6/2011 |
| 2009-2010 Interest Rates PDF (55.62 KB) [ more ] | Administration | 7/6/2011 |
| 2008-2009 Interest Rates PDF (55.88 KB) [ more ] | Administration | 7/6/2011 |
| 2007-2008 Interest Rates PDF (27.9 KB) [ more ] | Administration | 7/6/2011 |
| 2006-2007 Interest Rates PDF (56.6 KB) [ more ] | Administration | 7/6/2011 |
| 2005-2006 Interest Rates PDF (124.44 KB) [ more ] | Administration | 7/6/2011 |
| 2004-2005 Interest Rates PDF (100.2 KB) [ more ] | Administration | 7/6/2011 |
| History of Variable Interest Rates PDF (86.47 KB) [ more ] | Administration | 11/27/2012 |

## Interest Rate Memos from ED[ More Info ]

| ITEM NAME | POSTED BY | DATE POSTED |
|---|---|---|
| 2014-2015 Interest Rate Memo PDF (57.86 KB) [ more ] | Administration | 5/29/2014 |
| 2013-2014 Interest Rate Memo PDF (123.28 KB) [ more ] | Administration | 6/26/2013 |
| 2012-2013 Interest Rate Memo PDF (77.42 KB) [ more ] | Administration | 11/27/2012 |
| 2011-2012 Interest Rate Memo PDF (121.26 KB) [ more ] | Administration | 7/6/2011 |
| 2010-2011 Interest Rate Memo PDF (254.28 KB) [ more ] | Administration | 7/6/2011 |
| 2009-2010 Interest Rate Memo PDF (121.37 KB) [ more ] | Administration | 7/6/2011 |
| 2009 Calendar Year Interest Rate Memo PDF (71.75 KB) [ more ] | Administration | 7/6/2011 |

**MY PROFILE**

» Profile Home
» Manage Profile
» Groups
» Networks
» Files & Links
» Favorites
» Connections
» Membership Info
» Refer a Co-worker

**HOT TOPICS**          MORE

6/5/2014
Current Daily Briefing

**CALENDAR**          MORE

7/16/2014
NCHER Debt Management
Committee Meeting July 16, 2014

11/3/2014 » 11/5/2014
2014 KNOWLEDGE
SYMPOSIUM

**ONLINE SURVEYS**

» 2014 Spring Convention
Survey

Case 1:21-cv-00324-TSE-MSN   Document 35-1   Filed 06/23/21   Page 94 of 96 PageID# 1660

| | | |
|---|---|---|
| 2008-2009 Interest Rate Memo PDF (108.4 KB) [ more ] | Administration | 7/6/2011 |
| 2008 Calendar Year Interest Rate Memo PDF (72.21 KB) [ more ] | Administration | 7/6/2011 |
| 2007-2008 Interest Rate Memo-Rvsd Attachment PDF (107.98 KB) [ more ] | Administration | 7/6/2011 |
| 2007-2008 Interest Rate Memo PDF (121.81 KB) [ more ] | Administration | 7/6/2011 |
| 2007 Calendar Year Interest Rate Memo PDF (55.02 KB) [ more ] | Administration | 7/6/2011 |
| 2006-2007 Interest Rate Memo PDF (69.94 KB) [ more ] | Administration | 7/6/2011 |
| 2006 Calendar Year Interest Rate Memo PDF (132.24 KB) [ more ] | Administration | 7/6/2011 |
| 2005-2006 Interest Rate Memo PDF (56.75 KB) [ more ] | Administration | 7/6/2011 |
| 2005 Calendar Year Interest Rate Memo PDF (155.24 KB) [ more ] | Administration | 7/6/2011 |

**Special Allowance Rate Information**

| ITEM NAME | POSTED BY | DATE POSTED |
|---|---|---|
| History of T-Bill & Commercial Paper Rates(2005) PDF (13.25 KB) [ more ] | Administration | 7/6/2011 |
| History of Sp Allowance Rates (2005) PDF (62.2 KB) [ more ] | Administration | 7/6/2011 |
| History of Sp Allowance Rates by SAP Code (2005) PDF (31.54 KB) [ more ] | Administration | 7/6/2011 |
| LaRS & Special Allowance Reporting Table (2010) PDF (112.52 KB) [ more ] | Administration | 7/6/2011 |

**Special Allowance Rate Memos from ED**[ More Info ]

| ITEM NAME | POSTED BY | DATE POSTED |
|---|---|---|
| Special Allowance Rate Memo 3rd Qtr 2005 PDF (111.93 KB) [ more ] | Administration | 7/6/2011 |
| Special Allowance Rate Memo 2nd Qtr 2005 PDF (112.24 KB) [ more ] | Administration | 7/6/2011 |
| Special Allowance Rate Memo 1st Qtr 2005 PDF (72.88 KB) [ more ] | Administration | 7/6/2011 |
| Special Allowance Rate Memo 4th Qtr 2004 PDF (56.44 KB) [ more ] | Administration | 7/6/2011 |

**Page 2 of 2**
1 | 2



Copyright ©2004-2014
National Council of Higher Education Resources
1100 Connecticut Ave. NW, Suite 1200
Washington, DC 20036-4110
Phone: (202) 822-2106 Fax:(202) 822-2142

Membership Software Powered by YourMembership.com®  ::  Legal/Privacy

## History of 91-Day T-Bill and 3-Month Commercial Paper Average Rates

| Quarter Ending | Average 91-Day Tbill | | Quarter Ending | Average 91-Day Tbill | Average 3-Month CP |
|---|---|---|---|---|---|
| Mar-89 | 8.87% | | Mar-00 | 5.72% | 6.10% |
| Jun-89 | 8.73% | | Jun-00 | 5.94% | 6.66% |
| Sep-89 | 8.12% | | Sep-00 | 6.19% | 6.72% |
| Dec-89 | 7.89% | | Dec-00 | 6.23% | 6.67% |
| Mar-90 | 8.03% | | Mar-01 | 5.00% | 5.32% |
| Jun-90 | 8.03% | | Jun-01 | 3.77% | 4.14% |
| Sep-90 | 7.74% | | Sep-01 | 3.35% | 3.41% |
| Dec-90 | 7.25% | | Dec-01 | 1.97% | 2.07% |
| Mar-91 | 6.22% | | Mar-02 | 1.76% | 1.83% |
| Jun-91 | 5.76% | | Jun-02 | 1.75% | 1.84% |
| Sep-91 | 5.55% | | Sep-02 | 1.67% | 1.77% |
| Dec-91 | 4.66% | | Dec-02 | 1.36% | 1.50% |
| Mar-92 | 4.02% | | Mar-03 | 1.17% | 1.27% |
| Jun-92 | 3.78% | | Jun-03 | 1.06% | 1.17% |
| Sep-92 | 3.14% | | Sep-03 | .95% | 1.07% |
| Dec-92 | 3.17% | | Dec-03 | .93% | 1.09% |
| Mar-93 | 3.05% | | Mar-04 | .93% | 1.05% |
| Jun-93 | 3.05% | | Jun-04 | 1.12% | 1.23% |
| Sep-93 | 3.08% | | Sep-04 | 1.53% | 1.69% |
| Dec-93 | 3.14% | | Dec-04 | 2.06% | 2.23% |
| Mar-94 | 3.34% | | Mar-05 | 2.60% | 2.78% |
| Jun-94 | 4.15% | | Jun-05 | 2.94% | 3.23% |
| Sep-94 | 4.63% | | Sep-05 | 3.46% | 3.74% |
| Dec-94 | 5.46% | | Dec-05 | 3.93% | 4.32% |
| Mar-95 | 5.95% | | Mar-06 | 4.49% | 4.75% |
| Jun-95 | 5.79% | | Jun-06 | 4.83% | 5.22% |
| Sep-95 | 5.54% | | Sep-06 | 5.05% | 5.45% |
| Dec-95 | 5.43% | | Dec-06 | 5.03% | 5.38% |
| Mar-96 | 5.08% | | Mar-07 | 5.12% | 5.37% |
| Jun-96 | 5.17% | | Jun-07 | 4.90% | 5.38% |
| Sep-96 | 5.26% | | Sep-07 | 4.51% | 5.39% |
| Dec-96 | 5.11% | | Dec-07 | 3.59% | 4.92% |
| Mar-97 | 5.21% | | Mar-08 | 2.10% | 3.24% |
| Jun-97 | 5.21% | | Jun-08 | 1.71% | 2.75% |
| Sep-97 | 5.18% | | Sep-08 | 1.63% | 2.87% |
| Dec-97 | 5.24% | | Dec-08 | .35% | 2.58% |
| Mar-98 | 5.19% | | Mar-09 | .23% | .74% |
| Jun-98 | 5.13% | | Jun-09 | .18% | .41% |
| Sep-98 | 4.97% | | | | |
| Dec-98 | 4.40% | | | | |
| Mar-99 | 4.54% | | | | |
| Jun-99 | 4.60% | | | | |
| Sep-99 | 4.82% | | | | |
| Dec-99 | 5.22% | | | | |