**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, | |
| Plaintiff, | |
| v. | **Case No.: 1:21-cv-324-TSE-MSN** |
| DEPARTMENT OF EDUCATION and DR. MIGUEL CARDONA, Secretary of Education, in His Official Capacity, | |
| Defendants. | |

**SUPPLEMENTAL ADMINISTRATIVE RECORD**

**VOLUME 4 (Pages 1518-94)**

**NAVIENT V. DEPARTMENT OF EDUCATION**
**Case No. 21-CV-00324**
**SUPPLEMENTAL ADMINISTRATIVE RECORD**

| Document Description | Bates No. |
|---|---|
| Final Audit Determination of Federal Student Aid Letter from Patricia Trubia, Director, Financial Institution Oversight Service, Federal Student Aid, to John Remondi, President and Chief Operating Officer, Sallie Mae, Inc., dated September 25, 2013 | 1345-71 |
| Affidavit of Jason Wheeler dated November 24, 2015 | 1372-78 |
| Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 | 1379-476 |
| Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 | 1477-78 |
| Affidavit of John (Jack) Remondi, dated September 22, 2016 | 1479-81 |
| NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates | 1482-85 |
| 1993 Trust Agreement | 1486-517 |
| Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) | 1518-94 |
| Affidavit of Mark L. Heleen dated September 23, 2016 | 1595-97 |
| Navient Responses to OIG Questions of December 14, 2007 | 1598-600 |
| Letter from Robert S. Lavet, General Counsel, Sallie Mae, to Theresa Shaw, U.S. Department of Education, dated February 15, 2007 | 1601 |
| Affidavit of Jane Roig dated November 11, 2016 | 1602-03 |
| Emails concerning Freedom of Information Act dated April 26, 2017 and May 15, 2017 | 1604-07 |
| Letter from Theresa Shaw to Thomas J. Fitzpatrick dated January 24, 2007 | 1608-11 |
| Final Audit Report, Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations, dated August 2009 | 1612-75 |
| Respondent Navient Corporation's Request for Review of Final Audit Determination, dated July 27, 2016 | 1676-737 |
| Brief in Support of Navient Corporation's Appeal of the Final Audit Determination Issued by the Office of the Inspector General of the Department of Education, dated September 27, 2016 | 1738-83 |
| Navient Corporation's Reply Brief in Support of Appeal of Final Audit Determination, dated November 23, 2016 | 1784-816 |

| | |
|---|---|
| Transcript of March 30, 2017, Oral Argument | 1817-2018 |
| Navient Corporation's Supplemental Brief, dated May 19, 2017 | 2019-40 |
| Hearing Official's Initial Decision, dated March 7, 2019 | 2041-60 |
| DCL 93-L-161 | 2061-77 |
| DCL 93-L-163 | 2078-81 |
| DCL 96-L-186 | 2082-87 |
| DCL FP-06-15 | 2088-93 |
| DCL FP-07-01 | 2094-99 |
| DCL FP-07-06 | 2100-38 |
| Brief in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision, dated April 8, 2019 | 2139-91 |
| Motion for Leave To File a Reply in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision | 2192-201 |
| Navient Visuals from Oral Argument before the Department of Education Office of Hearings and Appeals, dated March 30 2017 | 2202-09 |
| Brief in Support of Federal Student Aid's Final Audit Determination, dated October 28, 2016 | 2210-54 |
| Supplemental Brief in Support of Federal Student Aid's Final Audit Determination, dated May 19, 2017 | 2255-76 |
| Brief in Response to Navient Corporation's Appeal of Hearing Official's Initial Decision, dated May 3, 2018 | 2277-318 |
| Motion for Leave To File a Sur-Reply Brief in Response to Reply Brief in Support of Navient Corporation's Appeal of Hearing Official's Initial Decision), dated May 31, 2019 | 2319-35 |

**NEW ISSUE — BOOK ENTRY ONLY**

*In the opinion of Bond Counsel, under existing law, interest on the Bonds is excluded from the gross income of the owners thereof for federal income tax purposes, assuming continued compliance by the Corporation with the Internal Revenue Code of 1986. Interest on the Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, but such interest will be taken into account for determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See "Tax Exemption" herein.*

## $107,000,000

# NELLIE MAE

## The New England Education Loan Marketing Corporation
## Student Loan Refunding Bonds, 1993 Series G

**Dated:  August 1, 1993**                                          **Due:  August 1, of the years set forth below**

The 1993 Series G Bonds (the "Bonds") are issuable as fully registered bonds and will be issued as one bond for each maturity registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York ("DTC"). DTC is to act as securities depository for the Bonds. Purchasers of the Bonds will not receive certificates representing their interests in the Bonds purchased by them. Ownership by the beneficial owners of the Bonds will be evidenced by book entry only. The principal of and interest on the Bonds is to be paid on behalf of the Corporation by The First National Bank of Boston, as Trustee. Interest on the Bonds is payable on February 1, 1994 and semiannually on each February 1 and August 1 thereafter until maturity or earlier redemption. As long as Cede & Co. is the registered owner of the Bonds and nominee of DTC, such payments are to be mailed directly to such registered owner and disbursal of such payments to the beneficial owners of the Bonds is the responsibility of DTC and the DTC Participants as described herein.

The Bonds are being issued by the Corporation to refinance certain obligations, as described herein. The Bonds are subject to redemption or acceleration prior to maturity, as described herein.

| Maturity Date | Amount | Interest Rate | Price |
|---|---|---|---|
| 1998 | $31,500,000 | 4.70% | 100% |
| 2000 | $28,100,000 | 5.00% | 100% |
| 2002 | $47,400,000 | 5.20% | 100% |

**(Plus Accrued Interest)**

**THE BONDS ARE UNSECURED GENERAL OBLIGATIONS OF THE CORPORATION AND DO NOT CONSTITUTE A DEBT OF THE COMMONWEALTH OF MASSACHUSETTS OR ANY INSTRUMENTALITY OR POLITICAL SUBDIVISION THEREOF FOR ANY PURPOSE WHATSOEVER AND NEITHER THE FAITH AND CREDIT NOR THE TAXING POWER OF THE COMMONWEALTH OF MASSACHUSETTS OR OF ANY INSTRUMENTALITY OR POLITICAL SUBDIVISION THEREOF IS PLEDGED TO THE PAYMENT OF THE PRINCIPAL OR OF INTEREST ON THE BONDS. THE CORPORATION IS NOT A GOVERNMENTAL ENTITY AND HAS NO TAXING POWER.**

The Bonds are offered subject to prior sale, withdrawal or modification of the offer without notice and to the approval of legality by Palmer & Dodge, Boston, Massachusetts, as Bond Counsel to the Corporation. Certain legal matters are to be passed upon for the Underwriters by their counsel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts. The settlement of the issuance of the Bonds is expected to occur at DTC on or about August 24, 1993.

## Smith Barney Shearson Inc.

**Bank of Boston**          **Pryor, McClendon,**          **State Street Bank**
The First National Bank of Boston          **Counts & Co. Inc.**          **and Trust Company**

August 17, 1993

THE REGISTRATION, QUALIFICATION OR EXEMPTION OF THE BONDS IN ACCORDANCE WITH THE APPLICABLE SECURITIES LAW PROVISIONS OF THE JURISDICTIONS IN WHICH THESE SECURITIES HAVE BEEN REGISTERED, QUALIFIED OR EXEMPTED SHOULD NOT BE REGARDED AS A RECOMMENDATION THEREOF. NEITHER THESE JURISDICTIONS NOR ANY OF THEIR AGENCIES HAVE GUARANTEED OR PASSED UPON THE SAFETY OF THE BONDS AS AN INVESTMENT, UPON THE PROBABILITY OF ANY EARNINGS THEREOF OR UPON THE ACCURACY OR ADEQUACY OF THIS OFFICIAL STATEMENT.

No dealer, broker, salesman or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of, the Bonds by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information set forth herein has been obtained from the Corporation and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Underwriters or, except with respect to itself, the Corporation. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the parties referred to above or that the other information or opinions are correct as of any time subsequent to the date hereof.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE ISSUER AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE BONDS HAVE NOT BEEN REGISTERED WITH THE STATE OF FLORIDA.

## SUMMARY OF OFFERING

*The information below is qualified in its entirety by the detailed information appearing in this Official Statement.*

| | |
|---|---|
| Issuer . . . . . . . . . . | The New England Education Loan Marketing Corporation (the "Corporation") is a Massachusetts private, nonprofit corporation organized by the Massachusetts legislature for the purpose of financing student, parent and consolidation loans ("Student Loans") guaranteed and reinsured under the United States Higher Education Act of 1965, as amended and supplemented (the "Act").

The Corporation purchases and originates Student Loans made pursuant to the Act and the Federal Family Education Loan Programs authorized thereunder.  Student Loans originated prior to October 1, 1993 are guaranteed as to 100% of principal and accrued interest against default, death, disability or bankruptcy by either state or private non-profit guarantee agencies.  The guarantee agencies are reinsured 80-100% with respect to such loans by the U.S. Department of Education depending upon default rates.  The Corporation is the largest non-profit holder of Student Loans and the fourth largest holder of Student Loans nationally.  As of June 30, 1993, the Corporation's Student Loan portfolio equalled approximately $1.4 billion. |
| Issue . . . . . . . . . . | $107,000,000 aggregate principal amount of Student Loan Refunding Bonds, 1993 Series G. |
| Tax-Exempt Status   . . . | In the opinion of Bond Counsel, under existing law interest on the Bonds is excluded from the gross income of the owners thereof for federal income tax purposes, assuming continued compliance by the Corporation with the Internal Revenue Code of 1986. Interest on the Bonds is not an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations, but such interest will be taken into account for determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. |
| Interest Payment Dates  . | Interest on the Bonds is payable semi-annually in arrears on each February 1 and August 1, commencing February 1, 1994. |
| Redemption . . . . . . . | The Bonds are not subject to optional redemption by the Corporation.  The Bonds are subject to extraordinary redemption, however, in the event that such action is necessary to avoid the imposition of unreasonable burdens or excessive liabilities on the Corporation as more fully described herein. |
| Trustee  . . . . . . . . . | The First National Bank of Boston, Boston, Massachusetts. |
| Form and Denomination | The Bonds will be issued as fully registered bonds and will be delivered as one fully registered bond for each maturity registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York ("DTC").  Bondholders may purchase interests in the Bonds in denominations of $5,000 or multiples thereof. |
| General  . . . . . . . . . | The Bonds are unsecured general obligations of the Corporation and do not constitute a debt of The Commonwealth of Massachusetts or any instrumentality or political subdivision thereof for any purpose whatsoever and neither the faith and credit nor the taxing power of The Commonwealth of Massachusetts or of any instrumentality or political subdivision thereof is pledged to the payment of the principal or of interest on the Bonds.  The Corporation is not a governmental entity and has no taxing power. |
| Use of Proceeds  . . . . . | Proceeds from the sale of the Bonds will be used to refund bonds issued by the California Student Loan Finance Corporation (now known as the Student Education Loan Marketing Corporation). |

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

|  | Page |
|---|---|
| INTRODUCTION | 1 |
| THE BONDS | 2 |
| General | 2 |
| Book Entry System | 3 |
| Redemption and Acceleration Provisions | 5 |
| THE CORPORATION | 6 |
| INVESTMENT CONSIDERATIONS | 6 |
| Government Regulation | 6 |
| Possible Changes in Legislation | 7 |
| 1993 Amendments | 8 |
| SELECTED HISTORICAL FINANCIAL DATA | 9 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 13 |
| Results of Operation | 13 |
| Loan Purchases | 14 |
| Portfolio | 15 |
| Other Earning Assets | 16 |
| Financings | 16 |
| Management Strategy | 16 |
| Net Assets | 17 |
| Loan Loss Protection | 18 |
| Interest Rate Sensitivity | 18 |
| MANAGEMENT | 19 |
| Directors | 19 |
| Officers and Employees | 20 |
| Nellie Mae, Inc. | 21 |
| DESCRIPTION OF THE CORPORATION'S LOAN PROGRAM | 23 |
| Student Loan Industry Overview | 23 |
| Acquisition of Student Loans | 24 |
| Marketing | 25 |
| Guarantee Agencies | 25 |
| Portfolio | 26 |
| Servicing, Collections, Claims and Recovery | 28 |
| Competition | 30 |
| Financings | 30 |
| Regulation | 30 |
| THE FEDERAL FAMILY EDUCATION LOAN PROGRAM | 31 |
| Legislative and Administrative Matters | 32 |
| Eligibility Requirements for Stafford Loans | 32 |
| Interest Subsidy Payments Upon Stafford Loans | 34 |
| Special Allowance Payments | 35 |

Origination and Rebate Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Unsubsidized Stafford Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
PLUS and SLS Loan Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
The Consolidation Loan Program . . . . . . . . . . . . . . . . . . . . . . . . . 38
Plans for Doing Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
Federal Insurance and Reinsurance of Guarantors . . . . . . . . . . . . . . . . . 39

LEGALITY FOR INVESTMENT IN MASSACHUSETTS . . . . . . . . . . . . . . . . . . . . 40

TAX EXEMPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

ABSENCE OF LITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

LEGALITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

UNDERWRITING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

FINANCIAL STATEMENTS OF THE CORPORATION . . . . . . . . . . . . . . . . . . . . . 42

MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Appendix A

Combining Financial Statements of the Corporation and Nellie Mae, Inc.
for the Year Ended December 31, 1992 . . . . . . . . . . . . . . . . A-1

Appendix B

Summary of Certain Terms of the Trust Agreement . . . . . . . . . . . . B-1

Appendix C

Proposed Opinion of Bond Counsel . . . . . . . . . . . . . . . . . . C-1

# OFFICIAL STATEMENT

### relating to

# NELLIE MAE

### THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION

### $107,000,000 Student Loan Refunding Bonds, 1993 Series G

## INTRODUCTION

This Official Statement, which includes the cover page and the appendices hereto, sets forth certain information concerning The New England Education Loan Marketing Corporation (the "Corporation") in connection with the initial offering of $107,000,000 aggregate principal amount of the Corporation's Student Loan Refunding Bonds, 1993 Series G (the "Bonds").

The Bonds will be issued by the Corporation pursuant to a Trust Agreement dated as of March 1, 1993, as amended and supplemented by the First Supplemental Trust Agreement dated as of June 1, 1993, the Second Supplemental Trust Agreement dated as of July 1, 1993, and the Third Supplemental Trust Agreement dated as of August 1, 1993, (the "Trust Agreement") between the Corporation and The First National Bank of Boston, as Trustee (the "Trustee"), as further described in this Official Statement. The Bonds are unsecured general obligations of the Corporation. The Bonds will rank equally with all other unsecured debt of the Corporation. The Bonds will not limit other indebtedness or securities which may be issued by the Corporation and will impose no financial or similar restrictions on the Corporation.

The Bonds are being issued to provide moneys to redeem certain obligations of the California Student Loan Finance Corporation (now known as the Student Education Loan Marketing Corporation and referred to herein as "CSLFC"), a nonprofit public benefit corporation duly organized and existing under California law. Upon the issuance of the Bonds, the Trustee will transfer the proceeds thereof to Bank of America N.T. & S.A., as Trustee (the "CSLFC Trustee"), to refund certain obligations of CSLFC. When the transfer is made, the CSLFC Trustee will transfer a like amount of cash (but not Student Loans) to the Corporation, which will use such cash to acquire Student Loans.

The Bonds do not constitute a debt, liability or obligation of The Commonwealth of Massachusetts (the "Commonwealth") or any agency or political subdivision thereof or a pledge of the faith and credit of the Commonwealth or of any agency or political subdivision thereof. The Corporation is not a governmental entity and has no taxing power.

The Corporation is a Massachusetts private, nonprofit corporation organized by the General Court of Massachusetts under §§ 1 through 12A of Chapter 356 of the Acts of 1982, as amended (the "Enabling Act"), for the purpose of financing student, parent and consolidation loans ("Student Loans") guaranteed and reinsured under the federal Higher Education Act of 1965, as amended and supplemented (the "Act"), or directly insured by the Secretary of the United States Department of Education (the "Department") pursuant to the Act. The Internal Revenue Service has issued determination letters concluding that the Corporation (i) is exempt from federal income under Section 501(c)(3) of the Internal Revenue Code of

1954, as amended (as recodified by the Internal Revenue Code of 1986, the "Code") and (ii) is not a private foundation as described in Section 509(a)(3) of the Code.

There can be no assurance that relevant federal laws, including the Act, and regulations promulgated thereunder, will not be changed in a manner which would adversely affect the amount of Student Loans available for the Corporation's Loan Program as hereinafter described.    See "DESCRIPTION OF CORPORATION'S LOAN PROGRAM."

The summaries of and references to certain statutes and other documents and materials included in this Official Statement are only outlines of certain provisions contained therein and do not purport to be comprehensive or definitive or to summarize or describe all of the provisions thereof.  Such summaries and references are qualified in their entirety by reference to each such document or statute.  Copies of such documents may be obtained upon written request during the offering period of the Bonds from Smith Barney Shearson Inc., Financial Institutions Division, 1345 Avenue of the Americas, 46th Floor, New York, New York 10105, and thereafter from the Corporation at 50 Braintree Hill Park, Braintree, Massachusetts 02184.

## THE BONDS

### General

The Bonds are dated, mature and bear interest as set forth on the cover of this Official Statement. The Bonds are being issued as fully registered bonds and will be delivered as one fully registered bond for each maturity registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York ("DTC").  Bondholders may purchase interests in the Bonds in denominations of $5,000 or multiples thereof.  Interest on the Bonds is payable semiannually on the first day of each February 1 and August 1, commencing on February 1, 1994, until maturity or earlier redemption or acceleration.  As long as the Bonds are registered under the book entry system described below, principal and interest will be paid solely to Cede & Co., as nominee of DTC.  If Bonds are issued in certificated form, interest on the Bonds will be payable thereafter by check or draft to the order of the owner thereof as of the close of business on the applicable record date sent by mail to such owner, or at the option of an owner of Bonds in the aggregate principal amount of $1,000,000 or more, by wire transfer, and principal of the Bonds will be payable upon presentation and surrender of such Bonds at the principal corporate trust office of The First National Bank of Boston, as Trustee under the Trust Agreement.

The Bonds are unsecured general obligations of the Corporation and will rank equally with all other currently outstanding unsecured debt of the Corporation.  The Bonds are payable from all funds of the Corporation legally available therefor, including (but not limited to) revenues and recoveries of principal received by the Corporation with respect to Student Loans acquired with the proceeds of the Bonds.

A substantial portion of the Corporation's debt has been secured under various trust indentures and security agreements by the pledge of specific pools of Student Loans.  Student Loans so pledged are not pledged to the payment of the Bonds.  The extent to which the earnings from such pools of Student Loans can be released from the lien of such indentures and agreements or used to purchase unencumbered Student Loans held by the Corporation, thereby freeing up cash for general corporate purposes, including

2

the payment of debt service on the Bonds, depends upon the collateral coverage and loan eligibility as well as the amortization or debt redemption. Management believes that such sources of funds will be sufficient to meet the debt service requirements of the Bonds.

## Book Entry System

The information contained in this section, "Book Entry System," is based solely on information provided by DTC. No representation is made by the Corporation or the underwriters as to the completeness or the accuracy of such information or as to the absence of material adverse changes in such information subsequent to the date hereof.

The Depository Trust Company ("DTC"), New York, New York, will act as securities depository for the Bonds. The ownership of one fully registered Bond for each maturity as set forth on the cover page hereof, in the aggregate principal amount of such maturity, will be deposited with DTC and registered in the name of Cede & Co., DTC's partnership nominee. *So long as Cede & Co. is the Registered Owner of the Bonds, as nominee of DTC, references herein to the Bondholders, Holders, Owners or Registered Owners of the Bonds shall mean Cede & Co. and shall not mean the Beneficial Owners of the Bonds.*

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds securities that its direct participants (the "Direct Participants") deposit with DTC. DTC also facilitates the settlement among Direct Participants of securities transactions, such as transfers and pledges, in deposited securities through electronic, computerized book-entry changes in Direct Participants' accounts, thereby eliminating the need for physical movement of securities certificates. Direct Participants include securities brokers and dealers, banks, trust companies, clearing corporations and certain other organizations. DTC is owned by a number of its Direct Participants and by the New York Stock Exchange, Inc., the American Stock Exchange, Inc. and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as banks, securities brokers and dealers, and trust companies that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (the "Indirect Participants"). The rules applicable to DTC and its Direct Participants are on file with the Securities and Exchange Commission.

Beneficial ownership interests in the Bonds must be purchased by or through Direct Participants, which are to receive a credit for the Bonds on the records of DTC. The ownership interest of each actual purchaser of each Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive confirmation from DTC of their purchases, but Beneficial Owners are expected to receive written confirmations providing details of their transactions, as well as periodic statements of their holdings, from the Direct or Indirect Participants through which the Beneficial Owners entered into the transactions. Beneficial Owners of Bonds will not receive certificates representing their beneficial ownership interests in such Bonds, unless use of the book-entry system for the Bonds is discontinued.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct Participants and Indirect Participants who act on behalf of the Beneficial Owners of such

3

Bonds.  To facilitate subsequent transfers, all Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co.  The deposit of Bonds with DTC and the registration of such Bonds in the name of Cede & Co. effect no change in beneficial ownership.  DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identities of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners.  The Direct Participants and Indirect Participants remain responsible for keeping account of their holdings on behalf of their customers.

Conveyances of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners are and will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to Cede & Co.  If less than all of the Bonds of a maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such Bonds to be redeemed.

Neither DTC nor Cede & Co. will consent or vote with respect to the Bonds. Under its usual procedures, DTC mails an omnibus proxy to the Trustee as soon as possible after the record date.  The omnibus proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (to be identified in a listing attached to the omnibus proxy).

Principal and interest payments on the Bonds are to be made to DTC or to its nominee.  DTC's current practice is to credit Direct Participants' accounts on the payable date in accordance with their respective holdings shown on the records of DTC, unless DTC has reason to believe that it will not receive payment on the payable date.  Payments by Direct Participants and Indirect Participants to Beneficial Owners are governed by standing instructions of the Beneficial Owner and customary practices, as is now the case with municipal securities held for the accounts of customers in bearer form or registered in "street name."  Such payments shall be the sole responsibility of such Direct Participant or Indirect Participant and not of DTC, the Corporation or the Trustee, subject to any statutory and regulatory requirements as may be in effect from time to time.  Payment of principal and interest to DTC is the responsibility of the Trustee, disbursement of such payments to Direct Participants shall be the responsibility of DTC, and disbursements of such payments to the Beneficial Owners shall be the responsibility of Direct and Indirect Participants.

NEITHER THE CORPORATION NOR THE TRUSTEE WILL HAVE ANY RESPONSIBILITY OR OBLIGATIONS TO DTC PARTICIPANTS OR THE PERSONS FOR WHOM THEY ACT AS NOMINEES WITH RESPECT TO THE PAYMENTS TO OR THE PROVIDING OF NOTICE FOR DTC PARTICIPANTS, INDIRECT PARTICIPANTS OR BENEFICIAL OWNERS.  SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE OF DTC, REFERENCES HEREIN TO THE BONDOWNERS OR REGISTERED OWNERS OF THE BONDS SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

The Trust Agreement provides for issuance of fully registered Bonds ("Replacement Bonds") to persons other than DTC only (i) in the event that DTC is no longer willing or able to continue to act as securities depository for the Bonds or (ii) the Corporation determines that it is not in the best interests

4

of the Beneficial Owners to continue the book-entry system. Upon occurrence of the event described in (i) above, the Corporation may in its discretion attempt to have established a securities depository book entry relationship with another securities depository. If the Corporation does not do so, or is unable to do so, and after the Trustee has made provisions for notification of DTC of such action, the Corporation and the Trustee will, at the expense of the transferees, arrange for printing of and authenticate and deliver Replacement Bonds of each issue in the denomination of $5,000 or any multiple thereof to the transferees designated by DTC.

## Redemption and Acceleration Provisions

If less than all of the Bonds of a maturity are to be redeemed, the beneficial interests of Direct Participants in the Bonds to be redeemed shall be selected by DTC as described under "THE BONDS--Book Entry System." If the Book Entry System has been discontinued, a system of certificated securities will be adopted, and the Trustee shall select the Bonds or portions thereof within a maturity to be redeemed in accordance with the terms of the Trust Agreement.

*No Optional Redemption.* The Bonds will not be subject to redemption, in whole or in part, at the option of the Corporation.

*Extraordinary Redemption.* The Bonds will be subject to extraordinary redemption on any interest payment date prior to maturity, in whole or in part, at the principal amount thereof plus accrued interest to the date of redemption, without premium, from monies available for such redemption, in the event that such action is necessary to avoid the imposition of unreasonable burdens or excessive liabilities on the Corporation in administering and maintaining its Student Loan purchase program. If less than all the bonds are being redeemed, the maturity of the Bonds to be redeemed shall be selected by the Corporation. The monies available for such redemption will include principal repayments and excess revenues from Student Loans but will not include the proceeds of the Bonds or amounts received from the CSLFC Trustee, which will be used to finance the acquisition of Student Loans. See "INVESTMENT CONSIDERATIONS -- 1993 Amendments," "DESCRIPTION OF THE CORPORATION'S LOAN PROGRAM -- Financings" and "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

*Notice and Effect of Redemption.* On the date designated for redemption, the Bonds so called for redemption shall become and be due and payable at the stated redemption price and to the extent moneys are available therefor, interest shall cease to accrue on such Bonds. Notice is to be furnished to the registered owners of those Bonds which are to be redeemed by first-class mail to the Bondowners mailed not less than 30 days prior to the redemption date.

*Acceleration.* Upon the happening of any Event of Default under the Trust Agreement, the Bonds will be subject to acceleration prior to maturity. See Appendix B -- "Summary of Certain Provisions of the Trust Agreement -- Events of Default."

5

## THE CORPORATION

The Corporation was organized under the Enabling Act in 1982 to promote access to higher education by providing liquidity to originators of Student Loans made under the federally sponsored student loan programs.

The Corporation purchases and originates Student Loans made pursuant to the Act and the Federal Family Education Loan Programs authorized thereunder. The Act provides for several programs of loans to students and parents of students attending eligible institutions. Student Loans made prior to October 1, 1993 are guaranteed as to 100%, and with respect to Student Loans originated thereafter as to 98%, of principal and accrued interest against default, death, disability or bankruptcy by either state or private non-profit guarantee agencies. The guarantee agencies are reinsured by the Department 80-100% with respect to Student Loans made prior to October 1, 1993, and 78-98% with respect to Student Loans originated thereafter, depending upon their default claims experience.

During calendar year 1992 the Corporation purchased or originated more than $426 million of Student Loans, compared to $311 million in calendar year 1991. As of June 30, 1993, the Corporation held Student Loans with an aggregate principal balance of approximately $1.4 billion. The Corporation is the largest non-profit holder of Student Loans in the United States and the nation's fourth largest holder overall. The Corporation's secondary market purchases of Student Loans are second in volume only to the Student Loan Marketing Association (Sallie Mae).

The Corporation's Student Loan portfolio earns interest at a floating rate based on a 3.10% to 3.50% spread over 91-day Treasury bills or one-year Treasury bills. The yield on the Corporation's Student Loan portfolio may also be subject to a floor, depending upon whether the stated interest rate on the borrower's promissory note is a fixed rate (7-9%) or if the loan was financed with the proceeds of a tax-exempt bond issue, and depending on when the loan was originated. The yield on Student Loans financed or refinanced with the proceeds of tax-exempt bonds issued on or before October 1, 1993, including the Bonds, is subject to a 9.5% floor.

For more information about the Corporation's Student Loan portfolio, its operating results and its financial condition, see "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS."

## INVESTMENT CONSIDERATIONS

Prospective buyers should consider carefully the following factors, in addition to the other information contained in this Official Statement, before purchasing the Bonds offered hereby.

### Government Regulation

The Corporation's principal business is acquiring and holding Student Loans. Every significant aspect of this business, from marketing to collection of loans, is subject to extensive regulation under the Act and the related rules of the Department. See "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM." The Corporation is also subject to the rules and regulations of, and examination by, the

6

agencies that act as guarantors of the Student Loans.  See "DESCRIPTION OF THE CORPORATION'S LOAN PROGRAM - Regulation."

The Act requires servicers to exercise "due diligence" (as defined in the regulations under the Act) in connection with the collection of Student Loans.  Servicing of Student Loans held by the Corporation is performed by third-party servicers pursuant to contracts under which the servicer covenants to service the Student Loans in compliance with the Act.  The Corporation's servicing agreements provide that any such servicer must indemnify the Corporation for losses due to errors in servicing.  Nonetheless, the regulations of the Department under the Act provide that the Department may disqualify an eligible holder of Student Loans from further federal insurance if the Department is not satisfied that such holder has met applicable due diligence requirements.  In addition, the guarantee agencies that provide direct guarantees of the Student Loans prescribe additional collection procedures.  Failure to comply with these procedures could lead to loss of guarantee coverage on the relevant Student Loan or could disqualify the holder from acquiring or originating Student Loans guaranteed by the relevant guarantee agency.  The Corporation is currently an eligible holder of Student Loans and believes that it is in material compliance with the requirements of the Act and of the guarantee agencies.

Although the Corporation believes that it is in compliance in all material respects with applicable laws, rules and regulations, more restrictive laws, rules and regulations, if adopted in the future, could make compliance more difficult or expensive, impose additional restrictions on the Corporation's operational activities or otherwise adversely affect the Corporation's operations or prospects.  Failure to comply with existing or future regulatory requirements could lead to loss of approved status as a lender or holder of Student Loans, termination of existing contractual arrangements or administrative enforcement proceedings, any of which would adversely affect the Corporation's operations and prospects.

## Possible Changes in Legislation

Substantially all of the Corporation's loan acquisition operations consist of acquiring Student Loans made under the provisions of the Act.  The Higher Education Amendments of 1992 extended the programs authorized by the Act for an additional six years, to September 30, 1998, but there can be no assurance that the provisions of the Act will be reauthorized at that time.  Moreover, the Act is subject to amendment by Congress at any time prior to its expiration date, and any such amendments, as well as the failure by Congress to reauthorize the Act in 1998, could have a materially adverse effect on the Corporation's operations and prospects.  Recently enacted amendments are expected to affect dramatically the operations of the programs previously authorized under the Act.  See "1993 Amendments" herein.

Federal payments in connection with the guaranteed student loan programs authorized by the Act are subject to the federal budget process.  In recent years, federal budgets have provided for the recovery of certain funds held by guarantee agencies in order to achieve reductions in federal spending.  Moreover, continuing federal budget deficits could increase pressure for modifications to the Act that would require lenders and secondary market holders of Student Loans to share some of the program's costs or modify their approach to doing business with the riskier segments of the market.  Recent legislation has required holders of Student Loans to implement new reporting requirements and system changes to maintain federal reinsurance.  Future federal budgets or regulatory actions may adversely affect expenditures by the Department or the financial condition of the Corporation or guarantee agencies.

## 1993 Amendments

The Omnibus Budget Reconciliation Act of 1993, which was approved by the President on August 10, 1993, contains provisions that are expected to alter materially the operations of the Federal Family Education Loan Program and of all holders of Student Loans, including the Corporation. Title IV of the Omnibus Budget Reconciliation Act of 1993 contains amendments to the Act (the "1993 Amendments") which mandate substantial changes in the existing loan programs authorized under the Act and which include the Student Loan Reform Act of 1993, establishing a Federal Direct Student Loan Program in addition to the Federal Family Education Loan Program.

Although the President had proposed to eliminate the existing Federal Family Education Loan Program by the federal fiscal year ending September 30, 1997, the 1993 Amendments provide for a more gradual phase-in of the new direct loan program. The existing program has been retained, albeit with sharply reduced loan volume and subject to various modifications intended to reduce costs.

Under the Federal Direct Student Loan Program established by the Student Loan Reform Act of 1993, approved institutions of higher education, or alternative loan originators approved by the Department, are to make loans to students or parents without application to or funding from outside lenders or guarantors. The Department is to provide the funds for such loans, and the program is to provide for a variety of flexible repayment plans, including extended, graduated and income-contingent repayment plans, forbearance of payments during periods of national service and consolidation under the direct loan program of existing Student Loans. Such consolidation is in effect expected to permit borrowers to prepay Student Loans and consolidate them into a direct consolidation loan under the new program.

The first loans under the new direct loan program are to be available for the 1994-1995 academic year, and the Department is instructed to implement the program so as to achieve an expeditious but orderly transition from the existing loan programs to the direct student loan program. The legislation articulates phase-in goals as follows: for the 1994-1995 academic year, direct loans are to represent 5% of new student loan volume under the Act (excluding consolidation loans); for the 1995-1996 academic year, 40% of such volume; for the 1996-1997 and 1997-1998 academic years, 50% of such volume; and for the 1998-1999 academic year, 60% of such volume. The 50% and 60% goals may be exceeded in the applicable years if the Department determines that a higher percentage is warranted by the number of institutions of higher education desiring to participate in the program and meeting the eligibility requirements for such participation.

The 1993 Amendments provide funding for existing guarantee agencies during the transition and establish alternative mechanisms to ensure payment on loan guaranties made by guarantors that cease to operate. The Department is allowed to require a guarantor under the Act to return to the Department all or a portion of its reserve fund in certain circumstances and is given increased flexibility to terminate a guarantor's reinsurance agreement if the Department determines that termination is necessary to protect the federal government's fiscal interests or to ensure an orderly transition to the direct lending program. The legislation does not impair the Department's obligation to assume responsibility for the functions of a guarantee agency as to the payment of outstanding Student Loans that were guaranteed by such agency. See "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM -- Federal Insurance and Reinsurance of Guarantors" herein.

8

The 1993 Amendments also make various changes to the Federal Family Education Loan Program which may have an adverse effect on revenues to lenders and secondary market institutions, including the Corporation, from new Student Loans originated and purchased under the program. Yields to holders of Student Loans are to be reduced, new fees are to be imposed and guarantor payments to holders of defaulted Student Loans are to be reduced. (For a description of the program including the changes under the 1993 Amendments, see "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" herein.)

Transition to a direct lending program as contemplated by the 1993 Amendments is expected to lead to a smaller volume of Student Loans being made than would otherwise have been made. The financial impact on the Corporation of such reduction in volume cannot yet be assessed.

## SELECTED HISTORICAL FINANCIAL DATA

The following tables present selected financial data derived from the audited financial statements of the Corporation and the related notes thereto for each of the years in the five-year period ended December 31, 1992 and for the first six months of 1992 and 1993. This information should be read in conjunction with the combining financial statements of the Corporation and Nellie Mae, Inc. and the notes related thereto and "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS" included elsewhere in this Official Statement.

9

**Balance Sheets**
(dollars in thousands)

As of June 30, (unaudited)

| ASSETS | 1993 | 1992 |
|---|---|---|
| Cash and investments | $  34,402 | $  38,252 |
| Student loans receivable | 1,457,346 | 1,368,967 |
| Accrued investment income receivable | 311 | 74 |
| Accrued student loan interest and special allowance receivable | 25,088 | 21,440 |
| Costs of issuance, net of amortization | 6,230 | 6,462 |
| Other assets | 3,555 | 1,956 |
| Total Assets | $1,526,932 | $1,437,151 |

| LIABILITIES AND NET ASSETS | | |
|---|---|---|
| Accounts payable and accrued expenses | $  2,405 | $  1,600 |
| Deferred gain | 12,332 | 0 |
| Accrued interest payable | 15,659 | 13,520 |
| Notes payable | 741,000 | 783,082 |
| Bonds payable | 670,636 | 582,750 |
| Total Liabilities | $1,442,032 | $1,380,952 |
| Net Assets | 84,900 | 56,199 |
| Total Liabilities and Net Assets | $1,526,932 | $1,437,151 |

As of December 31,

| | 1992 | 1991 | 1990 | 1989 | 1988 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and investments | $33,652 | $28,116 | $54,411 | $43,898 | $88,319 |
| Student loans receivable | 1,436,437 | 1,235,511 | 1,192,852 | 847,719 | 667,834 |
| Accrued investment income receivable | 320 | 35 | 265 | 698 | 719 |
| Accrued student loan interest and special allowance receivable | 25,183 | 19,932 | 23,996 | 16,281 | 12,055 |
| Costs of issuance, net of amortization | 6,581 | 6,932 | 6,426 | 7,369 | 7,872 |
| Other assets | 1,801 | 2,809 | -- | -- | 851 |
| Total Assets | $1,503,974 | $1,293,335 | $1,277,950 | $915,965 | $777,650 |
| **LIABILITIES AND NET ASSETS** | | | | | |
| Accounts payable and accrued expenses | $1,141 | 1,392 | $747 | $487 | $735 |
| Accrued interest payable | 13,883 | 6,863 | 9,155 | 7,452 | 6,625 |
| Notes payable | 793,928 | 861,750 | 858,113 | 506,532 | 374,901 |
| Bonds payable | 625,804 | 379,185 | 379,185 | 379,185 | 379,185 |
| Total liabilities | $1,434,756 | $1,249,190 | $1,247,200 | $893,656 | $761,446 |
| Net assets | 69,218 | 44,145 | 30,750 | 22,309 | 16,204 |
| Total liabilities and net assets | $1,503,974 | $1,293,335 | $1,277,950 | $915,965 | $777,650 |

Source:  Corporation management.

10

## Statements of Operations and Changes in Net Assets
### (dollars in thousands)

For the Six Months Ended June 30, (unaudited)

|  | 1993 | 1992 |
|---|---|---|
| **REVENUES** |  |  |
| Investment income | $ 966 | $ 1,703 |
| Interest and special allowance |  |  |
| on student loans | 61,532 | 55,395 |
| Total Revenues | $62,498 | $57,098 |
|  |  |  |
| **EXPENSES** |  |  |
| Interest expense | $33,007 | $31,860 |
| Amortization of costs of issuance | 2,857 | 3,678 |
| Administrative expenses | 6,973 | 5,525 |
| Management fee expenses | 3,977 | 3,981 |
| Total Expenses | $46,814 | $45,044 |
|  |  |  |
| Net Revenues | $15,684 | $12,054 |
|  |  |  |
| **NET ASSETS** |  |  |
|  |  |  |
| Beginning of period | 69,216 | 44,145 |
|  |  |  |
| End of Period | $84,900 | $56,199 |

For the Year Ended December 31,

|  | 1992 | 1991 | 1990 | 1989 | 1988 |
|---|---|---|---|---|---|
| **REVENUES** |  |  |  |  |  |
| Investment income | $2,278 | $3,635 | $5,813 | $5,785 | $5,664 |
| Interest and special allowance |  |  |  |  |  |
| on student loans | 116,092 | 110,718 | 108,358 | 83,309 | 55,305 |
| Total Revenues | $118,370 | $114,353 | $114,171 | $89,094 | $60,969 |
|  |  |  |  |  |  |
| **EXPENSES** |  |  |  |  |  |
| Interest expense | $66,109 | $78,816 | $85,787 | $66,413 | $44,280 |
| Amortization of costs of issuance | 7,444 | 4,052 | 3,511 | 3,250 | 2,715 |
| Administrative expenses | 11,610 | 10,467 | 9,300 | 7,414 | 5,898 |
| Management fee expenses | 8,134 | 7,623 | 7,132 | 5,912 | 4,373 |
| Total Expenses | $93,297 | $100,958 | $105,730 | $82,989 | $57,266 |
|  |  |  |  |  |  |
| Net Revenues | $25,073 | $13,395 | $8,441 | $6,105 | $3,703 |
|  |  |  |  |  |  |
| **NET ASSETS** |  |  |  |  |  |
| Beginning of period | 44,145 | 30,750 | 22,309 | 16,204 | 12,501 |
| End of period | $69,218 | $44,145 | $30,750 | $22,309 | $16,204 |

11

The following table summarizes selected financial statistics for the Corporation's fiscal years ended December 31, 1988 through 1992 and for the six months ended June 30, 1993.

(dollars in thousands)

| | As of June 30, 1993 | As of December 31, | | | | |
| | | 1992 | 1991 | 1990 | 1989 | 1988 |
|---|---|---|---|---|---|---|
| **Balance Sheet** | | | | | | |
| Total Assets | $1,526,932 | $1,503,974 | $1,293,335 | $1,277,950 | $915,965 | $777,650 |
| Total Loans | 1,457,346 | 1,436,437 | 1,235,511 | 1,192,852 | 847,719 | 667,834 |
| Total Liabilities | 1,442,032 | 1,434,756 | 1,249,190 | 1,247,200 | 893,656 | 761,446 |
| Tax Exempt Bonds | 670,636 | 625,804 | 379,185 | 379,185 | 379,185 | 379,185 |
| Taxable Notes | 741,000 | 793,928 | 861,750 | 858,113 | 506,532 | 374,901 |
| Net Assets | 84,900 | 69,218 | 44,145 | 30,750 | 22,309 | 16,204 |
| Unencumbered Assets | 209,413 | 34,946 | 10,151 | 7,800 | 4,600 | 4,000 |
| Average Assets | 1,531,438 | 1,451,676 | 1,294,318 | 1,132,355 | 838,882 | 639,209 |
| Average Earnings Assets | 1,485,813 | 1,412,066 | 1,257,739 | 1,096,949 | 811,045 | 621,104 |
| Average Loans | 1,436,786 | 1,352,376 | 1,199,998 | 1,023,569 | 749,115 | 548,019 |
| **Income Statement** | | | | | | |
| Net Interest Income | $23,466 | $41,187 | $25,221 | $19,084 | $15,330 | $10,791 |
| Net Income | 15,684 | 25,073 | 13,395 | 8,441 | 6,105 | 3,703 |
| Servicing Expense | 6,025 | 11,391 | 10,316 | 9,300 | 7,352 | 5,708 |
| Management Expense | 3,977 | 8,134 | 7,623 | 7,132 | 5,912 | 4,373 |
| **Ratios** | | | | | | |
| Return on Average Assets | 2.05% | 1.73% | 1.03% | 0.75% | 0.73% | 0.58% |
| Return on Average Earning Assets | 2.11 | 1.78 | 1.07 | 0.77 | 0.75 | 0.60 |
| Net Interest Margin | 3.16 | 2.92 | 2.01 | 1.74 | 1.89 | 1.74 |
| Capital Ratio | 5.56 | 4.60 | 3.41 | 2.41 | 2.43 | 2.09 |
| Risk Adjusted Capital Ratio | 26.78 | 22.50 | 16.20 | 11.77 | 11.73 | 9.92 |
| Average Loans/Average Assets | 93.82 | 93.16 | 92.71 | 90.39 | 89.30 | 85.73 |
| Servicing Expense Ratio | 0.84 | 0.84 | 0.86 | 0.91 | 0.98 | 1.04 |
| Management Expense Ratio | 0.55 | 0.60 | 0.64 | 0.70 | 0.79 | 0.80 |

Source:  Corporation management.

12

## MANAGEMENT'S DISCUSSION AND ANALYSIS
## OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Results of Operations**

The Corporation earned net income of $15,684,000 for the six months ended June 30, 1993, an increase of 30% over the $12,054,000 earned in the first six months of 1992. The return on average assets also increased significantly, rising to 2.05% for the first six months of 1993 versus 1.69% for the first six months of 1992.

The significant gain in net income is attributable to an increase in the student loan portfolio, to the benefits which accrue due to the low interest rate environment and to the increased utilization of tax exempt financings.

Total revenues for the first six months equaled $62,498,000 compared to $57,098,000 for the six month period ended June 30, 1992. Net interest income increased 18% to $23,466,000 for the six month period. Management expenses remained flat at $3,977,000 during the first six months of 1993 versus $3,981,000 during the first six months of 1992.

The Corporation earned record net income of $25,073,000 for the year ended December 31, 1992, an increase of $11,678,000 or 87% from the year ended December 31, 1991. Several factors combined to contribute to the significant growth in net income earned in 1992, including 16% growth in earning assets, lower spreads to Treasury bills on taxable liabilities and, most significantly, the benefit of the interest rate "floor" on Student Loans accruing in low interest rate environments. In effect, in low interest rate environments, the fixed interest rate paid by borrowers of Student Loans originated prior to October 1, 1992 becomes an interest rate "floor". Generally, the benefits from this floor begin when interest rates on the 91-day Treasury bill fall below 4.75%. The average of the 91-day Treasury bill was approximately 3.5% in 1992.

Total revenues for the year increased 3.5% to $118,370,000. Revenue growth was slower than the growth in average earning assets due to the lower level of interest rates in 1992 compared to 1991.

Interest expense declined $12,706,000 to $66,109,000 during 1992. The decline was due primarily to the fact that all of the Corporation's taxable financings and $157 million in tax-exempt financings were variable rate or were hedged to perform as variable rate liabilities, which declined with the general decline in interest rates. Management and Student Loan servicing expenses increased 6.7% and 10.4%, respectively, both significantly below the 12.7% increase in average Student Loans outstanding in 1992. In addition, both expense figures represented a smaller percentage of average Student Loans outstanding in 1992 compared to 1991.

Net interest income, which is measured as interest income earned on earning assets less interest and Student Loan servicing expenses, increased 63% in 1992 to $41,187,000. The increase was due to the increase in average earning assets and the benefits of the interest rate floor. The net interest margin improved to 2.92%, versus 2.01% in 1991 and 1.75% in 1990.

13

The following tables summarize operating results for the past three years.

## Condensed Statements of Income
(dollars in thousands)

For the Six Months Ended June 30,

| | 1993 | % Change | 1992 |
|---|---|---|---|
| Net Interest Income | $ 23,466 | 18.5% | $ 19,796 |
| Operating Expenses | 7,782 | -- | 7,742 |
| Net Income | $ 15,684 | 30.1% | $ 12,054 |

As of December 31,

| | 1992 | % Change | 1991 | % Change | 1990 |
|---|---|---|---|---|---|
| Net Interest Income | $41,187 | 63.3% | $25,221 | 32.2% | $19,084 |
| Operating Expenses | 16,114 | 36.3 | 11,826 | 11.1 | 10,643 |
| Net Income | $25,073 | 87.2% | $13,395 | 58.7% | $ 8,441 |

### Key Financial Ratios

| | As of June 30, 1993 | As of December 31, | | |
|---|---|---|---|---|
| | | 1992 | 1991 | 1990 |
| Return on Assets | 2.05% | 1.67% | 1.04% | 0.66% |
| Return on Average Assets | 2.05 | 1.73 | 1.03 | 0.75 |
| Return on Average Earnings Assets | 2.11 | 1.78 | 1.07 | 0.77 |
| Net Interest Margin | 3.16 | 2.92 | 2.01 | 1.74 |
| Servicing Expense Ratio | 0.84 | 0.84 | 0.86 | 0.91 |
| Management Expense Ratio | 0.55 | 0.60 | 0.64 | 0.70 |
| Return on Equity | 45.32 | 56.80 | 43.56 | 37.84 |

## Loan Purchases

The Corporation purchased over $426 million of Student Loans from lenders in the New England states, New York, New Jersey, California and other states in 1992. Total purchases increased by $115 million or 37% over Student Loans purchased in 1991. Through ten years of operation, the Corporation has purchased $2.5 billion in Student Loans.

Student Loans outstanding totaled $1,457,346,000 at June 30, 1993, an increase of $88,379,000 or 6.5% over June 30, 1992.

14

**Portfolio**

The following tables set forth the various characteristics of the Student Loan portfolio as of June 30, 1993 and December 31, 1992, 1991 and 1990. For information regarding characteristics of the various loan types, see "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

### Portfolio by Loan Type

| Loan Type | As of June 30, 1993 | As of December 31, 1992 | 1991 | 1990 |
|---|---|---|---|---|
| Stafford | 85.4% | 87.1% | 89.9% | 92.8% |
| PLUS | 3.3 | 3.1 | 2.2 | 1.5 |
| SLS | 6.6 | 5.9 | 4.8 | 3.4 |
| Consolidation | 4.7 | 3.9 | 3.1 | 2.3 |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% |

### Portfolio by Loan Status

| Loan Status | As of June 30, 1993 | As of December 31, 1992 | 1991 | 1990 |
|---|---|---|---|---|
| In School | 9.0% | 9.9% | 12.8% | 13.0% |
| Grace | 8.2 | 6.3 | 6.4 | 5.5 |
| Deferment | 7.8 | 8.1 | 8.1 | 7.9 |
| Repayment | 69.8 | 72.3 | 71.5 | 72.5 |
| Forbearance | 5.2 | 3.4 | 1.2 | 1.1 |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% |

### Portfolio by Guarantor

| | As of June 30, 1993 | As of December 31, 1992 | 1991 | 1990 |
|---|---|---|---|---|
| American Student Assistance Corporation | 54.5% | 54.2% | 59.8% | 63.4% |
| New York State Higher Education Services Corporation | 15.6 | 16.1 | 14.7 | 14.8 |
| Connecticut Student Loan Foundation | 11.6 | 11.7 | 14.2 | 14.5 |
| California Student Aid Commission | 7.3 | 7.3 | 2.3 | 0.0 |
| New Hampshire Higher Education Assistance Foundation | 5.6 | 5.9 | 6.3 | 5.4 |
| Other | 5.4 | 4.8 | 2.7 | 1.9 |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% |

15

Interest revenues on the Student Loan portfolio, including interest subsidy and special allowance payments received from the Department, amounted to $116,092,000 in 1992, an increase of 4.8%. Servicing expenses increased 10.4% to $11,391,000 in 1992. Student Loan servicing fees reduced the gross yield on the Student Loan portfolio by 0.84% in 1992, compared to 0.86% in 1991.

**Other Earning Assets**

Other earning assets at December 31, 1992 consisted of cash, investments in various short-term money market instruments and guaranteed investment contracts. At December 31, 1992, other earning assets totaled $33,652,000. Investments in assets other than Student Loans are governed by an investment policy adopted by the Corporation's Board of Directors.

For the year 1992, the Corporation earned $2,278,000 from its investment activities. The Corporation's focus is to remain as fully invested in Student Loans as practicable, minimizing both the size of the investment portfolio and the earnings derived from it. Earnings and principal collections received from the Student Loan portfolio are reinvested in new Student Loans or used to reduce short-term debt. In 1992, average Student Loan assets equaled 93.2% of average total assets, compared to 92.7% in 1991.

**Financings**

In 1992, the Corporation entered into, issued or remarketed over $973.3 million in various taxable and tax-exempt financings. These sources, along with $221 million in principal collections on Student Loans, provided the Corporation with the funds necessary to finance the acquisition of Student Loans. Among these financings were several innovative financings, using senior/subordinated structured transactions to obtain triple-A ratings. In 1993, the Corporation has completed three public offerings of senior unsecured debt in an aggregate amount of $279,305,000. In each of these offerings, the bonds are currently rated A1, A- and A by Moody's Investors Service, Standard & Poor's Ratings Group and Fitch Investors Service, respectively.

A substantial portion of the Corporation's borrowing agreements and indentures are collateralized by discrete pools of Student Loans. At June 30, 1993, the Corporation was in substantial compliance with the terms of each of the outstanding borrowing facilities.

**Management Strategy**

The Corporation focuses its business strategy on (i) providing a high degree of service to its customer base, including lending institutions that sell loans to the Corporation, financial aid administrators at schools and student borrowers, (ii) controlling costs associated with loan servicing and its operations, (iii) minimizing interest rate risk by matching the interest rate sensitivity associated with particular assets and liabilities or by locking in minimum interest rate spreads between particular assets and liabilities and (iv) minimizing loan losses by maintaining a high quality Student Loan portfolio and closely monitoring Student Loan characteristics and servicer performance.

16

**Net Assets**

Net assets (equity) increased 51% in the twelve-month period ended June 30, 1993 to $84,900,000. Under the terms of various borrowing agreements, net revenues derived from pledged assets may remain pledged until certain collateral ratios are achieved or the debt facility is retired.

Although not legally required to do so, the Corporation has adopted an internal policy to meet or exceed the capital and risk-adjusted requirements established for adequately capitalized commercial banks by the Federal Reserve Board, which are currently 4% and 8%, respectively. At June 30, 1993, the Corporation had a tier-one capital ratio of 5.56% and a risk-adjusted capital ratio of 26.78%, versus 3.91% and 18.75%, respectively, at June 30, 1992.

The following tables present the summarized balance sheet into major categories and key balance sheet ratios.

**Condensed Balance Sheets**
(dollars in thousands)

| | June 30, 1993 | June 30, 1992 | Increase (Decrease) $ | % |
|---|---|---|---|---|
| **Assets** | | | | |
| Student Loans | $ 1,457,346 | $ 1,368,967 | $ 88,379 | 6.5% |
| Cash and Investments | 34,402 | 38,252 | (3,850) | (10.1) |
| Other Assets | 35,184 | 29,932 | 5,252 | 17.5 |
| Total Assets | $ 1,526,932 | $ 1,437,151 | $ 89,781 | 6.2% |
| **Liabilities and Net Assets** | | | | |
| Notes Payable | $ 741,000 | $ 783,082 | $ (42,082) | (5.4%) |
| Bonds Payable | 670,636 | 582,750 | 87,886 | 15.1 |
| Other Liabilities | 30,396 | 15,120 | 15,276 | 101.0 |
| Total Liabilities | $ 1,442,032 | $ 1,380,952 | $ 61,080 | 4.4% |
| Net Assets | 84,900 | 56,199 | 28,701 | 51.1 |
| Total Liabilities and Net Assets | $ 1,526,932 | $ 1,437,151 | $ 89,781 | 6.2% |

| | June 30, 1993 | June 30, 1992 | Increase (Decrease) % |
|---|---|---|---|
| **Selected Balance Sheet Ratios** | | | |
| Capital Ratio | 5.56% | 3.91% | 42.2% |
| Risk Adjusted Capital Ratio | 26.78 | 18.75 | 42.8 |
| Average Loans to Average Assets | 93.82 | 91.09 | 3.0 |
| Average Earning Assets to Average Assets | 97.02 | 97.37 | (0.4) |

17

**Loan Loss Protection**

Substantially all of the Corporation's Student Loans are guaranteed against defaults, death, disability and bankruptcy by various third-party guarantors, which in turn, are reinsured by the Department. These guarantees and reinsurance arrangements are dependent upon compliance with certain regulatory standards established by the guarantors and the Department. As a result, and assuming compliance with such standards, the Corporation does not bear financial exposure from Student Loans which may default and therefore has not established a loan loss reserve. In addition, the Corporation retains full recourse to servicers and prior lenders in the event a default claim is denied by a guarantor due to their noncompliance. When a guaranty claim is denied, the Corporation writes off those Student Loans that are not covered by recourse provisions and that are deemed uncollectible.

**Interest Rate Sensitivity**

The Corporation seeks to minimize its exposure to fluctuating interest rates by matching the rate sensitivity of its assets and liabilities. Where appropriate, the Corporation has employed interest rate exchange agreements to provide a better match between the interest rate characteristics of particular assets and liabilities. At June 30, 1993, the Corporation had outstanding interest exchange agreements with a notional amount of $525 million. The chart below illustrates the interest rate sensitivity of the Corporation as well as the effects of the interest rate exchange agreements.

**Interest Rate Sensitivity Period**
As of June 30, 1993
(dollars in thousands)

| | 0-7 Days | 8-30 Days | 31-90 Days | 91-365 Days | 1-2 Years | 2-3 Years | Over 3 Years |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Student Loans | $ 1,313,490 | $ | $ | $143,856 | $ | $ | $ |
| Cash and Investments | 18,643 | | | | | | 15,759 |
| Fixed Assets | | | | | | | |
| Other Assets | 35,185 | | | | | | |
| | 1,367,318 | 0 | 0 | 143,856 | 0 | 0 | 15,759 |
| **LIABILITIES AND NET ASSETS** | | | | | | | |
| Notes Payable | 256,000 | | 260,000 | | | 150,000 | 75,000 |
| Bonds Payable | | | | 71,790 | | | 598,846 |
| Interest Exchange Agreements | 425,000 | 50,000 | (200,000) | | | (150,000) | (125,000) |
| Other Liabilities | 30,397 | | | | | | |
| Net Assets | | | | | | | 84,900 |
| | 711,397 | 50,000 | 60,000 | 71,790 | 0 | 0 | 633,746 |
| **Period Gap** | 655,921 | (50,000) | (60,000) | 72,066 | 0 | 0 | (617,987) |
| **Cumulative Gap** | $ 655,921 | $ 605,921 | $545,921 | $617,987 | $617,987 | $ 617,987 | $ 0 |

18

# MANAGEMENT

## Directors

The Corporation is authorized to have not less than 15 nor more than 21 directors. The Board of Directors presently consists of 19 positions. The Enabling Act provides that directors shall be elected by the Board of Directors and shall serve for a term established by the Corporation's by-laws. The Corporation's Board of Directors must be one-third representatives of lending institutions, one-third representatives of educational institutions and one-third representatives of the general public. Certain financial institutions whose officers, directors or employees are also serving on the Corporation's Board of Directors have entered or can be expected to enter into Student Loan purchase agreements with the corporation and sell eligible loans to the Corporation.

The following persons are the directors of the Corporation:

| Name and Position Held | Principal Occupation |
|---|---|
| Peter J. Blampied, Member of the Executive Committee . . . . . . . . . . | Chairman and Chief Executive Officer, Boston Five Cents Savings Bank, Boston, Massachusetts |
| John T. Casteen, III, Member of the Executive Committee . . . . . . . . . . | President, University of Virginia, Charlottesville, Virginia |
| Dr. Daniel S. Cheever, Jr. . . . . . . . . . . | President, American Student Assistance Corporation, Boston, Massachusetts |
| Dr. Joseph M. Cronin . . . . . . . . . . . . | President, Bentley College, Waltham, Massachusetts |
| Richard G. Dooley, Chairman of the Board and the Executive Committee . . . . . . . . . . | Retired Executive Vice President and Chief Investment Officer, Massachusetts Mutual Life Insurance Company, Springfield, Massachusetts |
| Paul M. Ferguson . . . . . . . . . . . . . . . . | Senior Vice President/Credit Administration, Concord Savings Bank, Concord, New Hampshire |
| Katharine Hanson, Member of the Executive Committee . . . . . . . . | Executive Director, Consortium on Financing Higher Education, District of Columbia |
| Ronald A. Homer, Member of the Executive Committee . . . . . . . . . . . | Chairman and Chief Executive Officer, Boston Bank of Commerce, Boston, Massachusetts |

19

| | |
|---|---|
| John C. Hoy, Vice Chairman and Member of the Executive Committee . . . . . . . . . . . | President, New England Board of Higher Education, Boston, Massachusetts |
| Alice Jelin Isenberg . . . . . . . . . . . . . . . . | President, School Business Partnership Services, Boston, Massachusetts |
| Bennett D. Katz . . . . . . . . . . . . . . . . | Trustee, University of Maine, Augusta, Maine |
| Judith Kurland . . . . . . . . . . . . . . . . | Former Commissioner, Boston City Hospital, Boston, Massachusetts |
| Leonard N. Mainiero . . . . . . . . . . . . . . | Executive Vice President, People's Bank, Bridgeport, Connecticut |
| Walter R. Peterson . . . . . . . . . . . . . . | President, Franklin Pierce College, Rindge, New Hampshire |
| William J. Ryan, Member of Executive Committee . . . . . . . . . . . | Chairman and Chief Executive Officer, People's Heritage Savings Bank, Portland, Maine |
| Consuelo Gonzales Thornell . . . . . . . . . . | Market Research Consultant, Dorchester, Massachusetts |
| Dr. William E. Trueheart . . . . . . . . . . . | President, Bryant College, Smithfield, Rhode Island |
| Robert A. Wells . . . . . . . . . . . . . . . . | President and Chief Executive Officer, Berkshire County Savings Bank, Pittsfield, Massachusetts |

**Officers and Employees**

The following persons are the officers of the Corporation:

| Name | Position Held | Year Commenced Employment |
|---|---|---|
| Lawrence W. O'Toole . . . . . . . | President | 1982 |
| John F. Remondi . . . . . . . . . | Treasurer | 1988 |
| Diane L. Saunders . . . . . . . . | Clerk | 1987 |

20

Mr. O'Toole has served as President of the Corporation since its formation.  Mr. O'Toole previously was Vice President and General Counsel of the Massachusetts Higher Education Assistance Corporation (now known as American Student Assistance Guarantor) from 1980 until April, 1983 and General Counsel of the New York State Higher Education Services Corporation from 1977 to 1980.  Mr. O'Toole currently serves as the Chairman of the Board of Directors and Acting President of Education Loan Services, Inc. and a director of the American Student Assistance Guarantor.  Mr. O'Toole received a B.A. degree in 1972 from Adelphi University and a J.D. degree in 1975 from Union University.

Mr. Remondi joined the Corporation in August, 1988 and has served as Treasurer and Chief Financial Officer of the Corporation since December, 1988 and as Senior Vice President of Finance and Administration since January, 1992.  Mr. Remondi previously was an Assistant Vice President of Corporate Finance at BayBank Boston, N.A., from 1984 to 1988.  He received a B.A. degree in 1984 from Connecticut College.

Ms. Saunders joined the Corporation in August, 1987 and has served as Clerk of the Corporation since June, 1990.  Prior to becoming Clerk, she had served as Assistant Clerk since September, 1989.  Ms. Saunders also currently serves as Vice President for Corporate Communications and Public Affairs.  Ms. Saunders previously worked as a consultant for both the Ministry of Local Government and the Ministry of Education for the Government of Botswana, Southern Africa, from 1981 to 1987.  Ms. Saunders received a B.A. degree from Portland State University.

Each of the foregoing officers is also an officer and employee of Nellie Mae, Inc.    See "MANAGEMENT -- Nellie Mae, Inc."

## Nellie Mae, Inc.

Nellie Mae, Inc. was incorporated in 1985 as a non-profit corporation pursuant to Chapter 180 of the Massachusetts General Laws and qualifies as a 501(c)(3) corporation under the Code.  It was created in order to provide secondary market support for private supplemental loan programs, an activity in which the Corporation could not engage under the Code and the Enabling Act.  The Board of Directors and officers of Nellie Mae, Inc. and the Corporation are the same.  The loan programs administered by Nellie Mae, Inc. include EXCEL, SHARE, GradSHARE, GradEXCEL and IBM PS/2 Loan for Learning.

Effective January 1,1986, the Corporation entered into an administrative services contract with Nellie Mae, Inc.  Pursuant to the administrative services contract, Nellie Mae, Inc. provides management, financial and administrative services in support of the Corporation's Student Loan purchase program.  All administrative expenses (primarily consisting of salaries, occupancy and general administrative expenses) are paid by and absorbed as expenses of Nellie Mae, Inc.  The Corporation absorbs its allowable portion of these expenses through payment of a management fee.  This fee is determined by management and approved by the Board of Directors based on the budgeted administrative expenses at the beginning of each year  As of June 30, 1993, Nellie Mae, Inc. had 120 employees.

21

In addition to the officers of the Corporation who serve in the same offices for Nellie Mae, Inc., the following persons are officers and employees of Nellie Mae, Inc. and perform critical management roles for the Corporation:

| Name | Position Held | Year Commenced Employment |
|---|---|---|
| Peter Mino | Senior Vice President of Operations and Technology | 1990 |
| Sheila Ryan | Director of Strategic Planning and Development | 1987 |
| Richard Tillotson | Regional Vice President of Marketing/Northeastern Region | 1983 |
| Eugene Cattie | Regional Vice President of Marketing/Southeastern Region | 1992 |

Mr. Mino joined Nellie Mae, Inc. as the Vice President/Group Executive of the Federal Loan Program in July of 1990 and has been serving as Senior Vice President of Operations and Technology since January of 1992. Prior to this position, Mr. Mino was Vice President of Operations for Citicorp's National Student Loan Business (1986-1990) and was Corporate Director of Information for Sybron Corporation (1980-1986). Mr. Mino received his B.B.A. degree from the Rochester Institute of Technology.

Ms. Ryan joined Nellie Mae, Inc. in July of 1987 and has served as Director of Strategic Planning and Development of the Corporation since July of 1989. Ms. Ryan was previously employed by the Student Loan Marketing Association and the Vermont Student Assistance Corporation. On behalf of the Corporation, Ms. Ryan serves as Co-Chair of the National Council of Higher Education Loan Programs Regulations Committee. Ms. Ryan received a B.A. degree from Johnson State College.

Mr. Tillotson joined the Corporation in September of 1983 and is currently the Regional Vice President of Marketing for the Northeastern Region of Nellie Mae, Inc. Mr. Tillotson was previously employed at American Student Assistance Corporation as a Program Review Officer. Prior to this, Mr. Tillotson was the Assistant Treasurer of a New Hampshire thrift institution. Mr. Tillotson received an associate degree in Business Administration from Hesser College and is a graduate of the Maine/New Hampshire School of Savings and Banking.

Mr. Cattie joined Nellie Mae, Inc. in November of 1992 as the Regional Vice President of Marketing for the Southeastern Region. Mr. Cattie was previously employed by United Student Aid Funds, Inc. as a Senior Vice President of Corporate Development (1990-1992) and as the Executive Director of the Virginia Education Loan Authority (1977-1990). Mr. Cattie received his B.S. degree from LaSalle University.

22

## DESCRIPTION OF THE CORPORATION'S LOAN PROGRAM

The Corporation purchases and originates Student Loans made pursuant to the Act and the Federal Family Education Loan Programs authorized thereunder. The Act provides for several programs of loans to students and parents of students attending eligible institutions. Student Loans made prior to October 1, 1993 are guaranteed as to 100%, and with respect to Student Loans originated thereafter as to 98%, of principal and accrued interest against default, death, disability or bankruptcy by either state or private non-profit guarantee agencies. The guarantee agencies are reinsured by the Department 80-100% with respect to Student Loans made prior to October 1, 1993, and 78-98% with respect to Student Loans originated thereafter, depending upon their default claims experience.

During calendar year 1992 the Corporation purchased or originated more than $426 million of Student Loans, compared to $311 million in calendar year 1991. As of June 30, 1993, the Corporation held Student Loans with an aggregate principal balance of approximately $1.4 billion. The Corporation is the largest not-for-profit holder of Student Loans in the United States and the nation's fourth largest holder overall. The Corporation's secondary market purchases of Student Loans are second in volume only to the Student Loan Marketing Association (Sallie Mae).

The Corporation's Student Loan portfolio earns interest at a floating rate based on a 3.10% to 3.50% spread over 91-day Treasury bills or one-year Treasury bills. The yield on the Corporation's Student Loan portfolio may also be subject to a floor depending upon whether the stated interest rate on the borrower's promissory note is a fixed rate (7-9%) or if the loan was financed with the proceeds of a tax-exempt bond issue. The yield on Student Loans financed or refinanced with the proceeds of tax exempt bonds originally issued on or before October 1, 1993, including the Bonds, is subject to a 9.5% floor.

For more information about the Corporation's Student Loan portfolio, its operating results and its financial condition, see "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS."

### Student Loan Industry Overview

The Department administers the Federal Family Education Loan Program (the "Program") under Title IV of the Act. Student Loans made prior to October 1, 1993 are guaranteed as to 100%, and with respect to Student Loans originated thereafter as to 98%, of principal and accrued interest against default, death, disability or bankruptcy by either state or private non-profit guarantee agencies. The agencies, in turn, are reimbursed by the Department for between 80% and 100% of their losses from default claims paid on loans made prior to October 1, 1993 and between 78% and 98% with respect to Student Loans originated thereafter. Amounts payable by guarantee agencies that are not reimbursed by the Department may be covered by insurance premiums, reserve funds, investment income, federal cost allowances and collections on defaulted loans. Approximately 7,800 lenders and 46 guarantee agencies participate in the program, with close to $60 billion in guaranteed student loans currently outstanding. For a description of the Act and the terms of the guaranteed student loans, see "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM."

The 1992 Amendments reauthorized and expanded the scope of the Program by increasing loan limits for current programs and introducing a new loan program covering previously ineligible students.

23

The Program is comprised of several loan programs with different eligibility profiles and varying loan terms: subsidized Stafford Loans, Parent Loans to Undergraduate Students (PLUS), Supplemental Loans to Students (SLS), Consolidation Loans and a new Unsubsidized Stafford Loan program. The 1992 Amendments also authorized an experimental direct lending program.

The 1993 Amendments, however, make various changes to the Federal Family Education Loan Program which may have an adverse effect on revenues to lenders and secondary market institutions, including the Corporation, from new Student Loans originated and purchased under the program. Yields to holders of Student Loans are to be reduced, new fees are to be imposed and guarantor payments to holders of defaulted Student Loans are to be reduced. (For a description of the program including the changes under the 1993 Amendments, see "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM" herein.)

Industry-wide volume of Student Loans totalled approximately $14.8 billion in the federal fiscal year ended September 30, 1992. Dollar volume of new loans in 1992 was up 9.4% over the federal fiscal year ended September 30, 1991, continuing a general trend of increasing volume. The major reason for this increase in loan volume is the increased cost of education. Total educational costs have risen at a compound annual growth rate of 7.91% between 1980 and 1991, outpacing the Consumer Price Index, which rose by 4.36% per annum over the same period. According to the Department, the average annual cost in 1990-91 of attending a four-year private school was $14,351.

An increase in the number of students enrolled in post-secondary schools has also contributed to the increase in loan volume. Between 1986 and 1990 college enrollment increased by 1.2 million students to 13.7 million. Increased enrollment is attributed, in part, to heightened emphasis being placed on post-secondary education, evidenced by the higher proportion of the population between the ages of 18 and 24 years now attending college. In addition, budget pressures at both the state and federal levels have limited increases or caused cutbacks in the amount of available grant aid to students, causing more students to rely on loans.

Unless otherwise indicated, all industry-related statistics in this Official Statement are derived from Department publications or information submitted by guarantee agencies to the Department. Such information is compiled for federal fiscal years ending September 30. Loan volume, as defined by the Department, represents commitments for Stafford, SLS and PLUS Loans guaranteed during the Federal fiscal year.

**Acquisition of Student Loans**

The Corporation is the largest non-profit holder of student loans and the fourth largest holder of student loans nationally. As of June 30, 1993, the Corporation's student loan portfolio equalled approximately $1.4 billion.

The Corporation acquires Student Loans from various lenders who originate Student Loans. Prior to the purchase of loans from a lender, the Corporation enters into a Student Loan Purchase Agreement with that lender. The Corporation has in place Student Loan Purchase Agreements with over 400 lenders. The Corporation may enter into additional Student Loan Purchase Agreements with other lenders in the future.

Under the Student Loan Purchase Agreements each lender agrees to sell to the Corporation a specified amount of Student Loans at specified times. Each lender, with respect to each Student Loan under a Student Loan Purchase Agreement, represents that at the date of sale to the Corporation each loan is Guaranteed or Insured as to 100% of principal plus accrued interest payable by the borrower. Each lender makes additional representations as to the validity, enforceability and transferability of each loan, as to the legal authority of the lender to engage in the transactions contemplated by the respective Student Loan Purchase Agreement, and as to the non-existence of any liens on such loans.

If any representation by a lender with respect to a Student Loan proves to have been materially incorrect, or if a Guarantor or the Department refuses to honor all or part of a guaranty or insurance claim filed with respect to any Student Loan on account of any circumstance or event occurring prior to the sale of such loan to the Corporation, the Corporation may require the lender to repurchase such loan at a price equal to the then outstanding principal balance, plus accrued interest and Special Allowance Payments, if any, plus any expenses incurred by the Corporation in connection therewith or to substitute a different Student Loan if the terms and condition of such loan are acceptable to the Corporation. The ability of the Corporation to effect the repurchase of loans may depend on the financial condition of a lender at the time repurchase is demanded and no representation is made by the Corporation concerning the creditworthiness of any lender. Some of the terms of the Student Loan Purchase Agreements vary from one another, but the provisions are generally as described above.

The Corporation also originates Student Loans. In 1992, the Corporation originated $23 million in student loans. The borrowers for whom the Corporation originates Student Loans include loan consolidation borrowers, repeat borrowers and referrals from financial aid administrators.

## Marketing

The Corporation markets its products and services to financial institutions and financial aid administrators. In secondary market activities, the Corporation competes on the basis of service and price. Institutions selling Student Loans are interested not only in price, but that the level of service provided to them and to the student customers is of superior quality.

In origination activities, the Corporation competes primarily on the basis of service. The Corporation, together with Nellie Mae, Inc., focus on offering a complete product line and providing high quality service to the financial aid administrators and the student borrowers.

## Guarantee Agencies

The Act authorized guarantee agencies to support education financing and credit needs of students at post-secondary schools. The Act requires every state either to establish its own agency or to contract with another guarantee agency. Under various programs throughout the United States, guarantee agencies insure and sometimes service and hold guaranteed student loans. The guarantee agencies are reinsured by the federal government for 78% to 100% of claims paid, depending on their default claims experience and when the loans were made. The 1993 Amendments reduce the federal reimbursement rates paid to guarantee agencies with respect to claims paid on defaulted Student Loans made on or after October 1, 1993. See "THE FEDERAL FAMILY EDUCATION LOAN PROGRAM -- Federal Insurance and Reinsurance of Guarantors."

25

Guarantee agencies collect a one-time insurance premium ranging from 1% to 3% of the principal amount of each guaranteed loan, depending on the guarantee agency. The 1993 Amendments prohibit guarantee agencies from charging more than 1%, effective July 1, 1994, but allow as of such date the same premium to be charged on Unsubsidized Stafford Loans, which premium was previously prohibited. Guarantee agencies are also allowed to retain a portion of their post-reimbursement collections on defaulted Student Loans (30% for loans made before October 1, 1993, 27% for loans made thereafter).

The guarantee agencies generally guarantee loans for students attending institutions in their particular state or region or for their residents attending schools in another state. States that do not have their own guarantee agency contract with United Student Aid Funds ("USAF"), a multi-state guarantee agency, or another state agency.

Substantially all Student Loans owned by the Corporation are guaranteed by one of the following guarantors:

Massachusetts Higher Education Assistance Corporation, doing business as American Student Assistance Guarantor (ASA)
New York State Higher Education Services Corporation (NYSHESC)
Connecticut Student Loan Foundation (CSLF)
New Hampshire Higher Education Assistance Foundation (NHHEAF)
California Student Aid Commission (CSAC)
New Jersey Higher Education Assistance Authority (NJHEAA)
Rhode Island Higher Education Assistance Authority (RIHEAA)
United Student Aid Funds, Incorporated (USAF)

The risk of guarantor insolvency was alleviated to a certain extent under the 1992 Amendments. The 1992 Amendments provide that in the event a guaranty agency fails to maintain certain minimum reserve requirements, it must provide a management plan to the Department. If the guaranty agency does not provide such a plan to the Department or if the Department determines that the agency has failed to improve its financial condition or is in danger of financial collapse, the Department has the authority to terminate such agency's agreement with the Department. Once an agreement has been so terminated, the Department is required to assume the functions of the agency.

For information regarding the distribution of the Corporation's portfolio among the foregoing guarantors, see "MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS -- Portfolio" herein.

**Portfolio**

At June 30, 1993, the Corporation held approximately $1.4 billion of Student Loans. The Corporation seeks to purchase student loans which meet certain return and risk parameters.

Student loans have different levels of profitability and risk characteristics depending upon several factors. These factors include payment status and default risk.

26

*Payment Status*

Loans of students that are in school are the most valuable. The minimal servicing costs and longer durations associated with these loans are the key profitability factors. Loans to students who have graduated or left school but are not yet in repayment, or who have either received a deferment or a forbearance, have similar profitability characteristics. These loans have similar servicing requirements and differ only by expected average life. Loans to borrowers in repayment are less profitable than the in-school group. Servicing costs are higher as a result of monthly payment processing and customer service inquiries. Loans that are delinquent or have gone to claim status are the least valuable because of their high servicing costs.

## Corporation Portfolio by Payment Status

| | June 30, 1993 | | 1992 | | 1991 | | 1990 | | 1989 | |
|---|---|---|---|---|---|---|---|---|---|---|
| In School | $ 131,030 | 9.0% | $ 142,207 | 9.9% | $ 158,145 | 12.8% | $ 154,568 | 13.0% | $ 96,888 | 11.5% |
| Grace | 118,794 | 8.2 | 90,496 | 6.3 | 79,073 | 6.4 | 65,590 | 5.5 | 48,667 | 5.8 |
| Deferment | 113,824 | 7.8 | 116,351 | 8.1 | 100,076 | 8.1 | 94,117 | 7.9 | 55,328 | 6.5 |
| Repayment | 1,017,187 | 69.8 | 1,039,064 | 72.3 | 883,391 | 71.5 | 864,967 | 72.5 | 631,431 | 74.8 |
| Forbearance | 76,511 | 5.2 | 48,319 | 3.4 | 14,826 | 1.2 | 13,610 | 1.1 | 12,032 | 1.4 |
| Total | $ 1,457,346 | 100.0% | $ 1,436,437 | 100.0% | $ 1,235,511 | 100.0% | $ 1,192,852 | 100.0% | $ 844,346 | 100.0% |

*Default Risk*

The default rate on student loans varies significantly from school of attendance. Generally, students who attend four year and graduate schools tend to default at lower rates than those who attend other types of schools. Students who attend proprietary schools tend to default at the highest rates. When loans default, the Corporation incurs higher servicing costs as well as the loss of an earning asset.

## Loan Portfolio by School Type

| | As of June 30, 1993 | As of December 31, | | | |
|---|---|---|---|---|---|
| | | 1992 | 1991 | 1990 | 1989 |
| Graduate | 6.0% | 7.5% | 7.9% | 7.9% | 5.9% |
| Four Year Private College | 54.0 | 51.5 | 54.4 | 53.7 | 50.5 |
| Four Year Public College | 20.4 | 23.4 | 21.7 | 22.3 | 22.9 |
| Two Year College | 7.8 | 4.3 | 3.2 | 3.4 | 3.6 |
| Proprietary | 2.9 | 3.1 | 3.7 | 3.6 | 2.6 |
| Vocational/Technical | 3.5 | 3.9 | 0.9 | 0.8 | 0.5 |
| Other | 5.4 | 6.3 | 8.2 | 8.3 | 14.0 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

27

**Delinquency Summary**
Percentage of Repayment Portfolio

| | As of June 30, 1993 | As of December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 1992 | 1991 | 1990 | 1989 |
| Current | 85.7% | 83.0% | 84.8% | 86.5% | 88.7% |
| 30-60 days | 5.2 | 5.7 | 6.1 | 6.2 | 5.1 |
| 61-90 days | 2.4 | 3.0 | 2.8 | 2.2 | 2.0 |
| 91 to 120 days | 1.3 | 1.9 | 1.6 | 1.3 | 1.1 |
| 121-150 days | 0.8 | 1.1 | 0.9 | 0.9 | 0.8 |
| 151-180 days | 0.9 | 1.1 | 0.8 | 0.8 | 0.6 |
| Over 180 days* | 3.7 | 4.2 | 3.0 | 2.1 | 1.7 |

*Includes default claims filed.

**Default History**

The Corporation's calendar year default experience expressed as a percentage of average loans in repayment is as follows.

| | |
| --- | --- |
| 1993* | 5.8% |
| 1992 | 3.2 |
| 1991 | 4.2 |
| 1990 | 3.0 |
| 1989 | 2.5 |

* Annualized

**Servicing, Collections, Claims and Recovery**

The Act requires the exercise of due diligence in the collection of Student Loans. Due diligence is defined in the Act as requiring the use of collection practices at least as extensive and forceful as those generally practiced by financial institutions for the collection of consumer loans. The Act also requires the exercise of reasonable care and diligence in the making and collection of Student Loans, and provides that the Department may disqualify an "eligible lender" (which could include the Corporation as a holder of Student Loans) from further federal insurance if the Department is not satisfied that the foregoing standards have been or will be met. An eligible lender may not relieve itself of its responsibility for meeting these standards by delegation of its responsibility to any servicing agent and, accordingly, if any

28

Servicer fails to meet such standards, the Corporation's ability to realize the benefits of insurance may be adversely affected.

The Act requires that a guaranty agency ensure that due diligence will be exercised by an eligible lender in making and collecting Student Loans guaranteed by such guaranty agency and in collecting loans which it holds. Each of the Guarantors has established procedures and standards for due diligence to be exercised by the Servicers and by eligible lenders which service loans subject to their guarantee. If the Corporation or a Servicer does not comply with the established due diligence standards, the Corporation's ability to realize the benefits of any guaranty may be adversely affected. Each Servicer is obligated under its Servicing Agreement to exercise due diligence and to ensure that its subcontractors exercise due diligence within the meaning of the Act and the applicable Guarantor's policies in the servicing, administration and collection of Student Loans. The Corporation's contracts with each of its Servicers requires the Servicer to indemnify the Corporation from any loss of Student Loan interest or principal in the event of their noncompliance with the established due diligence standards.

The Corporation currently employs third-party organizations to service its student loan portfolio. As of June 30, 1993, 65.6% of the portfolio was serviced by Education Loan Services, Inc. ("ELSI"), 29.6% was serviced by AFSA Data Corporation ("AFSA"), and 3.8% was serviced by Connecticut Assistance for Loan Servicing ("CALS"). Each of the servicers is audited annually by an independent accounting firm.

ELSI, the Corporation's largest servicer, was created in 1983 as a subsidiary of ASA. Ownership was transferred in 1986 to The Education Resources Institute, Inc. ("TERI"). TERI is a private loan guarantor created in 1986 through an initial contribution from ASA. In 1992, TERI sold a portion of its common stock in ELSI and ELSI issued common stock such that ELSI is currently owned 50% by Nellie Mae, Inc., 25% by TERI and 25% by American Student Assistance Corporation, an affiliate of ASA. Under a Shareholders Agreement, Nellie Mae, Inc. has the power to designate six of the eleven directors of ELSI. Lawrence W. O'Toole, President of the Corporation, serves as Chairman of the Board and Acting President of ELSI. ELSI is the sixth largest student loan servicer in the United States and the largest in New England. As of December 31, 1992, ELSI serviced over one million student loans representing a principal balance outstanding of $2.6 billion. In addition to the Corporation, ELSI services student loans for Sallie Mae, two other secondary markets and 63 primary lenders. ELSI is located in Braintree, Massachusetts.

AFSA Data Corporation is the second largest student loan servicer in the United States. It is a wholly owned subsidiary of Fleet Financial Group. As of December 31, 1992, AFSA serviced over 2 million borrower loans, with a principal balance outstanding of nearly $7 billion. AFSA includes as its clients secondary markets, including both the Corporation and Sallie Mae, banks, thrifts and other primary lenders. AFSA is located in Long Beach, California with additional facilities located in Utica, New York.

CALS is a division of the Connecticut Student Loan Foundation (CSLF), the designated guarantor in Connecticut under the federal loan programs. CALS only services loans which are guaranteed by CSLF. CALS is located near Hartford, Connecticut.

29

**Competition**

The student loan industry is highly competitive. The Corporation competes with approximately 7,800 other lenders and secondary market makers. Despite the large number of competitors, the industry is somewhat concentrated. According to Department statistics, as of September 30, 1991, the top 100 holders of loans held 78 percent of student loans outstanding.

The Corporation's largest competitor is Sallie Mae. Sallie Mae holds a portfolio of student loans 17 times that held by the Corporation. In addition, the Corporation competes with a variety of eligible lenders nationally to originate student loans referred by financial aid administrators.

**Financings**

The Corporation obtains funds for its operations primarily from the sale of its debt securities. The Corporation issues both taxable and tax-exempt debt securities. At June 30, 1993, the Corporation had outstanding $670,636,000 in tax-exempt bonds and $741,000,000 in taxable notes, commercial paper and bank credit lines.

A substantial portion of the Corporation's debt has been secured under various trust indentures and security agreements by the pledge of specific pools of Student Loans. Under such indentures and agreements, the earnings from the pledged pool of Student Loans may remain pledged until certain collateral ratios are achieved or the debt facility is retired. The extent to which the earnings from such pools of Student Loans can be released from the lien of such indentures and agreements or used to purchase unencumbered Student Loans held by the Corporation, thereby freeing up cash for general corporate purposes, including the payment of debt service on the Bonds, depends upon the collateral coverage and loan eligibility as well as amortization or debt redemption. Management believes that such sources of funds will be sufficient to meet the debt service requirements of the Bonds.

At June 30, 1993, the Corporation had unencumbered assets of $209,413,000. Upon the issuance of the Bonds, the Corporation will have pro forma unencumbered assets of $443,513,000. Management believes that funds derived from such unencumbered assets will be sufficient to meet the debt service requirements of the Bonds. It is the Corporation's intent to increase its issuance of unsecured debt securities and decrease its issuance of secured debt securities.

**Regulation**

*Higher Education Act Rules.* The Act specifies rules regarding loan origination practices. A lender can lose eligibility to participate in the program if it does not comply. Lenders are prohibited from offering points, premium, payments or other inducements, directly or indirectly, to any educational institution, guarantee agency or individual in order to secure loan applications, and may not offer loans as an inducement to a prospective borrower, either directly or indirectly, to purchase insurance policies or other products. In addition, a lender may not conduct unsolicited mailings of student loan applications to students who have not previously received student loans from that lender. Lenders may not engage in fraudulent or misleading advertising or discriminate against any borrower or applicant.

The Act requires the exercise of due diligence in the collection of guaranteed student loans. The Act defines due diligence as requiring specific steps at specific intervals. It also requires the exercise of reasonable care and diligence in the making and collection of loans, and provides that the Department may disqualify a lender (which could include the Corporation or the Trustee as a holder of guaranteed student loans) from originating insured loans if the Department is not satisfied that the foregoing standards have been or will be met.

*Department of Education.* The Corporation's loan program is subject to the rules and regulations of the Department and guarantee agencies with respect to originating, processing, disbursing, selling and servicing student loans. The Department is authorized to prescribe regulations that are necessary to carry out the purpose and provisions of the Act. This includes regulations concerning standards for guarantor capital levels, establishment of minimum standards with respect to sound management and accountability under the Act, collection and reporting of data on loan volume and default reimbursement by eligible lenders and guarantors, audits of eligible lenders and guarantee agencies and loan documentation review. The Department is also authorized to limit, suspend or terminate lenders from participation in the program as well as impose civil penalties for program violations by lenders or servicers.

Historically, the student loan industry has been subject to increasing regulatory and reporting requirements, concentrated primarily in the area of loan servicing due diligence. Both the Department and the guarantee agencies have established stringent servicing requirements, along with mandatory reporting and audit criteria that must be met by the lender in order to receive guarantee benefits.

During 1992, the Corporation was reviewed by the Department. Although final reports have not yet been issued, the preliminary results showed no material exceptions.

## THE FEDERAL FAMILY EDUCATION LOAN PROGRAM

Title IV of the Act provides for a two loan programs: the Federal Direct Student Loan Program providing for direct federal funding of student loans (the "Direct Loan Program") and the Federal Family Education Loan Program providing for private funding with reinsurance of student loans guaranteed or insured by a state agency or private non-profit corporation (collectively "Federal Family Education Loans" and the "Federal Family Education Loan Program"). Several types of loans are currently authorized as Federal Family Education Loans including: (i) loans with respect to which the federal government makes interest payments available to reduce student interest cost ("Stafford Loans"); (ii) supplemental loans with respect to which interest becomes due and payable prior to the commencement of repayment ("Unsubsidized Stafford Loans"); (iii) supplemental loans to graduate and professional students and independent undergraduate students and, under certain circumstances, dependent undergraduate students ("Loans to Students" or "SLS Loans"); (iv) supplemental loans to parents of dependent students ("PLUS Loans"); and (v) loans to fund payment and consolidation of the borrower's obligations under the Stafford Loans and certain other loans authorized pursuant to other federal programs ("Consolidation Loans").

This summary of the Federal Family Education Loan Program as established by the Act does not purport to be comprehensive or definitive and is qualified in its entirety by reference to the text of the Act and the regulations thereunder.

31

**Legislative and Administrative Matters**

Both the Act and the regulations promulgated thereunder have been the subject of extensive amendments in recent years and there can be no assurance that further amendments will not materially change the provisions described herein or the effect thereof. See "INVESTMENT CONSIDERATIONS - - Possible Changes in Legislation" herein. The Act was amended in 1992 by enactment of the Higher Education Amendments of 1992 (the "1992 Amendments"), the general provisions of which became effective on July 23, 1992 and which extended the principal provisions of the Federal Family Education Loan Program to September 30, 1998 (or in the case of borrowers who have received loans prior to that date, September 30, 2002, except that authority to make consolidation loans expires on September 30, 1998). The Act had been previously amended by the Higher Education Amendments of 1986 (the "1986 Amendments") and by the Higher Educational Technical Amendments Act of 1987.

Recently enacted amendments contained in Title IV of the Omnibus Budget Reconciliation Act of 1993 (the "1993 Amendments"), are expected to alter materially the operations of the Federal Family Education Loan Program and of all holders of Student Loans, including the Corporation. The 1993 Amendments provide for the establishment of a Federal Direct Student Loan Program in addition to the Federal Family Education Loan Program and impose higher costs and lower yields on the holders of Student Loans under the existing program.

**Eligibility Requirements for Stafford Loans**

The Act provides for federal (i) insurance or reinsurance of eligible Stafford Loans, (ii) interest subsidy payments ("Interest Subsidy Payments") to eligible lenders with respect to certain eligible Stafford Loans, and (iii) special allowance payments ("Special Allowance Payments") representing an additional subsidy paid by the Department to the holders of eligible Stafford Loans.

Stafford Loans are eligible for reinsurance under the Act if the eligible student to whom the loan is made has been accepted or is enrolled in good standing at an eligible institution of higher education or vocational school and is carrying at least one half the normal full-time workload at that institution. In connection with eligible Stafford Loans there are limits as to the maximum amount which may be borrowed for an academic year and in the aggregate for both undergraduate and graduate/professional study. Both aggregate limitations exclude loans made under the Supplemental Loans for Students and PLUS Programs. The Department has discretion to raise these limits to accommodate students undertaking specialized training requiring exceptionally high costs of education.

Subject to these limits, Stafford Loans are available to borrowers in amounts not exceeding their unmet need for financing as provided in the Act. Provisions addressing the implementation of need analysis and the relationship between unmet need for financing and the availability of Stafford Loan program funding have been the subject of frequent and extensive amendment in recent years. There can be no assurance that further amendment to such provisions will not materially affect the availability of Stafford Loan funding to borrowers or the availability of Stafford Loans for secondary market acquisition.

*Qualified Student*. Generally, a loan may be made only to a United States citizen or national or otherwise eligible individual under federal regulations who (i) has been accepted for enrollment or is enrolled and is maintaining satisfactory progress at an eligible institution, (ii) is carrying at least one-half of the normal full-time academic workload for the course of study the student is pursuing, as determined

32

by such institution, (iii) has agreed to notify promptly the holder of the loan of any address change and (iv) meets the application "need" requirements. Eligible institutions include higher educational institutions and vocational schools that comply with certain federal regulations. Each loan is to be evidenced by an unsecured promissory note.

*Principal and Interest*. Stafford Loans may bear interest at a rate not in excess of 7% per annum if made to a borrower to cover costs of instruction for any period beginning prior to January 1, 1981 or, subsequent to such date, if made to a borrower who, upon entering into a note for a loan, has outstanding student loans under the Federal Family Education Loan Program for which the interests rates do not exceed 7%. Stafford Loans made to new borrowers for periods of instruction between January 1, 1981 and September 13, 1983 bear interest at a rate of 9% per annum and for periods of instruction beginning on or after September 13, 1983 the rate for new borrowers is 8% per annum; loans first disbursed on or after October 1, 1992 to new borrowers shall bear interest at a variable rate, equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to June 1 of each year, plus 3.10%, with a maximum rate of 9% per annum. Stafford Loans and Unsubsidized Stafford Loans made to new borrowers on or after July 1, 1994 shall bear interest at a variable rate, equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to June 1 of each year, plus 3.1%, with a maximum rate of 8.25% per annum. Finally, Stafford Loans and Unsubsidized Stafford Loans made to new borrowers on or after July 1, 1998, shall bear interest at a rate equal to the bond equivalent rate of the U. S. Treasury security with a comparable maturity as established by the Department plus 1%, with a maximum rate of 8.25%.

Stafford Loans to first time borrowers for periods of enrollment beginning on or after July 1, 1988, but prior to July 23, 1992, will bear interest at rates of 8% per annum from disbursement through four years after repayment commences and 10% per annum thereafter, subject to a provision requiring annual discharge of principal to the extent that the sum of quarterly calculations of the amount by which interest calculated upon the rate of 10% per annum exceeds the amount which would result from application of a rate equivalent to the annual average T-Bill Rate plus 3.25%. For new loans made to all existing borrowers after July 23, 1992 and for loans made to all new borrowers after July 23, 1992 but prior to October 1, 1992, the provision that requires annual discharge of principal is effective immediately instead of after four years, the rate with which the quarterly calculation of interest is compared is equivalent to the annual average 91-day Treasury bill rate plus 3.10%, and any excess with respect to a loan for a period during which the Department is making interest subsidy payments is credited to the Department. The 1993 Amendments provide that with respect to Stafford Loans made on or after July 1, 1995, prior to the commencement of repayment and during any deferment period, the interest rate shall be equal to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to June 1 of each year, plus 2.5%, with a maximum rate of 8.25% per annum.

The Act requires that loans in excess of $1,000 made to cover enrollment periods longer than six months be disbursed by eligible lenders in at least two separate disbursements. Stafford Loans, originated prior to July 1, 1993, are subject to an aggregate limit of $17,250 for undergraduate study, while graduate or professional students, who may borrow up to $7,500 annually, are subject to an aggregate limit of $54,750, inclusive of loans for undergraduate study. The annual loan limit for undergraduate loans first disbursed on or after July 1, 1993 will be dependent on the class year of the borrower and the length of the academic year, and will range from a minimum of $2,625 for first year undergraduate borrowers to a maximum of $5,500 for undergraduate borrowers. The annual loan limit for graduate and professional loans for periods of enrollment beginning on or after October 1, 1993 is $8,500. Loans for which the first disbursement is made on or after July 1, 1993 are subject to an aggregate limit of $23,000

33

for undergraduate students and an aggregate limit of $65,500 for graduate or professional students, excluding PLUS Loans and SLS Loans. In either case, the Department has discretion to raise these limits by regulation to accommodate highly specialized or exceptionally expensive courses of study.

*Repayment*. Repayment of principal on a Stafford Loan does not commence while a student remains a qualified student, but generally begins upon expiration of the applicable grace period, as described below. Such grace periods may be waived by borrowers. In general, each loan must be scheduled for repayment over a period of not more than ten years after the commencement of repayment. The Act currently requires minimum annual payments of $600, including principal and interest, unless the borrower and the lender agree to lesser payments at least equal to accrued interest. The 1992 Amendments authorize the Department to promulgate regulations, effective for new borrowers on or after July 1, 1993, that require lenders to offer graduated or income-sensitive repayment schedules to all such borrowers and permit discharge of the remainder of a loan obligation not later than 25 years after commencement of repayment.

*Grace Period, Deferment Periods, Forbearance*. Repayment of principal of an insured student loan must generally commence following a period of (a) not less than 9 months or more than 12 months (with respect to loans for which the applicable interest rate is 7% per annum) and (b) not more than 6 months (with respect to loans for which the applicable interest rate is 9% per annum or 8% per annum and for loans to first time borrowers on or after July 1, 1988) after the student borrower ceases to pursue at least a half-time course of study (a "Grace Period"). However, during certain other periods and subject to certain conditions, no principal repayments need be made, including periods when the borrower has returned to an eligible educational institution on a full-time basis or is pursuing studies pursuant to an approved graduate fellowship program, when the borrower is a member of the Armed Forces or a volunteer under the Peace Corps Act or the Domestic Volunteer Service Act of 1973, when the borrower is temporarily totally disabled or is unable to secure employment by reason of the care required by a dependent who is so disabled, or when the borrower is on parental leave to care for a new born child or newly adopted child or is the mother of a pre-school child and is trying to re-enter the work force (the "Deferment Periods"). The lender may also allow periods of forbearance during which the borrower may defer principal payments because of temporary financing hardship. For new borrowers to whom loans are first disbursed on or after July 1, 1993, payment of principal may be deferred only while the borrower is at least a half-time student or is in an approved graduate fellowship program or is enrolled in a rehabilitation program, or when the borrower is seeking but unable to find full-time employment, subject to a maximum deferment of three years, or when for any reason the lender determines that payment of principal will cause the borrower economic hardship, also subject to a maximum deferment of three years. The 1992 Amendments also require mandatory forbearance of a loan, for up to three years, by a lender at the request of a borrower if the borrower's student loan debt burden equals or exceeds 20% of gross income.

**Interest Subsidy Payments Upon Stafford Loans**

The Department pays interest on Stafford Loans while the student is a qualified student, during a grace period or during certain periods of deferment. Deferment of principal payments is available to borrowers under conditions established by the Act. The Department makes interest subsidy payments to the owner of Stafford Loans in the amount of interest accruing on the unpaid balance thereof prior to the commencement of repayment or during any deferment period. The Act provides that the owner of an

34

eligible Stafford Loan shall be deemed to have a contractual right against the United States to receive interest subsidy payments in accordance with its provisions.

## Special Allowance Payments

The Act provides for Special Allowance Payments to be made by the Department to eligible lenders on all Federal Family Education Loans. Special Allowance Payments provide additional income to holders of eligible Federal Family Education Loans, which is meant to provide such holder with a more "equitable" return. Unlike the interest rates paid by borrowers, the yield earned by holders of Students Loans are not subject to any maximum rates. The rates for Special Allowances Payments are based on formulas that differ according to the type of loan (Stafford Loan or PLUS and SLS), the date the loan was originally made or insured and the type of funds used to finance such loan (tax-exempt or taxable). The formulas currently used to calculate Special Allowance Payment rates for Stafford Loans financed with tax-exempt proceeds and disbursed before October 1, 1992 are set forth in the following table:

| Base Interest Rate on Loan | Annualized SAP Rate/ Pre-October 1980 Loans(1) | Annualized SAP Rate/ Post-October 1980 Tax-Exempt Loans(1) |
|---|---|---|
| 7% | T-Bill - 3.5% | (T-Bill - 3.5%)/2: minimum 2.5% |
| 8% | T-Bill - 4.5% | (T-Bill - 4.5%)/2: minimum 1.5% |
| 9% | T-Bill - 5.5% | (T-Bill - 5.5%)/2: minimum 0.5% |

(1)   "T-Bill," as used in this table, means the average 13-week Treasury bill rate calculated as a "bond equivalent rate" in the manner applied by the Department of Education as referred to in Section 438 of the Act.

As noted in the foregoing table, there are minimum Special Allowance Payment rates for Stafford Loans made on and after October 1, 1980 and financed with the proceeds of tax-exempt bonds, except for loans that have rates that effectively ensure an overall minimum return of 9.5%. The formula for Special Allowance Payment rates for PLUS and SLS Loans is similar to that for post-October 1980 Stafford Loans except that no such payments are made until the rate on the PLUS or SLS Loan exceeds a certain rate per annum according to the type of loan and based on when the loan was first disbursed. The rate of Special Allowance Payments for Stafford Loans first disbursed on or after October 1, 1992 and financed with tax-exempt bond proceeds is based on the 91-day Treasury bill rate minus the base interest rate on the Loan plus 3.5%, all divided by two. With respect to Student Loans financed with the proceeds of tax-exempt bonds issued on or after October 1, 1993, the Special Allowance Payment rates will be equal to the special allowance payable on Student Loans financed with taxable funds. While the 1992 Amendments reaffirmed that the Special Allowance Payment rate for loans (including Stafford Loans, PLUS Loans and SLS Loans) financed through the issuance of tax-exempt bonds shall not be less than 9.5% minus the applicable interest rate on such loans, the 1993 Amendments eliminated this floor with respect to a Student Loans financed with the proceeds of tax-exempt bonds originally issued on or after October 1, 1993. The rate of Special Allowance Payments for Stafford Loans first disbursed on or after October 1, 1992 and financed with taxable funds is based on the 91-day Treasury bill rate plus 3.10%. During the period prior to commencement of repayment and during any deferment period,

35

holders of Stafford Loans made on or after July 1, 1995 and financed with taxable funds will receive a yield equal to the 91-day U.S. Treasury bill rate plus 2.5%. The rate on PLUS Loans first disbursed on or after October 1, 1992 must exceed 10% and for SLS Loans first disbursed on or after October 1, 1992 the rate must exceed 11%. The Special Allowance Payment rates applicable to Consolidation Loans are determined in the same manner as Stafford Loans made on or after October 1, 1980.

## Origination and Rebate Fees

Under the 1993 Amendments, holders of Student Loans will be required to pay an origination fee to the Department in the amount of 0.5% of the principal amount of Student Loans made on or after October 1, 1993. In addition, any holder of a Consolidation Loan made on or after October 1, 1993 is to pay the Department an annual rebate fee (calculated and paid monthly) in the amount of 1.05% of the principal of and accrued interest on the Consolidation Loan.

## Unsubsidized Stafford Loans

The Unsubsidized Stafford Loan program created under the 1992 Amendments is designed for students who do not qualify for Stafford Loans due to parental or student income and assets in excess of permitted amounts. Otherwise, the basic requirements for Unsubsidized Stafford Loans are essentially the same as those for the Stafford Loans. Most significant is that the interest rate, the annual loan limits and the Special Allowance Payments provisions of the Unsubsidized Stafford Loans are the same as the Stafford Loans. The terms of the Unsubsidized Stafford Loans, however, are different in some aspects. The federal government does not make interest subsidy payments before the beginning of the repayment period of the Unsubsidized Stafford Loans. The borrower must either pay interest from the time of the loan or capitalize the interest until repayment begins. Further, subject to the same loan limits established for Stafford Loans, the student may borrow the difference between cost of attendance and unmet financial need. Authority for offering the Unsubsidized Stafford Loan is effective for periods of enrollment beginning on or after October 1, 1992.

## PLUS and SLS Loan Programs

The Act authorizes PLUS Loans to be made to parents of eligible dependent students and SLS Loans to be made to certain categories of students. Only parents who do not have an adverse credit history are eligible for PLUS Loans that have a first disbursement date on or after July 1, 1993. The basic provisions applicable to PLUS and SLS Loans are similar to those of Stafford Loans with respect to the involvement of guarantors and the Department in providing federal reinsurance on the loans. However, PLUS and SLS Loans differ from Stafford Loans, particularly because federal interest subsidy payments are not available under the PLUS and SLS Programs and Special Allowance Payments are more restricted. Under the 1993 Amendments the SLS Loan Program is eliminated as of July 1, 1994, although the applicable provisions continue to apply to SLS Loans made prior to that date. Under the Direct Loan Program, the SLS Loan Program has been merged with the Federal Unsubsidized Stafford loan program into one program entitled Federal Direct Unsubsidized Stafford Loan Program.

SLS Loan limits for loans disbursed on or after July 1, 1993 will be dependent on the class year of the student and the length of the academic year. The annual loan limit for SLS Loans first disbursed

36

on or after July 1, 1993 will range from $4,000 for first and second year undergraduate borrowers to $10,000 for graduate borrowers, with a maximum aggregate amount of $23,000 for undergraduate borrowers and $73,000 for graduate and professional borrowers. The only limit on the annual and aggregate amounts of PLUS Loans first disbursed on or after July 1, 1993 is the student's unmet financial need. PLUS and SLS Loans disbursed prior to July 1, 1993 are limited to $4,000 per academic year with a maximum aggregate amount of $20,000. Prior to October 17, 1986, the applicable loan limits were $3,000 per academic year with a maximum aggregate amount of $15,000. PLUS and SLS loans are also limited, generally, to the cost of attendance minus other financial aid for which the student is eligible.

Interest rates on PLUS and SLS Loans depend upon the date of issuance of the loan and the period of enrollment for which the loan is to apply. For PLUS loans issued on or after October 1, 1981, but for periods of educational enrollment beginning prior to July 1, 1987, the applicable rate of interest is either 12 or 14 percent per annum. A variable interest rate applies to PLUS and SLS Loans made and disbursed on or after July 1, 1987 or made to refinance PLUS Loans pursuant to the Act. The variable interest rate for PLUS and SLS Loans made and disbursed on or after July 1, 1987 but prior to October 1, 1992 is reset annually for the 12-month period beginning on July 1 and ending on the following June 30, such that the rate shall be the bond equivalent rate of 52-week Treasury bills auctioned at the final auction held prior to the June 1 preceding the applicable 12-month period, plus 3.25%, with a maximum rate of 12% per annum. The variable interest rate for PLUS and SLS Loans first disbursed on or after October 1, 1992 is based on the same 12-month period as PLUS and SLS Loans disbursed prior to October 1, 1992, except that 3.10% shall be added to the bond equivalent rate of 52-week Treasury bills auctioned prior to the applicable period, with a maximum rate of 11% per annum for SLS Loans, and a maximum rate of 10% per annum for PLUS Loans. The 1993 Amendments reduce this interest rate ceiling to 9% for PLUS Loans made to new borrowers on or after July 1, 1994. PLUS Loans made on or after July 1, 1998 are to bear a rate equal to the bond equivalent rate of the U. S. Treasury security with a comparable maturity, as established by the Department, plus 2.1% (not to exceed 9%). Special Allowance Payments are available on variable rate PLUS and SLS Loans only if the rate determined by the formula above would exceed the applicable allowed maximum rate, as described above.

The 1992 Amendments provide SLS borrowers the option to defer commencement of repayment of principal until the commencement of repayment of Stafford Loans. Otherwise, repayment of principal of PLUS and SLS Loans is required to commence no later than 60 days after the date of disbursement of such loan, subject to certain deferral provisions. The deferral provisions which apply to SLS Loans are the same as those for Stafford Loans, but for SLS Loans the deferral provisions are more limited than those that apply to Stafford Loans. Repayment of interest, however, may be deferred only during certain periods specified under the Act. Further, whereas federal interest subsidy payments are not available for such deferments, the Act provides an opportunity for the capitalization of interest during such periods upon agreement of the lender and borrower.

A borrower may refinance all outstanding PLUS Loans under a single repayment schedule for principal and interest, with the new repayment period calculated from the date of repayment of the most recent included loan. The interest rate of such refinanced loan shall be the weighted average of the rates of all loans being refinanced. A second type of refinancing enables an eligible lender to reissue a PLUS Loan which was initially originated at a fixed rate prior to July 1, 1987 in order to permit the borrower to obtain the variable interest rate available on PLUS Loans on and after July 1, 1987. If a lender is unwilling to refinance the original PLUS Loan, the borrower may obtain a loan from another lender for the purpose of discharging the loan and obtaining a variable interest rate.

**The Consolidation Loan Program**

The Act authorizes a program under which certain borrowers may consolidate their various student loans into a single loan insured and reinsured on a basis similar to Stafford Loans. Consolidation Loans may be made in an amount sufficient to pay outstanding principal, unpaid interest and late charges on all federally insured or reinsured student loans incurred under and pursuant to the Federal Family Education Loan Program selected by the borrower, as well as loans made pursuant to the Federal Perkins and Health Professional Student Loan programs. These loans, for applications received on or after January 1, 1993, are available only to borrowers who have aggregate outstanding student loan balances of at least $7,500, and for applications received before January 1, 1993, are available only to borrowers who have aggregate outstanding student loan balances of at least $5,000. The borrowers must be either in repayment status or in a grace period preceding repayment and, for applications received prior to January 1, 1993 the borrower must not be delinquent by more than 90 days on any student loan payment; for applications received on or after January 1, 1993 delinquent or defaulted borrowers are eligible to obtain consolidation loans if they agree to re-enter repayment through loan consolidation. For applications received on or after January 1, 1993, borrowers may add additional loans to a Consolidation Loan during the 180-day period following origination of the Consolidation Loan. Further, a married couple whose application is received on or after January 1, 1993 and who agree to be jointly and severally liable will be treated as one borrower for purposes of loan consolidation eligibility. A Consolidation Loan will be federally insured or reinsured only if such loan is made in compliance with requirements of the Act.

Consolidation Loans bear interest at a rate which equals the weighted average of interest rates on the unpaid principal balance of outstanding loans, rounded to the nearest whole percent, with a minimum rate of 9%. Interest on Consolidation Loans accrues and, for applications received prior to January 1, 1993, is to be paid without deferral. For applications received on or after January 1, 1993 the Department pays the interest during the deferral period. Borrowers may defer periodic payments of principal under certain circumstances that are more limited than those applicable to the loans being refinanced. Deferral of principal repayments is authorized for periods similar to those for Stafford Loans. Borrowers may elect to accelerate principal payments without penalty. The rate for Special Allowance Payments for Consolidation Loans financed with tax-exempt funds is determined in the same manner as for Stafford Loans made on or after October 1, 1980. See "Special Allowance Payments" above. Further, no insurance premium may be charged to a borrower and no insurance premium may be charged to a lender in connection with a Consolidation Loan. However, a fee may be charged to the lender by the guarantor to cover the costs of increased or extended liability with respect to a Consolidation Loan.

Repayment of Consolidation Loans begins 60 days after discharge of all prior loans which are consolidated. Federal interest subsidy payments are not available with respect to Consolidation Loans. Repayment schedules must include, for applications received on or after January 1, 1993, the establishment of graduated and income sensitive repayment plans, subject to certain limits applicable to the sum of the Consolidation Loan and the amount of the borrower's other eligible student loans outstanding. The lender may at its option include such graduated and income sensitive repayment plans for applications received prior that date. Generally, depending on the total of loans outstanding, repayment may be scheduled over periods no shorter than ten but not more than thirty years in length. For applications received on or after January 1, 1993, the maximum maturity schedule is thirty years for consolidation loans of $60,000 or more.

38

**Plans for Doing Business**

In order to be eligible for the receipt of Special Allowance Payments in respect of Federal Family Education Loans which have been financed by the holder with funds obtained through the issuance of tax-exempt obligations, the holder of such loans must receive approval by the governor of the state of a plan for doing business which complies with statutory requirements. The Corporation has obtained approval of a Plan for Doing Business by the Governor of The Commonwealth of Massachusetts, the Governor of the State of New Hampshire and the Governor of the State of California.

**Federal Insurance and Reinsurance of Guarantors**

A Federal Family Education Loan is considered to be in default for purposes of the Act when the borrower fails to make an installment payment when due, or to comply with other terms of the loan, and if the failure persists for 180 days in the case of a loan repayable in monthly installments or for 240 days in the case of a loan repayable in less frequent installments.

If the loan in default is covered by federal loan insurance in accordance with the provisions of the Act, the Department is to pay the holder the amount of the loss sustained thereby, upon notice and determination of such amount, within 90 days of such notification subject to reduction as described in the third and fourth following paragraphs.

If the loan is guaranteed by a guarantor, the eligible lender is reimbursed by the guarantor for 100% of the unpaid principal balance of the loan plus accrued unpaid interest on any loan defaulted so long as the eligible lender has properly serviced such loan. Any holder of a defaulted Student Loan made on or after October 1, 1993 is to receive 98% of the unpaid principal of such loan from the applicable guarantor, except for a loan made by a lender-of-last-resort or under any agreement resulting from a guarantor insolvency.

Under the Act, the Department enters into a guaranty agreement with each guarantor which provides for federal reinsurance for amounts paid to eligible lenders by the guarantor with respect to defaulted loans. Pursuant to such agreement, the Department is to reimburse a guarantor for 100%, with respect to Student Loans made prior to October 1, 1993 and 98% with respect to Student Loans made on or after October 1, 1993, of the amounts expended in connection with a claim resulting from the death, bankruptcy, total and permanent disability of a borrower, the death of a student whose parent is the borrower of a PLUS Loan, or claims by borrowers who received loans on or after January 1, 1986 and who are unable to complete the programs in which they are enrolled due to school closure or borrowers whose borrowing eligibility was falsely certified by the eligible institution; such claims are not included in calculating a guarantor's claims rate experience for federal reinsurance purposes. The Department is also required to repay the unpaid balance of any loan if collection is stayed under the Bankruptcy Code and is authorized to acquire the loans of borrowers who are at high risk of default and who request an alternative repayment option from the Department. Further, the Department is to reimburse a guarantor for any amounts paid to satisfy claims not resulting from death, bankruptcy, or disability subject to reduction as described in the following two paragraphs.

The amount of such reinsurance payment is subject to reduction based upon the annual claims rate of the guarantor calculated to equal the amount of federal reinsurance as a percentage of the original principal amount of guaranteed loans in repayment on the last day of the prior fiscal year. The

39

reinsurance amounts with respect to Student Loans made prior to October 1, 1993, are summarized below:

| Claims Rate | Federal Payment |
|---|---|
| 0% up to 5% | 100% |
| 5% up to 9% | 100% of claims up to 5%; 90% of claims 5% and over |
| 9% and over | 100% of claims up to 5%; 90% of claims 5% and over up to 9%; and 80% of claims 9% and over |

With respect to Student Loans made on or after October 1, 1993 (other than Student Loans made pursuant to the lender-of-last-resort program or Student Loans transferred by an insolvent guarantor), the foregoing percentages are reduced from 100% to 98%, 90% to 88% and 80% to 78%.

The claims experience is not accumulated from year to year, but is determined solely on the basis of claims in any one federal fiscal year compared with the original principal amount of loans in repayment at the end of the preceding fiscal year.

The Act provides that, subject to compliance with such Act, the full faith and credit of the United States is pledged to the payment of insurance claims and such Act guarantees reinsurance is not subject to reduction. It further provides that guarantors shall be deemed to have a contractual right against the United States to receive reinsurance in accordance with its provisions. In addition, the 1992 Amendments provide that if a guarantor is unable to meet its insurance obligations, holders of loans may submit insurance claims directly to the Department for payment until such time as the obligations are transferred to a new guarantor capable of meeting such obligations or until a successor guarantor assumes such obligations. Federal reinsurance and insurance payments for defaulted loans are paid from the Student Loan Insurance Fund established under the Act. The Department is authorized, to the extent provided in advance by appropriations acts, to issue obligations to the Secretary of the Treasury to provide funds to make such federal payments.

## LEGALITY FOR INVESTMENT IN MASSACHUSETTS

The Act provides that the Bonds are securities in which all Massachusetts insurance companies, trust companies, savings banks, cooperative banks, credit unions, banking associations, investment companies, other financial institutions, executors, administrators, trustees and other fiduciaries may properly and legally invest funds, including capital in their control or belonging to them.

## TAX EXEMPTION

In the opinion of Palmer & Dodge, Bond Counsel, under existing law, interest on the Bonds is excluded from the gross income of the owners of the Bonds for federal income tax purposes. Interest on the Bonds, is not an item of tax preference for purposes of the federal alternative minimum tax

40

imposed on individuals and corporations (as defined for federal income tax purposes), but interest on the Bonds, will be taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on corporations.

The opinion of Bond Counsel does not cover the tax treatment of any of the Bonds, the transfer thereof, or the income therefrom under the laws of The Commonwealth of Massachusetts or any other state.

The Code establishes certain requirements that must be continuously satisfied subsequent to the issuance of the Bonds in order for interest on the Bonds to remain excluded from gross income for federal income tax purposes. These requirements include restrictions on the use, expenditure and investment of bond proceeds and the payment of rebates to the United States. Failure to comply with these requirements may cause interest on the Bonds to become included in the gross income of the owners thereof for federal income tax purposes retroactive to the date of issuance of the Bonds. The Corporation has covenanted in the Indenture to take all lawful action necessary under the Code to ensure that interest on the Bonds will remain excluded from gross income for federal income tax purpose and to refrain from taking any action which would cause interest on the Bonds to become included in such gross income.

Prospective purchasers of the Bonds should be aware that the Code denies a deduction for interest on indebtedness incurred or continued to purchase or carry the Bonds, or, in the case of a financial institution. for that portion of the owner's interest expense allocated to interest on the Bonds and, for insurance companies subject to the tax imposed by Section 831 of the Code, reduces the deduction for loss reserves by 15 percent of the sum of certain items, including interest on the Bonds. In addition, interest on the Bonds earned by certain corporations could be taken into account in determining the environmental tax imposed by Section 59A of the Code, or the foreign branch profits tax imposed by Section 884 of the Code, and may be included in passive investment income subject to federal income taxation under Section 1375 of the Code applicable to certain S corporations. The Code also requires recipients of certain social security and railroad retirement benefits to take into account receipts and accruals of interest on the Bonds in determining the portion of such benefits that are included in gross income. No assurance can be given that future legislation will not have adverse tax consequences for owners of the Bonds.

On the date of delivery of the Bonds, the original purchasers will be furnished with the applicable opinion of Bond Counsel substantially in the form attached hereto as Appendix C.

## ABSENCE OF LITIGATION

There is no controversy or litigation of any nature now pending or threatened, restraining or enjoining the issuance, sale, execution or delivery of the Bonds, or in any way contesting or affecting the validity of the Bonds, or any proceedings of the Corporation taken with respect to the issuance or sale thereof, the pledge or application of any moneys or securities provided for the payment of the Bonds or the due existence or powers of the Corporation.

41

## LEGALITY

The legality of the authorization, issuance and sale of the Bonds is subject to the approving legal opinion of Bond Counsel to the Corporation, Palmer & Dodge, Boston, Massachusetts. Certain legal matters are to be passed upon for the Underwriters by their counsel, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., Boston, Massachusetts.

## UNDERWRITING

All of the Bonds are to be purchased by Smith Barney Shearson Inc., The First National Bank of Boston, Pryor, McClendon, Counts & Co., Inc. and State Street Bank and Trust Company (the "Underwriters"). Subject to certain conditions, the Underwriters have agreed to purchase the Bonds at the initial public offering price set forth on the cover page hereof, plus accrued interest. The Corporation has agreed to pay the Underwriters an underwriting fee of $707,110. The Contract of Purchase provides that the Underwriters shall not be obligated to purchase any Bonds thereunder unless all such Bonds are available for purchase. The initial public offering price set forth on the cover page may be changed by the Underwriters from time to time without notice. Although there can be no assurance that any market for the Bonds will commence or be maintained, the Underwriters expect to make a market in the Bonds after the initial public offering.

## FINANCIAL STATEMENTS OF THE CORPORATION

The financial statements of the Corporation (combined with those of Nellie Mae, Inc.) as of December 31, 1992 and for the year ended, included in Appendix A, have been audited by Coopers & Lybrand, independent auditors, as stated in their report appearing herein.

## MISCELLANEOUS

The information contained in this Official Statement with respect to DTC has been furnished by DTC and has not been verified by the Corporation or the Underwriters. The Corporation and the Underwriters assume no responsibility for the accuracy or sufficiency of such information.

The summaries or descriptions herein of provisions of the Enabling Act, the Act, the Bonds and the Trust Agreement, and all references to other materials not purporting to be quoted in full, are only brief outlines of some of the provisions thereof and do not purport to summarize or describe all of the provisions thereof. Any statements in this Official Statement involving matters of opinion, whether or not expressly so stated, are intended as such and not as representations of fact. This Official Statement is not to be construed as a contract or agreement between the Corporation and the purchasers or owners of any of the Bonds.

All covenants, stipulations, promises, agreements and obligations of the Corporation contained in the Bonds shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Corporation and not of any officer, director or employee of the Corporation in such person's individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon against any officer, director or employee of the Corporation or against any person executing the Bonds.

THE NEW ENGLAND EDUCATION LOAN
MARKETING CORPORATION

By:/s/John F. Remondi
     Treasurer/Chief Financial Officer

August 17, 1993

316563.1

43

[THIS PAGE INTENTIONALLY LEFT BLANK]

Appendix A

Combining Financial Statements of the Corporation and Nellie Mae, Inc.
for the Year Ended December 31, 1992

A-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Coopers & Lybrand

Certified Public Accountants

**NELLIE MAE, INC. (NMInc)**

**THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)**

**COMBINING FINANCIAL STATEMENTS**

**for the year ended December 31, 1992**

[THIS PAGE INTENTIONALLY LEFT BLANK]

Coopers
&Lybrand

certified public accountants

## REPORT OF INDEPENDENT ACCOUNTANTS

To the Boards of Directors of
Nellie Mae, Inc. and
The New England Education Loan
Marketing Corporation:

We have audited the accompanying combining balance sheets of Nellie
Mae, Inc. and The New England Education Loan Marketing Corporation as
of December 31, 1992, and the related combining statements of
operations and changes in net assets and cash flows for the year then
ended.  These financial statements are the responsibility of the
Companies' management.  Our responsibility is to express an opinion on
these financial statements based on our audits.  We previously audited
and issued an unqualified opinion on the combining financial
statements of Nellie Mae, Inc. and The New England Education Loan
Marketing Corporation for the year ended December 31, 1991.  Combined
totals for the years ended December 31, 1992 and 1991 are included for
comparative purposes only.

We conducted our audits in accordance with generally accepted auditing
standards.  Those standards require that we plan and perform the audit
to obtain reasonable assurance about whether the financial statements
are free of material misstatement.  An audit includes examining on a
test basis, evidence supporting the amounts and disclosures in the
financial statements.  An audit also includes assessing the accounting
principles used and significant estimates made by management, as well
as evaluating the overall financial statement presentation.  We
believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present
fairly, in all material respects, the financial position of Nellie
Mae, Inc. and The New England Education Loan Marketing Corporation as
of December 31, 1992, and the results of their operations and their
cash flows for the year then ended in conformity with generally
accepted accounting principles.

Coopers & Lybrand

Boston, Massachusetts
January 31, 1993

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

COMBINING BALANCE SHEETS

December 31, 1992

(with comparative combined totals for the preceding year)
(dollars in thousands)

| | 1992 | | Combined (Note 1) | 1991 Combined (Note 1) |
|---|---|---|---|---|
| ASSETS | NMInc | NEELMC | | |
| Cash and investments (Note 2) | $ 10,310 | $ 33,652 | $ 43,962 | $ 84,884 |
| Investment in ELSI (Notes 1 and 6) | 1,866 | – | 1,866 | – |
| Student loans receivable (Note 3) | 235,628 | 1,436,437 | 1,672,065 | 1,397,265 |
| Accrued investment income receivable | 10 | 320 | 330 | 52 |
| Accrued student loan interest and special allowance receivable (Note 3) | 2,348 | 25,183 | 27,531 | 22,523 |
| Debt issuance costs, net of accumulated amortization (Note 4) | 1,177 | 6,581 | 7,758 | 7,806 |
| Fixed assets, net of accumulated depreciation (Note 1) | 482 | – | 482 | 635 |
| Other assets | 539 | 1,801 | 2,340 | 2,899 |
| Total assets | $252,360 | $1,503,974 | $1,756,334 | $1,516,064 |
| LIABILITIES AND NET ASSETS | | | | |
| Accounts payable and accrued expenses | 2,528 | 1,533 | 4,061 | 3,084 |
| Deferred management income (prepaid expense) (Note 1) | 392 | (392) | – | – |
| Accrued interest payable | 225 | 13,883 | 14,108 | 8,194 |
| Notes payable (Note 5) | 228,397 | 793,928 | 1,022,325 | 1,069,363 |
| Bonds payable (Note 5) | – | 625,804 | 625,804 | 379,185 |
| Reserve for losses on student loans (Note 3) | 7,498 | – | 7,498 | 3,451 |
| Total liabilities | 239,040 | 1,434,756 | 1,673,796 | 1,463,277 |
| Commitments (Note 7) | | | | |
| Contingencies (Note 9) | | | | |
| Net assets (Notes 1 and 5) | 13,320 | 69,218 | 82,538 | 52,787 |
| Total liabilities and net assets | $252,360 | $1,503,974 | $1,756,334 | $1,516,064 |

The accompanying notes are an integral
part of the combining financial statements.

2

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

COMBINING STATEMENTS OF OPERATIONS AND CHANGES IN NET ASSETS

for the year ended December 31, 1992

(with comparative combined totals for the preceding year)
(dollars in thousands)

|  | 1992 | | | 1991 |
|  | NMInc | NEELMC | Combined (Note 2) | Combined (Note 2) |
|---|---|---|---|---|
| **Revenues:** | | | | |
| Investment income | $ 1,096 | $ 2,278 | $ 3,374 | $ 3,719 |
| Interest and special allowance on student loans (Note 3) | 16,990 | 116,092 | 133,082 | 125,007 |
| Management fee income (Note 1) | 8,134 | – | 8,134 | 7,623 |
| Income (loss) from investment in ELSI (Notes 1 and 6) | (218) | – | (218) | – |
| Other income | 159 | – | 159 | 142 |
| Total revenues | 26,161 | 118,370 | 144,531 | 136,491 |
| **Expenses:** | | | | |
| Interest expense | 9,017 | 66,109 | 75,126 | 87,561 |
| Amortization and depreciation (Note 4) | 759 | 7,444 | 8,203 | 4,559 |
| Administrative expenses (Note 6) | 11,707 | 11,610 | 23,317 | 19,439 |
| Management fee expenses (Note 1) | – | 8,134 | 8,134 | 7,623 |
| Total expenses | 21,483 | 93,297 | 114,780 | 119,182 |
| Net revenues: $3,914 and $13,395 in 1991 for NMInc and NEELMC, respectively | 4,678 | 25,073 | 29,751 | 17,309 |
| **Net assets (Notes 1 and 5)** | | | | |
| Beginning of year | 8,642 | 44,145 | 52,787 | 35,478 |
| End of year | $13,320 | $ 69,218 | $ 82,538 | $ 52,787 |

The accompanying notes are an integral
part of the combining financial statements.

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

COMBINING STATEMENTS OF CASH FLOWS

for the year ended December 31, 1992

(with comparative summary totals for the preceding year)
(dollars in thousands)

|  | 1992 | | | 1991 |
|  | NMInc | NEELMC | Combined (Note 2) | Combined (Note 2) |
|---|---|---|---|---|
| **Cash flows from operating activities:** |  |  |  |  |
| Investment income received | $ 1,103 | $ 1,993 | $ 3,096 | $ 3,938 |
| Interest received on student loans | 17,233 | 110,840 | 128,073 | 128,362 |
| Other income | 159 | – | 159 | 189 |
| Management fees received | 8,579 | (8,579) | (8,579) | 7,134 |
| Management fees paid | – | (8,579) | (8,579) | (7,134) |
| Interest paid | (10,123) | (53,848) | (63,971) | (91,196) |
| Cash paid to suppliers and employees | (11,373) | (10,406) | (21,779) | (18,720) |
| Net cash provided by operating activities | 5,578 | 40,000 | 45,578 | 22,573 |
| **Cash flows from investing activities:** |  |  |  |  |
| Principal collected on student loans | 23,874 | 220,966 | 244,840 | 211,328 |
| Purchases of student loans | (94,194) | (426,401) | (520,595) | (383,298) |
| Proceeds from asset securitization | – | – | – | 72,057 |
| Rebate of TERI guarantee fees | 492 | – | 492 | 1,700 |
| Investments purchased | (2,084) | (13,606) | (15,690) | (467) |
| Investments sold | 2,000 | – | 2,000 | 5,001 |
| Capital expenditures | (87) | – | (87) | (50) |
| Net cash used by investing activities | (69,999) | (219,041) | (289,040) | (93,729) |
| **Cash flows from financing activities:** |  |  |  |  |
| Net proceeds from short-term debt | – | (68,526) | (68,526) | 38,600 |
| Proceeds from issuance of long-term debt net of discount | 132,800 | 521,592 | 654,392 | 162,353 |
| Repayment of long-term debt | (112,015) | (275,000) | (387,015) | (93,911) |
| Debt issuance costs paid | (822) | (7,095) | (7,917) | (5,401) |
| Net cash provided by financing activities | 19,963 | 170,971 | 190,934 | 101,641 |
| Net increase (decrease) in cash and cash equivalents | (44,458) | (8,070) | (52,528) | 30,485 |
| Cash and cash equivalents at beginning of year | 52,093 | 25,963 | 78,056 | 47,571 |
| Cash and cash equivalents at end of year | $ 7,635 | $ 17,893 | $ 25,528 | $ 78,056 |
| **Reconciliation of net revenues to net cash provided by operating activities:** |  |  |  |  |
| Net revenues | 4,678 | 25,073 | 29,751 | 17,309 |
| **Adjustments to reconcile net revenues to net cash provided by operating activities:** |  |  |  |  |
| Loss from investment in ELSI | 218 | – | 218 | – |
| Amortization and depreciation | 759 | 12,684 | 13,443 | 4,559 |
| **Changes in operating assets and liabilities:** |  |  |  |  |
| Accrued income receivable | 250 | (5,536) | (5,286) | 5,574 |
| Accrued interest payable | (1,106) | 7,020 | 5,914 | (3,635) |
| Other assets and liabilities | 779 | 759 | 1,538 | 766 |
| Net cash provided by operating activities: $3,442 and $19,131 in 1991 for NMInc and NEELMC, respectively | $ 5,578 | $ 40,000 | $ 45,578 | $ 22,573 |

Disclosure of accounting policy:
For purposes of reporting cash flows, cash includes cash on hand, obligations of the United States Government and its agencies, deposits and repurchase agreements with financial institutions which meet certain standards and have an original maturity of three months or less.

The accompanying notes are an integral
part of the combining financial statements.

4

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS

_____

1.  **Organization and Significant Accounting Policies:**

    **Organization**

    **Nellie Mae, Inc. (NMInc)**

    NMInc was organized as a private, nonprofit corporation to develop and administer programs of student financial aid through which students are assisted in financing their education costs. NMInc uses proceeds from the issuance of notes and other obligations to finance these programs (Note 5). These obligations are met from repayments of student loans. Certain assets of NMInc are restricted by related loan agreements or indentures. Unrestricted net assets amounted to approximately $9,247,000 and $2,691,000 at December 31, 1992 and 1991, respectively.

    **The New England Education Loan Marketing Corporation (NEELMC)**

    NEELMC was organized as a private, nonprofit corporation by an act of the Massachusetts General Court. NEELMC's objective is to increase the availability of education loans to students under federally sponsored loan programs by providing a liquid secondary market for originators of these loans. Loans to eligible students are purchased from lenders using proceeds of notes and bonds issued by NEELMC (Note 5). These obligations are met from repayments of the student loans. Certain assets of NEELMC are restricted by the related loan agreements or indentures. Unrestricted net assets amounted to approximately $34,946,000 and $10,151,000 at December 31, 1992 and 1991, respectively.

    NMInc and NEELMC are affiliated through common officers and common boards of directors. Pursuant to an administrative services contract, NMInc provides management, financial, and administrative services in support of NEELMC's loan purchase programs.

Continued

5

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

All administrative expenses (primarily consisting of salaries, occupancy and general administrative expenses) are paid by and recognized as expenses of NMInc. NEELMC absorbs its allowable portion of these administrative expenses through payment of a management fee. This fee is determined by management, approved by both boards of directors and is subject to the expense limitations described in the various NEELMC indentures.

<u>Presentation</u>

In 1992, the financial statements present the combining of two separate entities, NMInc and NEELMC. The 1992 and 1991 combined totals are presented for comparative purposes only. This does not indicate that the combined assets or net assets are available in any manner other than that provided in the note agreements or the bond indentures (see Note 5).

Certain 1991 amounts have been reclassified in order to conform to the 1992 presentation.

<u>Student Loans</u>

Student loans are presented at their unpaid principal balances and include unamortized premiums or unearned discounts.

<u>Investment in ELSI</u>

NMInc accounts for this investment by the equity method (see Note 6).

<u>Investments</u>

Investments are carried at cost and adjusted for any outstanding premium or discount. Interest is recognized as earned on the accrual basis.

<u>Interest Expense</u>

Interest expense is recognized on the accrual basis and includes certain costs incurred in the acquisition of student loans.

<u>Debt Issuance Costs</u>

Certain debt issuance costs are capitalized and are amortized on the straight-line method over the economic life of the related debt.

Continued

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

---

### Fixed Assets

Fixed assets are recorded at cost. Depreciation of furniture, equipment and leasehold improvements is computed on the straight-line method using lives ranging from 3 to 10 years. Capitalized leases are amortized on the straight-line method over the lease term.

### Income Taxes

Both NMInc and NEELMC are exempt from federal and state income taxes under section 501(a), as organizations described in section 501(c)(3), of the Internal Revenue Code.

2.  **Cash and Investments:**

    NMInc

    At December 31, 1992 and 1991, cash and investments consisted of the following:

| | 1992 Carrying Amount | 1992 Fair Value | 1991 Carrying Amount |
|---|---|---|---|
| Cash and cash equivalents: | | | |
| Demand deposits | $    665,000 | $    665,000 | $    143,000 |
| Commercial paper | 6,970,000 | 6,970,000 | 51,950,000 |
| | 7,635,000 | 7,635,000 | 52,093,000 |
| Investments: | | | |
| Corporate notes | 2,675,000 | 2,675,000 | 4,675,000 |
| Total cash and investments | $10,310,000 | $10,310,000 | $56,768,000 |

Cash and cash equivalents are carried at cost which approximates fair value because of the short maturity of these instruments. The carrying value of corporate notes, which receive a variable rate of return, approximates fair value.

During 1992, certain individual NMInc indentures invested short-term cash in investment securities issued by other individual NMInc and NEELMC indentures. In 1992, cash from individual NMInc indentures was used to purchase up to $48,795,000 in NEELMC indenture notes and earned interest income of $834,000. NMInc investments in NEELMC notes were $6,425,000 and $41,529,000 at December 31, 1992 and 1991, respectively. During 1991, NMInc used certain unrestricted funds to purchase $4,675,000 subordinated notes of a NMInc indenture. At December 31, 1992, the investment was $2,675,000.

Continued

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

NEELMC

At December 31, 1992 and 1991, cash and investments consisted of the following:

|  | 1992 Carrying Amount | Fair Value | 1991 Carrying Amount |
|---|---|---|---|
| Cash and cash equivalents: | | | |
| Demand deposits | $ 6,246,000 | $ 6,246,000 | $ 5,592,000 |
| Commercial paper, net | 11,647,000 | 11,647,000 | 19,981,000 |
| Collateralized repurchase agreements | — | — | 390,000 |
| | 17,893,000 | 17,893,000 | 25,963,000 |
| Investment: | | | |
| Guaranteed investment contracts | 15,759,000 | 16,618,000 | 2,153,000 |
| Total cash and investments | $33,652,000 | $34,511,000 | $28,116,000 |

The carrying value of cash and cash equivalents approximates fair value because of the short maturity of these instruments. The fair value of guaranteed investment contracts is estimated based on rates currently available with similar terms and maturities.

At various times in 1992 certain individual NEELMC indentures invested short-term cash in investment securities issued by other NEELMC indentures. These investments were made in accordance with the terms and conditions of the various indentures. In 1992 assets from individual NEELMC indenture funds were used to purchase up to $44,510,000 in other NEELMC notes and earned interest income of approximately $613,000. These investments in NEELMC notes were $0 and $19,981,000 at December 31, 1992 and 1991, respectively.

Certain investments are held in reserve funds and are generally not available for the purchase of student loans.

3. Student Loans:

NMInc

Substantially all student loans purchased by NMInc, as well as accrued interest thereon, are guaranteed by The Education Resources Institute Inc. (TERI) subject to a deductible of $9,377,000. NMInc has established reserves from guarantee fees collected from borrowers to pay the expected level of defaults subject to the deductible. TERI is obligated to pay claims on any defaulted loans guaranteed by it. These guarantees are

Continued

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

_____

subject to the performance of certain due diligence and loan servicing procedures in accordance with TERI guidelines.

The terms of the loans generally provide for repayment in monthly installments of principal and interest over a period of up to twenty years. Some loans carry monthly or annual variable interest rates. The monthly interest rate was 8% and the annual adjustable rate was 9.5% at December 31, 1992.

As of December 31, 1992, the fair value of student loans is approximately $238,502,000. The fair value is estimated by discounting the future cash flows using current rates of return required by investors in similar assets.

NEELMC

Substantially all of the student loans purchased by NEELMC, as well as accrued interest thereon, are insured against default, death, disability, or bankruptcy by certain guarantee agencies which are reinsured by the federal government. Further, these agencies have established reserves to pay losses on any defaulted loans guaranteed by the agencies and not reinsured by the federal government. These guarantees are made subject to the performance of certain due diligence and loan servicing procedures in accordance with the applicable regulations. If these requirements are not met, affected loans may not be covered by the guarantees should the borrowers default. Management contracts with third-party service companies to ensure proper servicing of its student loan portfolio. Under the terms of these agreements, a service company is held liable for any losses incurred by NEELMC due to that service company's error. Management believes that NEELMC has provided an adequate reserve for potential losses on such loans.

The United States government pays NEELMC an interest subsidy at the stated interest rate for most loans not yet in borrower repayment status. In high rate environments, when the stated loan rate may not provide a market rate of return, the federal government also pays a quarterly special allowance to NEELMC to increase the yield of most loans to between 3.10% and 3.50% over the average bond equivalent yield of all 91 day treasury bill auctions during that quarter.

Continued

9

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

During 1992, the method of amortizing premiums on student loans was changed to approximate the interest method, resulting in an additional $2,300,000 charge to net revenues.

As of December 31, 1992, the fair value of student loans is approximately $1,473,066,000. The fair value is estimated by discounting the future cash flows using current rates of return required by investors in similar assets.

4. **Debt Issuance Costs**:

At December 31, 1992 and 1991, debt issuance costs are net of accumulated amortization of $3,450,000 and $5,787,000, respectively, for NEELMC and $419,000 and $450,000, respectively, for NMInc.

In prior years, NEELMC amortized debt issuance costs of tax exempt debt over the life of the related indenture. In 1992, NEELMC amortized such costs over the first remarketing period, resulting in an additional $2,400,000 charge to net revenues.

5. **Notes and Bonds Payable**:

The following tables summarize outstanding notes and bonds payable issued by NMInc and NEELMC in order to finance activities as of December 31, 1992 and 1991 (Note 1). The terms of the individual indentures require the maintenance of certain financial ratios and may restrict the use of proceeds to the purchase of student loans and eligible investment securities. Under the terms of certain individual indentures, loans purchased and interest receivable on those loans are pledged as collateral to the indenture providing the proceeds. As of December 31, 1992, NMInc and NEELMC were in compliance with the requirements of their respective financing agreements.

| | 1992 | | | 1991 | |
| | Ending Balance Carrying Amount | Fair Value | Interest Range | Ending Balance Carrying Amount | Interest Range |
|---|---|---|---|---|---|
| **NMInc** | | | | | |
| Variable rate notes, due 1993 | $135,207,000 | $135,207,000 | 3.5% – 6.0% | $104,208,000 | 4.8% – 8.9% |
| due 1996 | 29,785,000 | 29,785,000 | 3.6% – 4.8% | 40,000,000 | 5.3% |
| due 2012 | 63,405,000 | 63,405,000 | 3.5% – 6.9% | 63,405,000 | 5.6% – 7.4% |
| | $228,397,000 | $228,397,000 | | $207,613,000 | |

Continued

10

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

The carrying values of variable rate notes approximate fair value. Variable rate notes include a reverse repurchase agreement whereby NMInc has sold, and is committed to repurchase, the $2,675,000 of investments in corporate notes. Due to the agreement to repurchase, this transaction has been treated as a borrowing rather than a sale in these financial statements.

| NEELMC | 1992 | | | 1991 | |
|---|---|---|---|---|---|
| | Ending Balance Carrying Amount | Fair Value | Interest Range | Ending Balance Carrying Amount | Interest Range |
| Variable rate note, due 1994 | $360,000,000 | $360,000,000 | 3.2%–4.7% | $536,816,000 | 4.6% – 9.8% |
| Fixed rate notes, due 1995-1999 | 225,000,000 | 244,190,000 | 8.3%–9.4% | 150,000,000 | 9.4% |
| Commercial paper, net | 208,928,000 | 208,928,000 | 3.1%–5.2% | 174,934,000 | 4.6% – 12.8% |
| Total notes payable | $793,928,000 | $813,118,000 | | $861,750,000 | |
| Variable rate bonds, due 2005-2013 | $107,395,000 | $107,395,000 | 2.0%–5.9% | $107,395,000 | 3.8% – 7.5% |
| Fixed rate bonds, due 1999-2002 | 518,409,000 | 524,372,000 | 5.8%–6.9% | 271,790,000 | 5.0% – 6.8% |
| Total bonds payable | $625,804,000 | $631,767,000 | | $379,185,000 | |

For variable rate notes and bonds, carrying value approximates fair value. The fair value of fixed rate bonds is estimated based on rates currently available to NEELMC for debt with similar terms and maturities. The fair value of interest rate swaps is the estimated amount that NEELMC would receive or pay to terminate the swap agreements at the reporting date, taking into account current interest rates.

NEELMC has entered into interest rate swap agreements in order to better match the interest rate sensitivities of NEELMC's assets and liabilities. At December 31, 1992 NEELMC had outstanding interest rate swap agreements having a total notional principal amount of $525,000,000 with an unrealized gain of $19,869,000. The periodic income or expense on these swap agreements is recognized as an adjustment to interest expense on the related liability.

Fixed rate notes mature as follows:

| | |
|---|---|
| 1995 | $150,000,000 |
| 1997 | 25,000,000 |
| 1999 | 50,000,000 |
| | $225,000,000 |

Continued

11

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

Approximately $175,000,000 of the commercial paper issuance is supported by an irrevocable direct payment letter of credit with a major bank for payment of 100% of principal issued.  NEELMC maintains $300 million in committed revolving lines of credit as liquidity backup support for a similar sized commercial paper program developed in 1992.  Approximately $34 million was outstanding under this program at December 31, 1992.

Bond maturities are as follows:

| | |
|---|---|
| 1998 | $ 37,217,000 |
| 1999 | 103,799,000 |
| 2000 | 42,341,000 |
| 2002 | 311,052,000 |
| 2005 | 47,395,000 |
| 2009 | 24,000,000 |
| 2013 | 60,000,000 |
| | $625,804,000 |

$71,790,000 of the bonds due in 1999 are supported by an irrevocable direct payment letter of credit with a major bank for payment of 100% of principal issued and up to 218 days of accrued interest. The bonds due in 2005 and 2013 are supported by irrevocable direct payment letters of credit with major banks for payment of 100% of principal issued and up to 123 days of accrued interest.  The $71,790,000 of bonds due in 1999 were remarketed on December 4, 1986 and are subject to redemption or tender for purchase on December 1, 1993.  Bonds due in 2005 were remarketed on March 18, 1989 and are subject to redemption upon seven days notice.  Bonds due in 2013 were issued on July 29, 1988 and are subject to redemption upon seven days notice.

6. Related Parties:

In 1992, NMInc completed its acquisition of a 50% interest in Education Loan Services, Inc. (ELSI), a student loan service company that services a substantial portion of the NMInc and NEELMC loan portfolios, through the purchase of outstanding and newly issued shares of ELSI common stock, at a purchase price of approximately $2 million. As part of this purchase agreement NMInc obtained and exercised the right to appoint a majority of the ELSI board of Directors.  Five directors of NMInc and the President of NMInc were appointed to the ELSI Board of Directors.   Also, as part of this

Continued

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

_____

agreement, the combined shareholders agreed to commit an additional $2M of capital, subject to the approval of a majority of shareholders. If approved, NMInc will invest an additional $1M in ELSI.

At December 31, 1992 and 1991, NMInc and NEELMC have contracted with ELSI to service a substantial portion of their student loan portfolios. For the years ended December 31, 1992 and 1991 loan servicing expense to ELSI amounted to approximately $886,000 and $523,000, respectively, for NMInc and approximately $8,155,000 and $7,784,000, respectively, for NEELMC.

NMInc and NEELMC share one director with TERI the guarantor of the NMInc student loan portfolio and American Student Assistance (ASA), a guarantor of a substantial portion of NEELMC's portfolio.

Six members of the NEELMC Board of Directors are officers at banks that sold loans to NEELMC in 1992 totaling approximately $20,000,000.

7.  Commitments:

As of December 31, 1992, NMInc and NEELMC were committed to the purchase of student loans through 1996 in the amounts of $653,000 and $279,000,000, respectively. These commitments have no fair value.

Effective May 1, 1992, NMInc amended its lease agreement for expanded office space through May 3, 1995. The lease payments are subject to annual escalation for increases in real estate taxes and operating expenses. Total rent expense for operating leases amounted to approximately $665,000 and $610,000 in 1992 and 1991, respectively.

The minimum payments for the operating lease are as follows:

| | |
|---|---|
| 1993 | $  661,000 |
| 1994 |    661,000 |
| 1995 |    220,000 |
| Minimum lease payments | $1,542,000 |

Continued

13

NELLIE MAE, INC. (NMInc)

THE NEW ENGLAND EDUCATION LOAN MARKETING CORPORATION (NEELMC)

NOTES TO COMBINING FINANCIAL STATEMENTS, Continued

8. **Pension Plan:**

Substantially all employees are eligible to participate in the NMInc Pension and 401(k) Savings Plans which are qualified under the Internal Revenue Code. These are defined contribution plans and it is NMInc's policy to fund all costs accrued on a current basis. Total expense for the plans was approximately $424,000 and $310,000 for 1992 and 1991, respectively.

9. **Contingencies:**

In prior years, NEELMC retained University Loan Services, Inc. (ULS), a wholly-owned subsidiary of The Student Loan Marketing Association (Sallie Mae), to service a portion of its purchased student loans. In December 1991 Sallie Mae reported that ULS was under investigation for operational improprieties. Sallie Mae's investigation is continuing, and conclusive findings have not been announced to date. If it is determined that ULS did not service loans in accordance with federal or guarantor requirements, the Department of Education may conclude that these loans are or were not eligible for claims payment in the event of borrower default (Note 3).

ULS currently services $1,020,000 of NEELMC student loans, all of which were in default status as of December 31, 1991. Since 1986, NEELMC has collected approximately $13,200,000 in insurance claims that were filed by ULS. Management believes that the outcome of this investigation, while not certain at this time, will not have a material impact on NEELMC's financial position. Should NEELMC sustain damages due to ULS servicing improprieties, NEELMC would seek recovery of such damages from ULS or its successor.

APPENDIX B

# SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT

The Trust Agreement contains various covenants and other provisions, certain of which are summarized below. Reference should be made to the Trust Agreement for a full and complete statement of its provisions.

**Definitions**

The following terms shall have the following meanings in the Trust Agreement and in this summary, unless the context otherwise requires:

"Additional Bonds" means bonds of the Corporation, other than original Bonds, issued pursuant to the Trust Agreement.

"Authorized Officer" means the chairman of the Board of Directors, the president, any vice president or the treasurer and, in the case of any act to be performed or duty to be discharged, any other director, officer or employee of the Corporation then authorized to perform such act or discharge such duty.

"Bondowners", "owners" or words of similar import means the registered owners of the Bonds from time to time as shown in the bond registration books of the Corporation, except that wherever appropriate the term "owners" shall mean the owners of the Bonds for federal income tax purposes.

"Bonds" means bonds issued pursuant to the Trust Agreement and any bond or bonds duly issued in exchange or replacement therefor.

"Bond Counsel" means an attorney or firm of attorneys of nationally recognized standing in the field of law relating to municipal, state and public agency financing, selected by the Corporation and satisfactory to the Trustee.

"Business Day" means each day of the year except Saturdays, Sundays and other days on which the Trustee, banks located in the State of New York or the Commonwealth, or the New York Stock Exchange are permitted or authorized to be closed.

"Higher Education Act" means the Higher Education Act of 1965, as amended, and the regulations duly promulgated from time to time thereunder.

"IRC" means the Internal Revenue Code of 1986, as it may be amended from time to time.

"Outstanding," when used to modify Bonds, refers to Bonds issued under the Trust Agreement, excluding: (i) Bonds which have been exchanged or replaced; (ii) Bonds which have been paid; (iii) Bonds which have become due and for the payment of which moneys have been duly provided; and (iv) Bonds for which there have been irrevocably set aside sufficient funds, or Government or Equivalent Obligations described in clause (i) or (ii) of the definition of Government or Equivalent Obligations bearing interest at such rates, and with such maturities as will provide sufficient funds. to pay or redeem them, provided, however, that if any such Bonds are to be redeemed prior to maturity, the Corporation shall have taken all action necessary to redeem such Bonds and notice of such redemption shall have been duly mailed in accordance with the Trust Agreement or irrevocable instructions so to mail shall have been given to the Trustee.

"Student Loan" means any loan made pursuant to the Higher Education Act to assist any eligible student attend any eligible institution of post-secondary education.

B-I

APPENDIX B

"Tax-Exempt Bond" means any Bond which when issued was accompanied by an opinion of Bond Counsel to the effect that interest on such Bond is excluded from gross income for federal income tax purposes.

## Purpose

The Trust Agreement provides for the issue of Bonds from time to time for purposes authorized by the Act as now in effect or as may hereafter be amended from time to time. All Bonds issued pursuant to the Trust Agreement are to be unsecured general obligations of the Corporation.

## Payments by the Corporation

Not later than 11:00 a.m., New York City time, on each date principal of, premium, if any, or interest on the Bonds is due, whether on an interest payment date, at maturity, upon redemption, upon acceleration, or otherwise, the Corporation shall pay to the Trustee the amount due. At any time when any principal of the Bonds is overdue, the Corporation shall also have a continuing obligation to pay to the Trustee an amount equal to interest on the overdue principal, but neither overdue interest nor overdue redemption premiums shall bear interest.

To the extent permitted by law, the obligation of the Corporation to make such payments to the Trustee shall be absolute and unconditional, shall be binding and enforceable in all circumstances whatsoever, shall not be subject to setoff, recoupment, or counterclaim, and shall be a general obligation of the Corporation to which its full faith and credit are pledged.

## Personnel and Servicing of Programs

The Corporation shall at all times appoint, retain, contract with or employ competent personnel for the purpose of carrying out its business and shall establish and enforce reasonable rules, regulations, tests and standards governing the employment of such personnel at reasonable compensation, salaries, fees and charges. All persons employed by the Corporation, and all parties with whom it shall so contract, shall be qualified for their respective positions.

The Corporation shall duly and properly service all Student Loans owned by it and enforce the payment and collection of all payments of principal and interest or shall cause such servicing to be done by one or more servicers, each evidencing, in the judgment of the Corporation, the capability and experience necessary to adequately service such Student Loans.

## Plan for Doing Business

The Corporation shall have obtained approval of a Plan for Doing Business pursuant to §438 of the Higher Education Act in each state where approval of such a plan is required to make all Student Loans owned by the Corporation eligible for Special Allowance Payments.

## Tax Covenants

The Corporation covenants that it shall at all times do and perform all acts and things necessary or desirable in order to assure that interest paid on the Bonds shall, for the purposes of federal income taxation, be excludable from the gross income of the recipients thereof under IRC Section 103(a).

## Powers of Amendment

Any modification of or amendment to the Trust Agreement and of the rights and obligations of the Corporation and of the Bondowners thereunder, in any particular, may be made by a supplemental Trust Agreement, with the written consent given as provided in the Trust Agreement of the owners of at least two-thirds in principal amount of the Bonds Outstanding at the time such consent is given; provided, that any modification of or amendment to the Trust Agreement which does not materially prejudice the rights of the owners of the Outstanding Bonds may

B-2

be made without consent of the owners of the Outstanding Bonds. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal of any Outstanding Bonds or of any installment of interest thereon or a reduction in the principal amount or the redemption price thereof or in the rate of interest thereon without the consent of the Holders of such Bonds, or shall reduce the percentages of Bonds, the consent of the owners of which is required to effect any such modification or amendment.

## Events of Default

Each of the following events is an "Event of Default":

(1)     payment of the principal or redemption premium of or interest on any Bond, either at maturity, on any redemption date, on any interest payment date or otherwise, shall not be made when and as the same shall become due; or

(2)     the Corporation shall fail or refuse to comply with the provisions of the Trust Agreement, or shall default in the performance or observance of any of the covenants, agreements or conditions on its part contained in the Trust Agreement or in the Bonds, and such failure, refusal or default shall continue for a period of forty-five (45) days after written notice thereof by the Trustee or the owners of not less than twenty-five percent (25%) in the aggregate of the Outstanding Bonds; or

(3)     an order or decree shall be entered, with the consent or acquiescence of the Corporation, appointing a receiver or other custodian for the assets of the Corporation, or approving a petition filed against the Corporation seeking reorganization or liquidation of the Corporation under the federal bankruptcy laws or any other similar state or federal law, or if any such order or decree, having been entered without the consent or acquiescence of the Corporation, shall not be vacated or discharged or stayed on appeal within ninety (90) days after the entry thereof; or any proceeding shall be instituted, with the consent or acquiescence of the Corporation, for the purpose of effecting a composition or other arrangement between the Corporation and its creditors or for the purpose of adjusting the claims of such creditors pursuant to any federal or state statute; or if the Corporation makes an assignment for the benefit of its creditors, or consents to the appointment of a receiver, trustee or other custodian for itself or for the whole or any part of its assets; or if (i) the Corporation is adjudged insolvent by a court of competent jurisdiction, or (ii) an order, judgment or decree be entered by any court of competent jurisdiction appointing, without the consent of the Corporation, a receiver, trustee or other custodian of the Corporation or of the whole or any substantial part of its property and any of the aforesaid adjudications, orders, judgments or decrees shall not be vacated or set aside or stayed within ninety (90) days from the date of entry thereof; or if the Corporation shall file a petition or answer seeking reorganization or any arrangement under the federal bankruptcy laws or any other applicable state or federal law; or if, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction shall assume custody or control of the Corporation or of the whole or any substantial part of its property, and such custody or control shall not be terminated within ninety (90) days from the date of assumption of such custody or control; or

(4)     A breach shall occur (and continue beyond any applicable grace period) with respect to a payment of indebtedness by the Corporation of for borrowed money with respect to loans exceeding $1,000,000, or with respect to the performance of any agreement securing such indebtedness or pursuant to which the same was issued or incurred, or an event shall occur with respect to provisions of any such agreement relating to matters of the character comparable to the Events of Default described in the Trust Agreement, so that a holder or holders of such indebtedness or a trustee or trustees under any such agreement accelerates or is empowered to accelerate any such indebtedness; but an Event of Default shall not be deemed to be in existence or to be continuing under this Paragraph (4) if (A) the Corporation is in good faith contesting the existence of such breach or event and if such acceleration is being stayed by judicial proceedings, (B) the power of acceleration is not exercised and it ceases to be in effect, or (C) such breach or event is remedied and the acceleration, if any, is wholly annulled. The Corporation shall notify the Trustee of any such breach or event immediately upon the Corporation's becoming aware of its

APPENDIX B

occurrence and shall from time to time furnish such information as the Trustee may reasonably request for the purpose of determining whether a breach or event described in this Paragraph (4) has occurred and whether such power of acceleration has been exercised or continues to be in effect.

**Acceleration**

Upon the occurrence of an Event of Default described in Paragraph (1), (3), or (4) of above, so long as such Event of Default shall not have been remedied, the Trustee may, or upon written request of the owners of not less than two-thirds (2/3) in aggregate principal amount of the Bonds then Outstanding shall, by written notice to the Corporation, declare the principal of all the Bonds then Outstanding and the interest accrued thereon to be due and payable immediately. Upon the occurrence of an Event of Default described in Paragraph (2) above, so long as such Event of Default shall not have been remedied, the Trustee may, or upon written request of the owners of all Bonds then Outstanding, by written notice to the Corporation, declare the principal of all the Bonds then Outstanding and the interest accrued thereon to be due and payable immediately.

Upon any declaration of acceleration of the Bonds, the Trustee shall give notice of such declaration and its consequences to Bondowners. Notice of such acceleration having been given as aforesaid, anything contained in the Trust Agreement or in the Bonds to the contrary notwithstanding, interest shall cease to accrue on the Bonds from and after the date set forth in such notice (which shall be not more than five (5) days from the date of such declaration).

**Application of Moneys**

In the event that an Event of Default shall have occurred and be continuing and at any time the moneys held by the Trustee shall be insufficient for the payment of the principal of and interest then due on the Bonds such moneys shall be applied first to the payment of the reasonable and proper fees and expenses of the Trustee and of such other expenses as are necessary in the judgment of the Trustee to protect the interests of the Bondowners and thereafter as follows:

FIRST, to the payment to the persons entitled thereto of all installments of interest then due (including any interest on overdue principal at the rate borne by the respective Bonds) in the order that such installments of interest shall have become due, and, if the amounts available shall not be sufficient to pay in full all installments of interest coming due on the same date, then to the payment thereof ratably, according to the amount due thereon, to the persons entitled thereto, without any discrimination or preference, and

SECOND, to the payment to the persons entitled thereto of the unpaid principal due on the Bonds at the time of such payment ratably, according to the total amount of principal due, to the persons entitled thereto without any discrimination or preference, and

THIRD, to the payment to the persons entitled thereto of any unpaid redemption premium due on the Bonds at the time of such payment ratably, according to the total amount of such premium due, to the persons entitled thereto without any discrimination or preference.

Whenever moneys are to be applied pursuant to the foregoing paragraphs, such moneys shall be applied at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future. Whenever the Trustee shall exercise such discretion, it shall fix the date upon which application is to be made, and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue on the affected Bonds. The Trustee shall give such notice as it may deem appropriate of the fixing of any such date and shall not be required to make payment to the owner of any unpaid affected Bond unless such Bond is presented for appropriate endorsement.

B-4

APPENDIX B

**Suits at Law or in Equity**

If an Event of Default shall occur and shall not have been remedied, then and in every such case, the Trustee, either in its own name or as trustee of an express trust, or as attorney-in-fact for the Bondowners or in any one or more of such capacities by its agents and attorneys, shall be entitled and empowered to proceed forthwith to institute such suits, actions and proceedings at law or in equity for the collection of all sums due in connection with the Bonds and to protect and enforce its rights and the rights of the Bondowners under the Trust Agreement.

The Trustee, at the request of the Owners of not less than two-thirds (2/3) in aggregate principal amount of the Bonds then Outstanding, and upon being furnished with reasonable security and indemnity, shall take such steps and institute such suits, actions or proceedings for the protection and enforcement of the rights of the Bondowners, as the case may be, to collect any amount due and owing from the Corporation or by injunction or other appropriate proceeding in law or in equity to obtain other appropriate relief.

Except as otherwise specifically described below, no Bondowner shall have any right to institute any suit, action or proceedings in equity or at law for the enforcement of any provision of, or the execution of any trust or for any remedy under, the Trust Agreement unless (i) such Bondowner previously shall have given to the Trustee notice of the Event of Default on account of which such suit, action or proceedings is to be instituted, (ii) the owners of not less than two-thirds (2/3) in aggregate principal amount of the Bonds then Outstanding, shall have filed a written request with the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued that such suit, action or proceeding be instituted, (iii) there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses and liability to be incurred therein or thereby, (iv) the Trustee for a period of thirty (30) days after the receipt by it of such notice, request and offer of indemnity shall have failed to proceed to exercise such powers or to institute any such action, suit or proceedings, or the Trustee shall at any time after such receipt have stated in writing that it shall not so proceed, and (v) no direction inconsistent with such written request shall have been given to the Trustee by Bondowners pursuant to the Trust Agreement.

Notwithstanding any other provision of the Trust Agreement, the right of any Bondowner to receive payment of the principal of, premium, if any, and interest on its Bond, on or after the respective due dates expressed in such Bond, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such Bondowner.

[THIS PAGE INTENTIONALLY LEFT BLANK]

PROPOSED OPINION OF BOND COUNSEL          APPENDIX C


# PALMER & DODGE

One Beacon Street
Boston, Massachusetts 02108

Telephone: (617) 573-0100

Facsimile: (617) 227-4420


[Delivery Date]


The New England Education Loan Marketing Corporation
50 Braintree Hill Park
Braintree, Massachusetts  02184

We have acted as bond counsel to The New England Education Loan Marketing Corporation (the "Corporation") in connection with the issuance by the Corporation of its $107,000,000 Student Loan Refunding Bonds, 1993 Series G (the "Bonds").

We have examined the law and such certified proceedings and other papers as deemed necessary to render this opinion, including Sections 1 through 12A of Chapter 356 of the Acts of 1982, as amended (the "Act") of The Commonwealth of Massachusetts (the "Commonwealth") and the Third Supplemental Trust Agreement dated as of August 1, 1993 (the "Third Supplement") between the Corporation and The First National Bank of Boston, as trustee (the "Trustee") amending and supplementing the Trust Agreement dated as of March 1, 1993, as previously amended and supplemented, between the Corporation and the Trustee (the "Trust Agreement" and together with the Third Supplement, the "Agreement").

As to questions of fact material to our opinion we have relied upon representations and covenants of the Corporation contained in the Agreement, a Tax Compliance Statement of the Corporation dated the date hereof, the certified proceedings and other certifications of officers of the Corporation furnished to us, without undertaking to verify the same by independent investigation. Capitalized terms used herein shall, unless otherwise specified, have the meanings set forth in the Agreement.

Based upon our examination, we are of opinion, as of the date hereof and under existing law, as follows:

1.      The Corporation is a duly organized and validly existing private, nonprofit corporation in good standing under the laws of the Commonwealth, with the corporate power to execute and deliver the Agreement, perform the agreements on its part contained therein and issue the Bonds.

2.      The Agreement has been duly authorized, executed and delivered by the Corporation and is a valid and binding agreement of the Corporation enforceable in accordance with its terms.

592

The New England Education Loan Marketing Corporation
[Delivery Date]
Page 2

3.    The Bonds have been duly authorized, executed, and delivered by the Corporation and are valid and legally binding obligations of the Corporation, enforceable in accordance with their terms.

4.    Interest on the Bonds is excluded from the gross income of owners of the Bonds for federal income tax purposes.  Interest on the Bonds will not be treated as a preference item in calculating the alternative minimum tax imposed under the Internal Revenue Code of 1986 (the "IRC") on individuals and corporations.  However, we call your attention to the fact that interest on the Bonds will be taken into account in determining adjusted current earnings for the purpose of computing the alternative minimum tax imposed on corporations.  We also call your attention to the fact that failure by the Corporation to comply subsequent to the issuance of the Bonds with certain requirements of the IRC may cause interest on the Bonds to become includable in the gross income of the owners of the Bonds for federal income tax purposes retroactive to the date of issuance of the Bonds.  The Corporation covenanted in the Agreement to take all lawful action necessary under the IRC to ensure that interest on the Bonds will remain excluded from the gross income of the owners of the Bonds for federal income tax purposes and to refrain from taking any action which would cause interest on the Bonds to become included in such gross income.  We express no opinion regarding any other tax consequences arising with respect to the Bonds.

It is to be understood that the rights of the holders of the Bonds and the enforceability of the Bonds and the Agreement are subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Yours faithfully,



# NELLIE MAE