# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

NAVIENT SOLUTIONS, LLC,

     Plaintiff,

     v.

DEPARTMENT OF EDUCATION and DR.
MIGUEL CARDONA, Secretary of
Education, in His Official Capacity,

     Defendants.

**Case No.: 1:21-cv-324-TSE-MSN**

## SUPPLEMENTAL ADMINISTRATIVE RECORD

### VOLUME 5 (Pages 1595-783)

**NAVIENT V. DEPARTMENT OF EDUCATION**
**Case No. 21-CV-00324**
**SUPPLEMENTAL ADMINISTRATIVE RECORD**

| Document Description | Bates No. |
|---|---|
| Final Audit Determination of Federal Student Aid Letter from Patricia Trubia, Director, Financial Institution Oversight Service, Federal Student Aid, to John Remondi, President and Chief Operating Officer, Sallie Mae, Inc., dated September 25, 2013 | 1345-71 |
| Affidavit of Jason Wheeler dated November 24, 2015 | 1372-78 |
| Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 | 1379-476 |
| Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 | 1477-78 |
| Affidavit of John (Jack) Remondi, dated September 22, 2016 | 1479-81 |
| NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates | 1482-85 |
| 1993 Trust Agreement | 1486-517 |
| Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) | 1518-94 |
| Affidavit of Mark L. Heleen dated September 23, 2016 | 1595-97 |
| Navient Responses to OIG Questions of December 14, 2007 | 1598-600 |
| Letter from Robert S. Lavet, General Counsel, Sallie Mae, to Theresa Shaw, U.S. Department of Education, dated February 15, 2007 | 1601 |
| Affidavit of Jane Roig dated November 11, 2016 | 1602-03 |
| Emails concerning Freedom of Information Act dated April 26, 2017 and May 15, 2017 | 1604-07 |
| Letter from Theresa Shaw to Thomas J. Fitzpatrick dated January 24, 2007 | 1608-11 |
| Final Audit Report, Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations, dated August 2009 | 1612-75 |
| Respondent Navient Corporation's Request for Review of Final Audit Determination, dated July 27, 2016 | 1676-737 |
| Brief in Support of Navient Corporation's Appeal of the Final Audit Determination Issued by the Office of the Inspector General of the Department of Education, dated September 27, 2016 | 1738-83 |
| Navient Corporation's Reply Brief in Support of Appeal of Final Audit Determination, dated November 23, 2016 | 1784-816 |

Transcript of March 30, 2017, Oral Argument                                      1817-2018

Navient Corporation's Supplemental Brief, dated May 19, 2017                      2019-40

Hearing Official's Initial Decision, dated March 7, 2019                          2041-60

DCL 93-L-161                                                                       2061-77

DCL 93-L-163                                                                       2078-81

DCL 96-L-186                                                                       2082-87

DCL FP-06-15                                                                       2088-93

DCL FP-07-01                                                                       2094-99

DCL FP-07-06                                                                       2100-38

Brief in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision,    2139-91
dated April 8, 2019

Motion for Leave To File a Reply in Support of Navient Corporation's Appeal of the              2192-201
Hearing Official's Initial Decision

Navient Visuals from Oral Argument before the Department of                                     2202-09
Education Office of Hearings and Appeals, dated March 30 2017

Brief in Support of Federal Student Aid's Final Audit Determination, dated October 28,          2210-54
2016

Supplemental Brief in Support of Federal Student Aid's Final Audit Determination, dated         2255-76
May 19, 2017

Brief in Response to Navient Corporation's Appeal of Hearing Official's Initial Decision,       2277-318
dated May 3, 2018

Motion for Leave To File a Sur-Reply Brief in Response to Reply Brief in Support of             2319-35
Navient Corporation's Appeal of Hearing Official's Initial Decision), dated May 31, 2019

*In re Audit Control No. ED-OIG/A03I0006*

*Special Allowance Payments to Sallie Mae's Subsidiary,*
*Nellie Mae, for Loans Funded by Tax Exempt Obligations*

**AFFIDAVIT OF MARK L. HELEEN**

MARK L. HELEEN, being duly sworn, deposes and says:

1.      I am Executive Vice President, Chief Legal Officer and Secretary of Navient

Corporation ("Navient").  I have held that position since November 2014. Prior to that date,

beginning in June 2014, I was Navient's Senior Vice President and Senior Deputy General

Counsel.   In addition, from July 1998 to December 2010, I held various positions in Sallie Mae,

Inc.'s ("Sallie Mae") legal department. My last position with Sallie Mae was Executive Vice

President and General Counsel from February 2008 to December 2010.

2.      I am submitting this Affidavit in connection with Navient's request for review of

the final audit determination ("FAD") dated as of September 25, 2013, of the U.S. Department of

Education, Federal Student Aid, concerning the final audit report issued to Sallie Mae, Inc. by

the Department's Office of Inspector General on August 3, 2009.

3.      I certify that, based on my personal knowledge gained during my time at Navient,

and in my position as Navient's Corporate Secretary, the below statements are true and accurate.

Further, I am prepared to make such statements and certification if called upon to do so in a court

of law or other administrative proceeding.

4.      The FAD reaches certain conclusions about the appropriate billing of special-allowance payments with respect to certain loans that, in July and August of 2004, were transferred from Nellie Mae Education Loan LLC (formerly known as Nellie Mae Education Loan Corporation, "NMELC," EIN *352)[1] to SLM Education Credit Finance Corporation ("ECFC," EIN *392).

5.      At the time of these loan transfers in July and August 2004, ECFC was a wholly-owned subsidiary of SLM Corporation.  ECFC, in turn, was the single-member owner of Nellie Mae Holdings LLC (EIN *783).  Nellie Mae Holdings LLC (EIN *783), in turn, was the single-member owner of NMELC (EIN *352) – the entity that transferred the relevant loans to ECFC. Nellie Mae Holdings LLC (EIN *783) and NMELC (EIN *352) were transferred to ECFC from Student Loan Marketing Association in June, 2004.  This transfer occurred as part of the wind-down of Student Loan Marketing Association, the government sponsored entity, and its ultimate dissolution which occurred at the end of 2004.


[INTENTIONALLY LEFT BLANK]


---

[1]      Like the FAD, this Affidavit uses each entity's last three EIN digits to identify it.

6.      Because they were limited liability companies at the time of the loan transfers, both Nellie Mae Holdings LLC (EIN *783) and NMELC (EIN *352) were disregarded for tax purposes under the Internal Revenue Code.  As a stock corporation – and as the direct parent of Nellie Mae Holdings (EIN *783) and the indirect parent of NMELC (EIN *352) – ECFC was not disregarded for tax purposes under the Internal Revenue Code.

FURTHER AFFIANT SAYETH NOT.

_____
Mark L. Heleen

Sworn to before me this 23rd day of September, 2016:



Kathleen Marie Miller

OIG Follow-up Questions for Sallie Mae dtd 12/14/07

**SSSC's OE and Branch Codes**

1. Does each taxable bond (e.g., AELMC 2001 A-1) or tax-exempt bond issued on/after 10/1/93 have multiple OE and branch combinations that tie 9.5% floor loans (e.g., loans A and B) back to the underlying eligible tax-exempt bond (e.g., AELMC 1997 B and FELMC 2002 A-3, respectively) from which each loan derived its eligibility for 9.5% floor treatment?

- **Yes**. For each bond, there are separate branches to segregate the portfolio by the underlying eligible tax exempt bond. For example, please see attachment A. Within the taxable bond 2001 A-1, loans from the underlying tax exempt bonds are labeled by branch:

| CURRENT BOND | UNDERLYING BOND | BRANCH ES |
|---|---|---|
| 2001 A-1 | 1993 SS | 4459/5459 |
| 2001 A-1 | 1992 SS | 4460/5460 |
| 2001 A-1 | 1997 B | 4461/5461 |
| 2001 A-1 | 1998 A-3B | 4462/5462 |
| 2001 A-1 | 2003 A-2  A-3 | 4463/5463 |

2. Under SLMA's business processes, would loan A cease to be billed at the 9.5% floor upon the maturity of the underlying tax-exempt bond (AELMC 1997 B)?

- **Yes.** Column O on attachment A lists the maturity date of the underlying bond, and column P specifies the date that the SAP for the loans associated with the underlying bond should be changed to full SAP. On the maturity date of AELMC 1997 B, branches 4461/5461 would be changed to bill at full SAP.

3. Under SLMA's business processes, would loan B cease to be billed at the 9.5% floor upon the maturity of the underlying tax-exempt bond (FELMC 2002 A-3)?

- **Yes.** On the maturity date of FELMC 2002 A-3, branches 4463/5463 would be changed to bill at full SAP.

**Refinancing of SSSC Bond 1991 A**

1. For purposes of determining 9.5% floor loan eligibility, does SLMA differentiate the $40 M of FELMC 2003 C-5 that relates back to Bond 1991 A and the $10 M of "new" monies? If yes, how does SLMA differentiate these two funding sources within FELMC 2003 C-5?

- Yes. See attachment B. Within the ownership of bond FELMC 2003-5, branches 4409/5409 related to the $40M floor eligible bonds and billed at half SAP, branches 4410/5410 related to the $10M and billed full SAP, and branches 4411/5411 and 4412/5412 related to other underlying floor bonds and billed at half SAP.

OIG Follow-up Questions for Sallie Mae dtd 12/14/07

**Maturity Dates - SSSC**

1. For purposes of determining when a loan ceases to be eligible for 9.5% floor treatment, does SLMA use the maturity date for the individual bond in the series (e.g., A-1, A-2, A-3, etc.) from which the loan derived its eligibility? Or, is the latest maturity date for any bond in the series used to determine when all 9.5% floor loans funded by the series cease to be eligible for 9.5% floor treatment?

- The latest maturity date within the series is used to determine the eligibility date for 9.5% floor treatment.

2. Assuming AELMC 2001 A-1 matured on 10/1/05, what impact does this have on the eligibility of 9.5% floor loans financed by AELMC 2001 A-1?

- This is not a scenario that would have occurred in our portfolio. AELMC 2001 A-1 is a taxable bond, so the maturity date would have been much longer than that of any of the underlying floor bonds. The 9.5% floor loans financed by 2001 A-1 would cease billing when the underlying bond matured, well before the taxable bond matured.

3. What effect on eligibility does the maturity of AELMC 2001 A-1 have on 9.5% floor loans that were initially financed by AELMC 2001 A-1 but were refinanced by another bond issue?

- Assuming for this discussion that AELMC 2001 A-1 was a tax-exempt, 9.5% eligible bond, all loans associated with this bond for 9.5% eligibility would cease billing on the maturity date of 10/01/05, regardless of the current financing.

**Maturity Dates – NLMA & SLFR**

4. If a $50 M eligible tax-exempt bond within a bond series matured, did SLMA sell the 9.5% floor loans (approximate $50 M) financed by the bond to the associated holding tank and continue to bill the loans under the 9.5% floor?

- Only if necessary. If the bond series had sufficient cash to fund the redemption, then no loans would be sold. If a sale was necessary to fund the redemption of a single bond, the loans would be sold to the holding tank, and would continue to bill at 9.5% floor until the bond series matured.

5. Continuing the above scenario, do the holding tank's loans continue to be billed under the 9.5% floor until the last eligible tax-exempt bond issue in the series matures or until the last bond (regardless of classification - taxable or post 9/30/93 tax-exempt) within the series matures?

- The latest maturity date within the series is used to determine the eligibility date for 9.5% floor treatment, so loans would continue to bill 9.5% until the last eligible bond issue matured. Please note that SLFR and NLMA did not mix taxable and tax-exempt bonds within the same series, so all bonds within a series would have been eligible for 9.5% SAP.

OIG Follow-up Questions for Sallie Mae dtd 12/14/07

6. The listing of NLMA's bonds (Bates248) indicates that Bond 93 H was issued on 11/15/93, and that it did not refund an earlier bond issue.  Is this correct?

   - No.  NLMA 93H refunded 1985R on 11/15/93.  Please see attachment C for the revised bond genealogy.


**ECFC**

1. Where did the loans billed for Education Credit Finance Corporation (ECFC, LID 834071) during quarters-end March 2005 and June 2005 come from (e.g., prior LID of bond issue) and where did they go?

   - The loans in question were from NLMA 93B, and came from LID 833691.  Upon maturity of this series on 7/1/05, the loans were legally sold to ECFC and ceased billing at half SAP (9.5%).


**Miscellaneous**

1. Please provide the missing pages (2-5) from the document labeled "Bates 440" or indicate if there are no additional pages.

   - We confirm that Bates No. 440 was inadvertently included as part of the document beginning with Bates No. 439 and that there are no additional pages to provide.

2. The Department's Datamart indicates that Education Finance Credit Corporation had billings under the 9.5% floor in quarters-end March 2005 and June 2005 under LID 834071.  Is this the same subsidiary as Education Credit Finance Corporation (business unit 375)?  If not, please elaborate on both entities.

   - Yes, this is the same Corporate Entity.  It appears that there is a transposition of words on the Datamart.   The correct name is Education Credit Finance Corporation.

3. What is the corporate relationship(s) between Education Credit Finance Corporation, Education Finance Credit Corporation, and Nellie Mae?

   - SLM Education Credit Finance Corporation is the correct name of the entity.  Education Finance Credit Corporation and Education Credit Finance Corporation are the same entity with the word 'Finance' and "Credit' transposed.  SLM Education Credit Finance Corporation was originally named NM Education Loan Corporation.  It was formerly a wholly-owned subsidiary of the Nellie Mae Corporation, which we acquired in 1999.

# SallieMae

**SLM CORPORATION**
12061 BLUEMONT WAY
RESTON, VIRGINIA 20190
703-984-5016, Fax 703-984-6587

ROBERT S. LAVET
Senior Vice President & General Counsel

February 15, 2007

Theresa Shaw
U.S. Department of Education
830 First Street, NE
Room 112G1
Washington, DC 20202

Dear Terri:

I am writing in response to your letter to Tim Fitzpatrick, dated January 24, 2007, as well as to the Dear Colleague Letter, dated January 23, 2007, which was posted on the Department of Education's website on January 24, 2007 (FP-07-01).

While we respectfully disagree with the interpretation set forth in the letters concerning eligibility for special allowance payment (SAP) at the 9.5% minimum return rate, we agree, subject to the conditions described below, as follows. First, we agree to make no further claims for SAP at the 9.5 percent minimum return rate. Second, we agree to accept payment on our recently submitted requests for special allowance payments for the fourth quarter of 2006 at the standard SAP rate. In the event that any industry participant successfully challenges the Department of Education's interpretation in FP-07-01, we reserve the right to reevaluate these agreements. Further, in the event that we acquire a controlling interest in an industry participant that has satisfactorily complied with the audit and certification requirements set forth in FP-07-01, we reserve the right to permit such acquired entity to continue to request payment of SAP at the 9.5 percent minimum return rate so long as it continues to comply with such requirements. Finally, we reserve the right to reevaluate these agreements if Congress, the Executive branch or any governmental entity takes any action that is materially adversely different from the Department of Education's resolution of this matter.

I appreciate your guidance on this very difficult issue and trust that this letter will mark our closing correspondence with respect to the 9.5 percent SAP issue.

Sincerely,

Robert S. Lavet

1601

NAV_000256

*In re Audit Control No. ED-OIG/A03I0006*

*Special Allowance Payments to Navient's Subsidiary,*
*Nellie Mae, for Loans Funded by Tax Exempt Obligations*

### AFFIDAVIT OF JANE ROIG

JANE ROIG, being duly sworn, deposes and says:

1.      In 1992-1993, the period discussed below, I was employed at the Kentucky Higher Education Assistance Authority (KHEAA) as Assistant Director of Program Administration.   During 1992 and 1993, on behalf of KHEAA, I was a member-at-large of the Board of the National Council of Higher Education Loan Programs (NCHELP) and served as the Vice Chairperson of the NCHELP Regulations Committee.

2.      During the period from 1992-1993,  I was frequently in Washington to meet with the Department of Education, along with other industry participants, and played a key role in coordinating and participating in the activities of the NCHELP Regulations Committee with respect to (i) the review panel formed in the Negotiated Rulemaking process for the 1992 Amendments to the Higher Education Act; (ii) public meetings convened by the Department of Education to gather industry feedback and comments with respect to the proposed 1992 regulations; and (iii) industry input to the Dear Colleague Letter (DCL) 93-L-161 issued in

NAV_000258

November, 1993 (the 1993 DCL) with administrative guidance pertaining to the Omnibus

Budget Reconciliation Act of 1993 (Pub. L. 103-66) ("OBRA 1993").

3.      I recall that during this period of time, many discussions were taking place

regarding the Department's change in policy with respect to loans subject to the 1/2 SAP/9.5%

floor rate as part of the 1992 regulations, and to the contents and language of the 1993 DCL.   I

specifically recall that the phrase "in whole or in part" was added to the draft language of the

1993 DCL under the heading "Special Allowance Payments" based on conversations that Sheila

Ryan-Macie, from Nellie Mae, had with Robert Evans, who was at that time the Department of

Education's Policy Division Director.

FURTHER AFFIANT SAYETH NOT.


_____
Jane Roig


Sworn to before me this 11ᵗʰ day of November, 2016:



JACOB DANIEL SEVIER
Notary Public - Arizona
Maricopa County
My Comm. Expires Mar 3, 2020

Jacob Sevier
March 3rd 2020

1603

NAV_000259

## Glick, Veronica R.

| | |
|---|---|
| **From:** | Pedersen, AnnMarie <AnnMarie.Pedersen@ed.gov> |
| **Sent:** | Wednesday, April 26, 2017 9:41 AM |
| **To:** | Glick, Veronica R. |
| **Subject:** | RE: IFAP website |

| | |
|---|---|
| **Categories:** | Important |
| **FilingDate:** | 5/1/2017 7:24:00 PM |

Hi Veronica,

We are finalizing our response to officially very soon, but unfortunately we weren't able to locate any of the actual complaints referenced.  Our records retention schedule didn't require us to keep that information and they weren't maintained.

You should be getting the official response in a week or so, we only heard back from the subject matter experts last week.

Sorry we couldn't be of more help.

Ann Marie

---

**From:** Glick, Veronica R. [mailto:vrglick@debevoise.com]
**Sent:** Tuesday, April 25, 2017 3:58 PM
**To:** Pedersen, AnnMarie
**Subject:** RE: IFAP website

Dear Ann Marie,

Good afternoon.  We were wondering whether you have located any materials in response to our FOIA request regarding the 1993 Dear Colleague Letter and Nellie Mae / Sallie Mae?

Sincerely,

Veronica



**Veronica R. Glick**
vrglick@debevoise.com
+1 202 383 8153 (Tel)

---

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in Washington, D.C. at 202-383-8000) and then delete and discard all copies of the e-mail. Thank you.

**From:** Pedersen, AnnMarie [mailto:AnnMarie.Pedersen@ed.gov]
**Sent:** Monday, February 06, 2017 16:49
**To:** Glick, Veronica R.
**Subject:** RE: IFAP website

Thanks Veronica, I will let you know if we need anything else.

**From:** Glick, Veronica R. [mailto:vrglick@debevoise.com]
**Sent:** Monday, February 06, 2017 4:48 PM
**To:** Pedersen, AnnMarie
**Subject:** RE: IFAP website

Dear Ann Marie:

Thank you for your call.  I have attached the Cover, Index, and Page 13 of the 1993 DCL to help identify the issues raised in the FOIA request.  Please let me know if I can clarify anything.

Sincerely,

Veronica

**Debevoise
&Plimpton**

**Veronica R. Glick**
vrglick@debevoise.com
+1 202 383 8153 (Tel)

This e-mail message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure. If you are not the intended recipient, please do not disseminate, distribute or copy this communication, by e-mail or otherwise. Instead, please notify us immediately by return e-mail (including the original message in your reply) and by telephone (you may call us collect in Washington, D.C. at 202-383-8000) and then delete and discard all copies of the e-mail. Thank you.

**From:** Pedersen, AnnMarie [mailto:AnnMarie.Pedersen@ed.gov]
**Sent:** Monday, February 06, 2017 16:14
**To:** Glick, Veronica R.
**Subject:** IFAP website

https://ifap.ed.gov/ifap/

Ann Marie Pedersen
Director, Correspondence Services
Office of Communications and Outreach
Federal Student Aid
U.S. Department of Education
830 First Street, NE, Room 22C5
Washington, DC  20202-5361
Phone: (202) 377-4543
annmarie.pedersen@ed.gov

## Glick, Veronica R.

| | |
|---|---|
| **From:** | Wehausen, Robert <Robert.Wehausen@ed.gov> |
| **Sent:** | Monday, May 15, 2017 3:02 PM |
| **To:** | Glick, Veronica R. |
| **Subject:** | U.S. Department of Education FOIA 17-00624-F |

Dear Veronica Glick:

This is the Department's final response to your request dated December 29, 2016, requesting information pursuant to the Freedom of Information Act (FOIA), 5 U.S.C. § 552, which was received in the FOIA Service Center (FSC) on January 2, 2017.  Your request was forwarded to the appropriate office within the Department of Education (the Department) for any responsive documents they may have.

You Requested:

>   Documents to include: (i) drafts of the November 1993 Dear Colleague Letter ("DCL") 93-L-161, (ii) any communications/documents regarding the terms "in whole or in part" therein, and (iii) any communications between Sheila Ryan and Robert (Bob) Evans, former director of policy and development for the Department of Education.  Date range: 1992-1993

This letter is to notify you that the Department was unable to locate any documents that are responsive to your request. The staff in Federal Student Aid (FSA) informed the FSC that they did not retain any of the complaints sought in this request as they were considered background material, and therefore temporary records for the purposes of records retention.

You have the right to seek assistance and/or dispute resolution services from the Department's FOIA Public Liaison or the Office of Government Information Services (OGIS).  The FOIA Public Liaison is responsible, among other duties, for assisting in the resolution of FOIA disputes.  OGIS, which is outside the Department of Education, offers mediation services to resolve disputes between FOIA requesters and Federal agencies as a non-exclusive alternative to appeals or litigation.

They can be contacted by:

| Mail | FOIA Public Liaison<br>Office of the Chief Privacy Officer<br>U.S. Department of Education<br>400 Maryland Ave., SW, LBJ 2E321<br>Washington, DC 20202-4536 | Office of Government Information Services<br>National Archives and Records Administration<br>8601 Adelphi Road<br>Room 2510<br>College Park, MD  20740-6001 |
|---|---|---|
| E-mail | robert.wehausen@ed.gov | OGIS@nara.gov |
| Phone | 202-205-0733 | 301-837-1996; toll free at 1-877-684-6448 |
| Fax | 202-401-0920 | 301-837-0348 |

Lastly, you have the right to appeal this determination.  You must submit any appeal within 90 calendar days after the date of this letter.  Using the services described above does not affect your right, or the deadline, to pursue an appeal.  An appeal must be in writing and must include a detailed statement of all legal and factual bases for the appeal; it should be accompanied by a copy of this letter, the initial letter of request, and any documentation that serves as evidence or supports the argument you wish the Department to consider in resolving your appeal.

Appeals may be submitted using the on-line form available at www.ed.gov/policy/gen/leg/foia/foia-appeal-form.pdf.

Appeals can also be submitted by:

      E-mail:    EDFOIAappeals@ed.gov
      Fax:      202-401-0920
      Mail:     Appeals Office
                Office of the Chief Privacy Officer
                U.S. Department of Education
                400 Maryland Avenue, SW, LBJ 2E320
                Washington, DC  20202-4536

Sincerely,
**Robert Wehausen**
Team Lead
FOIA Service Center
U.S. Dept. of Education
400 Maryland Avenue, SW
Washington, DC  20202-4510
202.205.0733

01/24/2007 11:58 FAX 202 275 4614                                                      ☑001



CHIEF OPERATING OFFICER

January 24, 2007

Thomas J. Fitzpatrick
Chief Executive Officer
SLMA Corporation
12061 Bluemont Way
Reston, VA 20190

Dear Mr. Fitzpatrick:

Our records show that you recently submitted a request for special allowance payments
(SAP) on Federal Family Education Loan Program (FFELP) loans. Your request
included a claim(s) for SAP at the 9.5 percent minimum return rate under 20 U.S.C.
§1087-1(b)(2)(B)(i)(2006). The purpose of this letter is to provide guidance to you on
the requirements applicable to claims for SAP at the 9.5 percent minimum return rate.

Recent examination of activities involving tax-exempt financing of FFELP loans
indicates that it is appropriate to restate the requirements of the Higher Education Act of
1965 as amended (HEA) and the Department's regulations that control whether FFELP
loans made or acquired with funds derived from tax-exempt financing sources acquire
eligibility for SAP at the 9.5 percent minimum return rate.

The HEA identifies the specific sources of funds derived from a tax-exempt obligation
that can be used to acquire loans that qualify for the 9.5 percent minimum SAP rate. 20
U.S.C. § 1087-1(b)(2)(B)(i)(2006). These sources are: (1) funds obtained from the
issuance of a tax-exempt obligation originally issued prior to October 1, 1993 or from
investment earnings on the proceeds of such an obligation; and (2) funds obtained as
collections on, interest benefits or special allowance payments on, or income on, loans
made or purchased from the proceeds of that tax-exempt obligation. *Id.* The regulations
describe these sources of funds in precise terms, as follows:

> (c)(3)(i) . . . the special allowance rate is one-half of the rate calculated
> under paragraph (c)(1)(iii)(F) of this section for a loan made or guaranteed
> on or after October 1, 1980 that was made or purchased with funds
> obtained by the holder from--
>   (A) The proceeds of tax-exempt obligations originally issued prior to
> October 1, 1993;
>   (B) Collections or payments by a guarantor on a loan . . . purchased
> with funds obtained . . . from obligations described in paragraph
> (c)(3)(i)(A) of this section;

830 First St. N.E., Washington, DC 20202
www.FederalStudentAid.ed.gov
1-800-4-FED-AID

FEDERAL STUDENT AID ▓▓ START HERE. GO FURTHER.

01/24/2007 11:59 FAX 202 275 4614                                               ☑002

(C) Interest benefits or special allowance payments on a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;

(D) The sale of a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;[1] or

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

34 C.F.R. § 682.302(c)(3)(i) (2006). These requirements have been in effect since 1993. Only the loans described in these statutory and regulatory provisions are eligible for SAP at the 9.5 percent minimum return rate. Each of the five categories (paragraphs (c)(3)(i)(A) through (c)(3)(i)(E)) includes funds separate and distinct from the funds in any other category. Each category of funds includes only those funds obtained directly from the specific source named in that paragraph.

Loans acquired from these five sources can be divided into two categories. The first category is "first-generation loans" – and includes only those loans acquired using proceeds of the tax-exempt obligation (*i.e.*, funds obtained directly from the issuance of the tax-exempt obligation). *See* 34 C.F.R. § 682.302(c)(3)(i)(A) (2006). The second category is "second-generation loans" – and includes only those loans acquired using funds obtained directly from first-generation loans.[2] *See* 34 C.F.R. § 682.302(c)(3)(i)(B)-(D) (2006). Funds obtained as collections on second-generation loans, interest and special allowance payments on second-generation loans, or sales of second-generation loans, or those same kinds of funds obtained from later generation loans, are not eligible sources of funds under the statute or regulation. Therefore, loans acquired with funds from second or later generation loans are not eligible for SAP at the 9.5 percent minimum return rate.

The Department pays SAP if it receives an accurate and complete request for payment from a lender. 20 U.S.C. § 1087-1(b)(3) (2006). A request for payment is accurate and complete if it contains all the information required by the Department, and does not include any loans that the Department has directed the lender to exclude from its request. 34 C.F.R. § 682.305(b)(5) (2006).

Finally, a claim for SAP at the 9.5 percent minimum return rate may be made only for first-generation and second-generation loans, as described above. On the "request for payment" form (Form LaRS 799) that you and other lenders submit to the Department, the certifying official represents that the data on the form conforms to the laws,

---

[1] The term "sale" as used in paragraph (c)(3)(i)(D) includes both a sale to a third party and an intra-portfolio transfer of loans.

[2] Loans from investments of proceeds, described in paragraph (c)(3)(i)(E), are like second-generation loans – the loans themselves qualify for the minimum rate, but loans acquired with funds obtained as collections, interest and SAP, or the sale of those loans described in paragraph (c)(3)(i)(E) do not. To ensure clarity regarding the eligibility of loans made from various funding sources, therefore, any references here to second-generation loans are to be understood to include loans made from investment earnings.

regulations, and policies applicable to the Federal Family Education Loan Program. By so certifying, the lender represents to the Department that no claim is made on that request for payment of 9.5 percent SAP on any loans that are not first-generation or second-generation loans.

Although the limitations on eligibility for SAP at the 9.5 percent minimum return rate restated in this letter and in DCL FP-07-01 dated January 23, 2007, have long been reflected in the HEA and the regulations, the Department has reason to believe that some lenders may be claiming 9.5 percent SAP on loans which are neither first-generation nor second-generation loans. Therefore, to ensure proper distribution of payments and to assess the incidence of such claims, the Department will take two steps before we pay any further claims for SAP at the 9.5 percent minimum return rate.

First, we will arrange for an audit or review of the loans on which you are currently claiming SAP at the 9.5 percent rate in order to determine which loans are first-generation and second-generation loans. The audit or review will be conducted by an independent accounting firm. As an alternative, you may arrange for the conduct of an audit or review by an independent accounting firm of your choosing, under a set of requirements to be established by the Department. The Department will pay all claims for SAP at the standard rate until the results of the audit or review have been received, evaluated, and accepted by the Department. We will consider, and rely upon, as appropriate, the results of the audit or review in determining what amount to pay at the 9.5 percent minimum return rate. We will also consider any objections you assert to our determination.

Second, you are to provide--with any request for payment of SAP at the 9.5 percent minimum return rate--a certification, executed by the chief executive officer (CEO) and chief financial officer (CFO) of your organization, that SAP is claimed at the 9.5 percent minimum return rate only for loans which are either first-generation or second-generation loans, and no others. The certification must be in the following form –

> We, _____, CEO and _____, CFO of ____ [company name] hereby certify that we have reviewed the billing for special allowance payments under the Federal Family Education Loan Program submitted to the Department of Education by _____[company name] on_____ [date]. We certify that we have internal controls in place to monitor and ensure the accuracy of the claim presented in this bill, and that as part of our regular annual audit, our independent auditor will attest to the effectiveness of these controls and the accuracy of the billing. Based on our review, we certify that the billing requests special allowance payment at the 9.5 percent minimum return rate only on loans that are first-generation or second-generation loans obtained from an eligible source, as described in the Department's Dear Colleague Letter [FP-07-01] dated January 23, 2007, and no others. We have disclosed to our independent auditors and

01/24/2007 12:00 FAX 202 275 4614                                                    ☑004

to the audit committee[3] all significant deficiencies in the design and
operation of the internal controls that could adversely affect the accuracy
of the information presented herein, as well as any fraud, whether or not
material, that involves management or any other employee connected to
the information contained in this bill.

Date

Signature

Title

The Department will pay SAP at the standard rate on any request for payment that is not
accompanied by this certification.

The Department is committed to resolving without protracted dispute any potential
objections both to the meaning and application of the statutory and regulatory
requirements as restated in this letter, and to ensuring that SAP is paid at the 9.5 percent
minimum return rate only on eligible loans.  Therefore, the Department will not seek to
recoup SAP already received in excess of that payable at the standard rate for quarters
ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans
that were neither first-generation loans nor second-generation loans for those lenders that
promptly comply with or accept, as applicable, the following--

1. The statutory and regulatory requirements for eligibility for SAP at the 9.5
   percent minimum return rate as restated in this letter;
2. The requirement that a request for payment of SAP at the 9.5 percent rate be
   supported by the management certification described above; and
3. The Department's payment of all SAP claims at the standard rate, rather than the
   9.5 percent minimum return rate, until the Department receives, accepts and
   evaluates the results of the audit or review described here, and determines, after
   our consideration of any objection you present, which of the loans on which you
   currently claim SAP at the 9.5 percent rate are eligible for payment at that rate.

Thank you for your cooperation.  Please contact Matteo Fontana, General Manager,
Financial Partners Services, at 202-377-3005 if you have any questions regarding the
procedures in this letter.

Theresa S. Shaw
Chief Operating Officer
Federal Student Aid

---

[3] If your organization has not established an audit committee, please substitute the director(s), trustee(s) or
other authority with responsibility for review of your annual financial statements.

4

# Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations

## FINAL AUDIT REPORT



**ED-OIG/A03I0006**
**August 2009**

Our mission is to promote the efficiency, effectiveness, and integrity of the Department's programs and operations.



U.S. Department of Education
Office of Inspector General
Philadelphia, PA

# NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General.  Determinations of corrective action to be taken will be made by the appropriate Department of Education officials.

In accordance with the Freedom of Information Act (5 U.S.C. § 552), reports issued by the Office of Inspector General are available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.



# UNITED STATES DEPARTMENT OF EDUCATION
### OFFICE OF INSPECTOR GENERAL

**Audit Services, Region III, Philadelphia**

August 3, 2009

Mark L. Heleen
Executive Vice President and General Counsel
Sallie Mae, Inc.
12061 Bluemont Way
Reston, VA 20190

Dear Mr. Heleen:

Enclosed is our final audit report, Control Number ED-OIG/A03I0006, entitled *Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations*. This report incorporates the comments you provided in response to the draft report. If you have any additional comments or information that you believe may have a bearing on the resolution of this audit, you should send them directly to the following Education Department official, who will consider them before taking final Departmental action on this audit:

> William J. Taggart
> Chief Operating Officer, Federal Student Aid
> US Department of Education
> Union Center Plaza III, Room 112G1
> 830 First Street, NE
> Washington, DC 20002

It is the policy of the U. S. Department of Education to expedite the resolution of audits by initiating timely action on the findings and recommendations contained therein. Therefore, receipt of your comments within 30 days would be appreciated.

In accordance with the Freedom of Information Act (5 U.S.C. § 552), reports issued by the Office of Inspector General are available to members of the press and general public to the extent information contained therein is not subject to exemptions in the Act.

Sincerely,

/s/
Bernard Tadley
Regional Inspector General for Audit

Enclosures

# TABLE OF CONTENTS

**Page**

EXECUTIVE SUMMARY ................................................................................................1

BACKGROUND .............................................................................................................3

AUDIT RESULTS ..........................................................................................................7

    FINDING – SLMA Billed Loans under the 9.5 Percent Floor
           Calculation after the Eligible Tax-Exempt Bond Matured
           and after Its Loans Were Refinanced with Ineligible Funds ...................7

OBJECTIVES, SCOPE, AND METHODOLOGY ...................................................23

Enclosure:  SLMA Comments ....................................................................................29

**Acronyms/Abbreviations Used in this Report**

| | |
|---|---|
| ADB | Average Daily Balance |
| CFR | Code of Federal Regulations |
| DCL | Dear Colleague Letter |
| Department | U.S. Department of Education |
| ECFC | Education Credit Finance Corporation |
| GAO | Government Accountability Office |
| GAS | Government Auditing Standards, July 2007 Revision |
| FFEL | Federal Family Education Loan |
| FSA | Federal Student Aid |
| HEA | Higher Education Act of 1965, as amended |
| HERA | Higher Education Reconciliation Act of 2005 |
| LaRS | Lender's Interest and Special Allowance Request and Report |
| LID | Lender Identification Number |
| NLMA | Nellie Mae |
| OIG | Office of Inspector General |
| Pub. L. | Public Law |
| SAP | Special Allowance Payments |
| SLMA | Sallie Mae, Inc. |
| TTPA | Taxpayer-Teacher Protection Act of 2004 |

# EXECUTIVE SUMMARY

The purpose of the audit was to determine if Nellie Mae (NLMA), a subsidiary of Sallie Mae, Inc. (SLMA), (1) billed loans under the 9.5 percent floor in compliance with the Taxpayer-Teacher Protection Act of 2004 (TTPA) and the Higher Education Reconciliation Act of 2005 (HERA) and (2) billed loans under the 9.5 percent floor after the eligible tax-exempt bonds from which the loans derived their eligibility matured or were retired.  Our audit period covered October 1, 2003, through September 30, 2006.

Special allowance payments (SAP) are made to lenders in the Federal Family Education Loan (FFEL) Program to ensure that lenders receive an equitable return on their loans.  In general, the amount of SAP is the difference between the amount of interest the lender receives from the borrower or the government and the amount that is provided under requirements in the Higher Education Act of 1965, as amended (HEA).

The HEA includes a special allowance calculation for loans that are funded by tax-exempt obligations issued before October 1, 1993.  The quarterly SAP for these loans may not be less than 9.5 percent, minus the interest the lender receives, divided by four.  We refer to this calculation as the "9.5 percent floor."  When interest rates are low, the 9.5 percent floor provides a significantly greater return than lenders receive for other loans.

We found that SLMA's billing for its NLMA subsidiary for SAP under the 9.5 percent floor, complied with the TTPA and HERA.  However, SLMA's billing for NLMA did not comply with other requirements for the 9.5 percent floor calculation.  Specifically, SLMA continued to bill loans under the 9.5 percent floor after the eligible tax-exempt bonds, from which the loans derived their eligibility for the 9.5 percent floor, had matured and been retired, and after the loans were refinanced with funds derived from ineligible sources.  We estimate that this noncompliance resulted in special allowance overpayments of about $22.3 million.

SLMA officials asserted that the date the last bond associated with an indenture matured determined the eligibility for the 9.5 percent floor calculation of loans financed by, or made eligible through, the bonds associated with that indenture.  SLMA justified its practice based, in part, upon the position that, because all of the bonds associated with an indenture shared common characteristics, all of the bonds should be treated as a single obligation for purposes of applying the 9.5 percent floor calculation.  This management control weakness resulted in noncompliance with regulations and special allowance overpayments.

We recommend that the Chief Operating Officer for Federal Student Aid (FSA) instruct SLMA to return to the U.S. Department of Education (Department), the special allowance overpayments we describe in our report, and disclose any other instances, at any of its subsidiaries (i.e., NLMA, Southwest Student Services Corporation, Student Loan Funding Resources, Student Loan Finance Association), of loans billed under the 9.5 percent floor calculation after the eligible tax-exempt bond issue matured and after the loans were refinanced with funds derived from an ineligible funding source.

A draft of this report was provided to SLMA for review and comment on March 10, 2009.  In its comments, SLMA agreed with our conclusion that it complied with TTPA and HERA, but strongly disagreed with our finding and recommendations.  SLMA confirmed that it treated loans it purchased from Nellie Mae that were made with the proceeds of the 1993 Bonds issued under the 1993 Trust Agreement as eligible for the 9.5 percent floor calculation until the last bond issued matured on July 1, 2005, but asserted that this practice was based on a reasonable application of the HEA, regulations, and clear legislative intent.  SLMA provided no evidence to cause us to revise our finding or recommendations.  The full text of SLMA's comments on the draft report is included as an Enclosure to this report, except for 36 pages of  Exhibit B that shows amortization tables supporting the two Eligible Loan Balance tables on page 56 of this report.  The full Exhibit B will be made available upon request.

# BACKGROUND

## Sallie Mae Corporation

SLMA was founded in 1972 as a government-sponsored enterprise and was originally chartered as a secondary market that purchased student loans.  In 2004, SLMA dissolved its charter, terminating its corporate ties to the federal government.  SLMA's primary business was to originate and hold student loans by providing funding, delivery, and servicing support for education loans in the U.S. through its participation in the FFEL Program and through offering private education loans.

SLMA managed the largest portfolio of FFEL Program and private education loans in the student loan industry, serving nearly 10 million student and parent customers through ownership and management of $142.1 billion in student loans as of December 31, 2006, of which $119.5 billion or 84 percent were federally insured.  SLMA served clients that included over 6,000 educational and financial institutions and state agencies.  SLMA also marketed student loans, both federal and private, directly to consumers.

SLMA acquired several companies in the student loan industry that billed loans under the 9.5 percent floor.  These include—

- Nellie Mae Corporation in July 1999,
- Student Loan Funding Resources in July 2000,
- Student Loan Finance Association in November 2003, and
- Southwest Student Services Corporation in October 2004.

On July 27, 1999, NLMA incorporated NM Education Loan Corporation.  On July 22, 2002, NM Education Loan Corporation's name was changed to SLM Education Credit Management Corporation.  On November 10, 2003, SLM Education Credit Management Corporation's name was changed to SLM Education Credit Finance Corporation (ECFC).  SLMA was 100 percent owner of ECFC, and ECFC was the sole owner of both Nellie Mae Holding LLC and Nellie Mae Education Loan LLC.

## Special Allowance Payments

A lender participating in the FFEL Program is entitled to a quarterly SAP for loans in its portfolio.  In general, the amount of a special allowance payment is the difference between the amount of interest the lender receives from the borrower or the government and the amount that is provided under requirements in the HEA.  For example, for Stafford loans,[1] the amount of the quarterly SAP is calculated in four steps:

1. Determining the average of the bond equivalent rates of 91-day Treasury bills auctioned during the quarter,

---

[1] The calculation used for other types of FFEL Program loans is slightly different.

2. Adding a specified percentage to this amount (the specified percentage varies based on the loan type, origination date, and other factors),
3. Subtracting the applicable interest rate for the loan, and
4. Dividing the resulting percentage by 4. (34 C.F.R. § 682.302(c))[2]

According to Section 438(a) of the HEA, the purpose of SAP is to ensure—

> . . . that the limitation on interest payments or other conditions (or both) on loans made or insured under this part, do not impede or threaten to impede the carrying out of the purposes of this part or do not cause the return to holders of loans to be less than equitable . . . .

## 9.5 Percent Floor

The Education Amendments of 1980 (Pub. L. 96-374) created a separate special allowance calculation for FFEL Program loans made or purchased with proceeds of tax-exempt obligations, and the Higher Education Amendments of 1992 (Pub. L. 102-325) continued this separate calculation for loans with variable interest rates.

In general, the quarterly SAP for these loans is one half of the percentage determined under the method described above, using 3.5 percent as the specified percentage in Step 2.  However, the separate calculation also provides a minimum payment.  The SAP for these loans "shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4."  (Section 438(b)(2)(B)(i) and (ii) of the HEA)  In this report, we refer to the separate calculation as the "9.5 percent floor."

When interest rates are low, the 9.5 percent floor calculation results in significantly greater SAP than the lender would otherwise receive.  For example, for a FFEL Program Stafford loan made on January 15, 2000, currently in repayment, and with an average daily balance of $5,000—

- For the quarter ending December 31, 2003, a lender would receive $76 under the 9.5 percent floor calculation (payment rate of 1.52 percent).  Under the calculation that would be used if the same loan was not eligible for the 9.5 percent floor calculation (payment rate of 0.0025 percent), the lender would receive $0.125.
- For the quarter ending December 31, 2006, a lender would receive $29.50 under the 9.5 percent floor calculation (payment rate of 0.59 percent).  Under the calculation that would be used if the same loan was not eligible for the 9.5 percent floor calculation (payment rate of 0.145 percent), the lender would receive $7.25.

The Student Loan Reform Act of 1993, which was included in the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66), repealed the 9.5 percent floor calculation, restricting it to loans made or purchased with the proceeds of tax-exempt obligations that were originally issued before October 1, 1993.  In this report, we refer to these obligations as "eligible tax-exempt" obligations or bond issues.  Tax-exempt obligations that were originally issued on or after October 1, 1993, are referred to as "ineligible tax-exempt" obligations or bond issues.  Other obligations are referred to as "taxable" obligations or bond issues.

---

[2] All regulatory citations are to the version dated July 1, 2003, unless otherwise noted.

**Taxpayer-Teacher Protection Act of 2004**

The TTPA (Pub. L. 108-409), enacted on October 30, 2004, revised Section 438(b)(2)(B) of the HEA to make certain loans ineligible for the 9.5 percent floor calculation.  Loans were ineligible for the 9.5 percent calculation if they were—

- Financed by a tax-exempt obligation that, after September 30, 2004, and before January 1, 2006, had matured or been retired or defeased;
- Refinanced after September 30, 2004, and before January 1, 2006, with a funding source other than the proceeds of an eligible tax-exempt obligation, as described in Section 438(b)(2)(B)(v)(I) of the HEA; or
- Sold or transferred to any other holder after September 30, 2004, and before January 1, 2006.

**Higher Education Reconciliation Act of 2005**

The HERA (Pub. L. 109-171), enacted on February 8, 2006, further revised Section 438(b)(2)(B) of the HEA.  First, the HERA made the TTPA provisions permanent by removing the January 1, 2006, sunset date.  Second, under the HERA, a loan is ineligible for the 9.5 percent floor calculation if it was—

- Made or purchased on or after February 8, 2006; or
- Not earning special allowance at the 9.5 percent floor rate on February 8, 2006.

The HERA provides an exception to these requirements for certain small lenders, but SLMA does not qualify for that exception.

**Eligible Tax-Exempt Bonds**

For the period October 1, 2003, through September 30, 2006, NLMA had three outstanding eligible tax-exempt obligations (bonds outstanding), totaling $159,800,000 (Table 1).

| Table 1 – NLMA Outstanding Eligible Tax-Exempt Obligations from October 1, 2003 – September 30, 2006 | | | | | |
|---|---|---|---|---|---|
| **Bond** | **Indenture** | **Issue Date** | **Bond Maturity** | **Indenture Maturity** | **Original Bond Amount** |
| 1992H | 1992H | 11/19/1992 | 11/1/2009 | 11/1/2009 | $24,000,000 |
| 1993A | 1993A | 3/1/1993 | 7/1/2005 | 7/1/2005 | $103,300,000 |
| 1993F | 1993A | 7/1/1993 | 7/1/2004 | 7/1/2005 | $32,500,000 |
| | | | | **Total** | **$159,800,000** |

On average, NLMA had total average daily balance (ADB) billings of about $399.3 million in 9.5 percent floor loans for each quarter.  During this same period, the Department paid special allowance, totaling about $75.1 million (net) to NLMA for its 9.5 percent floor loans.  Although ECFC did not have any bonds outstanding during this period, ECFC, on average, had total ADB

billings of about $221.4 million in 9.5 percent floor loans for each quarter ended September 30, 2004, through June 30, 2005.  The Department paid special allowance (net), totaling about $14.5 million (net) to ECFC for its 9.5 percent floor loans.  These amounts are provided below in Tables 2 (for NLMA) and 3 (for ECFC).

| Table 2 - NLMA's Quarterly 9.5 Percent Floor Loan Balances and Net SAP Paid | | | | |
|---|---|---|---|---|
| Quarterly Period Ending | Current Quarter ADB Billed | Net Adjustments to ADB | Total ADB Billed | SAP Paid (Net) |
| December 31, 2003 | $1,121,419,999 | ($22,469,676) | $1,098,950,323 | $17,473,409 |
| March 31, 2004 | $1,125,633,637 | ($19,523,037) | $1,106,110,600 | $17,562,882 |
| June 30, 2004 | $952,198,680 | $142,460,841 | $1,094,659,521 | $17,355,455 |
| September 30, 2004 | $380,389,990 | ($12,755,104) | $367,634,886 | $5,851,323 |
| December 31, 2004 | $344,424,312 | ($9,969,300) | $334,455,012 | $5,305,828 |
| March 31, 2005 | $312,379,041 | $485,819 | $312,864,860 | $4,994,624 |
| June 30, 2005 | $58,055,685 | $217,469,058 | $275,524,743 | $4,418,304 |
| September 30, 2005 | $51,413,978 | ($31,032) | $51,382,946 | $582,964 |
| December 31, 2005 | $45,437,762 | ($4,465) | $45,433,297 | $512,105 |
| March 31, 2006 | $39,330,356 | $3,575 | $39,333,931 | $440,244 |
| June 30, 2006 | $35,384,756 | $7,635 | $35,392,391 | $395,558 |
| September 30, 2006 | $29,494,247 | $0 | $29,494,247 | $192,335 |
| Total: | | | | $75,085,031 |
| Net adjustments are reflected during the quarters for which the adjustments were applied. Source: U.S. Department of Education, Datamart | | | | |

| Table 3 - ECFC's Quarterly 9.5 Percent Floor Loan Balances and Net SAP Paid | | | | |
|---|---|---|---|---|
| Quarterly Period Ending | Current Quarter ADB Billed | Net Adjustments to ADB | Total ADB Billed | SAP Paid (Net) |
| December 31, 2003 | $0 | ($17,137) | ($17,137) | $0 |
| March 31, 2004 | $0 | ($15,204) | ($15,204) | $0 |
| June 30, 2004 | $0 | ($18,766) | ($18,766) | $0 |
| September 30, 2004 | $0 | $353,718,924 | $353,718,924 | $5,858,826 |
| December 31, 2004 | $0 | $204,754,549 | $204,754,549 | $3,335,806 |
| March 31, 2005 | $86,486,254 | $91,622,389 | $178,108,643 | $2,931,280 |
| June 30, 2005 | $149,046,800 | $0 | $149,046,800 | $2,404,179 |
| September 30, 2005 | $0 | $0 | $0 | $0 |
| December 31, 2005 | $0 | $0 | $0 | $0 |
| March 31, 2006 | $0 | $0 | $0 | $0 |
| June 30, 2006 | $0 | $0 | $0 | $0 |
| September 30, 2006 | $0 | $0 | $0 | $0 |
| Total: | | | | $14,530,092 |
| Net adjustments are reflected during the quarters for which the adjustments were applied. Source: U.S. Department of Education, Datamart | | | | |

# AUDIT RESULTS

The purpose of the audit was to determine if SLMA's subsidiary, NLMA, (1) billed loans under the 9.5 percent floor in compliance with the TTPA and HERA, and (2) billed loans under the 9.5 percent floor, after the eligible tax-exempt bonds from which the loans derived their eligibility, had matured or been retired. Our audit period covered October 1, 2003, through September 30, 2006.

We found that SLMA's billing for its NLMA subsidiary for SAP under the 9.5 percent floor complied with the TTPA and HERA. We also found that SLMA's NLMA subsidiary continued to bill loans under the 9.5 percent floor after the eligible tax-exempt bonds, from which the loans derived their eligibility for the 9.5 percent floor, matured and after the loans were refinanced with funds derived from ineligible sources. As a result, SLMA's billing activities for its NLMA subsidiary did not comply with laws, regulations, and guidance for the 9.5 percent floor calculation.

In its comments to the draft report, SLMA agreed with our conclusion that it complied with TTPA and HERA, but did not concur with our finding and recommendations. SLMA's comments are summarized at the end of the finding. The full text of SLMA's comments on the draft report is included as an Enclosure to this report.

## FINDING – SLMA Billed Loans under the 9.5 Percent Floor Calculation after the Eligible Tax-Exempt Bond Matured and after Its Loans Were Refinanced with Ineligible Funds

SLMA continued to bill loans under the 9.5 percent floor calculation (1) after the eligible tax-exempt bond, from which the loans derived the 9.5 percent floor eligibility, matured and retired[3] and (2) after the loans were refinanced with funds derived from an ineligible funding source. Although three of the bonds matured in 2002 and one matured in 2004 (Table 4), SLMA continued to bill loans that had been financed by these bonds under the 9.5 percent floor calculation until June 2005. The loans billed were ineligible to receive special allowance under the 9.5 percent floor calculation. We estimate that this noncompliance resulted in special allowance overpayments of about $22.3 million.

---

[3] Bonds 93B, 93F, 93G and 93H were retired (i.e. repaid) upon each bond's respective maturity, as noted in Tables 4 and 5.

| Table 4 – NLMA Bond Issues | | | |
|---|---|---|---|
| **Bond** | **Original Bond Amount** | **Maturity Date** | **Bond Amount Outstanding at Maturity** |
| 93B | $48,905,000 | June 1, 2002 | $10,700,000 |
| 93F | $32,500,000 | July 1, 2004 | $32,500,000 |
| 93G | $107,000,000 | August 1, 2002 | $47,400,000 |
| 93H | $71,790,000 | December 1, 2002 | $14,370,000 |

Bonds 93B, 93F, 93G and 93H were issued under NLMA's 93A Indenture, which consisted of eight bonds totaling $458,095,000.  All eight bonds issued under the 93A Indenture were refunding bonds issued to refund obligations originally issued before October 1, 1993.  The last outstanding bond issued under the indenture matured on July 1, 2005.[4]  (Table 5)

| Table 5 – Bonds Issued under NLMA's 93A Indenture | | | | |
|---|---|---|---|---|
| **Bond or Supplement** | **Bond Name** | **Date Issued** | **Bond Maturity** | **Original Bond Issue** |
| Original Bond | 93A | 3/1/1993 | 7/1/2005 | $103,300,000 |
| First Supplement | 93B | 6/1/1993 | 6/1/2002 | $48,905,000 |
| Second Supplement | 93C | 7/1/1993 | 7/1/1998 | $26,100,000 |
| Second Supplement | 93D | 7/1/1993 | 7/1/1998 | $10,160,000 |
| Second Supplement | 93E | 7/1/1993 | 7/1/1999 | $58,340,000 |
| Second Supplement | 93F | 7/1/1993 | 7/1/2004 | $32,500,000 |
| Third Supplement | 93G | 8/1/1993 | 8/1/2002 | $107,000,000 |
| Fourth Supplement | 93H | 11/15/1993 | 12/1/2002 | $71,790,000 |
| | | | **Total** | **$458,095,000** |

SLMA's treatment of 9.5 percent floor loans financed by bonds associated with the 93A Indenture was not consistent with NLMA's practice prior to SLMA's acquisition of NLMA in July 1999.  According to SLMA officials, prior to SLMA assuming responsibility for NLMA's bonds and 9.5 percent floor loans, NLMA's practice was to cease billing loans under the 9.5 percent floor calculation upon the maturity of the applicable eligible tax-exempt bond.  SLMA took the position that NLMA was mistaken when it ceased billing on a particular bond prior to

---

[4] A bond is a valid debt obligation of the issuer.  An indenture is a formal agreement between the issuer of the bond and a trustee bank.  Generally, the indenture creates a trust estate administered by the trustee for the benefit of the bondholders to ensure repayment of the bonds.  Loans made or purchased with the bond proceeds and their associated payments and income are pledged by the issuer to the trust estate to ensure repayment of the bonds.  (NLMA's 93A Indenture did not include a pledge of collateral to secure the repayment of the bonds.)  The indenture describes the terms and conditions of the bond, such as the type of obligation, bond amount, interest rate and maturity date.  The indenture also specifies administrative tasks to be performed by the trustee, such as the handling of bond proceeds.  A single bond or multiple bonds may be issued under an indenture or additional bonds may be issued under supplements to an indenture.

the maturity of the particular bond indenture (i.e., the date that the last bond in the indenture matures).

Pursuant to 34 C.F.R. § 682.302(e)(2), certain loans are ineligible for the 9.5 percent floor calculation:[5]

> The Secretary pays a special allowance to an Authority at the rate prescribed in paragraph (c)(1) of this section [the usual special allowance rate] on a loan described in paragraph (c)(3)(i) of this section [a loan financed by an eligible tax-exempt obligation or related eligible financing sources]—
>> (i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in paragraph (c)(3)(i) of this section; and
>> (ii) If the authority retains a legal or equitable interest in the loan—
>> (A) The prior tax-exempt obligation is retired; or
>> (B) The prior tax-exempt obligation is defeased . . . .

On March 1, 1996, the Department issued Dear Colleague Letter (DCL) 96-L-186, *Clarification and interpretive guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992.* Item 30 of this DCL addressed the 9.5 percent floor calculation and stated—

> Under the regulations, if a loan made or acquired with the proceeds of a [eligible] tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

SLMA had a long-standing practice of continuing to bill loans under the 9.5 percent floor calculation until the last bond associated with the indenture matured. In this instance, SLMA treated loans made eligible for the 9.5 percent floor calculation by each of the bonds, issued under the 93A Indenture, as remaining eligible for the 9.5 percent floor calculation until Bond 93A matured on July 1, 2005.

SLMA explained that all of the individual bonds issued under the 93A Indenture shared common characteristics. For example, all of the bonds had identical terms and were payable from the same source of funds. SLMA considered it reasonable to treat all of the bonds issued under the 93A Indenture as a single "obligation," and to consider that obligation to mature only when its last bond matured. SLMA argued that it would be arbitrary to identify a bond series (a group of bonds issued on the same date and maturing on the same date, as described in Table 5) as the "obligation," because the 93A Indenture did not provide for such a distinction.

---

[5] After amendments were published in the Federal Register on December 18, 1992 (57 FR 60280), the text of 34 C.F.R. § 682.302(e) remained unchanged until September 8, 2006. We cite the text in effect prior to September 8, 2006.

We do not agree that SLMA's position is a reasonable interpretation of the HEA or regulations. Though all of the bonds issued under the 93A Indenture do share some common characteristics, they cannot be considered identical. For purposes of determining an obligation's eligibility for the 9.5 percent floor calculation, only the following characteristics are material:

- The tax treatment of income from the obligation. (HEA §438(b)(2)(B)(i))
- The date the obligation was originally issued. (HEA §438(b)(2)(B)(iv))
- If applicable, the date the obligation is refunded. (HEA §438(b)(2)(B)(iv))
- If the obligation is refunded, the tax treatment of income (i.e., tax-exempt or taxable) from refunding obligation(s). (34 C.F.R. §682.302(e)(2), effective September 8, 2006)
- The date the obligation matures, is retired or defeased. (HEA §438(b)(2)(B)(v))

Because bonds issued under the 93A Indenture have different maturity dates, it is unreasonable to ignore that characteristic and continue to bill under the 9.5 percent floor calculation: it is unreasonable to treat all bonds as eligible when it is clear from the maturity dates of the bond series that some of the bonds are no longer eligible.

In addition, the term "obligation," as it is used in the HEA, regulations, and other guidance issued by the Department, plainly refers to a bond, not to the bond's indenture:

- Pursuant to Section 438(b)(2)(B)(i) of the HEA, SAP is paid under the 9.5 percent floor for "loans which were made or purchased with funds obtained by the holder from the issuance of obligations."

- Pursuant to 34 C.F.R. § 682.302(c)(3)(i), SAP is paid under the 9.5 percent floor for a loan "that was made or purchased with funds obtained by the holder from . . . [t]he proceeds of tax-exempt obligations."

- Pursuant to DCL 96-L-186, guidance is provided for a loan "made or acquired with the proceeds of a [eligible] tax-exempt obligation [that] is refinanced with the proceeds of a taxable obligation."

All of these requirements assume that the issuance of an "obligation" provides a lender with funds that can be used to make or purchase loans. The issuance of a bond does provide such funds; the issuance of an indenture does not. An indenture is a formal agreement between the issuer of a bond and a trustee bank, and its issuance does not provide a lender with funds that can be used to make or purchase loans.

**Ineligible Loans Funded by Bond 93F**

In July 2004, SLMA sold loans with a principal value of about $688.6 million from its NLMA subsidiary to its ECFC subsidiary, in consideration of funds derived from ineligible sources. The eligibility of these loans for the 9.5 percent floor was derived from Bond 93F.[6] As a result of the sale, NLMA ceased billing the loans under the 9.5 percent floor calculation, and classified the loans as eligible for the usual special allowance rates, as Bond 93F was scheduled to mature on

---

[6] We did not perform audit procedures to confirm that these loans were in fact eligible for the 9.5 percent floor calculation.

July 1, 2004.  According to SLMA officials, the sale was an erroneous early liquidation of Bond 93F.

At the time of the sale, SLMA determined that loans financed by, or made eligible through, Bond 93F would not be eligible for the 9.5 percent floor calculation after the bond matured on July 1, 2004.  Upon maturity, Bond 93F was repaid and, as a result, retired.  Upon the sale to ECFC, the loans were classified as being financed by holding tanks associated with ECFC.  According to SLMA, holding tanks are funded with the proceeds of short-term borrowings and long-term notes.  Holding tanks are not funded with eligible tax-exempt obligations and, therefore, are an ineligible funding source for loans billed under the 9.5 percent floor calculation.  When Bond 93F was retired and the loans were transferred in consideration of an ineligible source (the holding tanks), the loans lost their eligibility for the 9.5 percent floor calculation.
 In February 2005, SLMA recoded the loans held by ECFC (the loans that previously derived their eligibility for the 9.5 percent floor from Bond 93F) and resumed billing their SAP under the 9.5 percent floor for the quarters ended March 31, 2005, and June 30, 2005.  SLMA adjusted prior billings for the quarters ended September 30, 2004, and December 31, 2004, to bill the loans under the 9.5 percent floor calculation.

The loans were billed under SLMA's ECFC subsidiary as detailed in Table 6.  On average, for each of the quarters ended from September 30, 2004, through June 30, 2005, SLMA billed an ADB of about $221 million under the 9.5 percent floor calculation for ineligible loans associated with Bond 93F.  SLMA received about $14.5 million in improper SAP under the 9.5 percent floor calculation for these ineligible loans.

We estimated the payments SLMA would have received based on the average usual special allowance rates for the same quarters.  Of the $14.5 million received for quarters ended September 30, 2004, through June 30, 2005, SLMA should have received an estimated $2.2 million under the usual rates, resulting in an estimated overpayment of about $12.3 million (Table 6).

| Table 6 – ECFC Special Allowance Billings | | | | | | |
|---|---|---|---|---|---|---|
| Quarter Ended | ECFC Current Quarter ADB Billed | ECFC Net Adjustments to ADB | Total ECFC ADB Billed | Estimated SAP at Usual Rates | 9.5 Percent SAP Paid | Estimated Overpayment |
| September 30, 2004 | $0 | $353,732,135 | $353,732,135 | $429,659 | $5,858,826 | $5,429,167 |
| December 31, 2004 | $0 | $204,767,175 | $204,767,175 | $510,871 | $3,335,806 | $2,824,935 |
| March 31, 2005 | $86,486,254 | $91,622,389 | $178,108,643 | $604,145 | $2,931,280 | $2,327,135 |
| June 30, 2005 | $149,046,800 | $0 | $149,046,800 | $644,926 | $2,404,179 | $1,759,253 |
| | | | Totals | $2,189,599 | $14,530,092 | $12,340,492 |
| Note - Details of our estimates are contained in the Objectives, Scope and Methodology section of this report, "Estimate of Ineligible 9.5 Percent SAP and Usual SAP on Loans Funded by Bond 93F."  For each quarter, the estimated overpayment is the difference between the special allowance paid under the 9.5 percent floor calculation and the estimated special allowance amount at the usual special allowance rates. | | | | | | |

**Ineligible Loans Funded by Bonds 93B, 93G and 93H**

Upon the maturity of Bonds 93B, 93G, and 93H (in June, August, and December 2002, respectively), the loans financed by, or made eligible through, these bonds were treated by SLMA in a manner similar to the loans associated with Bond 93F.  According to SLMA officials, loans funded by Bonds 93B, 93G, and 93H continued to be billed under the 9.5 percent floor calculation until July 1, 2005, which was the maturation date of the last bond (Bond 93A) associated with the 93A Indenture.  According to SLMA officials, the loans associated with Bonds 93B, 93G, and 93H were transferred to and maintained in holding tanks, associated with NLMA, immediately after each bond matured.  Holding tanks are not funded with eligible tax-exempt obligations and represent an ineligible funding source for loans billed under the 9.5 percent floor calculation.  As a result, the loans associated with Bonds 93B, 93G, and 93H became ineligible for the 9.5 percent floor calculation when they were refinanced with the ineligible funds in the holding tanks and the bonds matured.  Upon each bond's respective maturity, Bonds 93B, 93G, and 93H were repaid and, as a result, retired.

Within four holding tanks, the loans were commingled with loans associated with other eligible bonds from the 93A Indenture (i.e., Bonds 93A, 93B, 93F, 93G and 93H).[7]  The four holding tanks, which commingled both eligible and ineligible loans funded by the bonds under the 93A Indenture, had special allowance billings under the 9.5 percent floor calculation for the audit period as detailed in Table 7.

---

[7] The loans were billed under LID 833691 for NLMA.  SLMA's internal systems associated these loans with holding tanks 4402/5402 and 4421/5421.  These holding tanks were associated with the 93A Indenture.

| Table 7 – NLMA Holding Tank Billings for Eligible and Ineligible Loans Associated with Bonds 93A, 93B, 93F, 93G, and 93H | | |
|---|---|---|
| **Quarter Ended** | **Average Daily Balance** | **Estimate of 9.5 Percent SAP Paid** |
| December 31, 2003 | $818,752,786 | $13,003,077 |
| March 31, 2004 | $802,965,117 | $12,737,214 |
| June 30, 2004 | $792,198,634 | $12,559,635 |
| September 30, 2004 | $225,306,698 | $3,586,004 |
| December 31, 2004 | $216,111,835 | $3,427,641 |
| March 31, 2005 | $170,380,802 | $2,724,468 |
| June 30, 2005 | $123,819,876 | $1,985,496 |
| | **Total** | **$50,023,535** |

Note- We estimated the amount of SAP paid under the 9.5 percent floor calculation (9.5 Percent SAP Paid) on the ADB associated with the branch codes for the four holding tanks (4402/5402 and 4421/5421). For each quarter, we divided the total ADB billed for the four holding tanks by NLMA's total ADB billed under the 9.5 percent floor calculation. We then multiplied the resulting percentage by NLMA's total SAP paid under the 9.5 percent floor calculation to estimate the amount of 9.5 percent SAP paid for each respective quarter on the ADBs associated with the four holding tanks.

SLMA was unable to quantify its 9.5 percent floor calculation billings specifically associated with Bonds 93B, 93G, and 93H, because the loans within the holding tanks were commingled with loans associated with other eligible bonds associated with the 93A Indenture. We could not easily identify the ineligible loans and the quarterly ineligible ADBs associated with these loans. Therefore, we estimated the ineligible quarterly ADBs associated with Bonds 93B, 93G, and 93H that were billed under the 9.5 percent floor calculation.[8] We also estimated the amount of the overpayments attributed to these ineligible loans.

In Table 8, we estimated that, on average, for each of the quarters ended June 30, 2002, through June 30, 2005, SLMA billed an ADB of about $54 million under the 9.5 percent floor calculation for loans that were no longer eligible for the 9.5 percent floor calculation following the maturity of the associated eligible tax-exempt bond and after the loans were refinanced with funds derived from an ineligible funding source.

In Table 9, we estimated that SLMA would have received about $10.7 million in improper SAP under the 9.5 percent floor calculation for the estimated ineligible ADBs. We also estimated the payments SLMA would have received based on the average usual special allowance rates for the

---

[8] We estimated the quarterly ADBs for the ineligible loans associated with the three matured bonds by amortizing the loans' estimated outstanding amounts at the time each bond matured resulting in an estimated quarterly ADB through the July 1, 2005, maturation of Bond 93A (Table 8).

same quarters.  Of the estimated $10.7 million in improper SAP under the 9.5 percent floor calculation for quarters ended June 30, 2002, through June 30, 2005, SLMA would have received an estimated $632,000 under the usual rates, resulting in an estimated overpayment of about $10 million.

| Table 8 – Estimate of Ineligible ADB Billed for NLMA Bonds 93B, 93G and 93H ||||| 
|---|---|---|---|---|
| **Quarter Ended** | **Bond 93B** | **Bond 93G** | **Bond 93H** | **Quarterly Balances (Ineligible ADB)** |
| June 30, 2002 | $3,566,667 | | | $3,566,667 |
| September 30, 2002 | $10,490,196 | $31,445,098 | | $41,935,294 |
| December 31, 2002 | $10,175,490 | $46,005,882 | $4,790,000 | $60,971,372 |
| March 31, 2003 | $9,860,784 | $44,611,765 | $14,088,235 | $68,560,784 |
| June 30, 2003 | $9,546,078 | $43,217,647 | $13,665,588 | $66,429,314 |
| September 30, 2003 | $9,231,373 | $41,823,529 | $13,242,941 | $64,297,843 |
| December 31, 2003 | $8,916,667 | $40,429,412 | $12,820,294 | $62,166,373 |
| March 31, 2004 | $8,601,961 | $39,035,294 | $12,397,647 | $60,034,902 |
| June 30, 2004 | $8,287,255 | $37,641,177 | $11,975,000 | $57,903,431 |
| September 30, 2004 | $7,972,549 | $36,247,059 | $11,552,353 | $55,771,961 |
| December 31, 2004 | $7,657,843 | $34,852,941 | $11,129,706 | $53,640,490 |
| March 31, 2005 | $7,343,137 | $33,458,824 | $10,707,059 | $51,509,020 |
| June 30, 2005 | $7,028,431 | $32,064,706 | $10,284,412 | $49,377,549 |
| | | | **Average ADB** | **$53,551,154** |
| Note – Details of our estimates are contained in the Objectives, Scope and Methodology section in this report, "Estimate of Loans Billed After Bonds 93B, 93G, and 93H Matured."   Our estimate did not include a consideration for any loans that may have been transferred to the holding tank(s) before each bond matured. |||||

| Table 9 – Estimated SAP Overpayment for Bonds 93B, 93G, and 93H | | | | |
|---|---|---|---|---|
| **Quarter Ended** | **Estimated NLMA Ineligible ADB Billed** | **Estimated SAP at Usual Rates** | **Estimated 9.5 Percent SAP Paid** | **Estimated Overpayment** |
| June 30, 2002 | $3,566,667 | $0 | $34,534 | $34,534 |
| September 30, 2002 | $41,935,294 | $7,590 | $603,320 | $595,730 |
| December 31, 2002 | $60,971,372 | $7,012 | $871,757 | $864,745 |
| March 31, 2003 | $68,560,784 | $6,788 | $977,831 | $971,043 |
| June 30, 2003 | $66,429,314 | $4,783 | $948,382 | $943,599 |
| September 30, 2003 | $64,297,843 | $6,816 | $1,023,225 | $1,016,410 |
| December 31, 2003 | $62,166,373 | $8,890 | $987,299 | $978,410 |
| March 31, 2004 | $60,034,902 | $6,184 | $952,317 | $946,133 |
| June 30, 2004 | $57,903,431 | $60,162 | $918,010 | $857,848 |
| September 30, 2004 | $55,771,961 | $35,415 | $887,672 | $852,257 |
| December 31, 2004 | $53,640,490 | $58,146 | $850,765 | $792,619 |
| March 31, 2005 | $51,509,020 | $152,209 | $823,653 | $671,444 |
| June 30, 2005 | $49,377,549 | $278,144 | $791,787 | $513,643 |
| **Totals** | | $632,137 | $10,670,551 | $10,038,413 |
| Note - Details of our estimates are contained in the Objectives, Scope and Methodology section in this report, "Estimate of Ineligible 9.5 Percent SAP and Usual SAP on Loans Funded by Bonds 93B, 93G, and 93H." | | | | |

**Recommendations**

We recommend that the Chief Operating Officer for Federal Student Aid instruct SLMA to—

1.1    Adjust its special allowance billings for loans associated with Bond 93F that became ineligible for the 9.5 percent floor calculation, as described in the finding, and return all overpayments to the Department (for which we estimate to be about $12.3 million).

1.2    Identify the loans associated with Bonds 93B, 93G, and 93H that became ineligible for the 9.5 percent floor calculation, as described in the finding, and adjust its special allowance billings for the affected loans in the quarters ended June 30, 2002, through June 30, 2005, and return all overpayments to the Department (for which we estimate to be about $10 million).

1.3    Disclose any other instances, at any of its subsidiaries (e.g., NLMA, Southwest Student Services Corporation, Student Loan Funding Resources, Student Loan Finance Association), of loans billed under the 9.5 percent floor calculation after the eligible tax-exempt bond issue matured and after the loans were refinanced with funds derived from an ineligible funding source and, if necessary, adjust its special allowance billings for all affected loans and return all overpayments to the Department.

**SLMA Comments and OIG Responses**

Introduction and Summary of Arguments
- *SLMA Comment.*  SLMA agreed with our conclusion that it complied with TTPA and HERA, but strongly disagreed with our finding and recommendations.  In its comments, SLMA confirmed that it treated loans it purchased from Nellie Mae that were made with the proceeds of the 1993 Bonds issued under the 1993 Trust Agreement as eligible for the 9.5 percent floor calculation until the last bond issued matured on July 1, 2005, but asserted that this practice was based on a reasonable interpretation of the HEA, regulations, and clear legislative intent.

- *OIG Response.*  We have made some minor revisions to our report, for clarity, but we have not made the substantive revisions requested in SLMA's comments.  We do not agree that SLMA's practice was based on a reasonable application of the HEA, regulations, and Departmental guidance.

Definition of "Obligation"
- *SLMA Comment.*  SLMA disagreed with our understanding of the term "obligation," and stated ". . . the OIG adopted a new narrow legal interpretation of the term obligation.  An interpretation that, to the best of our knowledge, does not appear in the [HEA] . . . or in any legislative history and has never been published or communicated to the student lending community in any manner."

- *OIG Response.*  Our report does not advance a new or unusual definition of "obligation."  Our understanding of the term "obligation" is consistent with the term's use in the HEA, regulations, and Departmental guidance.  Though the HEA, regulations, and Departmental guidance do not include a specific definition of "obligation," their context indicates that the term means the particular debt or borrowing that was the source of the funds used to acquire or maintain ownership of a loan: the term is used to tie the 9.5 percent floor rate on a loan to the source of the funds used to acquire that loan.

  For example, 34 C.F.R. § 682.302(c)(3)(i)(A) states that a loan is eligible for the 9.5 percent rate if it "was made or purchased with funds obtained by the holder from . . . [t]he proceeds of tax-exempt obligations originally issued prior to October 1, 1993 . . .."  As such, the "obligation" is the underlined funding source for the eligible loan.  Contrary to this usage, SLMA's definition of "obligation" would tie the eligibility of a loan for the 9.5 percent rate to a group of bonds, none of which may have been its funding source.  This is not a reasonable application of the HEA's and regulations' use of "obligation."

Congressional Intent
- *SLMA Comment.*  SLMA stated that the finding is not consistent with the intent of Congress because the OIG's understanding of the requirements for the 9.5 percent floor—

  . . . is inconsistent with the original federal legislative intent that the 9.5%  rate act as a floor and thus a limitation on the yield lenders could obtain.  Therefore, the federal government encouraged maximizing loans within the 9.5% floor.  In the past, the Department insisted that lenders not be permitted to turn loans originally

financed through tax-exempt obligations, for which special allowance was one half the normal special allowance [i.e., subject to the 9.5% floor rate], into loans that yielded full special allowance [i.e., subject to the usual rates] by refinancing the loans through taxable financings.  Sallie Mae's interpretation is the only interpretation consistent with that Congressional intent.

SLMA also stated that the finding is not consistent with the history of requirements for the 9.5 percent floor, as reflected in an audit report issued by the Government Accountability Office (GAO) in 2004.[9]  SLMA stated, "The Department amended 34 C.F.R. § 682.302(e)(2) in 1992 to prevent holders from avoiding the Half-SAP cap through refinancing into non-floor eligible loans, by adding a provision that if the authority retained a legal interest in those loans and the original tax-exempt obligation remained outstanding, floor loan treatment must continue."

- *OIG Response.*  SLMA's general appeal to "congressional intent" is unsupported by specific evidence and does not address the particular circumstances of SLMA's billing activity.  The structure of the HEA provisions evidences Congress' intent was to align a loan's special allowance payments with the tax-exempt status of the bonds that were used to make or purchase it.  The Department described this intent specifically, in its preamble to final regulations it published in the Federal Register on February 8, 1985:

  The rule implements the Congressional intention in section 438(b)(2) of the HEA to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders.  *These regulations therefore tie the rate of special allowance to the source of the funds used to acquire or maintain the Authority's interest in a loan*, and more particularly, to the financing costs incurred in securing those funds.  Congress recognized that a party raising loan acquisition funds by means of tax-exempt borrowings had a financing cost well below that incurred by parties using other sources of funds, and the 1980 amendments to section 438 of the HEA which reduced the special allowance to tax-exempt borrowers reflect a Congressional judgment of the subsidy appropriate to their reduced borrowing costs.  (50 FR 5512, emphasis added)

SLMA's definition of "obligation" is contrary to Congress' intent to "tie the rate of special allowance to the source of the funds."  Its definition would continue special allowance payments on a loan at the 9.5 percent rate long after its funding source was retired.  For example, if a lender made or purchased $200 million in loans with the proceeds of $200 million in eligible tax-exempt bonds, and if $100 million of those bonds were retired within five years, and the remaining bonds continued until a 30-year maturity, these initial retirements, in SLMA's view, would have no impact on the special allowance payments on the loans.  The entire $200 million in loans would continue to receive special allowance payments at the 9.5 percent rate, until the remaining $100 million in bonds were retired.

_____

[9] "Federal Family Education Loan Program: Statutory and Regulatory Changes Could Avert Billions in Unnecessary Federal Subsidy Payments," GAO-04-1070, issued September 2004.

In addition to the reasons cited in the report's finding, ECFC's billings at the 9.5 percent floor calculation were also ineligible for 9.5 percent floor treatment because they did not comply with § 438(b)(2)(B)(i) of the HEA.  § 438(b)(2)(B)(i) authorizes payment under the 9.5 percent floor calculation only ". . . for holders of loans which were made or purchased with funds obtained by the holder from the issuance of [eligible tax-exempt] obligations . . ." As such, if the entity that issued the eligible tax-exempt obligation and used the proceeds to finance 9.5 percent floor loans no longer has title to, or interest in the loans, following the change in ownership of the loans, the loans can only qualify for the 9.5 percent floor calculation if the new holder used an eligible tax-exempt funding source to acquire the loan. ECFC was not eligible to bill loans under the 9.5 percent floor calculation because (1) ECFC did not use an eligible tax-exempt funding source to acquire the loans – it used holding tank funds, (2) NLMA did not retain an ownership interest in the loans sold to ECFC, and (3) NLMA and ECFC presented themselves as distinct and separate holders of loans for special allowance purposes.

## SLMA's Interpretation was Reasonable

- *SLMA Comment.*  SLMA stated, ". . . neither the statute nor regulations currently specifically define 'obligation' and the precise issue raised in the OIG's audit is one of first impression." In addition, "SLMA reasonably interpreted the term 'obligation' . . . to include multiple bonds issued in the same calendar year under a single trust agreement where the bonds shared important characteristics."

  SLMA also stated ". . . the OIG should not use an audit to advance a particular construction of an undefined term in a statutory provision that has long perplexed lenders, Congress, the Department and the press."  In addition, "If the Department takes the new position that 'obligation' for purposes of Section 438(b) and [34 CFR 682.302] should be interpreted more narrowly as an individual tax-exempt bond, it should publish public guidance for industry participants."

- *OIG Response.*  As stated in our previous responses, our understanding of the term "obligation" is consistent with the HEA, regulations and Departmental guidance.  SLMA provided no evidence that such a definition "has long perplexed lenders, Congress, the Department and the press."

## The OIG's Estimate is Incorrect and Overstated

- *SLMA Comment.*  SLMA declared that the estimate of a $10 million overpayment of special allowance for loans associated with Bonds 93B, 93G, and 93H is overstated, because it is "based on a flawed assumption of the average life of non-consolidated FFELP loans, and should be removed from any final audit report."  Our report assumes that—

  - The average life of a loan associated with Bonds 93B, 93G, and 93H was 8.5 years, but according to SLMA, the average life of these loans ranged from 3.7 years to 4.6 years; and
  - The loans were newly originated at the time of the bond maturity, but according to SLMA, the loans had been in repayment for several years.

In addition, SLMA noted that a significant percentage of the loans would have been consolidated before the end of their expected lives.  The correction of these assumptions would reduce the alleged $10 million estimated SAP overpayment.

- *OIG Response.*  We believe that our estimate is reasonable and accurate.  Our choice of 8.5 years as the average life of a loan was not arbitrary; it was consistent with the assumption made by the Department in its guidance for identifying loans that qualify for the 9.5 percent floor rate (DCL FP-07-06).  We assumed that the loans were newly originated at the time of the bond maturity, and SLMA has not provided evidence to the contrary.  Pursuant to 34 C.F.R. § 682.414(a)(4)(ii)(L), SLMA is required to document the accuracy of its billing, and it has not provided evidence to contradict our assumption.

  Regardless, our audit report does not recommend recovery of the estimated amount; instead, it recommends that SLMA be instructed to "[i]dentify the loans associated with Bonds 93B, 93G, and 93H that became ineligible" and to adjust its billing and return overpayments for those loans.  The Department may consider additional information provided by SLMA, including information on the specific life of the loans in its portfolio, when determining the corrective action for this audit.

The Issues Addressed Have No Application to Other Sallie Mae Subsidiaries

- *SLMA Comment.*  SLMA disagreed with our Recommendation 1.3.  It stated ". . . none of Sallie Mae's other subsidiaries with 9.5 percent floor loans: (1) issued tax-exempt bonds under similar indentures or trust agreements with similar structures; (2) issued general obligation or unsecured bonds; or (3) had similar trust structures that lacked a defined pool of loans."

- *OIG Response.*  We have not removed Recommendation 1.3.  During the audit's survey phase, we noted that, in addition to NLMA, both Southwest Student Services Corporation and Student Loan Funding Resources had indentures under which more than one eligible tax-exempt bond had been issued.  Our audit did not review the tax-exempt obligations and 9.5 percent floor rate SAP billings of SLMA's other subsidiaries, and the information provided with SLMA's response was not sufficient to confirm that SLMA's statements are accurate.  The Department may consider additional information provided by SLMA when determining the corrective action for this audit.

Sallie Mae's Legal Interpretation is Not a Management Control Weakness

- *SLMA Comment.*  SLMA stated "A difference in legal interpretation of an undefined statutory provision is not a management weakness in internal controls."  SLMA cites three authorities:

  1. The Public Company Accounting Oversight Board's (PCAOB) Auditing Standard No. 2, "An Audit of Internal Control over Financial Reporting Performed in Conjunction with an Audit of Financial Statements," does not include anything to suggest that a company's process of formulating a legal interpretation of a statute constitutes an internal control.
  2. The Securities and Exchange Commission's (SEC) "Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in

Exchange Act Periodic Reports: Frequently Asked Questions (revised October 6, 2004)" concludes that "[t]he definition of the term 'internal control over financial reporting' does not encompass a registrant's compliance with applicable laws and regulations . . . ."

3. An unspecified, prior version of the Office of Management and Budget's (OMB) Circular A-123, "Management Accountability and Control," which SLMA quotes as stating, "[I]nternal control does not encompass such matters as statutory development or interpretation."

- *OIG Response.* The authorities on internal control that SLMA cited were not applicable to our audit. The PCAOB and SEC authorities cited pertain to internal controls over financial reporting. Our audit was a performance audit, not a financial audit. The OMB circular cited pertains to Federal agencies' internal controls; SLMA is not a Federal agency. In addition, the current (December 21, 2004) OMB Circular A-123 does not contain the language cited by SLMA. As we state in the Objectives, Scope, and Methodology section of this report, our audit was conducted in compliance with standards issued by the Comptroller General of the United States, in *Government Auditing Standards*, July 2007 Revision (GAS). Section 1.30 of GAS states, "Internal control audit objectives relate to an assessment of the component of an organization's system of internal control that is designed to provide reasonable assurance of . . . compliance with applicable laws and regulations." As such, GAS does not exclude an entity's ability to arrive at a reasonable understanding of statutory and regulatory requirements from its definition of "internal controls."

Common Characteristics

- *SLMA Comment.* SLMA stated ". . . all of the 1993 bonds were governed by terms of the same 1993 Trust Agreement, were issued in the same calendar year, were payable from the same sources of funds and because they were unsecured, had no claim or security interest on a specific pool of loans." In addition, "Per the terms of the 1993 trust Agreement, each 1993 Bond was treated collectively and on a parity basis with the other 1993 Bonds in terms of the bondholders' right to payments, default provisions, and remedies." Consequently, SLMA concluded that, for purposes of applying the 9.5 percent floor provisions, it was reasonable to treat all of the 1993 Bonds as a single obligation because they shared common characteristics.

   SLMA also stated, "The OIG's separate consideration of each series relies on arguing that each series is unique only because of its issue date. However, the 1993 Bonds were not organized in such a way. For example, within certain of the series there were multiple interim maturity dates reflecting the maturity of some, but not all of the 1993 Bonds of an individual series." In addition, "The OIG's Draft Report would rely on the final maturity date of a bond series to determine eligibility for the 9.5 percent floor rate and ignore any interim maturity dates within the series. Sallie Mae's practice just as reasonably relies on the final maturity date of the 1993 Bonds of July 1, 2005 as the appropriate end date for the 9.5 percent floor rate."

- *OIG Response.* Whether the 1993 bonds had the same terms for right to payment, events of default, remedies, amendments, proceeds, and loan servicing has no bearing on their eligibility for special allowance payments at the 9.5 percent rate. As we state

in the finding, it is unreasonable to ignore attributes of obligations that are material in determining their eligibility for the 9.5 percent floor. SLMA's comments did not address this explanation of our position. In regards to the bonds' interim maturity dates, the interim maturities occurred prior to our audit period. As a result, our finding does not address SLMA's treatment of the interim maturities and their impact on its 9.5 percent floor billings. Had we expanded the scope of our audit, other matters may have come to our attention that we could have included in our report.

Other Statutory Guidance

- *SLMA Comment.* SLMA asserted, "In the absence of clear statutory, regulatory, or Dear Colleague Guidance it was reasonable for SLMA to look to other statutory guidance or definition. Treasury's regulations that permit a series of bonds to be treated as one obligation support Sallie Mae's practice of treating the 1993 Bonds as a single financial obligation. Under Treasury's regulations governing student loan bonds during the lifespan of the 1993 Bonds, Sallie Mae was permitted to calculate a single yield for all of the 1993 Bonds because of their significant relationship to each other under the 1993 Trust Agreement." Furthermore, "The courts have consistently held that undefined terms in a statute be placed beside other statutes relevant to the subject and given a meaning and effect derived from the combined whole." In addition, "The original provision of the HEA that established the Half-SAP program explicitly incorporated the Internal Revenue Code provisions to determine which obligations are tax-exempt. To this day, the Internal Revenue Code provisions establish and govern those obligations entitled to receive tax-exempt treatment."

- *OIG Response.* SLMA's response provided no evidence that it in fact relied on the Treasury regulations to determine its FFEL billing practices. Though the HEA, regulations, and Departmental guidance do not include a specific definition of "obligation," the meaning of the term is neither ambiguous nor unclear as used for Title IV purposes. The tax rule cited by SLMA offers no insight into the definition of "obligation" for purposes of the FFEL Program, because that tax rule relates to a limited issue on tax-exempt qualification. Tax law provides little support for SLMA's argument that "obligation" means a group of bonds. Section 150 of the Internal Revenue Code, which addresses whether student loan bonds can qualify as tax-exempt, defines the term "obligation" as synonymous with "bond": "The term 'bond' includes any obligation." (26 U.S.C. § 150(a)(1))

Inconsistent Practices

- *SLMA Comment.* SLMA asserted that our report's allegation of inconsistencies in SLMA's practices is not accurate**.** SLMA acknowledged inconsistencies with NLMA's 9.5 percent billing practices prior to its acquisition, and stated its billing procedure for 9.5 percent floor special allowance payments did not change. Our audit report states that the result of the July 2004 sale of loans associated with Bond 93F ceased billing the loans under the 9.5 percent floor rate and classified the loans as eligible for the usual special allowance rates. SLMA stated, "This sentence mischaracterizes the events associated with the July 2004 sale of loans associated with the 93F bond series". In addition, ". . . the July 2004 sale was an erroneous early liquidation of bond series 93F."

- *OIG Response.*  Our audit report does not state that SLMA applied its practices inconsistently; it states that SLMA's practices were inconsistent with NLMA's practices. Our report accurately states that as a result of the July 2004 sale to ECFC, NLMA ceased billing the loans under the 9.5 percent floor rate.  SLMA's comments do not propose any other results from this transaction, and an SLMA memorandum documenting the transaction, dated February 1, 2005, supports our statement: "The Half SAP flag was switched to Full SAP for these loans. . . .  This was an isolated transaction that was being evaluated for the first time.  Accordingly, this change did not arise from a control gap, but rather from adopting a legal conclusion on an issue that had not been previously researched."  However, we have revised our report to more clearly state that SLMA considered the sale to be an error.

Eligible Loans

- *SLMA Comment.*  SLMA stated in several places that the draft audit report acknowledged "the loans that were refinanced with the proceeds of the 1993 Bonds qualified to be billed under the 9.5 percent special allowance floor rate."

- *OIG Response.*  Our audit report does not acknowledge that "the loans that were refinanced with the proceeds of the 1993 Bonds qualified to be billed under the 9.5 percent special allowance floor rate."  The objectives of our audit were limited to (1) the requirements of the TTPA and HERA, and (2) loans billed under the 9.5 percent floor after the eligible tax-exempt bonds from which the loans derived their eligibility matured or were retired.  Our report makes no assertions about the eligibility of the loans under any other requirements.

# OBJECTIVES, SCOPE, AND METHODOLOGY

The original purpose of the audit was to determine if SLMA billed for SAP, under the 9.5 percent floor calculation, in compliance with requirements in the HEA, regulations, and guidance issued by the Department.[10]  Our audit was to cover the period January 1, 2005, through December 31, 2006.  Based on our initial audit work, the audit's objective and period of review were revised.  The revised objectives of the audit were to determine if SLMA's subsidiary, NLMA, (1) billed loans under the 9.5 percent floor in compliance with the TTPA and HERA, and (2) billed loans under the 9.5 percent floor, after the eligible tax-exempt bonds from which the loans derived their eligibility, had matured or been retired.  The revised audit period covered October 1, 2003, through September 30, 2006.

To achieve the audit objectives, we—

- Reviewed information on SLMA's four subsidiaries with 9.5 percent floor billings and eligible tax-exempt obligations: Southwest Student Services Finance Corporation, Student Loan Finance Association, Student Loans Funding Resources, and NLMA.

- Reviewed the Department's Datamart system for 9.5 percent floor billings for SLMA's four subsidiaries (listed above) and ECFC.

- Reviewed NLMA's current billings and billing adjustments applicable to the audit period, and identified the significant billing adjustments by the quarter the adjustments were entered by SLMA.  Billing adjustments less than $500,000 were excluded from our analysis, resulting in the net applied[11] significant billing adjustments displayed in Table 10.

- Reviewed applicable laws, regulations and guidance issued by the Department, including the HEA, TTPA, HERA, 34 C.F.R. Part 682, and Dear Colleague Letters.

| Table 10 - NLMA and ECFC Significant Billing Adjustments | | |
|---|---|---|
| **Applied Quarterly Period Ending** | **Significant NLMA Net Billing Adjustments (ADB)** | **Significant ECFC Net Billing Adjustments (ADB)** |
| December 31, 2003 | ($21,175,628) | $0 |
| March 31, 2004 | ($18,439,959) | $0 |
| June 30, 2004 | $142,497,264 | $0 |
| September 30, 2004 | ($12,759,720) | $353,732,135 |
| December 31, 2004 | ($9,894,223) | $204,767,175 |
| March 31, 2005 | $0 | $91,622,389 |
| June 30, 2005 | $217,480,127 | $0 |
| September 30, 2005 | $0 | $0 |
| December 31, 2005 | $0 | $0 |
| March 31, 2006 | $0 | $0 |
| June 30, 2006 | $0 | $0 |
| September 30, 2006 | $0 | $0 |

---

[10] We did not determine if SLMA's special allowance billings under the 9.5 percent floor calculation included only eligible first-generation and second-generation loans, as those terms are explained in DCL FP-07-01, issued on January 23, 2007, and in DCL FP-07-06, issued on April 27, 2007.

[11] Adjustments are shown in their applied quarters, and not the quarters in which they were entered.

- Reviewed SLMA's Form 10-K reports for the fiscal years ended December 31, 2005 and 2006; Compliance Audits (Attestation Examinations), for Lenders and Lender Servicers participating in the FFEL Program for the years ended December 31, 2003, 2004, 2005, and 2006, and for the period from July 1, 2004, through September 30, 2005 (for Southwest Student Servicers Corporation).

- Held discussions with SLMA officials, including the Vice President of Loan Accounting and Reporting, Director of Service Accounting, Deputy General Counsel, Senior Vice-President of Corporate Finance, Senior Director and Accountant for Financial Reconciliation, and SLMA's Information Technology Group.

- Reviewed documentation provided by SLMA, including—
  - A written explanation, created and provided at our request, of SLMA's position, understanding, policy, and implementation of SAP billing under the 9.5 percent floor calculation;
  - A written description of how SLMA's CLASS loan servicing system identified loans eligible for the 9.5 percent floor calculation;
  - SLMA's policies and procedures explaining SLMA's administration of its 9.5 percent portfolio to reflect changes in laws and regulations applicable to 9.5 percent floor calculation loans;
  - SLMA's internal systems coding to segregate and identify loans as 9.5 percent eligible using Lender Identification Number (LID) -Branch combinations;
  - Transaction documentation regarding the liquidation and subsequent recapture of loans funded by Bond 93F;
  - Bond Prospectus Cover Sheets, Internal Revenue Service Form 8038s, *Information Return for Tax-Exempt Private Activity Bond Issues*, and other bond documentation for SLMA's tax-exempt obligations originally issued prior to October 1, 1993;
  - A listing of SLMA's bonds funding 9.5 percent floor calculation loans, along with information related to each bond, including its taxable or tax-exempt status, the amount outstanding, and the average daily balance of 9.5 percent floor calculation loans funded in each quarter;
  - SLMA's bond genealogy for outstanding bonds during the audit period;
  - A written description of holding tanks' funding sources; and
  - An explanation of ECFC's relationship to NLMA.

- Obtained from the Department's Datamart system the amount of 9.5 percent floor SAP, the ADB, and ending principal balances included on NLMA's and ECFC's Lender's Interest and Special Allowance Request and Report (LaRS) billings for the audit period.

**Initial Selection and Review of Loans for TTPA and HERA Compliance**

We judgmentally selected and reviewed 2 of the 12 quarterly special allowance billings during the audit period.  We selected the quarter ending March 31, 2005 (because it was the first full quarter billed following the enactment of the TTPA) and the quarter ending June 30, 2006 (because it was the first full quarter billed following the enactment of the HERA).

Using an attribute sample, we randomly selected 120 unique loan records[12] from each of these two quarters (240 loans in total) from NLMA's and ECFC's LaRS data files.  The March 31, 2005, universe contained a population of 278,139 unique loan records.[13]  The June 30, 2006, universe contained a population of 12,605 unique loan records.

We tested for compliance to the TTPA by using the following criteria for the loans sampled in the quarter ended March 31, 2005:[14]
- The loan must have been classified in an eligible LID-Branch combination (i.e., eligible tax-exempt bond) prior to or during the billing quarter.
- The loan could not be refinanced after September 30, 2004.

We tested for compliance to the HERA and the TTPA by using the following criteria for the loans sampled in the quarter ended June 30, 2006:[15]
- The loan must have been classified in an eligible LID-Branch combination (i.e., eligible tax-exempt bond) prior to or during the billing quarter.
- The loan must be originated prior to February 8, 2006.
- The loan could not be refinanced after September 30, 2004.

**Identification of Loans Billed After Bond 93F Maturity**

When we were performing the audit's survey phase, SLMA officials notified us that SLMA had continued to bill loans associated with Bond 93F under the 9.5 percent floor past the bond's maturity date.  We identified these ineligible loans using the documentation provided to us by SLMA in its summary of the NLMA bond maturity transactions.  In the summary, SLMA outlined the amount of loans funded by Bond 93F that were sold to ECFC when the bond matured on July 1, 2004, and then billed under the usual special allowance rates.  Subsequent to the sale of loans to ECFC, SLMA's documentation detailed its process of recapturing the 9.5 percent SAP rate through current billings and billing adjustments during the quarters ended March 31, 2005, and June 30, 2005 (the adjustments were applicable to the quarters ended September 30, 2004, and December 31, 2004).

**Estimate of Ineligible 9.5 Percent SAP and Usual SAP on Loans Funded by Bond 93F**

To estimate the SAP overpayment on the loans funded by Bond 93F, we—

- Reviewed the Datamart database and ECFC's quarterly LaRS data files of loans billed under the 9.5 percent floor calculation for the quarters ending September 30, 2004, through

---

[12] For each universe, a unique loan record was created by combining the borrowers' SSN together with the loan Suffix and Loan Sequence Number fields.

[13] The quarter ending March 31, 2005, also included the LaRS adjustments made in subsequent quarters that applied to the March 31, 2005 quarter.

[14] SLMA was unable to provide documentation to show that 2 of the 120 loans in the March 31, 2005, sample were eligible for the 9.5% floor calculation.  Based upon the two errors in the sample, we are 90 percent confident that the overall error rate for this sampled quarter is no more than 4.4%.  (We considered these two errors to be materially insignificant.)

[15] We noted no errors in the June 30, 2006, sample of 120 loans.  Based upon the results of the sample, we are 90 percent confident that the overall error rate for this sampled quarter is no more than 1.9%.

June 30, 2005, to determine the amount of loans billed under the 9.5 percent floor calculation that were funded with ineligible funding sources after Bond 93F matured on July 1, 2004, and the amount of SAP paid on those loans.

- Queried the Datamart database for ECFC, LID 834071, for the quarterly LaRS data files of special allowance current billings, and the quarterly LaRS data files of the special allowance summary of tax-exempt current billings, billing adjustments for the quarters ended September 30, 2004, through June 30, 2005.

- Obtained ECFC's LaRS data files for the quarters ended September 30, 2004, December 31, 2004, March 31, 2005, and June 30, 2005.

- Used data analysis software to reconcile the LaRS/799 Lender Reports with the Datamart data to identify the amount of loans billed under the 9.5 percent floor calculation funded by Bond 93F.

- Estimated the SAP that should have been paid on the ineligible loans for each quarter by—
  - Based on the LaRS reports, identifying the ADB for loans that were billed under the usual SAP rates and the amount of SAP paid on those loans;
  - Dividing the SAP paid on the loans by their ADB; and
  - Multiplying the resulting percentages by the ADB for the ineligible loans.

- Subtracted the estimated usual SAP that should have been paid on the ineligible loans associated with Bond 93F from the 9.5 percent SAP that was actually paid.

**Estimate of Loans Billed After Bonds 93B, 93G, and 93H Matured**

SLMA was unable to provide documentation that quantified the loans associated with the matured Bonds 93B, 93G, and 93H that were maintained in a holding tank and billed under the 9.5 percent floor until the maturity of Bond 93A in July 2005.  We could not easily identify the ineligible loans and the quarterly ineligible ADBs associated with these loans.  Therefore, we performed calculations to estimate the ineligible loan amounts associated with Bonds 93B, 93G, and 93H by amortizing the final amount of bonds outstanding at the time each bond matured, starting with the month of the bond's maturity (Table 11).

| Table 11 – Bond Amounts Outstanding at Maturity | | |
|---|---|---|
| **Bond Name** | **Bond Maturity** | **Outstanding Bond Amount at Maturity** |
| 93B | 6/1/2002 | $10,700,000 |
| 93G | 8/1/2002 | $47,400,000 |
| 93H | 12/1/2002 | $14,370,000 |

The estimate was based on the assumptions that (1) the amount of loans transferred to the holding tank equaled the bond's outstanding amount for each bond at the time at which the bond

matured; (2) each loan was paid off over an 8.5 year period;[16] and (3) zero percent interest accrued on the loans.  Our estimate excluded any loans associated with Bonds 93B, 93G, and 93H that were transferred to the holding tank prior to the respective bonds' maturity date because we could not reliably estimate amounts associated with these ineligible loans.  The ADBs were prorated, between amounts eligible and ineligible for the 9.5 percent floor calculation, based upon periods in each quarter in which the bonds were outstanding.  The prorated ADBs were for Bond 93B for the quarter ended June 30, 2002; Bond 93G for the quarter ended September 30, 2002; and Bond 93H for the quarter ended December 31, 2002.  The result of the amortization for each bond was an estimated quarterly ADB for the loans associated with the matured Bonds 93B, 93G, and 93H for which we could estimate the 9.5 percent SAP paid (see Table 8).

**Estimate of Ineligible 9.5 Percent SAP and Usual SAP on Loans Funded by Bonds 93B, 93G, and 93H**

We estimated the 9.5 percent SAP paid on the estimated quarterly ADB for loans associated with the matured Bonds 93B, 93G, and 93H by calculating the percentage of 9.5 percent SAP paid as compared to the ADB billed by NLMA (LID 833691).  We divided the net 9.5 percent SAP paid by the total ADB billed by NLMA for each quarter ended June 30, 2002, through June 30, 2005.  We multiplied the resulting percentage by the estimated quarterly ADB (based on the amortization results) to estimate the amount of 9.5 percent SAP paid to NLMA on the loans associated with the matured Bonds 93B, 93G, and 93H.

We calculated the percentage of usual SAP paid by quantifying the ADB and SAP paid on loans billed by NLMA under usual SAP rates.  We divided the SAP paid for these loans by their ADB to identify the percentage of estimated usual SAP rates for each quarter described above.  We multiplied the resulting percentage of estimated usual SAP rates by the ADB of the loans associated with the matured Bonds 93B, 93G, and 93H in the quarters ended June 30, 2002, through June 30, 2005, to achieve the amount of usual SAP that should have been paid to SLMA.  Finally, we subtracted this amount of usual SAP from the 9.5 percent SAP to estimate the overpayment made to SLMA for the ineligible loans associated with the matured Bonds 93B, 93G, and 93H.

**Computer-Processed Data**

To accomplish the audit's objective, we relied, in part, on computer-processed data provided by SLMA.  We obtained SLMA's LaRS data files for the quarters ended December 31, 2003, through September 30, 2006.  To determine the reliability of the data, we performed limited data testing.  These tests included comparing the files' average and ending principal balances against the Department's FSA Datamart files, comparing information for the 240 randomly selected loans (described under "Initial Selection and Review of Loans for TTPA and HERA Compliance") to SLMA's CLASS loan servicing system, and applying logical tests to the data

---

[16] The Department has determined the average life span of non-consolidated FFELP loans to be 8.5 years.  The Department made this determination as part of its obligation under the Federal Credit Reform Act of 1990, 2 U.S.C. § 661 et seq., to calculate the subsidy cost for FFELP loans.  NLMA's 9.5 percent floor billings for the quarters ended June 30, 2002, through June 30, 2005, contained only non-consolidated loans.  In comments submitted to a draft of this finding, SLMA stated that the weighted average life of a loan on its FFELP Stafford portfolio ranges from 3.7 to 4.6 years, and asked us to revise our assumption from 8.5 years to 4.0 years.  We have not made this revision; our estimate relies on the average life span calculated by the Department.

files for the two quarters we selected.  Based upon our preliminary assessment of the data, we concluded that the data were sufficiently reliable for use in achieving the audit's objective.

**Internal Controls**

As part of our audit, we assessed SLMA's system of internal control significant to the audit objective and applicable to its billing for SAP under the 9.5 percent floor calculation, the process used to identify loans eligible for special allowance billing under the 9.5 percent floor calculation.  Our assessment disclosed a significant management control weakness that adversely affected SLMA's ability to accurately identify loans eligible for special allowance billing under the 9.5 percent floor calculation. Specifically, SLMA continued to bill loans under the 9.5 percent floor calculation after the maturity of the eligible tax-exempt bonds and after the loans were refinanced with funds derived from ineligible sources.  As a result of its management control weakness, SLMA's billing activities did not comply with laws, regulations, and guidance for the 9.5 percent floor calculation.  The weakness and its effects are fully discussed in the Audit Results section of this report.

We conducted on-site fieldwork at SLMA's office in Reston, Virginia, during the period October 16, 2007, through May 14, 2008.  On January 22, 2009, we held an exit conference with SLMA.  We conducted this performance audit in accordance with generally accepted government auditing standards.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our finding and conclusions based on our audit objectives.  We believe that the evidence obtained provides a reasonable basis for our finding and conclusions based on our audit objectives.

# Enclosure:  SLMA Comments

SLMA provided three exhibits with its cover letter.  The enclosed Exhibit B excludes 36 pages of the amortization tables supporting the two Eligible Loan Balance tables on page 56.  The full Exhibit B will be made available upon request.

# SallieMae

SALLIE MAE, INC.
12061 BLUEMONT WAY
RESTON, VIRGINIA 20190
703-984-5677, FAX 703-984-6587

MARK L. HELEEN
EXECUTIVE VICE PRESIDENT AND GENERAL COUNSEL

May 6, 2009

**VIA OVERNIGHT MAIL AND E-MAIL**

Mr. Bernard Tadley
Regional Inspector General for Audit
Audit Services, Region III
Office of Inspector General
U.S. Department of Education
The Wanamaker Building
100 Penn Square East, Suite 502
Philadelphia, PA 19107
bernard.tadley@ed.gov

      Re:    **Sallie Mae** – ED-OIG/A03I0006

Dear Mr. Tadley:

      I am pleased to enclose Sallie Mae, Inc.'s ("Sallie Mae") response to the above-referenced draft report received under your cover letter dated March 10, 2009. Pursuant to Mr. Howard Sorensen's April 13, 2009 e-mail message and April 28, 2009 e-mail message to Mr. Stan Freeman of Powers Pyles Sutter & Vervile P.C., this response is timely.

      Please do not hesitate to contact me with any questions you may have regarding the enclosed response, including the accompanying attachments and exhibits. I may be reached at (703) 984-5677.

                        Sincerely,

                        Mark L. Heleen

cc:    Stan Freeman, Esq., Powers Pyles Sutter & Vervile P.C.
        Anne Gish, Esq., Kutak Rock
        Patricia Smitson, Esq., Thompson Hine LLC
        Howard Sorensen, Esq., U.S. Department of Education

Enclosures

RESPONSE TO OFFICE OF INSPECTOR GENERAL
UNITED STATES DEPARTMENT OF EDUCATION
DRAFT AUDIT REPORT

FOR
SALLIE MAE, INC.
ED-OIG/A03I0006
Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-
Exempt Obligations.

May 6, 2009

## I.        Introduction and Summary of Arguments

The U.S. Department of Education's Office of Inspector General ("OIG") conducted a review of Sallie Mae's subsidiary Nellie Mae (defined below).  According to the OIG, the purpose of the audit was to determine if Nellie Mae: (1) billed loans under the 9.5% floor (defined below) in compliance with the Taxpayer Teacher Protection Act of 2004 ("TTPA") and the Higher Education Reconciliation Act of 2005 ("HERA"); and (2) billed loans under the 9.5% floor after the eligible tax exempt bonds from which the loans derived their eligibility matured or were retired. The audit covered the period from October 1, 2003 through September 30, 2006. For purposes of this response, "Sallie Mae" refers to Sallie Mae, Inc., and its affiliates other than the Student Loan Marketing Association and "Nellie Mae" refers to the New England Education Loan Marketing Corporation and its successors including SLM Education Credit Finance Corporation.[17]

With respect to the first audit purpose, the OIG found that Sallie Mae's billing for its Nellie Mae subsidiary for special allowance payments ("SAP") under the 9.5% floor complied with TTPA and HERA.  Sallie Mae agrees with this finding.

With respect to the second audit purpose, the OIG adopted a new narrow legal interpretation of the term "obligation."  An interpretation that, to the best of our knowledge, does not appear in the Higher Education Act of 1965, as amended ("HEA" or "Act") or in any legislative history and has never been published or communicated to the student lending community in any manner. In connection with the second audit purpose, the OIG concluded that Sallie Mae erred when it took the position that it was entitled to bill the 9.5% floor on loans funded with the proceeds of bonds issued under such a single master indenture until the last bond issued under such indenture matured.

Sallie Mae strongly disagrees with the OIG's conclusions.  We disagree for the following reasons:

### Sallie Mae's Interpretation is Correct and Consistent with Congressional Intent

In a case of first impression, the issue is whether loans financed by the issuance of bonds in the same calendar year that share common characteristics, and are governed by a single master indenture or trust agreement, may be treated as an "obligation" for purposes of Section 438(b) of the Act and 34 C.F.R 682.302(e).  Although there have been several OIG Audit Reports and other Department guidance on the 9.5% floor rate, such guidance has never addressed this particular issue.  Indeed, this particular construction is inconsistent with the original federal legislative intent that the 9.5% rate act as a floor and thus a limitation on the yield lenders could obtain.  Therefore, the federal government encouraged maximizing loans within the 9.5% floor. In the past, the Department insisted that lenders not be permitted to turn loans originally financed through tax-exempt obligations, for which special allowance was one half the normal special allowance, into loans that yielded full special allowance by refinancing the loans through taxable financings.   Sallie Mae's interpretation is the only interpretation consistent with that Congressional intent.

---

[17] The Student Loan Marketing Association, a government sponsored enterprise that was a subsidiary of SLM Corporation, was dissolved as of December 31, 2004 pursuant to the terms of its privatization process.

### Sallie Mae's Interpretation was Reasonable

Even if the Department were to now adopt OIG's new narrow legal interpretation of the term "obligation", Sallie Mae's practice was based on a reasonable application of the Act, the Department's regulations, and clear legislative intent.  This is particularly true here, where neither the statute nor regulations currently specifically define "obligation" and the precise issue raised in the OIG's audit is one of first impression.

Sallie Mae reasonably interpreted the term "obligation," a term that is not specifically defined in Section 438 (b) of the HEA or Section 682.302 in the regulations, to include multiple bonds issued in the same calendar year under a single trust agreement where the bonds shared important characteristics.  If the Department takes the new position that "obligation" for purposes of Section 438(b) and 34 CFR 683.302 should be interpreted more narrowly as an individual tax-exempt bond, it should publish public guidance for industry participants. Moreover, the OIG should not use an audit to advance a particular construction of an undefined term in a statutory provision that has long perplexed lenders, Congress, the Department and the press.

### The OIG's Estimate is Incorrect and Overstated

Apart from question of how the Act and federal regulations should be interpreted, the OIG's estimate of the amount of special allowance that it believes Sallie Mae should return is incorrect, speculative, and based on a flawed assumption of the average life of non-consolidated FFELP loans and should be removed from any final audit report.

### The Issues Addressed have no Application to Other Sallie Mae Subsidiaries

The OIG also suggests in its Draft Report that other Sallie Mae subsidiaries should be reviewed for the same issue. The issue addressed in the Draft Report is limited to Nellie Mae's special allowance billings and there is no reason for any final audit report to include the recommendation to the FSA as to information on Sallie Mae's other subsidiaries. The issue addressed in this audit is not relevant to Sallie Mae's other subsidiaries, since none of Sallie Mae's other subsidiaries with 9.5% floor loans: (1) issued tax-exempt bonds under similar indentures or trust agreements with similar structures; (2) issued general obligation or unsecured bonds; or (3) had similar trust structures that lacked a defined pool of loans.  As such, Sallie Mae properly treated the Nellie Mae-bonds differently than the bonds of its other subsidiaries and therefore there is no need to recommend any further review on this issue.

**Sallie Mae's Legal Interpretation is not a Management Control Weakness**

Finally, the OIG claims that there was a management control weakness at Sallie Mae. Even assuming for the sake of argument, that Sallie Mae incorrectly interpreted the 9.5% floor special allowance provision by continuing to bill 9.5% special allowance until the last bond issued under a single trust agreement matured, Sallie Mae's legal reasoning and interpretation on an issue of first impression is not a management control weakness, and the reference to management control weaknesses in the Draft Report should be removed from any final audit report.

We address each of the Draft Report's findings in detail below. It is important to note that the findings in the Draft Report relate to activities that ceased in June 2005, prior to the date of the Draft Report and prior to September 30, 2006, the end date of the last quarterly period for which Sallie Mae billed at the 9.5% floor rate.

## II.    Factual Background.

Nellie Mae issued tax-exempt bonds in series from time-to-time during a nine month period in 1993 (collectively, the "1993 Bonds") under the terms of the 1993 Trust Agreement (defined below). The purpose of these 1993 Bonds was to generate proceeds totaling approximately $458 million that could be used to refund tax-exempt bonds that were previously issued to purchase eligible student loans. In accordance with the HEA and as acknowledged by the OIG in its Draft Report, the loans that were refinanced with the proceeds of the 1993 Bonds qualified to be billed under the 9.5% special allowance floor rate.

## III.    9.5% Floor Rate Statutory and Regulatory Provisions.

The Act provides for the Secretary of Education to make special allowance payments to eligible lenders. The rates are based on formulas that differ according to the type of the loan; the date the loan was originally made or insured; and the type of funds used to finance the loan (taxable or tax-exempt). In 1980, concerned that lender yields for loans financed with tax-exempt obligations did not adequately reflect the lower costs associated with tax-exempt financing, Congress reduced the special allowance to be paid on loans financed with tax-exempt obligations to one-half of that otherwise payable ("Half-SAP"). At the same time, however, Congress guaranteed that the lender yield for loans financed with tax-exempt obligations would be no less than 9.5% (the "9.5% floor"). In the Student Loan Reform Act of 1993, included in the Omnibus Budget Reconciliation Act of 1993, P.L. 103-66, secs. 4105 and 411 (1993), Congress eliminated the Half-SAP and 9.5% floor for loans financed with tax-exempt obligations issued on or after October 1, 1993.

Section 438(b)(2)(B) of the Act, which specifies the criteria for eligible loans to initially qualify for the 9.5% floor, states in pertinent part:

> (i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under Title 26 shall be one-half the quarterly rate of

the special allowance established under subparagraph (A)[the full special allowance rate], except that… . . . .

(ii) The quarterly rate of the special allowance set under division (i) of this subparagraph shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4.[18]

The Department's regulations at Section 682.302(c)(4)[19] further specify that "[l]oans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations originally issued on or after October 1, 1993, . . . do not qualify for the minimum special allowance rate [of 9.5%]."  As noted above, the OIG acknowledges that the student loans purchased or refinanced with the proceeds of the 1993 Bonds did properly qualify for the 9.5% floor rate.

The regulations also address when such loans lose their eligibility for the 9.5% floor. Section 682.302(e)(2)(ii) states that such loans lose their entitlement to the 9.5% floor rate when they are "pledged or otherwise transferred in consideration of funds" that would not have previously qualified for the 9.5% floor and "the prior tax-exempt obligation [the proceeds of which were used to purchase the loans] is retired [or defeased]."

## IV.     <u>Sallie Mae Correctly Applied the Act and the Regulations in Billing Special Allowance on Loans Financed under Nellie Mae's 1993 Trust Agreement.</u>

Sallie Mae correctly applied the Act and the regulations in billing Special Allowance on loans financed under Nellie Mae's 1993 Trust Agreement.  Sallie Mae's practice was based on a reasonable application of the Act and the Department's Regulations.[20]  As the OIG stated, Sallie Mae's practice was to continue to bill loans that it purchased from Nellie Mae that were floor loans at the time of acquisition by Sallie Mae at the 9.5% SAP rate until the last serial issue associated with the 1993 Bond series associated with the 1993 Trust Agreement matured. Specifically, Sallie Mae treated loans it purchased from Nellie Mae that were made with the proceeds of the 1993 Bonds issued under the 1993 Trust Agreement as eligible for the 9.5% floor calculation until the last bond issued matured on July 1, 2005.  Sallie Mae never purchased loans

---

[18] Congress first enacted legislation which established different special allowance for holders of loans "made or purchased with funds obtained by the holder from the issuance of obligations, the income of which is exempt from taxation" in 1980, through the Education Amendments of 1980, Pub. L. 96-374, Title IV, § 420(b), Oct. 3, 1980.  In the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, Congress repealed the 9.5% floor for all loans "financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, the income of which is excluded from gross income under the Internal Revenue Code of 1986."

[19] The OIG's Draft Report cites an outdated copy of the Code of Federal Regulations.  While the relevant regulations have been substantially restructured and rewritten, there are no material differences in their application to this issue.

[20] In its Draft Report, the OIG claims that Sallie Mae's position is that obligation means indenture.  The OIG goes on to explain why an indenture is not an obligation.  The OIG completely misstates Sallie Mae's position.  Sallie Mae's position is that obligation refers to all bonds issued under the single master indenture, not the indenture itself.

that were made with the proceeds of Bonds 93C-E, thus at issue here is Sallie Mae's billing of 9.5% floor on loans that were included in Bonds 93B, F, G and H.[21]

Again, Sallie Mae's practice is based on a reasonable application of the Act and the Department's regulations.  All of the 1993 Bonds shared common characteristics that support treating them as a single obligation for purposes of applying the 9.5% floor provisions. The common characteristics of the 1993 Bonds are based on the specific terms of the 1993 Trust Agreement with The First National Bank of Boston (the "Trustee") dated March 1, 1993 (the "1993 Trust Agreement") and the relationship between the 1993 Bonds and the collective pool of loans purchased with the proceeds from the 1993 Bonds.  Enclosed as Exhibit A to this submission is a legal memorandum from experienced bond counsel at Thompson Hine which agrees with Sallie Mae's position.

### (a) 1993 Trust Agreement

Nellie Mae issued the 1993 Bonds in series A through H from time-to-time during a nine-month period in 1993 under the terms of the 1993 Trust Agreement.  The purpose of these 1993 Bonds were to generate proceeds totaling approximately $458 million that could be used to refund tax-exempt bonds that were previously issued by Nellie Mae to purchase eligible student loans.  In accordance with the Act and as acknowledged by the OIG's report, the loans that were refinanced with the proceeds of the 1993 Bonds qualified to be billed under the 9.5% special allowance floor rate.

Notably, all of the 1993 Bonds were governed by the terms of the same 1993 Trust Agreement, were issued in the same calendar year, were payable from the same sources of funds and because they were unsecured, had no claim or security interest on a specific pool of loans. Additionally, the rights of each bondholder under each series of 1993 Bonds were identical to the rights of the bondholders under the other series of 1993 Bonds issued pursuant to the 1993 Trust Agreement.   Per the terms of the 1993 Trust Agreement, each 1993 Bond was treated collectively and on a parity basis with the other 1993 Bonds in terms of the bondholders' right to payments, default provisions, and remedies.  The terms of these provisions are discussed below.

**Right to Payment:**  Article IV of the 1993 Trust Agreement stipulates that on each date on which payment on any of the 1993 Bonds is due, the Corporation [Nellie Mae] pays to the Trustee and the Trustee pays to the bondholders the requisite amount of interest on or principal of the 1993 Bond.  Collections on the purchased loans were not dedicated as the sole source of repayment of the 1993 Bonds.[22]  The provisions make no distinction and give no preference to any bondholder of any separate series of the 1993 Bonds.

**Events of Default:**  Article VIII of the 1993 Trust Agreement states that the failure to make a timely payment of the principal of or the interest on any of the 1993 Bonds constitutes an Event of Default for all of the 1993 Bonds.  Following an Event of Default, the 1993 Trust Agreement provides for the acceleration of the principal of all of the outstanding 1993 Bonds regardless of the series of 1993 Bonds.  In other words, the

---

[21] See OIG Workpaper G. 4.1. p.2.

[22] This feature was unique to these Nellie Mae 1993 Bonds.  These 1993 Bonds were general obligations of Nellie Mae and were therefore payable from the general revenues of Nellie Mae as opposed to collections from the loans.

interests of all of the bondholders under the 1993 Trust Agreement are evenly linked — if one bondholder is not paid, the Corporation [Nellie Mae] is in default with regard to all bondholders.

**Remedies:**  Article VIII of the 1993 Trust Agreement also provides for the distribution of funds received from the Corporation [Nellie Mae] to remedy an Event of Default or following a judgment from a suit filed by the Trustee.  The distribution provision causes those funds to be shared on a parity basis across all of the 1993 Bonds based on the amount of interest, principal, and redemption premium owed.  There is no right of the holder of an individual 1993 Bond or even the holders of all of the 1993 Bonds of a separate series to file suit to enforce the 1993 Trust Agreement without the consent of a total of two-thirds (2/3) of the aggregate principal amount of the 1993 Bonds outstanding (and not separated by series of 1993 Bonds).

**Amendments:**  Similar to the remedial rights, the 1993 Bonds also require collective action of all bondholders without regard to any separate series of 1993 Bonds to amend certain provisions of the 1993 Trust Agreement.  Under Section 7.2 of the 1993 Trust Agreement, the written consent of the holders of two-thirds (2/3) of the principal amount of all of the 1993 Bonds outstanding is required to modify or adopt an amendment to the rights and obligations of the Corporation [Nellie Mae] or the holders of the 1993 Bonds. In other words, series of 1993 Bonds that matured earlier than other series of 1993 Bonds did not control or have greater rights over the administration of all of the 1993 Bonds. This provision has the potential effect of an amendment being adopted that modified the rights of the bondholders of a particular series of 1993 Bonds even if all of the bondholders of that series voted against the amendment.

**Proceeds:**  In addition to equal treatment of all the bondholders under the 1993 Trust Agreement, the terms of the 1993 Trust Agreement do not create a connection between an individual 1993 Bond or series and the student loans purchased with the proceeds from the 1993 Bonds.  Unlike most student loan bond financings, the loans purchased with proceeds from the 1993 Bonds are not pledged as collateral in support of a particular series of 1993 Bonds.  Rather, all unencumbered loans of the Corporation [Nellie Mae], along with its general assets and credit, are the source of credit for the entire financing under the 1993 Trust Agreement.  A more specifically identifiable relationship between one series of bonds and one loan portfolio (e.g., where the loans are secured collateral for the specific series) did not exist because of the nature and terms of the 1993 Trust Agreement.

**Loan Servicing:**  Section 5.3(b) of the 1993 Trust Agreement requires the Corporation [Nellie Mae] to properly service all student loans owned by it regardless of the source of the proceeds used to purchase the loan.  The 1993 Trust Agreement details the criteria for executing a servicing agreement to service the loans and similarly treats each of the Corporation's [Nellie Mae's] loans equally regardless of which 1993 Bond series' proceeds were used to finance the loan.

### (b) Application of the Act to the 1993 Bonds

When Congress first enacted the statutory provision in 1980 that established Half-SAP treatment for certain loans, it did not specifically define the term "obligation."  Indeed, despite the fact that Congress has amended the special allowance provisions on numerous occasions since 1980, Section 438(b)(2) has never included a specific definition of "obligation" for purposes of applying the 9.5% floor rule. The current regulations that address the 9.5% floor provision similarly lack any specific definition of the term "obligation."[23]  Indeed, in interim regulations promulgated in 2006, the Department specifically acknowledged that "current regulations refer to obligations originally "issued" before or after specified dates, but do not define that term, derived from Section 438(b)(2)(B) of the Act." Interim Regulations, 71 Fed. Reg. 45680, August 9, 2006.

Because of an ambiguity inherent in the text of the Act and the regulations, Sallie Mae acted reasonably in relying on a good faith interpretation of the regulations to determine the appropriate practice for billing 9.5% floor rate loans.  The regulations specifically state that an otherwise eligible student loan loses its 9.5% floor rate status when "the prior tax-exempt obligation," the proceeds of which were used to purchase the loan, is retired or defeased.  The ambiguity arises from the use of the word "obligation" in its singular form.

### (c) The Department has Never Addressed the Issue Raised in the Draft Report.

The Department's regulations and guidance have not clearly answered the question of which group of bonds should be used for purposes of applying the 9.5% floor rules.  Such bonds could be grouped based on a multitude of different characteristics to determine which bonds should be associated with which particular loans.  For example, with secured bond issuances, the relationship between a group of bonds that are secured by a specific group of loans may be easy to discern.  Absent that arrangement, it is reasonable to associate bonds based on their issue date, maturity date, or some other common term(s), such as the terms of the applicable indenture or trust agreement.

Sallie Mae treated the 1993 Bonds as a single obligation because they were all issued during the same year with identical terms and provisions as discussed above.  That application is arguably consistent with the Department's interpretation of the regulations.   Sallie Mae's interpretation recognizes the 1993 Bonds as the group of issuances that has the most common and significant shared characteristics including issue year, payment rights, collateral and remedies.

It is a reasonable approach to treat the 1993 Bonds as a single obligation because of their common terms and characteristics, rather than arbitrarily identifying each bond series as a separate obligation.  The OIG's separate consideration of each series relies on arguing that each series is unique only because of its issue date.  However, the 1993 Bonds were not organized in such a way.  For example, within certain of the series there were multiple interim maturity dates

---

[23] Regulations implementing the Half-SAP provision, promulgated in 1985 broadly defined "obligation" to mean "any interest-bearing debt or original issue discount debt incurred by an Authority pursuant to its borrowing powers. [A]s used in this subpart, this term means only an obligation issued to acquire funds for financing or refinancing the making or purchasing of student loans."  50 Fed. Reg. 5515, February 8, 1985.  The Department removed the definition of "obligation" from the regulations in December 1992.

reflecting the maturity of some, but not all of the 1993 Bonds of an individual series. Additionally, of the eight series of the 1993 Bonds, half of them shared a common issue date. Instead of being substantively different financings, the use of multiple series for the 1993 Bonds was based on logistical convenience or investor demands.

In sum, Sallie Mae had a reasonable basis to treat the collective group of the 1993 Bonds as the obligation. Sallie Mae's position that all of the 1993 Bonds issued under the 1993 Trust Agreement — not the Agreement itself — constitute one obligation with a maturity date of July 1, 2005 is consistent with the intent of Congress in enacting the 9.5% floor provision, namely to offer less than full special allowance to non-profit lenders with access to tax-exempt financing and lower cost of funds than for-profit lenders. To address the 1993 Bonds by their separate series designation is to impart to each series distinct characteristics that do not exist under the 1993 Trust Agreement.

The OIG's Draft Report would rely on the final maturity date of a bond series to determine eligibility for the 9.5% floor rate and ignore any interim maturity dates within the series. Sallie Mae's practice just as reasonably relies on the final maturity date of the 1993 Bonds of July 1, 2005 as the appropriate end date for the 9.5% floor rate. The original intent of Congress in enacting the 9.5% floor provision was to maximize the amount of loans billed at 9.5% to penalize non-profit lenders and minimize any potential windfall they would otherwise obtain due to their low cost of funds. Sallie Mae's interpretation is the only interpretation consistent with that Congressional intent.

### (d) The OIG's Reliance on Alleged Inconsistencies in Sallie Mae's Practices is Misplaced.

In its Draft Audit Report, the OIG also attempts to highlight alleged inconsistencies between Sallie Mae's treatment of 9.5% floor loans after its acquisition of Nellie Mae and Nellie Mae's practice prior to the acquisition, as well as alleged inconsistencies in Sallie Mae's treatment of loans funded by Bond 93F. The OIG's attempt to rely on these alleged inconsistent interpretations is irrelevant and further misstates the facts.

Since its acquisition of Nellie Mae in July of 1999, Sallie Mae's billing procedure for loans eligible for the 9.5% special allowance floor has been consistent. As noted in the Overview of Policies Sallie Mae submitted to the OIG, Sallie Mae's policy for the management of Nellie Mae's student loans financed by tax-exempt obligations required that:

- Nellie Mae issues tax-exempt obligations under the terms of a trust indenture or trust agreement, which established the trust and governed the administration of the trust and the assets owned by the trust.
- Loans remained 9.5% floor loans if they were transferred to an affiliate of the entity issuing the tax-exempt obligations but not refinanced with an ineligible source of funds. These affiliates were referred to as "holding tanks" and were funded with general corporate funds including equity, cash and taxable, not tax-exempt debt.

- As the related bond trust was extinguished with the last tax-exempt bond series maturity, the eligibility of the related loans in the holding tank for 9.5% special allowance was extinguished and the loans had to start receiving full special allowance. [24]

Sallie Mae acknowledges that this interpretation was inconsistent with Nellie Mae's 9.5% billing practices in place prior to the acquisition of the company in 1999.[25]   However, the Nellie Mae loans cited in the OIG Draft Report that Sallie Mae purchased under the 1993 Trust Agreement (loans associated with the 93A, 93B, 93F, 93G, and 93H bond series) were billed at the 9.5% floor rate under the policy outlined above.[26]   The loans associated with the 1993 Bonds under the 1993 Trust Agreement that matured prior to Sallie Mae's purchase (bond series 93C, 93D, and 93E) were not loans Sallie Mae purchased and therefore were not billed under this policy.[27]

The OIG has included statements in the Draft Report and in its workpapers indicating that the purpose of the July 2004 sale of loans associated with bond series 93F was "to cease billing the loans under the 9.5% floor calculation, and to classify the loans as eligible for the usual special allowance rates, as Bond 93F was scheduled to mature on July 1, 2004."[28]   This sentence mischaracterizes the events associated with the July 2004 sale of loans associated with the 93F bond series.

As Sallie Mae has previously explained to the OIG, the July 2004 sale was an erroneous early liquidation of bond series 93F.[29]   As noted in Sallie Mae's February 1, 2005 memorandum, the process that had been used by Sallie Mae to "tag" loans qualified to receive 9.5% SAP was not entirely effective.[30]   As part of the monitoring process Sallie Mae initiated in 2004 to correctly identify and tag all 9.5% loans, Sallie Mae determined that the loans associated with the 93F[31] bond series had been switched from 9.5% to the full special allowance rate in error.[32] Sallie Mae corrected its 799 billings with respect to this error between January, 2005 and June, 2005.

---

[24] OIG Workpaper H.1.16, D.3.1

[25] See OIG Workpaper D.3.5., p. 2.

[26] OIG Workpaper A.1.1 – July 28, 2008 e-mail communication from J. Wheeler to Robert Janney; OIG Workpaper G.1.1.

[27] See OIG Workpaper G.4.1, p. 2.

[28] See Draft Report, p. 13; OIG Audit Workpaper D.3.4, D.3.5

[29] See OIG Workpaper H.1.39.

[30] See OIG Workpaper H.1.22, p. 2.

[31] Note, the February 1, 2005 memorandum refers to the loans associated with bond series 93F as bond series 93B, in error.

[32] See OIG Workpaper H.1.22at p. 3.

**(e) The History of the 9.5% Provision Supports Sallie Mae's Interpretation of "Obligation."**

The historical context of the 9.5% floor loan provisions also provides support for Sallie Mae's interpretation of "obligation."  As the Comptroller General recognized in a report issued by the General Accountability Office ("GAO")  in 2004,[33] in the early 1990s, the Department expected that interest rates would rise, and that such predicted rise would result in a higher lender yield for loans not subject to the Half-SAP limitation.  The Department was concerned that holders would transfer loans out of floor loan eligible issuances in order to obtain a higher yield, "thus resulting in higher special allowance payments for the Government."  GAO Report at p. 5.  The Department amended 34 C.F.R. § 682.302(e)(2) in 1992 to prevent holders from avoiding the Half-SAP cap through  refinancing into non-floor eligible loans, by adding a provision that if the authority retained a legal interest in those loans and the original tax-exempt obligation remained outstanding, floor loan treatment must continue.  Given this historical context, if interest rates had been high in 2005, by following the OIG's interpretation of the word, "obligation," Sallie Mae would have subjected itself to accusations of improperly boosting its yield on loans by treating bonds issued under a single trust agreement as separate obligations for purposes of the 9.5% floor.

**(f) In the Absence of Clear Regulatory or Dear Colleague Letter Guidance, it was Reasonable for Sallie Mae to look to other Statutory Guidance or Definitions.**

In the absence of clear statutory, regulatory, or Dear Colleague Letter Guidance, it was reasonable for Sallie Mae to look to other statutory guidance or definition.

Treasury's regulations that permit a series of bonds to be treated as one obligation support Sallie Mae's practice of treating the 1993 Bonds as a single financial obligation.   Under the Treasury's regulations governing student loan bonds during the lifespan of the 1993 Bonds, Sallie Mae was permitted to calculate a single yield for all of the 1993 Bonds because of their significant relationship to each other under the 1993 Trust Agreement.  Treas. Reg. 1.148-4(a).  This exception to the yield-calculation rules exists because the failure to treat bonds such as the 1993 Bonds as a single obligation can result in discriminatory treatment of the students whose loans were purchased.

While the Treasury regulations are tax-based and not derived from the Act, the OIG has indicated that it may consider economic-related rules and regulations from outside the Department when addressing billing issues.  In the OIG's Final Audit Report entitled "Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations,[34] the OIG relied in part on Financial Accounting Standards Board ("FASB") Accounting Standards, Statements of Standards FAS 125 and FAS 140 to determine whether certain loan transactions constituted sales or transfers.  Such consideration of other federal regulations supports Sallie Mae's reliance on the Treasury's regulations in its practices with respect to the 1993 Bonds, and in the absence of a specific definition of "obligation" in the HEA, Sallie Mae's analogy to the Treasury regulations was reasonable.

---

[33]   United States  Government  Accountability  Office,  Report,  GAO-04-1070,  September  2004,  http://www.gao.gov/products/GAO-04-1070.

[34] For a copy of the Nelnet Report see,  www.ed.gov/about/offices/list/oig/auditreports/a07f0017.pdf.

The Treasury regulation cited above is relevant to the consideration of the meaning of the term "obligation" under the HEA. One of the fundamental canons of statutory construction is that the words of a statute must be read in context with a view to how those provisions fit in the overall statutory scheme.[35] The courts have consistently held that undefined terms in a statute be placed beside other statutes relevant to the subject and given a meaning and effect derived from the combined whole.[36] Generally, where legislation dealing with particular subject consists of system of related general provisions indicative of settled policy, new enactments of a fragmentary nature on such subject are to be taken as intended to fit into the existing system and to be carried into effect conformably thereto, except where a different purpose is clearly shown.[37]

The original provision of the HEA that established the Half-SAP program explicitly incorporated the Internal Revenue Code provisions to determine which obligations are tax-exempt.[38] To this day, the Internal Revenue Code provisions establish and govern those obligations entitled to receive tax-exempt treatment.[39] In view of these facts, IRS interpretations establishing the meaning of a tax-exempt obligation; which bonds are entitled to be considered an 'obligation'; and the tax-treatment of those obligations, are relevant and appropriate guides to determine the meaning and treatment of those tax-exempt obligations under the HEA for purposes of the Half-SAP provision.

In summary, for all the reasons stated above, Sallie Mae's billing practices with respect to the 1993 Bonds issued under the 1993 Trust Agreement were a good faith effort to comply with the Act and as a reasonable and supported conclusion under the Act and the Department's regulations.

## V.     The OIG's Estimate of the Alleged Overpayment of SAP is Incorrect.

---

[35] Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 120 S.Ct. 1291 (2000) (Tobacco manufacturers, retailers and advertisers challenged the Food and Drug Administration regulation of tobacco products. In construing the relevant provisions of Food, Drug and Cosmetic Act, the court considered various statutes enacted to regulate the use of tobacco products in reaching the conclusion that the FDA did not have jurisdiction to regulate tobacco products as customarily marketed.)

[36] See e.g., United States v. American Trucking Association, 310 U.S. 534, 543-44 (1940) (Supreme Court interpreted Motor Carrier Act of 1935 in light of the Hours of Sevice Act, the Motor Vehicle Act, and other statutes where it was hesitant to interpret clause in question in a way that would deviate from the meaning of other related statutes); United States v. Abreu, 962 F.2d 1447 (10th Cir. 1992)(noting that in construing ambiguous or undefined statutory term, Supreme Court has indicated that references to other statutes may may be appropriate as well); Stribling v. United States, 419 F.2d 1350 (8th Cir. 1969)(where interpretation of particular statute is in doubt, express language of another statute not strictly in pari material but employing similar language and applying to similar persons and things may control by force of analogy).

[37] United States v. Arizona, 295 U.S. 174, 55 S.Ct. 666 (1935) (Court considered the statutory history of acts governing rivers and streams in reaching conclusion that one isolated provision did not evidence intention of Congress to change its long-standing interpretations).

[38] Education Amendments of 1980, Pub. L. 96-374, Title IV, §420(b), Oct. 3, 1980, 94 Stat. 1427.

[39] 20 USC §1087-1 (2008).

In its Draft Report, the OIG recommends that the Department require Sallie Mae to return approximately $12.3 million in SAP billings for loans associated with Bond 93F and approximately $10 million in SAP billings for loans associated with Bonds 93B, 93G and 93H. Putting aside the issue of whether the OIG's interpretation of the term "obligation" for purposes of the 9.5% floor loans is correct, the OIG's estimates of alleged SAP overpayments are based on a flawed assumption about the average life span of loans in the bonds at issue here for purposes of amortizing the loan balances, and therefore are overstated.

The OIG based its estimates of the alleged ineligible loan amounts associated with Bonds 93B, 93G and 93H on the assumption that each loan was paid off over an 8.5 year period. Draft Report, p. 17-18. This 8.5 year average life may in fact be valid for loans originated in 2008. We submit, however, that it is not valid for loans originated before or during the audit period 2002-2005. We also submit that OIG incorrectly assumed that the loans were newly originated at the time of the bond maturity rather than having been in repayment for several years. The OIG's faulty assumptions about the average life of the loans, therefore, skewed its estimate of the alleged SAP overpayment.

Sallie Mae provided information to the OIG that the average life span on the actual FFELP Stafford portfolios in question ranges from 3.7 to 4.6 years. These lower average lives result from two facts.

First, most of the loans in question were originated before the audit period 2002-2005 and therefore were well into repayment. Second, frequent loan consolidation during the relevant period makes the use of a non-consolidation average life span flawed. While these loans were "non-consolidation" FFELP loans, a significant percentage of these loans would have consolidated which would significantly speed up the overall pay down of the portfolio.

As the OIG is familiar, the FFEL Program witnessed a massive amount of loan consolidation during the 2002-2007 timeframe. In fact, over $40 billion of Sallie Mae's non-consolidation FFELP loans (Stafford and PLUS) consolidated between 2002-2005. On an annual basis, this constituted between 20-40% of Sallie Mae's entire non-consolidation portfolio. Because of this high level of prepayment experience, Sallie Mae calculates the average life of non-consolidation loans to use in determining a number of accounting related results. These results are included in our publicly disclosed filings with the SEC and are audited by our independent external auditors. These reports are available on our website (www.salliemae.com) and on the SEC's EDGAR system. The affect of these prepayments have the impact of shortening the overall average life of the portfolio. Our audited weighted average life information on our FFELP Stafford portfolio disclosed in our 10K report ranged from a high of 4.6 years to a low of 3.7 years.[40] Sallie Mae previously provided amortization tables (attached as Exhibit B as a courtesy) which recalculate the impact to the average billed balance using a 4.0 year average life of loan instead of the 8.5 year average used by the OIG. *See* Exhibit C for excerpts from relevant Sallie Mae disclosure documents.

---

[40] SLM Corporation Form 10-K for year ending December 31, 2007, pp. F-34 and F-40. http://www.sec.gov/Archives/edgar/data/1032033/000095013307000881/w30676e10vk.htm

The OIG ignored the more specific Sallie Mae data and arbitrarily determined that the average life span of nonconsolidated FFELP loans is 8.5 years. See Draft Report n.14.[41]   If the OIG had used the data specific to Sallie Mae's Stafford portfolio, the alleged SAP overpayment would be reduced.

For the reasons set forth above, Sallie Mae reaffirms its request that the OIG take this Sallie Mae specific information on the average life span of Stafford loans into consideration in calculating its estimate of the alleged SAP overpayments.

## VI.  OIG's Allegation that a Weakness in Sallie Mae's Internal Controls led to the Alleged Improper Billing lacks any Merit.

The OIG's finding that a weakness in Sallie Mae's internal controls led to the alleged improper billing lacks any merit and should be removed from any final report.  A difference in legal interpretation of an undefined statutory provision is not a management weakness in internal controls.

In its Draft Report, the OIG takes issue with Sallie Mae's interpretation of the 9.5% special allowance floor provisions in the Act and the regulations.  As described in detail above, the issue raised in the audit report is whether an "obligation" can be all bonds issued under a single trust agreement with common characteristics, or whether, as the OIG contends, each bond issued under that trust agreement is a separate "obligation" for purposes of applying the 9.5% floor calculation.  The OIG disputes Sallie Mae's legal interpretation that all of the 1993 Bonds issued under the 1993 Trust Agreement with common provisions are a single obligation and concludes that "[t]his management control weakness resulted in noncompliance with regulations and special allowance overpayments."  Draft Report at p.1.  At the end of its Draft Report, the OIG again made reference to Sallie Mae's internal controls as it relates to the 9.5% floor billing. The Draft Report states:

> As part of our audit, we assessed SLMA's system of internal control significant to the audit objective and applicable to its billing for SAP under the 9.5 percent floor calculation, the process used to identify loans eligible for special allowance billing under the 9.5 percent floor calculation.  Our assessment disclosed a significant management control weakness that adversely affected SLMA's ability to accurately identify loans eligible for special allowance billing under the 9.5 percent floor calculation. Specifically, SLMA continued to bill loans under the 9.5 percent floor calculation after the maturity of the eligible tax-exempt bonds and after the loans were refinanced with funds derived from ineligible sources.  As a result of its management control

---

[41] The Draft Report states:  "The Department has determined the average life span of non-consolidated FFELP loans to be 8.5 years.  The Department made this determination as part of its obligation under the Federal Credit Reform Act of 1990,…to calculate the subsidy cost for FFELP loans.  NLMA's 9.5% floor billings for the quarters ended June 30, 2003, through June 30, 2005, contained only non-consolidated loans.  In comments submitted to a draft of this finding, SLMA stated that the average weighted life of a loan on its FFELP Stafford portfolio ranges from 3.6 to 4.7 years.  We have not made this revision; our estimate relies on the average life span calculated by the Department." Draft Report n.14.

> weakness, SLMA's billing activities did not comply with laws, regulations, and guidance for the 9.5 percent floor calculation.

Draft Report at p. 19.

Whether Sallie Mae's legal interpretation of the regulatory language relating to what is an "obligation" ultimately is determined to be the correct interpretation, the OIG's statement that a weakness in Sallie Mae's internal controls led to the alleged improper billing lacks any merit. A company's legal interpretation of a statutory provision on an issue of first impression is not an internal control. None of the Public Company Accounting Oversight Boards, the Securities and Exchange Commission or the Office of Management and Budget is in line with the OIG's position.

The Public Company Accounting Oversight Board ("PCAOB") has issued an Auditing Standard that requires auditors to issue an opinion on the effectiveness of their public company clients' internal controls. Auditing Standard 2, "An Audit of Internal Control over Financial Reporting Performed in Conjunction with an Audit of Financial Statements", states that an internal control deficiency exists when the design or operation of a control does not allow for timely prevention or detection of misstatements. It defines a "material weakness" in internal controls as" a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Standard 2 defines "significant deficiency" as "one that affects the company's ability to reliably process and report financial data such that there is more than a remote likelihood that the financial statements will be impacted in a manner that is consequential but not material." There is absolutely nothing in Standard 2 to suggest that a company's process of formulating a legal interpretation of a statute constitutes an internal control. Indeed, in a publication of frequently asked questions concerning its Rules on Management's Report on Internal Control Over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports (Release No. 34-47986, June 5, 2003), the Securities and Exchange Commission concluded that "[t]he definition of the term 'internal control over financial reporting' does not encompass a registrant's compliance with applicable laws and regulations, with the exception of compliance with the applicable laws and regulations directly related to the preparation of financial statements, such as the Commission's financial reporting requirements." FAQ, revised October 6, 2004, Question and Answer 10.

In addition, the Office of Management and Budget ("OMB") has recognized that, in determining standards for internal control in government, statutory interpretation is not an internal control activity. The Federal Managers' Financial Integrity Act of 1982 ("FMIA"), 31 U.S.C. §3512, requires the General Accounting Office ("GAO") to issue standards for internal control in government. These standards are supposed to provide the framework for establishing and maintaining internal control and for identifying and addressing major performance and management challenges and areas at greatest risk of fraud, waste, abuse and mismanagement. OMB Circular A-123, Management Accountability and Control, provides the specific requirements for assessing and reporting on controls in government.  In Circular A-123, Internal Control Systems, the OMB discussed internal control activities designed to provide reasonable assurance that government resources are protected against fraud, waste and mismanagement, but specifically carved out statutory interpretation from the definition of internal controls. Circular A-123 states "[I]nternal control does not encompass such matters as statutory development or interpretation." While OMB Circular A-123 was revised on December 21, 2004, nothing in the

revision suggests that statutory interpretation is an internal control. Indeed, in the revised Circular, OMB gave examples of control activities as proper segregation of duties, physical controls over assets, proper authorization, and appropriate documentation and access to that documentation. Nothing in the revised circular remotely suggests that the method by which a company comes to a legal interpretation or the resulting legal interpretation itself is a management control.

Sallie Mae's legal reasoning and interpretation of arguably ambiguous statutory and regulatory provisions is not a management control, and the report's reference to management control weaknesses should be deleted.

## VII.   The Issues Addressed in the Draft Report have no Application to Other Sallie Mae Subsidiaries.

While the Draft Report focuses on special allowance payments to Nellie Mae for 9.5% floor loans, the OIG recommends that Federal Student Aid ("FSA") ask Sallie Mae to disclose "any other instances, at any of its subsidiaries (i.e., NLMA, Southwest Student Services Corporation, Student Loan Funding Resources, Student Loan Finance Association) of loans billed under the 9.5% floor calculation after the eligible tax-exempt bond issue matured and after the loans were refinanced with funds derived from an ineligible funding source." Without conceding that the OIG's findings as to Nellie Mae's billings are correct, Sallie Mae can state that none of its other subsidiaries with 9.5% floor loans issued tax-exempt bonds under similar indentures or trust agreements with similar structures. No other subsidiaries issued general obligation or unsecured bonds. No other subsidiaries had similar trust structures that lacked a defined pool of loans. As such, Sallie Mae treated the Nellie Mae-bonds differently than the bonds of its subsidiaries. The issue addressed in the Draft Report is limited to Nellie Mae's special allowance billings. Thus, there is no reason for any final audit report to include the recommendation to the FSA as to information on Sallie Mae's other subsidiaries.

## VIII.   Conclusion

Sallie Mae appreciates the opportunity to respond to the OIG's Draft Report. We believe our response demonstrates that Sallie Mae did not violate the Act or the applicable regulations in billing special allowance at the 9.5% floor on certain Nellie Mae loans. As explained in detail above, there is no definition of the term "obligation" in the statutory or regulatory provisions addressing the 9.5% floor provisions and Sallie Mae properly treated the 1993 Bonds which have significant and numerous common terms and conditions as a single obligation for purposes of determining the date on which to cease billing at the 9.5% floor on loans that were financed with the proceeds of such 1993 Bonds. In the alternative, even if the Secretary were to adopt the OIG's statutory interpretation, this case would be an appropriate one for the Secretary to exercise his discretion under the regulations to waive any repayment by Sallie Mae of the special allowance payments at issue.

Further, even assuming that the OIG has correctly interpreted the Act and the regulations, its estimate of the alleged overpayment of special allowance is speculative and excessive and must be reduced. Additionally, since Nellie Mae was the only subsidiary of Sallie Mae with this particular type of bond structure, there is no reason to recommend any further review of other Sallie Mae subsidiaries on this issue.

Finally, the OIG's finding that the alleged overbilling of special allowance was due to a weakness of management controls has no merit and must not be included in any final audit report, as a company's good faith interpretation of an ambiguous statutory provision is not a management weakness or a weakness in internal controls.

RESPONSE TO OFFICE OF INSPECTOR GENERAL
UNITED STATES DEPARTMENT OF EDUCATION
DRAFT AUDIT REPORT

FOR
SALLIE MAE, INC.
ED-OIG/A03I0006
Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded
by Tax-Exempt Obligations.

May 6, 2009

EXHIBIT A



## THOMPSON HINE

ATLANTA        CINCINNATI        COLUMBUS        NEW YORK
BRUSSELS        CLEVELAND        DAYTON        WASHINGTON, D.C.

# MEMORANDUM

January 16, 2009

TO:        Mark Heleen, General Counsel

CC:        Eric Watson, Associate General Counsel

FROM:      Patricia Mann Smitson
           Michael D. Barolsky

RE:        OIG Exception Report — 9.5% Special Allowance Billing

---

This memorandum is in response to your request for our review and comments regarding a draft Exception Report dated December 5, 2008 and prepared by the U.S. Department of Education's (the "Department's") Office of the Inspector General ("OIG"). Specifically, you have asked us to consider Sallie Mae's practice of billing qualified student loans under the 9.5% Special Allowance floor rate, where the loans were financed by the proceeds of tax-exempt bonds issued in 1993 under a single trust agreement (the "1993 Bonds").

As part of our analysis, we have reviewed the draft Exception Report entitled "Audit of SLMA --- A03-I0006: Exception Report dtd 12.5.08" as well as the existing statutes, regulations, and Department guidance pertaining to the Higher Education Act of 1965 (the "Act"). We have also reviewed the trust agreement under which the tax-exempt bonds were issued. Finally, we have reviewed related regulations from the U.S. Department of the Treasury (the "Treasury") as well as certain audit reports issued previously by the Department.

It is our understanding that Sallie Mae's practice was to treat all of the 1993 Bonds as a single financial obligation. We also understand that in keeping with that practice, Sallie Mae billed the qualified student loans purchased with the proceeds of the 1993 Bonds under the 9.5% floor rate until the last of the 1993 Bonds matured on July 1, 2005.

In our view, Sallie Mae's practice is based on a reasonable application of the Act and the Department's regulations as well as Treasury regulations relating to qualified student loan bonds. All of the 1993 Bonds shared common characteristics that support treating them as a single obligation for purposes of applying the 9.5% floor regulations; in addition, the applicable tax rules permitted treating them as part of a single issue. The common characteristics and the tax treatment of the bonds are based on the specific terms of the Trust Agreement with The First National Bank of Boston dated March 1, 1993 (the "1993 Trust Agreement" or the "Agreement") and the relationship between the 1993 Bonds and the collective pool of loans purchased with the proceeds from the bonds.

---

Trish.Smitson@ThompsonHine.com    Phone 513.352.6731   Fax 513.241.4771
Michael.Barolsky@ThompsonHine.com  Phone 513.352.6672   Fax 513.241.4771

---

THOMPSON HINE LLP                312 Walnut Street              www.ThompsonHine.com
ATTORNEYS AT LAW                14th Floor                    Phone  513.352.6700
                                Cincinnati, Ohio 45202-4089   Fax  513.241.4771

THOMPSON
HINE

January 16, 2009
Page 2

**9.5% Floor Rate Statutory and Regulatory Provisions**

Section 438(b)(2)(B) of the Act, which specifies the criteria for eligible loans to initially qualify for the 9.5% floor, states:

> (i) The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code of 1954 . . . .
>
> (ii) . . . shall not be less than 9.5 percent minus the applicable interest rate on such loans, divided by 4.

The Department's regulations at Section 682.302(c)(4)[1] further specify that "[l]oans made or purchased with funds obtained by the holder from the issuance of tax-exempt obligations originally issued on or after October 1, 1993, . . . do not qualify for the minimum special allowance rate [of 9.5%]." The OIG acknowledges that the student loans purchased or refinanced with the proceeds of the 1993 Bonds did properly qualify for the 9.5% floor rate.

The regulations also address when such loans lose their eligibility for the 9.5% floor. Section 682.302(e)(2)(ii) states that such loans lose their entitlement to the 9.5% floor rate when they are "pledged or otherwise transferred in consideration of funds" that would not have previously qualified for the 9.5% floor and "the prior tax-exempt obligation [the proceeds of which were used to purchase the loans] is retired [or defeased]."

**The 1993 Trust Agreement**

The New England Education Loan Marketing Corporation (the predecessor in interest to SLM Education Credit Finance Corporation) issued tax-exempt bonds from time-to-time during a nine month period in 1993 under the terms of the 1993 Trust Agreement. The purpose of these bonds was to generate proceeds totaling approximately $458 million that could be used to refund tax-exempt bonds that were previously issued to purchase eligible student loans. In accordance with the Act and as acknowledged by the OIG's report, the loans that were refinanced with the proceeds of the 1993 Bonds qualified to be billed under the 9.5% special allowance floor rate.

Notably, all of the 1993 Bonds were governed by the terms of the same 1993 Trust Agreement, were issued in the same calendar year, and were payable from the same sources of funds. Additionally, the

---

[1] The OIG's exception report cites an outdated copy of the Code of Federal Regulations. While the relevant regulations have been substantially restructured and rewritten, there are no material differences in their application to this issue.

---

T͟HOMPSON
H͟INE

January 16, 2009
Page 3

rights of each bondholder under each series of bonds were identical to the rights of the bondholders under the other series of bonds issued pursuant to the 1993 Trust Agreement.  Per the terms of the 1993 Trust Agreement, each bond was treated collectively and on a parity basis with the other bonds in terms of the bondholders' right to payments, default provisions, and remedies.  The terms of these provisions are discussed below.

*Right to Payment:*  Article IV of the 1993 Trust Agreement stipulates that on each date on which payment on any of the 1993 Bonds is due, the Corporation pays to the Trustee and the Trustee pays to the bondholders the requisite amount of interest on or principal of the bond.  The provisions make no distinction and give no preference to any bondholder of any separate series of the 1993 Bonds.

*Events of Default:*  Article VIII of the Agreement states that the failure to make a timely payment of the principal of or the interest on any of the 1993 Bonds constitutes an Event of Default for all of the 1993 Bonds.  Following an Event of Default, the Agreement provides for the acceleration of the principal of all of the outstanding 1993 Bonds regardless of the series of bonds.  In other words, the interests of all of the bondholders under the Agreement are evenly linked — if one bondholder is not paid, the Corporation is in default with regard to all bondholders.

*Remedies:*  Article VIII of the Agreement also provides for the distribution of funds received from the Corporation to remedy an Event of Default or following a judgment from a suit filed by the Trustee.  The distribution provision causes those funds to be shared on a parity basis across all of the 1993 Bonds based on the amount of interest, principal, and redemption premium owed.  There is no right of the holder of an individual bond or even the holders of all of the bonds of a separate series to file suit to enforce the Agreement without the consent of a total of two-thirds (2/3) of the aggregate principal amount of the 1993 Bonds outstanding (and not separated by series of bonds).

*Amendments:*  Similar to the remedial rights, the 1993 Bonds also require collective action of all bondholders without regard to any separate series of bonds to amend certain provisions of the 1993 Trust Agreement.  Under Section 7.2 of the Agreement, the written consent of the holders of two-thirds (2/3) of the principal amount of the 1993 Bonds outstanding is required to modify or adopt an amendment to the rights and obligations of the Corporation or the holders of the bonds.  This provision has the potential effect of an amendment being adopted that modified the rights of the bondholders of a particular series of bonds even if all of the bondholders of that series voted against the amendment.

*Proceeds:*  In addition to equal treatment of all the bondholders under the 1993 Trust Agreement, the terms of the Agreement do not create a connection between an individual bond or series and the student loans purchased with the proceeds from the 1993 Bonds.  Unlike most student loan bond financings, the loans purchased with proceeds from the 1993 Bonds are not pledged as

**T**HOMPSON
**H**INE

January 16, 2009
Page 4

collateral in support of a particular series of bonds.  Rather, all unencumbered loans of the company, along with its general assets and credit, are the source of credit for the entire financing under the 1993 Trust Agreement.  A more specifically identifiable relationship between one series of bonds and one loan portfolio (e.g., where the loans are secured collateral for the specific series) did not exist because of the nature and terms of the Agreement.

*Loan Servicing:*  Section 5.3(b) of the Agreement requires the Corporation to properly service all student loans owned by it regardless of the source of the proceeds used to purchase the loan.  The Agreement details the criteria for executing a servicing agreement to service the loans and similarly treats each of the Corporation's loans equally regardless of which series' proceeds were used to finance the loan.

**Tax Treatment of the 1993 Trust Agreement**

Sallie Mae's practice of treating the 1993 Bonds as a single financial obligation is supported by the Treasury's regulations regarding the tax treatment of that group of bonds.  Under the Treasury's regulations governing student loan bonds during the lifespan of the 1993 Bonds, Sallie Mae was permitted to calculate a single yield for all of the 1993 Bonds because of their significant relationship to each other under the 1993 Trust Agreement.  Treas. Reg. 1.148-4(a).  This exception to the yield-calculation rules exists because the failure to treat bonds such as the 1993 Bonds as a single obligation can result in discriminatory treatment of the students whose loans were purchased.

In a private letter ruling specifically addressing this regulation, the Internal Revenue Service noted that, where a "Corporation has a program for returning earnings on student loans in excess of the permitted yield to borrowers by forgiving a portion of the student loan[,]" "[t]he calculation of separate yields may . . . result in the disparate treatment of the student borrowers."  IRS PLR 200403095.

To avoid such possible discriminatory and unfair treatment of student borrowers, the IRS ruling recognized that treating a financing like the 1993 Bonds as a single obligation with a single portfolio of loans would eliminate such negative effects without resulting in additional costs to the Treasury and enable issuers to more efficiently and fairly manage their loans.

While the Treasury regulations are tax-based and not derived from the Higher Education Act, the OIG has indicated that it may consider economic-related rules and regulations from outside the Department when addressing billing issues.  In the OIG's Final Audit Report entitled "Special Allowance Payments to Nelnet for Loans Funded by Tax-Exempt Obligations," the OIG relied in part on Financial Accounting Standards Board (FASB) Accounting Standards, Statements of Standards FAS 125 and FAS 140 to determine whether certain loan transactions constituted sales or transfers.  Such consideration of other federal regulations supports Sallie Mae's reliance on the Treasury's regulations in its practices with respect to the 1993 Bonds.

THOMPSON
HINE

January 16, 2009
Page 5

**Application of the Act to the 1993 Bonds**

Because of an ambiguity inherent in the text of the Act's regulations, both Sallie Mae and the OIG were required to rely on a good faith interpretation of the regulations to determine the appropriate practice for billing 9.5% floor rate loans. The regulations specifically state that an otherwise eligible student loan loses its 9.5% floor rate status when "the prior tax-exempt obligation," the proceeds of which were used to purchase the loan, is retired or defeased. The ambiguity arises from the use of the word "obligation" in its singular form.

An "obligation" is an "agreement or acknowledgment of a liability to pay a certain sum or do a certain thing." *Black's Law Dictionary*, 6th ed., "Obligation" (1990). In apparent agreement with this definition, the OIG's Exception Report indicates at footnote 1 that an obligation is a bond (e.g., as represented by a bond certificate issued to a single bondholder). However, the OIG then applies the term "obligation" to each of the multiple series of the 1993 Bonds even though the regulations do not state that a *series of bonds* constitutes an "obligation". Rather, the plain language of the regulations uses "obligation" in its singular form, which suggests that only a single bond (i.e., represented by a single bond certificate) — not a group of bonds — qualifies as an obligation.

The ambiguity in applying the language of the regulations arises because identifying the specific bond (i.e., as represented by a certificate) that was used to purchase a specific loan is a generally impractical task because issuers such as Sallie Mae issue hundreds of millions of dollars of bonds at a single time, with denominations as small as $5,000, resulting in hundreds of potential bondholders from a single issuance. The Department does not interpret an "obligation" as a single bond because doing so would be unmanageable. Instead, the Department and the OIG have consistently interpreted "obligation" more broadly to refer to groups of bonds with common characteristics such as a common issue or maturity date or other common terms regarding characteristics such as pledged collateral. Under this approach, the Department does not distinguish between bonds of a single series. For example, the Department does not require issuers to recognize the redemption of a portion of the bonds of a series prior to the series' stated maturity date for purposes of the 9.5% floor rule.

The Department does not track eligible loans at a level more granular than that of a group (e.g., an issue or series) of bonds, which would be impractical if not impossible to do. The Department does not connect an individual loan with an individual bond, and its regulations and guidance have not clearly answered the question of which group of bonds should be used for purposes of applying the 9.5% floor rules. Such bonds could be grouped based on a multitude of different characteristics to determine which bonds should be associated with which particular loans. For example, with secured bond issuances, the relationship between a group of bonds that are secured by a specific group of loans may be easy to discern. Absent that arrangement, it is reasonable to associate bonds based on their issue date, maturity date, or some other common term(s), such as the terms of the applicable indenture or trust agreement.

THOMPSON
HINE

January 16, 2009
Page 6

Sallie Mae treated the 1993 Bonds as a single obligation because they were all issued during the same year with identical terms and provisions as discussed above. That application is arguably consistent with the Department's interpretation of the regulations. Sallie Mae's interpretation recognizes the 1993 Bonds as the group of obligations that has the most common and significant shared characteristics including issue year, payment rights, collateral, and remedies, as well as the right to receive common tax treatment as a single issue under the Treasury regulations.

It is a reasonable approach to treat the 1993 Bonds as a single obligation because of their common terms and characteristics, rather than arbitrarily identifying each bond series as a separate obligation. The OIG's separate consideration of each series relies on arguing that each series is unique because of its issue and maturity dates. However, the 1993 Bonds were not organized in such a way. For example, within certain of the series there were multiple interim maturity dates reflecting the maturity of some, but not all of the bonds of an individual series. Additionally, of the eight series of the 1993 Bonds, half of them shared a common issue date. Instead of being substantively different financings, the use of multiple series for the 1993 Bonds was based on logistical convenience or investor demands.

We understand the OIG's position that the Agreement itself does not constitute the "obligation," but Sallie Mae had a reasonable basis to treat the collective group of the 1993 Bonds as the obligation. Sallie Mae's position that the bonds under the 1993 Trust Agreement — not the Agreement itself — constitute one obligation with a maturity date of July 1, 2005 is consistent with the OIG's approach to interpreting the regulations. To address the 1993 Bonds by their separate series designation is to impart to each series distinct characteristics that do not exist under the 1993 Trust Agreement.

The OIG's Exception Report would rely on the final maturity date of a bond series to determine eligibility for the 9.5% floor rate and ignore any interim maturity dates within the series. Sallie Mae's practice just as reasonably relies on the final maturity date of the 1993 Bonds of July 1, 2005 as the appropriate end date for the 9.5% floor rate.

Based on the analysis above, Sallie Mae's billing practices with respect to the 1993 Bonds issued under the 1993 Trust Agreement should be viewed as a good faith effort to comply with the Act and as a reasonable and supported conclusion under the Department's regulations and related Treasury regulations.

Please do not hesitate to contact us with any questions or comments about this memorandum.

717479.9

RESPONSE TO OFFICE OF INSPECTOR GENERAL
UNITED STATES DEPARTMENT OF EDUCATION
DRAFT AUDIT REPORT

FOR
SALLIE MAE, INC.
ED-OIG/A03I0006
Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded
by Tax-Exempt Obligations.

May 6, 2009

EXHIBIT B

## Eligible Loan Balances

ORIGINAL assuming 8.5 yr average life

| Quarter Ended | Bond 93B | Bond 93G | Bond 93H |
|---|---|---|---|
| June 30, 2002 | 3,556,667 | | |
| September 30, 2002 | 10,490,196 | 31,445,098 | |
| December 31, 2002 | 10,175,490 | 46,005,882 | 479,000 |
| March 31, 2003 | 9,860,784 | 44,611,765 | 14,088,235 |
| June 30, 2003 | 9,546,078 | 43,217,647 | 13,665,588 |
| September 30, 2003 | 9,231,373 | 41,823,529 | 13,242,941 |
| December 31, 2003 | 8,916,667 | 40,429,412 | 12,820,294 |
| March 31, 2004 | 8,601,961 | 39,035,294 | 12,397,647 |
| June 30, 2004 | 8,287,255 | 37,641,177 | 11,975,000 |
| September 30, 2004 | 7,972,549 | 36,247,059 | 11,552,353 |
| December 31, 2004 | 7,657,843 | 34,852,941 | 11,129,706 |
| March 31, 2005 | 7,343,137 | 33,458,824 | 10,707,059 |
| June 30, 2005 | 7,028,431 | 32,064,706 | 10,284,412 |

Revised assuming 4.0 year average life

| Quarter Ended | Bond 93B | Bond 93G | Bond 93H |
|---|---|---|---|
| June 30, 2002 | 3,556,667 | | |
| September 30, 2002 | 10,490,196 | 31,445,098 | |
| December 31, 2002 | 9,834,559 | 46,005,882 | 479,000 |
| March 31, 2003 | 9,178,922 | 43,130,514 | 14,088,235 |
| June 30, 2003 | 8,523,284 | 40,255,147 | 13,207,720 |
| September 30, 2003 | 7,867,647 | 37,379,779 | 12,327,206 |
| December 31, 2003 | 7,212,010 | 34,504,412 | 11,446,691 |
| March 31, 2004 | 6,556,373 | 31,629,044 | 10,566,176 |
| June 30, 2004 | 5,900,735 | 28,753,676 | 9,685,662 |
| September 30, 2004 | 5,245,098 | 25,878,309 | 8,805,147 |
| December 31, 2004 | 4,589,461 | 23,002,941 | 7,924,632 |
| March 31, 2005 | 3,933,824 | 20,127,573 | 7,044,117 |
| June 30, 2005 | 3,278,186 | 17,252,206 | 6,163,603 |

RESPONSE TO OFFICE OF INSPECTOR GENERAL
UNITED STATES DEPARTMENT OF EDUCATION
DRAFT AUDIT REPORT

FOR
SALLIE MAE, INC.
ED-OIG/A03I0006
Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded
by Tax-Exempt Obligations.

May 6, 2009

EXHIBIT C

SLM CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS — (Continued)
(Dollars in thousands, except per share amounts)

**9.  Student Loan Securitization (Continued)**

non-amortizing, fixed rate and foreign currency denominated tranches. (As of December 31, 2004, the Company had $31.5 billion of securitized student loans in on-balance sheet securitization trusts.) These securitizations are included as financings in the table below.

The following table summarizes the Company's securitization activity for the years ended December 31, 2004, 2003 and 2002. Those securitizations listed as sales are off-balance sheet transactions and those listed as financings remain on balance sheet.

| | Years ended | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | December 31, 2004 | | | | December 31, 2003 | | | | December 31, 2002 | | | |
| | No. of Transactions | Amount Securitized | Pre-Tax Gain | Gain % | No. of Transactions | Amount Securitized | Pre-Tax Gain | Gain % | No. of Transactions | Amount Securitized | Pre-Tax Gain | Gain % |
| FFELP | | | | | | | | | | | | |
| Stafford loans | 4 | $10,002 | $134 | 1.3% | 4 | $ 5,772 | $ 73 | 1.3% | 7 | $11,033 | $101 | .9% |
| Consolidation Loans | — | — | — | — | 2 | 4,236 | 453 | 10.2 | 1 | 1,976 | 194 | 9.8 |
| Private Education Loans | 2 | 2,535 | 241 | 9.5 | 3 | 3,503 | 238 | 6.8 | 1 | 690 | 43 | 6.2 |
| Total securitizations — sales | 6 | 12,537 | $375 | 3.0% | 9 | 13,511 | $744 | 5.5% | 9 | 13,699 | $338 | 2.5% |
| Asset-backed commercial paper[1] | 1 | 4,186 | | | | | | | | | | |
| Consolidation Loans | 6 | 17,124 | | | 7 | 16,592 | | | — | — | | |
| Total securitizations — financings | 7 | 21,310 | | | 7 | 16,592 | | | — | — | | |
| Total securitizations | 13 | $33,847 | | | 16 | $30,123 | | | 9 | $13,699 | | |

[1] In the second quarter of 2004 the Company closed its first asset-backed commercial paper program. The program is a revolving 364-day multi-seller conduit that allows the Company to borrow up to $5 billion subject to annual extensions. The Company may purchase loans out of this trust at its discretion and as a result, the trust does not qualify as a QSPE and is accounted for on-balance sheet as a VIE.

Key economic assumptions used in estimating the fair value of the Residual Interests at the date of securitization resulting from the student loan securitization sale transactions completed during the years ended December 31, 2004 and 2003 were as follows:

| | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2004 | | | 2003 | | |
| | FFELP Stafford Loans | Consolidation Loans[1] | Private Education Loans | FFELP Stafford Loans | Consolidation Loans | Private Education Loans |
| Prepayment speed | ** | — | 6% | 9% | 7% | 6% |
| Weighted-average life (in years) | 4.2 | — | 7.2 | 4.6 | 8.0 | 6.5 |
| Expected credit losses (% of principal securitized) | 0.12% | — | 4.72% | 0.52% | 0.75% | 4.03% |
| Residual cash flows discounted at (weighted average) | 12% | — | 12% | 12% | 6% | 12% |

[1] No securitizations in the period qualified for sale treatment.

** Securitizations through August 2004 used a CPR of 20 percent for 2004, 15 percent for 2005, and 6 percent thereafter. Securitizations from September 2004 through December 2004 used a CPR of 20 percent for 2004 through 2005, 15 percent for 2006 and 6 percent thereafter.

F-34

**SLM CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(Dollars in thousands, except per share amounts, unless otherwise stated)**

**9.  Student Loan Securitization (Continued)**

Key economic assumptions used in estimating the fair value of the Residual Interests at the date of securitization resulting from the student loan securitization sale transactions completed during the years ended December 31, 2006, 2005 and 2004 were as follows:

| | Years Ended December 31, | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | | 2005 | | | 2004 | | |
| | FFELP Stafford | FFELP Consolidation Loans | Private Education Loans | FFELP Stafford | FFELP Consolidation Loans | Private Education Loans | FFELP Stafford | FFELP Consolidation Loans[2] | Private Education Loans[1] |
| Prepayment speed (annual rate)[1] | * | 6% | 4%† | ** | 6% | 4%† | 4%† | *** | 6% |
| Weighted average life | 3.7 yrs. | 8.2 yrs. | 9.4 yrs. | 3.8 yrs. | 7.9 yrs. | 8.9 yrs. | 4.2 yrs. | — | 7.2 yrs. |
| Expected credit losses (% of principal securitized) | .15% | .19% | 4.79% | —% | —% | 4.41% | .12% | — | 4.72% |
| Residual cash flows discounted at (weighted average) | 12.4% | 10.8% | 12.9% | 12.2% | 10.1% | 12.3% | 12.3% | 12.0% | 12.1% |

[1]  The prepayment assumptions include the impact of projected defaults.

[2]  No securitizations in the period, or such securitizations did not qualify for sale treatment.

†  20 percent for 2006, 15 percent for 2007, and 10 percent thereafter.

*  Securitizations through August 2005 used a Constant Prepayment Rate ("CPR") of 20 percent for 2005, 15 percent for 2006 and 6 per cent thereafter. Securitizations from September 2005 through December 2005 used a CPR of 30 percent for 2005, 20 percent for 2006, 15 percent for 2007 and 10 percent thereafter.

**  Securitizations through August 2004 used a CPR of 20 percent for 2004, 15 percent for 2005 and 6 percent thereafter. Securitizations from September 2004 through December 2004 used a CPR of 20 percent for 2004 through 2005, 15 percent for 2006 and 6 percent thereafter.

The following table summarizes cash flows received from or paid to the off-balance sheet securitization trusts during the years ended December 31, 2006, 2005 and 2004:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| (Dollars in millions) | | | |
| Net proceeds from new securitizations completed during the period | $19,521 | $13,523 | $12,476 |
| Purchases of delinquent Private Education Loans from securitization trusts | (72) | (63) | (33) |
| Servicing fees received[1] | 327 | 320 | 319 |
| Cash distributions from trusts related to Residual Interests | 598 | 630 | 844 |

[1]  The Company receives annual servicing fees of 90 basis points, 50 basis points and 70 basis points of the outstanding securitized loan balance related to its FFELP Stafford, FFELP Consolidation Loan and Private Education Loan securitizations, respectively.

F-40

*In re Audit Control No. ED-OIG/A03I0006*

*Special Allowance Payments to Navient's Subsidiary,*
*Nellie Mae, for Loans Funded by Tax Exempt Obligations*

---

## Respondent Navient Corporation's Request for
## Review of Final Audit Determination

4:45 / 7.27.16

*Bruce Harris* Bruce Harris

July 27, 2016

Ada Fernandez Johnson
Veronica R. Glick
Debevoise & Plimpton LLP
801 Pennsylvania Avenue NW, Suite 500
Washington, D.C. 20004
Phone: 202-383-8036
Fax: 202-383-8118
afjohnson@debevoise.com

*Attorneys for Respondent*
*Navient Corporation*

**Table of Contents**

INTRODUCTION .................................................................................................1

BACKGROUND ..................................................................................................2

SUMMARY OF THE ARGUMENTS .................................................................4

    I.     Nellie Mae Was Required to Bill at the 1/2 SAP Rate Until the Final
          Maturity of the 1993 Bonds..................................................................4

         A.     Nellie Mae's Treatment of the 1993 Trust as One Obligation
              for SAP Billing Was a Reasonable Interpretation of Applicable
              Law and Regulations..............................................................4

         B.     Nellie Mae Was Required to Claim the 1/2 SAP Rate on Any
              Loans Acquired *in Whole or in Part* with Tax-Exempt Funds..............5

    II.    Nellie Mae Appropriately Claimed the 1/2 SAP Rate on Loans that
          Were Transferred to ECFC by NMELC....................................................7

    III.   FSA's Determination that Navient Is Liable for Pre-June 1, 2002 1/2
          SAP Rate Claims Is Both Unsupported by Any Factual Finding and
          Incorrect...........................................................................................9

    IV.   FSA's Determination that Navient Must Disclose Any Other Similar
          Alleged Overbillings Has No Factual Support. ...............................10

    V.    FSA's Treatment of Navient is Notably Inconsistent with its Treatment
          of Other Industry Participants...........................................................12

APPLICABLE LAW AND GUIDANCE................................................................13

    I.     Loans to which the 1/2 SAP Rate Applies.........................................13

    II.    The 1/2 SAP Rate Was Intended to Limit SAP to Tax-Exempt
          Lenders. ...........................................................................................14

    III.   Under the Department's 1992 Regulations, the 1/2 SAP Rate
          Continues  Even After a Loan Is Refinanced. ...............................16

    IV.   Under the Department's 1993 DCL, the 1/2 SAP Rate Applies Even to
          Loans Financed *In Part* with Tax-Exempt Proceeds.......................18

STATEMENT OF POSITION ...............................................................................19

    I.     Nellie Mae Was Required to Claim the 1/2 SAP Rate on All Loans
          Originally Funded by the 1993 Tax-Exempt Financing Until the Last
          Bond Matured. ..................................................................................19

i

A.      Nellie Mae's Treatment of the 1993 Trust as One Obligation
        for SAP Billing Purposes Was a Reasonable Interpretation of
        Applicable Law and Regulations......................................................19

B.      At a Minimum, Nellie Mae Appropriately Billed Loans
        Acquired with the Pooled Bond Proceeds and Receipts of the
        1993 Bonds. ...................................................................................25

II.     Nellie Mae Appropriately Claimed the 1/2 SAP Rate on Loans that
        Were Transferred to ECFC by NMELC. ........................................38

        A.      FSA is Wrong on the Facts of the ECFC/Nellie Mae
                Ownership Structure. ...........................................................38

        B.      FSA's Conclusion on the ECFC Loans Directly Contradicts the
                Intent of the 1992 Regulations...........................................45

        C.      FSA Overstated the Alleged Liability for the ECFC Loans. ...............48

III.    FSA's Determination that Navient Is Liable for Pre-June 1, 2002 1/2
        SAP Rate Claims Is Both Unsupported by Any Factual Finding and
        Incorrect..........................................................................................49

IV.     FSA's Determination that Navient Must Disclose Any Other Similar
        Alleged Overbillings Has No Factual Support. ................................52

V.      FSA Is Treating Navient Unfairly Relative to Other Industry
        Participants. ....................................................................................55

**CONCLUSION** .............................................................................................**59**

ii

## INTRODUCTION

Pursuant to 34 CFR § 668.113, Navient Corporation ("Navient," formerly Sallie Mae[1]) respectfully submits this request for review of the final audit determination ("FAD") of the Office of Federal Student Aid ("FSA") of the U.S. Department of Education ("Department"), dated September 25, 2013, concerning the findings in the above-referenced final audit report ("FAR") issued by the Department's Office of Inspector General ("OIG") on August 3, 2009.

With the exceptions noted below, Navient does not dispute the facts as presented by FSA in the FAD. Navient, however, fully disputes FSA's conclusion that its subsidiary, Nellie Mae,[2] incorrectly received special allowance payments ("SAP") at the half-SAP/9.5 percent minimum return rate ("1/2 SAP Rate").[3]

---

[1]   Effective May 1, 2014, Sallie Mae, Inc., its former parent, SLM Corporation, and Navient underwent a transaction whereby Navient became a separate publicly traded company, the parent corporation for Sallie Mae, Inc. (now called Navient Solutions, Inc.), and the ultimate parent of all of the Nellie Mae entities.

[2]   For purposes of this request for review, "Nellie Mae" refers to Nellie Mae Holdings LLC (formerly known as Nellie Mae Corporation, then Nellie Mae Holdings Corporation ("Nellie Mae Holdings," EIN *783)), Nellie Mae Education Loan LLC (formerly known as Nellie Mae Education Loan Corporation ("NMELC," EIN *352)), and Nellie Mae Loan Finance, LLC ("NMLF," EIN * unavailable). Like the FAD, this Request for Review uses each entity's last three EIN digits to identify it.

[3]   Special allowance payments are those interest payments made by the federal government to the lender when the yield on the federal education loan is less than the rate prescribed in the Higher Education Act of 1965, as amended. The 1/2 SAP Rate was enacted as part of the 1980 Amendments to the Higher Education Act of 1965, as amended. 20 U.S.C. § 1087-1(2)(B)(i)-(ii); 34 C.F.R. § 682.302(c)(3)(i)-(ii) (1985). Out of concern that the yield on loans financed with tax-exempt obligations did not adequately reflect the lower costs associated with tax-exempt financing,

## BACKGROUND

This Appeal pertains to an audit initiated by OIG almost ten years ago, in 2007 and for which FSA issued its FAD regarding the audit findings in September 2013 – findings on bonds issued 20 years earlier in 1993.   In the audit, OIG examined, *inter alia*, Nellie Mae's special allowance billing practices with respect to a one-of-a-kind tax-exempt debt financing issued in 1993 – *i.e.*, The New England Education Loan Marketing Corporation Student Loan Refunding Bonds, Series A through H (the "1993 Bonds"). Navient cooperated promptly and fully with OIG during the course of the audit, and provided full access to all relevant records and history of special allowance billings for Nellie Mae, as well as its three other subsidiaries.

---

Congress reduced the special allowance to be paid on loans financed with tax-exempt obligations to one-half that otherwise payable (1/2 SAP).  At the same time, however, Congress guaranteed that the lender yield for loans financed with tax-exempt obligations would be no less than 9.5% (the 9.5% rate or floor).  These provisions were effective for loans made or acquired on or after October 1, 1980. Generally speaking, in higher interest rate environments, the total yield on a loan subject to the 1/2 SAP Rate restrictions is *lower* than the yield on a loan financed with other sources, and in lower interest rate environments, the total yield on a loan subject to the 1/2 SAP Rate is *higher* than the yield on a loan financed with other sources.

For clarification, lenders do not bill for 1/2 SAP or for the 9.5% floor, but instead file for special allowance using defined billing codes generally based on the date the loans were originated and the financing source.  The codes are then used by FSA to calculate the applicable SAP payments.  Nellie Mae billed for SAP based on the required codes, and depending on the interest rate environment and financing source, it received payments based on the Full SAP, the 1/2 SAP or the 9.5% floor calculation.

2

Although it fully disagrees with FSA's conclusions in the FAD, in order to draw this protracted matter to a close, Navient initiated and pursued a course toward reasonable resolution of the matter with FSA.  Navient has detailed for FSA its disagreement to the audit findings, as follows.  *First*, throughout the audit process, Navient has demonstrated that its approach to special allowance billing on the loans in question was based on written guidance that was issued by the Department specifically to address the unique structure of the 1993 Bonds – guidance that FSA did not consider when issuing the FAD. Navient's practices were also based on a reasonable interpretation, and in accordance with the clear intent, of the governing laws and regulations.  *Second*, FSA's conclusions in the FAD were flawed because they were based on an erroneous depiction of Nellie Mae's entity structure –a structure that did not exist at the time pertinent to the issues raised in the audit.  *Third*, FSA's findings seek to apply a new interpretation on matters relating to the 1/2 SAP Rate 20 years after the bonds in question were issued and eight years after the bonds were fully repaid.

Further, Navient consistently applied a conservative approach with respect to special allowance billing, electing not to exploit the 1/2 SAP Rate "loopholes" created by the 1992 regulatory change. While other lenders substantially grew their portfolio of loans subject to the 1/2 SAP Rate (as much as 800%) in order to increase the number of their loans eligible to receive the 9.5% floor, Navient reduced its portfolio of loans eligible for the 9.5% floor rate, and in 2006, Navient voluntarily ceased all 1/2 SAP Rate billing to which it was and continues to be statutorily entitled.  Navient's conservative

3

practices contrast sharply with its competitors, several of whom benefitted egregiously at government expense from their liberal interpretations of the 1/2 SAP Rate provisions.

For all these reasons, and because the parties have not yet reached a final resolution, Navient has determined that filing an appeal for review is the best course finally for bringing this longstanding historical matter to closure.[4]

## SUMMARY OF THE ARGUMENTS

### I.   Nellie Mae Was Required to Bill at the 1/2 SAP Rate Until the Final Maturity of the 1993 Bonds.

On several bases, Navient was permitted, and in fact required, to claim special allowance payments at the 1/2 SAP Rate on loans financed in whole or in part with funds derived from qualified tax-exempt debt.

### A.   Nellie Mae's Treatment of the 1993 Trust as One Obligation for SAP Billing Was a Reasonable Interpretation of Applicable Law and Regulations.

Because Nellie Mae's 1993 tax-exempt financing (the "1993 Trust" or the "1993 Bonds") was a single "obligation," the Higher Education Act of 1965, as amended ("HEA") and the Department's regulations and guidance *required* Nellie Mae to claim special allowance at the 1/2 SAP Rate as long as any bond within its 1993 tax-exempt

---

[4]   This appeal is timely filed pursuant to written extensions of time granted by FSA to Navient on May 25, 2016, April 8, 2016, February 8, 2016, December 10, 2015, November 11, 2015, October 13, 2015, August 11, 2015, July 7, 2015, May 28, 2015, March 30, 2015, January 30, 2015, December 18, 2014, November 18, 2014, October 17, 2014, September 18, 2014, August 21, 2014, June 18, 2014, April 18, 2014, March 21, 2014, and November 5, 2013.

4

financing remained outstanding. The Department's contrary reading of the HEA would have permitted Nellie Mae and any other institution to defeat the original purpose of the 1/2 SAP Rate – which was to *limit* the level of SAP that could be obtained based on tax-exempt financings – by retiring a single bond within the 1993 Trust and claiming full SAP on all of the associated loans at will. At a minimum, given the various and inconsistent terms that had been used by the Department to describe an "obligation," Nellie Mae acted in good faith and consistent with the original limiting purpose of the 1/2 SAP Rate in treating the entire financing as a single obligation.

**B.**   **Nellie Mae Was Required to Claim the 1/2 SAP Rate on Any Loans Acquired *in Whole or in Part* with Tax-Exempt Funds.**

Nellie Mae was required by the Department's own 1993 written guidance to bill at the 1/2 SAP Rate if the loan was acquired "in whole *or in part*" (emphasis added) with funds derived from qualified tax-exempt debt. *See* November 1993, Dear Colleague Letter ("DCL") 93-L-161, at 13 (providing guidance on the major changes made to the Federal Family Education Loan Program by the Omnibus Budget Reconciliation Act of 1993 (Pub. L.103-66)).

In the case of its 1993 Trust, Nellie Mae placed the proceeds of the bonds (the "Bond Proceeds") into a common funding pool for the acquisition of student loans. The 1993 Trust was a unique unsecured bond financing, in which no student loans were pledged to bondholders as security for the repayment of the 1993 Bonds. Within the

5

1993 Trust funding pool, there were two sub-pools designated[5] – one for Bond 1993A proceeds, and another for the proceeds of Bond 1993B through Bond 1993H.  Each month when Nellie Mae received any proceeds, including principal and interest on the loans, guarantor payments, special allowance, and other loan income (the "Receipts"), on the loans made or acquired with the 1993 Bonds, it allocated and deposited such proceeds to the sub-pools.  Given that no specific loans secured a specific series of 1993 Bonds, funds held in the account were fungible with all other funds received during that month.  Each month, student loans were purchased with cash available in the sub-pool accounts.  As a result, each loan associated with the 1993 Trust was acquired at least "in part" with available funds derived from all the bonds in the sub-pool issued prior to that date.  Affidavit of Jason Wheeler dated November 24, 2015 ("Wheeler Aff.") ¶¶ 7-9, Appendix ("App.") 1 hereto.

Nellie Mae was required to treat each loan in the 1993 Trust as subject to the 1/2 SAP Rate through at least the final maturity within the sub-pool because the loans were acquired "in part" with the various funds in the common pool.  In the FAD, FSA failed to consider the Department's own plain and unambiguous written guidance that more than one funding source could establish a loan's eligibility for the 1/2 SAP Rate, and that, in such instances, eligibility for the 1/2 SAP Rate does not cease until the last bond on which eligibility for the 1/2 SAP Rate was established matures, or is retired or defeased.

---

[5] The two sub-pools were created for administrative reasons relating to the various series of bonds that the 1993 Bonds refunded.

6

II.     **Nellie Mae Appropriately Claimed the 1/2 SAP Rate on Loans that Were Transferred to ECFC by NMELC.**

Navient disputes FSA's conclusion that the 1/2 SAP Rate was not payable on loans following their transfer from Nellie Mae Education Loan LLC ("NMELC," and previously Nellie Mae Education Loan Corporation, EIN *352) to SLM Education Credit Finance Corporation ("ECFC," EIN *392), supposedly because these were separate corporate entities and ECFC did not derive the benefit of the low cost of the tax-exempt 1993 Bonds issued by Nellie Mae's predecessor, the New England Education Loan Marketing Corporation ("NEELMC," EIN *323).  FSA erroneously argues that ECFC was a far-flung affiliate of NMELC (FAD at 20), separated by a corporate wall between Navient's government-sponsored entity and its origination business.

In fact, at the time the loans were transferred from NMELC to ECFC in 2004, ECFC was the *corporate parent* of Nellie Mae.[6]  The benefit of the 1993 Bonds held at NMELC flowed directly up to ECFC, because the activities of each of NMELC and its direct parent, Nellie Mae Holdings, both single member limited liability companies, were disregarded as separate entities from ECFC for tax purposes.  Affidavit of Mark Heleen dated July 20, 2016 ("Heleen Aff.") ¶¶ 5-6, App. 2.

FSA's position that the HEA and the Department's regulations and guidance removed the 1/2 SAP Rate restrictions and permitted full-SAP billing on loans transferred between such affiliated entities is based on a flawed understanding of Nellie Mae's

---

[6]     As of June 2004, ECFC was the sole member of Nellie Mae Holdings, which was the sole member of NMELC.

corporate structure.  FSA's position also is inconsistent with a December 1992 regulatory

change promulgated by the Department that required a loan refinanced with other

(taxable) sources of financing to continue to be subject to the 1/2 SAP Rate restrictions,

as long as the tax-exempt bonds which established its eligibility for the 1/2 SAP Rate

remained outstanding.[7]

Prior to the December 1992 regulatory change, the current funding source of a

loan determined its rate for special allowance payments.  The purpose of the 1992 change

in regulations (as detailed in a 1996 DCL (96-L-186), which provided clarifications and

interpretive guidance on certain provisions in the Federal Family Education Loan

("FFEL") Program regulations published on December 18, 1992), was to *limit* full-SAP

claims on loans acquired through tax-exempt financings that were later refinanced with

another source of financing.  At the time the Department initially proposed the regulatory

changes (November 1990), interest rates were generally high and the Department never

would have allowed a lender to escape the 1/2 SAP Rate restrictions by creating a

subsidiary or other affiliate and simply transferring loans to that entity.  The lower

interest-rate environment during the audit period, and resulting payment of SAP

according to the minimum yield provision (9.5%), presents FSA with a convenient

opportunity today to take a contrary position, but the Department should not endorse

---

[7]   Federal Family Education Loan (FFEL) Program regulations published by the U.S.
Department of Education on December 18, 1992, codified at 34 C.F.R. § 682.302(e)
(referred to herein as the "1992 Regulations").

8

FSA's attempt to capitalize on interest-rate swings in contravention of its own clear regulatory language and its follow-on administrative guidance.

### III.   FSA's Determination that Navient is Liable for Pre-June 1, 2002 1/2 SAP Rate Claims Is Both Unsupported by Any Factual Finding and Incorrect.

Navient disputes FSA's determination that it can be held liable for repayment of 1/2 SAP Rate payments received on loans funded by the 1993B, 1993G and 1993H bond series, with respect to periods prior to the respective 2002 bond maturities within those series. FAD at 23.  OIG's audit findings were explicitly limited to 1/2 SAP Rate claims made for periods on or after June 1, 2002. FAR at 8, 12-15.  Moreover, FSA's own factual findings in the FAD are explicitly limited to 1/2 SAP "received *from June 1, 2002* on all loans associated with" these respective bond series.  FAD at 12 (emphasis added). Therefore, neither OIG's findings nor FSA's findings support any final audit determination of liability with respect to pre-June 1, 2002 claims for billing at the 1/2 SAP Rate.

Even if the Department believes that Navient can be liable for SAP billing prior to the audit period, the unsecured bonds within series 1993B, 1993G and 1993H generated Bond Proceeds and Receipts that were pooled together in the same pool to acquire student loans.  As described above, because each loan associated with the 1993 Trust was acquired in part with Bond Proceeds and Receipts of the other 1993 Bonds in the same pool, Nellie Mae was required to treat each loan made or acquired with the proceeds of the 1993 Trust as subject to the 1/2 SAP Rate through the final maturity of the 1993 Bonds in that pool.  This was the case for 1/2 SAP Rate claims made for periods both

9

before and after June 1, 2002, and Navient has therefore met its obligations with respect to this finding.

**IV.     FSA's Determination that Navient Must Disclose Any Other Similar Alleged Overbillings Has No Factual Support.**

Navient disputes the FAD's determination that Navient must disclose any other instances at its subsidiaries in which loans were claimed at the 9.5 percent rate after the eligible tax-exempt bond from which their eligibility derived was retired, and adjust prior billing accordingly. The structure of Nellie Mae's 1993 tax-exempt financing was unique for both Navient (*i.e.*, no other Navient tax-exempt financing was unsecured by student loans) and for student loan tax-exempt financing in general (*i.e.*, we believe the 1993 Trust to be the only tax-exempt unsecured student loan obligation in the industry), and neither OIG nor FSA has provided any evidence of similar alleged overbillings by any other Navient entity.

Furthermore, the OIG audit work file includes information provided by Navient to OIG regarding its 1/2 SAP Rate billing practices at all of its subsidiaries and affiliates. Navient responded to specific questions from OIG about the bond issues of its various subsidiaries, stating consistently that, in each case, other than the 1993 Trust, Navient billed at the 1/2 SAP Rate until the final maturity of each bond issue.[8] If OIG found this

---

[8]     Both Navient and FSA use the term bond "issue" to mean a set of bonds issued on the same day. *See* FAD at p. 16, n. 15 (stating that the 1993 Trust was comprised of eight bond "series," but only five bond "issues," because Bonds 1993C through 1993F were issued on the same day).

practice to be questionable, it would have raised it as a concern in the audit, but it did not.

Instead, OIG chose to write an audit finding stating that Navient must disclose any other

instances at any of its subsidiaries "of loans billed under the 9.5 percent floor calculation

after the *eligible tax-exempt bond issue matured*" — not after an individual bond matured

— and after the loans were refinanced with funds derived from an ineligible funding

source. FAR at 15 (emphasis added). This finding lacked any basis in the evidence

reviewed by OIG during the audits. In any event, Navient confirmed to the Department

that it had not identified any instances in which any of its subsidiaries had billed for loans

under the 9.5% floor calculation after the relevant bond issue had matured, other than its

billings with respect to the 1993 Trust. *See* Wheeler Aff. ¶ 12 & Ex. 1 thereto, App. 1.

Navient has therefore made the disclosure required under the FAR and has satisfied its

obligations with respect to this audit finding.

In the FAD, FSA chose to expand OIG's finding to require Navient to disclose

not only instances of billing at the 1/2 SAP Rate after the maturity of the relevant bond

issue, but also any instances of billing after the maturity of any individual bond. This

finding clearly exceeds the parameters of the OIG audit, is not based on any evidence

identified by OIG in the audit, and should therefore be rejected. If the Department

disagrees, the finding should nevertheless be dismissed because Navient disclosed to the

Department during the negotiations leading to this Appeal that it had not identified any

instances (other than the 1993 Trust) at any of its subsidiaries "of loans on which special

allowance was received at the 9.5 percent minimum return rate after the eligible tax-

exempt bond from which their eligibility derived was retired and the loans transferred in

consideration of funds derived from an ineligible funding source." FAD at 23.  As

disclosed to OIG on multiple occasions during the course of the audit, except for the

unique instance of the unsecured 1993 Trust, Navient billed at the 1/2 SAP Rate through

the final maturity of each bond issue.  In each case, the loans in each bond issue were

pooled together and were financed at least in part with the proceeds of the bond that

matured last within the issue.  Wheeler Aff. ¶¶ 11-12 & Ex. 1 thereto, App. 1.  This

methodology for SAP billing comported entirely with regulatory policy in the 1992

Amendments and with the Department's own guidance delivered in the 1993 DCL.

Therefore, Navient has made the required disclosure and met its obligations with respect

to this finding.

**V.      FSA's Treatment of Navient is Notably Inconsistent with its Treatment of
          Other Industry Participants.**

For decades, Congress, the Department and lenders all have acknowledged the

uncertainties surrounding the special allowance provisions for tax-exempt debt.  Given

these uncertainties, the Department has consistently rejected prior OIG recommendations

to institute proceedings based on differing interpretations of those provisions.  Now, FSA

seeks punitive action against Navient in clear contrast to its history of non-enforcement

against Navient's competitors.

Throughout the OIG audit and later proceedings, Navient has demonstrated that it

acted at all times in good faith and in accordance with the intent of applicable law,

regulations, and Department administrative guidance.  Navient's 1/2 SAP billing

practices were consistent with those of others in the industry, except that it billed for

special allowance in a much more conservative manner, forgoing opportunities to exploit "loopholes" in the 1/2 SAP Rate regulations.  Nevertheless, FSA seeks to require Navient to repay SAP, even after it made a deal with the rest of the industry not to proceed with enforcement action for prior 1/2 SAP Rate billing practices in exchange for promises of prospective changes.  The Department should exercise a fair and level enforcement approach across all industry participants and overturn the findings of the FAD.

*********

As required by 34 CFR § 668.113, this request for review sets forth (1) the issues and facts in dispute and (2) Navient's position, together with the pertinent facts and reasons supporting that position.  Navient reserves the right to provide a more comprehensive response to the FSA's arguments in its hearing brief pursuant to 34 CFR §§ 668.114(b)-(c) and 668.116(b).  Navient also specifically reserves its right to review its prior billings to the Department, and to make appropriate adjustments.

## APPLICABLE LAW AND GUIDANCE

**I.      Loans to which the 1/2 SAP Rate Applies.**

The Higher Education Act of 1965, as amended (the "HEA"), provides for the Secretary of Education to make special allowance payments to eligible lenders of Federal Family Education Loans ("FFEL").  The rates are based on formulas that differ according to the type of loan, the date the loan was originally made or insured, and the type of funds used to finance the loan (taxable or tax-exempt).

13

When the transactions at issue occurred (FAD at 4), FFEL loans made or purchased with funds obtained from the issuance of *tax-exempt* obligations that were issued before October 1, 1993 were eligible for only half of the special allowance payment that otherwise would have been paid, subject to a minimum yield or "floor" equal to "9.5 percent minus the applicable interest rate on such loans, divided by 4" (the "1/2 SAP Rate").[9]  The 1/2 SAP Rate also applied to loans made with the *proceeds* of loans made with eligible tax-exempt obligations, such as (i) loan collections, (ii) payments by a guarantor, (iii) interest benefits, (iv) special allowance payments, or (v) loan sale proceeds, as well as investment income from the eligible tax-exempt obligations.[10]

## II.  The 1/2 SAP Rate Was Intended to Limit SAP to Tax-Exempt Lenders.

Congress enacted the 1/2 SAP Rate provision in 1980 during a period of high interest rates,[11] in an attempt to limit the amount of SAP that lenders could claim on loans financed by the proceeds of tax-exempt debt. *See State Profits on Tax-Exempt Student Loan Bonds: Analysis and Options*, Congressional Budget Office (March 1980); *Guaranteed Student Loan Tax-Exempt Financing: Hearing Before the Subcomm. on*

---

[9]   20 U.S.C. § 1087-1(2)(B)(i)-(ii); 34 C.F.R. § 682.302(c)(3)(i)-(ii) (1992).

[10]   20 U.S.C. § 1087-1(2)(B)(i); *see also* 34 C.F.R. § 682.302(c)(3)(i) (1992).

[11]   For reference, during 1980, the U.S. prime rate ranged from a low of 15.25% to a high of 21.50%, which is the all-time record high, and the effective federal funds rate ranged from a low of 9.03% to a high of 18.90%, each as reported by the Federal Reserve Bank of St. Louis.

*Oversight of the Comm. on Ways and Means*, 96th Cong., H.R. Rep. No. 96-109 (June 26, 1980).  As the Senate Committee on Labor and Human Resources stated in proposing the 1/2 SAP Rate provision:

> [T]he special allowance paid on [tax-exempt] bonds has been identical with that paid commercial lenders, an allowance which reflects the commercial cost of money. As a result, unforeseen amounts of special allowance have been paid to holders of loans which resulted from tax-exempt issuances, providing a return far in excess of the cost of administration or the cost of obtaining the capital. The Committee bill seeks to prevent this windfall by limiting the special allowance on loans made or purchased by tax-exempt funds to one-half the regular special allowance paid to commercial lenders[, subject to a guaranteed rate of return].[12]

The Department issued a summary of the changes made by the 1980 Amendments on December 16, 1980.  *See* Bulletin #G-44, *To All Guarantee Agencies – Effects of the Education Amendments of 1980* (Dec. 16, 1980).  On February 8, 1985, the Department published regulations relating to certain provisions of the 1980 Amendments.  *See* 34 CFR Part 682, *Guaranteed Student Loan Program; Final Rule and Proposed Rulemaking* (Feb. 8, 1985).  The preamble to those regulations (at 5512) provided clarification of the scope of the 1/2 SAP Rate restrictions:

> [A]ny sanctions or limitations imposed under this Subpart on loans financed by those tax-exempt obligations *apply only so long as the loans remained financed by tax exempt debt.* See ¶¶ 682.302; 682.302(e). Therefore, any party which uses funds derived from sources other than tax-exempt obligations to acquire loans from an Authority, or,

---

[12]   S. Rep. No. 96-733, at 36-37, 261 (1980).

15

> if an Authority, to refinance those loans, takes or holds
> those loans free of any sanctions previously imposed on the
> Authority. (Emphasis added.)

The Department also stated (at 5512, preamble) the purpose for its 1985 change in

regulation:

> This rule implements the Congressional intention to reduce
> special allowance to parties whose lower cost of borrowing
> does not justify Federal subsidy at the rate paid to
> commercial lenders. These regulations therefore tie the rate
> of special allowance to the source of those funds used to
> acquire or maintain the Authority's interest in a loan, and
> more particularly, to the financing costs incurred in
> securing those funds.

## III.   Under the Department's 1992 Regulations, the 1/2 SAP Rate Continues Even After a Loan is Refinanced.

Up until the Department issued the 1992 Regulations, its policy was that the

*current* funding source of a loan determined its SAP eligibility. In a marked departure

from this historical policy, the Department's 1992 regulations[13] provided that an

otherwise eligible loan was *required* to bill at the 1/2 SAP Rate "[a]fter the loan is

pledged or transferred in consideration of funds" derived from non-tax-exempt sources

"if the authority retains a legal or equitable interest in the loan," until "the prior tax-

exempt obligation is retired [or] defeased.[14]  The Department's March 1, 1996 Dear

---

[13]   34 C.F.R. § 682.302(e)(2) (1992).

[14]   The regulations define "authority" as "[a]ny private non-profit or public entity that
may issue tax-exempt obligations to obtain funds to be used for the making or
purchasing of FFEL loans." 34 C.F.R. § 682.200(b). Nellie Mae was the authority
that issued the bonds in the 1993 Trust. Pursuant to IRC § 150(d)(3), Nellie Mae

16

Colleague Letter (DCL) 96-L-186 (the "1996 DCL") provided "clarification and

interpretative guidance" concerning this 1992 Regulation, which the Department

described as "a shift in the Department's policy" from the 1985 regulations and guidance

upon which FSA's position in this matter explicitly rests (*see* FAD at 13-14):

> The Department's prior guidance stated that *the current funding source* defined the applicable special allowance provisions – if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance applied.  If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.
>
> *In the Department's December 18, 1992 regulations, the Department changed this policy.*  Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan.  If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

*See* March 1, 1996 Dear Colleague Letter (DCL) 96-L-186, *Clarification and interpretive*

*guidance on certain provisions in the Federal Family Education Loan (FFEL) Program*

*regulations published on December 18, 1992* ("DCL 96-L-186"), item 30 (emphasis

added).

---

made an election to transfer its assets and liabilities, including the 1993 Trust, to a
new for-profit subsidiary, Nellie Mae Corp. (EIN *783), which was later acquired by
Navient.

17

IV.   **Under the Department's 1993 DCL, the 1/2 SAP Rate Applies Even to Loans Financed *In Part* with Tax-Exempt Proceeds.**

On August 10, 1993, the Omnibus Reconciliation Act of 1993 ("OBRA 1993") was signed into law. As part of this law, changes were made to the SAP payments for loans made or acquired with the proceeds of tax-exempt financing originally issued on or after October 1, 1993. In November 1993, the Department issued administrative guidance concerning OBRA 1993. Nov. 1993 Dear Colleague Letter (DCL) 93-L-161 (the "1993 DCL"). Page 13 of that guidance clarified that the 1/2 SAP Rate provision applied to all loans acquired in whole *or in part* with funds derived from pre- October 1, 1993 tax-exempt obligations:

> The minimum special allowance rate "floor" on new loans made or purchased, *in whole or in part*, with funds derived from tax exempt obligations has been repealed. Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations *originally* issued on or after October 1, 1993, or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to receive the minimum special allowance. Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance. (Emphasis added.)

With this guidance, the Department made clear its understanding that (*i*) a single loan could be financed with more than one source of funds and (*ii*) if a loan was financed *even in part* with an eligible tax-exempt source of funds, the 1/2 SAP Rate applied to that loan.

18

## STATEMENT OF POSITION

I.   **Nellie Mae Was Required to Claim the 1/2 SAP Rate on All Loans Originally Funded by the 1993 Tax-Exempt Financing Until the Last Bond Matured.**

    A.   **Nellie Mae's Treatment of the 1993 Trust as One Obligation for SAP Billing Purposes Was a Reasonable Interpretation of Applicable Law and Regulations.**

Nellie Mae correctly treated the 1993 Trust as a single obligation for the purpose of special allowance billing. The 1993 Bonds shared common characteristics that rendered them a single "obligation" for purposes of the HEA and the Department's implementing regulations. All of the 1993 Bonds were governed by the terms of the same 1993 Trust Agreement, were issued in the same calendar year, and were payable from the same sources of funds. Moreover, the rights of each bondholder were identical to the rights of all other bondholders. Per the terms of the 1993 Trust Agreement (App. 3), each bond was treated collectively and on a parity basis with the other bonds in terms of bondholders' right to payments, default provisions, and remedies.

In particular:

- <u>Right to Payment</u>. Article IV of the 1993 Trust Agreement provided that, on each date on which payment on any of the 1993 Bonds was due, the Corporation paid to the Trustee, and the Trustee paid to the bondholders, the requisite amount of interest on or principal of the bond. The Trust Agreement gave no preference to any bondholder of any separate bond or series of bonds. App. 3 at 12-13.

- <u>Events of Default</u>. Article VIII of the Agreement stated that the failure to make a timely payment on any of the 1993 Bonds was an Event of Default for all of the 1993 Bonds, accelerating the principal payment obligations on all of the 1993 Bonds. *Id.* at 18-20.

- <u>Payment on Default</u>. Article VIII of the Agreement provided for the distribution of funds received from the Corporation to remedy an Event of Default, or following a judgment from a suit filed by the Trustee. Such

19

funds were to be shared on a parity basis across all of the 1993 Bonds, based on the amount of interest, principal and redemption premium owed. *Id.* at 21.

- <u>Enforcement of Agreement</u>.  Article VIII of the Agreement provided that bondholders of two-thirds of the aggregate principal amount of all 1993 Bonds needed to consent to a suit to enforce the Agreement; the bondholders of a single bond, or even of bonds within a single series, could not compel such an action.  *Id.* at 22.

- <u>Amendments</u>.  Section 7.2 of the Agreement required the written consent of the holders of two-thirds of the aggregate principal amount of all 1993 Bonds to modify or amend the rights or obligations of the Corporation or bondholders.  Potentially, even if all holders of a single bond, or of bonds within a single series, objected to a modification of their rights, the remaining bondholders could consent to the modification and impose it upon them.  *Id.* at 17.

Critically, unlike the typical structure of a student-loan bond financing, loans purchased with the proceeds of a single bond or series of bonds were not pledged as collateral in support of repayment of that bond or series.[15]  Rather, the Agreement made

---

[15]  Student loan taxable and tax-exempt bond structures issued by authorities were generally secured financings, meaning that investors had a right (with priority over other creditors) to foreclose upon specific pools of student loans and other assets in the event an issuer defaulted on its bonds.  Nellie Mae was the first (and, it believes, only) non-profit tax-exempt student loan issuer to secure general corporate ratings that allowed it to issue bonds on an unsecured basis.  *See* Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) at 16 (App. 4).  Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool, because Nellie Mae was not required to identify specific loan pools as collateral for those bonds, to make covenants with respect to those loan pools, or to track loan performance according to the specific requirements of the lenders or bondholders.  The unsecured financing was therefore much less administratively burdensome for Nellie Mae.  The 1993 Trust is the only tax exempt financing issued by Nellie Mae on an unsecured basis.

20

all unencumbered loans of the Corporation, along with its general assets and credit, the source of repayment for all of the 1993 Bonds. *Id.* at 13.

Given that the common characteristics among the bonds in Nellie Mae's 1993 tax-exempt financing far outweighed the bonds' differing maturity dates, the 1993 Bonds constituted a single financing obligation of Nellie Mae for purposes of the HEA's 9.5 percent floor requirements. Accordingly, Nellie Mae treated that single obligation as maturing when all of the 1993 Bonds had matured.

Nellie Mae's approach was fully consistent with the Department's prior statements concerning the meaning of the word "obligation." In 1985, the Department defined "obligation" to mean "debt." 34 C.F.R. § 682.801 (1985). Given that all bondholders of the 1993 Bonds shared the same rights and remedies against the same sources of funds, and that a default on any one 1993 Bond constituted a default on all 1993 Bonds, treating those bonds as a single "debt" was consonant with the regulatory definition. Conversely, treating each of the 1993 Bonds as a separate "debt" would have been inconsistent with the terms of the 1993 financing.

Moreover, 2006 Department guidance used the term "bond," instead of the statutory and regulatory term "obligation," to describe "the instrument used to borrow funds"; noted that lenders could use "notes or other instruments to raise funds"; and stated that references to "bond" in the guidance included "any other form of borrowing." FP-06-15, Attachment at 1 n.1. In the case of the 1993 tax-exempt financing, "the

instrument used to borrow funds" was the 1993 Trust Agreement; all of the 1993 Bonds were issued pursuant to that Agreement and its supplemental indentures.[16]

At a minimum, Nellie Mae's treatment of the entire 1993 tax-exempt financing as the "debt" constituting the "obligation," and the 1993 Trust Agreement as the relevant "instrument," was reasonable under the circumstances and should not be challenged by FSA after the fact. From 1980 through the time of the relevant SAP billings, the Department issued limited guidance relating to the treatment of unsecured serial tax-exempt financings like the one at issue in this matter. In fact, Department guidance issued in late 2006 – well after the billings challenged by FSA ceased – demonstrates that the Department's policy framework focused almost exclusively on secured financings, in which specific loans were pledged as collateral for specific bonds. *See* FP-06-15, Attachment at 2 ("To provide security for investors who buy a bond, lenders pledge the loans they acquire as collateral for the bond . . . . When an old bond is refunded, the loans pledged as collateral for the old bond become available to serve as collateral for the new bond.") Nellie Mae's approach did not contravene any existing Department guidance and best reflected the unique economic and structural realities of the 1993 tax-

---

[16]  The Department's use in 2006 of the term bond "for convenience" was hardly a definitive statement that an "obligation" is always a single "bond" for 1/2 SAP Rate purposes – especially given that the guidance addressed secured student loan bonds, not unsecured serial financings like the 1993 tax-exempt financing. *See* DCL FP-06-15, Attachment at 1 n.1. Neither was the use of the term "bond" definitive when it appeared in guidance regarding an audit process that expressly disclaimed any intent "to examine whether the eligibility of a loan for 9.5 percent SAP has lapsed." *See* DCL FP-07-06 (Apr. 27, 2007), Attached Methodology Description at 3.

22

exempt financing.[17]  The Department should not permit FSA to use an administrative action to second-guess Nellie Mae's approach.

Additionally, unlike FSA's approach in the FAD, Nellie Mae's approach fully comported with the original intent of the HEA's 1/2 SAP provisions.  These provisions, which Congress enacted in 1980 when interest rates were high, were intended to maximize the loans that were subject to 1/2 SAP.[18]  Similarly, the Department's 1992 regulations required 1/2 SAP to continue to be claimed on loans even after they were transferred from a tax-exempt obligation to a taxable obligation, so long as the tax-exempt obligation remained outstanding and the Authority maintained ownership of the loan.[19]  This regulation, which was put in place amid expectations of rising interest rates, was designed to prevent lenders from moving loans from tax-exempt obligations to taxable obligations to obtain the associated regular SAP.[20]

When these provisions were enacted, Congress and the Department would have looked with great skepticism at any effort by a lender to ignore the economic and structural realities of a serial unsecured financing, and instead to obtain Full SAP on loans associated with a portion of that financing simply because any particular bond

---

[17]  *See supra* n. 16.

[18]  *See* 50 Fed. Reg. 5512 (1985) ("The rule implements the Congressional intention . . . to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders.").

[19]  34 C.F.R. § 682.801(e)(2); DCL 96-L-186, item 30.

[20]  *See* U.S. Gov't Accountability Office, Report GAO-04-1070, at 5 (Sept. 2004) (available at http://www.gao.gov/products/GAO-04-1070).

23

within the financing had matured.  The fact that the interest-rate environment reversed in

the years following the 1992 regulation does not alter the original intent to subject all

loans that were originally financed by an outstanding tax-exempt obligation to 1/2 SAP,

and thereby to maximize the number of loans subject to the 1/2 SAP provision.[21]

Ultimately, FSA's position rests on a demonstrably false premise.  FSA asserts

that the Department "addressed this very matter" in the preamble to its 1985 regulations,

and in "subsequent explanations," by "consistently referr[ing] to the '*current funding*

*source*' as controlling the SAP rate payable on the loan."  FAD at 14 (emphasis added).

Although the Department wrote in the preamble to its 1985 regulations that those

regulations "tie[d] the rate of special allowance to the source of funds used to acquire or

---

[21]   Nellie Mae's approach also finds support in the treatment that Treasury Regulations
regarding the calculation of arbitrage rebate obligation afforded the 1993 Bonds.
Under those Regulations, Nellie Mae was required to utilize a single yield for a
single "issue" comprised of multiple bonds that were issued less than 15 days apart
pursuant to the same plan of financing, and that were reasonably expected to be paid
from substantially the same source of funds.  26 C.F.R. § 1.148-4(a); 26 C.F.R.
§ 1.150-1(c)(1) (definition of "issue").  The Treasury Regulations explicitly
contemplate that bonds within an issue may be redeemed at different times, yet still
require the use of a single yield for the issue as a whole.  26 C.F.R. § 1.148-4(b)(2).
Moreover, the Regulations provide that the Commissioner may permit issuers of
qualified student loan bonds to use a single yield for two or more issues.  26 C.F.R.
§ 1.148-4(a).  These regulations recognize that student loan bonds like the 1993
Bonds can share characteristics that render treating them as a single obligation
appropriate.  The FAD's arguments (at 15-17) that Nellie Mae did not in fact seek
single-yield treatment from the Commissioner, and that retired bonds are excluded
from the calculation of gross proceeds for purposes of the universal cap (*see* 26
C.F.R. § 1.148-6(b)(2)), miss the point:  the Treasury Regulations' single-yield
provisions support the proposition that multiple bonds with different maturity dates
can appropriately be treated as a single obligation, and treating the 1993 Bonds as a
single obligation was appropriate given their unifying characteristics.

24

maintain the Authority's interest in a loan," 50 Fed. Reg. 5512 (1985), the Department's

1996 guidance (which addressed regulations that were effective prior to the issuance of

the 1993 Trust) could not have been clearer that its amended 1992 regulations "changed

this policy" of treating the "current funding source" as controlling.  DCL 96-L-186, item

30.  To the contrary, the 1992 regulations and 1996 guidance were clear that, going

forward, even if a loan originally subject to the 1/2 SAP Rate was no longer "maintained"

by a tax-exempt obligation – *i.e.*, the "current funding source" was no longer a 1/2 SAP

Rate funding source – continued billing at the 1/2 SAP Rate on the loan was *required*.

*Id.*; 34 C.F.R. § 682.302(e)(2) (1992).  FSA's attempt to tie the statutory definition of

"obligation" to the continued funding source of a loan, therefore, is fundamentally wrong.

> **B.      At a Minimum, Nellie Mae Appropriately Billed Loans Acquired with
>           the Pooled Bond Proceeds and Receipts of the 1993 Bonds.**

Even if the Department disagrees that Navient correctly treated the 1993 Trust as

a single obligation for the purpose of special allowance billing, Navient at least was

required to continue to bill for special allowance at the 1/2 SAP Rate for (*i*) all loans

acquired with the proceeds of Bond 1993A until its maturity on July 1, 2005, and (*ii*) all

loans acquired with the proceeds of Bond 1993B through Bond 1993H until the final

maturity of those bonds on July 1, 2004.  Such billing was required by the guidance that

Nellie Mae and the industry received in the Department's 1993 Dear Colleague Letter,

because each of the loans was financed at least *in part* with the proceeds of the other

bonds with which they were pooled.

25

### 1.    The Bond Proceeds and Receipts from the 1993 Bonds Were Combined in Two Sub-pools.

The special allowance payments that are the subject of the FAD relate to loans

financed by the 1993 Nellie Mae Trust ("1993 Trust"), a series of *unsecured* tax-exempt

bonds issued pursuant to a master trust indenture totaling $458,095,000.  The 1993 Trust

included five series of bonds issued between March 1993 and November 1993, each of

which refunded previously issued tax-exempt bonds:

| Series | | Issue Date | Maturity Date | Maturity Amount |
|---|---|---|---|---|
| #1 | 1993A | 3/18/1993 | 7/1/2005 | $103,300,000 |
| #2 | 1993B | 6/9/1993 | 6/1/1998 | $5,800,000 |
| | | | 6/1/2000 | $32,405,000 |
| | | | 6/1/2002 | $10,700,000 |
| #3 | 1993C | 7/1/1993 | 7/1/1998 | $26,100,000 |
| #3 | 1993D | 7/1/1993 | 7/1/1998 | $10,160,000 |
| #3 | 1993E | 7/1/1993 | 7/1/1999 | $58,340,000 |
| #3 | 1993F | 7/1/1993 | 7/1/2004 | $32,500,000 |
| #4 | 1993G | 8/24/1993 | 8/1/1998 | $31,500,000 |
| | | | 8/1/2000 | $28,100,000 |
| | | | 8/1/2002 | $47,400,000 |
| #5 | 1993H | 11/15/1993 | 12/1/1999 | $57,420,000 |
| | | | 12/1/2002 | $14,370,000 |

Unlike the common student-loan bond structure,[22] the 1993 Trust was not secured

by the student loans acquired with the 1993 Bonds.  Rather than relying on specific

collateral, investors looked to the general corporate ratings of Nellie Mae to determine

the quality of the bonds.  Because the general corporate rating afforded Nellie Mae

increased flexibility in its financings, the proceeds from the various bonds (the "Bond

Proceeds") were combined into a common funding pool (the "1993 Bond Pool") that was

---

[22]    *See supra* n. 16.

26

used to acquire student loans.  The loans acquired under the 1993 Trust are referred to herein collectively as the "1993 Trust Loans."

Within the 1993 Bond Pool, Nellie Mae maintained two sub-pools, the first of which related to Bond 1993A ("Sub-pool 1") and the second of which related to all of the other 1993 Bonds ("Sub-pool 2").  The Bond Proceeds from Bond 1993A were deposited into Sub-pool 1 and the Bond Proceeds from Bond 1993B through Bond 1993H were deposited into Sub-pool 2.  In addition, each month Nellie Mae would deposit into the respective sub-pools the principal and interest payments, guarantor payments, interest benefits and special allowance, and other income from the loans financed by the sub-pool (the "Receipts").  Specifically, Receipts on the loans financed by Bond 1993A were deposited into Sub-pool 1, and Receipts on all other loans financed by the 1993 Bonds were deposited into Sub-pool 2.   Each month, loans were acquired with all or a portion of the cash available in Sub-pool 1 and Sub-pool 2.

Given that no specific pool of loans secured a specific series of 1993 Bonds, funds held in Sub-pool 1 were fungible with all other amounts on deposit in Sub-pool 1; the same was true for Sub-pool 2.  On any given date, Sub-pool 2 contained (*i*) Bond Proceeds from Bond 1993B through Bond 1993H, to the extent the Bonds had been issued by that date, and (*ii*) Receipts on all loans financed by such Bonds.  New loans

27

were acquired with such commingled funds on a pro rata basis. Wheeler Aff. ¶¶ 7-9, App. 1.[23]

FSA argues in the FAD (at 18) that "the proceeds of each of the bonds comprising a 1993 bond series issue were spent to acquire a distinct cohort of loans, and each of these bonds was in fact the exclusive source of funds – a 'source bond' – for a distinct cohort of loans and no other." FSA is wrong. Although the Bond Proceeds and Receipts relating to the loans financed with Bond 1993A proceeds were maintained in one sub-pool, the Bond Proceeds and Receipts of Bond 1993B through Bond 1993H were commingled within another single sub-pool. Because of the unsecured nature of the 1993 Trust and the commingling of these Bond Proceeds and Receipts, all loans financed by the 1993 Trust were made or acquired, at least *in part*, with proceeds from each of the

---

[23]   By early 2002, as part of a post-acquisition integration of functions, the administration of the 1993 Trust had been transferred from former-Nellie Mae employees to Navient employees. For ease of trust administration, Navient began a process of administratively allocating portions of the loans in Sub-pool 2 to those series of Bond 1993B through Bond 1993H that remained outstanding at the time. Because the loans had been acquired with Bond Proceeds and Receipts of Bond 1993B through Bond 1993H and remained commingled within Sub-pool 2 since the time of their acquisition, and because the loans were therefore funded in part with the Bond Proceeds and Receipts of Bond 1993B through Bond 1993H, the allocation could not and did not identify specific loans as having been funded by a specific bond. Rather, loans and cash were simply allocated by principal amount such that the account created for each 1993 Bond would hold sufficient resources to meet debt service for that particular Bond. After such allocations had been made, any new loan acquisitions for the 1993 Trust were made with amounts on deposit within the accounts created for each outstanding series of 1993 Bonds. Because any cash within those accounts derived from the commingled Receipts of Bond 1993B through Bond 1993H, the loans purchased with such cash were also funded in part by all such 1993 Bonds. Wheeler Aff. ¶ 11, App. 1.

28

1993 Bond series within its sub-pool.  For example, Bond 1993B was issued on June 9, 1993.  Less than a month later, Bonds 1993C through 1993F were issued.  The proceeds of these two issuances were deposited in Sub-pool 2 and used to acquire loans within the few weeks following the issuances.  Loans were acquired from all the funds available in the sub-pool at the time they were acquired.  *See* Wheeler Aff. ¶¶ 7-9, App. 1.

In addition, as soon as any Receipts were realized with respect to that portfolio of loans (including, but not limited to, interest and special allowance paid by the government for the quarter ending June 30, 1993), those Receipts were added to Sub-pool 2.  Continuing with the above example, when Bond 1993G was issued on August 24, 1993, and its Bond Proceeds were added to Sub-pool 2, those funds along with any available Receipts and Bond Proceeds previously deposited therein were used to finance more loans within the weeks following the Bond 1993G issuance.  This process continued with the final issuance of Bond 1993H on November 15, 1993.  *Id.* ¶ 9, App. 1.

In the FAD (at 18), FSA argues that "NEELMC represented that proceeds of each of its 1993 bonds would be fully invested – spent to acquire student loans – within days of its issuance . . . ."  From this, FSA infers that "the proceeds of each of the bonds comprising a 1992 bond series issue were spent to acquire a distinct cohort of loans," and that the bonds therefore were the exclusive source of funds for that cohort.  Once again, FSA is wrong.  It is true that Nellie Mae had arbitrage and tax-driven incentives to invest substantially all the Bond Proceeds within a short period of time, and also needed to comply with covenants in the tax certificates that accompanied the 1993 Bonds that

29

typically required loan investment within 30 to 90 days.  However, along with any Bond

Proceeds from a specific bond series, each sub-pool contained other funds that also were

used to acquire the same loans, including, as described above, Bond Proceeds from the

previous issuances and the Receipts on the 1993 Trust Loans financed previously.  When

acquiring new loans for the 1993 Trust, Nellie Mae used *all* available funds within a sub-

pool to buy loans in any given month, and did not in fact attribute specific loans to

specific Bond Proceeds or Receipts.

FSA may argue that funds available from prior Bond Proceeds and Receipts in the

sub-pools were *de minimis* in relation to the bond proceeds used to purchase 1993 Trust

Loans after the issuance of a particular series of 1993 Bonds.  It must be noted, however,

that even if this were the case (which Navient does not concede), there is no regulatory or

Department requirement that, when loans are purchased, they must be attributable to a

specific source of funds, or that any given percentage needs to be financed by a particular

source in order for them to be considered financed by that source.  The Department's own

guidance in the 1993 DCL recognizes that loans can be attributed to multiple sources of

funds.  In this case, those funds included both eligible Bond Proceeds and eligible

Receipts.

FSA may argue further that the Bond Proceeds from Bond 1993B were fully

expended prior to the issuance of Bond 1993F (the latest maturing series of bonds within

Sub-pool 2), and that because they were not commingled with the Proceeds of Bond

1993F, the loans acquired from such Bond Proceeds were entitled to the 1/2 SAP Rate

only through the maturity of Bond 1993B.  Navient has no remaining records that

30

indicate exactly when any of the Bond Proceeds of Bond 1993B were expended, but even if they were fully expended immediately, as loans acquired with the Bond Proceeds from Bond 1993B were repaid, those Receipts were deposited into Sub-pool 2. Assuming the 8.5-year average loan repayment period that FSA has used previously, the first loans to be made in Sub-pool 2 from the proceeds of Bond 1993B would have been fully repaid by December 2001, well before the maturity of Bond 1993B.[24] As such repayments were received, they were used *pro rata* with all the other available Receipts on deposit in Sub-pool 2 for the acquisition of a "second generation" of loans. That second generation was financed "in part" with the Receipts of all the 1993 Bonds within Sub-pool 2, including Bond 1993F, which matured on July 1, 2004. Therefore, all of the loans financed by Sub-pool 2 were eligible to receive the 1/2 SAP Rate at least through July 1, 2004.

>     **2.      The History of Department Guidance Regarding Loans
>              Financed by More than One Source Supports the
>              Appropriateness of Nellie Mae's Billing of Loans Acquired
>              with Pooled Bond Proceeds and Receipts.**

On December 18, 1992, the Department issued the 1992 Regulations, which would become effective on February 1, 1993. As discussed above, those regulations included changes in the special allowance billing applicable to tax-exempt obligations. Neither the Notice of Proposed Rule issued in November of 1990 nor the Final Rule

---

[24]   *See* DCL FP-07-06 (Apr. 27, 2007), Attached Methodology Description at 10 (assigning an average repayment period of 8.5 years to certain loans for the purpose of determining first and second generation loans eligible for the minimum 9.5 percent special allowance rate).

issued on December 18, 1992, however, included any commentary or other discussion regarding the change in special allowance calculations.  Furthermore, the newly published regulations contained provisions that conflicted with provisions of the 1992 Reauthorization of the Higher Education Act, enacted in July 1992.  Because of these conflicts and calls from the higher education and student lending communities for clarification, then-Secretary of Education Riley wrote a letter to Senator Kennedy and Senator Pell that stated that the Department would delay the enforcement of the regulations until the Department issued clarifying guidance (which eventually arrived in the form of the 1996 DCL).  Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 ("Ryan-Macie Aff.") ¶¶ 13-16, App 5.

On August 10, 1993, after Nellie Mae had issued three of the five series of 1993 Bonds, OBRA 1993 was enacted.  OBRA 1993 repealed the 1/2 SAP Rate for loans made or purchased with funds obtained from the issuance of obligations originally issued on or after October 1, 1993.[25]  Given that the Department had not yet provided guidance to the student lending community on the intent of the changes around special allowance billing for tax-exempt bonds in the 1992 Regulations and OBRA 1993, and given that Nellie Mae was issuing unsecured tax-exempt bonds during this time of uncertainty, Nellie Mae contacted the Department.   Nellie Mae requested that as part of the Dear Colleague

---

[25]   The changes made by OBRA 1993 did not impact Nellie Mae or the 1993 Trust, because (*i*) Nellie Mae did not have any loans financed with tax-exempt bonds originally issued on or after October 1, 1993, and (*ii*) all of the bonds included in the 1993 Trust were refunding bonds (*i.e.*, bonds that refunded bonds originally issued prior to October 1, 1993).

32

Letter addressing OBRA 1993, the Department provide guidance on the special allowance billing requirements for loans made or acquired with pooled proceeds, such as those in the 1993 Trust. To address Nellie Mae's questions, the Department revised the draft of the 1993 DCL to include in the final version the phrase "in whole or in part," clarifying that the 1/2 SAP Rate provision applied to all loans where *all* of the funds, *or* only *a portion* of the funds, used to acquire the loans were derived from tax-exempt obligations. Ryan-Macie Aff. ¶¶ 29-30, App. 5; *see also* Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 ("Evans Ltr.," App. 6). The 1993 DCL was integral to Nellie Mae's special allowance billing policy for the 1993 Bonds. *See* Ryan-Macie Aff. ¶¶ 29-30, App. 5; Affidavit of John (Jack) Remondi dated August 21, 2014 ("Remondi Aff.") ¶¶ 4-5, App. 7.[26]

---

[26] Navient acknowledges prior statements to the Department to the effect that Nellie Mae had a policy of terminating billing at the 1/2 SAP Rate when each series of 1993 Bonds matured, and that Navient changed this policy following its acquisition of Nellie Mae in 2000. However, upon further research with the benefit of input from individuals who were employed by Nellie Mae prior to the acquisition and who have since become re-employed by Navient, we can find no evidence to support such statements. To the contrary, certain 1993 Trust reports that remain from the period in time during which Nellie Mae managed the 1993 Trust (1993 through 2001) reflect that, in keeping with the unique unsecured nature of the financing, (*i*) the 1993 Trust Loans and the Receipts thereon were combined in two sub-pools (Sub-pool 1 for Bond 1993A and Sub-pool 2 for the remaining 1993 Bonds as described above), (*ii*) loan acquisitions within Sub-pool 2 were not tracked by 1993 Bond series and those loans were not otherwise identifiable by specific 1993 Bond series, and (*iii*) Nellie Mae therefore had no ability to identify loans in order to change their billing code from the 1/2 SAP Rate to a full SAP rate prior to the final 1993 Bond maturity within each sub-pool. *See* Wheeler Aff. ¶ 10, App. 1.

33

The Department cannot credibly argue that its expansion of the 1/2 SAP Rate policy to loans acquired in whole or in part from tax-exempt sources was not in keeping with its policy to apply the 1/2 SAP Rate as broadly as possible.  In addition, there can be no question that the Department fully understood that this expansion of the 1/2 SAP Rate policy would result in broadened application of the 9.5% minimum yield during low interest rate environments.  In response to Secretary Riley's letter requesting from industry participants a list of issues and concerns arising from the recent statutory and regulatory changes, in February 1993, the National Council of Higher Education Resources[27] ("NCHER," formerly known as the National Council of Higher Education Loan Programs or "NCHELP") provided a written list of issues and comments to the Department.  This list raised the question of whether the 1992 Regulations' expansion of the 1/2 SAP provision (34 CFR 682.302(e)) was in fact an error.  *See* Ryan-Macie Aff. ¶ 17 and Ex. 2(ii) thereto, App. 5.  The Department produced a written list of responses to the NCHER Comments, which it provided at a meeting with industry participants in March 1993 and characterized as "unofficial comments."  *See* Ryan-Macie Aff. ¶ 19 and Ex. 3 thereto at p.16, App. 5.  The Department's written response regarding NCHER's comment on Section 682.302(e)(2) confirmed that the provision was not an error and reflected the Department's position on the matter.

---

[27]  NCHER is an organization that represents education loan guarantors, secondary markets, nonprofit lenders and authorities, commercial lenders and loan servicers.

34

Despite the Department's written response, at the March 1993 meeting, industry participants continued to press the case that the changes promulgated in 34 CFR 682.302(e) could result in a large government liability to lenders if the then-current low interest rate environment continued and the higher 9.5% minimum rate was therefore triggered for all 1/2 SAP Rate loans. The Department representatives responded that they were aware of that potential "windfall" and acknowledged it as a known risk. In fact, one Department official sarcastically remarked that if interest rates continued to be such that the 9.5% minimum rate continued to be triggered, lenders could *voluntarily* forego special allowance billing at the 1/2 SAP Rate in low rate environments but be subject to the provision in higher interest rate environments, although the applicable regulations and SAP billing process clearly do not permit the lender to exercise this purported option. *See* Ryan-Macie Aff. ¶¶ 19-22, App. 5.

Then, in 1993, provisions of OBRA 1993 removed the 1/2 SAP Rate with respect to loans funded by bonds issued on or after October 1, 1993.[28] But for loans funded by pre-October 1, 1993 bonds (including the 1993 Bonds), the 1992 regulations remained in effect. At the time the 1993 DCL was published in November 1993, the rate on Treasury Bills (the index historically used to calculate SAP payments) was approximately 3.10%, and when the margin was added (generally 3.10% to 3.5%), loans subject to the 1/2 SAP Rate would have received the 9.5% minimum yield. *See* NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates (App. 8). Thus, even

---

[28]   *See* footnote 20 above.

35

though the immediate ramifications of the Department's interpretation in the 1992 Regulations and the 1993 DCL, specifically the "*in whole or in part*" language, were clear, the Department did not change its policy of applying the 1/2 SAP Rate as broadly as possible.

In evaluating the FSA's FAD, the Department must consider the plain and unambiguous language of its own guidance, including its reference to the term "in part" and the context in which that reference was made. By including this reference in response to Nellie Mae's request for guidance concerning unsecured tax-exempt financing pools, the Department acknowledged that it was possible for a loan to be financed with more than one source of financing. In fact, if it were not possible to have a loan financed with more than one source of financing, the phrase "in whole or in part" would have no meaning. Robert Evans, the former Director of Policy and Development at the U.S. Department of Education during the period in which the 1992 Regulations were promulgated and the 1993 DCL was issued, has stated that the Department would not have inserted the phrase "in whole or in part" into the DCL if it did not have meaning, and the phrase was likely in response to specific inquiries from industry participants. *See* App. 6. In addition, the term "in whole or in part" has appeared in subsequent guidance from the Department relating to OBRA 1993, including for example the December 1993 Dear Colleague Letter (DCL) 93-L-163. Surely the Department would not have continued using the phrase if it had no significance.

Given the Department's own past use of the phrase "in whole or in part," the Department must take exception to FSA's statement in the FAD that "[w]hether or not

36

NEELMC and its successors kept *adequate* records to tie the cohorts of loans acquired with the original proceeds of a 1993 Bond to particular loans held in 2002 and 2004 is irrelevant." (FAD at 18, emphasis added.) Nellie Mae was not required by any Department regulation or guidance to tie loans to particular bonds or bond series, but instead was required to identify loans that were made or acquired in whole *or in part* with proceeds of a qualifying tax-exempt financing. Nellie Mae *was* required, however, to bill for special allowance at the 1/2 SAP Rate for (*i*) the 1993A Bond through its final maturity on July 1, 2005, and (*ii*) the 1993B through 1993H Bonds at least through the final maturity of those bonds on July 1, 2004.

In the final analysis, FSA's failure to consider the reference in the 1993 DCL to "in whole or in part" demonstrates that it has conveniently decided after the fact to seek an alternative interpretation of the special allowance billing requirements based on changes in interest rate environments. If interest rates during the period in question had been elevated rather than at historical lows, FSA doubtless would have seized upon the "in whole or in part" language in the 1993 DCL and insisted that all loans financed by the 1993 Trust remained subject to the 1/2 SAP Rate restrictions until all bonds within the financing pool created by the 1993 Trust had matured. FSA's position to the contrary in light of historically low interest rates that actually prevailed during the relevant period is directly contrary to the Department's 1993 guidance, and should be rejected.

## II.     Nellie Mae Appropriately Claimed the 1/2 SAP Rate on Loans that Were Transferred to ECFC by NMELC.

The FAD argues (at 22) that Nellie Mae was not permitted to claim special allowance at the 1/2 SAP Rate for certain loans after they were transferred to ECFC (EIN *392) by NMELC (EIN *352) in July and August 2004.  (These loans are referred to herein as the "ECFC Loans.")  FSA's finding and estimate of liability for this finding are flawed for both factual and policy reasons.  FSA based its conclusion on its interpretation of Nellie Mae's corporate structure shortly after its acquisition by Navient, instead of appropriately examining Nellie Mae's corporate structure on the date of the loan transfer to ECFC.  Further, rather than using easily ascertainable information in its own records to determine the actual amount of special allowance paid to Navient for the ECFC loans in question to calculate the amount of alleged overpayment, OIG used certain estimates to reach an overstated liability for this finding, which FSA then accepted.  Finally, FSA's finding directly contradicts the original intent of the 1/2 SAP Rate provisions and the 1992 Regulations, which were promulgated to limit SAP payment on loans previously financed with tax-exempt sources of financing that, for a period of time, would benefit from a lower cost of funds.

### A.     FSA is Wrong on the Facts of the ECFC/Nellie Mae Ownership Structure.

In the FAD, FSA erroneously argues that after the transfer of the ECFC Loans from NMELC to ECFC, ECFC was not permitted to bill at the 1/2 SAP Rate on the ECFC Loans because ECFC was a distant affiliate of NMELC that did not experience the

38

tax-exempt cost of funds that accompanies 1/2 SAP Rate loans.  While the history of the

Nellie Mae companies was somewhat complex, the corporate structure at the time the

loans at issue were transferred to ECFC was simple.  ECFC was not in fact a distant

affiliate of NMELC; it was the direct second-level parent of NMELC.  Because of this

corporate structure, ECFC did in fact enjoy the tax-exempt cost of funds while 1993

Bonds were outstanding because both NMELC and its direct parent Nellie Mae Holdings

were single member LLCs, which were disregarded as separate entities from ECFC for

tax purposes.

The correct history of the ownership of the Nellie Mae companies is as follows:

In 1998, NEELMC (EIN *323), the original Authority that issued the 1993 Trust,

underwent a conversion to for-profit status.  In accordance with Section 150(d)(3) of the

Internal Revenue Code, all of NEELMC's outstanding bonds and loan portfolios were

transferred to a wholly-owned subsidiary, Nellie Mae Corporation, which was later

renamed Nellie Mae Holdings Corporation ("Nellie Mae Holdings," EIN *783).  Nellie

Mae Holdings in turn transferred the bulk of its student loan portfolios to its direct

subsidiary, NMELC (EIN *352).  Nellie Mae Holdings also transferred certain limited

obligation bonds and the student loans that secured those bonds to Nellie Mae Loan

Finance, LLC ("NMLF").  All of these transfers were necessitated by various tax and

financing requirements.

As contemplated under Section 150(d)(3), within a year following the conversion,

NEELMC sold its interest in Nellie Mae Holdings to the Navient entity known as the

Student Loan Marketing Association ("SLMA") and ceased its participation in the FFEL

39

Programs.  The Department of Treasury's Office of Sallie Mae Oversight ("OSMO")

regulated the portion of Navient's business that took place within SLMA and its

subsidiaries, which collectively were a government-sponsored enterprise (the "GSE").  At

the time of Nellie Mae's sale to Navient, as a condition for not objecting to the

acquisition and in recognition of the fact that the GSE's activities were restricted to being

a purchaser rather than an originator of student loan assets, OSMO required Nellie Mae's

loan origination business to be conducted outside of the GSE.  This requirement

necessitated the transfer of certain Nellie Mae loan origination functions out of Nellie

Mae Holdings to a newly-created subsidiary of SLM Holdings, known as Nellie Mae

Corporation ("NMC," EIN *373).  In addition, ECFC was created as a subsidiary of

NMC to hold certain loans originated by NMC and other non-GSE Navient subsidiaries.

      The corporate relationships between the relevant SLM, ECFC and Nellie Mae

companies shortly after the July 1999 acquisition of Nellie Mae by Navient are depicted

below.

40

## Corporate Structure Shortly After Navient Acquisition of Nellie Mae (Aug. 1999)



41

Over several subsequent years, the corporate structure at Navient evolved as its business lines multiplied. Nellie Mae Corporation (EIN *373) was grouped with other origination subsidiaries and ECFC became a direct subsidiary of SLM Corporation. In 2001 and 2002, each of Nellie Mae Holdings and NMELC were converted into limited liability companies. Then, in June, 2004, as part of the long-planned wind-down of the GSE, the membership of Nellie Mae Holdings was transferred from SLMA to ECFC. The corporate relationships between SLM, ECFC and the Nellie Mae companies after the June 2004 corporate reorganization (and the relationship that existed at the time of the ECFC Loan transfer upon which FSA now focuses) are depicted below. *See* Heleen Aff. ¶ 5, App. 2.

42



**Corporate Structure at Time of
Loan Transfers from
NMELC to ECFC
As of June 30, 2004**

43

When Bond 1993F matured in July, 2004 (*i.e.*, after the reorganization depicted above), all of the loans in the 1993 Trust other than the pool of loans financed by the Series 1993A Bond were transferred from NMELC to its indirect corporate parent, ECFC, and matched to a taxable source of financing within that entity.

In the FAD, FSA makes much of the notion that because ECFC sat on the non-GSE side of Navient's corporate organization chart and was not an obligor on Bond 1993F, it did not experience the tax-exempt cost of funds for ECFC Loans.  FAD at 22. As ostensible support for this assertion, the FAD cites the corporate separation imposed by OSMO, which required GSE assets and liabilities to be maintained separately from the non-GSE assets and liabilities.  While this was true at the time of the Nellie Mae acquisition in 1999, that fact is irrelevant because by the time the ECFC Loans were transferred to ECFC in 2004, OSMO no longer required the separation of the GSE assets from the non-GSE assets.  The corporate structure had changed such that ECFC was the sole member of Nellie Mae Holdings and Nellie Mae Holdings was the sole member of NMELC, the obligor on the 1993 Bonds.  Because Nellie Mae Holdings and NMELC had previously been converted into single member limited liability companies, they were disregarded as separate entities from their owner for tax purposes. *See* Heleen Aff. ¶¶ 5-6, App. 2.  Therefore, contrary to FSA's assertion, ECFC did in fact experience the tax-exempt cost of funds for the ECFC Loans, as the benefits of the 1993 Bonds were rolled directly up to ECFC.

44

**B.     FSA's Conclusion on the ECFC Loans Directly Contradicts the Intent of the 1992 Regulations.**

FSA's determination in the FAD that the ECFC Loans were not entitled to the 1/2 SAP Rate following their transfer to ECFC directly contradicts the original purpose of the 1/2 SAP Rate provisions and the 1992 Regulations. As discussed above, the 1992 Regulations were promulgated to expand the number of loans receiving the 1/2 SAP Rate to include all loans derived from a tax-exempt source of funds, whether or not those loans were subsequently transferred to a taxable source of funds. FSA argues, however, that because the ECFC Loans were transferred to an entity that was not the original bond-issuing Authority, the 1/2 SAP Rate no longer applies. In making this argument, FSA has ignored the complex history of the Nellie Mae companies, and has inconsistently applied a newly minted standard for determining whether a transferee entity is entitled to the 1/2 SAP Rate on its transferred loans.

In the FAD (at 20), FSA concedes that when NEELMC first transferred the ECFC Loans (along with all its other loans) to Nellie Mae Holdings and NMELC as part of its conversion, these entities were eligible to continue to claim SAP for those loans on the same basis that NEELMC, the Authority, would have been eligible to do. In its analysis, FSA reasons that because Nellie Mae Holdings, NMELC and NMLF were "successors" to the Authority within the meaning of IRC § 150(d)(3),[29] their loans should be subject to

---

[29]   In fact, only Nellie Mae Holdings was the "successor" as defined in IRC § 150(d)(3), which contains a multi-prong test for a successful election under the section. IRC § 150(d)(3) does not address transactions occurring after the initial transfers from the qualified scholarship funding corporation to the "successor" transferee. Like Nellie

45

the same SAP treatment to which the loans of the Authority were subject. Although

nothing in the statute or regulations addresses a situation in which 1/2 SAP Rate loans are

held by a successor to an Authority, FSA makes a fair and logical policy determination

that, because the successors were created as part of a corporate reorganization sanctioned

under IRC §150(d)(3), they are entitled to step into the shoes of the Authority for the

purpose of SAP claims.

Rather than extend the application of this reasoning to the subsequent transfer of

loans to ECFC, which would have been the fair and logical interpretation of the intent of

the 1992 Regulations (*i.e.*, to prevent avoidance of the 1/2 SAP Rate through a change in

funding source), FSA has manufactured a new requirement that ECFC be a "successor"

of NEELMC as defined in IRC §150(d)(3) – a requirement with no basis in law, rule

regulation or audit practices, and a requirement that none of NMELC, NMLF or any

other company other than Nellie Mae Holdings could ever meet under IRC §150(d)(3).

The final transfer of the ECFC Loans occurred from one Navient subsidiary to

another subsidiary (rather than an internal transfer between financing sources within a

single entity) solely because of the complexities of NEELMC's conversion. After the

conversion transaction and the acquisition by Navient, no further debt obligations were

issued by NMELC or any other Nellie Mae companies. Once Bond 1993F had matured,

---

Mae Holdings, most if not all "successors" of qualified scholarship funding
corporations that to date have made an election to convert their status under IRC
§ 150(d)(3) have made further transfers of their assets and liabilities after the initial
conversion transaction for various tax and financing-related reasons.

the loans then held at NMELC were no longer matched to a liability and so, in accordance with prudent financing practices, they were moved to ECFC, the closest related company with liabilities to which the loan assets could be matched. Nevertheless, FSA determined that this one transferee entity, ECFC, unlike the other members of the Nellie Mae organization tree (*i.e.*, Nellie Mae Holdings, NMELC or NMLF), would not be eligible to claim SAP on the same basis that NEELMC had done. This distinction by FSA between the transfer of loans to subsidiaries such as Nellie Mae Corp, NMELC and Nellie Mae Loan Finance, LLC on the one hand, and ECFC on the other, is arbitrary and punitive, especially in light of the clear intent of the changes promulgated in the 1992 Regulations. In other words, had the transfers between funding sources occurred within a student loan entity with a simple structure, FSA would have deemed the loans subject to the 1/2 SAP Rate. But because Navient, following the acquisition of Nellie Mae, had a complex corporate structure for various regulatory and corporate reasons, FSA acts as if the policies behind the 1992 regulations no longer apply.

Nellie Mae's continued billing of the 1/2 SAP Rate on the ECFC Loans after their transfer from NMELC to its affiliate ECFC was entirely consistent with Congress' and the Department's original objective to maximize the loans subject to the 1/2 SAP Rate and limit loans subject to full SAP. When enacting the 1/2 SAP Rate provisions in 1980 in an environment of high interest rates, Congress intended to maximize the loans subject to those provisions, and to limit full SAP claims, thus attempting to limit the amount of special allowance an entity could receive. Similarly, when enacting its 1992 regulations, the Department sought to prevent lenders from obtaining full SAP simply by transferring

47

1/2 SAP Rate loans from tax-exempt to taxable trusts, once again attempting to limit the amount of special allowance an entity could receive.  By continuing to bill the transferred loans under the 1/2 SAP Rate provisions, Nellie Mae acted in complete accord with the intent behind these provisions.

By contrast, FSA's position – that a lender could avoid the restrictions of 1/2 SAP simply by transferring a loan to a subsidiary – is both opportunistic and inconsistent with Departmental regulations.  FSA's position that a lender could transfer loans to an affiliated entity to avoid the 1/2 SAP Rate restrictions cannot be reconciled with the 1992 regulatory change promulgated by the Department.

The FAD provides no Departmental guidance or other support for the notion that a lender could evade the restrictions on full-SAP claims put in place by Congress and the Department merely by transferring 1/2 SAP Rate loans to an affiliate.  Indeed, if interest rates had been significantly higher following the loan transfer from NMELC to ECFC, FSA undoubtedly would not being taking this position (or any other of the positions outlined in the FAD) today.  And if Nellie Mae had ceased 1/2 SAP Rate billings on transferred loans in a high-interest-rate environment, FSA likely would have subjected Nellie Mae to administrative action.  The Department should reject FSA's attempt to base an administrative action on the movement of interest rates.

C.      **FSA Overstated the Alleged Liability for the ECFC Loans.**

In the FAD (at 24), FSA stated that it found the alleged overpayment (of special allowance) amount of $22.3 million to be a reasonable estimate, but stated that Navient

48

would have the right to contest that determination. Of the $22.3 million, OIG ascribed

$12.3 million in alleged overpayment to its finding relating to the transfer of the ECFC

Loans (FAR at 11). Without conceding its position that Navient correctly billed for

special allowance on the ECFC loans during the period in question, using information

readily available to both it and FSA, Navient has determined that, using the actual

payment amounts less the amount that would have been payable on the ECFC Loans at

the full-SAP rate, the alleged overpayment would be $11.1 million. *See* Wheeler Aff. ¶

14, App. 1.

### III.    FSA's Determination that Navient is Liable for Pre-June 1, 2002 1/2 SAP Rate Claims is Both Unsupported by Any Factual Finding and Incorrect.

Among other things, the FAD determines (at 23, no. 2) that Navient must repay

the Department for the 1/2 SAP Rate special allowance claimed by Nellie Mae in periods

prior to June 1, 2002, on loans associated with the 1993B, 1993G and 1993H bond series.

The FAD appears to take the position that Navient must return the special allowance that

was claimed after specific tranches of bonds (or interim maturities) within these series

matured prior to June 1, 2002. This FAD determination, which purports to require

Navient to identify loans and reimburse special allowance payments going back as far as

June 1998, is a significant departure from OIG's position and has no basis in any factual

finding in the FAD. Moreover, the FAD's determination is incorrect as a matter of law.

Accordingly, it should be reversed.

OIG's FAR correctly treated all interim maturities (tranches) within the 1993B,

1993G and 1993H series as having matured when the last tranche within its series

matured.  FAR at 7-8, Tables 4 & 5.  For example, the FAR treated Bond 1993B as

maturing on June 1, 2002, even though other tranches in that series matured on June 1,

1998 and June 1, 2000.  FAR at 7-8, Table 4 and Table 5.  Similarly, the FAR treated the

1993G and 1993H series as having matured on August 1, 2002 and December 1, 2002,

respectively, even though other tranches in those series matured in August 1998,

December 1999, and August 2000.  *Id.*  Accordingly, OIG recommended that FSA

instruct Navient to identify loans associated with the 1993B, 1993G and 1993H series

and return alleged overpayments for the quarters ended June 30, 2002 through June 30,

2005.  *Id.* at 15.  OIG did not find that Nellie Mae incorrectly submitted 1/2 SAP Rate

claims for loans associated with these bond series in prior periods, or recommend that

FSA seek recovery of special allowance claimed in prior periods.  In short, FSA's final

audit determination in the FAD goes significantly beyond the findings and

recommendations of OIG's FAR, and therefore has no basis in the FAR.[30]

---

[30]  Although OIG states (FAR, at 29) that its finding "does not address SLMA's
treatment of the interim maturities and their impact on its 9.5 percent floor billings,"
clearly OIG was aware of the earlier maturity dates within the 1993 Trust.
Furthermore, during the course of the audit, OIG requested and was provided with
substantial documentation and information regarding the billing practices relating to
interim maturities within the tax-exempt financings of Navient's various
subsidiaries.  Navient gave OIG specific examples at other Navient subsidiaries
where multiple tranches and maturity dates existed within a series of bonds and the
1/2 SAP rate was claimed for all loans financed by the series through the final
maturity date in that series.  *See* Navient Response to OIG Questions dated
December 14, 2007 (App. 9 hereto).  OIG did not raise any concerns or issue any
findings regarding this practice.  Instead, OIG's concerns were specific to the unique
unsecured structure of the 1993 Trust, where funds were commingled across series.

50

Moreover, this aspect of the FAD has no factual basis in the FAD itself.  The FAD's factual findings make clear that the allegedly improper 1/2 SAP Rate claims were made for periods after June 1, 2002, when the last bonds in series 1993B, 1993G and 1993H matured.  *See* FAD at 11 ("In June, August, and December 2002, the 1993B bond, the 1993G bond, and the 1993H bond, respectively, matured and were retired"); 12 ("Thus, special allowance was claimed at the 9.5 percent minimum return rate and received *for periods from June 1, 2002* on all loans associated with the 1993B, 1993G, 1993F and 1993H bonds after the bond with which they were associated was retired . . . .") (emphasis added).[31]  The FAD's failure to provide any factual findings in support of its determination that pre-June 1, 2002 special allowance payments should be returned requires that determination to be rejected.

In any event, for the reasons already stated, Nellie Mae appropriately billed the 1/2 SAP Rate on all loans associated with the 1993 Trust until the last bond maturity in that financing because Nellie Mae treated the 1993 Trust as a single obligation for SAP billing purposes, pursuant to a reasonable interpretation of the applicable law and regulations.  Furthermore, the Bond Proceeds of each tranche within a series of 1993 Bonds were pooled with the Bond Proceeds of all the other tranches within that Series and with all other amounts on deposit in the same Sub-pool.  As described above, the first generation of loans acquired with the proceeds of Bond 1993B were repaid prior to the

---

[31]   *Cf. also* FAD at 4 (stating that "the time the transactions occurred" was "2002 through 2005"); 18 n.20 ("The transactions in question here occurred after August 2000, when the second of the three 1993G series bonds was retired.").

51

final maturity of Bond 1993B and any "second generation" loans were acquired with funds commingled with the Bond Proceeds of Bond 1993F, the last of the bonds in Sub-pool 2 to mature.  Similarly, the loans acquired with the tranches of Bond 1993G and Bond 1993H maturing prior to 2002, which tranches were issued after Bond 1993F, were also commingled with the Bond Proceeds and Receipts of Bond 1993F, and therefore were appropriately billed at the 1/2 SAP Rate through July 1, 2004.

**IV.     FSA's Determination that Navient Must Disclose Any Other Similar Alleged Overbillings Has No Factual Support.**

Navient contests FSA's determination (at 23) that Navient should be required to disclose and remedy any similar alleged overbillings of special allowance by its other subsidiaries following the maturity of specific tax-exempt bonds.  This determination has no support in the record whatsoever, and should be rejected.  As discussed above, the unsecured, serial structure of Nellie Mae's 1993 tax-exempt financing was unique to that entity, and presents issues unique to that financing.

As an initial matter, this determination lacks any basis in the evidence reviewed by OIG during the audit.  The OIG audit work file includes numerous examples of information provided by Navient to OIG regarding the 1/2 SAP Rate billing practices at its subsidiaries other than Nellie Mae.  Navient responded to specific questions from OIG about its other subsidiaries' bond issues, stating consistently that Navient billed at the 1/2 SAP Rate until the final maturity in each bond issue.  *See, e.g.,* App. 9 (Navient Responses to OIG questions of Dec. 14, 2007).  If OIG found this practice to be questionable or found evidence that did not support the conclusion, it would have raised

52

it as a concern in the audit, but it did not.  It chose instead to write an audit finding stating

that Navient must disclose any other instances at any of its subsidiaries "of loans billed

under the 9.5 percent floor calculation after the *eligible tax-exempt bond issue matured*

and after the loans were refinanced with funds derived from an ineligible funding

source."  FAR at 15 (emphasis added).  In other words, it asked Navient to identify any

instances in which it had billed in a manner inconsistent with the practices it had

described to OIG during the audit.  *See* App. 9 (OIG questions to Navient dated

December 14, 2007 and Navient's response thereto dated January 2, 2008).  At no point

during the audit or in its audit reports did OIG suggest that it was inappropriate for

Navient to bill at the 1/2 SAP Rate following an *interim or tranche maturity* within a

bond issue.  OIG's concern was with billing that took place after the maturity of each

bond issue, which in some cases consisted of a group of bonds issued on the same date.

Notwithstanding its disagreement with OIG's Recommendation 1.3, and without

conceding its position in that regard, Navient nevertheless confirmed to the Department

that upon review of the relevant corporate records, it found no instances in which its

subsidiaries had billed for loans under the 9.5% floor calculation after the relevant bond

issue had matured.  *See* Wheeler Aff. ¶ 12 & Ex. 1 thereto, App. 1.  Navient has therefore

made the disclosure required under the FAR and has satisfied its obligations with respect

to this audit finding.

In the FAD, FSA chose to expand OIG's finding to require Navient to disclose

not only instances of billing at the 1/2 SAP Rate after the bond issue maturity, but also

any instances of billing after any interim maturities within a series.  *See* FAD at 23.

53

Navient reiterates that this finding clearly exceeds the parameters of the OIG audit and is not based on any evidence identified by OIG in the audit, and should therefore be rejected.   Even if the Department disagrees, this FSA finding should nevertheless be dismissed because Navient disclosed to the Department during the negotiations leading to this Appeal that upon review of its corporate records, it found no instances "of loans on which special allowance was received at the 9.5 percent minimum return rate after the eligible tax-exempt bond from which their eligibility derived was retired and the loans transferred in consideration of funds derived from an ineligible funding source." *See* FAD at 23.  As disclosed to OIG on multiple occasions during the course of the audit, Navient consistently billed at the 1/2 SAP Rate through the final maturity of each bond issue.  In each case, the loans in each bond issue were pooled together and were financed at least in part with the proceeds of the last maturing bond in the issue.  This methodology for SAP billing comported entirely with regulatory policy in the 1992 Amendments and with the Department's own guidance delivered in the 1993 DCL. Therefore, Navient has made the required disclosure and met its obligations with respect to this finding.  FSA has articulated no basis for requiring additional disclosure of similar alleged practices at other Navient subsidiaries.  The Department should not sanction a baseless request by FSA, and subject Navient to additional costs and burdens in the process.

54

## V.   FSA Is Treating Navient Unfairly Relative to Other Industry Participants.

Given the changes made to the special allowance provisions by the 1992 regulations, if Nellie Mae (or Navient following the acquisition of Nellie Mae) had intended to maximize its earnings and take advantage of the 9.5% minimum yield provision in its administration of the 1993 Trust, it could have refinanced all of the 1993 Trust Loans with Bond 1993A and continued to bill for special allowance at the 1/2 SAP Rate through 2005. Neither company did so. Furthermore, neither Nellie Mae nor Navient took advantage of its ability under the 1993 DCL and the 1996 DCL to refinance other parts of its loan portfolios with its tax-exempt debt, which would have maximized the yield on its loan portfolios in an interest rate environment where the 9.5% minimum yield exceeded what it was receiving when it billed at the Full-SAP Rate.[32]

At the same time, Navient's competitors were doing exactly the opposite. In a 2004 study, The Institute for College Access and Success, Inc. ("TICAS") analyzed the volume of loans billing at the 9.5% minimum yield by the top fifteen lenders on both January 1, 2003 and January 1, 2004. TICAS found that several lenders more than doubled their 9.5% yield portfolios during that time, with two lenders growing their 9.5%

---

[32] As of June 30, 2004, Navient was billing for special allowance at the 1/2 SAP Rate on only 2.4% of its FFEL portfolio, as compared to Nelnet, which as of the same date was billing for special allowance at the 1/2 SAP Rate on approximately 30% of its portfolio. *See* Wheeler Aff. ¶ 13, App. 1; Nelnet, Inc. Report on Form 10-Q for quarter ended June 30, 2004 (available at http://quote.morningstar.com/stock-filing/Quarterly-Report/2004/6/30/t.aspx?t=XNYS:NNI&ft=10-Q&d=619a7e0381b2debf); Final Audit Report issued to Nelnet by Office of Inspector General, September 2006, ED-OIG/A070017 (available at https://www2.ed.gov/about/offices/list/oig/auditreports/a07f0017.pdf).

yield portfolios by 626% and 818% respectively.[33] During the same period, the study

reported that Navient's 9.5% yield portfolio had declined by 18%.[34]

In 2006, because of the wide ranging practices of tax-exempt debt issuers with

respect to the 1/2 SAP Rate provisions, the Department announced in a Dear Colleague

Letter that it would forego enforcement action with respect to the entities' prior 1/2 SAP

Rate billing practices if those entities would adopt the Department's new standard policy

on a prospective basis.[35] The Department outlined the new standards for special

allowance billing at the 1/2 SAP Rate and announced that it would only pay special

allowance at the 1/2 SAP Rate to lenders that undertook certain independent audit

procedures and made certain certifications to the Department.

---

[33]   Notwithstanding the fact that one such lender, Nelnet, expanded its 1/2 SAP Rate portfolio by nearly tenfold by taking advantage of the applicable rules and regulations, the Department rejected OIG's recommendations to require Nelnet to return the estimated $278 million in improper 9.5% floor SAP billings. Final Audit Report issued to Nelnet by Office of Inspector General, September 2006, ED-OIG/A070017 (available at https://www2.ed.gov/about/offices/list/oig/auditreports/a07f0017.pdf)  The Department's settlement with Nelnet instead required Nelnet only to change its practices on a prospective basis and required no repayment of special allowance whatsoever.  *See* Settlement Agreement, dated as of January 19, 2007 by and between Nelnet, Inc. and the United States Department of Education (available at http://www.sec.gov/ Archives/edgar/data/1258602/000101143807000046/exhibit_10-1.txt).

[34]   *See* TICAS, *Money for Nothing* (Aug. 2004), at 10 (available at www.ticas.org/ticas_d/money_for_nothing_report.pdf).

[35]   Department of Education DCL FP-07-01 (Jan. 24, 2007).

56

These audit procedures were published by OIG[36] completely outside the federal rule-making process and contained entirely new interpretations of the laws and regulations governing 1/2 SAP Rate billing – laws and regulations that had been passed and promulgated 27 and 22 years earlier, respectively.  One such interpretation included in the Audit Guide was a new provision stating that the only loans entitled to receive special allowance at the 1/2 SAP Rate were loans that were the "first generation" or "second generation" of the bond issue.  The Audit Guide defined the terms "first generation" and "second generation" and described their application in the audit process. In addition, the Audit Guide arbitrarily created a deadline by which lenders had to complete their audits in order to be permitted to bill for special allowance at the 1/2 SAP Rate.  These interpretations and requirements had absolutely no basis in the existing special allowance laws and regulations and have served to deny lenders special allowance to which they are statutorily entitled.  The Department overstepped its administrative authority in the Audit Guide to fashion a remedy for what the Department by that time viewed as a weakness or loophole in its regulations.

In response to the Department's January 2007 DCL offer to the industry, Navient informed the Department in February 2007 that it would voluntarily cease *all* prospective billing for special allowance at the 1/2 SAP Rate, obviating the need for a time-

---

[36]   Department of Education DCL FP-07-06 (Apr. 27, 2007) (the "Audit Guide").

consuming and expensive audit under the Department's new policy.[37] On September 11, 2007, however, in direct contravention of its own pronouncement in the January 2007 DCL that it would forgo enforcement actions relating to prior SAP billing practices, the Department informed Navient by letter from the Department's Office of Inspector General, that it would undertake an audit of its special allowance billing practices with respect to the minimum yield provision of the 1/2 SAP Rate provision.   By undertaking this audit, the Department has breached the promise it made in the January 2007 DCL, a promise that Navient reasonably relied on in its decision to forgo any further SAP billing at the 1/2 SAP Rate.

In sum, Navient demonstrated throughout the OIG audit and FSA review that it practiced special allowance billing and applied the 1/2 SAP Rate in a conservative manner, according to reasonable interpretations of the Department's limited guidance, and always in keeping with the original intent of the applicable law and regulations. Despite these facts, FSA is attempting to create new regulatory policy and standards at Navient's expense, is treating Navient differently than other lenders, and is taking action counter to its own pronouncements in the January 2007 DCL.

---

[37]    Letter dated February 15, 2007 to Theresa Shaw, U.S. Department of Education, from Robert S. Lavet, General Counsel, Sallie Mae (App. 10).

58

**CONCLUSION**

For the foregoing reasons, the FAD's conclusions should be rejected in their entirety.

July 27, 2016                                    Respectfully submitted:


Ada Fernandez Johnson
Veronica R. Glick
Debevoise & Plimpton LLP
801 Pennsylvania Avenue NW, Suite 500
Washington, D.C. 20004
Phone: 202-383-8036
Fax: 202-383-8118
afjohnson@debevoise.com

*Attorneys for Respondent*
*Navient Corporation*

59

**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON, D.C. 20202

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the matter of                                 :
                                                 :          Docket No. 16-42-SA
NAVIENT CORPORATION,                             :
                                                 :          BRIEF IN SUPPORT OF
                          Respondent.            :          NAVIENT CORPORATION'S
                                                 :          APPEAL OF THE FINAL AUDIT
                                                 :          DETERMINATION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL
OF THE FINAL AUDIT DETERMINATION ISSUED BY THE OFFICE OF THE
INSPECTOR GENERAL OF THE DEPARTMENT OF EDUCATION**

ORAL ARGUMENT REQUESTED



DEBEVOISE & PLIMPTON LLP


Colby A. Smith
Ada Fernandez Johnson
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000

*Attorneys for Respondent*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ...................................................................................................................... 5

STANDARD OF REVIEW ....................................................................................................... 8

ARGUMENT ........................................................................................................................... 9

I.   NELLIE MAE WAS REQUIRED TO BILL AT 1/2 SAP UNTIL THE FINAL
     MATURITY OF THE 1993 BONDS ............................................................................... 9

     A.   Nellie Mae Was Required to Claim the 1/2 SAP Rate on Any Loans
          Acquired *in Whole or in Part* with Tax-Exempt Funds. ...................................... 9

     B.   Nellie Mae Properly Billed at 1/2 SAP Based on Reasonable
          Interpretation of Applicable Law, Regulations and Department
          Guidance ........................................................................................................... 22

II.  NELLIE MAE APPROPRIATELY CLAIMED THE 1/2 SAP RATE ON
     LOANS THAT WERE TRANSFERRED TO ECFC BY NMELC ................................... 27

     A.   FSA Is Wrong on the Facts of the ECFC/Nellie Mae Ownership
          Structure. ........................................................................................................... 28

     B.   FSA's Conclusion on the ECFC Loans Directly Contradicts the Intent of
          the 1992 Regulations. ........................................................................................ 31

     C.   FSA Overstated the Alleged Liability for the ECFC Loans. ............................... 34

III. FSA'S DETERMINATION THAT NAVIENT IS LIABLE FOR PRE-JUNE 1,
     2002 1/2 SAP RATES AND MUST DISCLOSE OTHER ALLEGED
     OVERBILLINGS IS INCORRECT ................................................................................ 35

     A.   FSA's Determination that Navient is Liable for Pre-June 1, 2002 1/2
          SAP Rate Claims Is Both Unsupported by Any Factual Finding and
          Incorrect. ........................................................................................................... 35

     B.   FSA's Determination that Navient Must Disclose Any Other Similar
          Alleged Overbillings Has No Factual Support. .................................................. 36

IV.  FSA'S TREATMENT OF NAVIENT IS NOTABLY INCONSISTENT WITH
     ITS TREATMENT OF OTHER INDUSTRY PARTICIPANTS ...................................... 37

CONCLUSION ...................................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Baytown Tech. Sch. Inc.*, U.S. Dep't of Educ., No. 91-40-SP
(Dec. 13 1993) ............................................................................... 15

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ............................... 39

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)............................................ 19

*Empire Tech. Sch.*, U.S. Dep't of Educ., No. 91-53-SP (Dec. 13, 1993) ........................ 20

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) ......................... 25

*Johnson v. Stolc*, 2012 U.S. Dist. LEXIS 119296,
(C.D. Cal. June 28, 2012) .............................................................. 20

*Iowa Student Loan Liquidity Corp.*, U.S. Dep't of Educ.,
No. 200621025013 (Jan. 11 2008)................................................. 17

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).................................. 21

*Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996).............. 9, 15, 20

*National Ass'n v. Defenders of Wildlife* 551 U.S. 644 (2007)........................ 20

*Penn. Sch. of Bus.*, U.S. Dep't of Educ., No. 15-04-SA (Oct. 27, 2015)......................... 8

*Phillips Colls., Inc.*, U.S. Dep't of Educ., No. 92-64-SA (July 13, 1995)..................... 35

*Student Loan Mktg. Ass'n*, U.S. Dep't of Educ., No. 96-23-SL
(Sept. 26, 1996)............................................................................... 9

*S.F. Coll. of Mortuary Sci.*, U.S. Dep't of Educ., No. 92-8-ST
(Dec. 31, 1992) .............................................................................. 35

*Travel Univ. Int'l*, U.S. Dep't of Educ., No. 94-99-SP (Feb. 3, 1995) ........................... 22

STATUTES

20 U.S.C. § 1087-1(b)(2)(B)............................................................................. 5

Higher Education Act of 1965 ...................................................... 5, 22, 24–26

ii

**TABLE OF AUTHORITIES**

**Page(s)**

Higher Education Reconciliation Act of 2005 .................................................................. 2

I.R.C. § 150(d)(3) ....................................................................................................... 6, 32

Omnibus Budget Reconciliation Act of 1993 ................................................ 7, 16, 19–20

Taxpayer-Teacher Protection Act of 2004 ................................................................... 1–2

**OTHER AUTHORITIES**

26 C.F.R. § 301.7701-2(c)(2) ........................................................................................ 29

34 C.F.R. § 668.113 ......................................................................................................... 1

34 C.F.R. § 668.116. ........................................................................................................ 8

34 C.F.R. § 682.200 ......................................................................................................... 6

34 C.F.R. § 682.302 ....................................................................................... 5–6, 18, 26

34 C.F.R. § 682.801 ....................................................................................................... 25

50 Fed. Reg. 5506 .......................................................................................................... 26

GAO Report GAO-04-1070 ..................................................................................... 19, 26

## PRELIMINARY STATEMENT

This appeal arises from a final audit determination ("FAD") by the Office of Federal Student Aid ("FSA") of the U.S. Department of Education (the "Department") that Navient Corporation's ("Navient's") subsidiary Nellie Mae[1] should repay purported overpayments it received from the Department under a special allowance program known as the half-SAP/9.5 percent minimum return rate ("1/2 SAP Rate").[2]  The FAD and resulting repayment order from FSA is predicated upon a retroactive reinterpretation of long-standing guidance from the Department about the 1/2 SAP Rate.  This retroactive interpretation should be rejected as (i) inconsistent with the law as it was clearly interpreted by the Department at the relevant times, and (ii) unjustified in light of the facts.  The FAD therefore should be overturned.

The Department's Office of Inspector General ("OIG") initiated in 2007 the audit from which this appeal is taken.  The purpose of the audit was to determine (1) whether Nellie Mae claimed and received from the Department SAP on Federal Family Education Loans ("FFELs") at the 1/2 SAP Rate in compliance with the Taxpayer-Teacher

---

[1]   For purposes of this appeal, "Nellie Mae" refers to Nellie Mae Holdings LLC (formerly known as Nellie Mae Corporation, then Nellie Mae Holdings Corporation ("Nellie Mae Holdings," EIN *783)), Nellie Mae Education Loan LLC (formerly known as Nellie Mae Education Loan Corporation ("NMELC," EIN *352)), and Nellie Mae Loan Finance, LLC ("NMLF," EIN * unavailable).  Like the FAD, this Appeal uses each entity's last three EIN digits to identify it.

[2]   On July 27, 2016, Navient submitted a Request for Review of Final Audit Determination to the Office of Federal Student Aid in accordance with 34 C.F.R. § 668.113, which Navient respectfully  incorporates by reference herein.  *In re Audit Control* No. ED-OIG/A03I0006, *Special Allowance Payments to Navient's Subsidiary, Nellie Mae, for Loans Funded by Tax Exempt Obligations*.

Protection Act of 2004[3] (TTPA) and the Higher Education Reconciliation Act of 2005[4] (HERA), and (2) whether Nellie Mae or its transferee continued to claim and receive SAP at that rate on loans that had been financed with tax-exempt bonds after the bonds from which the loans derived their eligibility matured and were retired.  The audit period covered October 1, 2003, through September 30, 2006. (Final Audit Report[5] at 1.)

The OIG issued a final audit report ("FAR") on August 3, 2009, Navient responded on October 2, 2009 and four years later, on September 25, 2013, FSA issued its FAD based upon the report.  FSA found that Nellie Mae had improperly received 1/2 SAP Rate payments on loans financed by certain New England Education Loan Marketing Corporation ("NEELMC") Student Loan Refunding Bonds, Series A through H, that were issued in 1993 and that had been fully repaid by 2005 (the "1993 Bonds"). The findings were based upon a determination that Nellie Mae had continued to receive payments after a portion of the 1993 Bond financing had matured.  In addition, as a result of certain corporate transactions and reorganizations, the FAD concluded that certain loans were ineligible for payments because of the manner in which they had been transferred from a Nellie Mae subsidiary to its corporate parent.  Ex. R-01.

In light of these findings, FSA determined that Navient must (i) calculate alleged excess payments received in connection with loans associated with Series F of the 1993 Bonds after that bond was retired and the loans were sold to SLM Education Credit

---

[3]     Pub. L. No. 108-409, 118 Stat. 2299 (2004).

[4]     Pub. L. No. 109-171, 120 Stat. 4 (2006).

[5]     The Final Audit Report is available at:
        https://www2.ed.gov/about/offices/list/oig/auditreports/fy2009/a03i0006.pdf.

Finance Corporation ("ECFC"); (ii) calculate alleged excess payments received in connection with loans associated with Series B, G and H of the 1993 Bonds after those bonds were retired or defeased; and (iii) identify and disclose other instances where any of its subsidiaries continued to receive payments after the bond from which the loans derived their eligibility were retired or refinanced with funds derived from an ineligible funding source.

FSA's findings and resulting order, however, are inconsistent with the law and unsupported by the uncontroverted facts.

*First*, Navient's approach to special allowance billing on the loans in question was based on written guidance that was issued by the Department at the request of Nellie Mae to address the unique structure of the 1993 Bonds – guidance that FSA was unaware of and failed to consider when issuing the FAD.

*Second*, the 1993 Bond issuance was a unique bond structure.  In fact, it was a general obligation bond with no specific collateral supporting any of the bonds.  As such, it was administered as a single obligation in which the financed loans and receipts were pooled together.  It was therefore appropriate and correct for Navient to bill for special allowance at the 1/2 SAP Rate through the final maturity of all of the series (A through H) of the 1993 Bonds.

*Third*, FSA's conclusions regarding the transfer of certain loans from a Nellie Mae subsidiary to its corporate parent are flawed because they are based on an erroneous understanding of Nellie Mae's entity structure at the time the loans were transferred.

*Finally*, despite the clear parameters of the OIG's audit as outlined in the FAR, FSA took a sweeping and unjustified approach in its findings, calling for Navient to repay special allowance for billing periods that were outside the scope of the OIG audit and therefore can have no basis in the factual findings of the audit.  Similarly, the findings also call for repayment of special allowance paid on loans financed by entirely different subsidiaries of Navient, unrelated to Nellie Mae and the 1993 Bond financing. The issuance by a reviewing agency of findings that exceed the scope of the audit investigation is patently inappropriate and unfair, and exceeds the authority of the FSA.

Given the uncertainties acknowledged by Congress, the Department and lenders surrounding special allowance provisions for tax-exempt debt, the Department has consistently rejected prior OIG recommendations to institute proceedings based on these provisions.  FSA decided not to proceed with enforcement action for prior 1/2 SAP Rate billing practices with the rest of the industry, in exchange for promises of prospective changes.  Now, after its history of non-enforcement against Navient's competitors, FSA seeks to require Navient to repay SAP.

In contrast with others in the industry who vastly expanded their 1/2 SAP Rate loan portfolios (by as much as 800%), Navient billed for special allowance in a much more conservative manner, forgoing opportunities to exploit "loopholes" in the 1/2 SAP Rate regulations.  The Department should exercise a fair and level enforcement approach across all industry participants and overturn the findings of the FAD.

For all of these reasons, which are discussed in detail below, the FSA's FAD must be overturned.

## **BACKGROUND**

Special allowance payments ("SAP") are those interest payments made by the federal government to the holder of a loan when the yield on a Federal Family Education Loan ("FFEL") is less than the rate prescribed in the Higher Education Act of 1965[6] ("HEA"), as amended.  The amount or rate of SAP paid on a FFEL is based on formulas that differ according to the type of FFEL, the date the loan was originally made, and the type of funds used to finance the loan (*i.e.,* taxable or tax-exempt).  SAP payments were implemented to provide lenders a market rate of return to encourage loan originations and help create liquidity that would assure a ready supply of lending capacity for those seeking support for their educational goals.  When the transactions at issue occurred (*see* FAD at 4), FFEL loans made or purchased with funds obtained from the issuance of *tax-exempt* debt issued before October 1, 1993 were eligible for only *half* the SAP that would otherwise be paid, subject to a minimum yield or "floor" equal to 9.5 percent minus the applicable interest rate on the loans, divided by 4 (the "1/2 SAP Rate").[7]  The 1/2 SAP Rate also applied to loans funded with the *proceeds* of other loans financed by eligible tax-exempt debt, such as (*i*) loan collections, (*ii*) payments by a guarantor, (*iii*) interest benefits, (*iv*) special allowance payments, or (*v*) loan sale proceeds, as well as investment income from the eligible tax-exempt debt.[8]  Generally speaking, in *higher* interest rate environments, the total yield on a loan subject to the 1/2 SAP Rate restrictions is lower

---

[6]     20 U.S.C. §§ 1001–1161 (2012).

[7]     20 U.S.C. § 1087-1(b)(2)(B)(i)-(ii) (2012); 34 C.F.R. § 682.302(c)(3)(i)-(ii) (1992).

[8]     20 U.S.C. § 1087-1(b)(2)(B)(i) (2012); *see also* 34 C.F.R. § 682.302(c)(3)(i) (1992).

than the yield on a loan financed with other sources; in *lower* interest rate environments, because of the 9.5% floor, the total yield on a loan subject to the 1/2 SAP Rate is higher than the yield on a loan financed with other sources.

Until 1992, the Department's policy was that the *current* funding source of a loan determined whether a loan would be eligible for full SAP or the 1/2 SAP Rate. The Department promulgated new regulations in 1992,[9] which provided that an otherwise eligible loan was *required* to be billed at the 1/2 SAP Rate "[a]fter the loan is pledged or transferred in consideration of funds" derived from non-tax-exempt sources "if the authority retains a legal or equitable interest in the loan," until "the prior tax-exempt obligation is retired [or] defeased."[10] On March 1, 1996, the Department issued a Dear Colleague Letter (DCL) 96-L-186 (the "1996 DCL") that gave "clarification and interpretative guidance" concerning the 1992 regulation. The Department confirmed that the 1992 regulations were "a shift in the Department's policy" from prior regulations:[11]

> The Department's prior guidance stated that *the current funding source* defined the applicable special allowance provisions – if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance applied. If the loan was financed with the proceeds of a

---

[9]   34 C.F.R. § 682.302(e)(2) (1992).

[10]   The regulations define "authority" as "[a]ny private non-profit or public entity that may issue tax-exempt obligations to obtain funds to be used for the making or purchasing of FFEL loans." 34 C.F.R. § 682.200(b) (1992). Nellie Mae was the authority that issued the bonds in the 1993 Trust. Pursuant to I.R.C. § 150(d)(3) (2012), Nellie Mae made an election to transfer its assets and liabilities, including the 1993 Trust, to a new for-profit subsidiary, Nellie Mae Corp. (EIN *783), which was later acquired by Navient.

[11]   March 1, 1996 Dear Colleague Letter (DCL) 96-L-186, *Clarification and interpretive guidance on certain provisions in the Federal Family Education Loan (FFEL) Program regulations published on December 18, 1992* ("DCL 96-L-186"), item 30 (emphasis added).

6

> taxable obligation, the taxable special allowance rules applied.
>
> *In the Department's December 18, 1992 regulations, the Department changed this policy.* Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

The purpose of the 1992 change in regulations as detailed in DCL 96-L-186 was to *limit* full-SAP claims on loans acquired through tax-exempt financing that were later refinanced with another source of financing.

On August 10, 1993, the Omnibus Budget Reconciliation Act of 1993[12] ("OBRA 1993") was signed into law. As part of this law, changes were made to the SAP payments for loans made or acquired with the proceeds of tax-exempt financing originally issued on or after October 1, 1993. In November 1993, partly in response to a request by Nellie Mae, the Department issued administrative guidance concerning OBRA 1993 in the form of a Dear Colleague Letter (the "1993 DCL").[13] Page 13 of that guidance clarified that the 1/2 SAP Rate provision applied to all loans acquired in whole *or in part* with funds derived from pre- October 1, 1993 tax-exempt obligations:

> The minimum special allowance rate "floor" on new loans made or purchased, *in whole or in part*, with funds derived from tax exempt obligations has been repealed.

---

[12]    Pub. L. No. 103-66, 107 Stat. 312.

[13]    *See* Nov. 1993 Dear Colleague Letter 93-L-161.

> Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations *originally* issued on or after October 1, 1993, or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to receive the minimum special allowance. Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance.   (Emphasis added.)

With this guidance, the Department made clear its understanding that (*i*) a single loan could be financed with more than one source of funds and (*ii*) if a loan was financed *even in part* with an eligible tax-exempt source of funds, the 1/2 SAP Rate applied to that loan.

## STANDARD OF REVIEW

The Department bears the burden of providing adequate notice for its demand in order to establish its prima facie case against Navient.  *See Penn. Sch. of Bus*., U.S. Dep't of Educ., No. 15-04-SA (Oct. 27, 2015).  Navient, in turn, bears the burden of proving by a preponderance of the evidence that FSA's conclusions in the FAD were erroneous.  *See id*.; 34 C.F.R. § 668.116(d).

## ARGUMENT

### I.   NELLIE MAE WAS REQUIRED TO BILL AT 1/2 SAP UNTIL THE FINAL MATURITY OF THE 1993 BONDS.

#### A.   Nellie Mae Was Required to Claim the 1/2 SAP Rate on Any Loans Acquired *in Whole or in Part* with Tax-Exempt Funds.

As noted above (Page 7) the 1993 DCL made clear that (*i*) a single loan could be financed with more than one source of funds and (*ii*) if a loan was financed *even in part* with an eligible tax-exempt source of funds, the 1/2 SAP Rate applied to that loan. *See* 1993 DCL, at 13.  In accordance with this guidance, Navient was required to continue to bill for special allowance at the 1/2 SAP Rate through the final maturity of the 1993 Bonds, or, at a minimum, for (*i*) all loans acquired with the proceeds of Bond 1993A until its maturity on July 1, 2005, and (*ii*) all loans acquired with the proceeds of Bond 1993B through Bond 1993H until the final maturity of those bonds on July 1, 2004.  Each of the loans was financed at least *in part* with the proceeds of the other bonds with which they were pooled.  It was certainly reasonable and appropriate for Nellie Mae to rely on the very specific guidance in the 1993 DCL, and FSA's determination is inconsistent with that guidance.  *See Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996).  During a hearing before the Department of Education's Office of Hearing and Appeals, the Department "chastised" Respondents for failing to seek guidance on its compliance with a statute.  *Student Loan Mktg. Ass'n,* U.S. Dep't of Educ., No. 96-23-SL (Sept. 26, 1996).   Here, Nellie Mae actively sought and received guidance in the form of the 1993 DCL, and is now being held liable for following that DCL guidance.

1.      **The Bond Proceeds and Receipts from the 1993 Bonds Were Combined.**

The special allowance payments that are the subject of the FAD relate to loans financed by the 1993 Nellie Mae Trust ("1993 Trust"), a series of *unsecured* tax-exempt bonds issued pursuant to a master trust indenture totaling $458,095,000.  Bonds issued under the 1993 Trust included five series of bonds issued between March 1993 and November 1993, each of which refunded previously issued tax-exempt bonds.

| Series | | Issue Date | Maturity Date | Maturity Amount |
|--------|-------|------------|---------------|-----------------|
| #1 | 1993A | 3/18/1993 | 7/1/2005 | $103,300,000 |
| #2 | 1993B | 6/9/1993 | 6/1/1998 | $5,800,000 |
| | | | 6/1/2000 | $32,405,000 |
| | | | 6/1/2002 | $10,700,000 |
| #3 | 1993C | 7/1/1993 | 7/1/1998 | $26,100,000 |
| #3 | 1993D | 7/1/1993 | 7/1/1998 | $10,160,000 |
| #3 | 1993E | 7/1/1993 | 7/1/1999 | $58,340,000 |
| #3 | 1993F | 7/1/1993 | 7/1/2004 | $32,500,000 |
| #4 | 1993G | 8/24/1993 | 8/1/1998 | $31,500,000 |
| | | | 8/1/2000 | $28,100,000 |
| | | | 8/1/2002 | $47,400,000 |
| #5 | 1993H | 11/15/1993 | 12/1/1999 | $57,420,000 |
| | | | 12/1/2002 | $14,370,000 |

Significantly, the 1993 Trust was not secured by the student loans acquired with the 1993 Bonds.  Rather than relying on specific collateral, investors looked to the general corporate ratings of Nellie Mae to determine the quality of the bonds.  Because the general corporate rating afforded Nellie Mae increased flexibility in its financings, the proceeds from the various bonds (the "Bond Proceeds") were combined into a common funding pool (the "1993 Bond Pool") that was used to acquire student loans.  The loans

10

acquired under the 1993 Trust are referred to herein collectively as the "1993 Trust Loans."

Within the 1993 Bond Pool, Nellie Mae maintained two sub-pools, the first of which related to Bond 1993A ("Sub-pool 1") and the second of which related to all of the other 1993 Bonds ("Sub-pool 2").[14]  The Bond Proceeds from Bond 1993A were deposited into Sub-pool 1 and the Bond Proceeds from Bond 1993B through Bond 1993H were deposited into Sub-pool 2.  In addition, each month Nellie Mae would deposit into the respective sub-pools the principal and interest payments, guarantor payments, interest benefits and special allowance, and other income from the loans financed by the sub-pool (the "Receipts").  Specifically, Receipts on the loans financed by Bond 1993A were deposited into Sub-pool 1, and Receipts on all other loans financed by the 1993 Bonds were deposited into Sub-pool 2.  Each month, loans were acquired with all or a portion of the cash available in Sub-pool 1 and Sub-pool 2.

Given that no specific pool of loans secured a specific series of 1993 Bonds, funds held in Sub-pool 1 were fungible with all other amounts on deposit in Sub-pool 1; the same was true for Sub-pool 2.  New loans were appropriately acquired with such commingled funds on a pro rata basis.  Wheeler Aff. ¶¶ 7-9, Ex. R-02.[15]

---

[14]   Sub-pool 2 was created for administrative reasons relating to the fact that Bond 1993B (and subsequent series) were refunding (*i.e.*, refinancing) bonds that had been originally issued by an authority other than NEELMC.  No provision in the 1993 Bond indenture or related agreements required the maintenance of the two separate Sub-pools.  Remondi Aff ¶ 7 Ex. R-05.

[15]   By early 2002, as part of a post-acquisition integration of functions, the administration of the 1993 Trust had been transferred from former Nellie Mae employees to Navient employees.  For ease of trust administration, Navient began a process of administratively allocating

FSA argues in the FAD (at 18) that "the proceeds of each of the bonds comprising a 1993 bond series issue were spent to acquire a distinct cohort of loans, and each of these bonds was in fact the exclusive source of funds – a 'source bond' – for a distinct cohort of loans and no other."  FSA's conclusion is factually incorrect.  Although the Bond Proceeds and Receipts relating to the loans financed with Bond 1993A proceeds were maintained in one sub-pool, the Bond Proceeds and Receipts of Bond 1993B through Bond 1993H were commingled within another single sub-pool.  Because of the unsecured nature of the 1993 Trust and the commingling of these Bond Proceeds and Receipts, all loans financed by the 1993 Trust were made or acquired, at least *in part*, with proceeds from each of the 1993 Bond series within its sub-pool.[16]  There was no distinct cohort of loans.  Under the 1993 DCL guidance, that should be enough to justify Nellie Mae's receipt of the 1/2 SAP Rate.

---

portions of the loans in Sub-pool 2 to those series of Bond 1993B through Bond 1993H that remained outstanding at the time.  Because the loans had been acquired with Bond Proceeds and Receipts of Bond 1993B through Bond 1993H and remained commingled within Sub-pool 2 since the time of their acquisition, and because the loans were therefore funded in part with the Bond Proceeds and Receipts of Bond 1993B through Bond 1993H, the allocation could not and did not identify specific loans as having been funded by a specific bond.  Rather, loans and cash were simply allocated by principal amount such that the account created for each 1993 Bond would hold sufficient resources to meet debt service for that particular Bond.  After such allocations had been made, any new loan acquisitions for the 1993 Trust were made with amounts on deposit within the accounts created for each outstanding series of 1993 Bonds.  Because any cash within those accounts derived from the commingled Receipts of Bond 1993B through Bond 1993H, the loans purchased with such cash were also funded in part by all such 1993 Bonds.  Wheeler Aff. ¶ 11, Ex. R-02.

[16]   For example, Bond 1993B was issued on June 9, 1993.  Less than a month later, Bonds 1993C through 1993F were issued.  The proceeds of these two issuances were deposited in Sub-pool 2 and used to acquire loans within the few weeks following the issuances.  Loans were acquired from all the funds available in the sub-pool at the time they were acquired.  *See* Wheeler Aff. ¶¶ 7-9, Ex. R-02.

In addition, as soon as any Receipts were realized (including interest and special allowance paid by the government for the quarter ending June 30, 1993), those Receipts were added to Sub-pool 2. Similarly, when Bond 1993G was issued on August 24, 1993, and its Bond Proceeds were added to Sub-pool 2, those funds, along with any available Receipts and Bond Proceeds previously deposited, were used to finance more loans within the weeks following the Bond 1993G issuance. This process continued with the final issuance of Bond 1993H on November 15, 1993. *Id.* ¶ 9, Ex. R-02. As a result, throughout the existence of each sub-pool, all of the related loans were financed at least in part with the proceeds of every bond series in that pool – requiring payment of the 1/2 SAP Rate until all the bonds in the pool were retired or defeased. *See* 1993 DCL, at 13.

In the FAD (at 18), FSA further argues that "NEELMC represented that proceeds of each of its 1993 bonds would be fully invested – spent to acquire student loans – within days of its issuance . . . ." From this, FSA *infers* that "the proceeds of each of the bonds comprising a 1992 bond series issue were spent to acquire a distinct cohort of loans," and that the bonds therefore were the exclusive source of funds for that cohort. FSA's inference, however, is wrong. Along with any Bond Proceeds from a specific bond series, each sub-pool contained other funds, including Bond Proceeds from the previous issuances and the Receipts on the 1993 Trust Loans financed previously. When acquiring new loans from these proceeds, Nellie Mae, as it was entitled to do, used *all* available funds within a sub-pool to buy loans in any given month, and did not in fact attribute specific loans to specific Bond Proceeds or Receipts. The Department's own guidance in the 1993 DCL recognizes that loans can be attributed to multiple sources of

funds.  In this case, those funds included both eligible Bond Proceeds and eligible

Receipts.

FSA may argue further that the Bond Proceeds from Bond 1993B were fully

expended prior to the issuance of Bond 1993F (the latest maturing series of bonds within

Sub-pool 2), and that because they were not commingled with the Proceeds of Bond

1993F, the loans acquired from such Bond Proceeds were entitled to the 1/2 SAP Rate

only through the maturity of Bond 1993B.  Navient has no remaining records that

indicate exactly when any of the Bond Proceeds of Bond 1993B were expended, but even

if they were fully expended immediately, as loans acquired with the Bond Proceeds from

Bond 1993B were repaid and other Receipts were received, those Receipts were

deposited into Sub-pool 2.  So long as those receipts were in the pools and used to

finance other loans, the 1/2 SAP Rate still applied.  Assuming the 8.5-year average loan

repayment period that FSA has used previously, the first loans to be made in Sub-pool 2

from the proceeds of Bond 1993B would have been fully repaid by December 2001, well

before the maturity of Bond 1993B. [17]  As such repayments were received; they were

used *pro rata* with all the other available Receipts on deposit in Sub-pool 2 for the

acquisition of a "second generation" of loans.  That second generation was financed "in

part" with the Receipts of all the 1993 Bonds within Sub-pool 2, including Bond 1993F,

which matured on July 1, 2004.

Navient's administration of the 1993 Bond proceeds and Receipts in a single pool

with two sub-pools appropriately reflected the nature of this unsecured financing.

---

[17]   *See* DCL FP-07-06 (Apr. 27, 2007), Attached Methodology Description at 10.

Because of this pooling approach, Navient correctly interpreted the Department's guidance so as to require billing at the 1/2 SAP Rate through the duration of the financing.  In sum, Navient was required to continue to bill for special allowance at the 1/2 SAP Rate through the final maturity of the 1993 Bonds, or at the very least for (*i*) all loans acquired with the proceeds of Bond 1993A until its maturity on July 1, 2005, and (*ii*) all loans acquired with the proceeds of Bond 1993B through Bond 1993H until the final maturity of those bonds on July 1, 2004.  Such billing was required by the guidance that Nellie Mae and the industry received in the 1993 DCL, because each of the loans was financed at least in part with the proceeds of the other bonds with which they were pooled.  Nellie Mae's reliance on the guidance expressly set forth in the 1993 DCL was reasonable and appropriate.  *See Baytown Tech. Sch., Inc.*, U.S. Dep't of Educ., No. 91-40-SP, (Jan. 13, 1993) (noting that Dear Colleague letters may assist the tribunal in interpreting the law, policies, or procedures); *Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996) (noting that Dear Colleague letters can clarify "unfounded assumptions" or ambiguities in regulations).

### 2. The History of Department Guidance Supports Navient's Position.

The history of Department guidance regarding loans financed by more than one source supports Navient's position that Nellie Mae's billing of the loans acquired with the pooled bond proceeds and receipts was entirely appropriate and justified.  On December 18, 1992, the Department issued the 1992 Regulations, which would become effective on February 1, 1993.  Those regulations included changes in the special

allowance billing applicable to tax-exempt obligations.  Neither the Notice of Proposed Rule issued in November of 1990 nor the Final Rule issued on December 18, 1992, however, included any commentary or other discussion regarding the change in special allowance calculations.  Furthermore, the newly published regulations contained provisions that conflicted with provisions of the 1992 Reauthorization of the Higher Education Act, enacted in July 1992.  Because of these conflicts and calls from the higher education and student lending communities for clarification, then-Secretary of Education Riley wrote a letter to Senator Kennedy and Senator Pell that stated that the Department would delay the enforcement of the regulations until the Department issued clarifying guidance (which eventually arrived in the form of the 1996 DCL).  Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 ("Ryan-Macie Aff.") ¶¶ 13-16, Ex. R-03.

On August 10, 1993, after Nellie Mae had issued three of the five series of 1993 Bonds, OBRA 1993 was enacted.  OBRA 1993 repealed the 1/2 SAP Rate for loans made or purchased with funds obtained from the issuance of obligations originally issued on or after October 1, 1993.[18]  Given that the Department had not yet provided guidance to the student lending community on the intent of the changes around special allowance billing for tax-exempt bonds in the 1992 Regulations and OBRA 1993, Nellie Mae contacted the Department.   Nellie Mae requested that the Department provide guidance on the special allowance billing requirements for loans made or acquired with pooled proceeds, such as

---

[18]   The changes made by OBRA 1993 did not impact Nellie Mae or the 1993 Trust, because (*i*) Nellie Mae did not have any loans financed with tax-exempt bonds originally issued on or after October 1, 1993, and (*ii*) all of the bonds included in the 1993 Trust were refunding bonds (*i.e.*, bonds that refunded bonds originally issued prior to October 1, 1993).

16

those in the 1993 Trust.  Nellie Mae's continued efforts to seek guidance and obtain clarification from the Department is entirely consistent with the conduct the Department has suggested it expects from the industry if there are questions or ambiguities related to applicable regulations. *See  Iowa Student Loan Liquidity Corp.*, U.S. Dep't of Educ., No. 200621025013 (Jan. 11 2008) (noting failure of entity to obtain clarification or further guidance and noting that it is "incumbent upon [the entity potentially subject to the regulations] to obtain clarification" regarding the interpretation of a statute's meaning). To address Nellie Mae's questions, the Department revised the draft of the 1993 DCL to include in the final version the phrase "in whole or in part," clarifying that the 1/2 SAP Rate provision applied to loans where *all* of the funds, *or* only *a portion* of the funds, used to acquire the loans were derived from tax-exempt obligations.  Ryan-Macie Aff. ¶¶ 29-30, Ex. R-03; *see also* Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 (noting that he recalled Nellie Mae's "numerous requests for guidance to ensure accurate billing") ("Evans Ltr.," Ex. R-04)*.*  The 1993 DCL was integral to Nellie Mae's special allowance billing policy for the 1993 Bonds.  *See* Ryan-Macie Aff. ¶¶ 29-30, Ex. R-03; Affidavit of John (Jack) Remondi dated August 21, 2014 ("Remondi Aff.") ¶¶ 4-6, Ex. R-05.

There can be no question that the Department fully understood that this application of the 1/2 SAP Rate policy would result in broadened application of the 9.5% minimum yield during low interest rate environments.  In response to Secretary Riley's letter requesting from industry participants a list of issues and concerns arising from the

recent statutory and regulatory changes, in February 1993, the National Council of
Higher Education Resources[19] ("NCHER") provided a written list of issues and
comments to the Department.  This list raised the question of whether the 1992
Regulations' expansion of the 1/2 SAP provision (34 C.F.R. § 682.302(e)) was in fact an
error.  *See* Ryan-Macie Aff. ¶ 17 and Ex. 2(ii) thereto, Ex. R-03.  The Department
produced a written list of responses to the NCHER Comments, which it provided at a
meeting with industry participants in March 1993 and characterized as "unofficial
comments."  *See* Ryan-Macie Aff. ¶ 19 and Ex. 3 thereto at p.16, Ex. R-03.  The
Department's written response regarding NCHER's comment on Section 682.302(e)(2)
confirmed that the provision was not an error and reflected the Department's position on
the matter.

Despite the Department's written response, at the March 1993 meeting, industry
participants continued to press the case that the changes promulgated in 34 C.F.R. §
682.302(e) could result in a large government liability to lenders if the then-current low
interest rate environment continued and the higher 9.5% minimum rate was therefore
triggered for all 1/2 SAP Rate loans.  The Department representatives responded that they
were aware of that potential and acknowledged it as a known risk. *See* Ryan-Macie Aff.
¶¶ 19-22, Ex. 03.

---

[19]   NCHER is an organization that represents education loan guarantors, secondary markets,
nonprofit lenders and authorities, commercial lenders and loan servicers.

Then, in 1993, provisions of OBRA 1993 removed the 1/2 SAP Rate with respect to loans funded by bonds issued on or after October 1, 1993.[20]  But for loans funded by pre-October 1, 1993 bonds (including the 1993 Bonds), the 1992 regulations remained in effect.  At the time the 1993 DCL was published in November 1993, the rate on Treasury Bills (the index historically used to calculate SAP payments) was approximately 3.10%, and when the margin was added (generally 3.10% to 3.5%), loans subject to the 1/2 SAP Rate would have received the 9.5% minimum yield.  *See* NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates (Ex. R-06).  Thus, even though the immediate ramifications of the Department's interpretation in the 1992 Regulations and the 1993 DCL, specifically the "*in whole or in part*" language, were clear, the Department did not change its policy of applying the 1/2 SAP Rate as broadly as possible.

In evaluating the FSA's FAD, the Department must consider the plain and unambiguous language of its own guidance, including its reference to the term "in part" and the context in which that reference was made.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98–99 (2003) (a basic tenant of statutory interpretation is that the language of a statute should be given its ordinary or plain meaning).  By including this reference in response to Nellie Mae's request for guidance concerning unsecured tax-exempt financing pools, the Department acknowledged that it was possible for a loan to be financed with more than one source of financing.  In fact, if it were not possible to have a

---

[20]   *See* U.S. Gov't Accountability Office, GAO-04-1070, Federal Family Education Loan Program: Statutory and Regulatory Changes Could Avert Billions in Unnecessary Federal Subsidy Payments at 5 (2004), http://www.gao.gov/products/GAO-04-1070.

loan financed with more than one source of financing, the phrase "in whole or in part" would have no meaning. Therefore, the Department's interpretation of "in whole or in part" constructively renders that language meaningless and should be rejected. *See Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996) (rejecting interpretation that "constructively renders the regulation meaningless"). In addition, the term "in whole or in part" has appeared in subsequent guidance from the Department relating to OBRA 1993, including for example the December 1993 Dear Colleague Letter (DCL) 93-L-163. Surely the Department would not have continued using the phrase if it had no significance. *See Johnson v. Stolc*, 2012 U.S. Dist. LEXIS 119296, at *25–*26 (C.D. Cal. June 28, 2012) (finding that "in whole or in part" has a "well-defined meaning," that is "some or all."); *Empire Tech. Sch.*, U.S. Dep't of Educ., No. 91-53-SP (Dec. 13, 1993) (citing to the statutory interpretation tenet to avoid rendering language superfluous); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife* 551 U.S. 644, 669 (2007) ("[W]e have cautioned against reading a text in a way that makes part of it redundant").

Given the Department's own past use of the phrase "in whole or in part," the Department must take exception to FSA's statement in the FAD that "[w]hether or not NEELMC and its successors kept *adequate* records to tie the cohorts of loans acquired with the original proceeds of a 1993 Bond to particular loans held in 2002 and 2004 is irrelevant." (FAD at 18, emphasis added.) Nellie Mae was not required by any Department regulation or guidance to tie loans to particular bonds or bond series. Rather, it was required to identify loans that were made or acquired in whole *or in part* with

20

proceeds of a qualifying tax-exempt financing.  Nellie Mae did do this.  Because of the

unsecured nature of the 1993 financing and Nellie Mae's accompanying method of

pooling the 1993 Bond proceeds and Receipts, Nellie Mae *was* then required to bill for

special allowance at the 1/2 SAP Rate through the duration of the 1993 financing until

July 1, 2005, or at the very least, for (*i*) the 1993A Bond through its final maturity on July

1, 2005, and (*ii*) the 1993B through 1993H Bonds at least through the final maturity of

those bonds on July 1, 2004.

In the final analysis, FSA's failure to consider the reference in the 1993 DCL to

"in whole or in part" demonstrates that it has conveniently decided after the fact to ignore

this guidance and implement an alternative interpretation of the special allowance billing

requirements based on changes in interest rate environments.  If interest rates during the

period in question had been elevated rather than at historical lows, FSA doubtless would

have seized upon the "in whole or in part" language in the 1993 DCL and insisted that all

loans financed by the 1993 Trust remained subject to the 1/2 SAP Rate restrictions until

all bonds within the financing pool created by the 1993 Trust had matured.  FSA's

position to the contrary, in light of historically low interest rates that prevailed during the

relevant period, is in direct conflict with the Department's 1993 guidance.  This is a

blatant attempt to retroactively apply a new interpretation that runs contrary to the plain

language of the Department's own guidance (upon which Nellie Mae and the industry

appropriately relied) and should therefore be rejected.  *Landgraf v. USI Film Prods.*, 511

U.S. 244, 280 (1994) (a provision operates retroactively when it "impair[s] rights a party

possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed"); *Travel Univ. Int'l* U.S. Dep't of Educ., No. 94-99-SP (Feb. 3, 1995) (holding that, when ED policies create "confusion," Respondents who seek assistance to correctly apply the policy "should not be punished retroactively for failing to correctly anticipate the standards later promulgated by ED").

    **B.**    **Nellie Mae Properly Billed at 1/2 SAP Based on Reasonable Interpretation of Applicable Law, Regulations and Department Guidance.**

Wholly apart from the Department's 1993 DCL guidance, Nellie Mae correctly treated its 1993 tax-exempt financing as a single "obligation" for the purpose of special allowance billing.  Because the 1993 Trust was a single obligation, the Higher Education Act of 1965 ("HEA"), as amended, and the Department's regulations and guidance *required* Nellie Mae to claim special allowance at the 1/2 SAP Rate as long as any bond within its 1993 tax-exempt financing remained outstanding.  The Department's contrary reading of the HEA would have permitted Nellie Mae and any other institution to defeat the original purpose of the 1/2 SAP Rate – which was to *limit* the level of SAP that could be obtained based on tax-exempt financings – by retiring a single bond within the 1993 Trust and claiming full SAP on all of the associated loans even though other 1993 Bonds financing the loans remained outstanding.

The 1993 Bonds shared common characteristics that rendered them a single "obligation" for purposes of the HEA and the Department's implementing regulations. All of the 1993 Bonds were governed by the terms of the same 1993 Trust Agreement,

issued in the same calendar year, and payable from the same sources of funds.  Moreover,

the rights of each bondholder were identical to the rights of all other bondholders

regardless of whether they held a 1993A bond or a 1993H bond.  Per the terms of the

1993 Trust Agreement (Ex. R-07), each bond was treated collectively and on a parity

basis with the other bonds in terms of bondholders' right to payments, default provisions,

and remedies.

In particular:

- Right to Payment.  Article IV of the 1993 Trust Agreement provided that, on each date on which payment on any of the 1993 Bonds was due, the Corporation paid to the Trustee, and the Trustee paid to the bondholders, the requisite amount of interest on or principal of the bond.  The Trust Agreement gave no preference to any bondholder of any separate bond or series of bonds.  Ex. R-07 at 12-13.

- Events of Default.  Article VIII of the Agreement stated that the failure to make a timely payment on any of the 1993 Bonds was an Event of Default for all of the 1993 Bonds, accelerating the principal payment requirement on all of the 1993 Bonds.  *Id.* at 18-20.

- Payment on Default.  Article VIII of the Agreement provided for the distribution of funds received from the Corporation to remedy an Event of Default, or following a judgment from a suit filed by the Trustee.  Such funds were to be shared on a parity basis across all of the 1993 Bonds, based on the amount of interest, principal and redemption premium owed.  *Id.* at 21.

- Enforcement of Agreement.  Article VIII of the Agreement provided that bondholders of two-thirds of the aggregate principal amount of all 1993 Bonds needed to consent to a suit to enforce the Agreement; the bondholders of a single bond, or even of bonds within a single series, could not compel such an action.  *Id.* at 22.

- Amendments.  Section 7.2 of the Agreement required the written consent of the holders of two-thirds of the aggregate principal amount of all 1993 Bonds to modify or amend the rights or obligations of the Corporation or bondholders.  Potentially, even if all holders of a single bond, or of bonds

within a single series, objected to a modification of their rights, the remaining bondholders could consent to the modification and impose it upon them. *Id.* at 17.

Critically, unlike the typical structure of a student-loan bond financing at that time, loans purchased with the proceeds of the 1993 Bonds were not pledged as collateral in support of repayment of that bond or series.[21]  Rather, the Agreement made all unencumbered loans of the Corporation, along with its general assets and credit, the source of repayment for all of the 1993 Bonds. *Id.* at 13.   Given that all bondholders of the 1993 Bonds shared the same rights and remedies against the same sources of funds, and that a default on any one 1993 Bond constituted a default on all 1993 Bonds, the 1993 Bonds constituted a single financing of Nellie Mae for purposes of the HEA's 1/2 SAP Rate.  The provisions of the Trust under which every series of the bonds were issued made them so interrelated that they constituted a single financial or economic obligation. Nellie Mae, therefore, appropriately treated that single obligation as maturing when all of the 1993 Bonds had matured.

---

[21]    Student loan taxable and tax-exempt bond structures issued by authorities were generally secured financings, meaning that investors had a right (with priority over other creditors) to foreclose upon specific pools of student loans and other assets in the event an issuer defaulted on its bonds.  Nellie Mae was the first (and, it believes, only) nonprofit tax-exempt student loan issuer to secure general corporate ratings that allowed it to issue bonds on an unsecured basis. *See* Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) at 16 (Ex. R-08).  Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool, because Nellie Mae was not required to identify specific loan pools as collateral for those bonds, to make covenants with respect to those loan pools, or to track loan performance according to the specific requirements of the lenders or bondholders.  The unsecured financing was therefore much less administratively burdensome for Nellie Mae.  The 1993 Trust was the only tax-exempt financing issued by Nellie Mae on an unsecured basis.

Nellie Mae's approach was fully consistent with the Department's prior statements concerning the meaning of the word "obligation."  In 1985, the Department defined "obligation" to mean "debt."  34 C.F.R. § 682.801 (1985).  Moreover, 2006 Department guidance used the term "bond," instead of the statutory and regulatory term "obligation," to describe "the instrument used to borrow funds"; noted that lenders could use "notes or other instruments to raise funds"; and stated that references to "bond" in the guidance included "any other form of borrowing."  FP-06-15, Attachment at 1 n.1.  In the case of the 1993 tax-exempt financing, "the instrument used to borrow funds" was the 1993 Trust Agreement; all of the 1993 Bonds were issued pursuant to that Agreement and its supplemental indentures.[22]  Even within the FAD, FSA references "bonds," "issues," and "series" in a sometimes interchangeable, unclear, and undefined manner, while also creating entirely new concepts – such as a "source bond."  *See generally Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126–27 (2016) (where the agency did not "explain why it deemed it necessary to overrule its previous position" – on which the industry had relied for years – the rule was arbitrary and capricious;  when changing its positions, an agency must be "cognizant that longstanding policies may have 'engendered

---

[22]   The Department's use in 2006 of the term bond "for convenience" was hardly a definitive statement that an "obligation" is always a single "bond" for 1/2 SAP Rate purposes, especially given that the guidance addressed secured student loan bonds and not unsecured serial financings like the 1993 tax-exempt financing.  *See* DCL FP-06-15, Attachment at 1 n.1.  Neither was the use of the term "bond" definitive when it appeared in guidance regarding an audit process that expressly disclaimed any intent "to examine whether the eligibility of a loan for 9.5 percent SAP has lapsed."  *See* DCL FP-07-06 (Apr. 27, 2007), Attached Methodology Description at 3.

serious reliance interests that must be taken into account'" and that a "reasoned explanation is needed for disregarding" those interests.)

Additionally, unlike FSA's approach in the FAD, Nellie Mae's approach fully comported with the original intent of the HEA's 1/2 SAP provisions.  These provisions, which Congress enacted in 1980 when interest rates were high, were intended to maximize the loans that were subject to 1/2 SAP.[23]  Similarly, the Department's 1992 regulations required 1/2 SAP to continue to be claimed on loans even after they were transferred from a tax-exempt obligation to a taxable obligation, so long as the tax-exempt obligation remained outstanding and the Authority maintained ownership of the loan.[24]  This regulation, which was put in place amid expectations of rising interest rates, was designed to prevent lenders from receiving a windfall by moving loans from tax-exempt obligations to taxable obligations to obtain the associated regular SAP.[25]

When these provisions were enacted, Congress and the Department would have looked with great skepticism at any effort by a lender to ignore the economic and structural realities of a serial unsecured financing, and instead to obtain full SAP on loans associated with a portion of that financing simply because any particular bond within the financing had matured.  The fact that the interest-rate environment reversed in the years following the 1992 regulation does not alter the original intent to subject any loans that

---

[23]   *See* Guaranteed Student Loan Program, 50 Fed. Reg. 5506 (Feb. 8, 1985) (to be codified at 34 C.F.R. pt. 682) ("The rule implements the Congressional intention . . . to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders.").

[24]   34 C.F.R. § 682.302(e)(2); DCL 96-L-186, item 30.

[25]   *See supra* n. 20.

were originally financed by an outstanding tax-exempt obligation to 1/2 SAP, and thereby to maximize the number of loans subject to the 1/2 SAP provision.

## II.     NELLIE MAE APPROPRIATELY CLAIMED THE 1/2 SAP RATE ON LOANS THAT WERE TRANSFERRED TO ECFC BY NMELC

The FAD argues (Ex. 01 at 22) that Nellie Mae was not permitted to claim special allowance at the 1/2 SAP Rate for certain loans after they were transferred to ECFC (EIN *392) by NMELC (EIN *352) in July and August 2004.  (These loans are referred to herein as the "ECFC Loans.")  FSA's finding and estimate of liability for this finding are flawed for both factual and policy reasons.  FSA based its conclusion on its interpretation of Nellie Mae's corporate structure shortly after its acquisition by Navient, instead of appropriately examining Nellie Mae's corporate structure on the date of the loan transfer to ECFC – a clear error that requires FSA's conclusion to be overturned.  Further, rather than using easily ascertainable information in its own records to determine the actual amount of special allowance paid to Navient for the ECFC loans in question to calculate the amount of alleged overpayment, OIG used estimates to reach an overstated liability for this finding, which FSA then erroneously accepted.  Finally, FSA's finding directly contradicts the original intent of the 1/2 SAP Rate provisions and the 1992 Regulations, which were promulgated to limit SAP payments on loans previously financed with tax-exempt sources of financing that, for a period of time, would benefit from a lower cost of funds.

### A.   FSA Is Wrong on the Facts of the ECFC/Nellie Mae Ownership Structure.

In the FAD, FSA erroneously argues that after the transfer of the ECFC Loans from NMELC to ECFC, ECFC was not permitted to bill at the 1/2 SAP Rate on the ECFC Loans because ECFC was a distant affiliate of NMELC that did not experience the tax-exempt cost of funds that accompanies 1/2 SAP Rate loans.  While the history of the Nellie Mae companies was somewhat complex, the corporate structure *at the time the loans at issue were transferred* to ECFC was simple and should be determinative.[26] ECFC was not in fact a distant affiliate of NMELC; it was the direct second-level parent of NMELC.  Because of this corporate structure, ECFC did in fact enjoy the tax-exempt cost of funds while 1993 Bonds were outstanding, because both NMELC and its direct parent Nellie Mae Holdings were single member LLCs, which were disregarded as separate entities from ECFC for tax purposes.

FSA relied on an erroneous understanding of the corporate relationship between ECFC and NMELC.  It would be arbitrary, capricious and manifestly unfair to impose liability on Navient based on FSA's erroneous misunderstanding.  *See Defenders of Wildlife*, 551 U.S. at 658 (holding that an agency's decision is arbitrary when, *inter alia*, it "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency.")

In the FAD, FSA makes much of the notion that because ECFC sat on the non-government sponsored enterprise ("GSE") side of Navient's corporate organization chart

---

[26]   The correct history of the ownership of the Nellie Mae companies is set forth at pages 30-31.

and was not an obligor on Bond 1993F, it did not experience the tax-exempt cost of funds

for ECFC Loans.  FAD at 22.  As ostensible support for this assertion, the FAD cites the

corporate separation imposed by the Office of Sallie Mae Oversight ("OSMO"), which

required GSE assets and liabilities to be maintained separately from the non-GSE assets

and liabilities.  While this was true at the time of the Nellie Mae acquisition in 1999, that

fact is irrelevant because by the time the ECFC Loans were transferred to ECFC in 2004,

the corporate structure had changed so that ECFC was the sole member of Nellie Mae

Holdings and Nellie Mae Holdings was the sole member of NMELC, the obligor on the

1993 Bonds.[27]  Because Nellie Mae Holdings and NMELC had previously been

converted into single member limited liability companies, they were disregarded as

separate entities from ECFC, their owner, for U.S. federal income tax purposes. 26

C.F.R. § 301.7701-2(c)(2).  Accordingly, any sale or transfer of assets between the two is

disregarded for U.S. federal income tax purposes.  *See* Heleen Aff. ¶¶ 5-6, Ex. R-09.

Even if Nellie Mae Holdings and NMELC had not been single member limited liability

companies, however, ECFC would still have benefited from the tax-exempt rate through

the corporate structure that existed in 2004 – the only relevant time.  Additionally, in

accordance with generally accepted accounting principles, the parent company, SLM

Corporation, consolidated both ECFC and NMELC for financial reporting purposes.

Consol., Accounting Stand. Codification 810-10-25-1 (Fin. Accounting Stand. Bd.

---

[27]   The wind-down of the SLMA, the GSE, took place at the end of 2004.  In June, 2004, in preparation for this wind-down and ultimately the dissolution of SLMA, SLMA's subsidiaries, including *inter alia* Nellie Mae Holdings LLC and Nellie Mae Education Loan LLC, were transferred to ECFC. Heleen Aff. ¶ 5, Ex. R- 09.

2016).  These accounting principles reflect the fact that the various entities, though they may be legally distinct, are not financially or economically distinct for 1/2 SAP Rate purposes.  Treating the transfer of loans to ECFC any differently reflects a flawed understanding of Navient's corporate structure.  Therefore, contrary to FSA's assertion, ECFC did in fact experience the tax-exempt cost of funds for the ECFC Loans, as the benefits of the 1993 Bonds were rolled directly up to ECFC.

**Corporate Structure Shortly After Navient Acquisition of Nellie Mae (Aug. 1999)**





**Corporate Structure at Time of
Loan Transfers from
NMELC to ECFC
As of June 30, 2004**

**B.     FSA's Conclusion on the ECFC Loans Directly Contradicts the Intent
        of the 1992 Regulations.**

FSA argues that because the ECFC Loans were transferred to an entity that was

not the original bond-issuing Authority, the 1/2 SAP Rate no longer applies.  In making

31

this argument, FSA has again ignored the history of the Nellie Mae companies, and has inconsistently applied a newly minted standard for determining whether a transferee entity is entitled to the 1/2 SAP Rate on its transferred loans.

In the FAD (at 20), FSA concedes that when NEELMC first transferred the ECFC Loans (along with all its other loans) to Nellie Mae Holdings and NMELC as part of its conversion, these entities were eligible to continue to claim SAP for those loans on the same basis that NEELMC, the Authority, would have been eligible to do. In its analysis, FSA reasons that because Nellie Mae Holdings, NMELC and NMLF were "successors" to the Authority within the meaning of I.R.C. § 150(d)(3),[28] their loans should be subject to the same SAP treatment to which the loans of the Authority were subject. Although nothing in the statute or regulations addresses a situation in which 1/2 SAP Rate loans are held by a successor to an Authority, FSA determined that, because the successors were created as part of a corporate reorganization sanctioned under IRC §150(d)(3), they are entitled to step into the shoes of the Authority for the purpose of SAP claims.

Rather than extend this fair and logical reasoning to the subsequent transfer of loans to ECFC, FSA manufactured a new requirement that ECFC be a "successor" of NEELMC as defined in I.R.C .§150(d)(3) – a requirement with no basis in law, rule,

---

[28]   In fact, only Nellie Mae Holdings was the "successor" as defined in I.R.C. § 150(d)(3), which contains a multipronged test for a successful election under the section. I.R.C. § 150(d)(3) does not address transactions occurring after the initial transfers from the qualified scholarship funding corporation to the "successor" transferee. Like Nellie Mae Holdings, most if not all "successors" of qualified scholarship funding corporations to date have made an election to convert their status under I.R.C. § 150(d)(3) have made further transfers of their assets and liabilities after the initial conversion transaction for various tax and financing-related reasons.

regulation or audit practices, and a requirement that none of NMELC, NMLF or any other company other than Nellie Mae Holdings could ever meet under I.R.C. §150(d)(3). FSA determined that this one transferee entity, ECFC, unlike the other members of the Nellie Mae organizational structure (*i.e.*, Nellie Mae Holdings, NMELC or NMLF), would not be eligible to claim SAP on the same basis as the original Authority, NEELMC.

This distinction by FSA between the transfer of loans to subsidiaries such as Nellie Mae Corp, NMELC and Nellie Mae Loan Finance, LLC on the one hand, and ECFC on the other, is arbitrary, punitive and designed to justify a conclusion rather than grapple with the facts under preexisting requirements – especially the changes promulgated in the 1992 Regulations. Nellie Mae's continued billing of the 1/2 SAP Rate on the ECFC Loans after their transfer from NMELC to its affiliate ECFC was entirely consistent with Congress' and the Department's original objective to maximize the loans subject to the 1/2 SAP Rate and limit loans subject to full SAP.  By contrast, FSA's position – that a lender could avoid the restrictions of 1/2 SAP simply by transferring a loan to a subsidiary – is both opportunistic and inconsistent with Departmental regulations.  FSA's position that a lender could transfer loans to an affiliated entity to avoid the 1/2 SAP Rate restrictions cannot be reconciled with the 1992 regulatory change promulgated by the Department.

The FAD provides no support or previously-published Departmental guidance for the view that a lender could evade the restrictions on full-SAP claims put in place by Congress and the Department merely by transferring 1/2 SAP Rate loans to an affiliate.

Indeed, if interest rates had been significantly higher following the loan transfer from NMELC to ECFC, FSA undoubtedly would not being taking this position (or any other of the positions outlined in the FAD) today.  And if Nellie Mae had ceased 1/2 SAP Rate billings on transferred loans in a high-interest-rate environment, FSA likely would have subjected Nellie Mae to administrative action.  The Department should reject FSA's attempt to base an administrative action on the effect of movements in interest rates, rather than clear regulatory interpretation or guidance.

**C.      FSA Overstated the Alleged Liability for the ECFC Loans.**

In the FAD (at 24), FSA stated that it found the alleged overpayment (of special allowance) amount of $22.3 million to be a reasonable estimate, but stated that Navient would have the right to contest that determination.  Of the $22.3 million, OIG ascribed $12.3 million in alleged overpayment to its finding relating to the transfer of the ECFC Loans (FAR at 11).  Without conceding its position that Navient correctly billed for special allowance on the ECFC loans during the period in question, using information readily available to both it and FSA, Navient has determined that, using the actual payment amounts less the amount that would have been payable on the ECFC Loans at the full-SAP rate, the alleged overpayment would be $11.1 million.  *See* Wheeler Aff. ¶ 14, Ex. R-02.

III.   **FSA'S DETERMINATION THAT NAVIENT IS LIABLE FOR PRE-JUNE 1, 2002 1/2 SAP RATES AND MUST DISCLOSE OTHER ALLEGED OVERBILLINGS IS INCORRECT**

FSA's final audit determination goes significantly beyond the findings and recommendations of OIG's FAR, and therefore has no basis in the FAR.[29]  *Phillips Colls., Inc.*, U.S. Dep't of Educ., No. 92-64-SA (July 13, 1995). (holding that, "[a]ny dispute regarding excess funds outside the scope of the OIG's audit and the record in this case is clearly beyond [the Agency's] means to impose a liability in this proceeding"); *S.F. Coll. of Mortuary Sci.*, U.S. Dep't of Educ., No. 92-8-ST (Dec. 31, 1992) (where Department's notice of fines related to only four audits over three years, the court limited its consideration of fines to only those four audits).

A.   **FSA's Determination that Navient Is Liable for Pre-June 1, 2002 1/2 SAP Rate Claims is Both Unsupported by Any Factual Finding and Incorrect.**

Navient disputes FSA's determination that it can be held liable for repayment of 1/2 SAP Rate payments received on loans funded by the 1993B, 1993G and 1993H bond series, with respect to periods prior to the respective 2002 bond maturities within those

---

[29]   Although OIG states (FAR, at 29) that its finding "does not address Student Loan Marketing Association's ("SLMA") treatment of the interim maturities and their impact on its 9.5 percent floor billings," clearly OIG was aware of the earlier maturity dates within the 1993 Trust.  Furthermore, during the course of the audit, OIG requested and was provided with substantial documentation and information regarding the billing practices relating to interim maturities within the tax-exempt financings of Navient's various subsidiaries.  Navient gave OIG specific examples at other Navient subsidiaries where multiple tranches and maturity dates existed within a series of bonds and the 1/2 SAP rate was claimed for all loans financed by the series through the final maturity date in that series.  *See* Navient Response to OIG Questions dated December 14, 2007 (Ex. R-10 hereto).  OIG did not raise any concerns or issue any findings regarding this practice.  Instead, OIG's concerns were specific to the unique unsecured structure of the 1993 Trust, where funds were commingled across series.

series.  FAD at 23.  OIG's audit findings were explicitly limited to 1/2 SAP Rate claims made for periods on or after June 1, 2002.  FAR at 8, 12-15.  Moreover, FSA's own factual findings in the FAD are explicitly limited to 1/2 SAP "received *from June 1, 2002* on all loans associated with" these respective bond series.  FAD at 12 (emphasis added). Therefore, neither OIG's findings nor FSA's findings support any final audit determination of liability with respect to pre-June 1, 2002 claims for billing at the 1/2 SAP Rate.

> **B.      FSA's Determination that Navient Must Disclose Any Other Similar Alleged Overbillings Has No Factual Support.**

Navient disputes the FAD's determination that Navient must disclose any other instances at its subsidiaries in which loans were claimed at the 9.5 percent rate after the eligible tax-exempt bond from which their eligibility derived was retired, and adjust prior billing accordingly.  The structure of Nellie Mae's 1993 tax-exempt financing was unique for both Navient (*i.e.*, no other Navient tax-exempt financing was unsecured by student loans) and for student loan tax-exempt financing in general (*i.e.*, we believe the 1993 Trust to be the only tax-exempt unsecured student loan financing in the industry), and neither OIG nor FSA has provided any evidence of similar alleged overbillings by any other Navient entity.

In the FAD, FSA chose to expand OIG's finding to require Navient to disclose not only instances of billing at the 1/2 SAP Rate after the maturity of the relevant bond issue, but also any instances of billing after the maturity of any individual bond.  This finding clearly exceeds the parameters of the OIG audit, is not based on any evidence

identified by OIG in the audit, and should therefore be rejected.  If the Department

disagrees, the finding should nevertheless be dismissed because Navient disclosed to the

Department during the negotiations leading to this Appeal that it had not identified any

instances (other than the 1993 Trust) at any of its subsidiaries "of loans on which special

allowance was received at the 9.5 percent minimum return rate after the eligible tax-

exempt bond from which their eligibility derived was retired and the loans transferred in

consideration of funds derived from an ineligible funding source."  FAD at 23.  As

disclosed to OIG on multiple occasions during the course of the audit, except for the

unique instance of the unsecured 1993 Trust, Navient billed at the 1/2 SAP Rate through

the final maturity of each bond issue.  In each case, the loans in each bond issue were

pooled together and were financed at least in part with the proceeds of the bond that

matured last within the issue.  Wheeler Aff. ¶¶ 11-12 & Ex. 1 thereto, Ex. R-02.  This

methodology for SAP billing comported entirely with regulatory policy in the 1992

Amendments and with the Department's own guidance delivered in the 1993 DCL.

Therefore, Navient has made the required disclosure and met its obligations with respect

to this finding.

## IV.   FSA'S TREATMENT OF NAVIENT IS NOTABLY INCONSISTENT WITH ITS TREATMENT OF OTHER INDUSTRY PARTICIPANTS

Navient consistently applied a conservative approach with respect to special

allowance billing, electing not to exploit the 1/2 SAP Rate "loopholes" created by the

1992 regulatory change. [30] While other lenders substantially grew their portfolio of loans subject to the 1/2 SAP Rate (by as much as 800%) in order to increase the number of their loans eligible to receive the 9.5% floor, Navient reduced its portfolio of loans eligible for the 9.5% floor rate, and in 2006, Navient voluntarily ceased all 1/2 SAP Rate billing to which it was statutorily entitled.

For decades, Congress, the Department and lenders all have acknowledged the uncertainties surrounding the special allowance provisions for tax-exempt debt.[31]  Given these uncertainties, the Department has consistently rejected prior OIG recommendations to institute proceedings based on differing interpretations of those provisions.  Now, FSA seeks punitive action against Navient in clear contrast to its history of non-enforcement against Navient's competitors.

In 2006, because of the wide ranging practices of tax-exempt debt issuers with respect to the 1/2 SAP Rate provisions, the Department announced in a Dear Colleague

---

[30]  Furthermore, neither Nellie Mae nor Navient took advantage of its ability under the 1993 DCL and the 1996 DCL to refinance other parts of its loan portfolios with its tax-exempt debt, which would have maximized the yield on its loan portfolios in an interest rate environment where the 9.5% minimum yield exceeded what it was receiving when it billed at the Full-SAP Rate.  At the same time, Navient's competitors were doing exactly the opposite.  In a 2004 study, The Institute for College Access and Success, Inc. ("TICAS") analyzed the volume of loans billing at the 9.5% minimum yield by the top fifteen lenders on both January 1, 2003 and January 1, 2004.  TICAS found that several lenders more than doubled their 9.5% yield portfolios during that time, with two lenders growing their 9.5% yield portfolios by 626% and 818% respectively.  During the same period, the study reported that Navient's 9.5% yield portfolio had declined by 18%.

[31]  During a U.S. House of Representatives hearing following the Nelnet settlement, former Department of Education Secretary Spellings acknowledged that industry disputes relating to the 1/2 SAP Provision "involved novel and complex questions of law" and that "no court has rendered any decision interpretation this specific statutory provision or regulation." *Accountability for the Department of Education's Oversight of Student Loans and the Reading First Program: Hearing Before the H. Comm. on Education and Labor*, 110th Cong. 110–32 (2007).

Letter that it would forego enforcement action with respect to the entities' prior 1/2 SAP Rate billing practices if those entities would adopt the Department's new standard policy on a prospective basis.  The Department outlined the new standards for special allowance billing at the 1/2 SAP Rate and announced that it would only pay special allowance at the 1/2 SAP Rate to lenders that undertook certain independent audit procedures.[32]  FSA's determinations seek to apply retroactively a new interpretation of the 1/2 SAP Rate provisions to bonds issued over 20 years that were fully repaid and retired in 2005.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) (holding that statutory grants of rulemaking authority will not be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by express terms).

In response to the Department's January 2007 DCL offer to the industry, Navient informed the Department in February 2007 that it would voluntarily cease all prospective billing for special allowance at the 1/2 SAP Rate, obviating the need for a time-consuming and expensive audit under the Department's new policy.[33]  On September 11,

---

[32]   These audit procedures were published by OIG completely outside the federal rule-making process and contained entirely new interpretations of the laws and regulations governing 1/2 SAP Rate billing – laws and regulations that had been passed and promulgated 27 and 22 years earlier, respectively.  One such interpretation included in the Audit Guide was a new provision stating that the only loans entitled to receive special allowance at the 1/2 SAP Rate were loans that were the "first generation" or "second generation" of the bond issue.  The Audit Guide defined the terms "first generation" and "second generation" and described their application in the audit process.  These interpretations and requirements had absolutely no basis in the existing special allowance laws and regulations and have served to deny lenders special allowance to which they are statutorily entitled.  The Department overstepped its administrative authority in the Audit Guide to fashion a remedy for what the Department by that time viewed as a weakness or loophole in its regulations.

[33]   Letter dated February 15, 2007 to Theresa Shaw, U.S. Department of Education, from Robert S. Lavet, General Counsel, Sallie Mae (Ex. R-11).

2007, however, in direct contravention of its own pronouncement in the January 2007 DCL that it would forgo enforcement actions relating to prior SAP billing practices, the Department informed Navient by letter from the Department's Office of Inspector General, that it would undertake an audit of its special allowance billing practices with respect to the minimum yield provision of the 1/2 SAP Rate provision.   By undertaking this audit, the Department has breached the promise it made in the January 2007 DCL, a promise that Navient reasonably relied on in its decision to forgo any further SAP billing at the 1/2 SAP Rate.

## **CONCLUSION**

In sum, Navient demonstrated throughout the OIG audit and FSA review that it practiced special allowance billing and applied the 1/2 SAP Rate in a conservative manner, according to reasonable interpretations of the Department's limited guidance, and always in keeping with the original intent of the applicable law and regulations. Despite these facts, FSA is attempting to create new regulatory policy and standards at Navient's expense, is treating Navient differently than other lenders, and is taking action counter to its own pronouncements in the January 2007 DCL.

Date: September 27, 2016

Respectfully Submitted,

_____

Colby A. Smith
Ada Fernandez Johnson
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
casmith@debevoise.com
afjohnson@debevoise.com

*Attorney for Respondent*

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on September 27, 2016 a true and correct copy of the foregoing BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF THE FINAL AUDIT DETERMINATION ISSUED BY THE OFFICE OF THE INSPECTOR GENERAL OF THE DEPARTMENT OF EDUCATION was served on the following counsel by electronic mail and hand delivery:

Fred Marinucci, Esq.
fred.marinucci@ed.gov
(Electronic mail)

Natasha Varnovitsky, Esq.
natasha.varnovitsky@ed.gov
(Electronic mail)

Harold Jenkins, Esq.
Assistant General Counsel
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Room 6E120
Washington, DC  20202-2110
harold.jenkins@ed.gov
(Electronic mail and overnight courier)

Veronica R. Glick
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, N.W.
Suite 500
Washington, D.C. 20004
(202)383-8153
vrglick@debevoise.com

*Attorney for Respondent*