**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

NAVIENT SOLUTIONS, LLC,

     Plaintiff,

     v.

DEPARTMENT OF EDUCATION and DR.
MIGUEL CARDONA, Secretary of
Education, in His Official Capacity,

     Defendants.

**Case No.: 1:21-cv-324-TSE-MSN**

**SUPPLEMENTAL ADMINISTRATIVE RECORD**

**VOLUME 7 (Pages 2078-209)**

**NAVIENT V. DEPARTMENT OF EDUCATION**
**Case No. 21-CV-00324**
**SUPPLEMENTAL ADMINISTRATIVE RECORD**

| Document Description | Bates No. |
|---|---|
| Final Audit Determination of Federal Student Aid Letter from Patricia Trubia, Director, Financial Institution Oversight Service, Federal Student Aid, to John Remondi, President and Chief Operating Officer, Sallie Mae, Inc., dated September 25, 2013 | 1345-71 |
| Affidavit of Jason Wheeler dated November 24, 2015 | 1372-78 |
| Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 | 1379-476 |
| Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 | 1477-78 |
| Affidavit of John (Jack) Remondi, dated September 22, 2016 | 1479-81 |
| NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates | 1482-85 |
| 1993 Trust Agreement | 1486-517 |
| Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) | 1518-94 |
| Affidavit of Mark L. Heleen dated September 23, 2016 | 1595-97 |
| Navient Responses to OIG Questions of December 14, 2007 | 1598-600 |
| Letter from Robert S. Lavet, General Counsel, Sallie Mae, to Theresa Shaw, U.S. Department of Education, dated February 15, 2007 | 1601 |
| Affidavit of Jane Roig dated November 11, 2016 | 1602-03 |
| Emails concerning Freedom of Information Act dated April 26, 2017 and May 15, 2017 | 1604-07 |
| Letter from Theresa Shaw to Thomas J. Fitzpatrick dated January 24, 2007 | 1608-11 |
| Final Audit Report, Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations, dated August 2009 | 1612-75 |
| Respondent Navient Corporation's Request for Review of Final Audit Determination, dated July 27, 2016 | 1676-737 |
| Brief in Support of Navient Corporation's Appeal of the Final Audit Determination Issued by the Office of the Inspector General of the Department of Education, dated September 27, 2016 | 1738-83 |
| Navient Corporation's Reply Brief in Support of Appeal of Final Audit Determination, dated November 23, 2016 | 1784-816 |

Transcript of March 30, 2017, Oral Argument                                      1817-2018

Navient Corporation's Supplemental Brief, dated May 19, 2017                     2019-40

Hearing Official's Initial Decision, dated March 7, 2019                         2041-60

DCL 93-L-161                                                                     2061-77

DCL 93-L-163                                                                     2078-81

DCL 96-L-186                                                                     2082-87

DCL FP-06-15                                                                     2088-93

DCL FP-07-01                                                                     2094-99

DCL FP-07-06                                                                     2100-38

Brief in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision,   2139-91
dated April 8, 2019

Motion for Leave To File a Reply in Support of Navient Corporation's Appeal of the   2192-201
Hearing Official's Initial Decision

Navient Visuals from Oral Argument before the Department of                      2202-09
Education Office of Hearings and Appeals, dated March 30 2017

Brief in Support of Federal Student Aid's Final Audit Determination, dated October 28,   2210-54
2016

Supplemental Brief in Support of Federal Student Aid's Final Audit Determination, dated   2255-76
May 19, 2017

Brief in Response to Navient Corporation's Appeal of Hearing Official's Initial Decision,   2277-318
dated May 3, 2018

Motion for Leave To File a Sur-Reply Brief in Response to Reply Brief in Support of   2319-35
Navient Corporation's Appeal of Hearing Official's Initial Decision), dated May 31, 2019

**UNITED STATES DEPARTMENT OF EDUCATION**

WASHINGTON, D.C. 20202-_____

December 1993

93-L-163 (LD)
93-G-248
Tax-Exempt

Summary: This letter contains information and provides guidance on the changes made by the Omnibus Budget Reconciliation Act that affect the Lender's Interest and Special Allowance Request and Report.

Dear Colleague:

The Omnibus Budget Reconciliation Act was signed into law by President Clinton on August 10, 1993. This act amended the Higher Education Act of 1965. There are several changes that affect reporting on the Lender's Interest and Special Allowance Request and Report (ED Form 799). This letter provides instructions for reporting the changes required by the new legislation. Also included in this letter are instructions for reporting the Federal Consolidation Loan Interest Rebate Fee (Consolidation Loan Fee) effective October 1, 1993. (An ED Form 799 with updated instructions is scheduled to be distributed for the March 1994 quarter).

Although several changes had effective dates of October 1, 1993, the Department requests that lenders delay reporting new information until the March 1994 quarter. At that time all activity for the quarter ending December 31, 1993, should be reported as adjustments. The changes are presented below.

## PART II - ORIGINATION FEES

A.   There will be a fee charged to lenders equal to 0.5 percent of the principal amount of any FFEL Program loan made *on or after October 1, 1993.*

   1)   Lender fees for current quarter should be reported in Part II, Column C as:

   **LN** -   New loans made (including those then sold);
   **LS** -   Loans made and sold in the current quarter if you are the purchaser and you owe the lender fees and;
   **LB** -   Loans bought from another lender in the current quarter, if you owe the lender fees.

   2)   Lender fee adjustments to previously reported quarters should be reported in Part II, Column C as:

   **LI** -   Net increases in loans made or bought as reported for a previous quarter if you owe the lender fees and;
   **LD** -   Net decreases in the loans made or bought as reported for a previous quarter if the fees are to be credited to you.

ED - B - 004749

**B.** The amount of origination fee that a lender may charge a borrower (except a Federal Consolidation Loan borrower) will be reduced from 5 percent to 3 percent of the principal amount of the loan, effective for loans first disbursed *on or after July 1, 1994* for a period of enrollment that either includes that date or begins after that date. Lenders will continue to report this information in Part II of the ED Form 799.

**C.** The 6.5 percent "origination fee/insurance premium" for Federal Unsubsidized Stafford loans will be renamed as simply the "origination fee" and the amount due will be reduced to 3 percent of the principal amount of a loan first disbursed *on or after July 1, 1994* for a period of enrollment that either includes that date or begins after that date. Lenders will continue to report this information in Part II of the ED Form 799.

## PART III – INTEREST BENEFITS

**A.** Lenders can now report loans that are subject to the 1992 excess interest rule for the current quarter using "EC".

Enter "EC" in Part III, Column C for current quarter reporting.

**B.** Lenders can report loan adjustments that are subject to the 1992 excess interest rule using "EI" or "ED".

Enter "EI" in Part III, Column C for adjustments that result in a net increase in the interest due.

Enter "ED" in Part III, Column C for adjustments that result in a net decrease in interest due.

## PART IV – SPECIAL ALLOWANCE

**A.** The minimum special allowance rate "floor" on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed. Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to receive the minimum special allowance. Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance.

Enter "XF" in Part IV, Column C for tax-exempt loans that are not subject to the floor.

ED - B - 004750 

**B.**   <u>Federal Stafford Loans - Variable interest rates beginning July 1, 1994</u>

The variable interest rate on a Federal Stafford Loan shall be determined on June 1 of each year and shall apply to the 12-month period beginning July 1 and ending on June 30.  The Secretary shall determine the interest rate by adding 3.1 percent to the bond equivalent rate of 91-day Treasury bills auctioned at the final auction held prior to such June 1, except that the interest rate shall not exceed 8.25 percent.  This change will become effective for loans first disbursed *on or after July 1, 1994* for periods of enrollment that either include that date or begin after that date.

Enter <u>SG</u> in Part IV, Column C and "<u>EVAR</u>" in Column E, for loans disbursed on or after July 1, 1994.

Enter <u>XG</u> in Part IV, Column C and "<u>EVAR</u>" in Column E, for loans disbursed on or after July 1, 1994 with tax-exempt funds.

**C.**   <u>Federal PLUS Loans - Variable interest rate beginning July 1, 1994</u>

The variable interest rate on a Federal PLUS Loan shall be determined on June 1 of each year and shall apply to the 12-month period beginning July 1 and ending June 30.  The Secretary shall determine the interest rate by adding 3.1 percent to the bond equivalent rate of 52-week Treasury bills auctioned at the final auction held prior to such June 1, except that the interest rate shall not exceed 9 percent.  This change will become effective for loans first disbursed *on or after July 1, 1994* for periods of enrollment that either include that date or begin after that date.

Enter <u>SG</u> in Part IV, Column C and "<u>EVAR</u>" in Column E for loans disbursed on or after July 1, 1994.

Enter <u>XG</u> in Part IV, Column C and "<u>EVAR</u>" in Column E, for loans disbursed on or after July 1, 1994 with tax-exempt funds.

## PART V - CHANGES IN GUARANTEED LOAN PRINCIPAL FOR THE QUARTER

There are no changes at this time.

## PART VI - GUARANTEED LOAN PORTFOLIO ANALYSIS FOR END OF QUARTER

There are no changes at this time.

ED - B - 004751

## OTHER CHANGES

### Federal Consolidation Loans - Consolidation Loan Rebate Fee

Each holder of a Federal Consolidation Loan that is disbursed *on or after October 1, 1993*, shall, on a monthly basis, pay to the Secretary, an interest payment rebate equal to an annualized rate of 1.05 percent of the unpaid principal and accrued interest on the loan. *This fee is in addition to the lender fee charged by the Secretary.*

The interim procedures described below will exist while the Department is developing a new form and system to accommodate the payment of fees on a monthly basis. Upon receipt of this letter, the holder of a Federal Consolidation Loan that was disbursed during October, November, or December 1993 should remit a combined payment for those months.

1)   The holder of the loan should calculate the amount of the fee due each month by multiplying the unpaid principal and accrued interest of such loan held by the lender at the end of each month by 0.0875 percent.

2)   The lender's check should be made payable to the U.S. Department of Education and clearly marked *"Consolidation Loan Fee."* In addition, please include a cover letter identifying the lender, the lender number, the month that the fee applies to, and the amount of the unpaid principal and accrued interest.

3)   Beginning with January 1994 and for each month thereafter during the interim period, holders should send a monthly check in the amount of the fee owed to the address below so that it is received by the end of the following month (e.g. by February 30 for the month of January).

U.S. Department of Education
Interest Payment Processing
P.O. Box 4138
Greenville, Texas  75403-4138

If you have any questions regarding this letter, please contact the Disbursement Branch at (202) 708-9776.

Sincerely,

William L. Moran
Acting Deputy Assistant Secretary
for Student Financial Assistance

Page 4
2081

IFAP - Dear Partner, Colleague Letters

<u>Skip Nav</u>



U.S. Department of Education

Information for Financial Aid Professionals (IFAP) Library

F E D E R A L
STUDENT AID
We Help Put America Through School

HOME   |  Help Center  | What's New |  Schools Portal  |  Other Links  |  Feedback  |

*The IFAP online library contains technical publications, regulations, and policy guide
the administration of the Federal Student Aid programs.*

DCLPublicationDate: 3/1/96
DCLID: 96-L-186
AwardYear:
Summary: Clarification and interpretative guidance on certain provisions in the Federal Family
Education Loan (FFEL) Program regulations published on December 18, 1992.


March 1996

96-L-186
96-G-287

SUBJECT: Clarification and interpretative guidance on certain
provisions in the Federal Family Education Loan (FFEL) Program
regulations published on December 18, 1992.

REFERENCE: December 18, 1992 Federal Family Education Loan
Program regulations and May 17, 1994 technical corrections to those
regulations.

Dear Colleague:

On July 23, 1992, the Higher Education Amendments of 1992
(Amendments) to the Higher Education Act were enacted. Later that
year, on December 18, 1992, the U.S. Department of Education (ED)
published final regulations for the Federal Family Education Loan
(FFEL) Program that incorporated changes made by the following
statutes:

- The Consolidated Omnibus Budget Reconciliation Act of 1985
- The Higher Education Amendments of 1986
- The Higher Education Technical Amendments Act of 1987
- Public Law 100-297
- Public Law 100-369
- The Omnibus Budget Reconciliation Act of 1989
- The Omnibus Budget Reconciliation Act of 1990

NCHELP-00002
9/3/2004 10:41 AM

of 4

IFAP - Dear Partner, Colleague Letters

- The National and Community Service Act of 1990
- The Higher Education Technical Amendments of 1991
- The Emergency Unemployment Compensation Act of 1991
- Selected self-implementing provisions of the Higher Education
Amendments of 1992

Because of the statutory requirement that the majority of the FFEL
provisions of the 1992 Amendments be regulated under negotiated
rulemaking and the timing involved in publishing the December 18,
1992 regulations, not all the provisions of the 1992 Amendments
could be incorporated into the regulatory package. In cases where
provisions of the Amendments conflicted with the December 18,
1992 regulations, the Amendments superseded the regulations.

The regulations published on December 18, 1992 generally were to
take effect on February 1, 1993. However, in response to inquires
from the student aid community, on January 29, 1993, Secretary
Richard W. Riley issued a letter advising FFEL Program participants
that he had decided to delay full enforcement of certain provisions of
the December 18, 1992 regulations. Doing so, the Secretary
explained, would allow ED to issue guidance identifying sections of
the December 18, 1992 regulations that had been superseded by the
Amendments and clarifying provisions of the regulations that
reflected policy changes. Secretary Riley also stated that FFEL
Program participants were expected to make a good-faith effort to
begin implementing the December 18, 1992 regulations when they
went into effect on February 1, 1993, including implementing the
provisions on which he was delaying enforcement. The Secretary's
enforcement delay did not apply to the self-implementing statutory
requirements contained in the regulations or to regulatory provisions
that were unchanged from earlier FFEL regulations.

Since Secretary Riley's letter in January 1993, ED has undertaken a
number of initiatives to address issues FFEL Program participants
raised about the regulations. In March and April 1993, ED met with
community representatives to identify and discuss the outstanding
issues that the representatives believed should be clarified.

Also since the January 1993 letter, the Secretary, following several
negotiated rulemaking sessions, has published a series of regulatory
amendments. These incorporate Amendments previously not
reflected in the December 18, 1992 regulations, as well as changes
enacted by later legislation. These FFEL Program amendatory
regulations were published in the Federal Register on:

- April 29, 1994

NCHELP-00003
9/3/2004 10:41 AM

°4

Dear Partner, Colleague Letters

- June 28, 1994
- June 29, 1994
- November 25, 1994
- November 29, 1994
- November 30, 1994
- December 1, 1995

The Secretary's delay of enforcement of certain parts of the December 18, 1992 regulations did not change the effective date of these regulations or other regulations that affect the FFEL program. On May 17, 1994, the Department also published technical corrections to the December 18, 1992 regulations.

The purpose of this" Dear Colleague" letter is to provide guidance only on those regulatory provisions of the December 18, 1992 final regulations that still require clarification and that have not been superseded by later statutory or regulatory changes currently in effect. It does not address issues pertaining to regulations published after the December 18, 1992 regulations. The letter is divided into two sections:

- Section I includes a series of questions and answers intended to clarify policy changes within the December 18, 1992 final regulations.

- Section II addresses the time frames for fully implementing and enforcing those provisions of the December 18, 1992 regulations that required guidance.

ED would like to recognize the support and cooperation of the FFEL program participants who assisted in the development of this guidance.

If you have questions about this letter, please contact Ms. Pamela Moran (Loan Branch Chief), Ms. Patricia Newcombe (FFEL Program Loans Branch Section Chief), or Ms. Patsy Beavan (Senior Program Specialist) at (202) 708-8242 or by fax at (202) 708-7196.


Sincerely,

Elizabeth M. Hicks
Deputy Assistant Secretary
for Student Financial Assistance

Attachment A

NCHELP-00004
9/3/2004 10:41 AM

Dear Partner, Colleague Letters

Skip Nav



**U.S. Department of Education**

Information for Financial Aid Professionals (IFAP) Library

F E D E R A L
STUDENT AID
*We Help Put America Through School*

HOME  | Help Center | What's New | Schools Portal  | Other Links |  Feedback  |

*The IFAP online library contains technical publications, regulations, and policy guides the administration of the Federal Student Aid programs.*

96-L-186 Section I (Questions 1-39)

Section I

QUESTIONS AND ANSWERS

Below is the Secretary's response to questions submitted by FFEL program participants on certain provisions of the December 18, 1992 regulations that involved policy changes. We have not included questions on sections of the December 18, 1992 regulations that have been amended through subsequent regulations. The regulatory cites used in this section are from the December 18, 1992 regulations and the May 17, 1994 technical corrections unless otherwise noted. Further information is provided if the cite was changed in subsequent regulations.

§682.102

1. Section 682.102(e)(3) provides an overview of SLS repayment begin dates. This section states that a borrower who has both Federal Stafford and Federal SLS loans, but who has not yet entered repayment on the Federal Stafford loan, may request postponement of repayment of the SLS loan until the borrower's grace period on the Federal Stafford loan expires. Does the extension apply to borrowers who have Federal Stafford loans with grace periods longer than six months?

Yes. In the 1992 Amendments, Congress enacted a number of provisions intended to support a single payment due date and a single repayment schedule for borrowers with multiple loans and multiple loan types. During the negotiated rulemaking process used to develop regulations to implement those Amendments, the Department agreed that reference to a specific time frame not be included in the regulations to provide for a single repayment begin date for borrowers with Stafford loan grace periods in excess of six months. Although this may only apply to a small number of borrowers, the Secretary believes that the intent of the law was to provide a coordinated repayment schedule for these borrowers.

§682.201

18

NCHELP-00005
9/3/2004 10:43 AM

this same special allowance and reinsured interest termination provision?

No. Currently the regulations only address claims returned due to inadequate documentation. The Secretary adopted a policy, as reflected in the regulations, that would ensure that lenders file complete claim packages as early as possible, thus supporting a streamlined claim review and claim payment process. Therefore, this provision is only applicable in cases where the lender did not provide complete documentation; it does not apply for cases where erroneous information was provided.

30. Section 682.302(e), which pertains to eligibility for special allowance for loans made or acquired with obligations on which the interest is exempt from taxation (tax-exempt obligations), has been revised in the 1992 regulations. What is the significance of the change and what is the effective date of the change?

Section 682.302(e) was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations. The regulations in effect prior to December 18, 1992 stated that a lender was paid special allowance on a loan made or acquired with the proceeds of a tax-exempt obligation based on the rules applicable to loans financed with taxable obligations after the loan was refinanced with the proceeds of a taxable obligation and the prior tax-exempt obligation was retired or defeased. The regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding. The Department's prior guidance stated that the current funding source defined the applicable special allowance provisions -- if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.

In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

This change is effective as of the effective date of the 1992 regulations, February 1, 1993, and applies to all loans transferred from a tax-exempt obligation to a taxable obligation on or after that date.

NCHELP-00006
9/3/2004 10:43 AM

Adjustments to ED 799 billings and current billings for any loans covered by this policy should be made using the applicable tax-exempt special allowance codes for the periods that the holder retains legal interest in the loan and the original tax-exempt obligation has not been retired or defeased.

§682.401

31. Section 682.202(c)(5) provides for the refund of the origination fee whenever: i) the school returns the full amount of the disbursement; ii) the loan disbursement is repaid within 120 days of disbursement; or iii) the loan disbursement is not delivered within 120 days of disbursement. Section 682.401(b)(10) provides for the refund of the insurance premium whenever: i) the loan disbursement is repaid within 120 days; or ii) the loan disbursement is not delivered within 120 days. Therefore, if a school returns the disbursement amount after the 120th day, the borrower receives a refund of the origination fee but not the insurance premium. May a guaranty agency refund the insurance premium when a school returns the loan proceeds after the 120th day of disbursement?

Yes, the guaranty agency may, but is not required, to refund the insurance premium under these circumstances. However, please note that section 682.401(b)(10)(vi) of the final regulations published on December 1, 1995, (effective July 1, 1996) will require the lender to refund the insurance premium, by credit to the borrower's account, whenever a school makes a refund to the lender regardless of whether the refund is the full amount of the loan or a portion of it.

32. Section 682.401(b)(17) states that a guaranty agency shall allow a loan to be assigned to an educational institution (whether or not it is an eligible lender) in connection with the institution's repayment on a loan that was ineligible. Must the educational institution enforce the debt in accordance with all FFEL program rules (e.g., deferment, forbearance)?

The institution may only collect on the loan based on the terms of its legal contract with the borrower—in other words, based on the terms of the promissory note. Therefore, the institution must observe the terms and provide any benefits for which a borrower is eligible based on the terms of the promissory note (e.g., deferments, forbearance). However, since for FFEL program purposes, an ineligible loan has lost its federal reinsurance, the school may not bill the Secretary for any interest or special allowance on the loan nor submit the loan to a guarantor or the Secretary for claim payment. However, the loan remains a debt owed by the borrower and both parties can be required to comply with its terms.

§682.402

NCHELP-00007
9/3/2004 10:43 AM



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

FP-06-15

Subject:   Payment of Special Allowance on Loans Made or Acquired with Funds From a Tax-Exempt Obligation

Summary:   This letter clarifies the applicability of the interim final regulations published by the Department on August 9, 2006 as they relate to the payment of SAP at the 9.5 percent minimum return rate for certain loans made or acquired by a lender using funds from a tax-exempt obligation.

Dear Colleague:

Prior to the publication of the interim final regulation on August 9, 2006, the regulatory provisions governing Special Allowance Payments (SAP) in the Federal Family Education Loan (FFEL) Program at 34 CFR 682.302 had not been updated since 1994, other than to reflect a statutory change in 1993 that eliminated the payment of SAP at the 9.5 percent minimum return rate for loans acquired with funds from tax exempt obligations originally issued on or after October 1, 1993. Thus, the regulations in place prior to the issuance of the August 9, 2006 regulations did not reflect SAP guidance issued by the Department since 1993 nor did they reflect changes made to the SAP provisions of the Higher Education Act (HEA) by the Taxpayer-Teacher Protection Act of 2004 (TTPA) (Pub. L. 108-409) or by the Higher Education Reconciliation Act of 2005 (HERA) (Pub. L. 109-171). Significantly, the Department had provided guidance in Dear Colleague Letters numbered L-93-161, L-93-163, L-96-186, FP-05-01, and FP-06-01.

The interim final regulations, which are summarized in an attachment to this letter, were written to describe the new requirements contained in the TTPA and HERA as well as to explain the requirements that were in effect under the Higher Education Act (HEA) as in effect prior to the enactment of the TTPA, under prior regulations, and under Department policy guidance.

The interim final regulations became effective on September 8, 2006. These regulations apply directly to transactions that occur on or after that date. With regard to transactions that occurred before September 8, 2006, the Department will apply the requirements regarding eligibility for SAP as stated in the HEA, in the regulations as they existed prior to September 8, 2006, and in the Dear Colleague Letters cited above.

We thank you for your cooperation.

Sincerely,

James F. Manning
Acting Assistant Secretary for
Postsecondary Education

ATTACHMENT To FP-06-15

Explanation of Interim Final Rule on Special Allowance Payments on loans made or acquired with funds from tax-exempt obligations

The Higher Education Act (HEA) authorizes payment by the government of a subsidy, called a special allowance payment (SAP), on Federal Family Education Loan Program (FFELP) loans.  20 U.S.C. § 1087-1 (2006).  Since FFEL interest rates are set by law and not by the market, this SAP payment, when added to interest paid by, or on behalf of, the borrower, is intended to give the lender a total yield on a FFELP loan that approximates the yield the lender could obtain by making a consumer loan at a market-based rate. However, the HEA provides a separate SAP rate for certain loans made or acquired with funds from a tax-exempt bond.[1]  That rate is ordinarily one-half the rate payable on other loans, but not less than that needed to give the lender a total yield of 9.5 percent.  20 U.S.C. § 1087-1(b)(2)(B)(i), (ii)(2006).   As we will explain below, whether this special SAP rate applies to a loan depends on when the tax-exempt bond that generated funds to acquire the loan was issued, on whether certain events subsequently occurred, on the status of the lender itself and its portfolio, and on the SAP status of the loan when acquired by the lender.

The SAP rules created by existing statutes and regulations can be explained by describing first the rules that govern how loans become eligible for SAP at the 9.5 percent rate, and then the rules that terminate that eligibility.  Both sets of rules can be best described by first stating the "general rules," and then explaining changes made to those "general rules" by the Taxpayer-Teacher Protection Act of 2004, Pub. L. 108-409 (TTPA), and the Higher Education Reconciliation Act of 2005, Pub. L. 109-171 (HERA).

### General Rules

The minimum 9.5 percent return SAP rate applies only to loans that had been acquired by the lender using funds from a tax-exempt bond "originally issued" prior to October 1, 1993.  Those acquired using funds from a bond "originally issued on or after October 1, 1993" receive SAP at the usual rate payable for loans from taxable funding sources.   20 U.S.C. § 1087-1(b)(2)(B)(iv)(2006).  The statutory term "originally issued" is not a conventional bond term.  In the context of the HEA provision for the payment of 9.5 percent SAP, the term "originally issued" refers to a bond issued to obtain funds to make or acquire loans – as opposed to a bond issued to obtain funds to repay an old bond.  The latter is a refunding bond.  The August 9, 2006 interim final rule articulates this distinction between a "new money" bond and a refunding bond. 34 C.F.R. § 682.302(f)(2)(2006).

---

[1] For convenience, we use the term "bond" in this explanation to describe the instrument used to borrow funds, instead of the term "obligation" used in the statute and regulations.  Lenders may use notes or other instruments to raise funds, and references to "bond" here include any other form of borrowing.

**How loans become eligible for 9.5 percent SAP:**

The statute identifies, in two sentences, the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for the 9.5 percent minimum SAP. 20 U.S.C. § 1087-1(b)(2)(B)(i)(2006).  These sources are (1) funds obtained directly from issuing the bond itself or from investment earnings on the proceeds of the bond, and (2) funds obtained by repayments and income derived from loans made from those bond proceeds.  *Id.*  The regulations contain this same list of eligible funding sources, along with proceeds from the sale of certain of these loans.  34 C.F.R. § 682.302(c)(3)(i)(1993).  The interim final rule makes no change to this list of sources that can be used to acquire a loan eligible for 9.5 percent minimum SAP.

**How refinancing and refunding affects continued eligibility for 9.5 percent SAP:**

To provide security to investors who buy a bond, lenders pledge the loans they acquire as collateral for the bond.  As a bond matures and must be repaid, lenders often issue new bonds to obtain funds to repay (refund) the outstanding bond. When an old bond is refunded, the loans pledged as collateral for the old bond become available to serve as collateral for the new bond.  Sometimes, rather than refunding the outstanding bond, lenders transfer to a different bond those loans that had been pledged to that outstanding bond.  This transfer of loans from one bond to another has acquired the label of "refinancing" of the loans.[2]  The regulations explain the SAP rate payable on loans involved in the refunding of a bond and the refinancing of loans.

All loans that were acquired using an eligible funding source  –  those listed in 34 C.F.R. § 682.302(c)(3)(i) - and that are part of a refinancing or refunding transaction can be divided into two groups.  The groups can be distinguished by the source of the funds used in the refunding or refinancing process.  The first group includes loans that have always been pledged to a tax-exempt refunding bond.  That refunding bond may be the first such bond, or may be one in a series of tax-exempt refundings.[3]  The second group includes all loans not in the first group.

Prior to the interim final rule which was published on August 9, 2006, the regulations had never expressly explained the SAP rate payable on loans in the first group - those that had been pledged at all times to a tax-exempt refunding bond.  However, the Department did address this question in two 1993 Dear Colleague Letters. (DCL L-93-161 and L-93-163)

---

[2] Ordinarily, the term "refinance" is used to describe obtaining a new loan to pay off an old debt, and is simply a synonym for "refunding."  The collateral for the old debt is then pledged as collateral for the new obligation.  Thus, a homeowner "refinances" a mortgage, not a house.  However, since at least 1996, the Department and lenders have used the term "refinance" to describe moving the collateral (student loans) from an old bond to a different bond, without connoting that the old debt is or is not paid off.  The TTPA uses the term "refinance" to refer to this transfer of collateral (the loans) from one bond to another.  The regulations make clear which sense of the word is intended, as appropriate (e.g., "a loan is refinanced when. . . . ") 34 C.F.R. § 682.302(f)(3)(2006).

[3] An example of such serial tax-exempt refunding was the practice of the New Mexico Educational Assistance Foundation, addressed in a 2005 Department Inspector General audit.

The interim final rule describes this group of loans in 34 C.F.R. § 682.302(e) (2)(i), and states that these loans retain eligibility for SAP at the 9.5 percent rate.  We have received some comments that the interim final rule requires "continuous financing" by tax-exempt bonds as a condition for eligibility for 9.5 percent SAP.  The interim final rule does not state that continuous financing by a tax-exempt source is a condition for eligibility for 9.5 percent SAP.  The interim final rule acknowledges that some loans have been "financed continuously" by a tax-exempt bond, and the rule explains the SAP rate payable on these loans.  Thus, although this language in the interim final rule is new, it simply articulates formal Department interpretation of the HEA and prior regulations, as provided in the 1993 letters, noted above.

The interim final rule next describes the SAP rate payable for loans in the second group, those that have not been "financed continuously" by a tax-exempt bond. 34 C.F.R. § 682.302(e)(2)(ii) (2006).  The interim final rule restates the provisions of the 1985 regulation and the position stated in the 1996 Dear Colleague Letter (DCL L-96-186).

This second group of loans, those that had not been "financed continuously" by a tax exempt bond, can be divided into two groups, depending on whether or not the lender refunds the existing tax-exempt bond that had been used to acquire the loans.

- If the lender uses funds from a taxable bond (regardless of its date of issue) to refund the tax-exempt bond used to acquire the loans, and then pledges the loans to that taxable bond, SAP is no longer payable at the special 9.5 percent rate.   34 C.F.R. § 682.302(e)(2) (ii)(A) (2006).  The interim final rule here restates the provisions of the 1985 regulations.  34 C.F.R. § 682.302(e)(3)(1985).

- If the lender uses funds from a taxable bond to refinance the loans and pledges the loans to that taxable bond, but <u>does not</u> refund the tax-exempt bond used to acquire the loans, SAP continues to be paid at the special 9.5 percent rate.  34 C.F.R. § 682.302(e)(2) (ii)(B) (2006).  This provision comes directly from the 1996 Dear Colleague Letter (DCL L-96-186).

**How the TTPA changes the general rules:**

The TTPA made significant changes to the general rules, for transactions that occurred after September 30, 2004, the effective date of the TTPA provisions.  The interim final rule states the TTPA requirements in a new, separate subsection - 34 C.F.R. § 682.302(e)(3)(2006) ("Loans affected by transactions or events after September 30, 2004").  The interim final rule makes clear that the TTPA provisions take precedence, when they apply, over the "general rules."  34 C.F.R. § 682.302(e)(2) (2006).

The TTPA provided that loans that were eligible for 9.5 percent SAP lose that eligibility when any of three events occur.  20 U.S.C. § 1087-1(b)(2)(B)(iv), (v)(II) (2005).  The new interim final rule closely paraphrases the language of the TTPA to describe these events.  Thus, the interim final rule provides, in new 34 C.F.R. § 682.302(e)(3), that

loans lose 9.5 percent SAP eligibility when any of the following occurs "after September 30, 2004"—

- The loan "is refinanced" from sources other than the eligible (pre-October 1, 1993), tax-exempt funding sources described in the HEA and regulations. 20 U.S.C. § 1087-1(b)(2)(B)(v)(II)(bb), and 34 C.F.R. § 682.302(e)(3)(i).

- The loan is "financed by a tax-exempt obligation that matures, is retired, is defeased," or "is refunded."  20 U.S.C. § 1087-1(b)(2)(B)(iv), (v)(II)(aa), and 34 C.F.R. § 682.302(e)(3)(iii).

- The loan is sold or transferred to any other holder.  20 U.S.C. § 1087-1(b)(2)(B)(v)(II)(cc), and 34 C.F.R. § 682.302(e)(3)(ii).

**How HERA changes the general rules:**

The HERA made two changes to then-existing law.  First, HERA made the TTPA provisions permanent by removing the January 1, 2006 sunset date provisions. Second, and more significantly, HERA – with a limited exception as discussed below – barred loans not already eligible for 9.5 percent SAP on February 8, 2006 – its date of enactment – from ever becoming eligible for 9.5 percent SAP.  20 U.S.C. § 1087-1(b)(2)(B)(vi) (2006).  As with the TTPA provisions, the interim final rule states these HERA requirements in a new, separate subsection – 34 C.F.R. § 682.302(e)(4)(2006). The interim final rule closely tracks the statutory language.  It provides that SAP is paid at the normal rate (not the 9.5 percent minimum rate) on any loan that was acquired on or after February 8, 2006, or (if previously acquired by the holder) that was not already eligible for 9.5 percent SAP on that date.  34 C.F.R. § 682.302(e)(4)(2006).

**How HERA applies to governmental or non-profit holders with small portfolios:**

HERA includes a narrow "carve out" that delays until December 31, 2010 for certain holders the provisions barring new 9.5 percent SAP loans.  20 U.S.C. § 1087-1(b)(2)(B)(vii)(2006).  The new interim final rule states this exception in a new, separate subsection - 34 C.F.R. § 682.302(e)(5)(2006).  It closely tracks the statutory language by providing that the HERA limits on new loan eligibility for 9.5 percent SAP take effect after December 30, 2010, for a lender that –

- Both on February 8, 2006 and in the quarter for which it claims SAP, was either a governmental entity or a non-profit organization not affiliated with a for-profit entity, and

- Held a portfolio of $100,000,000 or less that was eligible for, and was paid, SAP at the 9.5 percent rate, in the most recent payment made prior to September 30, 2006.

34 C.F.R. § 682.302(e)(5)(2006).

Finally, the statute and prior regulations use a few terms that have acquired a common meaning, but have not previously been explained in the regulations.   The interim final rule adopts explanations of two commonly used terms  –  "originally-issued" obligation, and "refinancing" of a loan.  34 C.F.R. § 682.302(f)(2), (3)(2006).

- The term "originally issued" obligation was adopted in the HEA in 1993 to describe a bond issued to obtain funds to make or acquire loans, as opposed to a bond issued to refund another bond.  The Department has implicitly interpreted the term in this way since 1993.
- The Department has used the term "refinancing"  –  with reference to a loan  – since at least 1996 to describe the transfer of a loan as collateral from one bond to another.  The Department considered this readily-recognized action  –  transfer of a loan as collateral  –   to provide a useful way to identify those transactions that are "refinancings" of loans.



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

JAN 2 3 2007

THE ASSISTANT SECRETARY

FP-07-01

Subject:  FFELP Loans Eligible for 9.5 Percent Minimum Special Allowance Rate

Summary:  This letter restates the applicable requirements of the HEA and regulations that control whether FFELP loans acquired with funds derived from tax-exempt financing sources acquire eligibility for special allowance payments at the 9.5 percent minimum return rate

Dear Colleague:

Recent examination of activities involving tax-exempt financing of Federal Family Education Loan Program (FFELP) loans indicates that it is appropriate to restate the requirements of the Higher Education Act of 1965, as amended (HEA) and the Department's regulations that control whether FFELP loans made or acquired with funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum return rate.

The HEA identifies the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for SAP at the 9.5 percent minimum return rate. 20 U.S.C. § 1087-1(b)(2)(B)(i)(2006). These sources are: (1) funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1, 1993 or from investment earnings on the proceeds of such an obligation; and (2) funds obtained as collections on, interest benefits or special allowance payments on, or income on, loans made or purchased from the proceeds of that tax-exempt obligation. *Id.* The regulations describe these sources of funds in precise terms, as follows:

> (c)(3)(i) . . . the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(F) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from--
>
>   (A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993;
>   (B) Collections or payments by a guarantor on a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;
>   (C) Interest benefits or special allowance payments on a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;
>   (D) The sale of a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;[1] or

---

[1] The term "sale" as used in paragraph (c)(3)(i)(D) includes both a sale to a third party and an intra-portfolio transfer of loans.

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

34 C.F.R. § 682.302(c)(3)(i) (2006). These requirements have been in effect since 1993. Only the loans described in these statutory and regulatory provisions are eligible for SAP at the 9.5 percent minimum return rate. Each of the five categories (paragraphs (c)(3)(i)(A) through (c)(3)(i)(E)) includes funds separate and distinct from the funds in any other category. Each category of funds includes only those funds obtained directly from the specific source named in that paragraph.

Loans acquired from these five sources can be divided into two categories. The first category is "first-generation loans" – and includes only those loans acquired using proceeds of the tax-exempt obligation (*i.e.*, funds obtained directly from the issuance of the tax-exempt obligation). *See* 34 C.F.R. § 682.302(c)(3)(i)(A) (2006). The second category is "second-generation loans" – and includes only those loans acquired using funds obtained directly from first-generation loans.[2] *See* 34 C.F.R. § 682.302(c)(3)(i)(B)-(D) (2006). Funds obtained as collections on second-generation loans, interest and special allowance payments on second-generation loans, or sales of second-generation loans, or those same kinds of funds obtained from later generation loans, are not eligible sources of funds under the statute or regulation. Therefore, loans acquired with funds from second-generation loans or later generations of loans are not eligible for SAP at the 9.5 percent minimum return rate.

Further, the Department pays SAP if it receives an accurate and complete request for payment from a lender. 20 U.S.C. § 1087-1(b)(3) (2006). A request for payment is accurate and complete if it contains all the information required by the Department, and does not include any loans that the Department has directed the lender to exclude from its request. 34 C.F.R. § 682.305(b)(5) (2006).

Finally, for your information, I have attached a more detailed letter that was sent to all lenders currently claiming SAP at the 9.5 percent minimum return rate.

James Manning
Delegated the Authority of the Assistant Secretary
Office of Postsecondary Education

---

[2] Loans from investments of proceeds, described in paragraph (c)(3)(i)(E), are like second-generation loans – the loans themselves qualify for the minimum rate, but loans acquired with funds obtained as collections, interest and SAP, or the sale of those loans described in paragraph (c)(3)(i)(E) do not. To ensure clarity regarding the eligibility of loans made from various funding sources, therefore, any references here to second-generation loans are to be understood to include loans made from investment earnings.

January 24, 2007

Dear _____ :

Our records show that you recently submitted a request for special allowance payments (SAP) on Federal Family Education Loan Program (FFELP) loans. Your request included a claim(s) for SAP at the 9.5 percent minimum return rate under 20 U.S.C. §1087-1(b)(2)(B)(i)(2006). The purpose of this letter is to provide guidance to you on the requirements applicable to claims for SAP at the 9.5 percent minimum return rate.

Recent examination of activities involving tax-exempt financing of FFELP loans indicates that it is appropriate to restate the requirements of the Higher Education Act of 1965 as amended (HEA) and the Department's regulations that control whether FFELP loans made or acquired with funds derived from tax-exempt financing sources acquire eligibility for SAP at the 9.5 percent minimum return rate.

The HEA identifies the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for the 9.5 percent minimum SAP rate. 20 U.S.C. § 1087-1(b)(2)(B)(i)(2006). These sources are: (1) funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1, 1993 or from investment earnings on the proceeds of such an obligation; and (2) funds obtained as collections on, interest benefits or special allowance payments on, or income on, loans made or purchased from the proceeds of that tax-exempt obligation. *Id.* The regulations describe these sources of funds in precise terms, as follows:

> (c)(3)(i) . . . the special allowance rate is one-half of the rate calculated under paragraph (c)(1)(iii)(F) of this section for a loan made or guaranteed on or after October 1, 1980 that was made or purchased with funds obtained by the holder from--
>
> (A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993;
>
> (B) Collections or payments by a guarantor on a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;
>
> (C) Interest benefits or special allowance payments on a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;

(D) The sale of a loan . . . purchased with funds obtained . . . from obligations described in paragraph (c)(3)(i)(A) of this section;[1] or

(E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

34 C.F.R. § 682.302(c)(3)(i) (2006). These requirements have been in effect since 1993. Only the loans described in these statutory and regulatory provisions are eligible for SAP at the 9.5 percent minimum return rate. Each of the five categories (paragraphs (c)(3)(i)(A) through (c)(3)(i)(E)) includes funds separate and distinct from the funds in any other category. Each category of funds includes only those funds obtained directly from the specific source named in that paragraph.

Loans acquired from these five sources can be divided into two categories. The first category is "first-generation loans" – and includes only those loans acquired using proceeds of the tax-exempt obligation (*i.e.*, funds obtained directly from the issuance of the tax-exempt obligation). *See* 34 C.F.R. § 682.302(c)(3)(i)(A) (2006). The second category is "second-generation loans" – and includes only those loans acquired using funds obtained directly from first-generation loans.[2] *See* 34 C.F.R. § 682.302(c)(3)(i)(B)-(D) (2006). Funds obtained as collections on second-generation loans, interest and special allowance payments on second-generation loans, or sales of second-generation loans, or those same kinds of funds obtained from later generation loans, are not eligible sources of funds under the statute or regulation. Therefore, loans acquired with funds from second or later generation loans are not eligible for SAP at the 9.5 percent minimum return rate.

The Department pays SAP if it receives an accurate and complete request for payment from a lender. 20 U.S.C. § 1087-1(b)(3) (2006). A request for payment is accurate and complete if it contains all the information required by the Department, and does not include any loans that the Department has directed the lender to exclude from its request. 34 C.F.R. § 682.305(b)(5) (2006).

Finally, a claim for SAP at the 9.5 percent minimum return rate may be made only for first-generation and second-generation loans, as described above. On the "request for payment" form (Form LaRS 799) that you and other lenders submit to the Department, the certifying official represents that the data on the form conforms to the laws, regulations, and policies applicable to the Federal Family Education Loan Program. By so certifying, the lender represents to the Department that no claim is made on that

---

[1] The term "sale" as used in paragraph (c)(3)(i)(D) includes both a sale to a third party and an intra-portfolio transfer of loans.

[2] Loans from investments of proceeds, described in paragraph (c)(3)(i)(E), are like second-generation loans – the loans themselves qualify for the minimum rate, but loans acquired with funds obtained as collections, interest and SAP, or the sale of those loans described in paragraph (c)(3)(i)(E) do not. To ensure clarity regarding the eligibility of loans made from various funding sources, therefore, any references here to second-generation loans are to be understood to include loans made from investment earnings.

request for payment of 9.5 percent SAP on any loans that are not first-generation or second-generation loans.

Although the limitations on eligibility for SAP at the 9.5 percent minimum return rate restated in this letter and in DCL FP-07-01 dated January 23, 2007, have long been reflected in the HEA and the regulations, the Department has reason to believe that some lenders may be claiming 9.5 percent SAP on loans which are neither first-generation nor second-generation loans. Therefore, to ensure proper distribution of payments and to assess the incidence of such claims, the Department will take two steps before we pay any further claims for SAP at the 9.5 percent minimum return rate.

First, we will arrange for an audit or review of the loans on which you are currently claiming SAP at the 9.5 percent rate in order to determine which loans are first-generation and second-generation loans. The audit or review will be conducted by an independent accounting firm. As an alternative, you may arrange for the conduct of an audit or review by an independent accounting firm of your choosing, under a set of requirements to be established by the Department. The Department will pay all claims for SAP at the standard rate until the results of the audit or review have been received, evaluated, and accepted by the Department. We will consider, and rely upon, as appropriate, the results of the audit or review in determining what amount to pay at the 9.5 percent minimum return rate. We will also consider any objections you assert to our determination.

Second, you are to provide--with any request for payment of SAP at the 9.5 percent minimum return rate--a certification, executed by the chief executive officer (CEO) and chief financial officer (CFO) of your organization, that SAP is claimed at the 9.5 percent minimum return rate only for loans which are either first-generation or second-generation loans, and no others. The certification must be in the following form –

> We, _____, CEO and _____, CFO of ____ [company name] hereby certify that we have reviewed the billing for special allowance payments under the Federal Family Education Loan Program submitted to the Department of Education by _____[company name] on_____ [date]. We certify that we have internal controls in place to monitor and ensure the accuracy of the claim presented in this bill, and that as part of our regular annual audit, our independent auditor will attest to the effectiveness of these controls and the accuracy of the billing. Based on our review, we certify that the billing requests special allowance payment at the 9.5 percent minimum return rate only on loans that are first-generation or second-generation loans obtained from an eligible source, as described in the Department's Dear Colleague Letter [FP-07-01] dated January 23, 2007, and no others. We have disclosed to our independent auditors and to the audit committee[3] all significant deficiencies in the design and operation of the internal controls that could adversely affect the accuracy

---

[3] If your organization has not established an audit committee, please substitute the director(s), trustee(s) or other authority with responsibility for review of your annual financial statements.

of the information presented herein, as well as any fraud, whether or not material, that involves management or any other employee connected to the information contained in this bill.

Date

Signature

Title

The Department will pay SAP at the standard rate on any request for payment that is not accompanied by this certification.

The Department is committed to resolving without protracted dispute any potential objections both to the meaning and application of the statutory and regulatory requirements as restated in this letter, and to ensuring that SAP is paid at the 9.5 percent minimum return rate only on eligible loans.  Therefore, the Department will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly comply with or accept, as applicable, the following--

1. The statutory and regulatory requirements for eligibility for SAP at the 9.5 percent minimum return rate as restated in this letter;
2. The requirement that a request for payment of SAP at the 9.5 percent rate be supported by the management certification described above; and
3. The Department's payment of all SAP claims at the standard rate, rather than the 9.5 percent minimum return rate, until the Department receives, accepts and evaluates the results of the audit or review described here, and determines, after our consideration of any objection you present, which of the loans on which you currently claim SAP at the 9.5 percent rate are eligible for payment at that rate.

Thank you for your cooperation.  Please contact Matteo Fontana, General Manager, Financial Partners Services, at 202-377-3005 if you have any questions regarding the procedures in this letter.

Theresa S. Shaw
Chief Operating Officer
Federal Student Aid



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

FP-07-06

April 27, 2007

Subject:     Audit Requirements for 9.5 Percent Minimum Special Allowance Payment Rate

Summary:   This letter provides general information about the audit requirements with which
FFELP lenders must comply to receive Special Allowance Payments (SAP) at the
minimum 9.5 percent rate.

Dear Colleague:

Dear Colleague Letter FP-07-01 (DCL FP-07-01), issued on January 23, 2007, restated the
requirements of the statute and regulations that control whether Federal Family Education Loan
Program (FFELP) loans made or acquired with funds derived from pre-October 1, 1993 tax-
exempt financing sources are eligible for special allowance payments (SAP) at the 9.5 percent
minimum return rate. DCL FP-07-01 included, as an attachment, a copy of a more detailed letter
that was sent to any lender that was claiming, at that time, SAP at the 9.5 percent minimum
return rate.

The lender letter stated that as of January 24, 2007 (date of lender letter), the Department would
pay SAP at the standard rate on any loans that were included in SAP billings submitted at the 9.5
percent minimum rate until the Department received the results of an audit or review of the loans
included in the lender's December 31, 2006 request for SAP at the 9.5 percent rate, and accepted
the results as proving that the loans met the 9.5 percent billing requirements restated in DCL FP-
07-01. Such audits must be conducted either by an accounting firm engaged by the Department
or, at the lender's option, by an independent accounting firm of the lender's choosing, using the
audit methodology established by the Department. A lender's internal auditor may not be used
for this purpose.

The Department's Office of the Inspector General (OIG) has drafted a special Auditor's Guide to
implement a methodology established by the Department to identify first-generation and second-
generation loans that the Department will accept as eligible for SAP at the 9.5 percent minimum
return rate as part of the comprehensive resolution offered to lenders in the January 24, 2007
correspondence. The Auditor's Guide, a copy of which is included as an attachment to this
letter, must be used for this audit. The Auditor's Guide uses a methodology that will allow a
lender to identify loans included in a lender's December 31, 2006 SAP billing that the
Department will consider to be eligible for the 9.5 percent SAP rate. A description of the basis
for the methodology is also included as a separate attachment to this letter.

Audit Requirements for 9.5 Percent Minimum Special Allowance Payment Rate
Page 2

Much as we did for DCL FP-07-01, we will be sending an individual letter to any FFELP lender that submitted SAP claims for the 9.5 percent minimum return rate in their December 31, 2006 SAP billing.  That letter will ask those lenders to confirm that they wish to have their SAP billing paid at the 9.5 percent rate, and if so, how they plan to comply with the audit requirements.

Sincerely,

James Manning
Delegated the Authority of the Assistant Secretary
Office of Postsecondary Education

Attachments

Methodology to Identify Loans Eligible for 9.5 Percent SAP
DCL FP-07-06
April 27, 2007

The following provides a brief summary of the basis for the Department's methodology and procedures, as included in the Auditor's Guide that was developed by the Department's Office of the Inspector General (OIG), to ensure the accuracy of special allowance payment (SAP) billings at the 9.5 percent minimum return rate.   See Dear Colleague Letters FP-06-15, FP 07-01 and FP-07-06.

Objectives of the Methodology

The methodology to identify loans eligible for SAP at the 9.5 percent minimum return rate was designed by the Department to be relatively uncomplicated, easy to implement, and to apply uniformly both to lenders that make loans and to lenders that acquire loans in the secondary market.  The methodology draws inferences regarding loan eligibility from data that are readily available to the lender and is designed to identify those loans that are currently eligible for the 9.5 percent SAP rate sufficient for purposes of the comprehensive resolution offered in a letter, dated January 24, 2007, that was sent to any lender that was claiming, at that time, SAP at the 9.5 percent minimum return rate.

Data Required for Implementation of the Methodology

To achieve the objectives of the 9.5 percent minimum SAP audit, the methodology requires examination of readily retrievable data from records routinely created by lenders for each loan on which the lender is claiming SAP at the 9.5 percent minimum return rate.  This includes data about the tax-exempt bond or other eligible source that funded the loan and about each loan.

For the tax-exempt bond, the data required includes the date of issue of the bond on which the eligibility of the loan for SAP at the 9.5 percent rate depends, and the amount of the bond.  The bond on which eligibility of the loan depends refers to that tax-exempt obligation, the proceeds of which were used either to make or acquire the loan or to make or acquire a loan (first generation loan) that generated funds used to make or acquire the loan in question (second generation loan).  Only tax-exempt bonds originally issued prior to October 1, 1993 or a tax-exempt obligation that refunds such an original obligation can support eligibility.

For each loan for which the lender currently claims SAP at the 9.5 percent rate, the methodology requires only a limited set of data, including the date of the transaction when the lender made or acquired the loan and the amount spent by the lender to make or acquire the loan.  In some instances, the loan may be one that the lender initially made or acquired using sources other than those from a pre-October 1, 1993 tax-exempt obligation.  For such a loan, the transaction in question is the one by which the lender refinanced the loan using funds from an eligible tax-exempt source, and then began treating the loan as one that qualifies for the 9.5 percent SAP rate. Whether or not the lender has created or retained records of the particular source of funds used to acquire the loan, the lender is reasonably expected to have billed for SAP on the loan at all times, and to have recorded the date on which it first characterized the loan as billable for SAP at the 9.5 percent rate.  The methodology focuses on that date as the date on which the lender "acquired" the loan for its tax-exempt portfolio.

Methodology to Identify Loans Eligible for 9.5 Percent SAP
Page 2

Assumptions Used in the Methodology

The audit methodology applies several assumptions, based on Department experience and pertinent legal requirements, about the use of bond proceeds and the characteristics of loans. The methodology considers the FFELP loans for which 9.5 percent minimum SAP is being billed to have the same average lifespan as other FFELP loans, which the Department has determined to be 19 years for consolidation loans and 8.5 years for other FFELP loans.[1]  The methodology also assumes that the lender spent the original proceeds of the eligible bond to make or acquire loans within the three-year period expected under applicable rules that apply to using the proceeds of a tax-exempt obligation.  Loans are assumed to have been amortized in a straight-line manner over this 19-year or 8.5-year lifespan.  Finally, repayments, as well as interest and SAP received on first-generation loans are assumed to have been promptly used to make or acquire second-generation loans.

The assumptions, noted above, may offset any disadvantage that might otherwise be imposed on a lender whose practices and loan characteristics differed from those assumptions.  First, the methodology initially assumes that each of the loans made or acquired within three years of the bond issuance date is an eligible, first-generation loan, and that each of the loans acquired within the subsequent period (19 years or 8.5 years, as applicable) is an eligible, second-generation loan.  Of course, the methodology limits this assumption – for both generations of loans  – to the extent that the amount of the funds expended to make or acquire the loans can not exceed the amount that would have been available either as bond proceeds or as repayments, interest, and SAP on first-generation loans.

Second, the methodology assumes that all proceeds of the eligible bond were used to acquire first-generation loans. In reality, the costs of issuance would have consumed some bond proceeds.

Third, the methodology assumes that the lender used all repayments and interest and special allowance payments received on first-generation loans to make or acquire eligible, second-generation loans.

Fourth, the methodology treats any loan made or acquired within a full period of 22 years (Consolidation) or 11.5 years (Stafford/PLUS) from the issuance of the bond to be a potentially eligible second-generation loan.

---

[1] The Department makes this determination as part of its obligation under the Federal Credit Reform Act of 1990, 2 U.S.C. § 661 et seq., to calculate the subsidy cost for FFELP loans.

Methodology to Identify Loans Eligible for 9.5 Percent SAP
Page 3

<u>Limits on Use of the Audit Results</u>

Demonstrating the eligibility of pending and future 9.5 percent SAP claims under the prescribed audit methodology is an essential condition in the comprehensive resolution offered in a letter, dated January 24, 2007, that was sent to any lender that was claiming, at that time, SAP at the 9.5 percent minimum return rate. The Department agrees to accept the results of the audit as sufficient proof of current and prospective eligibility under the conditions stated and for the purpose of resolving disputes regarding eligibility. In agreeing to this method of demonstrating eligibility of loans that were included in a lender's December 31, 2006 billing for SAP at the 9.5 percent minimum rate, the Department is not waiving the legal requirements, as restated in DCL FP-07-01, for a loan to be eligible to receive SAP at the 9.5 percent minimum rate. The Department simply agrees to the manner in which a lender that accepts this offer of comprehensive resolution can prove that its loans met those requirements. In any other context, proof of eligibility remains the obligation of the lender.

Finally, this audit process examines only whether a loan billed at the 9.5 percent SAP rate is considered to be eligible now and in the future as a first-generation or second-generation loan. However, under applicable law, an eligible loan loses eligibility for SAP at the 9.5 percent rate if any of a number of transactions or events occurs. This audit is not designed to examine whether the eligibility of a loan for 9.5 percent SAP has lapsed. A determination that a particular loan is an eligible first-generation or second-generation loan is not a determination that the loan retained eligibility for SAP at the 9.5 percent rate, or that the loan met other applicable legal requirements for receiving SAP.

**U.S. Department of Education**
Office of Inspector General



# Auditor's Guide

For audits to ensure the accuracy of
certain Federal Family Education Loan
Program special allowance payments.

April 2007

# TABLE OF CONTENTS

Page

1. General Requirements ............................................................. 1

2. Audit Overview ..................................................................... 6

3. Management's Assertions .................................................... 13

4. Audit Procedures ................................................................ 19

5. Submitting Your Report ....................................................... 24

Attachment: Required Schedules ............................................. 26
    A. Management's Assertions
    B. Bond Worksheet
    C. Engagement Letter
    D. Audit Report
    E. Auditor's Certifications
    F. Lender's Response to Audit Report

# CHAPTER 1

# GENERAL REQUIREMENTS

---

**What is the purpose of this Guide?**

This Guide provides requirements for an audit of a lender participating in the Federal Family Education Loan (FFEL) Program.  The audit is an examination level attestation engagement on an assertion of the lender—referred to in this Guide as the "audit"—and is limited to verifying that, for the quarter ended December 31, 2006, a lender has accurately identified its first-generation and second-generation loans that are eligible for special allowance payments under the 9.5 percent floor.  The Guide uses the Department's methodology to identify eligible first-generation and second-generation loans.

This audit is required by the U.S. Department of Education's (Department's) Dear Colleague Letter FP-07-06 (April 2007) and by notification letters that the Department sent to lenders on January 24, 2007, in connection with Dear Colleague Letter FP-07-01 (January 23, 2007).  The Dear Colleague Letters provide the terms under which the Department has agreed to accept loans as eligible for special allowance payments under the 9.5 percent floor.

**Am I qualified to perform audits using this Guide?**

To perform the audit described in this Guide, you must meet the independence, professional judgment, and competence general standards specified in *Government Auditing Standards, January 2007 Revision* (GAS), including organizational independence, continuing education, and peer review requirements.  A lender's internal auditors do not meet GAS's independence standards.

You must also comply with applicable provisions of the public accountancy law and with the rules of the jurisdiction in which you are licensed and where the engagement is being conducted.  If the lender is located in a state outside your home state, you must document your

1

compliance with the licensing requirements of the public accountancy laws of that state.

## How do I use this Guide?

To perform an audit, both you and the lender must follow the requirements in Chapters 1 and 2 of this Guide.  The lender must follow the procedures described in Chapter 3 to provide its Management's Assertions and, later, its reply to the auditor's report.  You must follow the procedures described in Chapters 4 and 5 to verify Management's Assertions and report the results of the engagement.

This Guide includes Schedules that identify the required elements for Management's Assertions, your audit report, and other procedures for this audit.  These schedules are included as an Attachment to this Guide and must be used by management and by you to provide this information.

## How do I prepare for an audit?

To ensure that you are using the most current guidance, you must first review our website for updated information regarding this Guide, at http://www.ed.gov/about/offices/list/oig/nonfed/sfa.html.

## What general considerations are there for audits?

Among other things, you should keep the following considerations in mind while you perform and report this audit:

- You must exercise due care in planning, performing, and reporting the audit, and you must exercise the proper degree of professional skepticism so there is a reasonable degree of assurance that material noncompliance will be detected.

- You must not ignore basic weaknesses in internal control, perform audit steps mechanically (auditing form over substance), or accept explanations for audit exceptions without acquiring adequate evidence.

- Since the Management's Assertions you are verifying will affect billing paid by the Department not only for the quarter ended December 31, 2006, but for future quarters, you must consider these additional amounts, if any, when assessing risk.

- You must design and perform procedures that can be reasonably expected to detect significant fraud or other illegal acts. To do this, you must be aware of fraud and high risk areas and must recognize any basic weaknesses in internal control.

**What must I do if I detect fraud or other illegal acts?**

Some examples of high risk indicators specific to audits of lenders are provided below:

- Inadequate documentation.
- Social Security Numbers duplicated or erroneous.
- Billing under more than one lender ID (for example, having two accounts and billing for the same portfolio under both IDs).
- Undisbursed portions of multiple disbursed loans included in balances used for interest and special allowance computations.
- Reporting full balance of loan portfolio in two Categories.

If you detect fraud or any other illegal act, you must report it immediately to our Investigation Services, by phone or fax at the numbers shown below, before further extending audit steps and procedures:

> Assistant Inspector General for Investigations
> U.S. Department of Education
> 400 Maryland Avenue, SW
> Washington, DC 20202-1510
>
> Phone: 202-245-6966
> Fax: 202-245-6990

You must promptly prepare a separate written report, as instructed by our Investigations Services, and you must submit the report to the address provided above, either within 30 days after you discover the act or within a time frame agreed to by our Investigations Services and you.

You must exercise due professional care when pursuing any indication of fraud or any other illegal act, so that potential future investigations or legal proceedings are not compromised. See paragraphs 6.13 and 6.14 of GAS.

## What is your role in assuring the quality of my audit?

We will evaluate your audits.  As part of our evaluation, you must make supporting working papers available to us or our representative upon request.  If we determine that you have submitted substandard working papers (for example, if you fail to document your work or conclusions in accordance with GAS), or that there are other major inadequacies in your audit, we may—

- Refer the issue to the cognizant State Board of Accountancy and the American Institute of Certified Public Accountants (AICPA), if you are a member;
- Take action to suspend or debar you from conducting additional U.S. federal program audits; or
- Act to recover civil penalties from you.

## What if my working papers contain confidential commercial information?

"Confidential commercial information," as defined by the Freedom of Information Act (FOIA), means trade secrets and commercial or financial information that is privileged or confidential, because disclosure could reasonably be expected to cause substantial competitive harm.  If you or the lender believes that your working papers contain confidential commercial information, you should take appropriate steps to identify that information in your working papers, to protect its confidentiality.

If you are asked to submit your working papers to us, and we subsequently receive a request under FOIA for information that you have designated as confidential commercial information, we must make an independent determination of whether that information meets the criteria for exemption from release.  To the extent permitted by law, we will make a good faith effort to notify you and provide you, or the lender, an opportunity to object if we disagree with your designation.

## Who can I contact about this Guide?

If you are performing your audit under a contract with the Department, contact the official specified in that contract with any questions about this Guide or its requirements.

4
2110

If you are performing your audit under a contract with the lender, and you have questions about this Guide or its requirements, contact—

U.S. Department of Education
Office of Inspector General
Assistant Director, Non-Federal Audits
400 Maryland Ave., SW
Washington, DC 20202-1510

Phone: 202-245-6982
Fax: 202-245-7088

# CHAPTER 2

# AUDIT OVERVIEW

---

**What is the objective of this audit?**

> Identify loans included in the lender's special allowance billing for the quarter ended December 31, 2006, that qualify as first-generation or second-generation loans, eligible for special allowance payments under the 9.5 percent floor, according to the methodology established by the Department.

**What kind of audit is this?**

> This audit is an examination level attestation engagement on an assertion, as described in the AICPA's *Statements on Standards for Attestation Engagements* (SSAEs) and in GAS 1.23: "Consists of obtaining sufficient, appropriate evidence to express an opinion on whether the subject matter is based on (or in conformity with) the criteria in all material respects or the assertion is presented (or fairly stated), in all material respects, based on the criteria." Additional information about the audit type is included in Chapter 4 of this Guide.

**What are first-generation and second-generation loans?**

> First-generation and second-generation loans are the only loans billed by a lender that are eligible for special allowance payments under the 9.5 percent floor.
>
> A lender participating in the FFEL Program is entitled to a quarterly special allowance payment for loans in its portfolio. In general, for Stafford loans, the amount of the quarterly special allowance payment is calculated in four steps:
>
> 1.  Determining the average of the bond equivalent rates of either 91-day Treasury bills auctioned during the quarter, or for loans made in 2000 or later, 3-month commercial paper;
> 2.  Adding a specified percentage to this amount (the specified percentage varies based on the loan type, origination date, and other factors);

3.  Subtracting the applicable interest rate for the loan; and
4.  Dividing the resulting percentage by 4.  (34 C.F.R. § 682.302(c))

If a loan was made or purchased with the proceeds of a tax-exempt obligation that was originally issued before October 1, 1993, it may qualify for a separate, special allowance calculation that provides—with the interest paid on the loan—a minimum return of 9.5 percent. In this Guide, we refer to this separate calculation as the "9.5 percent floor."

Under 34 C.F.R. § 682.302(c)(3)(i), to qualify for the 9.5 percent floor, a loan must be—

> . . . made or purchased with funds obtained by the holder from—
> (A) The proceeds of tax-exempt obligations originally issued prior to October 1, 1993;
> (B) Collections or payments by a guarantor on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
> (C) Interest benefits or special allowance payments on a loan that was made or purchased with funds obtained by the holder from obligations described in paragraph (c)(3)(i)(A) of this section;
> (D) The sale of a loan that was made or purchased with funds obtained by the holders from obligations described in paragraph (c)(3)(i)(A) of this section; or
> (E) The investment of the proceeds of obligations described in paragraph (c)(3)(i)(A) of this section.

A summary of these eligible funding sources is provided below:

- **Source A**: Proceeds of the eligible tax-exempt obligation.
- **Source B**: Collections or payments on a loan funded by Source A.
- **Source C**: Interest benefits or special allowance payments on a loan funded by Source A.
- **Source D**: Funds obtained from the sale of a loan that was funded by Source A.
- **Source E**: The investment of funds in Source A.

Sources B through D consist exclusively of funds obtained directly from a loan funded by Source A.  Applicable law treats loans made from Source E (earnings from the investment of bond proceeds) like loans made from Sources B through D.

An example is provided below:

- *Loan 1 (the "first-generation loan")*, funded by the proceeds of the tax-exempt obligation, is eligible for the 9.5 percent floor because it is funded by Source A.

- *Loan 2 (the "second-generation loan")*, purchased with funds obtained from the sale of Loan 1, is eligible for the 9.5 percent floor because it is funded by Source D.

- *Loan 3 (the "third-generation loan")*, purchased with funds obtained from the sale of Loan 2, is not eligible for the 9.5 percent floor.  It is not funded by Source D, because its funds were not obtained from the sale of a loan that was funded by Source A.

Dear Colleague Letter FP-07-01 (January 23, 2007) explains first-generation and second-generation loans as follows:

> Loans acquired from these five sources can be divided into two categories. The first category is "first-generation loans" – and includes only those loans acquired using proceeds of the tax-exempt obligation (*i.e.*, funds obtained directly from the issuance of the tax-exempt obligation). . . .  The second category is "second-generation loans" – and includes only those loans acquired using funds obtained directly from first-generation loans. . . .  Funds obtained as collections on second-generation loans, interest and special allowance payments on second-generation loans, or sales of second-generation loans, or those same kinds of funds obtained from later generation loans, are not eligible sources of funds under the statute or regulation. Therefore, loans acquired with funds from second-generation loans or later generations of loans are not eligible for SAP at the 9.5 percent minimum return rate.

## Where can I find the criteria for this audit?

The criteria for this audit are provided in—
- Dear Colleague Letters FP-07-06 (April 2007), FP-07-01 (January 23, 2007), and FP-06-15 (October 6, 2006);
- Title 34 C.F.R. § 682.302, as amended in the Federal Register on August 9, 2006 (71 FR 45703 through 45705) and on November 1, 2006 (71 FR 64398); and
- Section 438(b)(2)(B) of the Higher Education Act of 1965, as amended (HEA) (20 U.S.C. 1087-1(b)(2)(B)), including amendments made by the Taxpayer-Teacher Protection Act of 2004 and by the Higher Education Reconciliation Act of 2005.

All of these sources are available on the Department's Information for Financial Aid Professionals web site, at http://ifap.ed.gov.

## What are some examples of criteria that I need to be aware of?

For example, a loan is ineligible if it—
- Is currently funded by a tax-exempt bond, issued on or after October 1, 1993, that did not refund, or was not one of a series of tax-exempt refundings of, a tax-exempt bond originally issued before that date.
- Is currently funded by a taxable bond that was used to refinance the loan after September 30, 2004.
- Is currently funded by a taxable bond but derived its eligibility from a tax-exempt bond that has matured or been retired or defeased from sources other than qualifying tax-exempt sources.
- Is pledged to a tax-exempt bond that matured or was refunded, retired or defeased after September 30, 2004.
- Unless the lender is a small lender, has an acquisition date later than February 7, 2006.

These requirements are in 34 C.F.R. § 682.302(c)(3)(i), (e), and (f). You need to be aware of these and other criteria as you conduct your audit, and you must report exceptions if they come to your attention.

## Why is this audit needed?

The attachment to Dear Colleague Letter FP-07-01 is a letter that was sent to all lenders currently claiming special allowance payments under the 9.5 percent floor. In this letter, the Department stated that it would make no further special allowance payments to lenders at the

9.5 percent floor rate until the lenders' first-generation and second-generation loans had been identified.  This audit is needed to make that determination.

The attachment states—

> The audit or review will be conducted by an independent accounting firm.  As an alternative, you may arrange for the conduct of an audit or review by an independent accounting firm of your choosing, under a set of requirements to be established by the Department.  The Department will pay all claims for SAP at the standard rate until the results of the audit or review have been received, evaluated, and accepted by the Department.  We will consider, and rely upon, as appropriate the results of the audit or review in determining what amount to pay at the 9.5 percent minimum return rate.

### How can first-generation and second-generation loans be identified?

The procedures that a lender must use to identify its first-generation and second-generation loans and make its Management's Assertions are described in Chapter 3.  The procedures for the audit are described in Chapter 4.

The following chart provides a simplified illustration of the model used by the methodology in Chapter 3 to identify first-generation and second-generation loans:



In this simplified illustration, the first-generation loans are funded within the first three years of the bond's issuance, and are then paid down over the next 8.5 years.  The funds that are used to pay down the first-generation loans are used to create second-generation loans.  After the first 11.5 years of the bond's issuance, no first-generation loans remain as a source of funds, and any loans acquired thereafter are third-generation or later-generation loans.

In most cases though, additional factors will impact the audit methodology:

- A bond's first-generation loans may include consolidation loans, which would be paid down over a lifetime of 19 years, instead of the 8.5 year lifetime of non-consolidation loans;
- Loans will amortize beginning on various dates over the first three years after the bond's issuance date (the simplified illustration assumes that all loans begin to amortize on the same date, three years after the bond issuance date); and
- Lenders will use interest and special allowance payments on the first-generation loans to make second-generation loans.

The procedures described in Chapter 3 incorporate these additional factors into the model illustrated in the chart.

## What is a "small lender"?

As used in this Guide, a small lender is a lender that meets the criteria in 34 C.F.R. § 682.302(e)(5)(ii).  It is a lender that—

> (A) On February 8, 2006 and during the quarter for which special allowance is determined under this paragraph—
> (*1*) Is a unit of State or local government or a private nonprofit entity, and
> (*2*) Is not owned or controlled by, or under common ownership or control by, a for-profit entity; and
> (B) In the most recent quarterly special allowance payment prior to September 30, 2005, held, directly or through any subsidiary, affiliate, or trustee, a total unpaid balance of principal of $100,000,000 or less for which special allowance was determined and paid under paragraph (c)(3) of this section.

Under 34 C.F.R. § 682.302(e)(4), loans cannot become eligible for the 9.5 percent floor after February 7, 2006, or remain eligible if they are re-purchased after that date.  However, small lenders are not subject to this provision until December 31, 2010.  (34 C.F.R. § 682.302(e)(5))

If the lender that you are auditing asserts that it is a small lender, you will need to verify the lender's assertion and address this difference in your audit procedures.

**What process will be used for these audits?**

> A lender must follow the procedures described in Chapter 3 to make its Management's Assertions and its reply to your report.  You must follow the procedures in Chapter 4 to verify Management's Assertions and follow the procedures in Chapter 5 to report the results of your audit.

> As stated in Dear Colleague Letter FP-07-06, the audit described in this Guide may be conducted either by an independent accounting firm under contract with the Department or, as an alternative, by an independent accounting firm of the lender's choosing.  In both cases, the quality of the audits will be closely monitored by the Department.

# CHAPTER 3

# MANAGEMENT'S ASSERTIONS

---

**What are the steps a lender must follow for this audit?**

The lender follows the procedures in this Chapter to provide its Management's Assertions on Schedule A. If the lender is a small lender, it includes that assertion on the Schedule.

The lender documents the calculations that identify its first-generation and second-generation loans by completing a Bond Worksheet (Schedule B) for each eligible tax-exempt bond from which its loans derive eligibility for the 9.5 percent floor. After reviewing the auditor's report, the lender provides its response to that report on Schedule F.

**How does a lender identify its first-generation and second-generation loans?**

The lender performs the following Steps to identify loans that are potentially eligible for the 9.5 percent floor and their funding bonds:

1) *Loan information*. List the loans billed under the 9.5 percent floor for the quarter ended December 31, 2006 (the "December 2006 loans"). Include in the list, for each loan—
   a) the loan's—
      - identification number,
      - loan type,
      - billing code;
      - Lender's Request for Payment of Interest and Special Allowance (LaRS) special allowance category code ("X Code"); and
      - ending and average daily principal balances as of December 31, 2006.

    b) the identification number of the eligible tax-exempt bond from which the loan derives its current eligibility;[1]

    c) the date on which the loan was originated or purchased by the eligible tax-exempt bond (the "acquisition date");[2]

    d) the amount of the bond's funds used to originate or purchase the loan (the "acquisition amount"); and

    e) the identification number of the bond issue currently funding the loan and the date on which the loan was originated or purchased by that bond.

2) *Bond information.* List the bonds from which the December 2006 loans derive their eligibility for the 9.5 percent floor.[3] Include in the list, for each bond—

    a) the bond's identification number,

    b) the total amount of the bond (the "bond amount"),[4] and

    c) the date on which the bond was issued (the "bond issuance date").[5]

---

[1] A loan may derive its eligibility only from a tax-exempt bond originally issued before October 1, 1993, the proceeds of which were used to acquire either that loan or the loan that generated the funds used to acquire the loan in question.

[2] A loan's acquisition date must be earlier than February 8, 2006. Under the Higher Education Reconciliation Act of 2005, except for small lenders, no loan originated or purchased on or after February 8, 2006, or not already earning 9.5 percent floor SAP on that date, can become eligible for SAP under the 9.5 percent floor.

[3] See Note 1.

[4] There may be cases in which an eligible tax-exempt bond, issued before October 1, 1993, refunded a prior, eligible tax-exempt bond and, at the same time, created additional money that was used to make loans eligible for the 9.5 percent floor. For example, tax-exempt Bond A is issued for $75 million in 1985, and it funds loans eligible for the 9.5 percent floor. Tax-exempt Bond B is issued in 1992 for $100 million: $75 million is used to refund Bond A and $25 million in new money is used to create additional loans eligible for the 9.5 percent floor. In this case—and in other, similar cases—this Guide's use of the terms "bond amount" and "bond issuance date" refers to the portion of the bond from which a loan's eligibility for the 9.5 percent floor is derived. In the example, of the $100 million in loans funded by Bond B, $75 million would remain associated with Bond A (the bond issuance date and bond amount would be the date and amount of Bond A, and that portion of Bond B would be treated like any other refunding bond) and $25 million would be associated with Bond B (the bond issuance date and bond amount would be the date of Bond B and the amount of the new money added by Bond B, $25 million). The lender would need to perform Steps 3 through 7 of this process separately for the $75 million in loans for Bond A and the $25 million in loans for Bond B's new money.

[5] The bond issuance date for a refunding or refinancing bond is the same as the issuance date of the pre-October-1993, tax-exempt bond that was first refunded. As such, all issuance dates for bonds from which a loan derives its eligibility must be earlier than October 1, 1993.

The lender then uses a separate Bond Worksheet (Schedule B) to perform the following steps for each bond identified in Step 2:

3) *First-generation loans*.  To identify a bond's first-generation loans—
   a) List the December 2006 loans by acquisition date, from earliest to latest, and create running totals for the loan acquisition amounts.
   b) If a loan's acquisition date is no more than 3 years after its bond's issuance date, and the running total including the amount for acquisition of that loan does not exceed the bond amount, the loan is a **first-generation loan**.

4) *Calculate second-generation cap.*
   a) Total the acquisition amounts of the consolidation loans identified as first-generation loans in Step 3.  This amount is considered to be the amount of the bond's first-generation loans that were consolidation loans.
   b) Subtract the amount identified in Step 4a from the bond amount.  The remainder is considered to be the amount of the bond's first-generation loans that were non-consolidation loans.
   c) Calculate the total interest and special allowance payments that would accrue on the consolidation and non-consolidation loans identified in Steps 4a and 4b, over the life of the loans, using a straight-line amortization.  Except for small lenders, do not include any interest or special allowance payments that would accrue after February 7, 2006.  The calculation must assume that—
      - Combined interest and special allowance payments accrue at 9.5 percent per annum,
      - A bond's entire first generation of loans has been acquired within 3 years after the bond issuance date, in equal amounts in each of those 3 years, and
      - The lives of consolidation and non-consolidation loans are 19 years and 8.5 years, respectively.

      The calculation must also include an allowance for investment income on the unexpended balance of the bond proceeds, accruing at 9.5 percent per annum during the three-year period after the bond issuance date.
   d) Using the same amortization schedule applied to the first-generation consolidation loans in Step 4c, identify the amount of principal outstanding for those first-generation consolidation loans on February 7, 2006.

    e)  The **second generation cap** is determined by adding the bond amount to the amount determined in Step 4c and subtracting the amount determined in Step 4d.

5)  *Second-generation loans (First Cut).*
    a)  Omitting first-generation loans, list the December 2006 loans by acquisition date, from earliest to latest, and create running totals for the loan acquisition amounts.
    b)  A loan is a **second-generation loan** if its acquisition date is no more than 11.5 years after its bond's issuance date and the running total including the amount for its acquisition does not exceed the second-generation cap calculated in Step 4.

6)  *Second-generation loans (Second Cut).*
    a)  Calculate the remaining amount of the second-generation cap by subtracting the running total expended through the acquisition of the last loan identified as a second-generation loan in Step 5b from the second-generation cap calculated in Step 4.
    b)  Omitting first-generation loans identified in Step 3 and second-generation loans identified in Step 5, list the December 2006 loans by acquisition date, from earliest to latest, and create running totals for the loan acquisition amounts.
    c)  A loan is a **second-generation loan** if its acquisition date is no more than 22 years after its bond's issuance date and the running total including the amount for its acquisition does not exceed the lesser of—
       •  The remaining amount of the second-generation cap (determined in Step 6a), or
       •  The amount of principal, interest and special allowance payments (as calculated in Step 4c) that would accrue on the bond's first-generation consolidation loans (determined in Step 4a) during the period 11.5 to 22 years after the bond issuance date, excluding any amount that would accrue or would be required to be repaid after February 7, 2006 (or December 31, 2006, for a small lender).

7) *Billing amounts*.
   a) Total the ending and average daily principal balances for the quarter ended December 31, 2006, for the first-generation loans identified in Step 3 and the second-generation loans identified in Steps 5 and 6.
   b) Calculate grand totals for these amounts and provide them in item 1 of Schedule A.
   c) Complete item 2 of Schedule A, review the remaining items, and sign in Section C of Schedule A.

**For Steps 3, 5, and 6, how does a lender identify a first-generation or second-generation loan if more than one loan have the same acquisition date?**

If more than one loan has the same acquisition date, and this ambiguity would affect the identification of loans as first-generation or second-generation loans, the lender orders the loans acquired on that date by the time of their acquisition, from earliest to latest. If that information is not readily available, the lender orders the loans acquired on the same date randomly.

**How does a lender perform the straight-line amortization required in Step 4?**

Lenders are required to use the Microsoft Excel spreadsheets we have developed for this purpose (the "Bond Spreadsheets"). Instructions on the Bond Worksheet (Schedule B) identify the data that must be entered into the Bond Spreadsheet by the lender. These instructions also identify the data that must be entered into the Bond Worksheet by the lender, from the calculations of the Bond Spreadsheet.

The Bond Spreadsheets—one for small lenders and another for all other lenders—are available at the following web site:

http://www.ed.gov/about/offices/list/oig/nonfed/sfa.html

To use a Bond Spreadsheet, follow the instructions on its first worksheet, tabbed, "Schedule B Calculations."

**What if a lender disagrees with the results of the audit?**

The lender documents its disagreement with the audit results on the Lender's Response to Audit Report, Schedule F. The lender is required to complete Schedule F for all audits, to document its agreement or disagreement with the audit results.

The lender may dispute the results of application of this methodology only on the ground that the auditor erred in applying the methodology stated in this Guide.  The lender must explain each instance in which it contends that the auditor erred, and demonstrate that application of the methodology correctly would identify as first-generation or second-generation loans one or more loans not identified as such in the audit.

The Department will consider each dispute on a case-by-case basis, as part of its review of the audit report.

### What if a lender disagrees with the method this Guide uses to identify first-generation and second-generation loans?

This Guide may not be used to audit an assertion by a lender that is not the result of the procedures described in this Guide.  A lender that disputes the Department's methodology stated in this Guide may not use this Guide, its procedures, or its underlying assumptions to establish the eligibility of its claims for special allowance payments at the 9.5 percent floor rate.

# CHAPTER 4

# AUDIT PROCEDURES

---

**What are the steps I follow to perform this audit?**

The lender gives you its Management's Assertions (Schedule A), which includes its Bond Worksheets (Schedule B).  You then follow the procedures in this Chapter to test management's assertions.  If you are being paid by the lender to perform the audit, you must complete Schedule C, Engagement Letter, before beginning the audit.

You report the results of your audit using Schedule D and provide your certifications on Schedule E.  You follow the procedures in Chapter 5 of this Guide to obtain the lender's response to the audit report on Schedule F and assemble and submit the audit package to the Department.

**What type of engagement is this?**

This audit is an examination level attestation engagement, as defined in GAS 1.23.  You must follow applicable GAS and SSAE requirements for this type of engagement when performing the audit.  All references to GAS in this Guide refer to its January 2007 version (GAO-07-162G).

GAS 6.05 specifies additional attestation engagement fieldwork standards that go beyond the requirements contained in the SSAEs.  In performing this engagement, auditors must comply with these additional standards.  These standards relate to—
1) Auditor communication during planning;
2) Previous audits and attestation engagements;
3) Internal control;
4) Fraud, illegal acts, violations of provisions of contracts or grant agreements, or abuse that could have a material effect on the subject matter;

5)  Developing elements of a finding; and
6)  Documentation.

## How do I define *materiality*?

You use the applicable requirements in GAS to develop your definition.  During the audit you must consider the effect of the lender's compliance with the procedures in this Guide on special allowance payments made to the lender by the Department, not only for the quarter ended December 31, 2006, but for future quarters.  You must consider these additional amounts, if any, when developing your definition of materiality, and your considerations on materiality should be properly documented in the audit working papers.

## What if the lender has more than one Lender ID?

Some lenders bill the Department for special allowance payments under multiple Lender IDs or may use the Lender IDs of one or more eligible lender trustees to bill the Department for their loans.  Some lenders may submit separate reports for each lender ID, and others may combine their lender IDs into one or more reports.  The lender you are auditing is required to disclose all of its Lender IDs to you on its Management's Assertions.

## Must I review the lender's previous audit reports as part of my audit?

Yes.  You ask the lender's management to identify all reports of previous audits and reviews of the lender issued within the two years immediately preceding your audit.  This includes reports for the previous compliance audit and for any OIG audits, FSA program reviews, FFEL Program guarantee agency reports, licensing agency reports, and other audits or program reviews related to the lender's compliance with FFEL Program requirements issued during that two-year period.

You must identify all unresolved prior findings that are material to this audit, the status of their resolution, and the actions necessary for the lender to resolve those findings.  To do this, you may find it necessary to test the status of the prior findings.  For example, you may need to observe an activity that was redesigned to address a prior finding, or you may need to test transactions, similar to those in the prior finding, that are material to an examination of the Management's Assertions.

**If the lender uses a servicer, how do I test the lender's assertions?**

You must first obtain the servicer's most recent audit report from the lender.  If the audit report contains findings of noncompliance that are material to this audit, you assess the effect of the noncompliance on the nature, timing, or extent of substantive tests at the lender.  If significant noncompliance is disclosed in the servicer's audit, you assess the effect of that noncompliance on this audit of the lender and include that information in the audit report.

A servicer may maintain records or provide services for the lender that must be examined in order to perform the audit steps described in this Chapter.  If this is the case, you must examine the servicer's records or services as if they were the lender's.  Depending on the nature of the records or services, this may require a separate on-site visit at the Servicer to perform the audit steps.

**What audit steps must I perform?**

You must perform the following audit steps:

1) *Obtain information from lender*.  You must obtain from the lender—
   a) the lender's Management's Assertions and Bond Worksheets (Schedules A and B) and any attachments; and
   b) if you are being paid by the lender, you and the lender must complete an Engagement Letter (Schedule C).

2) *Verify status as small lender*. If in item 2 of its Management's Assertions, the lender asserts that it is a small lender, you must review—
   a) the charter, documents of incorporation, audited financial statements, or any other documents needed to determine whether the lender is a unit of State or local government, or is a private nonprofit entity that is not owned, controlled, or under common ownership or control by a for-profit entity; and
   b) the lender's billing records to confirm that, in its most recent quarterly special allowance payment before September 30, 2005, the lender held, directly or through any subsidiary, affiliate, or trustee, a total unpaid balance of principal of $100,000,000 or less for which the Department paid special allowance under the 9.5 percent floor.

3) *Ensure that data are reliable.*  Follow the guidance in the Government Accountability Office's *Assessing the Reliability of Computer-Processed Data* (GAO-03-273G, October 2002) to ensure that data used in the audit are reliable.  At a minimum, you must—

   a) select and test a sample of loans in the electronic data attached to the Management's Assertion to verify that it is accurate: the loan's tax-exempt bond issue, acquisition date, acquisition amount, loan type, and other information must accurately reflect the information in the Lender's data system;

   b) evaluate and analyze the query used by the lender to select the data attached to the Management's Assertions, to ensure that the query did not include or exclude loans inappropriately; and

   c) test the universe of loans queried by selecting a sample of loans in the lender's data system and verifying that those loans are accurately represented in the data attached to the Management's Assertions.

4) *Verify amounts and issuance dates of bonds used to qualify loans for the 9.5 percent floor.*  Use the bond's prospectus, IRS Form 8038, and other documents to verify the amount of the bond.  Determine that the bond identified as the bond from which the loan derives its eligibility—

   a) is a tax-exempt bond;

   b) was originally issued before October 1, 1993 (if the bond with which the loan is currently associated is a refunding bond, the tax-exempt bond it refunded meets this requirement, either directly or through an intervening refunding bond); and

   c) after September 30, 2004, did not mature and was not retired or defeased.

5) *Conduct preliminary test of loans.*  Verify that all loans in the list have a "BC" billing code, indicating that the amount is for special allowance for the current quarter.

6) *Identify first-generation and second-generation loans.*  Using the data you verified in Steps 1 through 5 identify the lender's first-generation and second-generation loans using the procedures provided to lenders in Chapter 3.  Compare the result to the lender's Management's Assertions and Bond Worksheets.

7) *Verify lender's billing under the 9.5 percent floor.*  Verify that, for the quarter ended December 31, 2006—

a)  the total average daily principal balance for the lender's eligible first-generation and second-generation loans is the same as the amount reported by the lender in item 1a of its Management's Assertions; and

b)  the total ending principal balance for the lender's eligible first-generation and second-generation loans is the same as the amount reported by the lender in item 1b of its Management's Assertions.

## How do I select my sample for Step 3?

All samples must be selected randomly.  If the total number of loans in the universe is 500 or greater, select a minimum sample of 50 loans.  If the total number of loans in the universe is less than 500 loans, select a minimum random sample of 10 percent of the loans or 10 loans, whichever is greater.

If you determine that material noncompliance may exist, you must expand the sample in order to evaluate the error statistically.  Your expanded sample must be sufficient to project the error rate to the universe at the 95 percent confidence level, with a confidence interval of ± 5 percent.

# CHAPTER 5

# SUBMITTING YOUR REPORT

**How do I report the results of my audit?**

You complete and submit Schedule D, Audit Report, following the instructions provided on the Schedule. You also read and sign the Auditor's Certifications, on Schedule E, and obtain the lender's response to the audit report, on Schedule F.

**What must be included in the audit report package?**

Your audit report package must include—

- All the Schedules and Bond Worksheets that are required by this Guide for the audit;

- Any separate report on illegal acts that you submitted under the procedures described in Chapter 1;

- Any additional reports or communication between you and the lender concerning the audit; and

- A cover letter, on your company's letterhead, signed by a responsible official.

The cover letter may include any additional statements or information not required on the Schedules but required under your company's practices. The minimum elements of your audit report (Schedule D) and the auditor certifications (Schedule E) must be included in the audit report package on those schedules, but may be duplicated in your cover letter, if you wish.

**When and to whom do I submit my audit report package?**

If you are performing your audit under a contract with the Department, your report is due and delivered under the terms of the contract.

If you are performing your audit under a contract with the Lender, you must submit the audit report to the Department no later than September 30, 2007.

The audit report package must be addressed to—

U. S. Department of Education
Federal Student Aid, Financial Partners Services
Union Center Plaza
830 First Street NE, Room 84F3
Washington, DC 20202-5353
     Attn: SAP Audit Reports

# ATTACHMENT

# REQUIRED SCHEDULES

This Attachment includes the following Schedules:

- Schedule A: Management's Assertions
- Schedule B: Bond Worksheet
- Schedule C: Engagement Letter
- Schedule D: Audit Report
- Schedule E: Auditor's Certifications
- Schedule F: Lender's Response to Audit Report

# SCHEDULE A
# MANAGEMENT'S ASSERTIONS

**SECTION A: PROVIDE IDENTIFYING INFORMATION ABOUT THE LENDER.**

| Lender's name: | Lender's ID Number(s) used to bill any special allowance payments under the 9.5 percent floor: |
|---|---|
|  |  |

**SECTION B: PROVIDE BILLING AMOUNTS.**

1. The management of our lender asserts that, under the procedures and criteria in the *Auditor's Guide*, for the eligible first-generation and second-generation loans in its special allowance billing for the quarter ended December 31, 2006—

   a. The total average daily principal balance is $ _____.

   b. The total ending principal balance is $ _____.

**SECTION C: ASSERT SMALL LENDER STATUS.**

2. Is your lender a small lender, as that term is defined in the *Auditor's Guide*?    ☐ Yes  ☐ No

**SECTION D: PROVIDE ADDITIONAL ASSERTIONS.**

In addition, the management of our lender asserts that—

3. It has attached to this Schedule, in an electronic format, the list required under lender procedures Step 1 in Chapter 3 of the Auditor's Guide. The list is complete and accurate, and it identifies eligible first-generation and second-generation loans according to the procedures and criteria in the *Auditor's Guide*.

4. It has attached to this Schedule the completed Bond Worksheets, on Schedule B, for each of its eligible bonds.

5. It has made available to the auditor all documentation and communications related to its compliance with the requirements and procedures in the Auditor's Guide.

6. It has not provided interpretations to the auditor for any requirements in the Auditor's Guide that may have varying interpretations.

7. It has internal controls in place to monitor and ensure the accuracy of the amounts it provides on this Schedule, and these amounts include only loans that are first-generation and second-generation loans obtained from an eligible source, as described in the Department's Dear Colleague Letter (FP-07-01), dated January 23, 2007, and no others.

8. It has disclosed to the auditor and to the audit committee all significant deficiencies in the design and operation of the internal controls that could adversely affect the accuracy of the information provided on this schedule, as well as any fraud, whether or not material, that involves management or any other employee connected to the information provided on this Schedule A.

**SECTION E: LENDER'S PRESIDENT OR CEO SIGNS.**

The management of the lender identified in Section A confirms that the assertions provided on this Schedule A, and in its attachments, are true and accurate to the best of its knowledge and belief.

_____     _____     _____
**Signature of President or CEO**                          **Title (Print)**              **Date Signed**

# SCHEDULE B
# BOND WORKSHEET

**STEP 2: BOND INFORMATION.**

**A** _____   Bond Identification Number *(Enter into Bond Spreadsheet, Line 1)*

**B** $_____   Bond Amount *(Enter into Bond Spreadsheet, Line 2)*

**C** _____   Bond Issuance Date: Can't be later than October 1, 1993 *(Enter into Bond Spreadsheet, Lines 3 through 5)*

**STEP 3: FIRST-GENERATION LOANS.**

**D** _____   End date: **C** + 3 years *(From Bond Spreadsheet, Line 11)*

**E** $_____   Total acquisition amount of first-generation loans: can't be greater than **B**

**STEP 4: CALCULATE SECOND-GENERATION CAP.**

**F** $_____   Total acquisition amount of consolidation loans in first generation *(Enter into Bond Spreadsheet, Line 7)*

**G** $_____   Total acquisition amount of non-consolidation loans in first-generation: **B** – **F** *(From Bond Spreadsheet, Line 8)*

**H** $_____   Total interest and SAP over life of first-generation loans *(From Bond Spreadsheet, Line 13)*

**I** $_____   Amount of principal outstanding for first-generation consolidation loans on February 7, 2006 *(From Bond Spreadsheet, Line 14)*

**J** $_____   Second Generation Cap: **B** + **H** – **I** *(From Bond Spreadsheet, Line 15)*

**STEP 5: SECOND-GENERATION LOANS (FIRST CUT).**

**K** _____   End date: **C** + 11.5 years *(From Bond Spreadsheet, Line 17)*

**L** $_____   Total acquisition amount of first-cut second-generation loans: can't be greater than **J**

**STEP 6: SECOND-GENERATION LOANS (SECOND CUT).**

**M** $_____   Remaining amount of second-generation cap: **J** – **L**

**N** $_____   Amount of principal, interest, and special allowance payments that would be due or accrue on the first-generation consolidation loans *(From Bond Spreadsheet, Line 16)*

**O** _____   End date: **C** + 22 years *(From Bond Spreadsheet, Line 18)*

**P** $_____   Total acquisition amount of second-cut second-generation loans: cannot be greater than **M** *and* cannot be greater than **N**

**STEP 7: BILLING AMOUNTS.**

**Q** $_____   Total ending principal balance for quarter ended December 31, 2006

**R** $_____   Total average daily principal balance for quarter ended December 31, 2006

# SCHEDULE C
# ENGAGEMENT LETTER

**SECTION A: PROVIDE INFORMATION ABOUT THE LENDER.**

**1.** Lender's name and address (street, city, state, zip), including any aka's:

**2.** President's name:

**3.** Contact person's name and title:

**4.** Contact person's telephone:

**5.** Contact person's fax:

**6.** Contact person's e-mail address:

**SECTION B: PROVIDE INFORMATION ABOUT THE AUDITOR.**

**7.** Auditing firm's name and address (street, city, state, zip):

**8.** Lead auditor's name:

**9.** Lead auditor's telephone:

**10.** Lead auditor's fax:

**11.** Lead auditor's e-mail address:

**12.** Lead auditor's license (Home State):

**13.** Lead auditor's license (Out of State):

**SECTION C: CERTIFICATIONS.**

14. Our signatures below certify that—

    a.  The lender identified in Section A has engaged the auditor identified in Section B to perform the audit described in the *Auditor's Guide*.

    b.  The audit must be performed and reported in accordance with the *Auditor's Guide,* as issued by the U.S. Department of Education's Office of Inspector General.

    c.  The U.S. Department of Education intends to use the auditor's report to ensure the accuracy of the lender's special allowance payments for Federal Family Education Loan Program loans.

    d.  The auditor is required to provide access, on request, to records, audit work papers, and other documents necessary to review the audit (including the right to obtain photocopies) to the U.S. Department of Education, to the Inspector General, and to their representatives (34 C.F.R. §§ 668.23(e)(1)(ii) and 682.305(b)(5) and (c)).

**SECTION D: LENDER AND AUDITOR SIGN.**

**15. Signature for Lender:**

**a. Signature**

**b. Title (Print)**

**c. Date Signed**

**16. Signature for Auditor:**

**a. Signature**

**b. Title (Print)**

**c. Date Signed**

# SCHEDULE D
# AUDIT REPORT

| SECTION A: PROVIDE IDENTIFYING INFORMATION ABOUT THE LENDER. |
|---|

| Lender's name: | Lender's ID Number(s): | Date of Lender's Assertion (Schedule A): |
|---|---|---|
| | | |

| SECTION B: PROVIDE THE RESULTS OF YOUR AUDIT (If needed, provide continuations of responses on separate sheets) |
|---|

**1.** In your opinion, are management's assertions on Schedule A fairly stated, in all material respects, based on the criteria set forth in the *Auditor's Guide*, issued by the U.S. Department of Education, Office of Inspector General, dated April 2007 (the "*Auditor's Guide*")?   ☐ Yes   ☐ No

**2.** If you answered "No" to item 1, explain below:

**3.** **a.** Were the loans you identified as first-generation and second-generation loans (in Step 6 of the audit procedures in the *Auditor's Guide*) the same loans identified as first-generation and second-generation in the list provided by the lender for Schedule A?   ☐ Yes   ☐ No

**b.** If you answered "No" to item 3a, explain below.  You must identify all exceptions between your lists of first-generation and second-generation loans and the lender's lists of eligible first-generation and second-generation loans.  If it is more convenient, you may attach to this schedule, in an electronic format, your complete list identifying first-generation and second-generation loans.

**4.** If you answered "No" to item 3a, provide your totals for the lender's special allowance billing for the quarter ended December 31, 2006:

a. Total average daily principal balance for all eligible first-generation and second-generation loans:   $_____.

b. Total ending principal balance for all eligible first-generation and second-generation loans:   $ _____.

**5.** **a.** In the table below, provide information about your samples for each bond.  Identify the total dollar amounts in the universe, in your sample, for sample error, and for projected error, for each bond tested.

| Bond<br>ID | Entire Population<br>Amount | Sample Population<br>Amount | Sample<br>Error | Projected<br>Error |
|---|---|---|---|---|
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |
| | $ | $ | $ | $ |

b. If the sample was expanded to evaluate the projected error rate statistically, provide information about the sample's confidence level and precision below:

**6.** **a.** During your audit, did you identify any material instances of non-compliance with the Higher Education Act of 1965, as amended, regulations, or other guidance provided by the U.S. Department of Education?   ☐ Yes   ☐ No

**b.** If you answered "Yes" to item 6a, explain below:

**7.** **a.** Was there any restriction on the scope of the audit?   ☐ Yes   ☐ No

**b.** If you answered "Yes," explain below:

# SCHEDULE E
# AUDITOR'S CERTIFICATIONS

**SECTION A: PROVIDE IDENTIFYING INFORMATION ABOUT THE COMPLIANCE AUDIT.**

| Lender's name: | Lender's ID Number(s): | Date of Lender's Assertion (Schedule A) |
|---|---|---|
| | | |

**SECTION B: AUDITOR'S CERTIFICATION.**

The signature below certifies that—

1. We have examined management's assertions, accompanying this report as Schedule A, concerning the amounts of the lender's loans that are eligible for the 9.5 percent floor special allowance payments, as described in the *Auditor's Guide*, issued by the U.S. Department of Education, Office of Inspector General, dated April 2007 (the "*Auditor's Guide*").

2. The lender identified in Section A is responsible for management's assertions. Our responsibility is to express an opinion on the assertions based on our examination.

3. Our examination was conducted in accordance with generally accepted government auditing standards for attestation engagements and with attestation standards established by the American Institute of Certified Public Accountants.

4. Our examination included procedures, specified in the *Auditor's Guide*, to test evidence supporting management's assertions and performing such other procedures that we considered necessary in the circumstances.

5. Our opinion on management's assertions is provided on Schedule D and is based on the criteria set forth in the *Auditor's Guide*. We believe that our examination provides a reasonable basis for our opinion.

6. This engagement was performed using procedures prescribed in the *Auditor's Guide*. The sufficiency of these procedures is solely the responsibility of the report's users. We can make no representations regarding the sufficiency of the procedures.

7. If we had performed additional procedures, other matters might have come to our attention that would have been reported. As a result, this report is intended solely for the information and use of the audit committee, management, and the U.S. Department of Education. It is not intended to be, and should not be, used by anyone other than these specified parties.

**SECTION C: AUDITOR SIGNS.**

I certify that the statements on this Schedule and on Schedule D, including any attachments, are true and accurate to the best of my knowledge and belief.


_____     _____     _____

**Signature for Auditor**                                          **Title (Print)**                    **Date Signed**

SCHEDULE F

# LENDER'S RESPONSE TO AUDIT REPORT

**SECTION A: PROVIDE IDENTIFYING INFORMATION ABOUT THE LENDER.**

Lender's name:

Lender's ID Number(s):

**SECTION B: PROVIDE YOUR RESPONSE TO THE AUDIT REPORT.**

**1.** Do you concur with the Audit Report?  ☐ Yes  ☐ No

**2.** If you answered "No" to item 1, for your special allowance billing for the quarter ended December 31, 2006, provide the total amounts you assert are eligible first-generation and second-generation loans—

a. The total average daily principal balance is  $_____.

b. The total ending principal balance is  $ _____.

**3** If you answered "No" to item 1, explain below  (if needed, provide additional information on separate sheets).  Your explanation must use your Bond Worksheets (attached to Schedule A) to demonstrate your understanding of the correct application of the methodology.

**SECTION  C: LENDER'S PRESIDENT OR CEO SIGNS.**

The management of the lender identified in Section A confirms that the information on this Schedule, and on any attachments, is true and accurate to the best of its knowledge and belief.

_____        _____        _____

**Signature of President or CEO**                                **Title (Print)**                                **Date Signed**

_____        _____

**Name (Print)**                                                        **Telephone Number**

**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON, D.C. 20202

```
------------------------------------------------------------ x
In the matter of                         :
                                         :   Docket No. 16-42-SA
NAVIENT CORPORATION,                     :
                                         :   BRIEF IN SUPPORT OF
                    Respondent.          :   NAVIENT CORPORATION'S
                                         :   APPEAL OF THE HEARING
                                         :   OFFICIAL'S INITIAL DECISION
------------------------------------------------------------ x
```

## <u>BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF THE HEARING OFFICIAL'S INITIAL DECISION</u>

DEBEVOISE & PLIMPTON LLP

Colby A. Smith
Ada Fernandez Johnson
Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000

Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000

*Attorneys for Respondent*

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .................................................................... 4

STANDARD OF REVIEW ........................................................................................... 14

ARGUMENT ................................................................................................................ 15

I.      NAVIENT PROPERLY BILLED AT THE 1/2 SAP RATE BASED ON
DEPARTMENT GUIDANCE ADDRESSING THE UNIQUE STRUCTURE OF
THE 1993 BONDS ............................................................................................. 15

          A.     The Hearing Official Improperly Invalidated Department Guidance upon
               Which Navient Had Reasonably Relied to Establish Its Special Allowance
               Billing Procedures for Pooled Proceeds ............................................ 16

          B.     The Unique Structure of the 1993 Trust Justified Its Administration as a
               Single Obligation ............................................................................... 24

II.     THE HEARING OFFICIAL FAILED TO ADDRESS THE FACT THAT FSA'S
CLAIM IS PRECLUDED BY ITS 2007 SETTLEMENT WITH NAVIENT ................ 28

III.   THE HEARING OFFICIAL ERRED IN FINDING THAT NELLIE MAE
COULD NOT CLAIM 1/2 SAP ON LOANS THAT WERE TRANSFERRED
TO ECFC BY NMELC .................................................................................... 32

IV.   FSA'S CLAIM IS UNTIMELY AND EXCEEDS THE SCOPE OF THE OIG
AUDIT ............................................................................................................. 39

          A.     The Statute of Limitations Bars FSA's Claim for Navient to Forfeit
               Alleged SAP Overpayments ............................................................... 40

          B.     FSA's Unjustified Bifurcation Has Further Delayed Proceedings and
               Prejudiced Navient ............................................................................. 43

CONCLUSION .............................................................................................................. 46

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allied Mut. Ins. Co. v. Colby Dev. Co.*, 669 N.W.2d 261 (Iowa Ct. App. 2003).....................29–30

*Baytown Tech. Sch., Inc.*, U.S. Dep't of Educ., No. 91-40-SP (Jan. 13, 1993) .............................21

*Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570 (D.C. Cir. 2016) .........22

*Briggs & Stratton Corp. v. Chongqing RATO Power Co.*, No. 5:13-CV-316, 2013 WL
   5963151 (N.D.N.Y. Nov. 7, 2013) .......................................................................................44

*Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 42 F.3d 1398 (9th Cir. 1994) ........................................45

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .................................................27, 35

*Gabelli v. SEC*, 133 S. Ct. 1216 (2013) ..........................................................................3, 41–42

*Goldberg v. Kelly*, 397 U.S. 254 (1970) .......................................................................................41

*In re Appraisal of Enstar Corp.*, CIV. A. No. 7802, 1989 WL 11139 (Del. Ch. Jan. 31,
   1989) ......................................................................................................................................29

*Interactive Learning Sys.*, U.S. Dep't of Educ., No. 04-08-SA (Mar. 8, 2005) ...........................40

*Iowa Student Loan Liquidity Corp.*, U.S. Dep't of Educ., No. 200621025013 (Jan. 11
   2008) ......................................................................................................................................18

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017) ........................................................................................42

*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994)......................................................................23

*Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996)................................21, 23

*Penn. Sch. of Bus.*, U.S. Dep't of Educ., No. 15-04-SA (Oct. 27, 2015).......................................14

*SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016) ...................................................................41–42

*Student Loan Mktg. Ass'n*, U.S. Dep't of Educ., No. 96-23-SL (Sept. 26, 1996) ........................17

*Travel Univ. Int'l*, U.S. Dep't of Educ., No. 94-99-SP (Feb. 3, 1995).........................................23

*United States ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 1:07-cv-960-
   CMH-JFA (Mar. 24, 2017) ...................................................................................................29

ii

**STATUTES**

20 U.S.C. § 1087-1 ...................................................................................................5, 20

28 U.S.C. § 2415 ...........................................................................................................40

28 U.S.C. § 2462 ..............................................................................................40–43, 46

31 U.S.C. § 3716 ...........................................................................................................42

Higher Education Act of 1965 .........................................................................................4

Higher Education Reconciliation Act of 2005 ...............................................................12

I.R.C. § 150 ..........................................................................................5, 13, 32–34, 39

Omnibus Budget Reconciliation Act of 1993 .............................................7, 8, 18, 21

Taxpayer-Teacher Protection Act of 2004 ....................................................................12

**OTHER AUTHORITIES**

26 C.F.R. § 301.7701-2 .................................................................................................35

34 C.F.R. § 30.22 ..........................................................................................................42

34 C.F.R. § 668.113 .......................................................................................................13

34 C.F.R. § 668.116 .................................................................................................14, 44

34 C.F.R. § 668.119 .........................................................................................................4

34 C.F.R. § 668.120 .......................................................................................................14

34 C.F.R. § 682.200 .........................................................................................................5

34 C.F.R. § 682.302 ...................................................................................................5, 27

34 C.F.R. § 682.413 .......................................................................................................43

34 C.F.R. § 682.801 .......................................................................................................26

50 Fed. Reg. 5506 ..........................................................................................................27

57 Fed. Reg. 60280 ........................................................................................................21

72 Fed. Reg. 3432 ..........................................................................................................17

3 Williston on Contracts § 7:4 (4th ed. 2018) ..............................................................31

iii

Fed. R. Civ. P. 42 ............................................................................................................43, 45

GAO Report GAO-04-1070 ...............................................................................................21, 27

## PRELIMINARY STATEMENT

This appeal arises from the hearing official's affirmance of a final audit determination ("FAD") by the Office of Federal Student Aid ("FSA") of the U.S. Department of Education (the "Department") seeking to require Navient Corporation's ("Navient's") subsidiary Nellie Mae[1] to give back purported overpayments it received from the Department under a special allowance program known as the half-SAP/9.5 percent minimum return rate ("1/2 SAP Rate").  The hearing official's initial decision is erroneous and must be overturned:

*First*, in reaching his decision, the hearing official invalidated key language in a Dear Colleague Letter ("DCL") sent by the Department in 1993 that was expressly included to clarify certain requirements for lenders' eligibility to bill at the 1/2 SAP Rate.  As a result, the hearing official has rendered a key form of regulatory guidance — the DCL — meaningless.  The implications of the hearing official's ruling are wide ranging because it effectively eliminates the Department's ability to direct the action of industry participants, short of congressional legislation or formal rulemaking.  This decision is patently unfair to the industry participants who have relied on (and up to now have been expected to follow) guidance in DCLs when making significant decisions about how to comply with governing regulations and statutes.  As a result, industry participants like Nellie Mae and Navient are left with only limited sources of authoritative guidance on which to act.  They also face the Hobson's choice of either following DCL guidance at the risk of liability years (or in this case, decades) later, or ignoring DCL guidance and likely suffering near-term penalties or adverse audit findings.

---

[1]   For purposes of this appeal, "Nellie Mae" refers to Nellie Mae Holdings LLC (formerly known as Nellie Mae Corporation, then Nellie Mae Holdings Corporation ("Nellie Mae Holdings," EIN *783)), Nellie Mae Education Loan LLC (formerly known as Nellie Mae Education Loan Corporation ("NMELC," EIN *352)), and Nellie Mae Loan Finance, LLC ("NMLF," EIN *unavailable).  Like the FAD, this Appeal uses each entity's last three EIN digits to identify it.

*Second*, Navient reasonably relied on the 1993 DCL issued by the Department, and its approach to special allowance billing on the loans in question was appropriately structured to implement the guidance in that DCL.  In his ruling, the hearing official admits that Navient correctly interpreted the guidance in the relevant DCL and appropriately received payments under that guidance.[2]  He concludes, nevertheless, that Navient should be required to give that money back for no better reason than he simply disagrees with the Department's interpretation of the law as reflected in the DCL.  Not only does the ruling undermine Navient's reasonable reliance on the Department's own interpretation of governing law, but it suggests that a hearing official — years after the fact — can simply substitute his own views for the reasonable and long-standing interpretation of the Department.  If the hearing official's new interpretation were correct, the Department had a duty to revise its interpretation many years ago, thereby allowing industry participants to conform their behavior to that new guidance.  Taken to its logical conclusion, the hearing official's ruling would also impose an impractical duty on the Department to reexamine every DCL it has ever issued to determine whether they are "inconsistent with the governing statutes."[3]  This would expose lenders, schools, and other participants to retroactive exposure, likely impacting every area of the federal student loan program, along with every other program administered by the Department.

*Third*, the overreach of the hearing official's decision is even more difficult to understand given that he could easily have decided the appeal without creating such unworkable and wide-ranging precedent.  There was a binding settlement agreement between Navient and FSA to settle potential claims for alleged overbilling of payments at the 1/2 SAP Rate prior to September

---

[2]   *See* Initial Decision at 13, Ex. R-21.

[3]   *Id.*

30, 2006.  However, the hearing official simply failed to address this argument, despite hearing oral argument on this issue and then requesting and receiving supplemental briefing regarding the same.[4]

*Fourth*, the hearing official reached a flawed conclusion regarding the transfer of certain loans from a Nellie Mae subsidiary to its corporate parent because of a misinterpretation of an Internal Revenue Code provision that is, by the plain terms of the statutory language, inapplicable to the transfer at issue in this case.

*Finally*, though the hearing official acknowledged that FSA's claim exceeds the scope of the audit, his conclusion that there is no applicable statute of limitations to FSA's forfeiture claim is contrary to a clearly applicable statute, to the principles of due process, and to the clear trend of recent Supreme Court rulings strictly upholding statutes of limitations against government agencies.[5]  Under the hearing official's reasoning, FSA would be able to seek forfeiture of money disbursed fifty years ago or more, a result that defies fundamental due process and destabilizes an entire industry by creating unlimited backward-looking liability for billing practices.

For all of these reasons, the hearing official's determination is erroneous and must be reversed.

---

[4]    *See* Navient Corp.'s Suppl. Br. at 13–15, Ex. R-20.

[5]    *See Gabelli v. SEC*, 133 S. Ct. 1216, 1221 (2013).

## STATEMENT OF UNDISPUTED FACTS

Understanding the context of this appeal requires an appreciation of the shifting regulatory landscape behind special allowance payments ("SAP"), Navient's good-faith efforts to apply the Department's SAP specific guidance to the unique structure of its 1993 Trust, the Department's attempts to renege on its agreements with Navient while honoring those agreements with the rest of the industry, and the hearing official's decision to disavow the Department's prior guidance issued more than 25 years ago, on which Navient had relied in good faith. The facts underlying the key events are not meaningfully disputed, and the hearing official's ruling did not turn on the determinations of any factual disagreements between the parties. For that reason, the facts set forth below are undisputed and, pursuant to 34 C.F.R. § 668.119(c), constitute the findings of fact necessary to adjudicate this appeal.

### Regulatory Changes to SAP Billing

SAP are interest payments made by the federal government to the holder of a loan when the yield on a Federal Family Education Loan ("FFEL") as prescribed in the Higher Education Act of 1965[6] ("HEA"), as amended, is greater than the rate assessed to the borrower. The amount or rate of SAP paid on an FFEL is based on formulas that differ according to the type of FFEL, the date the loan was originally made, and the type of funds used to finance the loan (i.e., taxable or tax-exempt). These payments were implemented to provide lenders a market rate of return in order to help create liquidity and to encourage loan originators to supply sufficient lending capacity for those seeking support for their educational goals. When the transactions at issue in this appeal occurred, FFEL loans made or purchased with funds obtained from tax-exempt debt issued before October 1, 1993, were subject to the 1/2 SAP Rate, which was only

---

[6]     20 U.S.C. §§ 1001–1161 (2012).

half the SAP that would otherwise be paid, subject to a minimum yield or "floor" equal to 9.5 percent minus the applicable interest rate on the loans, divided by 4.[7]  The 1/2 SAP Rate also applied to loans funded with the proceeds of other loans financed by eligible tax-exempt debt, such as (*i*) loan collections, (*ii*) payments by a guarantor, (*iii*) interest benefits, (*iv*) special allowance payments, or (*v*) loan sale proceeds, as well as investment income from the eligible tax-exempt debt.[8]  Generally speaking, in higher interest rate environments, the total yield on a loan subject to the 1/2 SAP Rate restrictions is lower than the yield on a loan financed with other sources; in lower interest rate environments, because of the 9.5% floor, the total yield on a loan subject to the 1/2 SAP Rate is higher than the yield on a loan financed with other sources.

Until 1992, the Department's policy was that the current funding source of a loan determined whether a loan would be eligible for full SAP or the 1/2 SAP Rate.  The Department promulgated new regulations in 1992, which provided that an otherwise eligible loan was required to be billed at the 1/2 SAP Rate "[a]fter the loan is pledged or otherwise transferred in consideration of funds" derived from non-tax-exempt sources "if the authority retains a legal or equitable interest in the loan," until "the prior tax-exempt obligation is retired[] or . . . defeased."[9]  On March 1, 1996, the Department issued DCL 96-L-186, which gave

---

[7]  20 U.S.C. § 1087-1(b)(2)(B)(i)–(ii); *see also* 34 C.F.R. § 682.302(c)(3)(i)–(ii) (1994).  For example, if the HEA rate is 10% and the borrower's rate is capped at 7%, a lender receives 3% in SAP if the loan is eligible for full SAP, for a total yield of 10%.  If the loan is eligible for the 1/2 SAP Rate, the lender would normally receive only 1.5% in SAP.  However, because the total yield would be 8.5%, which is below the 9.5% floor, the lender instead receives 2.5% in SAP.

[8]  20 U.S.C. § 1087-1(b)(2)(B)(i); *see also* 34 C.F.R. § 682.302(c)(3)(i).

[9]  34 C.F.R. § 682.302(e)(2) (1993).  The regulations define "authority" as "[a]ny private non-profit or public entity that may issue tax-exempt obligations to obtain funds to be used for the making or purchasing of FFEL loans."  *Id.* § 682.200(b).  Nellie Mae was the authority that issued the bonds in the 1993 Trust.  Pursuant to I.R.C. § 150(d)(3), Nellie Mae made an

"[c]larification and interpretative guidance" concerning the 1992 regulation.[10]  The Department

confirmed that the 1992 regulations were "a shift in the Department's policy" from prior

regulations:

> The Department's prior guidance stated that *the current funding source*
> defined the applicable special allowance provisions — if a loan was
> financed with the proceeds of a tax-exempt obligation, the tax-exempt
> special allowance applied.  If the loan was financed with the proceeds of a
> taxable obligation, the taxable special allowance rules applied.
>
> In the Department's December 18, 1992 regulations, the Department
> changed this policy.  Under the regulations, if a loan made or acquired
> with the proceeds of a tax-exempt obligation is refinanced with the
> proceeds of a taxable obligation, the loan remains subject to the tax-
> exempt special allowance provisions if the authority retains legal interest
> in the loan.  If, however, the original tax-exempt obligation is retired or
> defeased, special allowance is paid based on the rules applicable to the
> new funding source (taxable or tax-exempt).[11]

As DCL 96-L-186 confirms, the purpose of the 1992 change in regulations (originally proposed

in 1990, when interest rates were higher and the yield on such loans was half the yield applicable

to loans financed with taxable sources) was to apply the 1/2 SAP Rate to loans acquired through

tax-exempt financing that were later refinanced with another source of financing.  During public

meetings in 1993, the Department explained that the intent for this change was to discourage

entities from moving loans among different types of financing in order to receive full SAP rather

than the 1/2 SAP Rate.  The Department also acknowledged that this could result in a large

---

election to transfer its assets and liabilities, including the 1993 Trust, to a new for-profit
subsidiary, Nellie Mae Corp. (EIN *783), which was later acquired by Navient.

[10]   Dear Colleague Letter 96-L-186 ("DCL 96-L-186"), U.S. Dep't of Educ., Clarification and
Interpretive Guidance on Certain Provisions in the Federal Family Education Loan (FFEL)
Program Regulations Published on December 18, 1992 (Mar. 1, 1996), Ex. R-24.

[11]   *Id.* at item 30 (emphasis added).

government liability to lenders if the then-current low interest rate environment continued and the higher 9.5% floor was therefore triggered for all 1/2 SAP Rate loans.[12]

On August 10, 1993, the Omnibus Budget Reconciliation Act of 1993[13] ("OBRA 1993") was signed into law.  As part of this law, changes were made to the SAP for loans made or acquired with the proceeds of tax-exempt financing originally issued on or after October 1, 1993. The Department eventually issued guidance on this change and provided Nellie Mae with a draft DCL for initial review and comment.[14]  Nellie Mae requested that, as part of the DCL, the Department provide guidance on the special allowance billing requirements for loans made or acquired with pooled proceeds (i.e., proceeds from both tax-exempt and taxable bonds).[15]

In November 1993, the Department issued its DCL providing administrative guidance concerning OBRA 1993.[16]  Page 13 of that guidance clarified that the 1/2 SAP Rate provision applied to all loans acquired in whole *or in part* with funds derived from pre- October 1, 1993 tax-exempt obligations:

> The minimum special allowance rate "floor" on new loans made or purchased, *in whole or in part*, with funds derived from tax-exempt obligations has been repealed.  Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations *originally issued on or after October 1, 1993*, or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to

---

[12]   Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 ("Ryan-Macie Aff.") ¶¶ 21–22, Ex. R-03.

[13]   Pub. L. No. 103-66, 107 Stat. 312.

[14]   Ryan-Macie Aff. ¶ 28, Ex. R-03.

[15]   *Id.* ¶ 29.

[16]   *See* Dear Colleague Letter 93-L-161 ("DCL 93-L-161"), U.S. Dep't of Educ., Letter About the Major Changes Made to the Federal Family Education Loan Program by the Omnibus Budget Reconciliation Act (Pub. L. 103-66) (Nov. 1993), Ex. R-22.

> receive the minimum special allowance.  Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance.[17]

The "in whole or in part" language was not in the original draft of the 1993 DCL and was added in direct response to Nellie Mae's inquiries about pooled proceeds.[18]  With this guidance, the Department made clear its understanding and position that (*i*) a single loan could be financed with more than one source of funds and (*ii*) if a loan was financed *even in part* with an eligible tax-exempt source of funds, a lender was required to bill at the 1/2 SAP Rate.  The Department later repeated that guidance in another DCL issued the next month.[19]

*The 1993 Nellie Mae Trust*

Nellie Mae's inquiries were part of its good-faith efforts to establish the correct billing procedures for loans made or acquired with a bond financing it was issuing when OBRA 1993 was enacted.  The loans were financed by the 1993 Nellie Mae Trust (the "1993 Trust"), a series of unsecured tax-exempt bonds issued between March 1993 and November 1993 by the New England Education Loan Marketing Corporation ("NEELMC") pursuant to a master trust indenture totaling $458,095,000 ("the 1993 Bonds").  The 1993 Bonds consisted of five series — Series A through H — each of which refunded previously issued tax-exempt bonds.

---

[17]   *Id.* (first emphasis added).

[18]   Ryan-Macie Aff. ¶¶ 29–30, Ex. R-03; Affidavit of John (Jack) Remondi dated August 21, 2014 ("Remondi Aff.") ¶¶ 4–6, Ex. R-05; *see also* Letter from Robert Evans, former Dir. of Policy & Dev., U.S. Dep't of Educ., to Sheila Ryan-Macie ("Evans Ltr.") (Mar. 18, 2014), Ex. R-04.

[19]   *See* Dear Colleague Letter 93-L-163, U.S. Dep't of Educ., Letter About the Changes Made by the Omnibus Budget Reconciliation Act That Affect the Lender's Interest and Special Allowance Request and Report (Dec. 1993), Ex. R-23.

| Series | | Issue Date | Maturity Date | Maturity Amount |
|---|---|---|---|---|
| #1 | 1993A | 3/18/1993 | 7/1/2005 | $103,300,000 |
| #2 | 1993B | 6/9/1993 | 6/1/1998 | $5,800,000 |
| | | | 6/1/2000 | $32,405,000 |
| | | | 6/1/2002 | $10,700,000 |
| #3 | 1993C | 7/1/1993 | 7/1/1998 | $26,100,000 |
| #3 | 1993D | 7/1/1993 | 7/1/1998 | $10,160,000 |
| #3 | 1993E | 7/1/1993 | 7/1/1999 | $58,340,000 |
| #3 | 1993F | 7/1/1993 | 7/1/2004 | $32,500,000 |
| #4 | 1993G | 8/24/1993 | 8/1/1998 | $31,500,000 |
| | | | 8/1/2000 | $28,100,000 |
| | | | 8/1/2002 | $47,400,000 |
| #5 | 1993H | 11/15/1993 | 12/1/1999 | $57,420,000 |
| | | | 12/1/2002 | $14,370,000 |

Significantly, the 1993 Trust was secured by the general corporate ratings of Nellie Mae rather than, as is typical in student-loan bond financing, the student loans acquired with the 1993 Bonds. This afforded Nellie Mae increased flexibility in its financings because the proceeds from the various bonds (the "Bond Proceeds") could be combined into a common funding pool (the "1993 Bond Pool") to acquire student loans. The loans acquired under the 1993 Trust are referred to herein collectively as the "1993 Trust Loans."

Within the 1993 Bond Pool, Nellie Mae maintained two sub-pools, the first of which related to Bond 1993A ("Sub-pool 1") and the second of which related to all of the other 1993 Bonds ("Sub-pool 2").[20] The Bond Proceeds from Bond 1993A were deposited into Sub-pool 1 and the Bond Proceeds from Bonds 1993B through 1993H were deposited into Sub-pool 2. In addition, Nellie Mae would deposit into the respective sub-pools the monthly principal and interest payments, guarantor payments, interest benefits and special allowance, and other income

---

[20] Sub-pool 2 was created for administrative reasons relating to the fact that Bond 1993B (and subsequent series) was refunding (i.e., refinancing) bonds that had been originally issued by an authority other than NEELMC. No provision in the 1993 Bond indenture or related agreements required the maintenance of the two separate sub-pools. Remondi Aff. ¶ 7, Ex. R-05.

9

from the loans financed by the sub-pool (the "Receipts"). Specifically, Receipts on the loans financed by Bond 1993A were deposited into Sub-pool 1, and Receipts on all other loans financed by the 1993 Bonds were deposited into Sub-pool 2. Each month, loans were acquired with all or a portion of the cash available in Sub-pool 1 and Sub-pool 2.

Given that no specific pool of loans secured a specific series of 1993 Bonds, funds held in Sub-pool 1 were fungible with all other amounts on deposit in Sub-pool 1; the same was true for Sub-pool 2. New loans were appropriately acquired with such commingled funds on a pro rata basis.[21] This, combined with the unsecured nature of the trust, meant that all loans financed by the 1993 Trust were made or acquired, at least *in part*, with proceeds from each of the tax-exempt 1993 Bond series within its sub-pool. Based on the 1993 DCL guidance that Nellie Mae received in response to its specific inquiries about the special allowance billing requirements for loans made or acquired with pooled proceeds, Nellie Mae appropriately and in good faith determined that it was required to bill at the 1/2 SAP Rate until all the 1993 Bonds were retired

---

[21]   Affidavit of Jason Wheeler dated November 24, 2015 ("Wheeler Aff.") ¶¶ 7–9, Ex. R-02. By early 2002, as part of a post-acquisition integration of functions, the administration of the 1993 Trust had been transferred from former Nellie Mae employees to Navient employees. For ease of trust administration, Navient began a process of administratively allocating portions of the loans in Sub-pool 2 to those series of Bond 1993B through Bond 1993H that remained outstanding at the time. Because the loans had been acquired with Bond Proceeds and Receipts of Bond 1993B through Bond 1993H and remained commingled within Sub-pool 2 since the time of their acquisition, and because the loans were therefore funded in part with the Bond Proceeds and Receipts of Bond 1993B through Bond 1993H, the allocation could not and did not identify specific loans as having been funded by a specific bond. Rather, loans and cash were simply allocated by principal amount such that the account created for each 1993 Bond would hold sufficient resources to meet debt service for that particular Bond. After such allocations had been made, any new loan acquisitions for the 1993 Trust were made with amounts on deposit within the accounts created for each outstanding series of 1993 Bonds. Because any cash within those accounts derived from the commingled Receipts of Bond 1993B through Bond 1993H, the loans purchased with such cash were also funded in part by all such 1993 Bonds. *Id.* ¶ 11.

10

or defeased.[22]  Under this approach, Nellie Mae would receive less than full SAP in times of high interest rates, but greater than full SAP (because of the 1/2 SAP Rate's 9.5% floor) if low interest rates prevailed.  In 1993, neither Nellie Mae nor the Department could have predicted the direction of interest rates over the next 10 to 15 years, and they recognized that this policy could sometimes produce yields that were lower than loans financed with other types of financing and at other times produce yields that would be higher.

*The 2007 Settlement Agreement*

In January 2007, after a protracted period of historically low interest rates, the Department once again revisited its position on special allowance billing and announced that it would pay special allowance at the 1/2 SAP Rate only to lenders that undertook certain independent audit procedures.  These new 1/2 SAP Rate requirements were announced in a DCL and in individually addressed letters to lenders, including Navient, and were meant to address the wide-ranging 1/2 SAP billing practices of tax-exempt debt issuers.[23]  In its letter to Navient, the Department offered to forgo enforcement action with respect to 1/2 SAP Rate billing practices prior to September 30, 2006, if Navient adopted the Department's new policy on a prospective basis.  Navient accepted this binding settlement offer on February 15, 2007, and informed the Department that Navient would voluntarily cease all prospective billing for special allowance at the 1/2 SAP Rate, obviating the need for a time-consuming and expensive audit under the Department's new policy.[24]

---

[22]   *See* Remondi Aff. ¶ 5, Ex. R-05.

[23]   *See* Dear Colleague Letter FP-07-01, U.S. Dep't of Educ., FFELP Loans Eligible for 9.5 Percent Minimum Special Allowance Rate (Jan. 23, 2007), Ex. R-26; Letter from Theresa Shaw to Tim Fitzpatrick (Jan. 24, 2007), Ex. R-14.

[24]   Letter from Robert S. Lavet to Theresa Shaw (Feb. 15, 2007), Ex. R-11.

On September 11, 2007, however, in direct contravention of this binding settlement agreement, the Department informed Navient by letter from the Department's Office of Inspector General ("OIG") that it would undertake an audit of its special allowance billing practices with respect to the minimum yield provision of the 1/2 SAP Rate.

*The Audit Report and Final Determination*

The purpose of the OIG audit was to determine (*i*) whether Nellie Mae claimed and received payments from the Department on FFELs at the 1/2 SAP Rate in compliance with the Taxpayer-Teacher Protection Act of 2004[25] and the Higher Education Reconciliation Act of 2005[26] and (*ii*) whether Nellie Mae or its transferee continued to claim and receive SAP at that rate on the 1993 Trust Loans after the 1993 Bonds matured and were retired.  The audit period covered October 1, 2003, through September 30, 2006.[27]

OIG issued a final audit report ("FAR") on August 3, 2009; Navient responded on October 2, 2009; and four years later, on September 25, 2013, FSA issued its FAD based on the report.  FSA found that Nellie Mae had improperly received 1/2 SAP Rate payments on the 1993 Trust Loans.  The findings were based upon a determination that Nellie Mae had continued to receive payments after a portion of the 1993 Bond financing had matured.  In addition, as a result of certain corporate transactions and reorganizations, the FAD concluded that certain loans were ineligible for payments because of the manner in which they had been transferred from a Nellie Mae subsidiary to its corporate parent.[28]

---

[25]   Pub. L. No. 108-409, 118 Stat. 2299.

[26]   Pub. L. No. 109-171, 120 Stat. 4 (2006).

[27]   Final Audit Report at 1, Ex. R-15.

[28]   FAD at 19–23, Ex. R-01.

In light of these findings, FSA determined that Navient must (*i*) calculate alleged excess payments received in connection with loans associated with Series F of the 1993 Bonds after that bond was retired and the loans were sold to SLM Education Credit Finance Corporation ("ECFC"); (*ii*) calculate alleged excess payments received in connection with loans associated with Series B, G, and H of the 1993 Bonds after those bonds were retired or defeased; and (*iii*) identify and disclose other instances where any of its subsidiaries continued to receive payments after the bond from which the loans derived their eligibility were retired or refinanced with funds derived from an ineligible funding source.[29]  FSA did not make a final determination of the amount of the alleged special allowance overpayments but estimated the amount to be $22.3 million.[30]

Navient requested a review of the FAD pursuant to 34 C.F.R. § 668.113 on July 27, 2016. On March 7, 2019, after briefing, oral argument, and supplemental briefing, the hearing official issued an initial decision affirming the FAD.  Addressing only some of Navient's arguments, the hearing official held that Navient was liable for the overpayments described in the FAD on the grounds that (*i*) the 1993 DCL's "in whole or in part" language contradicted the governing statute's language, (*ii*) ECFC was not a "successor" corporation for the purposes of I.R.C. § 150(d)(3), and (*iii*) no statute of limitations applies to FSA's forfeiture claim.  Navient now appeals from the hearing official's initial decision.

---

[29]  Navient has been unable to identify any such instances, and FSA has since withdrawn its request that Navient be required to provide further disclosure.  *See* Initial Decision at 18 n.10, Ex. R-21.

[30]  FAD at 24, Ex. R-01.

## <u>STANDARD OF REVIEW</u>

The Department bears the burden of providing adequate notice for its demand in order to establish its prima facie case against Navient.[31]   Navient, in turn, bears the burden of proving by a preponderance of the evidence that FSA's conclusions in the FAD were erroneous.[32]   "The Secretary may affirm, modify, or reverse the decision of the hearing official, or may remand the case to the hearing official for further proceedings consistent with the Secretary's decision."[33]

---

[31]   *See Penn. Sch. of Bus.*, U.S. Dep't of Educ., No. 15-04-SA (Oct. 27, 2015).

[32]   *See id.*; 34 C.F.R. § 668.116(d).

[33]   34 C.F.R. § 668.120(a)(1).

14

## ARGUMENT

**I.    NAVIENT PROPERLY BILLED AT THE 1/2 SAP RATE BASED ON DEPARTMENT GUIDANCE ADDRESSING THE UNIQUE STRUCTURE OF THE 1993 BONDS**

The hearing official erred by improperly excising, after the fact, the clear and unambiguous "in whole or in part" language in the1993 DCL when ruling that the 1993 Trust Loans were not eligible for the 1/2 SAP Rate.  He did not contend that Navient misapplied or misinterpreted that language when it collected funds at the 1/2 SAP Rate.  In fact, he recognized just the opposite and acknowledged that under the terms of the DCL guidance, Navient was entitled to the money it received.  Instead, he simply rewrote the DCL — thereby retroactively rewriting the eligibility rules 25 years after the fact — and then applied his new rules to claw back the money that Navient had received.  In so doing, the hearing official undermined the efficacy of DCLs and the Department's ability to direct the action of industry participants through definitive guidance.

The 1993 Trust was uniquely structured as an unsecured, general obligation financing sold in different tranches that were combined into a common funding pool to acquire student loans.  This structure required billing at the 1/2 SAP Rate through the final maturity of the 1993 Bonds, or, at a minimum, for (*i*) all loans acquired with the proceeds of Bond 1993A until its maturity on July 1, 2005, and (*ii*) all loans acquired with the proceeds of Bonds 1993B through 1993H until the final maturity of those bonds on July 1, 2004.  Each of the 1993 Trust Loans was financed at least *in part* with the proceeds of the 1993 Bonds with which they were pooled, and Nellie Mae had actively sought and received Department guidance for how to bill appropriately for loans made or acquired from pooled proceeds.  The hearing official erroneously concluded that this guidance contradicted the statutory language.  The Secretary should reverse the initial decision because the 1993 DCL clarified rather than contradicted the statutory language and it

15

would be unjust to require Navient to forfeit the alleged overpayments because it reasonably relied on this guidance.  Permitting this ruling to stand would leave industry participants with the uncertainty of not knowing which DCLs or DCL provisions are correct and which might be retroactively invalidated decades later, and it would force the Department to rely exclusively on formal rules and regulations.

Importantly, the hearing official acknowledged that the 1993 Bond structure was unique,[34] but he otherwise failed to address Navient's arguments that the 1993 Trust was a single "obligation" for the purpose of special allowance billing, which required Nellie Mae to claim special allowance at the 1/2 SAP Rate until all of the 1993 Bonds had matured.  Because Navient's proper treatment of the 1993 Trust as a single obligation independently justified billing at the 1/2 SAP Rate until all of the 1993 Bonds had matured, the Secretary should reverse the initial decision and overturn the FAD.

A.   **The Hearing Official Improperly Invalidated Department Guidance upon Which Navient Had Reasonably Relied to Establish Its Special Allowance Billing Procedures for Pooled Proceeds**

The hearing official acknowledged the clear "in whole or in part" language of the DCL but nevertheless affirmatively discarded the language because it was purportedly "inconsistent" with the governing statute.  This is not only wrong on the law and against the equities, but it also sets the dangerous precedent that a hearing official at the Department can ignore Department guidance simply because he disliked the outcome of applying that guidance, regardless of how long industry participants had relied on it.  The Secretary should reverse the hearing official's erroneous conclusion, which is based on a faulty rationale.

---

[34]   *See* Initial Decision at 16, Ex. R-21.

DCLs are guidance documents that, when "used properly," are intended to "channel the discretion of agency employees, increase efficiency, and enhance fairness by providing the public clear notice of the line between permissible and impermissible conduct while ensuring equal treatment of similarly situated parties."[35]  These documents represent the Department's current thinking on a topic, and lenders, institutions of higher education, and others regularly conform or change their behavior in accordance with the guidance.  Indeed, the Department has previously "chastised" respondents for failing to seek guidance regarding compliance with a statute.[36]  The hearing official's invalidation of the DCL's "in whole or in part" language creates a dangerous precedent that hearing officials who are adjudicating cases and appeals can simply ignore or rewrite DCLs, with significant retroactive consequences.  Such a ruling means that DCLs are meaningless to those who rely on them to navigate often complex and ambiguous statutory provisions.  DCLs have been issued on topics as wide-ranging as student-loan servicing, Pell Grants, racial discrimination, campus sexual misconduct, religion, and public charter schools — all of which are now at risk of being undermined if the hearing official's decision is allowed to stand.

Here, the facts are particularly stark because Nellie Mae actively sought and received guidance in the form of the 1993 DCL and is now being ordered to forfeit payments after following the very guidance that it sought and received.  The hearing official did not question Navient's interpretation of the 1993 DCL's "in whole or in part" language, and he acknowledged that, under this interpretation, Navient would be required to bill at the 1/2 SAP Rate for all of the

---

[35]   Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432 (Jan. 25, 2007).

[36]   *See Student Loan Mktg. Ass'n*, U.S. Dep't of Educ., No. 96-23-SL (Sept. 26, 1996).

1993 Trust Loans.[37]  Yet, the hearing official erroneously concluded that the 1993 DCL's guidance was contrary to the language and purpose of the governing statute and that the "in whole or in part" language therefore should simply be treated as if it were never part of the DCL. This fundamentally flawed conclusion disregards the 1993 DCL's drafting history and provides a conclusory analysis of the statute's language based on a misunderstanding of the statute's purpose.

The hearing official stated that it was "not clear why [the 'in whole or in part'] language was included in the DCL."[38]  However, the undisputed record on appeal establishes exactly why the language was included in the 1993 DCL.  Given the unique unsecured nature of the 1993 Trust and the changes in special allowance billing for tax-exempt bonds introduced in the 1992 regulations and OBRA 1993, Nellie Mae requested that the Department provide guidance on the special allowance billing requirements for loans made or acquired with pooled proceeds.[39] Nellie Mae's continued efforts to seek guidance and obtain clarification from the Department is entirely consistent with the conduct the Department expects from the industry if there are questions or ambiguities related to applicable regulations.[40]  To address Nellie Mae's questions, the Department revised the draft 1993 DCL and included in the final version the phrase "in whole or in part," clarifying that the 1/2 SAP Rate provision applied to loans where *all* of the funds, *or only a portion* of the funds, used to acquire the loans were derived from tax-exempt

---

[37]   *See* Initial Decision at 13, Ex. R-21.

[38]   *Id.*

[39]   Ryan-Macie Aff. ¶ 29, Ex. R-03.

[40]   *See Iowa Student Loan Liquidity Corp.*, U.S. Dep't of Educ., No. 200621025013 (Jan. 11 2008) (noting failure of entity to obtain clarification or further guidance and noting that it is "incumbent upon [the entity potentially subject to the regulations] to obtain clarification" regarding the interpretation of a statute's meaning).

obligations.[41]  The 1993 DCL was integral to Nellie Mae's special allowance billing policy for the 1993 Bonds.[42]  The Department has never presented any evidence to contradict the facts presented by Navient.

There can be no question that the Department fully understood that this application of the 1/2 SAP Rate policy would result in broadened application of the 9.5% minimum yield during low interest rate environments.  In response to Department requests, industry participants twice raised the concern that the 1992 regulatory change affecting special allowance billing was an error because a loan originally financed with tax-exempt obligations would always be subject to the 1/2 SAP Rate, and therefore the 9.5% floor, regardless of the current financing used to fund the loan.[43]  The Department not only responded that the change was not an error, it also acknowledged that this could be against the Department's interests if the then-current low interest rate environment continued and the higher 9.5% floor was therefore triggered for all 1/2 SAP Rate loans, resulting in a large government liability to lenders.[44]  The Department explained that, by requiring 1/2 SAP billing for loans originally financed with tax-exempt obligations, the policy change was intended to prevent lenders from being able to receive full SAP rather than 1/2 SAP simply by refinancing their loans.[45]

At the time the 1993 DCL was published in November 1993, the rate on Treasury Bills (the index historically used to calculate SAP payments) was approximately 3.10%, and when the

---

[41]   Ryan-Macie Aff. ¶¶ 29–30, Ex. R-03; *see also* Evans Ltr., Ex. R-04 (noting that Robert Evans recalled Nellie Mae's "numerous requests for guidance to ensure accurate billing").

[42]   *See* Ryan-Macie Aff. ¶¶ 29–30, Ex. R-03; Remondi Aff. ¶¶ 4–6, Ex. R-05.

[43]   *See* Ryan-Macie Aff. ¶¶ 14, 17 and Exs. 1–2 thereto, Ex. R-03.

[44]   *Id.* ¶¶ 18, 21–22 and Ex. 3 thereto.

[45]   *Id.* ¶ 21.

margin was added (generally 3.10% to 3.5%), loans subject to the 1/2 SAP Rate would have received the 9.5% minimum yield.[46]  Thus, even though the immediate ramifications of the Department's 1992 regulations and the 1993 DCL, specifically the "in whole or in part" language, were clear, the Department did not change its policy of applying the 1/2 SAP Rate as broadly as possible.  In other words, the Department knew exactly what it was doing when it issued guidance under the 1993 DCL.

After failing to acknowledge this critical historical context, the hearing official summarily concluded that the 1993 DCL's "in whole or in part" language contradicted the statutory language, which he found "is clear and unambiguous, and does not contain any qualifier or detailing descriptions for loans made with funds from tax-exempt obligations."[47] The relevant statute, 20 U.S.C. § 1087-1(b)(2)(B), applies to "loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under Title 26."  Contrary to the hearing official's assertion, this language neither clearly nor unambiguously contradicts the interpretation of the Department as set forth in the DCL — especially when the DCL is applied to an obligation in which loans were financed through pooled proceeds and did not secure a specific series of bonds.  If anything, the 1993 DCL's interpretation is the more natural reading of the statute, which is precisely why Nellie Mae requested guidance from the Department in the first place.  The Department's response — that 20 U.S.C. § 1087-1(b)(2)(B) applies to "loans made or purchased, *in whole or in*

---

[46]   *See* NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates, Ex. R-06.

[47]   Initial Decision at 13, Ex. R-21.

*part*, with funds derived from tax-exempt obligations"[48] — clarifies rather than contradicts the correct reading of the statute.[49]

Moreover, the "in whole or in part" language was consistent with the 1/2 SAP Rate program's rules and regulations, particularly the regulations issued on December 18, 1992.[50]  In fact, in the Department's response to a report issued by the U.S. Government Accountability Office in September 2004, it stated, "In general, under the Department's regulations, loans that are eligible for the special 9.5 percent subsidy retain that eligibility as long as the tax-exempt bond whose proceeds were used to make or purchase the loans remains open."[51]  In other words, as long as the whole tax-exempt bond or any part of the tax-exempt bond is open (i.e., not retired or defeased), billing at the 1/2 SAP Rate is mandatory.

The hearing official was wrong to invalidate the Department's eminently reasonable clarification of the statute.  The Department issued the 1993 DCL three months after OBRA 1993's enactment, when the Department was intimately familiar with the intended scope and effect of the statute.  The 1993 DCL was also the product of careful consideration and collaboration, having been issued only after the Department sought and received comments from

---

[48]   DCL 93-L-161, at 13, Ex. R-22.

[49]   *See Baytown Tech. Sch., Inc.*, U.S. Dep't of Educ., No. 91-40-SP (Jan. 13, 1993) (noting that DCLs may assist the tribunal in interpreting the law, policies, or procedures); *see also Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996) (noting that DCLs can clarify "unfounded assumptions" or ambiguities in regulations).

[50]   Federal Family Education Loan Programs, 57 Fed. Reg. 60280 (Dec. 18, 1992) (to be codified at 34 C.F.R. pt. 682).

[51]   *See* U.S. Gov't Accountability Office, GAO-04-1070, Federal Family Education Loan Program:  Statutory and Regulatory Changes Could Avert Billions in Unnecessary Federal Subsidy Payments at 42 (2004), http://www.gao.gov/products/GAO-04-1070.

21

industry participants.[52]  It is not the hearing official's role — and well beyond his scope of authority — to unilaterally undermine this process more than 25 years after the fact through mere *ipse dixit*, claiming that "[t]he statutory language is clear and unambiguous" and therefore applies to loans that were funded *only* from tax-exempt obligations.[53]

As support for striking down the 1993 DCL's definitive guidance on the very subject of the current dispute, the hearing official described the "windfall" that would occur if the 1993 Trust were subject to the 1/2 SAP Rate.[54]  But this ignores the fact that billing at full SAP would similarly be a "windfall" if interest rates were higher.  By allowing the Department to enforce or ignore its guidance based on prevailing interest rates, industry members are put in a lose-lose situation that defeats the initial purpose of the SAP regime — to create liquidity and encourage loan originators to supply sufficient lending capacity for those seeking higher education.  If interest rates during the period in question had been elevated rather than at historical lows, FSA doubtless would have seized upon the "in whole or in part" language in the 1993 DCL and insisted that all loans financed by the 1993 Trust remained subject to the 1/2 SAP Rate restrictions until all bonds within the financing pool created by the 1993 Trust had matured. FSA's position to the contrary, in light of historically low interest rates that prevailed during the relevant period, is a blatant attempt to retroactively apply a new interpretation that runs contrary to the plain language of the Department's own guidance — upon which Nellie Mae and the

---

[52]  *See* Ryan-Macie Aff. ¶¶ 28–29, Ex. R-03.

[53]  Notably, the hearing official's interpretation requires the insertion of the word "only" into the statutory language, and courts "will not read the word 'only' into the statute 'when Congress has left it out.'"  *Blue Water Navy Viet. Veterans Ass'n, Inc. v. McDonald*, 830 F.3d 570, 575 (D.C. Cir. 2016) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)).

[54]  Initial Decision at 13, Ex. R-21.

industry appropriately relied — and should therefore be rejected.[55]  Industry participants warned the Department about this exact issue back when it proposed the 1992 regulations, and the Department acknowledged the risks and implemented the regulations nevertheless.  The hearing official should not be allowed to revisit this decision 25 years later.

As noted above, the 1993 DCL made clear that (*i*) a single loan could be financed with more than one source of funds and (*ii*) if a loan was financed *even in part* with an eligible tax-exempt source of funds, the 1/2 SAP Rate applied to that loan.[56]  In the case of the 1993 Trust, the pooled proceeds included both eligible Bond Proceeds and eligible Receipts.  As a result, throughout the existence of each sub-pool, all of the related loans were financed at least in part with the proceeds of every bond series in that pool.  Navient was therefore required to bill for special allowance at the 1/2 SAP Rate until all the bonds in the pool were retired or defeased because each of the 1993 Trust Loans was financed at least *in part* with the proceeds of the 1993 Bonds with which they were pooled.  It was reasonable and appropriate for Nellie Mae to rely on the very specific guidance in the 1993 DCL, and FSA's determination is inconsistent with that guidance.[57]

Affirming the hearing official's initial decision will yield a perverse result for the Department, industry participants, and students alike.  Though the Department will gain a one-

---

[55]  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994) (a provision operates retroactively when it "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed"); *Travel Univ. Int'l*, U.S. Dep't of Educ., No. 94-99-SP (Feb. 3, 1995) (holding that, when Department policies create "confusion," respondents who seek assistance to correctly apply the policy "should not be punished retroactively for failing to correctly anticipate the standards later promulgated by [the Department]").

[56]  *See* DCL 93-L-161, at 13, Ex. R-22.

[57]  *See Lincoln Tech. Inst.*, U.S. Dep't of Educ., No. 95-42-SP (May 17, 1996).

time lump sum of money, it comes at the cost of signaling to industry participants that they cannot rely on Department guidance.  The consequences of this go well beyond the area of 1/2 SAP billing:  the wide variety of stakeholders who regularly depend on DCLs will know that they can be penalized for following these letters in good faith and that they should instead act according to their own interpretations of statutes and regulations, rather than the Department's.  By contrast, reversing the hearing official's initial decision will have no precedential impact for the Department because this case is truly unique:  Nellie Mae was the first and, it believes, the only nonprofit tax-exempt student loan issuer that had the financial standing to issue bonds on an unsecured basis.

### B.   The Unique Structure of the 1993 Trust Justified Its Administration as a Single Obligation

Other than acknowledging that the 1993 Bond structure was unique,[58] the hearing official failed to address Navient's argument that this structure justified its administration as a single "obligation" subject to the 1/2 SAP Rate.  Because the 1993 Trust was a single obligation, the HEA and the Department's regulations and guidance *required* Nellie Mae to claim special allowance at the 1/2 SAP Rate as long as any bond within its 1993 tax-exempt financing remained outstanding.  This alone requires the FAD to be overturned.  The Department's contrary reading of the HEA would have permitted Nellie Mae and any other institution to defeat the original purpose of the 1/2 SAP Rate — which was to *limit* the ability to obtain full SAP based on tax-exempt financings — by retiring a single bond within the 1993 Trust and claiming full SAP on all of the associated loans even though other 1993 Bonds financing the loans remained outstanding.

---

[58]   *See* Initial Decision at 16, Ex. R-21.

The 1993 Bonds shared common characteristics that rendered them a single "obligation" for purposes of the HEA and the Department's implementing regulations.  All of the 1993 Bonds were governed by the terms of the same 1993 Trust Agreement, issued in the same calendar year, and payable from the same sources of funds.  Moreover, the rights of each bondholder were identical to the rights of all other bondholders regardless of whether they held a 1993A bond or a 1993H bond.  Per the terms of the 1993 Trust Agreement,[59] each bond was treated collectively and on a parity basis with the other bonds in terms of bondholders' right to payments, default provisions, and remedies.[60]

Critically, unlike the typical structure of student-loan bond financing at that time, loans purchased with the proceeds of the 1993 Bonds were not pledged as collateral in support of repayment of that bond or series.[61]  Rather, the 1993 Trust Agreement made all unencumbered loans of the Corporation, along with its general assets and credit, the source of repayment for all of the 1993 Bonds.[62]  Given that all bondholders of the 1993 Bonds shared the same rights and

---

[59]   *See* Trust Agreement, Ex. R-07.

[60]   *See id.* Right to Payment at 12–13; Events of Default at 18–20; Payment on Default at 21; Enforcement of Agreement at 22; and Amendments at 17.

[61]   Student loan taxable and tax-exempt bond structures issued by authorities were generally secured financings, meaning that investors had a right (with priority over other creditors) to foreclose upon specific pools of student loans and other assets in the event an issuer defaulted on its bonds.  Nellie Mae was the first (and, it believes, only) nonprofit tax-exempt student loan issuer to secure general corporate ratings that allowed it to issue bonds on an unsecured basis.  *See* Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) at 16, Ex. R-08.  Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool, because Nellie Mae was not required to identify specific loan pools as collateral for those bonds, to make covenants with respect to those loan pools, or to track loan performance according to the specific requirements of the lenders or bondholders.  The unsecured financing was therefore much less administratively burdensome for Nellie Mae.  The 1993 Trust was the only tax-exempt financing issued by Nellie Mae on an unsecured basis.

[62]   Ex. Trust Agreement at 13, Ex. R-07.

remedies against the same sources of funds, and that a default on any one 1993 Bond constituted

a default on all 1993 Bonds, the 1993 Bonds constituted a single financing for purposes of the

HEA's 1/2 SAP Rate.  The provisions of the 1993 Trust under which every series of the bonds

were issued made them so interrelated that they constituted a single financial or economic

obligation.  Nellie Mae, therefore, appropriately treated that single obligation as maturing when

all of the 1993 Bonds had matured.

Nellie Mae's approach was fully consistent with the Department's prior statements

concerning the meaning of the word "obligation."  In 1985, the Department defined "obligation"

to mean "debt."[63]  Moreover, 2006 Department guidance used the term "bond," instead of the

statutory and regulatory term "obligation," to describe "the instrument used to borrow funds";

noted that lenders could use "notes or other instruments to raise funds"; and stated that

references to "bond" in the guidance included "any other form of borrowing."[64]  In the case of

the 1993 tax-exempt financing, "the instrument used to borrow funds" was the 1993 Trust

Agreement, and all of the 1993 Bonds were issued pursuant to that agreement and its

supplemental indentures.[65]  Even within the FAD, FSA references "bonds," "issues," and

---

[63]   34 C.F.R. § 682.801 (1985).

[64]   Dear Colleague Letter FP-06-15, U.S. Dep't of Educ., Payment of Special Allowance on
       Loans Made or Acquired with Funds from a Tax-Exempt Obligation (Oct. 2006),
       Attachment at 1 n.1, Ex. R-25.

[65]   The Department's use in 2006 of the term bond "for convenience" was hardly a definitive
       statement that an "obligation" is always a single "bond" for 1/2 SAP Rate purposes,
       especially given that the guidance addressed secured student loan bonds and not unsecured
       serial financings like the 1993 tax-exempt financing.  *See id.*  Neither was the use of the
       term "bond" definitive when it appeared in guidance regarding an audit process that
       expressly disclaimed any intent "to examine whether the eligibility of a loan for 9.5 percent
       SAP has lapsed."  *See* Dear Colleague Letter FP-07-06, U.S. Dep't of Educ., Audit
       Requirements for 9.5 Percent Minimum Special Allowance Payment Rate (Apr. 27, 2007),
       Attached Methodology Description at 3, Ex. R-27.

"series" in a sometimes interchangeable, unclear, and undefined manner, while also creating entirely new concepts — such as a "source bond." Penalizing Navient by enforcing a previously unarticulated distinction between these terms would be arbitrary and capricious.[66]

Unlike FSA's approach in the FAD, Nellie Mae's approach fully comported with the original intent of the HEA's 1/2 SAP provisions and the Department's 1992 regulations. The HEA provisions, which Congress enacted in 1980 when interest rates were high, were intended to maximize the loans that were subject to 1/2 SAP.[67] Similarly, the Department's 1992 regulations required 1/2 SAP to continue to be claimed on loans even after they were transferred from a tax-exempt obligation to a taxable obligation, so long as the tax-exempt obligation remained outstanding and the authority maintained ownership of the loan.[68] This regulation, which was originally proposed during a period of higher interest rates, was designed to prevent lenders from receiving a windfall by moving loans from tax-exempt obligations to taxable obligations to obtain the associated regular SAP.[69]

When these provisions were enacted, Congress and the Department would have looked with great skepticism at any effort by a lender to ignore the economic and structural realities of a

---

[66] *See generally Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126–27 (2016) (ruling that where the agency did not "explain why it deemed it necessary to overrule its previous position" — on which the industry had relied for years — the rule was arbitrary and capricious; when changing its positions, an agency must be "cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account'" and that a "reasoned explanation is needed for disregarding" those interests).

[67] *See* Guaranteed Student Loan Program, 50 Fed. Reg. 5506 (Feb. 8, 1985) (to be codified at 34 C.F.R. pt. 682) ("The rule implements the Congressional intention . . . to reduce special allowances to parties whose lower cost of borrowing does not justify Federal subsidy at the rate paid commercial lenders.").

[68] 34 C.F.R. § 682.302(e)(2); DCL 96-L-186, item 30, Ex. R-24.

[69] *See* U.S. Gov't Accountability Office, supra note 51, at 4–5.

serial unsecured financing and instead obtain full SAP payment simply because any particular bond within the financing had matured.  The fact that the interest-rate environment reversed in the years following the 1992 regulation does not alter Congress's and the Department's original intent.

As Navient's proper treatment of the 1993 Trust as a single obligation independently justified billing at the 1/2 SAP Rate until all of the 1993 Bonds had matured, the Secretary can and should reverse the initial decision and overturn the FAD on this ground alone.  At minimum, the Secretary must reverse and remand for further proceedings so that the hearing official can rule on this issue, which he failed to address in his initial decision.

## II. THE HEARING OFFICIAL FAILED TO ADDRESS THE FACT THAT FSA'S CLAIM IS PRECLUDED BY ITS 2007 SETTLEMENT WITH NAVIENT

The hearing official erred by ignoring the 2007 settlement agreement between FSA and Navient, which precludes FSA's claim.  Wholly apart from the erroneous invalidation of the Department's definitive guidance noted above, this failure requires reversal of the initial decision.  In its 2007 DCL, the Department announced that it would broadly forgo enforcement action with respect to 1/2 SAP Rate billing practices prior to September 30, 2006, if a lender adopted the Department's new standard policy on a prospective basis.  The Department also made this offer individually to Navient in a letter dated January 24, 2007, which Navient accepted in its February 15, 2007 response letter.  Consequently, FSA's demand that Navient forfeit 1/2 SAP Rate payments is foreclosed by the plain language of its binding settlement agreement with Navient.  By undertaking the OIG audit, the Department breached the promise it made in the 2007 DCL and January 24, 2007 letter, a promise that Navient reasonably relied on in its decision to forgo any further billing at the 1/2 SAP Rate.  The Secretary should exercise her final decision-making power to hold that the Department is bound by the terms of its 2007

settlement agreement with Navient and cannot seek repayment of any alleged overbilling of 1/2

SAP prior to September 30, 2006.  Ruling otherwise would signal to industry participants that

not only can they not rely on the Department's guidance in the normal course of their business,[70]

but they also cannot rely on the Department's explicit written agreements.

There is no question that the parties' letter exchange formed a binding settlement

agreement.  A settlement agreement is a contract and therefore requires "parties who have the

capacity and authority to agree, a definitive offer and acceptance, and consideration."[71]  Here, all

of those elements are met.

*Offer*:  The Department's 2007 DCL and subsequent January 24, 2007 letter constituted

an offer to settle all potential claims for repayment based on overbilling of SAP that occurred

prior to September 30, 2006.  As the government acknowledged in a recent filing, the

Department's 2007 DCL "offered lenders a *general administrative settlement* of the special

allowance billing controversy by stating that it would not seek to recover disputed funds already

paid to a lender as long as that lender refrained from billing for disputed funds in the future."[72]

***Meeting of the Minds***:  The plain language of the 2007 DCL and subsequent letter

included "terms with precise meaning that provide[d] certainty of performance."[73]  The

Department stated that, in exchange for complying with certain new procedures going forward, it

---

[70]  *See supra* Section I.A.

[71]  *In re Appraisal of Enstar Corp.*, CIV. A. No. 7802, 1989 WL 11139, at *5 (Del. Ch. Jan. 31, 1989).

[72]  Statement of Interest by the United States of America at 4, *United States ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 1:07-cv-960-CMH-JFA (Mar. 24, 2017) (emphasis added).

[73]  *Allied Mut. Ins. Co. v. Colby Dev. Co.*, 669 N.W.2d 261, at *4 (Iowa Ct. App. 2003) (citing *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 268 (Iowa 2001)).

would "not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate for loans that were neither first-generation loans nor second-generation loans."  The 2007 DCL and January 24 letter "induce[d] a reasonable belief"[74] that when Navient accepted the terms in its February 15, 2007 letter, all potential claims for prior overbilling of 1/2 SAP were extinguished.

*Acceptance*:  "A binding contract also requires acceptance of the offer,"[75] which Navient expressly did in a letter dated February 15, 2007, when it accepted the Department's terms and voluntarily ceased *all* prospective billing for special allowance at the 1/2 SAP Rate.[76]  Navient further "agree[d] to accept payment on . . . submitted requests for special allowance payments for the fourth quarter of 2006 at the standard SAP rate."[77]  Navient's acceptance acknowledged its understanding of the conditions that the Department placed on its offer in the 2007 DCL and corresponding January 24, 2007 letter.[78]  Rather than undertake a time-consuming and expensive audit, Navient stated that it would simply stop billing for special allowance at the 1/2 SAP Rate, and it accepted payment at the standard SAP Rate for all then-outstanding requests.

*Consideration*:  Making good on its promise, Navient did, in fact, forgo all additional billing for 1/2 SAP beginning in the fourth quarter of 2006 and consequently forfeited money to which it was otherwise entitled.  From October 2006 until the fourth quarter of 2014, when the

---

[74]   *Id.*

[75]   *Id.* (citing *Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997)).

[76]   Letter from Robert S. Lavet to Theresa Shaw (Feb. 15, 2007), Ex. R-11 (stating that Navient "agree[d] to make no further claims for SAP at the 9.5 percent minimum return rate").

[77]   *Id.*

[78]   Letter from Theresa Shaw to Tim Fitzpatrick (Jan. 24, 2007), Ex. R-14.

last of its qualifying tax exempt obligations were repaid, Navient accepted lower payments than it was entitled to on every loan qualifying for 1/2 SAP.  This is sufficient consideration resulting in a valid contract.[79]

Attempts by FSA to recast the 2007 DCL and subsequent correspondence as anything other than a settlement agreement are unfair and belied by the plain language of those documents.  This unfairness is highlighted by FSA's inconsistent treatment of other industry participants.  While other lenders substantially grew their portfolio of loans subject to the 1/2 SAP Rate (by as much as 800%) to increase the number of their loans eligible to receive the 9.5% floor, Navient reduced its portfolio of such loans and, in response to the 2007 DCL and January 24, 2007 letter, voluntarily ceased all 1/2 SAP Rate billing to which it was statutorily entitled.  Despite Navient's good-faith efforts, FSA breached its settlement agreement by instituting this audit and insisting on the forfeiture of alleged SAP overpayments.  By contrast, the Department's settlement with Nelnet required Nelnet only to change its practices on a prospective basis and required no repayment of the $278 million in "excess" special allowance whatsoever.[80]  This disparate treatment is inequitable considering Navient's good-faith efforts to reduce its portfolio of loans eligible to receive the 9.5% floor while other lenders were doing the exact opposite.

Based on the foregoing, FSA's demand for repayment of alleged 1/2 SAP overbilling by Navient prior to September 30, 2006, is foreclosed by the parties' controlling settlement

---

[79]   "[G]iving up something which the promise was theretofore privileged to retain" is adequate consideration.  3 Williston on Contracts § 7:4 (4th ed. 2018).

[80]   *See* Resp't Navient Corp.'s Req. for Review of Final Audit Determination at 55–56 & nn.32–33, Ex. R-16.

agreement.  The hearing official failed to address this argument,[81] which requires reversal.  The Secretary should rule that the settlement agreement is binding and the Department is prevented from seeking repayment of any alleged overbilling of 1/2 SAP prior to September 30, 2006.  At minimum, the hearing official's failure to analyze whether FSA's claim was extinguished by this settlement agreement requires a reversal and remand for further proceedings.

### III.   THE HEARING OFFICIAL ERRED IN FINDING THAT NELLIE MAE COULD NOT CLAIM 1/2 SAP ON LOANS THAT WERE TRANSFERRED TO ECFC BY NMELC

The hearing official erroneously held that Nellie Mae was not permitted to claim special allowance at the 1/2 SAP Rate for certain loans (the "ECFC Loans") after they were transferred from NMELC (EIN *352) to ECFC (EIN *392) in July and August 2004.  This conclusion regarding the transfer of loans from a Nellie Mae subsidiary to its corporate parent is based on a flawed understanding of an Internal Revenue Code provision that simply does not apply to the transfer at issue.  It also contradicts the Department's past practices and the original intent of the 1/2 SAP Rate provisions and the 1992 regulations, which were promulgated to limit lenders' ability to receive full SAP on loans previously financed with tax-exempt sources of financing.  The ECFC Loans were, in fact, eligible for the 1/2 SAP Rate after their transfer, and the Secretary should accordingly reverse the initial decision and overturn this finding in the FAD.

Specifically, the hearing official held that the ECFC Loans were ineligible for the 1/2 SAP Rate because the transfer from NMELC to ECFC did not satisfy the requirements of I.R.C. § 150(d)(3)(B), which defines the requirements for bonds to maintain their tax-exempt status

---

[81]   The hearing official noted only that "Navient states that in 2007 it told FSA it would voluntarily cease all prospective billing for special allowance payments at the 1/2 SAP rate in exchange for FSA's offer to purportedly forego enforcement of the existing statutory language."  Initial Decision at 15, Ex. R-21.  He offered no analysis explaining why FSA's "purported[]" offer was anything less than a binding settlement agreement.

when an issuer elects to cease status as a qualified scholarship funding corporation and transfer its assets to a taxable subsidiary, or "successor" corporation.  The hearing official referred to this provision as "[t]he determinative statutory requirements for a successor entity to retain qualification for tax-exempt bond purposes."[82]  But this statement reveals his fundamental misunderstanding of that provision.  I.R.C. § 150(d)(3) deals *solely* with the initial transfer of assets and liabilities from the nonprofit qualified scholarship funding organization to a newly created first-level for-profit subsidiary; it does not address transactions occurring after the initial transfers from the qualified scholarship funding corporation to the "successor" transferee.[83] Indeed, the headings of I.R.C. § 150(d)(3) ("Election to cease status as qualified scholarship funding corporation") and I.R.C. § 150(d)(3)(B) ("Assets and liabilities of issuer transferred to taxable subsidiary") make it clear that the tax code provision is addressing the *initial* transfer of the bond issuer's (here, NEELMC's) assets and liabilities to a newly created for-profit subsidiary

---

[82]  *Id.* at 14.

[83]  The full text of I.R.C. § 150(d)(3)(B) is as follows:

(B) Assets and liabilities of issuer transferred to taxable subsidiary
The requirements of this subparagraph are met by an issuer if—
(i) all of the student loan notes of the issuer and other assets pledged to secure the repayment of qualified scholarship funding bond indebtedness of the issuer are transferred to another corporation within a reasonable period after the election is made under this paragraph;
(ii) such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer within a reasonable period after the election is made under this paragraph;
(iii) to the extent permitted by law, such transferee corporation assumes all of the responsibilities, and succeeds to all of the rights, of the issuer under the issuer's agreements with the Secretary of Education in respect of student loans;
(iv) immediately after such transfer, the issuer, together with any other issuer which has made an election under this paragraph in respect of such transferee, hold all of the senior stock in such transferee corporation; and
(v) such transferee corporation is not exempt from tax under this chapter.

(in this case, Nellie Mae Holdings Corporation (EIN *783), originally named Nellie Mae Corporation) and not any subsequent transfers to new subsidiaries (e.g., from NMELC to ECFC).

FSA concedes that when NEELMC first transferred the ECFC Loans (along with all its other loans) to Nellie Mae Holdings and NMELC as part of its conversion, these entities were eligible to continue to claim 1/2 SAP for those loans on the same basis that NEELMC, the authority, would have been eligible to do.[84]  But the hearing official assumed, without addressing any of Navient's arguments to the contrary, that I.R.C. § 150(d)(3)(B)'s requirements apply to subsequent transfers as well.  The hearing official's agreement with the Department's bald assertion that subsidiaries of Nellie Mae Holdings (such as NMELC and Nellie Mae Loan Finance LLC) or any subsequent transferees must conform to I.R.C. § 150(d)(3)(B)'s requirements is completely unsupported by any reasonable reading of the statute and creates a nonsensical, impossible standard.

Notably, the Department never denied special allowance at the 1/2 SAP Rate to NMELC, Nellie Mae Loan Finance LLC, or (to Navient's knowledge) any other entity on the basis that the company did not meet I.R.C. § 150(d)(3)(B)'s requirements — a fact the hearing official ignored in his initial decision.  Further, nothing in the HEA, applicable regulations, or guidance supports FSA's newly asserted position that this definition must be met for an entity to receive the 1/2 SAP Rate.  In the past, FSA allowed payment at the 1/2 SAP Rate to entities that received eligible loans in the context of corporate reorganizations.  Only now, when it aligns with FSA's incorrect conclusions in the FAD, does FSA argue that these are improper and demand forfeiture of the related special allowance.  It is inappropriate for FSA to hold Navient to this newly crafted

---

[84]   *See* FAD at 20, Ex. R-01.

standard without notice, especially when it conflicts with the Department's longstanding practice.[85]

Nellie Mae's continued billing of the 1/2 SAP Rate on the ECFC Loans after their transfer from NMELC to its affiliate ECFC was entirely consistent with Congress's and the Department's original objective to maximize the loans subject to the 1/2 SAP Rate and limit loans subject to full SAP. By contrast, FSA's position — that a lender could avoid the restrictions of 1/2 SAP simply by transferring a loan to a subsidiary — is both opportunistic and inconsistent with Departmental regulations. Indeed, if interest rates had been significantly higher following the loan transfer from NMELC to ECFC, FSA undoubtedly would not being taking this position (or any other of the positions outlined in the FAD). And if Nellie Mae had ceased 1/2 SAP Rate billing on transferred loans in a high-interest-rate environment, FSA likely would have subjected Nellie Mae to administrative action.

When NMELC transferred loans to ECFC in 2004, ECFC was the sole member of Nellie Mae Holdings and Nellie Mae Holdings was the sole member of NMELC, the obligor on the 1993 Bonds.[86] Because Nellie Mae Holdings and NMELC had previously been converted into single member limited liability companies, they were disregarded as separate entities from ECFC, their owner, for U.S. federal income tax purposes.[87] Accordingly, any sale or transfer of

---

[85]   *See Encino Motorcars*, 136 S. Ct. at 2126 (agencies should be "cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account").

[86]   The wind-down of the SLMA, the GSE, took place at the end of 2004. In June, 2004, in preparation for this wind-down and ultimately the dissolution of SLMA, SLMA's subsidiaries, including Nellie Mae Holdings LLC and Nellie Mae Education Loan LLC, were transferred to ECFC. Affidavit of Mark L. Heleen dated July 20, 2016 ("Heleen Aff.") ¶ 5, Ex. R-09.

[87]   *See* 26 C.F.R. § 301.7701-2(c)(2).

assets between the two is disregarded for U.S. federal income tax purposes.[88]  Even if Nellie Mae

Holdings and NMELC had not been single member limited liability companies, however, ECFC

would still have benefited from the tax-exempt rate through the corporate structure that existed in

2004 — the only relevant date.  Additionally, in accordance with generally accepted accounting

principles, the parent company (SLM Corporation) consolidated both ECFC and NMELC for

financial reporting purposes.[89]  These accounting principles reflect the fact that the various

entities, though they may be legally distinct, are not financially or economically distinct for 1/2

SAP Rate purposes.  Therefore, contrary to the hearing official's holding that NMELC's

liabilities were not the liabilities of ECFC, ECFC did in fact experience the tax-exempt cost of

funds for the ECFC Loans because the benefits of the 1993 Bonds were rolled directly up to

ECFC.  For the Secretary's convenience, an illustration of SLM Corporation's structure is

provided below:

---

[88]   *See* Heleen Aff. ¶¶ 5–6, Ex. R-09.

[89]   *See* Consolidation, Accounting Stand. Codification 810-10-25-1 (Fin. Accounting Stand.
Bd. 2016).

**Corporate Structure Shortly After Navient Acquisition of Nellie Mae**
**(Aug. 1999)**



**Corporate Structure at Time of
Loan Transfers from
NMELC to ECFC
As of June 30, 2004**



SLM CORPORATION

SLM EDUCATION
CREDIT FINANCE
CORPORATION
(ECFC) (EIN *392)

SLMA

(GSE)*

dissolved on Dec. 29, 2004

NELLIE MAE
HOLDINGS LLC
(EIN *783)
(now single member llc
disregarded for tax
purposes)

NELLIE MAE
EDUCATION LOAN
LLC (EIN *352)
(now single member llc
disregarded for tax
purposes (1993 Bonds and
ECFC Loans held here))

NELLIE MAE LOAN
FINANCE LLC

Because the hearing official's ruling that ECFC was not eligible to receive the tax-exempt bonds was based on a misapplication of I.R.C. § 150(d)(3)(B) and is contrary to the Department's own policies and past practices, the Secretary should reverse the hearing official's initial decision and rule that the ECFC Loans were eligible for the 1/2 SAP Rate.[90]  A short-sighted ruling that FSA is entitled to seek the forfeiture of alleged 1/2 SAP Rate overpayments based on a novel (and incorrect) application of the Internal Revenue Code would signal to lenders that they cannot expect consistent, lawful enforcement of regulations in the student loan industry.

## IV.   FSA'S CLAIM IS UNTIMELY AND EXCEEDS THE SCOPE OF THE OIG AUDIT

The hearing official incorrectly found that no statute of limitations applies to this action, a position that is unsupported by the law and undermines due process guarantees.  This appeal pertains to an audit initiated by OIG a dozen years ago, in 2007, and a FAD issued in 2013 regarding findings on bonds issued 20 years earlier in 1993.  FSA's claim for alleged SAP overpayments is untimely and, as the hearing official acknowledged, exceeds the scope of the

---

[90]  Without conceding its position that Navient correctly billed for special allowance on the ECFC loans during the period in question, Navient has determined that, using the actual payment amounts less the amount that would have been payable on the ECFC Loans at the full-SAP rate, the alleged overpayment would be $11.1 million — not the $12.3 million ascribed by the OIG.  *See* Wheeler Aff. ¶ 14, Ex. R-02.  If the Secretary disagrees with Navient's contention that the hearing official's initial decision should be reversed and the FAD's findings overturned, the Secretary should at least exercise her power to modify the initial decision so as to limit Navient's liability to $11 million for alleged overpayments relating to the transfer of the ECFC Loans.  This simple, straightforward calculation can be made using information available in the record, which FSA acknowledged at oral argument. *See* Tr. at 117:4–10, Ex. R-19 ("[T]he documentary evidence that would be necessary for that determination is already on the record, because the dates the bonds in question were retired were specifically included in NMELC's SEC filings, which were public record and certified by their counsel.  So we have those dates already.").

OIG audit.[91]   Not only does the relevant statute of limitations bar FSA's claim, but FSA's unjustified delay and unnecessary bifurcation of proceedings has further prejudiced Navient, justifying the dismissal of FSA's claim on equitable grounds.

### A.   The Statute of Limitations Bars FSA's Claim for Navient to Forfeit Alleged SAP Overpayments

FSA's claim that Navient forfeit alleged SAP overpayments is barred by 28 U.S.C. § 2462, which affords the government five years in which to bring suit to enforce "any civil fine, penalty, or forfeiture, pecuniary or otherwise."  In reaching the flawed conclusion that "there is no successful statute of limitations challenge to final audit determinations"[92] the hearing official erroneously relied on *Interactive Learning Systems*, U.S. Dep't of Educ., No. 04-08-SA (Mar. 8, 2005).  But that proceeding held that the six-year statute of limitations under a different statute, 28 U.S.C. § 2415, was not applicable because FSA was "not seeking damages."[93]  That case did not address § 2462, and it certainly did not hold that no statute of limitations applies to audit determinations.

---

[91]   The hearing official stated, "While FSA may have the authority to audit, review and require repayment for the period before June 1, 2002, it may not do so in the context of the appeal of its FAD for this proceeding.  This decision's necessarily limited scope may not be extended to the period before June 1, 2002."  Initial Decision at 18–19, Ex. 21.  Navient continues to dispute that FSA has the authority to require repayment for the period before June 1, 2002, and agrees with the hearing official's ruling that the FAD's scope may not be extended to the period before June 1, 2002.  In addition to being outside the scope of the OIG audit, any claim for the forfeiture of alleged overpayments prior to June 1, 2002, is barred by the doctrine of laches because FSA's lack of diligence in asserting its claim has greatly prejudiced Navient.  *See generally* Navient Corp.'s Suppl. Br. at 6–10, Ex. R-20.

[92]   Initial Decision at 18, Ex. R-21.

[93]   *Interactive Learning Sys.*, U.S. Dep't of Educ., No. 04-08-SA (Mar. 8, 2005).  Navient has not argued that § 2415 applies nor has it argued that FSA is seeking damages.

The hearing official's position that no statute of limitations applies here would, by FSA's own argument, open up claims for the repayment of money disbursed fifty years ago or more.[94] Such a result would violate the basic tenets of due process. "'The fundamental requisite of due process of law is the opportunity to be heard' . . . '*at a meaningful time* and in a meaningful manner.'"[95] FSA's claim concerns payments made fifteen years before the FAD was issued; far beyond a "meaningful time" that would allow Navient to challenge the claim in a "meaningful manner." Statutes of limitations are designed to prevent precisely what FSA seeks — an unlimited period of time to pursue a stale claim. In *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), the Supreme Court reaffirmed that statutes of limitations "promote justice by preventing surprises through the revival of claims that have been allowed to slumber."[96]

Due process requires there to be a time limit for FSA's claim. That time limit is clearly supplied by § 2462, which applies to FSA's claim that Navient forfeit alleged SAP overpayments. A "forfeiture occurs when a person is forced to turn over money or property" due to alleged wrongdoing,[97] which is precisely what would be required of Navient under the terms of the FAD. In *SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016), the Eleventh Circuit found "no indication that in enacting § 2462's widely applicable statute of limitations, Congress meant to

---

[94]   *See* Tr. at 141:17–20, Ex. R-19 ("Hearing Official:  So under that provision, you could go back 50 years?  Ms. Varnovitsky:  Says any period.  Yes, Your Honor.").

[95]   *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (first quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), then quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965) (emphasis added)).

[96]   133 S. Ct. at 1221 (quoting *R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49 (1944)).

[97]   *SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) (holding that disgorgement is a forfeiture under § 2462 and that the five-year statute of limitations applies).

adopt . . . technical definitions of forfeiture and disgorgement."[98]  Here, FSA is seeking to force Navient to turn over money due to alleged 1/2 SAP overbilling.  Consequently, its claim falls squarely within the definition of a forfeiture.[99]

The five-year statute of limitations bars any action by FSA.  Under § 2462, the five-year period runs from the date of the alleged conduct, not from when the government became aware of the conduct.[100]  Because FSA's claim is based on bills Navient submitted beginning in 1998, the statute of limitations expired in 2003.[101]  Even if the statute of limitations was tolled until 2005 — the date of the *final* Navient SAP bill for the 1993 Trust — the FAD should have been issued no later than 2010.  The FAD was not issued until 2013, three years beyond even the most conservative view of the applicable statute of limitations.

---

[98]   *Id.* at 1364.  Furthermore, in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), the Supreme Court ruled that a claim for disgorgement to the SEC is necessarily a forfeiture under § 2462 and is subject to its five-year statute of limitations.  Although this appeal involves forfeiture to FSA rather than the SEC, *Kokesh*'s reasoning applies with equal force here.

[99]   FSA's contention that its claim qualifies as an administrative offset under 31 U.S.C. § 3716 rather than a forfeiture is untenable.  By its own explicit terms, § 3716 excludes "[p]ayments certified by the Department of Education under a program administered by the Secretary of Education under title IV of the Higher Education Act of 1965."  31 U.S.C. § 3716(c)(1)(C) (stating such payments "shall not be subject to administrative offset under this subsection").  Never before has FSA characterized this claim as an administrative offset of a debt under § 3716.  To the extent it wishes to do so now, it has clearly failed to follow its own applicable procedures.  *See, e.g.*, 34 C.F.R. § 30.22(a)(1) (requiring "the Secretary [to] provide[] a debtor with written notice of the Secretary's intent to offset before initiating the offset").  Instead, FSA has consistently cited procedures set forth in 34 C.F.R. §§ 668.114–116 as governing its claim for repayment.

[100]   *See Gabelli*, 133 S. Ct. at 1220–21.

[101]   The Department was clearly aware of Navient's billing in 1993, as Navient submitted its bills directly to the Department, which remitted payment.  Additionally, Navient had specific discussions with the Department about SAP billing rules for loans financed on an unsecured basis, such as those in the 1993 Trust.  *See* Ryan-Macie Aff. ¶ 29, Ex. R-03; Evans Ltr., Ex. R-04.

FSA's cited support for its proposition that no limitations period applies — 34 C.F.R. § 682.413(a)(1)(iii) — simply refers to repayment of special allowance compensation "for any period in which the lender . . . *violates the requirements*" and is silent as to the period in which a claim for such repayment must be brought.  The Secretary should hold that the five-year statute of limitations set forth in § 2462 applies and therefore that FSA's claim is untimely, and the Secretary should accordingly reverse the initial decision and overturn the FAD.

### B.    FSA's Unjustified Bifurcation Has Further Delayed Proceedings and Prejudiced Navient

Not only did the hearing official fail to address Navient's arguments that bifurcation would further delay proceedings and cause prejudice to Navient,[102] he erroneously stated that "Navient does not contest the unusual bifurcated nature of this appeal."[103]  Navient has consistently contested FSA's unjustified request for bifurcation, which has further delayed proceedings and caused prejudice to Navient.  In fact, Navient objected to this at the hearing and again in the supplemental briefing submitted to the hearing official.[104]  Fed. R. Civ. P. 42(b) sets forth the factors for a court to consider in determining whether bifurcation is appropriate: "convenience, to avoid prejudice, or to expedite and economize."  None of these goals was served by bifurcating these proceedings.  Should the Secretary disagree with Navient's arguments that the initial decision should be reversed and the FAD overturned, Navient respectfully requests that the Secretary concurrently decide liability and, if necessary, damages.

Deciding liability now and damages later could add additional years before the final resolution of this action:  after the Secretary determines liability, FSA will then need to

---

[102]   *See* Navient Corp.'s Suppl. Br. at 10–13, Ex. R-20.

[103]   Initial Decision at 3, Ex. R-21.

[104]   *See* Tr. at 71:10–73:7, Ex. R-19; Navient Corp.'s Suppl. Br. at 10–13, Ex. R-20.

undertake additional fact-finding, and then Navient would almost certainly dispute FSA's

calculation.  After all of that, the parties would simply end up back before the Secretary.  The

evidentiary challenges and long-endured uncertainty with regard to liability faced by Navient

weigh against bifurcating this proceeding.  Memories diminish, key employees depart, and

locating documents from separate entities that date back to the 1990s becomes significantly

harder with each passing day.  "[P]rejudice of considerable delay resulting if bifurcation of

liability and damages is granted . . . can only be cured by denying bifurcation."[105]

      As FSA readily admits, its request for bifurcation stems from a desire to reach beyond the

time period reviewed under the FAD and to seek forfeiture of additional alleged

overpayments.[106]  This bootstrapping rationale is not an appropriate justification for bifurcation.

The regulation governing Navient's appeal of the FAD explicitly states that evidence is

"irrelevant and immaterial" if it "relat[es] to a period of time other than the period of time

covered by the audit program review."[107]  Knowing that it cannot introduce pre- June 2002

evidence in front of the hearing official, FSA sought to bifurcate as a means to include this

"irrelevant and immaterial" evidence in calculating damages at a later date.

      FSA's approach has left Navient in a perpetual state of uncertainty, which the hearing

official failed to recognize or address.  On the one hand, FSA purports to rely on the FAR in

---

[105]  *Briggs & Stratton Corp. v. Chongqing RATO Power Co.*, No. 5:13-CV-316, 2013 WL 5963151, at *6 (N.D.N.Y. Nov. 7, 2013) (quoting *BASF Catalysts LLC v. Aristo, Inc.*, 2009 WL 523123, at *2 (N.D. Ind. Mar. 2, 2009)).

[106]  *See* Tr. at 114:18–155:17, Ex. R-19; *see also id.* at 140:13–14 ("[W]e may not need any additional calculations, or we may.  That's the point of bifurcation.").

[107]  34 C.F.R. § 668.116(f)(1).

setting forth the forfeiture amount as $22.3 million.[108]  On the other, FSA attempts to separate

the FAD from the FAR and argues for forfeiture of alleged overpayments dating back to 1998.

This is not the "convenience" contemplated by Fed. R. Civ. P. 42(b).  Bifurcation is often

necessary to "simplif[y] the issues for [a] jury" in order to "reduce[] the danger of unnecessary

jury confusion."[109]  This consideration is inapplicable here.[110]

Because none of the justifications for bifurcation would be served here, the Secretary

should concurrently decide liability and, if necessary, damages.

---

[108]   *See* FAD at 23–24, Ex. R-01 (stating that "FSA considers the overpayment amount of
$22.3M as calculated by the OIG, to be a reasonable estimate").

[109]   *Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 42 F.3d 1398, at *2 (9th Cir. 1994) (table decision)
(quoting *Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982)).

[110]   With regard to the alleged $12.3 million overpaid since 2004, Navient has already calculated
that the alleged overpayment amount would be $11.1 million.  *See* Wheeler Aff. ¶ 14, Ex. R-
02 (using the formula prescribed in the Higher Education Act, Mr. Wheeler calculated the
actual special allowance paid less the amount that would have been payable on the ECFC
loans at the full-SAP rate).  FSA's failure to calculate the amount correctly in the FAD does
not mean the calculation is complicated to perform or requires a special formula or method.
*See* FAD at 24, Ex. R-01.

## **CONCLUSION**

Navient's approach to special allowance billing on the loans in question was based on written guidance that the Department issued at Nellie Mae's request to address the unique structure of the 1993 Bonds, and Navient applied the 1/2 SAP Rate in a conservative manner, according to reasonable interpretations of the Department's guidance, and in keeping with the original intent of the applicable statute and regulations. In addition, Navient entered into a binding settlement agreement with the Department by which Navient agreed to stop billing at the 1/2 SAP Rate in exchange for FSA's promise to forgo enforcement action with respect to prior 1/2 SAP Rate billing practices. Despite Navient's good-faith efforts, the hearing official affirmed the findings of an untimely FAD and erroneously held Navient liable for following the Department's own guidance.

This FAD and initial decision have the potential to cause lasting, long-term harm to the student loan industry because they demonstrate to lenders, servicers, institutions of higher learning, and others that they can no longer rely on the Department's guidance and promises. Therefore, Navient requests that the Secretary correct this unjust and dangerous precedent by adopting Navient's Statement of Undisputed Facts and concluding as follows:

1. Navient is not liable for the special allowance overpayments alleged in the FAD for any or all of the following reasons:

    (a) Navient was entitled to bill at the 1/2 SAP Rate through the final maturity of the 1993 Bonds;

    (b) FSA's claim is precluded by the 2007 settlement agreement between FSA and Navient; and

    (c) FSA's claim is untimely under 28 U.S.C. § 2462.

2.      FSA is time-barred from pursuing claims against Navient for alleged overbilling

before June 1, 2002, which predates the audit period.

3.      The hearing official's initial decision is REVERSED, the FAD is

OVERTURNED, and the proceedings against Navient are DISMISSED.

Date:  April 8, 2019                              Respectfully Submitted,

Colby A. Smith
Ada Fernandez Johnson
Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
casmith@debevoise.com
afjohnson@debevoise.com
jsimon@debevoise.com


Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jncohen@debevoise.com

*Attorneys for Respondent*

47

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on April 8, 2019, a true and correct copy of the foregoing BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF THE HEARING OFFICIAL'S INITIAL DECISION was served on the following counsel by electronic mail and overnight courier:

Natasha Varnovitsky, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202
(202) 205-3529
natasha.varnovitsky@ed.gov
(Electronic mail and overnight courier)

Ji Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
jsimon@debevoise.com

*Attorney for Respondent*

**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON, D.C. 20202

```
------------------------------------------------------------ x
In the matter of                              :
                                              :    Docket No. 16-42-SA
NAVIENT CORPORATION,                          :
                                              :    Federal Student Aid Proceeding
                                              :    ACN:  ED-OIG/A0310006
                                              :
                                              :    MOTION FOR LEAVE TO FILE
                        Respondent.           :    A REPLY IN SUPPORT OF
                                              :    NAVIENT CORPORATION'S
                                              :    APPEAL OF THE HEARING
                                              :    OFFICIAL'S INITIAL DECISION
------------------------------------------------------------ x
```

## MOTION FOR LEAVE TO FILE A REPLY
## IN SUPPORT OF NAVIENT CORPORATION'S APPEAL
## OF THE HEARING OFFICIAL'S INITIAL DECISION

Navient Corporation ("Navient") respectfully requests leave to file a reply brief in support of its appeal of the hearing official's initial decision.  The reply is attached hereto as Exhibit A.  This reply is necessary to address several erroneous statements in Federal Student Aid's ("FSA's") Brief in Response to Navient Corporation's Appeal of Hearing Official's Initial Decision (the "Response") filed on May 3, 2019.

In its Response, FSA misstates key findings and conclusions of the hearing official and mischaracterizes Navient's arguments.  Many of these misstatements relate to the hearing official's determinations regarding the meaning of DCL 93-L-161's "in whole or in part" language.  In addition, FSA recasts the hearing official's decision as having explicitly rejected the 2007 settlement, whereas, in fact, the hearing official simply (and inexplicably) failed to address this argument.  FSA also distorts the grounds for Navient's arguments regarding its billing practices and its subsidiary's eligibility to receive special allowance payments.

The Secretary has previously held that in situations such as this, where the appellee has made material misstatements, an appellant may request leave to file a reply.  *See Accrediting Comm'n for Cmty. & Junior Colls., W. Ass'n of Sch. & Colls.*, U.S. Dep't of Educ., No. 14-10-O, at 4 (Jan. 4, 2016).

For the foregoing reasons, Navient respectfully requests that the Secretary grant Navient leave to file the attached Reply Brief in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision.

Date:  May 20, 2019

Respectfully Submitted,

Colby A. Smith
Ada Fernandez Johnson
Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
casmith@debevoise.com
afjohnson@debevoise.com
jsimon@debevoise.com

Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jncohen@debevoise.com

*Attorneys for Respondent*

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on May 20, 2019, a true and correct copy of the foregoing MOTION FOR LEAVE TO FILE A REPLY IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF THE HEARING OFFICIAL'S INITIAL DECISION was served on the following counsel by electronic mail and overnight courier:

Natasha Varnovitsky, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202
(202) 205-3529
natasha.varnovitsky@ed.gov
(Electronic mail and overnight courier)

Ji Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
jsimon@debevoise.com

*Attorney for Respondent*

# Exhibit A

**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON, D.C. 20202

```
------------------------------------------------------------ x
In the matter of                            :
                                            :       Docket No. 16-42-SA
NAVIENT CORPORATION,                        :
                                            :       Federal Student Aid Proceeding
                                            :       ACN:  ED-OIG/A0310006
                                            :
                                            :       REPLY BRIEF IN SUPPORT OF
                          Respondent.       :       NAVIENT CORPORATION'S
                                            :       APPEAL OF THE HEARING
                                            :       OFFICIAL'S INITIAL DECISION
------------------------------------------------------------ x
```

## <u>REPLY BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF THE HEARING OFFICIAL'S INITIAL DECISION</u>

Federal Student Aid's ("FSA's") Brief in Response to Navient Corporation's ("Navient's") Appeal of Hearing Official's Initial Decision (the "Response") inappropriately and unfairly misstates the hearing official's findings and mischaracterizes Navient's position on appeal.  In particular, FSA argues that the hearing official made findings about the 1993 Dear Colleague Letter ("DCL") that cannot be found in the hearing official's initial decision.  FSA also argues that the hearing official ruled on Navient's argument that it accepted a settlement offer from the U.S. Department of Education (the "Department"), but the initial decision contains no holding or analysis regarding this point.  FSA also mischaracterizes Navient's core arguments that it was entitled to bill at the half-SAP/9.5 percent minimum return rate (the "1/2 SAP Rate") and that its subsidiary was properly permitted to receive the payments.  In view of these

misstatements and mischaracterizations, this Reply Brief is submitted to clarify a record that FSA's Response has left confused and unclear.[1]

## I.   FSA's Response Repeatedly Misstates the Hearing Official's Decision, Suggesting That FSA Finds the Decision Indefensible on Its Own Terms

FSA's Response mischaracterizes the initial decision in at least three ways, all of which appear to be designed to shift focus away from errors in the hearing official's initial decision and weaknesses in FSA's own arguments.

*First*, contrary to FSA's suggestion, the hearing official did not find that the "in whole or in part" language contained in DCL 93-L-161 (the "1993 DCL") should be read to be "consistent with the statutory language."  Resp. at 15.  To the contrary, the hearing official was clear in ruling that he could *not* reconcile the "in whole or in part" language with his interpretation of the underlying statute and regulations.  *See* Initial Decision at 13–14.  Navient has argued that the hearing official's inability to reconcile the language of the 1993 DCL, which was carefully considered by the Department when it was issued, *see* Opening Br. at 18–20, confirms that the hearing official's interpretation of the statute was itself flawed.  FSA's claim that the "in whole or in part" language referred only to "refinancing bonds" was not part of the hearing official's initial decision.  *See* Resp. at 16.  That argument should provide no grounds for upholding the hearing official's ruling.

*Second*, FSA inaccurately states that the hearing official found that Navient's interpretation of the 1993 DCL's "in whole or in part" language was "inconsistent with the rest of the letter."  Resp. at 1.  The hearing official made no such finding.  To the contrary, the hearing official found only that it was "not clear why that . . . language was included in the

---

[1]   On May 20, 2019, Navient filed a motion seeking leave to file this reply brief, due to the misstatements and mischaracterizations in FSA's Response.

DCL" (thus failing to address the ample evidence Navient proffered to explain how that language became part of the 1993 DCL).  Initial Decision at 13.  The initial decision never discussed any inconsistencies within the 1993 DCL itself and appeared never to fully digest the historical information regarding the genesis of the key language in the 1993 DCL.  FSA's statement to the contrary appears to be an improper attempt by FSA to align the initial decision with its own arguments against Navient's justified reliance on the DCL's plain language.

*Third*, FSA claims that the hearing official determined there was no binding settlement agreement between Navient and FSA.  Resp. at 29, 31.  FSA provides no citations to support this bald assertion because it cannot — the hearing official made no such finding.  Although the hearing official mentioned the offer once, *see* Initial Decision at 15, he provided no analysis or ruling regarding Navient's argument that the 2007 offer and acceptance created a binding settlement agreement with FSA.  The hearing official's failure to explicitly rule on this issue is sufficient grounds for reversal of the initial decision.  In the absence of a ruling, FSA's argument that the settlement was limited to so-called "recycling claims" — a contention that has no support in the record — cannot support the initial decision.

These and other misstatements by FSA suggest that it cannot defend the hearing official's ruling according to its own terms.  Such arguments only confirm that the initial decision should be overturned.

## II.   FSA's Response Mischaracterizes Navient's Arguments in a Manner That Confuses the Record and Fails to Address Navient's Most Important Arguments

FSA mischaracterizes Navient's argument that it is entitled to the 1/2 SAP Rate by claiming that it "rests solely on three words" in the 1993 DCL.  Resp. at 12.  That is not true.  Navient's justification for billing at the 1/2 SAP Rate is firmly grounded in the relevant statute and regulations.

As the initial decision acknowledges, the 1/2 SAP Rate was created by the Education Amendments of 1980 and codified at 20 U.S.C. § 1087-1.  The legislation provides, in part, that the 1/2 SAP Rate applies to loans "made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation" and to "holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans . . . or from income on the investment of such funds."  20 U.S.C. § 1087-1(b)(2)(B)(i).  As this language makes clear, the 1/2 SAP Rate applies not only to loans that were made or purchased with funds obtained from the original issuance of tax-exempt obligations, but also to loans funded by collections, guarantor payments, interest benefits, special allowance payments, sale proceeds, or investment income on these loans.  *See also* 34 C.F.R. § 682.302(c)(3)(i).  It is inconceivable that this provision, which contemplates funds from many sources, mandates that the 1/2 SAP Rate is available only when the funds are derived "in whole" from the tax-exempt obligation.  It was for this reason that Nellie Mae asked the Department to state in the 1993 DCL that the rate was available for loans funded "in whole or in part" from funds "derived from tax-exempt obligations."  *See* Opening Br. at 18–19.  FSA's claim that Navient's argument rests solely on three words in the 1993 DCL appears to be an attempt to circumvent the firm statutory grounding of Navient's argument and to distract from the fact that the Department fully understood the implications of its statement in the 1993 DCL.  The Department's well-considered and definitive guidance in the 1993 DCL, which is entirely consistent with the plain words of the statute, should be upheld.

Separately, FSA also mischaracterizes Navient's argument in support of the receipt of 1/2 SAP payments by its subsidiaries.  According to FSA, Navient argues that ECFC qualifies as a "successor" entity pursuant I.R.C. § 150(d).  Resp. at 25.  Navient made no such argument, nor did it need to.  The initial transfer from NEELMC to Nellie Mae Holdings and NMELC is the only relevant transfer, and there is no dispute that this transfer met all of the requirements for billing at the 1/2 SAP Rate.  As Navient has consistently argued, I.R.C. § 150(d) deals solely with the initial transfer of assets and liabilities to a newly created for-profit subsidiary when an issuer elects to cease status as a qualified scholarship funding corporation.  After that initial transfer to a for-profit entity, it is irrelevant whether a subsequent transfer, such as the transfer to ECFC, satisfies those same requirements.  *See* Opening Br. at 32–34.  FSA's misstatement of Navient's position is part of its attempt to win a straw man argument.  The transfer to ECFC is irrelevant because the original transfer undisputedly qualified under the Internal Revenue Code. The hearing official's mistaken ruling on this point also should be overturned.

## **CONCLUSION**

For these reasons, and for those highlighted in Navient's opening brief, the hearing official's initial decision should be overturned and the underlying Final Audit Determination should be rejected.

Dated:  May 20, 2019

Respectfully Submitted,

Colby A. Smith
Ada Fernandez Johnson
Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
casmith@debevoise.com
afjohnson@debevoise.com
jsimon@debevoise.com

Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jncohen@debevoise.com

*Attorneys for Respondent*

# Navient Visuals

Oral Argument before the Department of
Education Office of Hearings and Appeals

**Colby Smith**

**March  30, 2017**





# 1993 Tax Exempt Bond Deal



**TRUST**

Guarantee payments on default

**DEPT. OF EDUCATION**

1/2 SAP

*Pools of Funds for Loans*

**STUDENTS**

PAYMENTS

LOANS

2204

**3**

# Nellie Mae Tax Exempt Bond Deals

## 1992
## SECURED LOAN FINANCING
**(Structure Typically Used by Lenders)**

**VS.**

## 1993
## GENERAL OBLIGATION RATING

*1992 Trust Issue A-C*
*Issue date: Apr. 24*
*$131M*

→ 

*1992 Trust Issue D-F*
*Issue date: June 10*
*$77M*

→ 

*1992 Trust Issue '85A and G*
*Issue date: Aug. 9*
*$216M*

→ 

*1992 Trust Issue H*
*Issued date. Nov. 19*
*$24M*

→ 

*1993 Trust*

*Pools of Funds for Loans*

*Drawn as needed:*

*Mar. 18 $103M*
*June 9 $49M*
*July 1 $127*
*Aug. 24 $107*
*Nov. 15 $71*



2205

# United States Prime Rate  1977 – 2007



Source: FedPrimeRate.com

**5**

# Timeline of Regulations



**Feb. 1 – "1992 Regulations" become effective**
Enforcement delayed until guidance, which was issued in March, 1996

**March 1 – Dear Colleague Letter DCL 96-L-186**
Guidance re: 1992 Regulations – describes as "a shift in the Department's policy"

**Dec. – "1992 Regulations"**
Effective Feb. 1, 1993. *Required* to bill 1/2 SAP "[a]fter the loan is pledged or transferred in consideration of funds" derived from taxable sources "if the authority retains a legal or equitable interest in the loan," until "the prior tax-exempt obligation is retired [or] defeased."

**Aug. 10 – OBRA 1993** Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66)
Eliminates unique SAP provisions for loans financed with newly issued tax-exempt obligations

**Nov. – Dear Colleague Letter, DCL 93-L-161**
Administrative guidance re: OBRA 1993. Clarified 1/2 SAP Rate provision applied to all loans acquired in whole *or in part* with funds derived from pre- October 1, 1993 tax-exempt obligations

**Sept. 25, Final Audit Determination**

## 1992            1993                    1996            2013

**March 18 –Series A**
Maturity Date July 1, 2005 ($103M)

**June 9 –Series B**
Maturity Dates
June 1, 1998 ($5.8M)
June 1, 2000 (32.4M)
June 1, 2002 ($10.7M)

**July 1 –Series C-F**
Series C Maturity Date July 1, 1998 ($26.1M)
Series D Maturity Date July 1, 1998 ($10.2M)
Series E Maturity Date July 1, 1999 ($58.3M)
**Series F Maturity Date July 1, 2004 ($32.5M)**

**Aug. 24 –Series G**
Maturity Dates
Aug. 1, 1998 ($31.5M)
Aug. 1, 2000 ($28.1M)
Aug. 1, 2002 ($47.4M)

**Nov. 11 –Series H**
Maturity Dates Dec. 1, 1999 ($57.4M)
Dec. 1, 2002 ($14.4M)

**1993 Trust – $458 Million Student Loan Financing**

Blue highlighting on the timeline represents a period of intense discussion of regulations among the Department and the industry

**Debevoise
&Plimpton**

**6**

# Corporate Structure Assumed in the FAD





**7**

# Actual Corporate Structure





**8**

2209