**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

NAVIENT SOLUTIONS, LLC,

     Plaintiff,

     v.

DEPARTMENT OF EDUCATION and DR.
MIGUEL CARDONA, Secretary of
Education, in His Official Capacity,

     Defendants.

**Case No.: 1:21-cv-324-TSE-MSN**

**SUPPLEMENTAL ADMINISTRATIVE RECORD**

**VOLUME 8 (Pages 2210-335)**

**NAVIENT V. DEPARTMENT OF EDUCATION**
**Case No. 21-CV-00324**
**SUPPLEMENTAL ADMINISTRATIVE RECORD**

| Document Description | Bates No. |
|---|---|
| Final Audit Determination of Federal Student Aid Letter from Patricia Trubia, Director, Financial Institution Oversight Service, Federal Student Aid, to John Remondi, President and Chief Operating Officer, Sallie Mae, Inc., dated September 25, 2013 | 1345-71 |
| Affidavit of Jason Wheeler dated November 24, 2015 | 1372-78 |
| Affidavit of Sheila M. Ryan-Macie dated March 24, 2015 | 1379-476 |
| Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie, dated March 18, 2014 | 1477-78 |
| Affidavit of John (Jack) Remondi, dated September 22, 2016 | 1479-81 |
| NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates | 1482-85 |
| 1993 Trust Agreement | 1486-517 |
| Official Statement Relating to Nellie Mae 1993 Series G (Aug. 1, 1993) | 1518-94 |
| Affidavit of Mark L. Heleen dated September 23, 2016 | 1595-97 |
| Navient Responses to OIG Questions of December 14, 2007 | 1598-600 |
| Letter from Robert S. Lavet, General Counsel, Sallie Mae, to Theresa Shaw, U.S. Department of Education, dated February 15, 2007 | 1601 |
| Affidavit of Jane Roig dated November 11, 2016 | 1602-03 |
| Emails concerning Freedom of Information Act dated April 26, 2017 and May 15, 2017 | 1604-07 |
| Letter from Theresa Shaw to Thomas J. Fitzpatrick dated January 24, 2007 | 1608-11 |
| Final Audit Report, Special Allowance Payments to Sallie Mae's Subsidiary, Nellie Mae, for Loans Funded by Tax-Exempt Obligations, dated August 2009 | 1612-75 |
| Respondent Navient Corporation's Request for Review of Final Audit Determination, dated July 27, 2016 | 1676-737 |
| Brief in Support of Navient Corporation's Appeal of the Final Audit Determination Issued by the Office of the Inspector General of the Department of Education, dated September 27, 2016 | 1738-83 |
| Navient Corporation's Reply Brief in Support of Appeal of Final Audit Determination, dated November 23, 2016 | 1784-816 |

Transcript of March 30, 2017, Oral Argument     1817-2018

Navient Corporation's Supplemental Brief, dated May 19, 2017     2019-40

Hearing Official's Initial Decision, dated March 7, 2019     2041-60

DCL 93-L-161     2061-77

DCL 93-L-163     2078-81

DCL 96-L-186     2082-87

DCL FP-06-15     2088-93

DCL FP-07-01     2094-99

DCL FP-07-06     2100-38

Brief in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision, dated April 8, 2019     2139-91

Motion for Leave To File a Reply in Support of Navient Corporation's Appeal of the Hearing Official's Initial Decision     2192-201

Navient Visuals from Oral Argument before the Department of Education Office of Hearings and Appeals, dated March 30 2017     2202-09

Brief in Support of Federal Student Aid's Final Audit Determination, dated October 28, 2016     2210-54

Supplemental Brief in Support of Federal Student Aid's Final Audit Determination, dated May 19, 2017     2255-76

Brief in Response to Navient Corporation's Appeal of Hearing Official's Initial Decision, dated May 3, 2018     2277-318

Motion for Leave To File a Sur-Reply Brief in Response to Reply Brief in Support of Navient Corporation's Appeal of Hearing Official's Initial Decision), dated May 31, 2019     2319-35

## UNITED STATES DEPARTMENT OF EDUCATION
### WASHINGTON D.C. 20202

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In the matter of | : | **Docket No. 16-42-SA** |
| | : | |
| **NAVIENT CORPORATION,** | : | Federal Student Aid Proceeding |
| Respondent. | : | ACN: ED-OIG/A0310006 |
| | : | BRIEF IN SUPPORT OF |
| | : | FEDERAL STUDENT |
| | : | AID'S FINAL AUDIT |
| | : | DETERMINATION |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## BRIEF IN SUPPORT OF FEDERAL STUDENT AID'S FINAL AUDIT DETERMINATION

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov

*Attorney for FSA*

2210

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...........................................................................................1

BACKGROUND...............................................................................................................2

       Federal Family Education Loan Program Overview......................... ...........2

       Special Allowance Payment History...........................................................3

       Corporate Organizational Structure of Navient/Sallie Mae.........................9

       1993 Bonds ..............................................................................................10

       OIG Audit Finding, Sallie Mae Response, and Final Audit Determination.........13

STANDARD OF REVIEW................................................................................................14

ARGUMENT..................................................................................................................14

  I.  ECFC WAS NOT ELIGIBLE TO CLAIM AND RECEIVE 9.5 SAP ON ANY

      FFELs..................................................................................................14

      A. ECFC was not an "Authority" ............................................................15

      B. ECFC did not qualify as a "successor" corporation to NEELMC,

          the issuer of the tax-exempt bonds..................................................16

  II.  THE HEA AND REGULATIONS REQUIRED NAVIENT TO STOP BILLING

      LOANS AT 9.5 SAP AFTER THE TAX-EXEMPT BOND THAT FINANCED

      THE LOANS WAS RETIRED.....................................................................20

      A. The record does not support Navient's preferred meaning of

          "in whole or in part.".......................................................................21

      B. Even if the words "in whole or in part" mean what Navient suggests,

          they do not determine when the limitation on loans subject to the 9.5 SAP

          rate ceased....................................................................................23

          1. *The Master Trust Is Not an "Obligation"*......................................24

          2. *The Last Bond to Mature In a Sub-pool of Multiple Bonds Cannot*

             *Control the 9.5 SAP Status Of All the Loans in That Sub-pool* ............27

i

3.  *An Individual Bond Is the "Prior Tax-Exempt Obligation" That Determined When 9.5 SAP Limitation No Longer Applied To Loans Reasonably Allocated To It*...............................................................31

III. NAVIENT'S TREATMENT OF 1993A SERIES BOND AS SEPARATE

    FUNDING SOURCE SHOWS THAT THIS BOND COULD NOT CONTROL

    THE 9.5 SAP STATUS OF LOANS IN SUB-POOL 2.....................................33

IV. FSA HAS AUTHORITY TO DETERMINE AND RECOVER THE

    LIABILITY ASSERTED IN THIS FAD...................................................... 34

V. FSA'S TREATMENT OF NAVIENT IS CONSISTENT WITH ITS TREATMENT

    OF OTHER INDUSTRY PARTICIPANTS......................................................35

VI. NAVIENT'S DISPUTE OF FAD'S LIABILITY ESTIMATE IS PREMATURE.........38

VII. EDUCATION DOES NOT SEEK TO RECOVER FOR ITEM 3 OF THE

    FSA PROGRAM DETERMINATION ...............................................38

CONCLUSION............................................................................................38

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*CBS Corp. v. F.C.C.*, 535 F.3d 167, 188 (3d Cir. 2008), *as amended* (Aug. 6, 2008),
*cert. granted, judgment vacated*, 556 U.S. 1218 (2009) ...........................................................32

**STATUTES**

Higher Education Act of 1965 ...........................................2, 3, 6, 8, 9, 18, 19, 22, 27, 30, 35, 37

Education Amendments of 1980 .........................................................................................................3

Omnibus Budget Reconciliation Act of 1993.................................................................................6, 22

Omnibus Consolidated Appropriations Act of 1997...........................................................................9

Taxpayer-Teacher Protection Act of 2004...................................................................................8,13

Higher Education Reconciliation Act of 2005.....................................................................................8

26 U.S.C. §150(d)......................................................................................................................16-20

Del. Code Ann. Tit. 6, §18-303 .........................................................................................................18

**REGULATIONS**

26 C.F.R. §1.150-1...........................................................................................................11, 26, 36

26 C.F.R. §1.148-6..........................................................................................................................33

34 C.F.R. §668.116 (2016)..............................................................................................................14

34 C.F.R. §682.200...........................................................................................................................15

34 C.F.R. §682.302 (1985)..............................................................................4 – 6, 15, 22, 26, 29

34 C.F.R. §682.302(1993).................................................................................................................6

34 C.F.R. §682.413 (2106)..............................................................................................................36

**OTHER AUTHORITIES**

Dear Colleague Letter 93-L-161.....................................................1, 6-7, 20-23, 31, 34, 40

DCL 93-L-163....................................................................................................................................7

DCL 96-L-186.............................................................................................................................7-8, 22-23

DCL FP-07-01...................................................................................................................27, 37-38

Dear Borrower Letter-93-1................................................................................................................22

iii

## PRELIMINARY STATEMENT

Navient Corporation (Navient) bases its challenge to Federal Student Aid's (FSA) Final Audit Determination (FAD) on a mistaken claim that Education Credit Finance Corporation (ECFC) was eligible to receive special allowance payments (SAP) at a rate that assured the holder of the loan, with interest paid by the borrower, a return on the loan of at least 9.5 percent[1] and on an impermissible reading of sub-regulatory guidance as explained by Nellie Mae's former Vice President of Strategy and Development, Sheila Ryan-Macie. As this brief will show, the plain language of the Higher Education Act (HEA), the Internal Revenue Code, and the implementing regulations refutes Navient's assertions.

The transfer of ownership of Nellie Mae Holdings Corporation (NMC), a Navient subsidiary, to ECFC, another Navient subsidiary, could not and did not make loans held by ECFC subject to the eligible for 9.5 SAP limit because the tax-exempt obligation financing the loans had terminated. Navient claims that the Department's Dear Colleague Letter directed that all loans made "in whole or in part" from tax-exempt obligations were subject to the 9.5 SAP limit required Navient to claim SAP at that rate on all loans purchased with the proceeds of any 1993 bonds until the last of the 1993 bonds had been retired. The claim rests on an untenable reading of both Department regulations and the term "obligation." Finally, Navient was not unfairly singled out with respect to the 9.5 SAP billing practice at issue in this FAD, and FSA has the authority to require the actions demanded in this FAD.

In summary, the conclusions reached in FSA's FAD are solidly based in law and fact, and Navient fails to show, by the preponderance of the evidence, that its 9.5 SAP billing was in compliance with the applicable requirements. The determinations contained in the FAD should, therefore, be upheld in their entirety.

---

[1] Hereinafter, "9.5 SAP."

## BACKGROUND

### The Federal Family Education Loan Program

The Federal Family Education Loan Program (FFELP) (formerly the Guaranteed Student Loan (GSL) Program) established by Title IV-B of the Higher Education Act of 1965, as amended (HEA) is one of several types of student loan programs administered by the U.S. Department of Education (Education). (20 U.S.C. §§1071 *et. seq.*)) (Regulations at 34 C.F.R. Part 682). Under the FFELP, loans by banks or other lending institutions were guaranteed by State or non-profit guarantors and reinsured by Education. 20 U.S.C. §1078. Most FFELP loans were made by a limited number of large banks with nationwide lending programs. A variety of financial institutions comprised a very active secondary market in FFELP loans, including banks, State and non-profit student loan "Authorities," and the Federally-chartered Student Loan Marketing Association ("Sallie Mae" or SLMA). [2]

Generally, banks and other for-profit institutions obtained funds to make new FFELP loans or purchase existing FFELP loans from customer deposits, from loans from other lenders (including Sallie Mae), from sales of existing FFELP loans in a secondary market, and from notes, bonds[3], and commercial paper sold to investors. In addition, State agencies could also issue tax-exempt bonds to acquire funds, and Section 150(d) of the Internal Revenue Code also authorized certain non-profit corporations (student loan "Authorities"), to issue tax-exempt bonds ("qualified scholarship funding bonds"). Tax-exempt bonds provided these particular lenders with a cheaper source of funds to make student loans than those available to other lenders, but at a loss in tax revenue to the federal government. Thus, the cost of tax-exempt

---

[2] HEA §435(d) lists some eight different kinds of entities that may be an eligible FFELP lender. 20 U.S.C. §1085(d).
[3] A bond is a valid debt obligation of the issuer.

2

bonds was of significant concern to Congress, which sought to reduce its use in the FFEL program. H.R. Rep. 98-324, 8 (1983).

**Special Allowance Payment History**

Special allowance payments (SAP), provided for in Section 438 of the HEA, are Federal subsidy payments to holders of FFELP loans that ensured equitable returns to student loan holders, thus guaranteeing lenders' continued participation in FFELP. 20 U.S.C. §1087-1.  SAP payments were designed to compensate lenders, in a high interest rate environment, for the difference between returns they could achieve were they to make loans at interest rates prevalent in the marketplace and the return they could achieve at the reduced interest rates they were permitted to charge on student loans.[4]  Lenders' cost of capital was an important factor to be considered in determining the appropriate rate of special allowance. In 1976, Congress directed a committee to recommend a formula for SAP, stating that

> (g)(3) In developing the method for the determination of the quarterly rate of the special allowance under this section, the Committee shall consider—
> * * *
> (C) relevant and widely available financial indicators which accurately reflect the costs of  capital invested in programs under this part, or substitute financial indicators which equitably represent the cost of such capital. …

Pub. L. 94–482, §127(a), 90 Stat. 2135 (Oct. 12, 1976).

The Education Amendments of 1980 provided, for the first time, a unique SAP rate for loans acquired with tax-exempt financing.  Pub. L. 96-374, §420, 90 Stat. 1425 (Oct. 3, 1980). Because the issuance of tax-exempt bonds resulted in loss of federal tax revenue, and because the cost of funds incurred by lenders who used tax-exempt financing was lower than that cost for

---

[4] In the high interest rate environment of 1980's average interest rates routinely exceeded  the maximum student loan interest rates which Congress has set at the time. 20 U.S.C. §1077a.  This ensured that lenders making student loans would incur a loss, unless a federal subsidy designed to compensate for the shortfall was put in place.

3

other lenders,[5] issuers of tax-exempt obligations were to receive special allowance payments at a rate one-half that payable to other lenders, but sufficient to assure a total return to the lender, with interest paid by the borrower, of at least 9.5 percent - referred to as "half-sap" or "1/2 SAP." 34 C.F.R. §682.302(c)(2)(i)(1985).

It was in this restrictive environment that the Department first issued regulations implementing the 9.5 SAP rule, as well as a new Subpart H that required these lenders, in order to qualify for any SAP, to demonstrate to the Department that an unmet need in their region for student loan credit could be met only by tax-exempt funding. 34 C.F.R. §§682.800 *et seq.* (1985).[6] Subpart H defined the terms "Authority" and "Obligation'" as follows:

> *Authority* means any entity, public or private non-profit, which may issue tax-exempt obligations in order to obtain funds to be used for the making or purchasing of GSL or PLUS loans. The term "Authority" includes any agency, including a State postsecondary institution or any other instrumentality of a State or local governmental unit, regardless of the designation or primary purpose of that agency, which may issue tax-exempt obligations. The term also includes any party authorized to issue such obligations on behalf of a governmental agency, and any non-profit organization that issues qualified scholarship funding bonds under 26 U.S.C. 103(e).
>
> *Obligation* means any interest-bearing debt or original issue discount debt incurred by an Authority pursuant to its borrowing powers. As used in this subpart, this term means only an obligation issued to acquire funds for financing or refinancing the making or purchasing of student loans.

34 C.F.R. §682.801 (1985).

---

[5] Interest earned by holders of taxable bonds were subject to federal tax, whereas interest earned by holders of tax-exempt bonds was not. As a result, purchasers of tax-exempt bonds were willing to accept a lower rate of return, which resulted in a lower cost of funds for the issuers of such bond.

[6] Subpart H implemented amendments made in 1983, in which Congress also required these entities, known as Authorities, to submit a Plan for Doing Business. Pub. L. 98-79, §1, 97 Stat. 482 (August 15, 1983).

Thus, 34 C.F.R. §682.302(c)(2), also adopted in 1985, provided that the 9.5 SAP limit would

apply on loans purchased by the holder with funds obtained from issuance of tax-exempt

obligation and its proceeds:

> (c)(2)(i)…the percentage rate for the special allowance is one-half the rate determined
> under paragraph (c)(1) for a loan disbursed on or after October 1, 1980 and made or
> purchased with funds obtained by the holder from
>
>> (A) Issuance of obligations, the income from which is exempt from taxation under
>> the Internal Revenue Code;
>> (B) Funds obtained from collections or payments by a guarantor on a loan
>> described in paragraph (c)(2)(i); and
>> (C) Interest or special allowance payments on a loan described in paragraph
>> (c)(2)(i).

34 C.F.R. §682.302(c)(2)(i)(1985).

The regulation also provided that such SAP would be payable to an Authority at *full* SAP rate

> . . . after the loan is pledged or otherwise transferred in consideration of funds derived
> from sources other than a tax-exempt obligation *and*
>> (i)     The prior tax-exempt obligation is retired; or
>> (ii)    The prior tax-exempt obligation is defeased …

34 C.F.R. §682.302(e)(3)(1985)(*emphasis added*).  Thus, continuing to match the source of

funds with the SAP payable on the loan purchased with such funds, the regulation provided for

the termination of the 9.5 limitation in the event a loan was refinanced with proceeds of a

taxable obligation as soon as the original tax-exempt obligation was retired or defeased.[7]

On December 18, 1992 Education published final regulations for the FFELP, amending

the language of 34 C.F.R. §682.302(e) by adding section (e)(3)(ii).

> (e) *Special allowance payments for loans financed by proceeds of tax-exempt
> obligations.*(3)The Secretary pays a special allowance to an Authority at the rate
> described in paragraph (c)(1) of this section on a loan described in paragraph
> (c)(3)(i) of this section –

---

[7] Defeasance is the providing for future retirement of a bond from funds deposited in an escrow dedicated to
repayment of the bond.

5

(i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in paragraph (c)(3)(i) of this section; **and**

**(ii) if the authority retains a legal or equitable interest in the loan –**
    (A) The prior tax-exempt obligation is retired;
    (B) The prior tax-exempt obligation is defeased.

34 C.F.R. §682.302(e)(1993)(*bold added*). This change merely restated the pre-existing HEA requirement that 9.5 SAP be paid to an Authority.[8] The scope of the 9.5 SAP limitation was not impacted by this clarification.

On August 10, 1993 the Omnibus Budget Reconciliation Act (OBRA) amended Section 438(b), 20 U.S.C. §1087-1(b)(2), to change the rate of SAP to the standard rate with respect to loans made or purchased with funds from the issuance of obligation "originally issued on or after October 1, 1993, the income from which is excluded from gross income under the Internal Revenue Code of 1986." Pub. L. 103–66, §4111 (August 10, 1993). In other words, loans purchased with tax-exempt bonds "originally issued" on or after October 1, 1993 would not be subject to the 9.5 SAP limitation.[9] The regulations were not amended to include this change until 1996. Education did, however, in November of 1993, issue a DCL 93-L-161 to provide regulatory guidance on this issue.

DCL 93-L-161 was designed "to provide the student loan community with information on the major program changes mandated by the new law." It informed the industry that "[t]he minimum special allowance rate 'floor' on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed," and that "loans made or purchased with funds obtained by the holder from the issuance of obligations originally issued on

---

[8] In the words of the statute itself, "for holders of loans which were made or purchased with funds *obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under Title 26. . .*" 20 U.S.C. §1087-1(b)(2)(B)(i)(*emphasis added*).

[9] This change affected 9.5 SAP payments only. The full SAP payments were not affected.

or after October 1, 1993, or with funds derived from default reimbursements, collections, interest... no longer qualify to receive the minimum special allowance." DCL 93-L-161, p.13. It also clarified that "[r]efinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing. ..." DCL 93-L-161, p.13. In December of 1993 Education followed up on DCL 93-L-161 by issuing DCL 93-L-163, which provided instructions for reporting the changes required by the new legislation.

DCL 96-L-186, issued in March of 1996, was designed to provide guidance with regards to the regulations adopted on December 18, 1992. DCL 96-L-186 correctly noted that

> regulations in effect prior to December 18, 1992 stated that a lender was paid special allowance on a loan made or acquired with the proceeds of a tax-exempt obligation based on the rules applicable to loans financed with taxable obligations after the loan was refinanced with the proceeds of a taxable obligation and the prior tax-exempt obligation was retired or defeased. The regulations were silent as to the method of calculating the applicable special allowance rate for a loan made or acquired with a tax-exempt obligation that was subsequently refinanced with the proceeds of a taxable obligation, but the prior tax-exempt obligation remained outstanding.

DCL 96-L-186, Item 30. It also accurately explained that

> [u]nder the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt).

DCL 96-L-186, Item 30. Although DCL 96-L-186 described this regulatory amendment as a "shift in the Department's policy,"[10] it was, in reality, a clarification regarding a previously

---

[10] This paragraph of the DCL was apparently originally drafted by Ms. Ryan-Macie. ED-14, p.2.

unexplained scenario – that in which the prior tax-exempt obligation remains outstanding while a loan is refinanced with proceeds of a taxable source of funds.  DCL 96-L-186, Item 30.

As the market interest rates began to drop in the 1990's, the 9.5 SAP limitation on loans acquired with proceeds of tax-exempt bonds issued before October 1, 1993 started to produce a return that exceeded the sum of 91-day T-bill rate and the 3.1% payable under 20 U.S.C. §1087-1(b)(2)(A) – the standard SAP rate payable on other loans.  Tax-exempt financing thus became increasingly attractive to lenders, which began to use a variety of techniques to increase their portfolio of loans subject to the 9.5 SAP limitation.  One popular method, referred to as "transferring," involved associating pools of loans with eligible tax-exempt bonds for short periods of time, thus "converting" loans on which SAP had been payable at the standard rate into loans subject to the 9.5 SAP limitation.  Another technique, referred to as "recycling," involved continued billing at 9.5 SAP on loans acquired not with the proceeds of tax-exempt bonds, nor from collections or sales of those original loans, but on funds recovered from sales or collections on the subsequent cohorts of loans purchased with those earlier recoveries. As the Report of the Committee on the Budget of the House of Representatives noted, "[f]rom 2001 to 2004, the Department of Education's special allowance payments ... increased from $209 million to $955.5 million." H.R. Rep. 109-276 (November 7, 2005).

In light of these abuses Congress enacted two pieces of legislation - Taxpayer-Teacher Protection Act of 2004 (Pub. L. 108-409)(TTPA) and Higher Education Reconciliation Act of 2005 (Pub. L. 109-171)(HERA)(2006). The TTPA revised Section 438(b)(2)(B) of the HEA to make loans financed by a tax-exempt obligation that, after September 30, 2004, had matured or been retired or defeased, loans refinanced after September 30, 2004 with a funding source other than the proceeds of an eligible tax-exempt obligation, or loans sold or transferred to any other

8

holder after September 30, 2004, ineligible for 9.5 SAP. HERA further revised Section 438(b)(2)(B) of the HEA, ending the practice of "recycling" loans by ensuring that no additional loans would become eligible for 9.5 SAP.

### Corporate Organizational Structure of Navient/Sallie Mae

In 1972 Congress established the Student Loan Marketing Association (SLMA) [EIN *271][11] as a government-sponsored enterprise (GSE) to serve as a secondary market for student loans and provide financing – "warehousing advances" – for FFEL lenders to enable them to make FFELs. 20 U.S.C. §1087-2. In 1997, The Omnibus Consolidated Appropriations Act (Pub. L. 104-208) provided for a creation of a for-profit "holding company," SLM Corporation [*874], of which SLMA, the GSE, would be a subsidiary, for a gradual wind-down and termination of the GSE SLMA, for the complete separation of the funds and assets of SLMA, the GSE, from the assets and operations of the Holding Company and its subsidiaries, as well as separating the various activities the GSE could continue to perform from those activities that the Holding Company and its subsidiaries could initiate. 20 U.S.C. §1087-3(c). Any liabilities of the GSE not satisfied in the wind-down "shall become liabilities of the Holding Company." The wind-down in fact was completed by the end of 2004.

In 1999 SLMA [*271], the GSE, acquired Nellie Mae Corp. (NMC) [*783] (also referred to by Navient here as Nellie Mae Holding Corporation) and its subsidiary, Nellie Mae Education Loan Corp. (NMELC) [*352]. NMELC [*352] had assumed liability from New England Education Loan Marketing Corporation (NEELMC) [*323] on the 1993F bond and had acquired the beneficial ownership of loans purchased with the proceeds of the 1993 Trust bonds. NMC [*783] and NMELC [*352] were successors to the original issuer of the 1993 Trust bonds,

---

[11] For purposes of clearly identifying each entity we will use the last three digits of the entity's EIN.

9

NEELMC [*323] with respect to 9.5 SAP billing.    In June 2004, as part of the wind-down of SLMA, the GSE, the ownership of NMC and NMELC were transferred to ECFC [*392], where it remained at all the times relevant thereafter.

**1993 Bonds**

In a typical tax-exempt bond financing, the Authority issues tax-exempt bonds that are purchased by investors.  The Authority uses the proceeds of the bonds to make new loans or purchase existing loans from banks and other institutions.  The Authority then pledges the loans it acquires with proceeds of a particular bond as collateral for that bond, and those loans are held in a bond "estate," separate from any loans acquired with funds from other bonds issued by that Authority.  The Authority typically gives legal title to the loans to a bank, which serves as a trustee, and the Authority retains beneficial ownership of the loans.  The Authority may pay off (retire) an existing bond when that bond matures, or may "defease" the bond by arranging for its payoff from a designated escrow fund upon the bond's maturity.  To obtain funds to retire the bond, the Authority may issue a new bond (a refunding bond), or may use internal resources (accumulated reserve funds or other sources).  If the Authority borrows to obtain these funds, the loans that had been pledged as collateral to the retired bond are then re-pledged as collateral to the new bond or financing arrangement.  Alternatively, an Authority may refinance an existing bond by issuing a new bond and re-pledging to it loans previously pledged to the refinanced bond without paying off the original bond.

Prior to 2004 amendments not relevant here, if an Authority used funds from a tax-exempt refunding bond to pay off (retire) an existing tax-exempt bond, the loans subject to the 9.5 SAP limit associated with the refunded bond remained subject to that limit when the Authority repledged the loans to the refunding bond.  If the Authority used funds from another

10

2223

source, not a tax-exempt obligation (e.g., commercial paper, other bonds, internal reserves), to retire the tax-exempt bond, the eligibility status of the loans changed, and the 9.5 SAP limitation ceased on those loans.  If, however, the Authority used funds from such other source but did not retire or defease the tax-exempt bond, the 9.5 SAP limitation continued to apply to the loans – now pledged as collateral to the "other" source –for as long as the original tax-exempt bond remained outstanding.

The bonds in question in this appeal were issued by NEELMC [*323] under a 1993 Trust Agreement, dated March 1, 1993, between NEELMC [*323] and First National Bank of Boston.[12]  The bonds were refunding bonds and were general unsecured obligations of NEELMC.  If NEELMC defaulted on the bonds, the Agreement authorized the bank to use any funds on hand to pay investors, but otherwise left the bank to sue NEELMC to recover for investors.  R-07, p.21.  NEELMC issued the bonds in eight series[13] (1993A through 1993H), of which four series (1993C, D, E & F) were issued together and comprised a single issue, while the other four series (1993A, B, G & H) were issued separately.[14]  There were 13 separate bonds; some series contained several bonds with different maturity dates.  If a series had several maturity dates, NEELMC issued one bond for each maturity date, regardless of the amount owed on that bond.  *See, e.g.,* R-08.

---

[12] A typical bond agreement creates a trustee estate administered by the trustee for the benefit of the bondholders to ensure repayment of the bonds.  Loans made or purchased with the bond proceeds and their associated payments and income are pledged by the issuer to the trustee estate to ensure repayment of the bonds.  Either a single or multiple bonds can be issued under a single agreement.

[13] The issuing documents refer to 1993A, B, C, D, E, F, G & H as separate series.  R-08.

[14] "Issue" is defined as two or more bonds sold at substantially the same time pursuant to the same plan of financing and payable from the same source of funds.  26 C.F.R. §1.150-1(c).

11

| Series | Issue date per IRS Form 8038 (*) or trust agreement(†) | Maturity date | Interest Rate |
|---|---|---|---|
| 1993A | March 18, 1993* | July 1, 2005 – $103,300,000 | 5.7% |
| 1993B | June 9, 1993* | June 1, 1998 – $5,800,000 | 5% |
| | | June 1, 2000 – $32,405,000 | 5.4% |
| | | June 1, 2002 – $10,700,000 | 5.6% |
| 1993C | July 1, 1993† | July 1, 1998 – $26,100,000 | 4.75% |
| 1993D | July 1, 1993† | July 1, 1998 – $10,160,000 | 4.75% |
| 1993E | July 1, 1993† | July 1, 1999 – $58,340,000 | 5% |
| 1993F | July 1, 1993† | July 1, 2004 – $32,500,000 | 5.625% |
| 1993G | August 24, 1993* | Aug. 1, 1998 – $31,500,000 | 4.7% |
| | | Aug. 1, 2000 – $28,100,000 | 5% |
| | | Aug. 1, 2002 – $47,400,000 | 5.2% |
| 1993H | November 15, 1993† | Dec. 1, 1999 – $57,420,000 | 4.75% |
| | | Dec. 1, 2002 – $14,370,000 | 5.05% |
| Total | | $458,095,000 | |

As the various bonds matured, NEELMC and later Nellie Mae retired them at their respective maturity, using funds to repay them derived from internal resources, rather than from tax-exempt borrowings. As they retired the bonds, NEELMC and later Nellie Mae retained the loans originally financed with those tax-exempt bonds, now "refinanced" with the funds from

12

2225

sources other than the tax-exempt bonds. Repayments on these loans were mixed with repayments on loans still financed with tax-exempt bonds, and the mixture of funds – part tax-exempt, part taxable – was used to acquire even more loans. The OIG audit, and this FAD, deals with the SAP claimed and paid on these refinanced loans and the loans acquired using their repayments.

**OIG Audit Finding, Sallie Mae Responses, and Final Audit Determination**

The Office of Inspector General (OIG) conducted an audit of special allowance payments to Navient's subsidiary, NLMA, in 2008. The purpose of the audit was to determine if "NLMA, (1) billed loans under the 9.5 percent floor in compliance with the TTPA and HERA, and (2) billed loans under the 9.5 percent floor, after the eligible tax-exempt bonds from which the loans derived their eligibility, had matured or been retired." ED-01, p.7. The audit covered period of October 1, 2003, through September 30, 2006. The audit found no violations of TTPA. However, it found that the holder(s) of loans had claimed and been paid 9.5 SAP on loans that were no longer subject to that rate because the tax-exempt bond from which the loans derived their eligibility has been retired or defeased. It also found that 9.5 SAP was paid to ECFC, a Navient affiliate that had no right to receive 9.5 SAP.

On September 25, 2013, after the review of Navient's responses, FSA issued its FAD. It found that Navient improperly billed and received 9.5 SAP on loans purchased with bonds that were part of the 1993 Trust indenture after the respective bonds were retired or defeased. It also found that Navient improperly billed and received 9.5 SAP on loans purchased with the proceeds of the 1993F series bond, which was also part of the 1993 Trust, after that bond was retired and loans were sold to ECFC. ED-02.

13

## STANDARD OF REVIEW

Pursuant to 34 C.F.R. §668.116(d), the party requesting review of a final audit determination issued by FSA has to prove, by preponderance of the evidence, that the party complied with the program requirements.

## ARGUMENT

### I.    ECFC WAS NOT ELIGIBLE TO CLAIM AND RECEIVE 9.5 SAP ON ANY FFELs.

The FAD concluded that ECFC [*392], a subsidiary of SLM Corp., claimed and received SAP at the 9.5 percent return rate on loans that ECFC bought from NMELC [*352] in 2004. NMELC [*352] sold the loans to ECFC [*392] in July 2004 when the 1993F bond matured and was retired. The FAD concludes that the loans were no longer subject to the 9.5 SAP rate for two distinct reasons: the first, discussed later, is that the loans were financed with the 1993F bond, which was matured and retired, which terminated the 9.5 SAP rate limit for those loans. We discuss here the second reason: that ECFC was at no time an entity that was authorized by law to claim and receive 9.5 SAP on these or any other loans.

To support this conclusion, the FAD focused its analysis on fact that at the time of the transfer (July 2004) to ECFC [*392], it appeared that ECFC [*392] was a subsidiary of the for-profit holding company, SLM Corp. [*874], and not SLMA [*271], the government sponsored entity, or a SLMA [*271] subsidiary.  It now appears that in June 2004, through a corporate restructuring, ECFC [*392] became the owner of NMELC [*352] and NMC [*783], the former SLMA subsidiaries.  Navient argues that this ownership change made ECFC [*392] subject to the 9.5 SAP rate on these loans: "ECFC was not in fact a distant affiliate of NMELC; it was the

14

direct second-level parent of NMELC. Because of this corporate structure, ECFC did in fact enjoy the tax-exempt cost of funds while 1993 bond series were outstanding because both NMELC and its direct parent Nellie Mae Holdings were single member LLCs, which were disregarded as separate entities from ECFC, their owner, for U.S. federal income tax purposes." Respondent's Brief, p. 28. For the following reasons, Navient is incorrect. Despite the change in ownership of these subsidiaries, ECFC [*392] was not at any time required or eligible to claim and receive SAP at the 9.5 percent rate.

### A. ECFC was not an "Authority."

Section 438(b)(2)(B) explicitly provides that 9.5 SAP is payable "for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income of which is exempt from taxation under title 26." 20 U.S.C. 1087-1(b)(2)(B)(i)(*emphasis added*). Education regulations have dubbed such an entity an "Authority:" "A private non-profit or public entity that may issue tax-exempt obligations to obtain funds to be used for the making or purchasing of FFEL loans." 34 C.F.R. §682.200. SAP at the 9.5 rate is payable only on loans "held on behalf of or by an Authority." 34 C.F.R. §682.302(e). Navient expressly admits that ECFC [*392] was "created as a subsidiary of NMC Corporation, [*373] to hold certain loans originated by NMC and other non-GSE Navient subsidiaries." Navient Request for Review, p. 40. In other words, Navient concedes that, having been created for an expressly commercial purpose of originating loans, ECFC [*392] could never have been an "Authority" as required under 34 C.F.R. §682.302(c).

> ## B. ECFC did not qualify as a "successor" corporation to NEELMC, the issuer of the tax-exempt bonds.

Navient argues that ECFC [*392] properly billed loans associated with the 1993F bond series at 9.5 SAP rate because ECFC qualifies as a "successor" entity pursuant to the requirements of Section §150(d)(3)(B) (i) & (ii) of the Internal Revenue Code. In fact, ECFC does not qualify. Section §150(d) allows a non-profit entity that has issued tax-exempt student loan bonds to transfer its student loan holdings and obligations to a for-profit subsidiary without jeopardizing the tax exempt status of those bonds the entity had already issued. It states, in relevant part:

> (A) In general
>
> Any qualified scholarship funding bond, and qualified student loan bond, outstanding on the date of the issuer's election under this paragraph (and any bond (or series of bonds) issued to refund such a bond) shall not fail to be a tax-exempt bond solely because the issuer ceases to be described in subparagraphs (A) and (B) of paragraph (2) if the issuer meets the requirements of subparagraphs (B) and (C) of this paragraph.
>
> (B) Assets and liabilities of issuer transferred to taxable subsidiary
>    The requirements of this subparagraph are met by an issuer if—
>       (i)   all of the student loan notes of the issuer and other assets pledged to secure the repayment of qualified scholarship funding bond indebtedness of the issuer are transferred to another corporation within a reasonable period after the election is made under this paragraph;
>       (ii)   such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer within a reasonable period after the election is made under this paragraph;
>       (iii)   to the extent permitted by law, such transferee corporation assumes all of the responsibilities, and succeeds to all of the rights, of the issuer under the issuer's agreements with the Secretary of Education in respect of student loans;

26 U.S.C. §150(d)(3)(B) (i) & (ii). ECFC met none of these requirements and cannot qualify as a "successor."

The facts are clear: the original issuer of the tax-exempt bonds, NEELMC [*323], made the election under 26 U.S.C. §150(d) to transfer its student loan portfolio and obligations effective June 30, 1998. ED-15, p.1. On that date, NEELMC [*323] transferred its student loans and its liabilities on the 1993 bonds to a new, for-profit subsidiary, NMC [*783]. ED-15, p.2. On that same day, NMC [*783] in turn transferred beneficial ownership of the student loans and its obligation on the 1993F bond to its new subsidiary, NMELC [*352]. Thereafter, only NMELC [*352] was liable to bondholders on the 1993F bond. ED-15, p. 4.

After their acquisition by Sallie Mae and prior to June of 2004, NMC [*783] and its subsidiary, NMELC [*352], were part of the government-sponsored enterprise (GSE), while ECFC [*392] was engaged in for-profit loan origination business and was therefore located on the for-profit side of the enterprise. Navient states, however, that "[i]n June, 2004, in preparation for ... wind-down [of the GSE side of Sallie Mae] ... SLMA's subsidiaries, including inter alia Nellie Mae Holdings LLC and Nellie Mae Education Loan LLC, were transferred to ECFC." Respondent's Brief, p. 29, n. 27. Navient asserts that this June 2004 transfer of ownership required ECFC [*392] to bill for the loans funded with the proceeds of 1993F bond series at 9.5 SAP because "ECFC did in fact experience the tax-exempt cost of funds for the ECFC Loans, as the benefits of the 1993 Bonds were rolled directly up to ECFC." Respondent's Brief, p. 30. Whatever legal significance may be attached to the claimed "experiencing the tax-exempt cost of funds," Navient does not, and cannot, claim that ECFC [*392] experienced any such reduced cost of funds prior to June of 2004. Nor does Navient claim that, as part of the transfer of loans to ECFC [*392], ECFC assumed any obligation on the 1993F bond itself. Nor could it – the 1993F bond series that was the source of funds of the loans transferred to ECFC [*392] was retired on July 1, 2004 – at the same time the transfer of the loans to ECFC [*392] took place. In

17

fact, even if 1993F bond series was not retired on July 1, 2004, ECFC would still not have been obligated on the 1993F bond, since, as Navient concedes, NMC and NMELC were "converted into limited liability companies" in 2001 and 2002, (Navient's Request for Review, p.42), and thus under Delaware law their legal obligations were not liabilities of their member, ECFC [*392]. [15]

As the express language of 26 U.S.C. §150(d) makes clear, ownership of loans alone does not qualify ECFC [*392] as the "successor." Only if "such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer *within a reasonable period after the election is made*" and "assumes all of the responsibilities, and succeeds to all of the rights, of the issuer" would an entity qualify as a "successor." 26 U.S.C. §150(d)(3)(B)(ii) (*emphasis added*). Thus, consistent with Education's imperative of matching the special allowance rate loans to the cost of funds used to acquire them, the Internal Revenue Service Code identifies as the successor that corporate entity to which the funding corporation has transferred, within a reasonable time after making its election, both the loan held by the funding corporation, and liability on, or the duty to provide for payment of, the underlying bond that the funding corporation had issued. Until July of 2004, ECFC [*392] did not hold these loans, and never had any legal responsibility for the 1993F bond. Instead, these payments were made by NMELC [*352].

By Navient's own admission, NMELC [*352] resided on the GSE side of Sallie Mae as an indirect subsidiary of SLMA [*271], through June 2004. The HEA required that

---

[15] "[O]bligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company." Del. Code Ann. tit. 6, § 18-303 (West).

18

(C)(i) The funds and assets of the Association *[SLMA]* shall at all times be maintained separately from the funds and assets of the Holding Company [*non-GSE side*] or any subsidiary of the Holding Company and may be used by the Association solely to carry out the Association's purposes and to fulfill the Association's obligations.

(ii) The Association shall maintain books and records that clearly reflect the assets and liabilities of the Association, separate from the assets and liabilities of the Holding Company or any subsidiary of the Holding Company.

20 U.S.C. §1087-3(c)(8).

The HEA required the GSE side of SLM Corporation be organized so separately from non-GSE side that non-GSE side could not share either ownership of any GSE assets or liability for any GSE obligations, thus ensuring a complete separation of assets and liabilities between the GSE and ECFC at least through Sallie Mae's reorganization in 2004. Thus, payments made by NMELC [*352] could not be attributed to ECFC [*392] for the purposes of satisfying the requirements of 26 U.S.C. §150(d).

Navient admits as much, stating that while it is true that "at the time of Nellie Mae acquisition in 1999" that "GSE assets and liabilities [needed] to be maintained separately from the non-GSE assets and liabilities," "that fact was irrelevant because by the time the ECFC Loans were transferred to ECFC in 2004, OSMO[16] no longer required the separation of the GSE assets from the non-GSE assets." Navient Request for Review, p.44 (*footnote added*). We agree that this fact became irrelevant by July of 2004, when the loans were transferred to ECFC [*392], because 1993F bond that was the source of funds for the loans transferred to ECFC [*392] was retired on July 1, 2004 and thus ECFC [*392] could not have and did not assume any liability on that bond.

---

[16] Department of Treasury's Office of Sallie Mae Oversight.

Navient's assertion that the transfer of ownership of NMELC [*352] to ECFC [*392] in June of 2004 made ECFC [*392] a "successor" to NMELC [*352] ignores the key point that the 1993F bond that was the source of funds of the loans in question was retired at the time the loan transfer to ECFC [*392] took place. ECFC [*392] thus could not have, and did not in fact assume, as required by 26 U.S.C. §150(d), any liability for repayment of that 1993F bond. Due to forced separation between GSE and non-GSE side of Sallie Mae, ECFC could not have been deemed to assume that responsibility prior to the transfer, so it is abundantly clear that ECFC [*392] does not satisfy the definition of "successor" under 26 U.S.C. §150(d), and was therefore not required or entitled to bill for loans purchased with the proceeds of 1993F bond series at the 9.5 SAP rate.

To the extent that Navient may be relying on 1993A bond series, which remained outstanding until July of 2005, to claim that ECFC [*392], between July of 2004 and July of 2005, both held the loans associated with 1993F bond series and was responsible for making payments on the underlying 1993A bond series, its argument still fails. By its own admission, as discussed below, the proceeds, receipts, and any interest on 1993A bond series were completely segregated from the proceeds, receipts, and interest on the 1993F bond series.

## II.   THE HEA AND REGULATIONS REQUIRED NAVIENT TO STOP BILLING LOANS AT 9.5 SAP AFTER THE TAX-EXEMPT BOND THAT FINANCED THE LOANS WAS RETIRED.

Navient claims that the first finding in the FAD – that 9.5 SAP was improperly claimed and received on FFELs after the tax-exempt obligation on which that limitation depended was retired using taxable funding sources – contradicts the direction given by Education to Navient to continue claiming 9.5 SAP well past that time. Navient bases this assertion on five words – "in whole or in part" - in DCL 93-L-161, as they are explained by Nellie Mae's former Vice

20

President of Strategy and Development, Sheila Ryan-Macie. The meaning of these words is not clear, but the record here offers slim support for Ms. Ryan-Macie's interpretation. The context, does, however, suggest a different meaning. And even if the words "in whole or in part" mean what Navient suggests, they do not support Navient's conclusion that all loans associated with bonds in 1993 Trust had to be billed at 9.5 SAP until the last bond in that Trust had been retired or defeased.

A. The record does not support Navient's preferred meaning of "in whole or in part."

Ms. Ryan-Macie alleges that she asked Mr. Robert Evans, Education's then-Policy Division Director, for guidance regarding the 9.5 SAP billing status of unsecured FFELs financed with the proceeds of Nellie Mae's 1993 bonds, and that the words "in whole or in part" were inserted in Dear Colleague Letter 93-L-161 in order to provide an express direction for Nellie Mae to bill the loans acquired with the 1993 bonds at 9.5 SAP. The context of the DCL suggests a different intention.

If the words "in whole or in part" were in fact included in the DCL 93-L-161, issued in 1993, in response to any inquiry from Ms. Ryan-Macie about Nellie Mae, the records supplied by Ms. Ryan are devoid of any such inquiry. The records, as pertinent here, show only inquiries regarding the continued application of the 9.5 SAP to loans that were originally subject to the 9.5 SAP rate after an Authority refinances the loans using taxable source, but the Authority did not retire the prior tax-exempt obligation. This is the question posed to Education in the January 29, 1993 letter by Jean S. Froblicher, the President of the Council of Higher Education Loan Programs, Inc., which Ms. Ryan-Macie cites in her Declaration. R-03, Ex.2, NAV_000075. This is the same question Ms. Ryan-Macie documented in her handwritten notes, referred to in

21

paragraph 22 of her Declaration. R-03, Ex.2, NAV_000099. This is also the question she posed in her May 27, 1993 letter to Mr. Evans, and the question Mr. Evans expressly promised to address "in a future Dear Colleague Letter" in his July, 29, 1993 response to her. ED-07, p.2; ED-08, p.3. Nothing in these extensive exchanges and annotations of written comments and responses documents any exchange about pooling funds to finance loans – the question she believes that she posed to Mr. Evans.[17]

Neither the circumstances under which DCL 93-L-161 was created nor the issues it sought to address support Navient's interpretation. DCL 93-L-161 stated that its purpose was "to provide the student loan community with information on the major program mandated by the new law" – not to summarize existing law. The "new law" was the amendment to the HEA provisions for 9.5 percent return SAP made by OBRA. The Special Allowance section of the DCL thus first advised that SAP on "loans acquired with the proceeds of bonds originally issued on or after October 1, 1993" would be paid the standard rate – not the 9.5 SAP rate. ED-03, p.13. The second sentence of the section responded to the industry's question about whether "originally issued" bonds included refunding bonds.

The third sentence of the Special Allowance section addressed industry questions regarding the Department's 1992 change in the regulations. *See* NAV_000075, 000099; *see also* NAV_000116, 000132. Those changes focused on refinancings – transactions in which the Authority used its taxable funding sources to acquire a loan from its tax-exempt bond estate but did not retire the tax-exempt bond. DCL 93-L-161 informed the industry that

---

[17] Documentation provided by Ms. Ryan-Macie does not show that Mr. Evans was involved in drafting the DCL 93-L-161, which was signed by William L. Moran, Acting Deputy Assistance Secretary for Student Financial Assistance. There are clear indications that Mr. Evans could not contribute to this DCL, which was issued in November of 1993, as he was assigned, on August 1, 1993, to work "full-time" on the implementation of Federal Direct Student Loan Program. *See* DBL-93-1.

22

Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance.

ED-03, p.13. [18]

In context, then, the DCL 93-L-161 may well have included the phrase "loans made or purchased, in whole <u>or in part</u>, with funds derived from tax-exempt obligations" to describe these refinanced loans that were the subject of multiple documented inquiries by Ms. Ryan-Macie regarding refinancing, not the treatment of loans acquired from the proceeds of a Trust, about which no written inquiries exist. As later explained in DCL 96-L-186, a holder of a loan acquired with tax-exempt funds and then refinanced with taxable funding sources has only one funding source if the original tax-exempt bond was retired: the cost of the taxable financing. If, however, the holder uses taxable funds to refinance the loan but does not retire the original tax-exempt bond, the holder now has two funding sources, and two costs of funds: the original, outstanding tax-exempt bond, with low cost of funds, and the new taxable obligation, with a higher cost of funds. Such a loan was then considered to be funded "in part" with tax-exempt funds, and thus the 9.5 SAP limitation still applied. *Id.*

> B. Even if the words "in whole or in part" mean what Navient suggests, they do not determine when the limitation on loans subject to the 9.5 SAP rate ceased.

The finding in this FAD concerns the issue of whether and when loans that are subject to 9.5 SAP lose that limitation. Assuming that the words "in whole or in part" were added as Navient suggests, they clarify that, at the time of their purchase, the loans <u>acquired</u> "in whole or in part" with proceeds of the 1993 bond series were subject to 9.5 SAP. These words, however,

---

[18] As noted, a more detailed explanation of the refinancing issue was provided some three years later, in DCL 96-L-186 (March 1, 1996), which explained the effect of the 1992 change to 34 C.F.R. §682.302(e).

do not resolve the question at issue in the FAD: when did that limitation expire for those loans. It is beyond dispute that the 9.5 SAP limit ceases when a loan subject to the 9.5 SAP limit is "pledged or transferred" to a different, non-tax-exempt bond or source and that prior "tax exempt obligation" is retired.  Navient states that it pooled funds derived from the 13 bonds to make or acquire loans.  The DCL 93-L-161, which contains "in whole or in part" terminology, does not explain which of the 13 bonds is the "prior tax exempt obligation" for particular loans.  For any particular loan, the "prior tax exempt obligation" must be one of the three possibilities: the Master Trust Agreement, which Navient argues was an "obligation" for every loan derived from every 1993 bond; the last bond to mature in the particular "sub-pool" in which the loan is held, which Navient appears to propose as an alternative, or the bond to which Navient could reasonably have allocated that loan in the course of administering the "sub-pool."    The first alternative – that the Master Trust Agreement constitutes a "prior tax-exempt obligation" – fails because the Agreement is not an "obligation" at all.  The second alternative – that the last bond to mature in a sub-pool of several bonds constitutes the "prior tax-exempt obligation" – assumes a regulatory requirement that is contrary to express Congressional intent and could not have been supported if the Department had ever adopted such a view.    The third alternative – that a specific bond to which Navient could or did allocate the loan constitutes a "prior tax-exempt obligation" –  provides the only reasonable application of the regulation to these facts.

### *1.  Master Trust Is Not An "Obligation."*

Navient argues that "the 1993 Trust was a single 'obligation,' and therefore every loan derived from any 1993 bond remained subject to the 9.5 percent return SAP rate until the Trust Agreement ended when the last of the 1993 bonds was retired in 2005."  Respondent's Brief, p.22.  This view disregards the plain language of the bonds themselves, as well as FFELP

24

regulations, relevant provisions of the Code, and common usage. The bonds in question here were issued in eight series. Official Statements were issued separately for each of the bond series. Each Statement provided that bonds (plural) in the series "are issuable as fully registered bonds. ..." R-08, p.1. Nothing in the Official Statements suggests that either the bonds within series or bond series A through H were supposed to be combined and treated as a single obligation.

Furthermore, as explained above, the term "obligation" was initially defined in 34 C.F.R. §682.801(1985), as part of 34 C.F.R. §682, Subpart H, the sole purpose of which was to implement the special allowance program and the limitations on issuance of tax-exempt bonds inherent therein. The terms defined in Subpart H were honed precisely to achieve the legislative purpose: to match the cost of funds used to acquire loans with the SAP to be paid on those loans. Thus, Section H is instructive not only for the terms it contains, but also for the ones it does not. Notably, 34 C.F.R. §682, Subpart H does not define the term "bond issue," "bond series," or any plural form of "debt" or "obligation."

As adopted in 1985, 34 C.F.R. §682.801 defined "obligation" as "any interest-bearing debt... issued to acquire funds for ... making or purchasing of student loans." This definition clearly refers to the smallest possible unit of debt that can be used for the designated purpose. Such smallest unit is a single bond – a stand-alone debt obligation that can be issued together with or separately from any other obligation. If Education had intended to create definitions of both "bond" and "bond issue," it would have done so, as did the IRS. 26 C.F.R. §1.150-1(b) & (c). It did not. Instead, Education chose to define only the term "obligation," which was fully consistent with the Congressional intent to tie special allowance rates payable on loans to the cost of funds used to acquire them in the most precise way possible. Given the Congressional

25

intent to "police the amounts of capital raised through tax exempt offerings to insure that excessive amounts beyond the reasonable needs of student credit are not being sold," Cong. Rec. H6121 (August 1, 1983), any other definition was unnecessary and, in fact, counterproductive because it would not allow for the primary purpose – tracking of the cost of funds – to be effectuated.

Subsequent sub-regulatory guidance issued by Education invariably referred to debt obligations in the singular, such as "a bond," "a tax-exempt bond," "an instrument to borrow funds," etc. *See* DCL FP-07-01, FP 06-15. Dear Colleague FP-07-01 further emphasized this point by stating that "[t]he HEA identifies the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for SAP at the 9.5 percent minimum return rate. 20 U.S.C. §1087-1(b)(2)(B)(i)(2006)." Navient is unable to point to any term in the HEA or the regulations used to signify that multiple units of debt issued as part of a single package were an "obligation."

Nor did some shared terms, such as payment on default, requirements to amend the right or obligation of bond holders, or decisions to sue, make the 1993 Trust Agreement a single "obligation." Such reasoning would be inconsistent with the Congressional intention that the Authority not issue "obligations for amounts in excess of the reasonable needs for student loan credit within the area served by the Authority, after taking into account existing sources of student loan credit in that area." Pub.L. 98–79, §7, 97 Stat. 476 (Aug. 15, 1983). Furthermore, none of the so-called "unifying" characteristics listed by Navient are contained in the definition of "obligation" in 34 C.F.R. §682.801 and thus would not be determinative, or even at all relevant, to the determination of special allowance payments. On the other hand, the maturity

26

date is a characteristic that is most relevant to the definition of an "obligation" because it defines its very term of existence.

Navient also points to the fact that the 1993 Trust bonds were issued on an unsecured basis, i.e. loans purchased with proceeds of a single bond or series of bonds were not pledged as collateral in support of repayment of that bond or series, to support its position that 1993 Trust "constituted a single financing." Respondent's Brief, p.24. This argument is inapposite, as securitization status, joint or separate, is not an element of the definition of an "obligation" as set forth in 34 C.F.R. §682.801 (1985). Furthermore, Navient states expressly that Nellie Mae was able to "issue bonds backed by its general corporate rating." Respondent's Brief, p.24. It is this very favorable corporate rating, rather than the loans, that provided bond buyers with the assurance that the bonds would be repaid. This corporate rating applied equally to each individual bond, making Navient's argument about "a single financing" irrelevant.

Rather, as Navient's brief makes clear, the rationale behind issuing the bonds on an unsecured basis was convenience. As Navient clearly indicated in its own brief, "Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool" that was "much less administratively burdensome." Respondent's Brief, p.24, n.21. The fact that it was a "desirable financing tool" does not make the 1993 Trust a single "obligation" under 34 C.F.R. §682.301 for special allowance purposes.

### 2. The Last Bond to Mature In a Sub-pool of Multiple Bonds Cannot Control the 9.5 SAP Status Of All the Loans in That Sub-pool.

Alternatively, Navient argues that the last 1993 bond to mature in either sub-pool is the "prior tax-exempt obligation" under 34 C.F.R. §682.302(e) for all loans in both sub-pools. There is no factual basis for this claim. Navient appears to then assert that the last bond to mature in

27

sub-pool 2 - the 1993F bond – was the "prior tax-exempt obligation" under 34 C.F.R. §682.302(e) for the loans in question in the FAD, and that Nellie Mae was required by law to claim 9.5 SAP on all those loans at least until the 1993F bond matured and was retired in June 2004.   The 1993F bond was for only $32.5 million – about nine percent of the total amount ($355.7 million) of the 1993 bonds (1993B through 1993H) associated with sub-pool 2.    By December 2002, every 1993 Bond associated with sub-pool 2 had been retired except this last bond, 1993F.   Nevertheless, Navient considers every loan in sub-pool 2 to remain subject to the 9.5 SAP restriction solely because that last bond – 1993F - remained outstanding until July 2004. Navient' Brief, p. 12. Navient bases this claim on the practice of combining in sub-pool 2 recoveries on all loans derived from the 1993B through H bonds, and using a "pro-rata" portion of those funds in the sub-pool to acquire new loans, so that each loan would be derived from a "pro-rata" share of funds from each of Bonds 1993B through H.   Navient then suggests that each loan in sub-pool 2 was derived from or corresponding to a "pro-rata" share from the last bond to mature, the 1993F bond.   As shown, that "pro-rata" share would have been about nine percent of the funds used to buy the loan.   This percentage would be far too small to justify the 9.5 SAP limitation.   Mandating the use of 9.5 SAP in such circumstances would flaunt Congressional intent to tie the SAP rate to the cost of funds and would amount to a punitive measure not intended by Congress. For the reasons we explain here, Navient's claim rests on an interpretation of controlling regulations that would be an unreasonable and would blatantly disregard the legislative intent.   Such a rule, if Education had adopted it, would have been arbitrary and capricious.  Education adopted no such rule.

The 9.5 SAP provision has ended up as a boon to some lenders, but the provision was originally enacted as a restriction, in order to "prevent this windfall" of payment of special

allowances at the standard rate that would provide tax-exempt bond issuers "a return far in excess of the cost of administration or the cost of obtaining the capital." Sen. Rep. No. 96-733, 96th Cong. 2d Sess. 36 (May 25, 1980). As the Department stated in first adopting regulations in 1985 to implement the law, the "regulations ... tie the rate of special allowance to the source of funds used to acquire or maintain the Authority's interest in a loan, and more particularly, to the financing costs incurred in securing these funds" and "provide that any sanctions or limitations imposed . . . on loans financed by those tax-exempt obligations apply only so long as the loans remain financed by tax-exempt obligations." 50 FR 5512 (Feb. 8, 1985). The HEA itself, in two distinct sentences, shows the extent to which Congress considered this "windfall" to exist, and thus identified the loans would enjoy returns from SAP that, unless restrictions were imposed, would give the issuer of the tax-exempt bond this "windfall" – a return "far in excess of the cost of capital." Section 438(b)(2) thus applied the reduced rate SAP restriction to:

> . . . loans made or purchased with funds obtained by the holder from the issuance of [tax-exempt] obligations. . .
> . . . loans which were made or purchased with funds obtained by the holder from collections, default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph, or from income on the investment of such funds.

20 U.S.C. 1087-1(b)(2)(D)(i)(1980).

On its face, the statute applies the SAP restriction only to these two groups of loans – "original" loans, and loans made from recoveries on original loans. Congress determined that payment of SAP at the standard rate on these two types would produce this "windfall" – and applied the reduced rate sanction to both. For example, $3000 of tax-exempt bond proceeds provides capital to make or purchase one loan, and recoveries on or proceeds of selling that first loan provide $3000 to make or buy a second loan. The statute recognizes the reduced "cost of

29

capital" from tax-exempt financing only for these two loans. The statute considers a dollar of bond proceeds to provide this reduced "cost of capital" for those funds that finance no more than two dollars of loans. The statute therefore necessarily applies the sanction only to loans for which tax-exempt bond proceeds provide a very substantial share of the funds used to acquire the loan. A lender that mixes tax-exempt funds and other funds to make or acquire a loan enjoys no such "windfall" – no "return far in excess of the cost of obtaining the capital" for that loan - unless the lender used a very substantial amount of tax-exempt funds to buy or make the loan. Including a small amount of tax-exempt funds with higher-cost funds from other sources to buy a loan does not give the lender a low cost of the capital for that loan, and payment of SAP at the standard rate on that loan would produce no "windfall" that Congress intended to prevent. Applying the reduced SAP rate sanction on such a loan would ignore those realities, unfairly depriving the lender of the return on the loan that the lender actually needed to afford that higher cost of funds.

The statute does not impose such a sanction, nor do any Department regulations. Yet that is precisely the interpretation that Navient here asserts the Department espoused in the DCL 93-L-161 – that the reduced rate 9.5 SAP sanction applies to loans acquired with funds of which as little as nine percent were derived from tax-exempt funds. Had the Department in fact adopted such a regulation, or interpreted an existing regulation to produce that result, such a position would be untenable. Such an interpretation would produce an arbitrary and unreasonable result, contrary to the congressional intent demonstrated in the language of the statute and the pertinent history, and would have been "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *CBS Corp. v. F.C.C.*, 535 F.3d 167, 188 (3d Cir. 2008), *as amended* (Aug. 6, 2008), *cert. granted, judgment vacated*, 556 U.S. 1218 (2009)

(quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)).   Navient's interpretation, and its resultant conclusion that all loans in sub-pool 2 were properly billed at 9.5 SAP until bond 1993F was retired in June of 2004 must consequently be rejected.

### 3. An Individual Bond Is the "Prior Tax-Exempt Obligation" That Determined When 9.5 SAP Limitation No Longer Applied To Loans Reasonably Allocated To It.

While Navient insists that the type of securitization and other characteristics made the 1993 Trust a single "obligation," it does not assert, nor could it, that the structure of the 1993 Trust made tracing of the source of funds impossible.   In fact, not only was tracing or allocating particular loans to specific bonds possible, but doing so was the only way to identify the "prior tax-exempt obligation" for any loans.

The 1993 Trust consisted of multiple bond series – 1993A, B, C, D, E, F, G & H.  Some of these series, such as 1993A, were comprised of a single bond, while others, such as 1993B, consisted of several separate bonds with different maturity dates.  The bonds within those series were clearly labelled as separate in their Prospectus, as well as their Certificate and Agreement as to Tax Matters, which clearly provides that "the Corporation's $48,905,000 Student Loan Refunding Bonds, 1993 Series B (the 'Bonds'), issued pursuant to a Trust Agreement dated as of March 1, 1993"… "bear interest and mature in the principal amounts and on the dates described below" followed by a list of three separate bonds maturing on June 1, 1998, June 1, 2000, and June 1, 2002. The Certificate, dated June 9, 1993 and signed by John Remondi, Navient's President and Chief Operating Officer, clearly stated that it expected all proceeds from these three bonds to be invested in student loans by June 30, 1993 – i.e. within three weeks of the date of the Certificate.  Other bonds in the series had similar provisions. In fact, Navient confirms that

31

proceeds of issuances of bond series 1993C through 1993F "were deposited in Sub-pool 2 and used to acquire loans within the few weeks following the issuances." Respondent's Brief, p. 12, n.16. In fact, Navient expressly concedes that proceeds of 1993A bond series, which matured on July 1, 2005, were segregated from proceeds of the other bonds, the latest maturity date of which was 2004, and kept in a separate sub-pool within the 1993 Trust throughout. Navient's decision to keep proceeds of 1993A separate, and the successful segregation of proceeds of the loans purchased with the 1993A bond series, clearly showed both that the nature of the 1993 Trust allowed loans to be traced to particular bond, and that Navient was perfectly capable of doing so.

Another illustration of Navient's ability to trace the funds within the 1993 Trust was Navient's duty to comply with federal tax laws. Under 26 C.F.R. §1.148-6(a)(1), the issuer or obligor of tax-exempt bonds is required to calculate yield on its bonds, and to do so, the obligor must use some "reasonable, consistently applied accounting method to account for gross proceeds, investments and expenditures or an issue," 26 C.F.R. §1.148-6(a)(1). Not only must the obligor allocate particular loans to outstanding bonds, but to do so, it must allocate other proceeds and investments to refunded bonds, and must exclude those assets from the calculation. 26 C.F.R. §§ 1.148-6(b)(2)(ii), 1.148-9(b)(1). To calculate the yield on each of those bonds, the entities had to use some "accounting method" to allocate particular loans to each of the remaining 1993 bonds. Navient presumably did so, showing in the process that the structure of the 1993 Trust allowed for some reasonable way to allocate loans to particular bonds, even if precise tracing were not practicable. The Department had no regulations specifying how an Authority must make this allocation, and thus Navient could have used any "reasonable, consistently-applied" method to associate particular groups of loans with particular 1993 bonds. Navient appears to have done so for some purposes, such as administrative convenience, but

32

chose not to do so for the purposes of calculating which loans were subject to the 9.5 SAP limit. Instead, Navient opted to claim that all loans in sub-pool 2 were subject to that limit, and bill Education for 9.5 SAP on them all, until the 1993A bond that had no financial connection with those loans was retired in July of 2005.

As Navient clearly indicated in its brief, "Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool." Respondent's Brief, p.24, n.21. Thus, Navient's decision not to associate student loans with any particular bond from the 1993 Trust for SAP purposes was a business decision that benefited Navient financially at the time. It does not, however, constitute a basis for considering those loans subject to the 9.5 SAP limit.

## III.   NAVIENT'S TREATMENT OF 1993A SERIES BOND AS SEPARATE FUNDING SOURCE SHOWS THAT THIS BOND COULD NOT CONTROL THE 9.5 SAP STATUS OF LOANS IN SUB-POOL 2.

Navient expressly concedes that proceeds of the 1993A bond, which matured on July 1, 2005, were segregated from proceeds of the other bonds, the latest maturity date of which was July 2004, and were kept in a separate sub-pool within the 1993 Trust throughout. Respondent's Brief, p.11. Thus, even under Navient's own expansive reading of the DCL 93-L-161, it had no basis to claim that any of the loans associated with bond series 1993B through 1993H were financed by any proceeds of the 1993A bond. At a very minimum, therefore, Navient should be obligated to refund the excess special allowance payments received on loans associated with these other bonds between July 1, 2004, the maturity of the 1993F bond– the latest maturity date of any 1993 bond in sub-pool 2 – and July 1, 2005, when the 1993A bond was retired.

## IV.   FSA HAS AUTHORITY TO DETERMINE AND RECOVER THE LIABILITY ASSERTED IN THIS FAD.

Navient contests that "FSA's final audit determination goes significantly beyond the findings and recommendations" of OIG's Final Audit Report and "disputes FSA's determination that it can be held liable for repayment of 1/2 SAP Rate payments received on loans funded by the 1993B, 1993G and 1993H bond issues, with respect to period prior to the respective 2002 bond maturities within those series." Respondent's Brief, p. 35-36.   In fact, FSA has both the authority and the legal basis to make determinations that go beyond those made by OIG and, in this case, to demand that Navient identify and adjust its billing for the loans that were no longer subject to the 9.5 SAP rate when the individual bond, the proceeds of which were used for their purchase, was retired or defeased.

Section 432 of the HEA, 20 U.S.C. §1082(a), provides FSA authority to implement and enforce any provision of the FFELP by stating, in relevant part:

> In the performance of, and with respect to, the functions, powers, and duties, vested in him by this part *[20 U.S.C. §§1071 et seq.]*, the Secretary may-
>
> (1) Prescribe such regulations as may be necessary to carry out the purpose of this part *[20 U.S.C. §§1071 et seq.]*... to establish minimum standards with respect to sound management and accountability of programs under this part.
> ***
> (6) enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

20 U.S.C. §1082(a).

34 C.F.R. §682.413(a)(1), in turn, provides:

> The Secretary requires a lender and its third-party servicer administering any aspect of the FFEL programs under a contract with the lender to repay interest benefits and special allowance or other compensation received on a loan guaranteed by a guaranty agency, pursuant to paragraph (a)(2) of this section –
> ***

     (iii)    For any period in which the lender or servicer, with respect to the loan, violates the requirements of subpart C of this part. …

34 C.F.R. §682.413(a)(1).  Subpart C of 34 C.F.R. §682 is entitled "Federal Payments of Interest and Special Allowance" and is specifically designed to govern special allowance payments.  The legislative and regulatory framework therefore makes it amply clear that Education, and FSA, which is responsible for administering student aid financial programs, have full authority to identify liabilities for violations of  34 C.F.R. §682, Subpart C, and are not constrained by the scope of a particular OIG recommendation.

## V.    FSA'S TREATMENT OF NAVIENT IS CONSISTENT WITH ITS TREATMENT OF OTHER INDUSTRY PARTICIPANTS

Navient asserts that FSA's treatment of Navient was inconsistent with its treatment of other industry participants, especially in light of what Navient describes as its "conservative approach with respect to special allowance billings."  Respondent's Brief, p. 37.  Navient further asserts that the actions FSA here takes against Navient are inconsistent with a Dear Colleague letter, DCL FP-07-01, which, it claims, "announced… that it would forego enforcement action with respect to the entities' prior 1/2 SAP rate billing practices if those entities would adopt the Department's new standard policy on a prospective basis."  Respondent Brief, p. 39.  Navient's assertions are mistaken.

This FAD addresses the practice of claiming 9.5 SAP on loans that were no longer subject to the limitation solely because the "prior tax-exempt obligation" that financed the loans had been retired.  The 9.5 SAP limit does not apply to any loan, whether made from original proceeds of a tax-exempt bond or from recoveries on those original loans, after the tax-exempt obligation that financed the loan is retired.  The FAD does not question whether these particular loans were subject to the 9.5 SAP limit in the first place; it assumes that the loans were.  The

35

FAD focuses on whether SAP was claimed at the 9.5 SAP rate after that limit ceased. DCL FP-07-01, which Navient describes as an all-encompassing 9.5 SAP offer, addressed a very different question. It was issued in January of 2007 to "restate the requirements of the …HEA… and the Department's regulations that control whether FFELP loans made or acquired with funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum return rate." The DCL stated, in relevant part:

> The HEA identifies the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for SAP at the 9.5 percent minimum return rate. 20 USC §1087-1(b)(2)(B)(i)(2006). These sources are (1) funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1, 1993 or from investment earnings on the proceeds of such an obligation; and (2) funds obtained as collections on, interest benefits or special allowance payments on, or income on, loans made or purchased from the proceeds of that tax-exempt obligation. … These requirements have been in effect since 1993.

FP-07-01, p.1-2.

The DCL dubbed the loans made from (1) bond proceeds, "first generation loans," and those acquired with funds described in (2), "second generation loans." The DCL states that "the Department will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate **for loans that were neither first-generation loans nor second-generation loans** for those lenders that promptly comply with or accept" criteria described in the letter. DCL FP 07-01, p.6 (*bold added*). The highlighted language unequivocally limits this compromise to claims for overpayments made and received on subsequent "generations" of loans. In fact, DCL FP-07-01 is devoted exclusively to the discussion of the "recycling" practice, and introducing the audit requirements necessary to verify whether loans on which a lender wished to claim SAP at the 9.5

36

rate met regulatory criteria. Nothing in this DCL suggested or could reasonably be interpreted to suggest that this offer of compromise would cover other reasons for 9.5 SAP overpayment.

Furthermore, this action against Navient is fully consistent with Education's history of pursuing, both before and after the DCL FP-07-01, actions against holders of loans financed with tax-exempt obligations on issues other than first- and second-generation loan recycling. For example, in 2006, FSA demanded repayment of excess SAP from American Education Services (AES); AES appealed that determination, which the Secretary upheld in a January 2008 decision. (ED-10). FSA made a similar determination demanding repayment from the Iowa Student Loan Liquidity Corporation, which the Secretary also upheld on appeal. (ED-11). Kentucky Higher Education Student Loan Corporation was likewise subject to an OIG report issued in May of 2009, as were other entities, such as CollegeInvest and Panhandle Plains. Navient has not been singled out with regards to the 9.5 SAP claims at issue in this FAD.

Nor was Navient denied the opportunity to settle. For close to three years FSA has attempted to negotiate a settlement with Navient on this very matter, to which end it provided Navient with continuous extensions to contest this FAD. Navient can hardly claim that its decision to forgo settlement constituted unfair treatment on the part of FSA.

37

## VI.   NAVIENT'S DISPUTE OF FAD'S LIABILITY ESTIMATE IS PREMATURE

As FSA's letter conveying the final audit determination dated September 25, 2013 specifies, this appeal is bifurcated. The parties will first have the opportunity to resolve the legal basis of their claims. Only if the findings contained in the FAD are upheld on appeal will FSA "provide an opportunity for Sallie Mae… to identify the affected loans, to calculate the overpayments, and take the other actions directed in this letter." ED-02, p.2. Consistent with this instruction, Navient's claim regarding FSA's estimate of the amount of liability is premature and must be deferred until the resolution of the first part of the appeal.

## VII.  EDUCATION DOES NOT SEEK TO RECOVER FOR ITEM 3 OF THE FAD

During their April, 2014 meeting with FSA, Navient representatives assured FSA that no instances of similar inappropriate 9.5 SAP billing have occurred within Sallie Mae or any of its subsidiaries. FSA, therefore, no longer seeks to enforce Item 3 of the FAD, which asked Navient to "[d]isclose any other instances, at any of its subsidiaries (e.g., NLMA, Southwest Student Services Corporation, Student Loan Funding Resources, Student Loan Finance Association), of loans on which special allowance was received at the 9.5 percent minimum return rate after the eligible tax-exempt bond from which their eligibility derived was retired and the loans transferred in consideration of funds derived from an ineligible funding source, and, if necessary, adjust its special allowance billings for all affected loans and return all overpayments to the Department." ED-02, p.23.

### CONCLUSION

As the above analysis shows, Navient's claim that the transfer of ownership of NMELC to ECFC required ECFC to bill at 9.5 SAP rate on loans ECFC acquired from NMELC when the

38

2251

underlying 1993F bond was simultaneously retired or defeased is without merit.  Furthermore, the words "in whole or in part" contained in DCL 93-L-161 did not address the 9.5 SAP status of loans acquired with the proceeds of bonds issued as part of the 1993 Trust.  However, even if they did, they did not interpret or apply the regulations that control whether and when the 9.5 SAP rate ceases to apply to loans already subject to that limit. Instead, when the regulations terminate the 9.5 SAP rate requirement necessarily depends on identifying which obligation financed the loans (the "prior tax-exempt obligation").  Consistent with the legislative purpose of matching the source of funds to the special allowance rate, Department regulations identify neither the Master Trust, the bond sub-pools, nor the last bond to mature in a group as "prior tax-exempt obligation" that controls the SAP rate payable on all loans associated with a group of bonds. The statute and regulations can be reasonably interpreted to apply the 9.5 limitation only to loans acquired with a such a substantial amount of low cost, tax-exempt funds that payment of SAP at the standard rate would give the holder a "windfall" – a "return  far in excess of the cost of obtaining the capital" actually used to acquire the loan.  Paying SAP at the standard rate to an issuer such as Nellie Mae, that acquired the loans at issue here, in sub-pool 2, using funds, only as little as nine percent of which were derived from tax-exempt sources, would have given Nellie Mae no such windfall.  Applying the 9.5 SAP limit to those loans would be arbitrary and contrary to the stated intent of the statute and regulations.

Navient's actions in allocating for various purposes loans in sub-pool 2 to the original 1993 bonds, and its obligation to do so for tax purposes, shows that Navient could have similarly made a reasonable allocation of loans for SAP purposes.  Furthermore, Navient's decision to segregate the proceeds of 1993A bond meant that bond 1993A could not serve as the basis for claiming 9.5 SAP for loans never financed by that bond, and further supports FSA's demand for

39

repayment of SAP claimed at the 9.5 SAP rate on loans derived from proceeds of the 1993B through 1993H bonds between July 1, 2004 and July 1, 2005.

Navient was treated fairly in this process, and FSA asserts no claim here that Education agreed to forbear in 2007.   FSA is fully authorized to assert the claims here regardless of whether they differ from the recommendations made by the OIG in the underlying audit.

The conclusions reached by the FAD are solidly based in law and in facts.   Navient has failed to demonstrate, by the preponderance of the evidence, that its 9.5 SAP billing was in compliance with the applicable requirements.   The determinations made by the FAD should, therefore, be upheld in their entirety.


Date: October 28, 2016                                    Respectfully Submitted,


                                                         Natasha Varnovitsky
                                                         Office of the General Counsel
                                                         U.S. Department of Education
                                                         Washington, D.C. 20202
                                                         (202)205-3529
                                                         nvarnovitsky@ed.gov

                                                         *Attorney for  Respondent*

40

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on October 28, 2016 a true and correct copy of the foregoing BIREF IN SUPPORT OF FEDERAL STUDENT AID'S FINAL AUDIT DETERMINATION was served on the following counsel by electronic mail and overnight courier:

Veronica R. Glick
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
vrglick@debevoise.com
(Electronic mail)

Ada Fernandez Johnson
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
afjohnson@debevoise.com
(Electronic mail)

Colby A. Smith
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
casmith@debevoise.com
(Electronic mail)

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
nvarnovitsky@ed.gov

*Attorney for Respondent*

**UNITED STATES DEPARTMENT OF EDUCATION**
WASHINGTON D.C. 20202

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In the matter of | : | **Docket No. 16-42-SA** |
| | : | |
| **NAVIENT CORPORATION,** | : | Federal Student Aid Proceeding |
| Respondent. | : | ACN: ED-OIG/A0310006 |
| | : | SUPPLEMENTAL BRIEF |
| | | IN SUPPORT OF |
| | : | FEDERAL STUDENT |
| | : | AID'S FINAL AUDIT |
| | : | DETERMINATION |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>**SUPPLEMENTAL BRIEF IN SUPPORT OF FEDERAL STUDENT AID'S FINAL AUDIT DETERMINATION**</u>

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov

*Attorney for FSA*

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................1

II.     NO STATUTE OF LIMITATIONS APPLIES TO FSA's CLAIMS FOR RECOVERY
        OF MISSPENT FEDERAL STUDENT FINANCIAL ASSISTANCE FUNDS ...............1

    A.  THE CLAIMS PRESENTED IN THIS SUBPART H PROCEEDING ARE FOR
        RECOVERY OF FEDERAL FUNDS TO WHICH THE LENDER WAS NOT
        ENTITLED ....................................................................................................1

    B.  NO STATUTE OF LIMITATIONS APPLIES TO CLAIMS UNDER REVIEW IN THIS
        SUBPART H PROCEEDING ..............................................................................2

        1.  The Statute of Limitations in 28 U.S.C. §2462 Applies Only to Proceedings
            to Enforce "Any Civil Fine, Penalty, or Forfeiture" and Therefore Does Not Apply
            to This Proceeding ....................................................................................3

        2.  The Statutes of Limitations in 28 U.S.C. §2415 Are Not Applicable to This
            Proceeding.................................................................................................4

        3.  The Record Retention Requirements Do Not Create a Time Limit for  This
            Proceeding.................................................................................................5

    C.  FSA's CLAIM IS NOT BARRED BY THE DOCTRINE OF LACHES .........................6

III.    NEITHER DCL FP-07-01 NOR RELATOR ASSERTIONS IN *U.S. EX REL.
        OBERG v. PHEAA* APPLY TO THE FINDINGS UNDER REVIEW IN THIS
        PROCEEDING ...............................................................................................10

    A.  DCL FP-07-01 .............................................................................................11

    B.  *EX REL. OBERG* ..........................................................................................13

        1.  Background....................................................................................................13

        2.  The Issues in *Ex Rel. Oberg* Are Not Relevant to This Appeal..................................14

        3.  SLM Corporation's Settlement in *Ex Rel. Oberg* Expressly Excludes the FSA
            Claims That Were Based on the OIG Report at Issue Here.........................................15

IV.     CONCLUSION..................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bowen v. Inspector Gen. of Health & Human Services,* 2008 U.S. LEXIS 103302
(S.D. Ohio 2008) .................................................................................................................7

*City Univ. of N.Y. on Behalf of Laguardia Cmty. Coll.*, Dkt. No. 93-3-0 (March 30, 1994)...2, 5, 6

*Costello v. U.S.,* 365 U.S. 265 (1961) ................................................................................7

*EEOC v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69 (3rd Cir. 1984) ......................................7

*Hatchett v. U.S.*, 330 F.3d 875 (6th Cir. 2003) ..................................................................7

*In the Matter of EdNet Career Inst.*, Dkt. No. 07-41-SP (August 31, 2009)..................................8

*In the Matter of Ga. Northwestern Technical Coll.*, Dkt. No. 16-21-SP (February 2, 2017)..........3

*In the Matter of Interactive Learning Sys.*, Dkt. No. 04-08-SA (March 8, 2005) .........................5

*In the Matter of Lincoln University*, Dkt. No. 13-68-SF, Decision of the Secretary
(April 25, 2016) ..............................................................................................................2, 4

*In the Matter of OIC Vocational Inst.*, Dkt. No. 98-12-SF (July 16, 1998).....................................6

*In the Matter of Spartan Health Sciences*, Dkt. No. 98-7-SAP (July 16, 1998).........................2, 6

*Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101 (2002)..........................................................7

*Pa. Higher Educ. Assistance Agency v. U.S. ex rel. Oberg*, 137 S. Ct. 617 (2017) .....................14

*Platt Junior College*, Dkt. No. 90-2-SA, Initial Decision on Remand (October 31, 1991).............3

*S.E.R. Jobs for Progress. Inc. v. U.S.*, 759 F.2d 1 (Fed. Cir. 1985) .................................................4

*U.S. v. Assocs. in Eye Care, P.S.C.*, 2014 WL 12606508 (E.D. Ky. 2014)....................................7

*U.S. v. John Hancock Mut. Life Ins.*, 364 U.S. 301 (1960)..........................................................6

*U.S. v. Peoples Household Furnishings, ltc.,* 75 F.3d 252 (6th Cir. 1996) .......................................7

*U.S. v. Summerlin*, 310 U.S. 414 (1940).......................................................................................7

*U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575 (4th Cir. 2012).........14

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014) ..........14

*U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency,* 804 F.3d 646 (4th Cir. 2015) ..........14

**STATUTES**

Higher Education Act of 1965 ................................................................................2, 3, 6, 11, 13

Taxpayer-Teacher Protection Act of 2004 ...........................................................................7

Higher Education Reconciliation Act of 2005 ......................................................................7

28 U.S.C. §2415 ...............................................................................................................4, 5

28 U.S.C. §2462 ...............................................................................................................3, 4

31 U.S.C. §3716 ...................................................................................................................5

31 U.S.C. §3729 .................................................................................................................13

**REGULATIONS**

34 C.F.R. §668.24 .......................................................................................................6, 9, 10

34 C.F.R. §682.414 .....................................................................................................8, 10

34 C.F.R. §682.610 .............................................................................................................6

**OTHER AUTHORITIES**

DCL FP-06-15 ...................................................................................................................12

DCL FP-07-01 ...............................................................................................10, 11, 12, 13

## I.      INTRODUCTION

This action stems from Navient's challenge to the Final Audit Determination ("FAD") issued by Federal Student Aid ("FSA") on September 25, 2013.  During the March 30, 2017 hearing in this case Judge Layton asked the parties for supplemental briefing on the applicability of a statute of limitations, as well as the possible relevance of certain arguments made in the case of *U.S. Ex rel. Oberg v. PHEAA, C.A. No.* 07-cv-960 (E.D.Va.) ("*Ex rel. Oberg*"), which is currently before the District Court in the Eastern District of Virginia.   We address both issues in detail below.  As the analysis will show, neither one has any impact on the current proceeding.

## II.     NO STATUTE OF LIMITATIONS APPLIES TO FSA's CLAIMS FOR RECOVERY OF MISSPENT FEDERAL STUDENT FINANCIAL ASSISTANCE FUNDS.

During the March 30, 2017 hearing Navient's counsel asserted that "there's a general federal statute of limitations, which is five years." March 30, 2017 Hearing Transcript, p. 124. Counsel did not identify any statute or other legal basis for this assertion, and our independent research has not identified any legal support for this claim.     Furthermore, as we will show below, none of the various statutes of limitations that may apply to actions by the United States or the Department of Education ("Department") apply to this type of proceeding in general or this appeal in particular.

A.  THE CLAIMS PRESENTED IN THIS SUBPART H PROCEEDING ARE FOR RECOVERY OF FEDERAL FUNDS TO WHICH THE LENDER WAS NOT ENTITLED

The tribunal's authority to hear this appeal from the FAD issued by FSA on September 25, 2013 arises from  the Memorandum on Delegation of Authority ("Delegation") issued by the Secretary of Education to the Department's Office of Hearings and Appeals ("OHA") on October 19, 2012.  ED-01.  This Delegation stipulated that objections raised by an Federal

Family Education Loan Program ("FFELP") Participant with regards to liability determinations that "turn on whether the transactions on which the determination rests comply with applicable requirements of the Higher Education Act of 1965, as amended ("HEA") and Department regulations, and whether the amount that FSA determines the Participant must repay is accurate," are to be "resolved through a proceeding under 34 C.F.R. Part 668, Subpart H." ED-01, p.1. The Delegation specifically directed the hearing official "to conduct a proceeding under the terms provided in 34 C.F.R. §§668.114 through 668.118 to resolve objections by a FFELP Participant to an FSA determination regarding liability of the FFELP Participant. …" ED-01, p.2. The September 25, 2013 FAD at issue in this proceeding assessed liability against Navient, a FFELP participant, for failure to comply with the requirements of Section 438 of the HEA, 20 U.S.C. §1087-1. Thus, the appeal of FSA's determination dated September 25, 2013 at issue here is to be resolved through a proceeding under 34 C.F.R. Part 668, Subpart H.

## B. NO STATUTE OF LIMITATIONS APPLIES TO CLAIMS UNDER REVIEW IN THIS SUBPART H PROCEEDING

Subpart H proceedings are generally used to recover funds disbursed to educational institutions pursuant to Title IV, Part B of the HEA (20 U.S.C. §§1071 *et. seq.*)) ("Title IV") that may have been misspent by the institution. Actions to recover Title IV funds "are purely remedial and not punitive." *In the Matter of Lincoln University*, Dkt. No. 13-68-SF, Decision of the Secretary, FN 23 (April 25, 2016). Unlike other proceedings conducted under the HEA, 34 C.F.R. Part 668, Subpart H proceedings ("Subpart H proceedings") are not designed to impose fines, penalties, or monetary damages.[1] This tribunal has consistently held that "no statute of limitations … applies to the recovery of misspent funds in a Title IV program review." *In the Matter of Spartan Health Sciences*, Dkt. No. 98-7-SAP, at 3 (July 16, 1998) (*citing City Univ. of*

---

[1] Proceedings to impose fines, penalties, or monetary damages are conducted pursuant to 34 C.F.R. Part 668, Subpart G, made applicable to fine proceedings against FFELP lenders by 34 C.F.R. §682.413(d)(1).

2

*N.Y. on Behalf of Laguardia Cmty. Coll.*, Dkt. No. 93-3-0 (March 30, 1994); *Platt Junior College*, Dkt. No. 90-2-SA, Initial Decision on Remand (October 31, 1991)).   Thus, in accordance with these prior decisions, no statute of limitations should apply to the review of the September 25, 2013 FAD.  Nevertheless, out of an abundance of caution we specifically address the inapplicability of each potentially relevant statute of limitations below.

### 1.  The Statute of Limitations in 28 U.S.C. §2462 Applies Only to Proceedings to Enforce "Any Civil Fine, Penalty, or Forfeiture" and Therefore Does Not Apply to This Proceeding

28 U.S.C. §2462 provides, in relevant part:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. §2462.

As the plain language of this statute makes clear, this statute of limitations is applicable solely to fine, penalty, or forfeiture proceedings.[2]  By contrast, Subpart H proceedings are designed to recover Title IV funds that were improperly received or retained by a Title IV program participant.  Thus, by its own express terms, 28 U.S.C. §2462 is inapplicable to any Subpart H proceeding, including this one.   The September 25, 2013 FAD seeks to recover Title IV funds that were incorrectly claimed by and paid to Navient, not to impose a fine or penalty.  It is identical to the proceeding in *In the Matter of Ga. Northwestern Technical Coll.*, Dkt. No. 16-21-SP (February 2, 2017), where this tribunal pointed out that "the liabilities attributed to this Finding arise out of the regulations at Title 34, Part 668, Subpart H which is distinct from the

---

[2] HEA §432(f), 20 U.S.C. §1082(f), explicitly authorizes the Department's Inspector General to conduct audits of FFELP transactions of any FFELP lender, and this audit was conducted under that authority.  Separately, HEA §432(g), 20 U.S.C. §1082(g) explicitly authorizes the Department to impose a fine ("civil penalty") on a lender, and states the amount and manner of calculating that fine.  Nowhere did OIG or FSA purport to rely on that explicit fine authority in seeking to recover against Navient for overcharges identified in that audit.

fines imposed under Subpart G of those regulations." *Id*, at 10. This proceeding involves claims for repayment of FFELP funds under 34 C.F.R. §682.413(a), conducted pursuant to the Delegation to fulfill the requirement imposed by 34 C.F.R. §682.413(e)(1)(i) that the Secretary provide the lender an opportunity to be heard on the claims. Therefore, the September 25, 2013 FAD was "purely remedial and not punitive (and therefore not subject to 28 U.S.C. §2462)." *In the Matter of Lincoln Univ.*, Dkt. No. 13-68-SF, Decision of the Secretary, FN 23. Thus, the statute of limitations contained in 28 U.S.C. §2462 is not applicable to the review of this FAD.

### 2. The Statutes of Limitations in 28 U.S.C.§2415 Are Not Applicable to This Proceeding

28 U.S.C. §2415(a) provides, in relevant part:

> Subject to the provisions of section 2416 of this title, and except as otherwise provided by Congress, every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract express or implied in law or fact, shall be barred unless the complaint is filed within six years after the right of action accrues or within one year after final decisions have been rendered in applicable administrative proceedings required by contract or by law, whichever is later. …

28 U.S.C. §2415(a).

28 U.S.C. §2415(a) is limited by its own express language to an "action for money damages." In contrast, the September 25, 2013 FAD merely seeks the return of Title IV funds improperly paid to and retained by Navient. Furthermore, 28 U.S.C. §2415(a) sets a statute of limitations exclusively for one kind of "actions" - lawsuits brought by the United States to recover on various claims. This proceeding is not a lawsuit to collect, but rather an administrative proceeding. Thus, the action on review before this tribunal is identical to that at issue in *S.E.R. Jobs for Progress. Inc. v. U.S.*, 759 F.2d 1 (Fed. Cir. 1985), which held that 28 U.S.C. §2415 did not apply to "an administrative appeal by a contractor from a contracting office's decision that the contractor owes the Government the amount of certain disallowed

costs." *Id.*, at 5.  The same conclusion, that 28 U.S.C. §2415 does not apply to actions for overpayments, has been reached consistently by this tribunal with respect to other Subpart H proceedings.  Thus, *In the Matter of Interactive Learning Sys.*, Dkt. No. 04-08-SA (March 8, 2005), which involved a Title IV program participant seeking a review of an FAD that sought the return of federal funds, this tribunal concluded that 28 U.S.C. §2415 was inapplicable where, as here, "FSA seeks only to recoup Title IV funds which were improperly disbursed to ILS for the years in question."  *Id.*, p.6.  This tribunal arrived at the same conclusion  in  *In the Matter of Platt Junior Coll.*, Initial Decision on Remand, where it stated that "an administrative proceeding involving a challenge of a Final Audit Determination by a Designated ED official that an institution has not properly utilized funds is not an 'action for money damages' within the meaning of §2415."  *Id*, at 3.  *See also In the Matter of City Univ. of N.Y. on Behalf of Laguardia Cmty. Coll.*, Dkt. No. 93-3-0, FN 20 (holding that the statute of limitations found in §2415(a) is inapplicable to an appeal of a final program review determination).  The findings contained in the September 25, 2013 FAD are not the final decision "rendered in applicable administrative proceeding" after the issuance of which the right of action would accrue.  Rather, they are the subject of the administrative proceeding currently before this tribunal.[3]  Furthermore, the findings sought no remedy other than the return of special allowance ("SAP") overpayments from the respondent Navient.  Thus, the statutes of limitations in 28 U.S.C. §2415(a) do not apply to this proceeding. [4]

### 3.  The Record Retention Requirements Do Not Create a Time Limit for This Proceeding

---

[3] Federal law applies no limitation period, for example, to non-judicial, administrative proceedings to collect by administrative offset. 31 U.S.C. §3716(e).

[4] Other subsections of 28 U.S.C. §2415 that establish limitation period for suits by the United States are similarly inapplicable. Subsections (b) and (d) of 28 U.S.C. §2415 create statutes of limitations on lawsuits by the United States to recover for tort actions and federal funds paid to or on behalf of a civilian or military employee of the federal government and are on their face inapplicable to this administrative proceeding.  In addition, 28 U.S.C. §2415(i) specifically provides that no statute of limitations shall apply to collections of claims via administrative offset.

This tribunal has consistently held that the various record retention requirements that apply to institutions participating in programs established by Title IV of the HEA cannot be interpreted as imposing statutes of limitations on actions by FSA. For example, as this tribunal has explained, the three-year record retention requirement in 34 C.F.R. §668.24(e) is not a statute of limitations. *In the Matter of OIC Vocational Inst.*, Dkt. No. 98-12-SF (July 16, 1998) is instructive. In that appeal of FSA's final program review determination the institution, OIC, argued that the three-year record retention requirement created "an implied three-year statute of limitations on actions by the Department." *Id*, at 4. The hearing official pointed to 34 C.F.R. §668.24(e)(3), noting that the institution's claim "ignores the fact that the retention regulations also require that an institution retain 'all records involved in any loan, claim, or expenditure questioned by a Title IV, HEA program audit until the resolution of that questioned loan, claim, or expenditure.'" This tribunal concluded that "the adoption of an implied statute of limitations would defeat the clear purpose of this additional language." *Id*. Similarly, the five-year record retention requirement in 34 C.F.R. §682.610(d) was also found by this tribunal not to be a statute of limitations. *See In the Matter of Spartan Health Sciences*, Dkt. No. 98-7-SP. Thus, none of the record retention regulations promulgated under the HEA can be interpreted to limit the time period governing FSA's ability to recover from Navient[5].

C. FSA's CLAIM IS NOT BARRED BY THE DOCTRINE OF LACHES

Nor are the September 25, 2013 FAD findings barred by the doctrine of laches. "It is well established that the Government generally is exempt from the consequences of its laches."

---

[5] It also bears noting that no state statute of limitations could apply to this proceeding, as "the Federal Government is not subject to state statutes of limitations unless Congress explicitly provides for such in plain and clear statutory language." *U.S. v. John Hancock Mut. Life Ins*., 364 U.S. 301, 308-309 (1960). As this tribunal has previously pointed out, "[t]he HEA neither provides a statute of limitations nor evidences Congress' intent that the Federal Government be subject to state statutes of limitations." *City Univ. of N.Y. on Behalf of Laguardia Cmty. Coll.*, Dkt. No. 93-3-O, FN 20.

*Hatchett v. U.S.*, 330 F.3d 875, 887 (6th Cir. 2003) (quoting *U.S. v. Summerlin*, 310 U.S. 414, 416 (1940)); *see also Bowen v. Inspector Gen. of Health & Human Services,* 2008 U.S. LEXIS 103302 (S.D. Ohio 2008) (holding that laches is not available as a defense against the government); *U.S. v. Peoples Household Furnishings, Inc.,* 75 F.3d 252, 254 (6th Cir. 1996) ("The sovereign is exempt from the consequences of its laches."); *U.S. v. Assocs. in Eye Care, P.S.C.*, 2014 WL 12606508 (E.D. Ky. 2014) ("the government is not subject to a defense of laches when it is asserting a public right or acting in the public interest").

Furthermore, even if we assume, *arguendo*, that this doctrine applied to the federal government, it would not provide Navient the immunity it seeks because it would not be able to prove the requisite elements of this defense. The doctrine of laches "applies where there is '(1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.'" *Costello v. U.S.,* 365 U.S. 265, 282 (1961); *see also Pro Football, Inc. v. Harjo,* 565 F.3d 880, 882 (D.C.Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 121–22 (2002)). The burden of establishing the elements of laches is borne by the defendant. *See EEOC v. Great Atlantic & Pacific Tea Co.,* 735 F.2d 69, 80–81 (3rd Cir. 1984).

Navient cannot show that either of the two requisite elements of laches has been met. First, as the record clearly shows, Office of the Inspector General ("OIG") and FSA investigated this case in the most diligent fashion. The audit giving rise to the 2009 OIG report was conducted between October 16, 2007 and May 14, 2008 in order to determine Navient's compliance with provisions of the Taxpayer-Teacher Protection Act of 2004 ("TTPA") and the Higher Education Reconciliation Act of 2005 ("HERA") and covered the period of October 1, 2003 through September 30, 2006. The audit did not find any noncompliance with either the TTPA or the HERA, but did discover that Navient had not complied with the 9.5 percent SAP

billing requirements at issue in this action.  After the OIG report was issued in 2009, FSA engaged in a continuous and thorough discovery until the date FSA issued the FAD in 2013.   In fact, the record is replete with references to communications between FSA and Navient, as FSA worked to establish the underlying facts.  The matter at issue is incredibly complex and required a thorough investigation, which both OIG and FSA undertook in good faith.  It therefore cannot be said, and in fact Navient does not say, that FSA was not diligent in investigating and issuing its determination.  *See In the Matter of EdNet Career Inst.*, Dkt. No. 07-41-SP (August 31, 2009).

Furthermore, Navient could not have been and was not in fact prejudiced by the passage of time in this case because the HEA and the regulations appraised Navient of its duty to retain the relevant documents from the moment it submitted a request for special allowance to the Department.  Specifically, 34 C.F.R. §682.414(a)(4)(ii) required Navient, as a FFELP lender, to "keep … records that are necessary to document the validity … or accuracy of reports submitted under this part."  Thus Navient was on notice that it had to retain all records that served as the basis for the Lender's Interest and Special Allowance Request and Report ("LARS"), which it submitted to the Department to obtain special allowance subsidies, for no less than three years after the date the loans that comprised the basis of the billing have been repaid. The loans that Navient deemed eligible for 9.5 percent SAP by virtue of the transactions in question here were billed at 9.5 percent SAP through July 1, 2005, when the last bond – bond 1993A – had matured. That means that under 34 C.F.R. §682.414(a)(4)(ii) Navient had a duty to retain records that established the accuracy of its 9.5 percent SAP billings for at least three years after July 1, 2005. OIG conducted its audit during the period of October 16, 2007 and May 14, 2008. ED-03, p.28. Consequently, at the time the audit was conducted Navient was still under an obligation to keep

the records establishing the accuracy of the 9.5 percent SAP billing in question in the audit.  In addition, Navient was on notice, by virtue of 34 C.F.R. §668.24(e)(3), that it had to retain all the records pertinent to the audit until at least the final resolution of that audit.  Thus, Navient was under a continuing obligation to retain records pertinent to its special allowance billings and could not be prejudiced by the need to utilize these records now.

Nor does FSA's demand that Navient now determine the amount of liability for overpayments of SAP on loans financed by Bond 1993B (maturity date June 1, 1998), Bond 1993B (maturity date June 1, 2000), Bond 1993G (maturity date August 1, 1998), Bond 1993G (maturity date August 1, 2000), and Bond 1993H (maturity date December 1, 1999)  unfairly prejudice Navient.  Whether or not Navient has the loan-specific information required to support claims for SAP on individual loans, Navient (and FSA) could use other data still readily available to calculate the amount of SAP at the 9.5 percent return rate claimed and received on loans financed by those bonds after they were retired.  Navient (and FSA) could calculate this amount using the same method that OIG used to calculate the amount of SAP at the 9.5 percent return rate on loans financed by the bonds that matured and were retired in June 2002 (1993B), August 2002 (1993G) and December 2002 (1993H).  OIG estimated the amount of overcharges based on the amount outstanding of each of the three bonds that were retired in 2002.  OIG considered loans in the amount of the bond when it was retired to have been financed by that bond, and thus OIG considered any 9.5 percent SAP amounts claimed on loans totaling that amount after the date the bond matured to be overcharges.  See ED-03, FN 8.  To determine the portion of those loans that were financed by each 1993 bonds that matured between 1998 and 2002, Navient (and FSA) could use the same method that the OIG used: consider the amount of loans financed by a given bond as an amount equal to the amount outstanding on the bond when

it was retired.  Thereafter, the 9.5 percent provision would no longer apply to that fraction of the loans associated with that series, and any SAP paid at the 9.5 percent return rate on that amount of loans would be considered to be an overcharge. Whether or not Navient has the loan and bond-specific records required by 34 C.F.R. §682.414(a)(4)(ii) and 34 C.F.R. §668.24(e)(3), this method would provide a very conservative estimate of the amount of overcharges on loans financed by the bonds that matured between 1998 and 2002 after the date of their maturity.  Thus, FSA's demand that Navient account for those overcharges does not prejudice Navient.

Nor has Navient identified any specific records or witnesses that may no longer be available or how those witnesses or records are essential to Navient's case.  It therefore cannot avail itself of the defense of laches.

## III.   NEITHER DCL FP-07-01 NOR RELATOR ASSERTIONS IN *U.S. EX REL. OBERG v. PHEAA* APPLY TO THE FINDINGS UNDER REVIEW IN THIS PROCEEDING

During the March 30, 2017 hearing Judge Layton requested that the parties provide supplemental briefing on the "Pennsylvania Matter which was raised by the respondent."  March 30, 2017 Hearing Transcript, p. 150.  The issue raised by Navient related to an alleged admission by FSA concerning the scope of an alleged settlement offer in the Department's Dear Colleague Letter ("DCL") FP-07-01, which Navient incorrectly claims is relevant to this case. ED-02. Navient's counsel claimed that the alleged admission was made by the Department in the case of *U.S. Ex rel. Oberg v. Pa. Higher Educ. Asst. Agency,* C.A. No. 07-cv-960 ("*Ex rel. Oberg*"), which is currently before the District Court in the Eastern District of Virginia.  As the discussion below will show, Navient is wrong - neither DCL FP-07-01 nor the relator's statements in *Ex rel. Oberg* apply to the conduct at issue in this proceeding.  The language contained in DCL FP-07-

10

01, by its own terms, pertained exclusively to other claims, not the claims at issue here, and the admission allegedly made by the relator in *Ex rel. Oberg* does not change the Department's statement of the scope or future effect of that language.

A. <u>DCL FP-07-01</u>

HEA §438(b)(1)(B), 20 U.S.C. §1087-1(b)(1)(B), provides that the 9.5 percent SAP restriction - and, as applicable here, the minimum return it guaranteed - applied exclusively to two kinds of loans: loans made with funds obtained with the proceeds of tax-exempt bonds, and, if those loans were sold or repaid, the loans acquired with funds from the repayments or recoveries from those loans. In DCL FP-07-01, the Department referred to these loans, respectively, as "first generation" loans, and "second generation" loans. During the extremely low interest rate environment of 2000-2007, FFELP loans generally earned little or no special allowance payments, but because of the guaranteed minimum return, loans subject to this restriction received a return far in excess of that to which other loans qualified. This prompted lenders to engage in practices that substantially increased the volume of loans to which this restriction applied. One of these practices, called "recycling," involved using recoveries on "second generation" and later generations of loans to acquire additional loans, and continuing to bill these loans - acquired neither with the proceeds of tax-exempt bonds, nor from collections or sales of those original loans - at 9.5 percent SAP. In 2005-2006 OIG conducted audits of several lenders that claimed SAP at the 9.5 percent return rate on substantial numbers of loans that were neither first generation nor second generation loans.

In DCL FP-07-01 the Department provided guidance on this issue in order to prevent this type of conduct from reoccurring. DCL FP-07-01 stressed that the 9.5 percent SAP provisions applied exclusively to "first generation" and "second generation" loans, not to subsequent

"generations" of loans.  DCL FP-07-01 addressed no other requirements for tax-exempt-financed

loans.  DCL FP-07-01 directed that SAP would be paid in the future at the 9.5 minimum return

rate only if the lender supported that claim by an audit prescribed by the Department.  ED-02.

Most pertinent here, the Department agreed to release any claims for SAP at the 9.5 percent

return rate already received by a lender on loans that were ineligible for that payment because

they were neither first- nor second generation loans if the lender did not challenge the position

articulated in the DCL.[6]  Thus lenders were not required to repay overpayments already received

if they did not challenge the Department's position on eligibility requirements and made further

claims for SAP at the 9.5 percent return rate only if supported by audit proof of eligibility.  As

explained in the DCL FP-07-01, this language was limited exclusively to the overpayments

resulting from billing for SAP on loans that were neither first- nor second- generation.[7]

> Department will not seek to recoup SAP already received in excess of that
> payable at the standard rate for quarters ending on or before September 30, 2006
> at the 9.5 percent minimum return rate **for loans that were neither first-
> generation loans nor second-generation loans** for those lenders that promptly
> comply with or accept criteria described in the letter.

DCL FP 07-01, p.6 (*bold added*).

The limited scope of the offer made in the DCL FP-07-01 is further confirmed by the fact

that, long after lenders accepted the terms of that DCL, FSA continued to pursue them for

liabilities resulting from practices other than "recycling."  Thus, FSA continued to pursue the

Pennsylvania Higher Education Assistance Agency ("PHEAA") for liabilities resulting from

non-recycling-related practices, resulting in a determination letter dated January 25, 2008.  *See*

ED-05 (AES/PHEAA January 25, 2008 determination). This pattern of enforcement clearly

---

[6] The Department entered into an explicit written agreement to settle with Nelnet for the claims based on the audit cited above. Any other lender that did not challenge application of the eligibility standards articulated in the DCL and sought no further 9.5 percent return SAP without a supporting audit was not required to repay overpayments already received. SLM did not challenge this position and made clear that it would seek no further payments of SAP at the 9.5 percent return rate.

[7] The limited scope of DCL FP-07-01 is especially obvious when compared to other guidance issued on this subject, such as DCL FP-06-15.  ED-04.

confirms that the resolutions reached pursuant to DCL FP-07-01 did not release claims for overbilling for SAP at the 9.5 percent return rate that were not based directly on the practice of "recycling."

Nor did SLM Corp.'s ("SLM's")[8] own February 15, 2007 response to the DCL FP-07-01 contradict this position.   The letter stated merely that SLM did not intend to make further claims for 9.5 percent SAP and to accept payments for the fourth quarter of 2006 at the standard SAP rate. The letter contained no mention of a settlement of any kind. *See* ED-06 (SLM February 15, 2007 Letter).   It therefore does not support Navient's belated claim that the FAD at issue here is precluded by the terms of DCL FP-07-01. [9]

B.  *EX REL. OBERG*

1.  **Background**

The terms of DCL FP-07-01 are unaffected by any statement made by the relator in *Ex rel. Oberg*, a *qui tam*[10] action brought by the relator, Jon Oberg, under the False Claims Act ("FCA"), 31 U.S.C. §3729 *et seq*.   The relator alleges that the defendants, lenders who held FFELP loans, claimed SAP at the 9.5 percent rate on loans that were ineligible for that rate.   The relator alleges that the defendants deliberately ignored or circumvented the legal requirements of §438(b)(2)(B) of the HEA, 20 U.S.C. §1087-1(b)(2)(B), to increase the volume of loans that would appear eligible for these 9.5 percent SAP payments.   The FCA authorizes the government to intervene in a *qui tam* case and pursue recovery directly.   Significantly, the government chose not to intervene in this action, and Oberg is pursuing the case on his own.

---

[8] Navient's corporate predecessor.
[9] Nor did the resolution of the claims under the terms of DCL FP-07-01 release any claim the government might have against the lenders under the False Claims Act.  31 U.S.C. §3729.
[10] *Qui tam* lawsuits are a type of civil action brought by individuals under the False Claims Act on behalf of the government.

The claims against seven of the eight defendants, including that of  SLM, were settled between 2010 and 2015; claims against other lenders were dismissed, and the case against the remaining defendant, PHEAA, has gone back and forth between the district court and the Fourth Circuit on the issue of whether the defendants are "persons" subject to suit under the False Claims Act.  *U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575 (4th Cir. 2012); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014). On Oberg's third appeal, the court of appeals concluded that PHEAA was not an "arm of the state" of Pennsylvania, reversed the district court's order and remanded for further proceedings on the merits.  *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency,* 804 F.3d 646 (4th Cir. 2015).  PHEAA sought a *writ of certiorari*, which was denied on January 9, 2017.  *Pa. Higher Educ. Assistance Agency v. U.S. ex rel. Oberg*, 137 S. Ct. 617 (2017). The case has been remanded to the district court, where, on March 24, 2017 Oberg filed a Brief in Opposition to PHEAA's Motion for Judgment on the Pleadings.  *See* ED-07 (March 24, 2017 Brief in Opposition).  Navient cites to this brief as somehow significant to the current action.  Navient's reliance is misplaced.  Oberg's characterizations of government positions are simply the views of a private party; neither the U.S. Government nor the Department exercised any control over the his characterizations, and neither the United States nor the Department is bound by those characterizations.

## 2.  The Issues in *Ex Rel. Oberg* are Not Relevant to This Appeal

While both the findings in the September 25, 2013 FAD under review in this proceeding and the claims asserted in the *Ex rel. Oberg qui tam* arose as a result of alleged 9.5 percent SAP overpayment, the similarities between two proceedings end there.  The conduct giving rise to the alleged overpayment in *Ex rel. Oberg* is not at issue in this appeal, nor are the legal issues posed

14

in *Ex rel. Oberg* to date of any import to the issues currently before this tribunal.  Nor does Navient allege otherwise.

Navient did allege, however, during the March 30, 2017 hearing, that Oberg's characterization of DCL FP-07-01 was made by the "legal counsel for the U.S. government," implying that Oberg's statement is somehow binding on FSA.  March 30, 2017 Hearing Transcript, p. 38.  Oberg's March 24th, 2017 Brief in Opposition made an inaccurate representation that "[a]t the same time that it issued the 2007 DCL, the DOE indicated that, while it would engage in more searching review of 9.5% SAP claims going forward, it generally would not seek to recapture prior payments."  ED-07, p. 17. To the extent that this statement purports to announce an intention to ignore non-recycling-related claims, we show above that the Department had no such intent, and in fact pursued recovery for violations of other SAP requirements.

Whether or not the Oberg assertion is accurate, moreover, it was Oberg who made the assertion, not "legal counsel for the U.S. government," as Navient's counsel misstated in oral argument.  Neither the Department nor FSA is a party to the *Ex rel. Oberg* litigation and the brief and the assertions contained therein represent the views of the relator, Jon Oberg, alone.  FSA is not in any way bound by the characterizations of government positions made by a relator in a *qui tam* suit.  Thus, Navient's attempt to use Oberg's erroneous representation to recast the scope of DCL FP-07-01 fails.

### 3. SLM Corporation's Settlement in *Ex Rel. Oberg* Expressly Excludes the FSA Claims That Were Based on the OIG Report at Issue Here.

Navient's attempt to use statements by the relator in *Ex rel. Oberg* to support its expansive view of the scope of DCL FP-07-01 fails for yet another reason: SLM Corporation, Navient's corporate predecessor, explicitly acknowledged in its October 22, 2010 settlement

15

with Oberg, with the United Stated, and with the Department of Education in *Ex rel. Oberg* that any release by Oberg and the government, while applying to "transferring and recycling of loans," "shall not apply to Higher Education Act claims by the Department of Education in connection with Nellie Mae in OIG Final Audit Report ED-OIG/A03I0006." ED-08 (October 22, 2010 SLM *Ex rel Oberg* Settlement Agreement, par.7). Those claims are the very claims at issue in this proceeding. Thus, the claims at issue in this proceeding were specifically excluded from the scope of SLM's settlement with the government[11] in *Ex rel. Oberg*.

## IV.    CONCLUSION

As the above analysis shows, no statute of limitation applies to this action. While a variety of statutes of limitations apply to various penalty, fine, and money damages proceedings, none apply to Subpart H proceedings to recover an overpayment of Title IV funds, such as the current appeal of the September 25, 2013 FAD. Moreover, the doctrine of laches does not apply against the federal government, and, even if it did, Navient has not and cannot establish the two elements of laches - lack of diligence by the party against whom the defense is asserted, and prejudice to the party asserting the defense in this case.

Nor does the Department's proposal to lenders in DCL FP-07-01, which was limited by its own express terms to a type of conduct not relevant here, apply to the conduct at issue in this proceeding. The assertions made by the relator in *Ex rel. Oberg,* a *qui tam* case in which the Department declined to intervene, do nothing to change that fundamental fact, especially where, as here, the OIG report at issue in this case was specifically excluded from the scope of a settlement by Navient's corporate predecessor in the case. Thus the conduct identified in FSA's

---

[11] While the United States had not intervened in the case, the settlement was made explicitly with Oberg, with the United States, and with this Department, and the terms of that settlement expressly bound Oberg, the United States, this Department, and – as pertinent here – SLM .

September 25, 2013 FAD was not covered by any settlement and can properly be resolved before this tribunal.

Date:   May 19, 2017

Respectfully Submitted,

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202) 205-3529
nvarnovitsky@ed.gov

*Attorney for FSA*

17

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on May 19, 2017 a true and correct copy of the foregoing SUPPLEMENTAL BIREF IN SUPPORT OF FEDERAL STUDENT AID'S FINAL AUDIT DETERMINATION was served on the following counsel by electronic mail and overnight courier:

Veronica R. Glick
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
vrglick@debevoise.com
(Electronic mail and Federal Express)

Ada Fernandez Johnson
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
afjohnson@debevoise.com
(Electronic mail)

Colby A. Smith
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
casmith@debevoise.com
(Electronic mail)

Jil R. Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
jsimon@debevoise.com
(Electronic mail)

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202) 205-3529
nvarnovitsky@ed.gov

*Attorney for FSA*

## UNITED STATES DEPARTMENT OF EDUCATION
### WASHINGTON D.C. 20202

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In the matter of | : | **Docket No. 16-42-SA** |
| | : | |
| **NAVIENT CORPORATION,** | : | Federal Student Aid Proceeding |
| Respondent. | : | ACN: ED-OIG/A0310006 |
| | : | BRIEF IN RESPONSE TO |
| | : | NAVIENT |
| | | CORPORATION'S |
| | : | APPEAL OF HEARING |
| | : | OFFICIAL'S INITIAL |
| | | DECISION |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## <u>BRIEF IN RESPONSE TO NAVIENT CORPORATION'S APPEAL OF HEARING OFFICIAL'S INITIAL DECISION</u>

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov


*Attorney for FSA*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ……………………………………………………1

BACKGROUND……………………………………………………………………2

      Federal Family Education Loan Program …………….…………………...…………2

      Special Allowance Payment History…………………….…...…………….................3

      Corporate Organizational Structure of Navient/Sallie Mae.……………………........7

      1993 Bonds …………………………………………………………………………8

      OIG Audit Finding, Sallie Mae Response, and Final Audit Determination.……...11

STANDARD OF REVIEW…………………………………………………………...12

ARGUMENT…………………………………………………………………….......12

I.      THE HEARING OFFICIAL CORRECTLY DETERMINED THAT THE
HEA AND REGULATIONS REQUIRED NAVIENT TO STOP BILLING
LOANS AT 9.5 SAP AFTER THE TAX-EXEMPT BOND THAT
FINANCED THE LOANS WAS RETIRED…………………………………………12

     A. To the extent that DCL 93-L-161 is in direct conflict with statutory authority,
statues and regulations prevail……………………...………………………………12

     B. DCL 93-L-161, properly read, conforms to the statute and the Congressional
intent……………………………………………………………………………...…15

     C. Even Navient's proposed reading of "In Whole Or In Part" does not
support Navient's billing practices………...………………………………………17

          1. *The Master Trust Is Not an "Obligation"*…..………………………….…..18
          2. *The Last Bond to Mature In a Pool of Multiple Bonds Cannot Control
the 9.5 SAP Status Of All the Loans Associated with Bonds in That
Pool …… … … … … … … … … … … … … … … … … … … … … … ……* 21
          3. *An Individual Bond Is the "Prior Tax-Exempt Obligation" That
Determined When 9.5 SAP Federal subsidy No Longer Applied To
Loans Reasonably Allocated To It… … … … … … … … … … … … … …*23

II.     THE HEARING OFFICIAL CORRECTLY DETERMINED THAT THE TRANSFER OF
LOANS TO ECFC MADE THOSE LOANS INELIGIBLE FOR 9.5 SAP …………….…25

i

III.    THE HEARING OFFICIAL CORRECTLY DETERMINED THAT
NAVIENT'S CONDUCT WAS NOT COVERED BY 2007 SETTLEMENT
AND THAT NAVIENT WAS NOT TREATED DIFFERENTLY FROM OTHER
INDUSTRY PARTICIPANTS**……………………………………………………….. 29

IV.    THE HEARING OFFICIAL CORRECTLY DETERMINED THAT COLLECTION OF
SAP OVERPAYMENT IS NOT BARRED BY THE STATUTE OF LIMITATIONS...31

        A. No statute of limitations applies to final audit determinations………………..… 31

        B.  Applying statute of limitations to Navient is not unjust………………………….35

V.    NAVIENT'S DISPUTE OF FAD'S LIABILITY ESTIMATE IS PREMATURE………36


CONCLUSION………………………………………………………………………………….36

## PRELIMINARY STATEMENT

In this appeal, Navient Corporation ("Navient") asks the Secretary to reverse the hearing official's affirmance of a final audit determination ("FAD") and allow Navient to keep millions of taxpayer dollars to which it was not entitled.   As the hearing official's decision makes clear, Navient's argument is based on a misreading of five words in a Department guidance document and on a mischaracterization of the law and the facts.  Accordingly, Federal Student Aid ("FSA") asks the Secretary to uphold the hearing official's decision.

Navient Corporation bases its challenge to the March 7, 2019 affirmance ("Decision") of the FAD by the hearing official on an unsupportable reading of sub-regulatory guidance, a claim that Navient's conduct was covered by a binding settlement agreement, and a legally incorrect argument that FSA's restitution claim is barred by a statute of limitations.  As this brief will show, the hearing official correctly determined that the plain language of the Higher Education Act ("HEA") and the implementing regulations refutes Navient's assertions.

The hearing official correctly determined that Navient's  preferred reading of five words - "in whole or in part" - in a Dear Colleague letter ("DCL") is inconsistent with the rest of the letter and would be in direct conflict with the pertinent statutes and regulations, contrary to the legislative intent of the statute discussed in the letter, and lead to inequitable results.  Navient asserts that DCL 93-L-161 directed that all loans made "in whole or in part" from tax-exempt obligations be subject to the 9.5 special allowance payment ("SAP") - a Federal subsidy.  Navient claims that this required it to claim SAP at that rate on all loans purchased with the proceeds of any bonds that were part of the 1993 Trust indenture until the last of the 1993 bonds had been retired.  The hearing official correctly concluded that this reading would be "inconsistent with the governing statutes," and the "purpose for the legislation," and that the resultant interest rates received by Navient would be "far beyond equitable." ED-03, p.13.

The hearing official also correctly established that Education Credit Finance Corporation ("ECFC") did not meet the statutory requirements for a successor entity, as ECFC did not assume bond indebtedness on the 1993F bond. Finally, the hearing official correctly found that this action against Navient was not subject to any statute of limitations and that Navient was not unfairly singled out with respect to the 9.5 SAP billing practice at issue in this FAD.

In summary, the conclusions reached by the hearing official and by FSA in its FAD are solidly based in law and fact, and Navient fails to show, by the preponderance of the evidence, that its 9.5 SAP Federal subsidy billing complied with the applicable requirements. The March 7, 2019 Decision should, therefore, be upheld in its entirety.

## BACKGROUND

**The Federal Family Education Loan Program**

The Federal Family Education Loan Program ("FFELP") (formerly the Guaranteed Student Loan ("GSL") Program) established by Title IV, Part B of the Higher Education Act of 1965, as amended ("HEA") is one of several types of student loan programs administered by the U.S. Department of Education ("Education" or "Department"). (20 U.S.C. §§1071 *et. seq.*)) (Regulations at 34 C.F.R. Part 682). Under the FFELP, loans by banks or other lending institutions were guaranteed by State or non-profit guarantors and reinsured by Education. 20 U.S.C. §1078. Most FFELP loans were made by a limited number of large banks with nationwide lending programs[1]. A variety of financial institutions comprised a very active secondary market in FFELP

---

[1] The FFEL student loan program was discontinued effective July 1, 2010. No new FFEL student loans have been made since that date.

2

loans, including banks, State and non-profit student loan "Authorities," and the Federally-chartered

Student Loan Marketing Association ("Sallie Mae" or "SLMA"). [2]

Generally, banks and other for-profit institutions obtained funds to make new FFELP loans

or to purchase existing FFELP loans from customer deposits, from loans from other lenders

(including Sallie Mae), from sales of existing FFELP loans in a secondary market, and from notes,

bonds[3], and commercial paper sold to investors.  In addition, certain State agencies could issue

tax-exempt bonds to acquire funds, and Section 150(d) of the Internal Revenue Code also

authorized certain non-profit corporations (student loan "Authorities"), to issue tax-exempt bonds

("qualified scholarship funding bonds").   Tax-exempt bonds provided these particular lenders

with a cheaper source of funds to make and purchase student loans than those available to other

lenders, but at a loss in tax revenue to the federal government.  Thus, the cost of tax-exempt bonds

was of significant concern to Congress, which sought to reduce its use in the FFEL program.  H.R.

Rep. 98-324, 8 (1983).


**Special Allowance Payment History**

Special allowance payments ("SAP"), are Federal subsidies paid to holders of FFELP loans

in order to provide a return over and above interest paid by the borrower.  20 U.S.C. §1087-1.

SAP payments were designed to induce lenders, in a high interest rate environment, to make and

hold FFELP loans in times when the lenders could get greater returns on other consumer loans.[4]

Lenders that derived their funds from tax-exempt bonds enjoyed a much lower cost of funds than

other lenders.  In1980, Congress made the lenders' cost of capital the controlling factor in setting

---

[2] HEA §435(d) lists some eight different kinds of entities that may be an eligible FFELP lender. 20 U.S.C. §1085(d).
[3] A bond is a valid debt obligation of the issuer.
[4] In the high interest rate environment of 1980's average interest rates routinely exceeded  the maximum student loan interest rates which Congress has set at the time. 20 U.S.C. §1077a.  This ensured that lenders making student loans would incur a loss, unless a federal subsidy designed to compensate for the shortfall was put in place.

the Federal subsidy rate for loans. Pub. L. 96-374, §420, 90 Stat. 1425 (Oct. 3, 1980). By these changes, Congress cut in half the federal subsidy rate for Lenders who used tax-exempt bonds to finance their student loans, but kept the rate sufficient to assure a total return to the lender, including the interest paid by the borrower, of at least 9.5 percent - referred to as "half-sap" or "1/2 SAP." 34 C.F.R. §682.302(c)(2)(i)(1985). This rule is generally referred to as the "9.5 SAP Federal subsidy rule" in the record of this case.

It was in this restrictive environment that the Department first issued regulations implementing the 9.5 SAP Federal subsidy rule, as well as adding new Subpart H to the FFELP regulations in 34 C.F.R. Part 682 that required these lenders, in order to qualify for any SAP, to demonstrate to the Department that an unmet need in their region for student loan credit could be met only by tax-exempt funding. 34 C.F.R. §§682.800 *et seq.* (1985).[5] Subpart H defined the terms "Authority" and "Obligation'" as follows:

> *Authority* means any entity, public or private non-profit, which may issue tax-exempt obligations in order to obtain funds to be used for the making or purchasing of GSL or PLUS loans. The term "Authority" includes any agency, including a State postsecondary institution or any other instrumentality of a State or local governmental unit, regardless of the designation or primary purpose of that agency, which may issue tax-exempt obligations. The term also includes any party authorized to issue such obligations on behalf of a governmental agency, and any non-profit organization that issues qualified scholarship funding bonds under 26 U.S.C. 103(e).
>
> *Obligation* means any interest-bearing debt or original issue discount debt incurred by an Authority pursuant to its borrowing powers. As used in this subpart, this term means only an obligation issued to acquire funds for financing or refinancing the making or purchasing of student loans.

34 C.F.R. §682.801 (1985).

---

[5] Subpart H implemented amendments made in 1983, in which Congress also required these entities, known as Authorities, to submit a Plan for Doing Business. Pub. L. 98-79, §1, 97 Stat. 482 (August 15, 1983).

Thus, 34 C.F.R. §682.302(c)(2), also adopted in 1985, provided that the 9.5 SAP Federal subsidy would apply on loans purchased by the holder with funds obtained from issuance of a tax-exempt obligation and its proceeds:

> (c)(2)(i)…the percentage rate for the special allowance is one-half the rate determined under paragraph (c)(1) for a loan disbursed on or after October 1, 1980 and made or purchased with funds obtained by the holder from
>
> > (A) Issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code;
> > (B) Funds obtained from collections or payments by a guarantor on a loan described in paragraph (c)(2)(i); and
> > (C) Interest or special allowance payments on a loan described in paragraph (c)(2)(i).

34 C.F.R. §682.302(c)(2)(i)(1985).

The regulation also provided that such SAP would be payable to an Authority at *full* SAP rate

> . . . after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than a tax-exempt obligation *and*
> > (i)     The prior tax-exempt obligation is retired; or
> > (ii)    The prior tax-exempt obligation is defeased …

34 C.F.R. §682.302(e)(3)(1985)(*emphasis added*).   Thus, continuing to match the source of funds with the SAP payable on the loan purchased with such funds, the regulation provided for the termination of the 9.5 SAP Federal subsidy in the event a loan was refinanced with proceeds of a taxable obligation as soon as the original tax-exempt obligation was retired or defeased.[6]

On December 18, 1992 the Department published final regulations for the FFELP, amending the language of 34 C.F.R. §682.302(e) by adding subsection (e)(3)(ii).

> (e) *Special allowance payments for loans financed by proceeds of tax-exempt obligations.* (3)The Secretary pays a special allowance to an Authority at the rate described in paragraph (c)(1) of this section on a loan described in paragraph (c)(3)(i) of this section –

---

[6] Defeasance is the providing for future retirement of a bond from funds deposited in an escrow dedicated to repayment of the bond.

(i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in paragraph (c)(3)(i) of this section; **and**

**(ii) if the authority retains a legal or equitable interest in the loan –**
    (A) The prior tax-exempt obligation is retired;
    (B) The prior tax-exempt obligation is defeased.

34 C.F.R. §682.302(e)(1993)(*bold added*). This change merely restated the pre-existing HEA requirement that 9.5 SAP Federal subsidy be paid to an Authority.[7] The scope of the 9.5 SAP Federal subsidy was not impacted by this clarification.

On August 10, 1993 the Omnibus Budget Reconciliation Act (OBRA) of 1993, Pub.L. 103-66, amended Section 438(b), 20 U.S.C. §1087-1(b)(2), to change the Federal subsidy rate for tax-exempt lenders to the standard rate for loans acquired using funds from tax-exempt bonds "originally issued on or after October 1, 1993." Pub. L. 103–66, §4111 (August 10, 1993). Loans purchased with tax-exempt bonds "originally issued" on or after that date would not be entitled to the 9.5 SAP Federal subsidy.[8] In November 1993, Education issued DCL 93-L-161 to explain the change in law.

DCL 93-L-161 was designed "to provide the student loan community with information on the major program changes mandated by the new law."[9] It informed the industry that "[t]he minimum special allowance rate 'floor' on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed," and that "loans made or purchased with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, or with funds derived from default reimbursements, collections, interest… no

---

[7] In the words of the statute itself, "for holders of loans which were made or purchased with funds *obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under Title 26. . .*" 20 U.S.C. §1087-1(b)(2)(B)(i)(*emphasis added*).
[8] This change affected 9.5 SAP Federal subsidy payments only. The full SAP payments were not affected.
[9] The SAP provisions were included in a part of OBRA titled the "Student Loan Reform Act of 1993" which included major changes to the Federal student loan programs. DCL 93-L-161 discussed a number of the changes made by the Student Loan Reform Act including the changes made to the SAP rules.

longer qualify to receive the minimum special allowance." DCL 93-L-161, p.13.  It also clarified that "[r]efinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing. ..."  DCL 93-L-161, p.13.  In December of 1993 Education followed up on DCL 93-L-161 by issuing DCL 93-L-163, which provided instructions for reporting the changes required by the new legislation.

**Corporate Organizational Structure of Navient/Sallie Mae**

In 1972 Congress established the Student Loan Marketing Association ("SLMA") [EIN *271][10] as a government-sponsored enterprise ("GSE") to serve as a secondary market for student loans and provide financing for FFEL lenders to enable them to make FFELs.   20 U.S.C. §1087-2.   In 1997, The Omnibus Consolidated Appropriations Act (Pub. L. 104-208) provided for a creation of a for-profit "holding company," SLM Corporation [*874], of which SLMA, the GSE, would be a subsidiary. The purpose of this was a gradual wind-down and termination of the GSE SLMA as well as the complete separation of the funds, assets and activities of SLMA, the GSE, from the assets and operations of the Holding Company and its subsidiaries.  20 U.S.C. §1087-3(c).  Any liabilities of the GSE not satisfied in the wind-down "shall become liabilities of the Holding Company."  The wind-down in fact was completed by the end of 2004.

In 1999 SLMA [*271], the GSE, acquired Nellie Mae Corp. (NMC) [*783] (also referred to by Navient here as Nellie Mae Holding Corporation) and its subsidiary, Nellie Mae Education Loan Corp. (NMELC) [*352].  In June 2004, as part of the wind-down of SLMA, the GSE, the

---

[10] For purposes of clearly identifying each entity we will use the last three digits of the entity's EIN.

ownership of NMC and NMELC were transferred to ECFC [*392], where it remained at all the times relevant thereafter.

On April 10, 2014, SLM Corporation approved the strategic separation of its loan management, servicing, and assert recovery business from its consumer banking business. To that end, it launched a new company, called Navient Corporation, which took over the all the management and servicing of federal loans.

**1993 Bonds**

In a typical student loan tax-exempt bond financing, the Authority issues tax-exempt bonds that are purchased by investors. The Authority uses the proceeds of the bonds to make new student loans or to purchase existing student loans from banks and other institutions. The Authority then pledges the loans it acquired with the proceeds of a particular bond as collateral for that bond, and those loans are held in a bond "estate," separate from any loans acquired with funds from other bonds issued by that Authority. The Authority typically gives legal title to the student loans to a bank, which serves as a trustee, and the Authority retains beneficial ownership of the loans. The Authority may pay off (retire) an existing bond when that bond matures or may "defease" the bond by arranging for its payoff from a designated escrow fund upon the bond's maturity. To obtain funds to retire the bond, the Authority may issue a new bond (a refunding bond) or may use internal resources (accumulated reserve funds or other sources). If the Authority borrows to obtain these funds, the loans that had been pledged as collateral to the retired bond are then re-pledged as collateral to the new bond or financing arrangement. Alternatively, an Authority may refinance an existing bond by issuing a new bond and re-pledging to it loans previously pledged to the refinanced bond without paying off the original bond.

Prior to 2004 amendments to the HEA not relevant to the issues in this case, if an Authority used funds from a tax-exempt refunding bond to pay off (retire) an existing tax-exempt bond, the loans subject to the 9.5 SAP Federal subsidy associated with the refunded bond remained subject to that limit when the Authority repledged the loans to the refunding bond. If the Authority used funds from a source, which is not a tax-exempt obligation (e.g., a taxable source such as commercial paper, other bonds, internal reserves), to retire the tax-exempt bond, the eligibility status of the loans changed, and the 9.5 SAP Federal subsidy ceased on those loans. If, however, the Authority used funds from such a taxable source but did not retire or defease the tax-exempt bond, the 9.5 SAP Federal subsidy continued to apply to the loans – now pledged as collateral to the "other" source –for as long as the original tax-exempt bond remained outstanding.

The bonds in question in this appeal were issued by NEELMC [*323] under a 1993 Trust Agreement, dated March 1, 1993, between NEELMC [*323] and the First National Bank of Boston.[11] The bonds were refunding bonds and were general unsecured obligations of NEELMC. If NEELMC defaulted on the bonds, the Agreement authorized the bank to use any funds on hand to pay investors, but otherwise left the bank to sue NEELMC to recover for investors. R-07, p.21. NEELMC issued the bonds in eight series[12] (1993A through 1993H), of which four series (1993C, D, E & F) were issued together and comprised a single issue, while the other four series (1993A, B, G & H) were issued separately.[13] There were 13 separate bonds; some series contained several bonds with different maturity dates. If a series had several maturity dates, NEELMC issued one bond for each maturity date, regardless of the amount owed on that bond. *See, e.g.,* R-08.

---

[11] A typical bond agreement creates a trustee estate administered by the trustee for the benefit of the bondholders to ensure repayment of the bonds. Loans made or purchased with the bond proceeds and their associated payments and income are pledged by the issuer to the trustee estate to ensure repayment of the bonds. Either a single bond or multiple bonds can be issued under a single agreement.

[12] The issuing documents refer to 1993A, B, C, D, E, F, G & H as separate series. R-08.

[13] "Issue" is defined as two or more bonds sold at substantially the same time pursuant to the same plan of financing and payable from the same source of funds. 26 C.F.R. §1.150-1(c).

9

The chart below lists the bonds, their issue dates, and their maturity dates:

| Series | Issue date per IRS Form 8038 (*) or trust agreement(†) | Maturity date | Interest Rate |
|--------|--------|--------|--------|
| 1993A | March 18, 1993* | July 1, 2005 – $103,300,000 | 5.7% |
| 1993B | June 9, 1993* | June 1, 1998 – $5,800,000 | 5% |
| | | June 1, 2000 – $32,405,000 | 5.4% |
| | | June 1, 2002 – $10,700,000 | 5.6% |
| 1993C | July 1, 1993† | July 1, 1998 – $26,100,000 | 4.75% |
| 1993D | July 1, 1993† | July 1, 1998 – $10,160,000 | 4.75% |
| 1993E | July 1, 1993† | July 1, 1999 – $58,340,000 | 5% |
| 1993F | July 1, 1993† | July 1, 2004 – $32,500,000 | 5.625% |
| 1993G | August 24, 1993* | Aug. 1, 1998 – $31,500,000 | 4.7% |
| | | Aug. 1, 2000 – $28,100,000 | 5% |
| | | Aug. 1, 2002 – $47,400,000 | 5.2% |
| 1993H | November 15, 1993† | Dec. 1, 1999 – $57,420,000 | 4.75% |
| | | Dec. 1, 2002 – $14,370,000 | 5.05% |
| Total | | $458,095,000 | |

As the various bonds matured, NEELMC and later Nellie Mae retired them at their respective maturity dates, using funds derived from internal resources, rather than from tax-exempt borrowings. As they retired the bonds, NEELMC and later Nellie Mae retained ownership of the student loans originally financed with those tax-exempt bonds, but now "refinanced" with the

10

funds from taxable sources. Repayments of these loans by the borrowers were mixed with repayments on loans still financed with tax-exempt bonds, and the mixture of funds – part tax-exempt, part taxable – was used to acquire even more student loans. The OIG audit, and this FAD, deals with the SAP Federal subsidy claimed and paid on these refinanced loans and the loans acquired using the funds paid on these loans.

**OIG Audit Finding, Sallie Mae Response, and Final Audit Determination**

The Department's Office of Inspector General ("OIG") conducted an audit of special allowance payments to Navient's subsidiary, NLMA, in 2008. The purpose of the audit was to determine if "NLMA, (1) billed loans under the 9.5 percent floor in compliance with the TTPA and HERA, and (2) billed loans under the 9.5 percent floor, after the eligible tax-exempt bonds from which the loans derived their eligibility, had matured or been retired." [14] ED-01, p.7. The audit covered the period of October 1, 2003, through September 30, 2006. The audit found no violations of TTPA. However, it found that the holder(s) of loans had claimed and been paid 9.5 SAP Federal subsidy on loans that were no longer subject to that rate because the tax-exempt bond from which the loans derived their eligibility has been retired or defeased. It also found that 9.5 SAP Federal subsidy was paid to ECFC, a Navient affiliate that had no right to receive 9.5 SAP.

On September 25, 2013, after the review of Navient's responses to the OIG audit, FSA issued its FAD. It found that Navient had improperly billed and received 9.5 SAP Federal subsidy on loans purchased with bonds that were part of the 1993 Trust indenture after the respective bonds

---

[14] The Taxpayer-Teacher Protection Act of 2004 ("TTPA"), Pub. L. 108-409(2004), revised Section 438(b)(2)(B) of the HEA to make loans financed by a tax-exempt obligation that, after September 30, 2004, had matured or been retired or defeased, loans refinanced after September 30, 2004 with a funding source other than the proceeds of an eligible tax-exempt obligation, or loans sold or transferred to any other holder after September 30, 2004, ineligible for 9.5 SAP Federal subsidy.

Higher Education Reconciliation Act of 2005 ("HERA"), Pub. L. 109-171(2006), revised Section 438(b)(2)(B) of the HEA, ending the practice of "recycling" loans by ensuring that no additional loans would become eligible for 9.5 SAP Federal subsidy.

11

were retired or defeased.   It also found that Navient improperly billed and received 9.5 SAP

Federal subsidy on loans purchased with the proceeds of the 1993F series bond, which was also

part of the 1993 Trust, after that bond was retired and loans were sold to ECFC.  ED-02.

Navient requested a review of the FAD on July 27, 2016. On March 7, 2019, after briefing,

oral argument, and supplemental briefing, the hearing official issued a decision affirming the FAD.

ED-03, p.19.   The hearing official  determined that Navient was liable for the overpayments

described in the FAD on the grounds that (*i*) the DCL's "in whole or in part" language on which

Navient relies is inconsistent with the governing statutes, (*ii*) ECFC was not a qualifying transferee

corporation, and (*iii*) Navient has not shown other similarly-situated industry participants who

received different treatment.  ED-03, p.13-16.  On April 8, 2019 Navient filed an appeal from the

hearing official's determination.

## STANDARD OF REVIEW

Pursuant to 34 C.F.R. §668.116(d), the party requesting review of a final audit determination

issued by FSA has to prove, by preponderance of the evidence, that the party complied with the

program requirements.

## ARGUMENT

**I.      THE HEARING OFFICIAL CORRECTLY DETERMINED THAT THE HEA AND REGULATIONS REQUIRED NAVIENT TO STOP BILLING LOANS AT 9.5 SAP AFTER THE TAX-EXEMPT BOND THAT FINANCED THE LOANS WAS RETIRED.**

**A.      TO THE EXTENT THAT DCL 93-L-161 IS IN DIRECT CONFLICT WITH STATUTORY AUTHORITY, THE STATUTES AND REGULATIONS PREVAIL.**

Navient argues that the law required it to claim subsidy at the 9.5% Federal subsidy rate.

The hearing official found that Navient's claim rests solely on three words in DCL 93-L-161: the

Federal subsidy applied to loans made "in whole *or in part*," with funds from tax-exempt

obligations.  DCL 93-L-161 (emphasis added).  As the hearing official aptly noted, "Navient has not cited any statutes, regulations, other DCLs or case decisions as legal authority to justify its receipt of the 9.5 percent 1/2 SAP rate." ED-03, p. 12.  Neither the statute nor the regulations address the subsidy rate for loans made "in part" from tax-exempt funds.  The conspicuous absence of the "in whole or in part" language on which Navient relies from the applicable statutes and regulations is clear and unambiguous. The statutes and regulations are in direct conflict with the "in whole or in part" language of DCL 93-L-161.  As the hearing official correctly concluded, in instances such as this the express and clear language of the statutes and regulations must prevail.

Furthermore, the conspicuous absence of the "in whole or in part" language on which Navient relies from the statutory and regulatory provisions governing the payment of 9.5 SAP Federal subsidy reflects Congressional intent that is completely incompatible with Navient's interpretation of the  language of the DCL 93-L-161.  The intent of the statutory provisions providing for 9.5 SAP Federal subsidy payments was to ensure an equitable return to the holders of FFEL loans.  20 U.S.C. §1087-1(a).  Ensuring an equitable return was inextricably intertwined with the lenders' cost of capital.  Time and time again, the HEA and the Department's regulations tied the rate of special allowance paid on FFEL loans to the cost of the capital used to make or purchase those loans.  Thus, 34 C.F.R. §682.302(c)(2), adopted in 1985, provided that the 9.5 SAP Federal subsidy would apply to loans purchased by the holder with funds obtained from issuance of tax-exempt obligations and their proceeds.  34 C.F.R. §682.302(c)(2)(i)(1985).  Conversely, the regulation also provided that an Authority would be paid at the *full* SAP rate

> . . . after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than a tax-exempt obligation *and*
> (iii)    The prior tax-exempt obligation is retired; or
> (iv)    The prior tax-exempt obligation is defeased …

13

34 C.F.R. §682.302(e)(3)(1985)(*emphasis added*).   Thus, continuing to match the source of funds with the SAP Federal subsidy payable on the loan purchased with such funds, the regulation provided for the termination of the 9.5 SAP Federal subsidy in the event a loan was refinanced with proceeds of a taxable obligation as soon as the original tax-exempt obligation was retired or defeased. Other statutes and regulations did the same, as described above.

This legislative intent of providing an equitable return to the loan holder would be completely subverted if the words "in whole or in part" contained in DCL 93-L-161 were given the meaning urged by Navient.  Navient's reading of the five words in the DCL,  "in whole or in part," would mean that even a single dollar of a tax-exempt obligation would require a loan holder to bill the loans at the 9.5 SAP Federal subsidy rate, and that the cost of capital would play no part in determining the rate of SAP paid on the loans purchased with such capital.  This, in turn, would defeat the legislative intent of ensuring an equitable return to the holders of the loans, as required by 20 U.S.C. §1087-1(a), and lead to unjust results, allowing holders of such loans to receive a windfall.  As the hearing official correctly noted, in such case "the purpose of the 1/2 SAP payments is turned upside down." ED-03, p.13.

"If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n. 9 (1984); *see also St. Louis Univ. v Duncan*, 97 F. Supp. 3d. 1106, 1119-20 (E.D. Mo. 2015).  Likewise, 34 C.F.R. § 668.117(d) states that, "[t]he hearing official may not [w]aive applicable statutes and regulations; or [r]ule them invalid."

Navient's skewed interpretation of DCL 93-L-161 cannot stand because it ignores the express language and clear and unequivocal intent to apply the 9.5 SAP Federal subsidy of 20

14

U.S.C. §1087-1(a) to ensure an equitable return to the holders of the loans based on the cost of funds to the lender. The hearing official, who properly gave effect to both the express language and the intention of the law, correctly rejected this interpretation.

Furthermore, contrary to Navient's claim, the hearing official never "acknowledged that under the terms of the DCL guidance, Navient was entitled to the money it received." Appellant's Brief, p. 15. In fact, the hearing official repeatedly focused on the inequity and patent absurdity of Navient's proposed reading of the DCL, noting that "[i]n the case of Navient, whose 93A Indenture involved $458 million in tax-exempt bonds, if one single dollar of the tax-exempt funds remains, then the 1/2 SAP rate of 9.5 percent is payable for all $458 million." ED-03, p. 13. The hearing official correctly noted that "[s]uch a windfall through five words in a letter negates the entire statute, and allows for a 99.999 percent taxable bond fund to receive interest rates that are **far beyond equitable**, and that are in direct contradiction to the limits imposed for 1/2 SAP payment rates." ED-03, p.13 (emphasis added).

Thus, the hearing official's determination clearly established that Navient's proposed reading of DCL 93-L-161 is in direct conflict with the existent statutes and regulations, not supported by legislative history, and leads to absurd and inequitable results. The hearing official's conclusion, which is based on a thorough analysis of the statutory language, legislative history, and the weighing of equities, should be affirmed.

B.   DCL 93-L-161, PROPERLY READ, CONFORMS TO THE STATUTE AND THE CONGRESSIONAL INTENT.

As the hearing official correctly stated, "[i]n reconciling the statute and the Dear Colleague Letter, the letter's term 'in whole or in part' cannot be applied in this appeal in a way that violates the statute's language." ED-03, p. 13-14. In fact, the words "in whole or in part" can and should be read to be consistent with the statutory language.

DCL 93-L-161 stated that its purpose was "to provide the student loan community with information on the major program mandated by the new law" – not to summarize existing law. Congress amended the statute in 1993 to change the Federal subsidy for loans financed by new tax-exempt bonds.  20 U.S.C. §1087-1(b)(2).  Those statutory changes expressly focused on the subsidy rate for loans acquired with tax-exempt bonds "originally issued" on or after Oct. 1, 1993. That term - "originally issued" - was not explained in the statute or commonly used.  The DCL explained that bonds "originally issued" were those issued to obtain funds to acquire loans.  In contrast, lenders frequently issued new bonds merely to refund ("refinance") existing bonds. The DCL explained that the subsidy rate for loans associated with such newly-issued refunding ("refinancing") bonds remained the same:

> Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance.

ED-03, p.13. [15]

DCL 93-L-161 introduced the distinction between "new money" bonds - those "originally issued" on or after Oct. 1, 1993, and "refinancing bonds," those issued after that date simply to refund existing bonds. The use of the phrase "loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations" should be read to describe the loans associated with these transactions, not to the treatment of loans acquired from the proceeds of a Trust.  As later explained in DCL 96-L-186, a holder of a loan acquired with tax-exempt funds which is then refinanced with taxable funding sources has only one funding source if the original tax-exempt bond was retired:  the taxable financing.  If, however, the holder uses taxable funds to refinance

---

[15] As noted, a more detailed explanation of the refinancing issue was provided three years later, in DCL 96-L-186 (March 1, 1996), which explained the effect of the 1992 change to 34 C.F.R. §682.302(e).

the loan but does not retire the original tax-exempt bond, the holder has two funding sources, and two costs of funds: the original, outstanding tax-exempt bond, with a low cost of funds, and the new taxable obligation, with a higher cost of funds. Such a loan was then considered to be funded "in part" with tax-exempt funds, and thus the 9.5 SAP Federal subsidy still applied. *Id*. In this case, Navient retired the original tax-exempt bond, so the in-part language is inapplicable to its situation.

Unlike Navient's proposed interpretation of "in whole or in part" language, which sought to apply the 9.5 SAP Federal subsidy even where the actual tax-exempt bonds have been substantially - if not entirely  - paid off, this interpretation is consistent with the existing statutes and regulations, as it does not effectively negate the requirement that loans billed at 9.5 SAP be funded with tax-exempt bonds. Nor does it lead to inequitable result, where "if one single dollar of the tax-exempt funds remains, then the 1/2 SAP rate of 9.5 percent is payable for all $458 million." ED-03, p.13.

C.     EVEN NAVIENT'S PROPOSED READING OF "IN WHOLE OR IN PART" DOES NOT SUPPORT NAVIENT'S BILLING PRACTICES.

Even under Navient's own reading of the phrase "in whole or in part," the FAD determination must still be upheld, because only an individual bond can be considered the "prior tax-exempt obligation" that controls the rate of SAP of the loans allocated to it.

The issue presented in this audit determination, and in this appeal, concerns the question of whether and when loans that are entitled to 9.5 SAP Federal subsidy lose that subsidy. Even if Navient's reading of the words "in whole or in part" was supported by the record, those words do not resolve the question at issue: when did that subsidy expire for those loans. It is beyond dispute that the 9.5 SAP Federal subsidy ceases when a loan entitled to the 9.5 SAP Federal subsidy is "pledged or transferred" to a different, taxable bond or source and the prior "tax exempt obligation"

17

is retired.  Navient states that it pooled funds derived from the 13 bonds to make or acquire loans. In fact, each of these bonds was issued on a separate date, and the proceeds of each of the bonds was used promptly to acquire particular loans. Even if, as Navient contends, DCL 93-L-161 was issued to provide guidance to Navient's predecessor on this group of bonds, it does not explain which of the 13 individual bonds is considered the "prior tax-exempt obligation" for any particular loans.  Navient grouped the bonds, and the loans purportedly financed by those bonds, into two "pools," but provided no evidence tying any loan considered in the audit period to any particular 1993 bond.   In this situation, for any particular loan, the "prior tax-exempt obligation" can only be one of  three possibilities: the Master Trust Agreement, which Navient argues was an "obligation" for every loan derived from every 1993 bond; the last bond to mature in the particular "sub-pool" to which the loan was subsequently assigned, which Navient appears implicitly to propose as an alternative, or the bond to which Navient could reasonably have allocated that loan in the course of administering these tax-exempt bonds.   The Master Trust Agreement cannot be a "prior tax-exempt obligation" because the Agreement is not an "obligation" at all.  The second alternative – that the last bond to mature in a sub-pool of several bonds constitutes the "prior tax-exempt obligation" – assumes a regulatory requirement that is contrary to express Congressional intent and could not have been supported if the Department had ever adopted such a view.   The third alternative – that a specific bond to which Navient could or did allocate the loan constitutes the "prior tax-exempt obligation" for that loan – provides the only reasonable application of the statute to these facts.

### 1.   Master Trust Is Not An "Obligation."

Navient argues that "the 1993 Trust was a single 'obligation' for the purpose of special allowance billing, which required Nellie Mae to claim special allowance at the 1/2 SAP Rate until all of the 1993 Bonds had matured." Appellant's Brief, p. 16. This view disregards the plain language

of the bonds themselves, as well as FFELP regulations, relevant provisions of the statute, and common usage. The bonds in question here were issued in eight series. Official Statements were issued separately for each of the bond series.  Each Statement provided that bonds (plural) in the series "are issuable as fully registered bonds. ..." R-08, p.1.  Nothing in the Official Statements suggests that either the bonds within an individual series or within bond series A through H were supposed to be combined and treated as a single obligation.

Furthermore, as explained above, the term "obligation" was initially defined in 34 C.F.R. §682.801(1985), as part of 34 C.F.R. Part 682, Subpart H, the sole purpose of which was to implement the special allowance program and the limitations on issuance of tax-exempt bonds inherent therein. The terms defined in Subpart H were honed precisely to achieve the legislative purpose: to match the cost of funds used to acquire loans with the SAP to be paid on those loans. Thus, Section H is instructive not only for the terms it contains, but also for the ones it does not. Notably, 34 C.F.R.  Part 682, Subpart H does not define the term "bond issue," "bond series," or any plural form of "debt" or "obligation."

As adopted in 1985, 34 C.F.R. §682.801 defined "obligation" as "any interest-bearing debt... issued to acquire funds for … making or purchasing of student loans." This definition clearly refers to the smallest possible unit of debt that can be used for the designated purpose.  Such smallest unit is a single bond – a stand-alone debt obligation that can be issued together with or separately from any other obligation.  If Education had intended to create definitions of both "bond" and "bond issue," it would have done so, as did the IRS. 26 C.F.R. §1.150-1(b) & (c).  It did not.  Instead, Education chose to define only the term "obligation," which was fully consistent with the Congressional intent to tie SAP Federal subsidy rates payable on loans to the cost of funds used to acquire those loans in the most precise way possible.  Given

the Congressional intent to "police the amounts of capital raised through tax-exempt offerings to insure that excessive amounts beyond the reasonable needs of student credit are not being sold," Cong. Rec. H6121 (August 1, 1983), any other definition was unnecessary and, in fact, counterproductive because it would not allow for the primary purpose – tracking of the cost of funds – to be effectuated.

Subsequent sub-regulatory guidance issued by Education invariably referred to debt obligations in the singular, such as "a bond," "a tax-exempt bond," "an instrument to borrow funds," etc. *See* DCL FP-07-01. Dear Colleague Letter FP-07-01 further emphasized this point by stating that "[t]he HEA identifies the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for SAP at the 9.5 percent minimum return rate. 20 U.S.C. §1087-1(b)(2)(B)(i)(2006)." Navient is unable to point to any term in the HEA or the regulations used to signify that multiple units of debt issued as part of a single package were an "obligation."

Navient also claims that it is legally significant that the multiple units of debt had the same terms.  However, Navient does not cite to any precedent concluding that the fact that the individual debt units use similar terminology, such as payment on default, requirements to amend the right or obligation of bond holders, or decisions to sue, makes the 1993 Trust Agreement a single "obligation."  Such a conclusion would be inconsistent with the Congressional intention that the Authority not issue "obligations for amounts in excess of the reasonable needs for student loan credit within the area served by the Authority, after taking into account existing sources of student loan credit in that area." Pub.L. 98–79, §7, 97 Stat. 476 (Aug. 15, 1983).  Furthermore, none of the so-called "unifying" characteristics listed by Navient are contained in the definition of "obligation" in 34 C.F.R. §682.801 and thus would not be determinative, or even at all relevant,

to the determination of SAP Federal subsidy payments.  On the other hand, the maturity date is a characteristic that is most relevant to the definition of an "obligation" because it defines its very term of existence.

Navient also points to the fact that the 1993 Trust bonds were issued on an unsecured basis, i.e. loans purchased with proceeds of a single bond or series of bonds were not pledged as collateral in support of repayment of that bond or series, to support its position that 1993 Trust "constituted a single financing."  Appellant's Brief, p.26.  This argument is inapposite, as securitization status, joint or separate, is not an element of the definition of an "obligation" as set forth in 34 C.F.R. §682.801 (1985).  Furthermore, Navient states expressly that Nellie Mae was able to issue bonds "secured by its general corporate rating."  Appellant's Brief, p.9.  It is this very favorable corporate rating, rather than the loans, that provided bond buyers with the assurance that the bonds would be repaid.  This corporate rating applied equally to each individual bond, making Navient's argument about "a single financing" irrelevant.

Rather, as Navient's brief makes clear, the rationale behind issuing the bonds on an unsecured basis was convenience. As Navient clearly indicated in its own brief, "Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool" that was "much less administratively burdensome."  Appellant's Brief, p.25, n.61.  The fact that it was a "desirable financing tool" does not make the 1993 Trust a single "obligation" under 34 C.F.R. §682.301 for special allowance purposes.

> 2.  *The Last Bond to Mature In a Pool of Multiple Bonds Cannot Control the 9.5 SAP Status Of All the Loans Associated with Bonds in That Pool.*

Alternatively, Navient argues that the last 1993 bond to mature in either sub-pool is the "prior tax-exempt obligation" under 34 C.F.R. §682.302(e) for all loans in both sub-pools.  There

21

is no factual basis for this claim.   Navient appears to then assert that the last bond to mature in sub-pool 2 - the 1993F bond – was the "prior tax-exempt obligation" under 34 C.F.R. §682.302(e) for the loans in question in the FAD, and that Nellie Mae was required by law to claim 9.5 SAP Federal subsidy on all those loans at least until the 1993F bond matured and was retired in June 2004.  The 1993F bond was for only $32.5 million – about nine percent of the total amount ($355.7 million) of the value of the 1993 bonds (1993B through 1993H) associated with sub-pool 2.   By December 2002, every 1993 Bond associated with sub-pool 2 had been retired except this last bond, 1993F.   Nevertheless, Navient considers every loan in sub-pool 2 to remain entitled to the 9.5 SAP Federal subsidy solely because that last bond – 1993F - remained outstanding until July 2004.  Appellant's' Brief, p. 9-10. Navient bases this claim on its practice of combining in sub-pool 2 recoveries on all loans derived from the 1993B through H bonds, and using a "pro-rata" portion of those funds in the sub-pool to acquire new loans, so that each loan would be derived from a "pro-rata" share of funds from each of Bonds 1993B through H.  Navient then suggests that each loan in sub-pool 2 was derived from or corresponding to a "pro-rata" share from the last bond to mature, the 1993F bond.   As shown, that "pro-rata" share would have been about nine percent of the funds used to buy the loan.  This percentage would be far too small to justify application of the 9.5 SAP Federal subsidy.  Mandating the use of 9.5 SAP Federal subsidy in such circumstances would flaunt Congressional intent to tie the SAP rate to the cost of funds and would amount to a punitive measure not intended by Congress. For the reasons we explain here, Navient's claim rests on an unsupportable interpretation of controlling regulations that would be an unreasonable and would blatantly disregard the legislative intent.  Such a rule, if Education had adopted it, would have been arbitrary and capricious.  Education adopted no such rule.

As the Department stated in first adopting regulations in 1985 to implement the 9.5 percent SAP Federal subsidy law, the "regulations ... tie the rate of special allowance to the source of funds used to acquire or maintain the Authority's interest in a loan, and more particularly, to the financing costs incurred in securing these funds" and "provide that any sanctions or limitations imposed . . . on loans financed by those tax-exempt obligations apply only so long as the loans remain financed by tax-exempt obligations." 50 FR 5512 (Feb. 8, 1985). Yet the interpretation of DCL 93-L-161 proposed by Navient would apply the rate of 9.5 SAP Federal subsidy to loans acquired with funds of which as little as nine percent were derived from tax-exempt funds. Had the Department in fact adopted such a regulation, or interpreted an existing regulation to produce that result, such a position would be untenable. Such an interpretation would produce an arbitrary and unreasonable result, contrary to the congressional intent demonstrated in the language of the statute and the pertinent history and would have been "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *CBS Corp. v. F.C.C.*, 535 F.3d 167, 188 (3d Cir. 2008), *as amended* (Aug. 6, 2008), *cert. granted, judgment vacated*, 556 U.S. 1218 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Navient's proposed interpretation, and its resultant conclusion that all loans in sub-pool 2 were properly billed at 9.5 SAP Federal subsidy rate until bond 1993F was retired in June of 2004 must consequently be rejected.

> ### 3. An Individual Bond Is the "Prior Tax-Exempt Obligation" That Determined When 9.5 SAP Federal Subsidy No Longer Applied To Loans Reasonably Allocated To It.

While Navient insists that the type of securitization and other characteristics made the 1993 Trust a single "obligation," it does not assert, nor could it, that the structure of the 1993 Trust made tracing of the source of funds impossible. In fact, not only was tracing or allocating particular

loans to specific bonds possible, but doing so is the only logical way to identify the "prior tax-exempt obligation" for any loans.

The 1993 Trust consisted of multiple bond series – 1993A, B, C, D, E, F, G & H. Some of these series, such as 1993A, were comprised of a single bond, while others, such as 1993B, consisted of several separate bonds with different maturity dates. The bonds within those series were clearly labelled as separate in their Prospectus, as well as their Certificate and Agreement as to Tax Matters, which clearly provides that "the Corporation's $48,905,000 Student Loan Refunding Bonds, 1993 Series B (the 'Bonds'), issued pursuant to a Trust Agreement dated as of March 1, 1993"… "bear interest and mature in the principal amounts and on the dates described below" followed by a list of three separate bonds maturing on June 1, 1998, June 1, 2000, and June 1, 2002. The Certificate, dated June 9, 1993 and signed by John Remondi, Navient's President and Chief Operating Officer, clearly stated that it expected all proceeds from these three bonds to be invested in student loans by June 30, 1993 – i.e. within three weeks of the date of the Certificate. Other bonds in the series had similar provisions. In fact, Navient confirms that the proceeds of issuances of bond series 1993B through 1993F "were deposited in Sub-pool 2." Appellant's Brief, p. 10. Thereafter, "[e]ach moth loans were acquired with … cash available in … Sub-pool 2." Appellant's Brief, p. 10. In fact, Navient expressly concedes that proceeds of 1993A bond series, which matured on July 1, 2005, were segregated from proceeds of the other bonds, the latest maturity date of which was 2004, and kept in a separate sub-pool within the 1993 Trust throughout. Navient's decision to keep proceeds of 1993A separate, and the successful segregation of proceeds of the loans purchased with the 1993A bond series, clearly showed that the nature of the 1993 Trust allowed loans to be traced to particular bond, and that Navient was perfectly capable of doing so.

24

As Navient clearly indicated in its brief, "Nellie Mae's ability to issue bonds backed by its general corporate rating was an extremely desirable and effective financing tool." Appellant's Brief, p.25, n.61. Thus, Navient's decision not to associate student loans with any particular bond from the 1993 Trust for SAP Federal subsidy purposes was a business decision that benefited Navient financially at the time. It does not, however, constitute a legal basis for considering those loans subject to 9.5 SAP Federal subsidy. Only individual bonds within the 1993 Trust could be the "prior tax-exempt obligation" that determined the rate of SAP Federal subsidy. Thus, FSA correctly determined that Navient improperly billed and received 9.5 SAP Federal subsidy on loans purchased with funds that were part of the 1993 Trust indenture after the respective bonds were retired or defeased. Therefore, the Secretary must affirm the conclusion reached in FAD.

## II.    THE HEARING OFFICIAL CORRECTLY DETERMINED THAT THE TRANSFER OF LOANS TO ECFC MADE THOSE LOANS INELIGIBLE FOR 9.5 SAP.

The hearing official correctly determined that Navient could not seek 9.5 SAP Federal subsidy for loans transferred from NMELC to ECFC in 2004. This determination was correct for two reasons. First, it was correct because ECFC was not a "successor" entity under 26 U.S.C. §150(d) with respect to the loans transferred to it from NMELC. Second, it was correct because, as the hearing official pointed out, "ECFC did not assume bond indebtedness on the 1993F bond. In fact, the 1993F bond was retired when the loans were transferred to ECFC." ED-03, p. 15.

Navient argues that ECFC properly billed loans associated with the 1993F bond series at the 9.5 SAP Federal subsidy rate because ECFC qualifies as a "successor" entity pursuant to the requirements of Section §150(d)(3)(B) (i) & (ii) of the Internal Revenue Code. In fact, ECFC does not qualify. Section §150(d) allows a non-profit entity that has issued tax-exempt student loan bonds to transfer its student loan holdings and obligations to a for-profit subsidiary without

jeopardizing the tax-exempt status of those bonds the entity had already issued.  It states, in relevant part:

> (A)  In general
>
> Any qualified scholarship funding bond, and qualified student loan bond, outstanding on the date of the issuer's election under this paragraph (and any bond (or series of bonds) issued to refund such a bond) shall not fail to be a tax-exempt bond solely because the issuer ceases to be described in subparagraphs (A) and (B) of paragraph (2) if the issuer meets the requirements of subparagraphs (B) and (C) of this paragraph.
>
> (B)  Assets and liabilities of issuer transferred to taxable subsidiary
> The requirements of this subparagraph are met by an issuer if—
>> (i)   all of the student loan notes of the issuer and other assets pledged to secure the repayment of qualified scholarship funding bond indebtedness of the issuer are transferred to another corporation within a reasonable period after the election is made under this paragraph;
>> (ii)   such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer within a reasonable period after the election is made under this paragraph;
>> (iii)  to the extent permitted by law, such transferee corporation assumes all of the responsibilities, and succeeds to all of the rights, of the issuer under the issuer's agreements with the Secretary of Education in respect of student loans;

26 U.S.C. §150(d)(3)(B) (i) & (ii).  ECFC met none of these requirements and cannot qualify as a "successor."

The facts are clear: the original issuer of the tax-exempt bonds, NEELMC [*323], made the election under 26 U.S.C. §150(d) to transfer its student loan portfolio and obligations effective June 30, 1998. ED-13, p.1.  On that date, NEELMC [*323] transferred its student loans and its liabilities on the 1993 bonds to a new, for-profit subsidiary, NMC [*783].  ED-13, p.2.  On that same day, NMC [*783] in turn transferred beneficial ownership of the student loans and its obligation on the 1993F bond to its new subsidiary, NMELC [*352].  Thereafter, only NMELC [*352] was liable to bondholders on the 1993F bond. ED-13, p. 4.

26

Navient does not claim that, as part of the transfer of loans to ECFC [*392], ECFC assumed any obligation on the 1993F bond itself.  Nor could it – the 1993F bond series that was the source of funds of the loans transferred to ECFC [*392] was retired on July 1, 2004 – at the same time the transfer of the loans to ECFC [*392] took place.  In fact, even if the 1993F bond series was not retired on July 1, 2004, ECFC would still not have been obligated on the 1993F bond, since, as Navient concedes, NMC and NMELC were "converted into limited liability companies" in 2001 and 2002, (Navient's Request for Review, p.42), and thus under Delaware law their legal obligations were not liabilities of their member, ECFC [*392]. [16]

As the express language of 26 U.S.C. §150(d) makes clear, ownership of loans alone does not qualify ECFC [*392] as the "successor."  Only if "such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer *within a reasonable period after the election is made*" and "assumes all of the responsibilities, and succeeds to all of the rights, of the issuer" would an entity qualify as a "successor." 26 U.S.C. §150(d)(3)(B)(ii) (*emphasis added*).  Thus, consistent with Education's imperative of matching the special allowance rate loans to the cost of funds used to acquire them, the Internal Revenue  Code identifies as the successor that corporate entity to which the funding corporation has transferred, within a reasonable time after making its election, both the loan held by the funding corporation, and the liability on, or the duty to provide for payment of, the underlying bond that the funding corporation had issued.  Until July of 2004, ECFC [*392] did not hold these loans, and never had any legal responsibility for the 1993F bond.  Instead, these payments were made by NMELC [*352].  After July of 2004, ECFC [*392] could not have any

---

[16] "[O]bligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company." Del. Code Ann. tit. 6, § 18-303 (West).

legal responsibility for the 1993F bond because it was retired on July 1, 2004 – at the same time the transfer of the loans to ECFC [*392] took place.

Furthermore, Navient's attempt to limit the scope of 26 U.S.C § 150(d)(3) to the "initial transfer of assets and liabilities from the nonprofit qualified scholarship funding organization to a newly created first-level for-profit subsidiary," Appellant's Brief, p. 33, is unavailing.  The plain language of 26 U.S.C § 150(d)(3) does not distinguish between the types or timing of transfers.  It makes no mention of "initial" transfers or "newly created first-level for-profit subsidiary."  In fact, the plain language of the statute does not qualify the transferee corporation or the transfer itself in any way.  "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *U. S. v. Am. Trucking Assns., Inc.*, 310 U.S. 534, 543 (1940).  "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *U. S. v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 242, (1989) (citing *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571 (1982)).  Navient made no showing that the result here would be demonstrably at odds with the intention of its drafters.  Nor could it, as the intent was clearly to match the ownership of the loans to the "responsibilities, and rights… of the issuer" on the underlying bond. 26 U.S.C. §150(d)(3)(B)(ii).  Such an intent would never depend on whether the subsidiary is "newly created" or "first-level."  The absence of the qualifying language proposed by Navient is thus not an omission, but the intent.  Thus, the hearing official correctly rejected Navient's strained and artificial reading of the statute.

The second reason the hearing official's determination was correct is that the 1993F bond that was the source of funds for the loans in question was retired at the time the loan transfer to ECFC took place.  ECFC thus could not have, and did not in fact, assume, as required by 26 U.S.C.

28

§150(d), any liability for repayment of that 1993F bond.  Therefore, it could have never been a "successor" under 26 U.S.C. §150(d), and was therefore not required or entitled to bill for loans purchased with the proceeds of 1993F bond series at the 9.5 SAP Federal subsidy rate.

To the extent that Navient may be relying on the 1993A bond series, which remained outstanding until July of 2005, to claim that ECFC [*392], between July of 2004 and July of 2005, both held the loans associated with 1993F bond series and was responsible for making payments on the underlying 1993A bond series, its argument still fails. By its own admission, as discussed below, the proceeds, receipts, and any interest on the 1993A bond series were completely segregated from the proceeds, receipts, and interest on the 1993F bond series.

Thus, the hearing official's determination that the transfer to ECFC made the loans ineligible for 9.5 SAP Federal subsidy was correct and should be upheld in its entirety.

### III.    THE HEARING OFFICIAL CORRECTLY DETERMINED THAT NAVIENT'S CONDUCT WAS NOT COVERED BY 2007 SETTLEMENT AND THAT NAVIENT WAS NOT TREATED DIFFERENTLY FROM OTHER INDUSTRY PARTICIPANTS.

The hearing official correctly determined that the terms of a 2007 settlement offer by the Department to certain loan holders did not apply to the facts of this case, and that, contrary to Navient's assertion, Navient was not treated differently from other industry participants.

The hearing official correctly rejected Navient's claim that in its Dear Colleague Letter DCL FP-07-01, "the Department announced that it would broadly forgo enforcement action with respect to 1/2 SAP Rate billing practices prior to September 30, 2006, if a lender adopted the Department's new standard policy on a prospective basis." Appellant's Brief, p. 28.  In fact, DCL FP-07-01 contained no such promise and was, instead, strictly limited to only one type of SAP overbilling, termed "recycling."  The DCL was issued in January of 2007 to "restate the requirements of the ...HEA... and the Department's regulations that control whether FFELP loans

29

made or acquired with funds derived from tax-exempt financing sources acquired eligibility for SAP at the 9.5 percent minimum return rate." The DCL stated, in relevant part:

> The HEA identifies the specific sources of funds derived from a tax-exempt obligation that can be used to acquire loans that qualify for SAP at the 9.5 percent minimum return rate. 20 USC §1087-1(b)(2)(B)(i)(2006). These sources are (1) funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1, 1993 or from investment earnings on the proceeds of such an obligation; and (2) funds obtained as collections on, interest benefits or special allowance payments on, or income on, loans made or purchased from the proceeds of that tax-exempt obligation. … These requirements have been in effect since 1993.

FP-07-01, p.1-2.

The DCL dubbed the loans made from (1) bond proceeds, "first generation loans," and those acquired with funds described in (2), "second generation loans." The DCL states that "the Department will not seek to recoup SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the 9.5 percent minimum return rate **for loans that were neither first-generation loans nor second-generation loans** for those lenders that promptly comply with or accept" certain requirements described in the letter. DCL FP 07-01, p.6 (*bold added*). The highlighted language unequivocally limits this compromise to claims for overpayments made and received on subsequent "generations" of loans. In fact, DCL FP-07-01 is devoted exclusively to the discussion of the "recycling" practice, and to introducing the audit requirements necessary to verify whether loans on which a lender wished to claim SAP at the 9.5 percent rate met the regulatory criteria. Nothing in this DCL suggested or could reasonably be interpreted to suggest that this offer of compromise would cover other reasons for 9.5 SAP Federal subsidy overpayments.

On the other hand, the FAD at issue in this proceeding addresses the practice of claiming 9.5 SAP Federal subsidy on loans that were no longer entitled to that subsidy solely because the

"prior tax-exempt obligation" that financed the loans had been retired. The 9.5 SAP Federal subsidy does not apply to any loan, whether made from original proceeds of a tax-exempt bond or from recoveries on those original loans, after the tax-exempt obligation that financed the loan is retired. The FAD focuses on whether SAP was claimed at the 9.5 SAP Federal subsidy rate after the loans no longer qualified for that rate. Thus, the hearing official's determination that DCL FP 07-01 did not apply to the conduct at issue here is correct and must be affirmed.

Furthermore, as the hearing official pointed out, this action against Navient is fully consistent with Education's history of pursuing, both before and after the issuance of DCL FP-07-01, actions against holders of loans financed with tax-exempt obligations on issues other than first- and second-generation loan recycling. For example, in 2006, FSA demanded repayment of excess SAP from American Education Services (AES); AES appealed that determination, which the Secretary upheld in a January 2008 decision. (ED-09). FSA made a similar determination demanding repayment from the Iowa Student Loan Liquidity Corporation, which the Secretary also upheld on appeal. (ED-10). Kentucky Higher Education Student Loan Corporation was likewise subject to an OIG report issued in May of 2009, as were other entities, such as CollegeInvest and Panhandle Plains. Thus, the hearing official's rejection of Navient's claim that it has been singled out with regards to the 9.5 SAP Federal subsidy claims at issue in this FAD is correct.

## IV.   THE HEARING OFFICIAL CORRECTLY DETERMINED THAT COLLECTION OF SAP OVERPAYMENT IS NOT BARRED BY THE STATUTE OF LIMITATIONS.

### A.   NO STATUTE OF LIMITATIONS APPLIES TO FINAL AUDIT DETERMINATIONS.

Navient suggests that the Department's action in this case is barred by a statute of limitations. The hearing official, however, correctly determined that "there is no successful statute

31

of limitations challenge to final audit determinations." ED-03, p.18. This determination must be affirmed for reasons explained below.

Section 432 of the HEA, 20 U.S.C. §1082(a), provides the Department authority to implement and enforce any provision of the FFELP by stating, in relevant part:

> In the performance of, and with respect to, the functions, powers, and duties, vested in him by this part *[20 U.S.C. §§1071 et seq.]*, the Secretary may-
>
> (1) Prescribe such regulations as may be necessary to carry out the purpose of this part *[20 U.S.C. §§1071 et seq.]*... to establish minimum standards with respect to sound management and accountability of programs under this part.
> \*\*\*
> (6) enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

20 U.S.C. §1082(a).

The Department's regulation, 34 C.F.R. §682.413(a)(1), governing special allowance Federal subsidy, in turn, provides:

> The Secretary requires a lender and its third-party servicer administering any aspect of the FFEL programs under a contract with the lender to repay interest benefits and special allowance or other compensation received on a loan guaranteed by a guaranty agency, pursuant to paragraph (a)(2) of this section –
> \*\*\*
> (v)   For any period in which the lender or servicer, with respect to the loan, violates the requirements of subpart C of this part. ...

34 C.F.R. §682.413(a)(1).

This regulation is part of Subpart C of 34 C.F.R. Part 682, which is entitled "Federal Payments of Interest and Special Allowance" and is specifically designed to govern special allowance payments. The legislative and regulatory framework therefore makes it amply clear that the Department has full authority to require repayment of special allowance Federal subsidy payments received pursuant to Subpart C of 34 C.F.R. Part 682. None of these provisions include time limits on the Department's exercise of that authority.

32

As the hearing official correctly determined, Education's request for repayment of special allowance Federal subsidy amounts received is not subject to the statutes of limitation in 28 U.S.C. § 2415 and 20 U.S.C. § 1091a because it "seeks only to recoup Title IV funds which were improperly disbursed." *See In re Interactive Learning Systems*, Dkt. No. 04-08-SP, U.S. Dep't of Educ. (March 8, 2005) at 6; *In re Belzer Veshiva*, Dk. No. 95-55-SP, U.S. Dep't of Educ. (June 19, 1996) at n.3.   In fact, that is the reason why this appeal proceeds under Subpart H, "Appeal Procedures for Audit Determinations and Program Review Determinations," rather than Subpart G, "Fine, Limitation, Suspension and Termination Proceedings."

28 U.S.C. §2462 does not apply to Education's request for repayment of 9.5 SAP Federal subsidy for the same reason that makes 28 U.S.C. § 2415 inapplicable – namely, because Education is pursuing the recoupment of public funds improperly paid rather than imposing a fine, forfeit, or punishment.  28 U.S.C. §2462 provides, in relevant part, that "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued."   28 U.S.C. §2462.   Education's request for 9.5 SAP Federal subsidy repayment is neither a fine, penalty, nor forfeiture.  As the Supreme Court in *Kokesh v. S.E.C.*, 137 S. Ct. 1635 (2017), explained, to constitute a penalty subject to 28 U.S.C. §2462, the request for compensation must be "imposed for punitive purposes."  *Id*. at 1643.   The punitive nature of the payment means that it "does not simply restore the status quo; it leaves the defendant worse off."  *Id*. at 1645.   Furthermore, "disgorgement is not compensatory," *id*. at 1644, when "disgorged profits are paid to the district court," rather than the government entity that is seeking the return of funds.  *Id.*   None of the *Kokesh* factors are present here.

33

First, the request for repayment of special allowance here is not barred by 28 U.S.C. §2462 under *Kokesh* because it was not made for punitive purposes. As Education is not seeking disgorgement of profits, but merely the return of the 9.5 SAP Federal subsidy funds Navient improperly received, it will not leave Navient in a worse position, but merely in the exact same position had it not improperly requested and received the 9.5 SAP Federal subsidies to which it was not entitled. The non-punitive nature of this repayment request is further confirmed by the fact that the payment would be made not to district court, but to the Department, the entity that made the special allowance payment to Navient. The purpose behind this is to restore to the Department the funds that were improperly disbursed, not to punish Navient for improper billing.

Second, the request for repayment of special allowance here is not barred by 28 U.S.C. §2462 under the *Kokesh* standard because it is purely compensatory. 34 C.F.R. §682.413(a)(1) clearly provides that the lender may be required "*to repay* interest benefits and special allowance or other compensation received on a loan guaranteed by a guaranty agency." 34 C.F.R. §682.413(a)(1)(emphasis added). Consistent with this mandate, Education is not seeking any amounts in excess of the actual overpayment. The purely compensatory nature of this subsidy repayment request is further emphasized by the fact that, just as in *In re Interactive Learning Systems*, Dkt. No. 04-08-SP, U.S. Dep't of Educ. (March 8, 2005), the appeal here is brought under Subpart H, "Appeal Procedures for Audit Determinations and Program Review Determinations," rather than under Subpart G, "Fine, Limitation, Suspension and Termination Proceedings." The reason this appeal is brought under Subpart H is because it "seeks only to recoup Title IV funds which were improperly disbursed." *Id.* at 6.

Far from requesting Navient to disgorge profits made as a result of the violation, Education is merely seeking the return of the 9.5 SAP Federal subsidy Education previously paid to Navient.

Such repayment request, far from being punitive, is merely compensatory, as it is designed to restore to Education the amount of the Federal subsidy improperly paid. As such, it not barred by 28 U.S.C. §2462. Thus, the hearing official's determination that no statute of limitations bars this action is accurate and must be upheld.

### B.     APPLYING STATUTE OF LIMITATIONS TO NAVIENT IS NOT UNJUST

The hearing official correctly determined that no statute of limitations applies to the final audit determination because the application of such statute of limitations does not cause injustice to Navient. The OIG conducted an audit of special allowance Federal subsidy payments to Navient's subsidiary, NLMA, in 2008. The Final Audit Report was issued on August 3, 2009. The report specifically informed Navient that OIG recommended that "the Chief Operating Officer for Federal Student Aid (FSA) instruct SLMA to return to the U.S. Department of Education (Department), the special allowance overpayments we describe in our report...." ED-01, p.6.

After much communication with Navient, on September 25, 2013, FSA issued its FAD. The FAD appraised Navient of the opportunity to appeal the FSA liability determination. ED-02, p.1. For close to three years after the issuance of FAD, FSA attempted to negotiate a settlement with Navient on this matter, to which end it provided Navient with continuous extensions to contest this FAD. Finally, negotiations ended and Navient requested an OHA review of the FAD on July 27, 2016. On March 7, 2019, after briefing, oral argument, and supplemental briefing, the hearing official issued a decision affirming the FAD.

As the above facts clearly show, throughout this lengthy process Navient knew that the recoupment action by FSA was likely and was aware of the findings on which this action would be based. It cannot now claim "surprises through the revival of claims that have been allowed to slumber." *Gabelli v. SEC*, 133 S. Ct. 1216 (2013). Thus, the hearing official's conclusion that no

statute of limitations applies to the final audit determination does not cause injustice to Navient and must be upheld.

## V.    NAVIENT'S DISPUTE OF FAD'S LIABILITY ESTIMATE IS PREMATURE

In the Audit Determination, OIG estimated the amount of liability caused by the actions of the lender.   As FSA's letter conveying the final audit determination dated September 25, 2013 specifies, this proceeding and appeal is bifurcated: liability is adjudicated first, followed by the amount of liability.  ED-02, p.2.  Far from prejudicing Navient, the bifurcated approach serves to maximize the efficiency and minimize the burden on all the parties involved.   The Secretary adopted this procedure to conserve time and effort for the parties by first giving each party the opportunity to obtain a decision on the legal basis of their claims. Only if the findings contained in the FAD are upheld on appeal will FSA "provide an opportunity for Sallie Mae… to identify the affected loans, to calculate the overpayments, and take the other actions directed in this letter." ED-02, p.2.  Consistent with this instruction, the Secretary should defer any consideration of the amount of liability until she resolves the first part of the appeal.

## CONCLUSION

As the above analysis shows, the hearing official correctly determined that the statute and regulations required Navient to cease claiming 9.5 SAP Federal subsidy on loans after Navient retired the underlying tax-exempt obligation.  The hearing official also correctly concluded that Navient's proposed interpretation of "in whole or in part" language of DCL 93-L-161 is in direct conflict with the governing statute and the purpose of the legislation.  Furthermore, as the hearing official correctly decided, paying 9.5 SAP Federal subsidy to an issuer such as Navient, that acquired the loans using funds, only as little as nine percent of which were derived from tax-exempt sources, would give Navient a windfall.  Alternatively, the FAD determination can be

upheld by reading the phrase "in whole or in part" in a way that is not inconsistent with the statutory or regulatory language.

Even under Navient's own reading of the phrase "in whole or in part," the FAD determination must still be upheld, because only individual bonds within the 1993 Trust could be the "prior tax-exempt obligation" that determined the rate of 9.5 SAP Federal subsidy. Neither the 1993 Trust nor the "pools" into which Navient gathered funds derived from the bonds can be considered the "obligations" that determined the rate of 9.5 SAP Federal subsidy. Thus, FSA correctly determined that Navient improperly billed and received 9.5 SAP Federal subsidy on loans purchased with funds that were part of the 1993 Trust indenture after the respective bonds were retired or defeased. Therefore, the Secretary must affirm the conclusion reached in the FAD.

The hearing official also correctly decided that ECFC did not meet the statutory requirements for a successor entity under 26 U.S.C. §150(d)(3)(A-B), as ECFC did not assume bond indebtedness on the 1993F bond. In fact, as the hearing official correctly observed, ECFC could not have assumed such bond indebtedness, as the 1993F bond was retired when the loans were transferred to ECFC.

The hearing official correctly rejected Navient's claim that DCL FP-07-01 absolved Navient from liability for the conduct actually at issue here, and correctly determined that Navient was treated fairly vis-à-vis other industry participants. DCL FP-07-01 was devoted exclusively to the discussion of the "recycling" practice. Nothing in that DCL suggested or could reasonably be interpreted to suggest that this offer of compromise would cover other reasons for 9.5 SAP Federal subsidy overpayment, such as the ones at issue here. In fact, this action against Navient is fully consistent with Education's history of pursuing, both before and after the DCL FP-07-01, actions against holders of loans financed with tax-exempt obligations on issues other than first- and

37

second-generation loan recycling.   Nor can Navient point to other similarly-situated industry participants that were treated differently.  Navient has not been singled out with regards to the 9.5 SAP Federal subsidy claims at issue in this FAD.

Finally, as the hearing official correctly determined, no statute of limitations barred this recovery action.  Education's demand for repayment of special allowance Federal subsidy amounts wrongly received is not barred by 28 U.S.C. §2462 because this demand is neither a fine, forfeiture, nor a penalty, the only actions to which 28 U.S.C. §2462 applies.    Nor would such recovery be unjust, as Navient knew, throughout this lengthy process, that the recoupment action by FSA was likely, and was aware of the findings on which this action would be based.

The conclusions reached by the hearing official are solidly based in law and in facts. Navient has failed to demonstrate, by the preponderance of the evidence, that its 9.5 SAP Federal subsidy billing was in compliance with the applicable requirements.  The Secretary should affirm the determinations made by the hearing official in their entirety.

Date: May 3, 2018

Respectfully Submitted,

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
natasha. varnovitsky@ed.gov

*Attorney for  FSA*

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on May 3, 2018 a true and correct copy of the foregoing <u>BRIEF IN RESPONSE TO NAVIENT CORPORATION'S APPEAL OF HEARING OFFICIAL'S INITIAL DECISION</u> was served on the following counsel by electronic mail and overnight courier:

Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
jsimon@debevoise.com
(Electronic mail)

Ada Fernandez Johnson
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
afjohnson@debevoise.com
(Electronic mail)

Colby A. Smith
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
<u>casmith@debevoise.com</u>
(Electronic mail)

Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jncohen@debevoise.com

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
<u>natasha.varnovitsky@ed.gov</u>

*Attorney for FSA*

## UNITED STATES DEPARTMENT OF EDUCATION
### WASHINGTON D.C. 20202

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| In the matter of | : | **Docket No. 16-42-SA** |
| | : | |
| **NAVIENT CORPORATION,** | : | Federal Student Aid Proceeding |
| Respondent. | : | ACN: ED-OIG/A0310006 |
| | : | MOTION FOR LEAVE TO |
| | : | FILE A SUR-REPLY BRIEF |
| | : | IN RESPONSE TO REPLY |
| | : | BRIEF IN SUPPORT OF |
| | : | NAVIENT |
| | : | CORPORATION'S |
| | : | APPEAL OF HEARING |
| | : | OFFICIAL'S INITIAL |
| | | DECISION |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## MOTION FOR LEAVE TO FILE A SUR-REPLY BRIEF IN RESPONSE TO REPLY BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF HEARING OFFICIAL'S INITIAL DECISION

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov

*Attorney for FSA*

2319

On May 20, 2019, without obtaining prior approval from the Secretary, Navient Corporation ("Navient") filed a Motion For Leave To File A Reply In Support of Navient Corporation's Appeal Of The Hearing Official's Initial Decision ("Motion"), attaching to it as Exhibit A the Reply Brief In Support Of Navient Corporation's Appeal Of The Hearing Official's Initial Decision ("Reply Brief").    This unauthorized filing should be rejected by the Secretary. Nevertheless, should the Secretary choose to accept it, Federal Student Aid ("FSA") respectfully requests leave to file a Sur-Reply Brief In Response To Reply Brief In Support Of Navient Corporation's Appeal Of Hearing Official's Initial Decision ("Sur-Reply Brief"), attached hereto as Exhibit A, to address the the erroneous statements contained in the Reply Brief.

Navient's Motion is a ruse, as Navient did not wait for leave to file the said reply, but rather chose to file it simultaneously with the Motion, without obtaining leave and therefore subverting the intent and purpose of the Motion.  Furthermore, Navient's request to file a reply is premised on a baseless claim that FSA's Response Brief, filed on May 3, 2019, misstated the Hearing Official's Decision, rendered in *In The Matter of Navient Corporation*, Docket No. 16-42-SA, U.S. Dep't of Educ. (March 7, 2019).  As FSA's Sur-Reply Brief makes clear, the Response Brief accurately presented the Hearing Official's reasoning, which is solidly based in law and fact and should be affirmed.

For the foregoing reasons, FSA respectfully requests that the Secretary reject Navient's request to file a Reply Brief.  Nevertheless, should this request be granted, FSA respectfully requests that the Secretary grant FSA leave to file the attached Sur-Reply Brief in In Response To Reply Brief In Support Of Navient Corporation's Appeal Of Hearing Official's Initial Decision.

Date: May 31, 2018                                    Respectfully Submitted,


Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
natasha. varnovitsky@ed.gov

*Attorney for  FSA*

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on May 31, 2018 a true and correct copy of the foregoing MOTION FOR LEAVE TO FILE A SUR-REPLY BRIEF IN RESPONSE TO REPLY BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF HEARING OFFICIAL'S INITIAL DECISION was served on the following counsel by electronic mail and overnight courier:

Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
jsimon@debevoise.com
(Electronic mail)

Ada Fernandez Johnson
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
afjohnson@debevoise.com
(Electronic mail)

Colby A. Smith
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
casmith@debevoise.com
(Electronic mail)

Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jncohen@debevoise.com

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov

*Attorney for FSA*

# EXHIBIT A

# UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON D.C. 20202

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| In the matter of | : **Docket No. 16-42-SA** |
| | : |
| **NAVIENT CORPORATION,** | : Federal Student Aid Proceeding |
| Respondent. | : ACN: ED-OIG/A0310006 |
| | : |
| | : SUR-REPLY BRIEF IN |
| | : RESPONSE TO REPLY |
| | : BRIEF IN SUPPORT OF |
| | : NAVIENT |
| | : CORPORATION'S |
| | : APPEAL OF HEARING |
| | : OFFICIAL'S INITIAL |
| | : DECISION |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## SUR-REPLY BRIEF IN RESPONSE TO REPLY BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF HEARING OFFICIAL'S INITIAL DECISION


Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
400 Maryland Ave, SW
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov

*Attorney for FSA*

2324

On May 20, 2019, without obtaining prior approval from the Secretary, Navient Corporation ("Navient") filed a Motion For Leave To File A Reply In Support of Navient Corporation's Appeal Of The Hearing Official's Initial Decision, attaching to it as Exhibit A the Reply Brief In Support Of Navient Corporation's Appeal Of The Hearing Official's Initial Decision ("Reply Brief"). This Sur-Reply Brief In Response To Reply Brief In Support Of Navient Corporation's Appeal Of Hearing Official's Initial Decision ("Sur-Reply Brief") is filed by Federal Student Aid ("FSA") solely to address the arguments raised in the unauthorized Reply Brief in the event the Secretary chooses to accept it.

In its Reply Brief, Navient attempts to obfuscate the issues by uncovering imaginary flaws in the Hearing Official's Initial Decision ("Decision")[1]. Such flaws do not exist. Furthermore, FSA's original Response Brief,  filed May 3, 2019, correctly presents the Hearing Official's reasoning, which is solidly based in law and fact and should be affirmed.

## I.    The Hearing Official Correctly Determined That Navient's Interpretation Of "In Whole Or In Part" Was Not Supported by Statute, Regulations, Other DCLs, Or Case Decisions.

Navient claims that "FSA mischaracterizes Navient's argument that it is entitled to the 9.5 SAP Federal subsidy rate by claiming that it 'rests solely on three words' in the 1993 DCL." Reply Brief, p.3.  Far from a mischaracterization, this is the only accurate description of Navient's position.  As the Hearing Official aptly noted, "Navient has not cited any statutes, regulations, other DCLs or case decisions as legal authority to justify its receipt of the 9.5 percent 1/2 SAP rate." Decision, p. 12.  Neither the applicable statute nor the regulations address the subsidy rate

---

[1] *In The Matter of Navient Corporation*, Docket No. 16-42-SA, U.S. Dep't of Educ. (March 7, 2019).

for loans made "in part" from tax-exempt funds.  The conspicuous absence of the "in whole or in part" language on which Navient relies from the applicable statutes and regulations is clear and unambiguous. The statutes and regulations are in direct conflict with the "in whole or in part" language of Dear Colleague Letter ("DCL") 93-L-161.  As the hearing official correctly concluded, in instances such as this the express and clear language of the statutes and regulations must prevail.

Navient's claim that their interpretation of "in whole or in part" is supported by 20 U.S.C. § 1087-1(b)(2)(B)(i)(2006)[2] is also to no avail, as it derives from a truncated reading of the statute that subverts its true meaning.  20 U.S.C. § 1087-1(b)(2)(B)(i)(2006)  provides:

> The quarterly rate of the special allowance for holders of loans which were **made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation** under Title 26 shall be one-half the quarterly rate of the special allowance established under subparagraph (A), except that, in determining the rate for the purpose of this clause, subparagraph (A)(iii) shall be applied by substituting "3.5 percent" for "3.10 percent". Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans **made or purchased with funds described in the preceding sentence of this subparagraph** or from income on the investment of such funds.

20 U.S.C.A. § 1087-1(b)(2)(B)(2006)(emphasis added).

While it is true that the 9.5 SAP Federal subsidy could be claimed on loans purchased with funds obtained as collections on, interest benefits or special allowance payments on, or income on, loans made or purchased from the proceeds of that tax-exempt obligation under 20 U.S.C. § 1087-1(b)(2)(B)(i), as well as the funds obtained from issuance of such an obligation, any such funds must be derived from loans "made or purchased with funds described in the preceding sentence of this subparagraph." 20 U.S.C. § 1087-1(b)(2)(B). The first sentence of 20 U.S.C. § 1087-1(b)(2)(B), in turn, states that the loans must be "purchased with funds obtained

---

[2] Navient's Reply Brief, p.4.

by the holder **from the issuance of obligations, the income from which is *exempt from taxation***

**under Title 26.**" 20 U.S.C. § 1087-1(b)(2)(B)(i)(emphasis added).   Navient chose to omit the

words "made or purchased with funds described in the preceding sentence of this subparagraph"

from its quotation of  20 U.S.C. § 1087-1(b)(2)(B)(i) on p.4 of its Reply Brief, as these words

clearly state that in order to qualify for the 9.5 SAP Federal subsidy the funds must have been

originally obtained from the issuance of a *tax-exempt* obligation.   Unlike 20 U.S.C. § 1087-

1(b)(2)(B)(i), Navient's interpretation of "in whole or in part" is not confined to proceeds,

repayments, or interest collected on loans purchased with funds derived from *tax-exempt* bonds.

Rather, Navient  argues that loans funded in part with funds derived from *taxable* obligations

should likewise be entitled to 9.5 SAP Federal subsidy.  Such interpretation of the DCL 93-L-161

is not supported by 20 U.S.C. § 1087-1(b)(2)(B)(i).  Nor is it supported by any other statutory or

regulatory authority.  The Hearing Official therefore correctly concluded that the words "in whole

or in part" "cannot be applied in this appeal in a way that violates the statute's language.  The 1/2

SAP payments are not qualified in this manner and are available only for loans funded with tax-

exempt bonds." Decision, p. 13-14.  This determination is based solidly in law and fact must be

upheld in its entirety.

**II.      The Hearing Official Correctly Determined That the DCL's Language Directly**

**Contradicts the Governing Authority.**

Navient claims that "FSA inaccurately states that the hearing official found that Navient's

interpretation of the 1993 DCL's 'in whole or in part' language was 'inconsistent with the rest

of the letter.'" Navient Reply Brief, p.2 (internal citations omitted).  This claim is not true, nor is

it  outcome-determinative. The  Hearing  Official  unequivocally  determined  that  "the  nearly

unlimited exception created by  the 'in whole or in part'" language contained in DCL 93-L-161

made this DCL "inconsistent with the governing statutes" and with "the purpose of the legislation." Decision, p. 13. This served as the primary basis for rejecting Navient's proposed interpretation. The Hearing Official also pointed out that it was not clear why that language – "describing … the law being repealed" - "was included in the DCL." Decision, p.13. The Hearing Official thus clearly focused on the crucial incongruity between the forward-looking nature ot DCL 93-L-161 and the backward-looking nature of the "in whole or in part" language. Consequently, Navient's claim that the Hearing Official never found that Navient's interpretation of DCL 93-L-161 "in whole or in part" language was "inconsistent with the rest of the letter," Navient Reply Brief, p.2, is simply not true.

DCL 93-L-161, by its own terms, was designed "to provide the student loan community with information on the major program changes mandated by the new law" - the Omnibus Budget Reconciliation Act ("OBRA"). This law amended Section 438(b) of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. §1087-1(b)(2), and changed the rate of the SAP Federal subsidy payment to the standard rate with respect to loans made or purchased with funds from the issuance of obligation "originally issued on or after October 1, 1993, the income from which is excluded from gross income under the Internal Revenue Code of 1986." Pub. L. 103–66, §4111 (August 10, 1993). In other words, DCL 93-L-161 was written to provide guidance on the eligibility of loans purchased with tax-exempt bonds "originally issued" *on or after* October 1, 1993, not to comment on the eligibility of loans purchased with tax-exempt bonds that *predated* October 1, 1993. Thus, Navient's proposed interpretation of the "in whole or in part" language would constitute a retroactive interpretation of the law being repealed, which would conflict with the DCL's very purpose. This is the incongruity that the Hearing Official aptly observed and noted.

The Hearing Official's determination that Navient's proposed interpretation of the "in whole or in part" language was "inconsistent with the governing statutes" and with "the purpose of the legislation," Decision, p. 13, was alone sufficient to reject Navient's proposed interpretation. The Hearing Official's observation of the inconsistency within the DCL 93-L-161 that would result should Navinet's proposed interpretation of "in whole or in part" be adopted further underscores the absurdity of such an approach.

## III. The Hearing Official Properly Ascertained the Absence of a Settlement.

Contrary to Navient's allegation, the Hearing Official thoroughly analyzed the issue of the purported 2007 settlement Navient claims to have entered into with FSA.   The Hearing Official did it by examining FSA's treatment of other similarly situated participants.   As explained in FSA's Response Brief, the offer of compromise in DCL FP-07-01 was limited exclusively to the "recycling" practice[3]. Nothing in this DCL suggested or could reasonably be interpreted to suggest that this offer of compromise would cover other reasons for 9.5 SAP Federal subsidy overpayments.  Nevertheless, Navient continued to claim that the 2007 settlement was binding regardless of the type of 9.5 SAP subsidy overpayment involved.  To verify the veracity of Navient's claim, the Hearing Official examined FSA's treatment of other industry participants who claimed 9.5 SAP Federal subsidy.  If other industry participants never had to face liability for 9.5 SAP Federal subsidy overpayments resulting from practices other than "recycling," then Navient may have been correct.  The Hearing Official correctly ascertained that this was not the case. He pointed out that "FSA has identified other participants who have faced similar liability," while "Navient has not shown other similarly-situated participants who received different treatment."

---

[3] "Recycling" involved continued billing at 9.5 SAP Federal subsidy rate on loans acquired not with the proceeds of tax-exempt bonds, nor from collections or sales of those original loans, but on funds recovered from sales or collections on the subsequent cohorts of loans purchased with those earlier recoveries.

Decision, p. 16.   Having ascertained that FSA affirmatively pursued other industry participants

for 9.5 SAP Federal subsidy overpayments resulting from practices other than "recycling" long

after the alleged 2007 settlement took place, the Hearing Official correctly concluded that "Navient

has not met its threshhold showing that FSA ... declined to enforce the HEA against other

similarly-situated industry participants."   Decision, p. 16.   Thus, the Hearing Official's

determination that the purported 2007 settlement did not apply to Navient was well-rooted in law

and in fact, and should be affirmed.

IV.     **The Hearing Official Correctly Determined That ECFC Was Not Eligible To**
        **Receive 9.5 SAP Federal Subsidy.**

Contrary to Navient's assertion, the Hearing Official properly focused on the transfer of

loans to Education Credit Finance Corporation ("ECFC") in determining whether those loans

qualified for the 9.5 SAP Federal subsidy.   Navient argues that "FSA ... mischaracterizes

Navient's argument in support of the receipt of 1/2 SAP payments by its subsidiaries" by focusing

on whether "ECFC qualifies as a 'successor' entity pursuant to I.R.C. § 150(d)."   Navient Reply,

p.5.  This contention is incorrect.  The issue has never been whether ECFC qualified as a successor

entity, but rather whether the transfer of loans to ECFC satisfied the requirements of I.R.C. §

150(d)(3)(B).  Navient admitted as much in its Appellate Brief, which stated: "...the hearing

official held that the ECFC Loans were ineligible for the 1/2 SAP Rate because the transfer from

NMELC to ECFC did not satisfy the requirements of I.R.C. § 150(d)(3)(B), which defines the

requirements for bonds to maintain their tax-exempt status when an issuer elects to cease status as

a qualified scholarship funding corporation and transfer its assets to a taxable subsidiary, or

'successor' corporation."  Navient's Appellate Brief, p. 32-33.  Indeed, the Hearing Official

specifically stated that "[t]he determinative statutory requirements for a successor entity *to retain*

*qualification for tax-exempt bond purposes* are in I.R.C. §150(d)(3)(A-B). I.R.C. §150(d)(3)(B)(i-iii) have very specific requirements for continuing tax-exempt status for transferred bonds. They are all directed at requiring the transferee corporation to take the same roles and liabilities on the loans and bonds." Decision, p.14 (emphasis added). After analyzing the requirements of I.R.C. §150(d)(3)(B)(i-iii) the Hearing Official correctly concluded that "ECFC is not a qualifying transferee corporation." Decision, p.15.

I.R.C. §150(d) allows a non-profit entity that has issued tax-exempt student loan bonds to transfer its student loan holdings and obligations to a for-profit subsidiary without jeopardizing the tax-exempt status of those bonds the entity had already issued if certain conditions are met. It states, in relevant part:

(A) In general

Any qualified scholarship funding bond, and qualified student loan bond, outstanding on the date of the issuer's election under this paragraph (and any bond (or series of bonds) issued to refund such a bond) shall not fail to be a tax-exempt bond solely because the issuer ceases to be described in subparagraphs (A) and (B) of paragraph (2) if the issuer meets the requirements of subparagraphs (B) and (C) of this paragraph.

(B) Assets and liabilities of issuer transferred to taxable subsidiary
    The requirements of this subparagraph are met by an issuer if—
        (i)   all of the student loan notes of the issuer and other assets pledged to secure the repayment of qualified scholarship funding bond indebtedness of the issuer are transferred to another corporation within a reasonable period after the election is made under this paragraph;
        (ii)   such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer within a reasonable period after the election is made under this paragraph;
        (iii)  to the extent permitted by law, such transferee corporation assumes all of the responsibilities, and succeeds to all of the rights, of the issuer under the issuer's agreements with the Secretary of Education in respect of student loans;

26 U.S.C. §150(d)(3).

Navient's attempt to limit the scope of 26 U.S.C. § 150(d)(3) to the "initial transfer of assets and liabilities to a newly created for-profit subsidiary when an issuer elects to cease status as a qualified scholarship funding corporation," Navient Reply Brief, p. 5, is unavailing. The plain language of 26 U.S.C. § 150(d)(3) does not distinguish between the types or timing of transfers. It makes no mention of "initial" transfers or "newly created first-level for-profit subsidiary." In fact, the plain language of the statute does not qualify the transferee corporation or the transfer itself in any way. "There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes." *U. S. v. Am. Trucking Assns., Inc.*, 310 U.S. 534, 543 (1940). "The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'" *U. S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)). Navient made no showing that the result here would be demonstrably at odds with the intention of its drafters. Nor could it, as the intent was clearly to match the ownership of the loans to the "responsibilities, and rights… of the issuer" on the underlying bond. 26 U.S.C. §150(d)(3)(B)(ii). Such an intent would never depend on whether the subsidiary is "newly created" or "first-level." The absence of the qualifying language proposed by Navient is thus not an omission, but the intent. Thus, far from improperly focusing on the definition of "successor," the Hearing Official correctly analyzed and rejected Navient's strained and artificial reading of the statute, and therefore his determination that "ECFC is not a qualifying transferee corporation," Decision, p.15, must be affirmed.

## V.    FSA Is Authorized to Provide Alternative Grounds for Upholding the Hearing Official's Decision.

Contrary to Navient's suggestion, FSA never claimed that the Hearing Official found that the "in whole or in part" language contained in DCL 93-L-161 can or should be read to be "consistent with the statutory language." Navient Reply Brief, p. 2. Instead, FSA is proposing this approach as an alternative basis for upholding the Hearing Official's determination. An appeal of a Hearing Official's determination is reviewed by the Secretary *de novo*. *Cf. Commission On Collegiate Nursing Education*, Docket No. 17-56-O, U.S. Dep't of Educ. (October 1, 2018); *Northwest Commission On Accrediting Agency Colleges And Universities*, Docket No. 14-07-O, U.S. Dep't of Educ. (December 11, 2014). Nor does Navient cite to any authority that prohibits FSA from supplying such alternative bases for upholding the Hearing Official's determination, as such authority does not exist.[4] Therefore, FSA is not limited to arguments provided by the Hearing Official but can supply alternative grounds for upholding the Decision.

While the Hearing Official did not find that the language of DCL 93-L-161 could be read to be consistent with the relevant statute and regulations, as FSA's analysis explains, such a reading is nevertheless possible. As explained in DCL 96-L-186, a holder of a loan acquired with tax-exempt funds which is then refinanced with taxable funding sources has only one funding source if the original tax-exempt bond was retired: the taxable financing. If, however, the holder uses taxable funds to refinance the loan but does not retire the original tax-exempt bond, the holder has two funding sources, and two costs of funds: the original, outstanding tax-exempt bond, with a low cost of funds, and the new taxable obligation, with a higher cost of funds. Such a loan would then be considered as funded "in part" with tax-exempt funds, and thus the 9.5 SAP Federal subsidy would still apply. This alternative interpretation of the words "in whole or in part" is consistent

---

[4] The sole limitation on the scope of the appeal is the prohibition against the introduction of "new evidence." 34 C.F.R. §668.119(f). The alternative reading proposed by FSA is neither "new," as it was asserted in FSA's Brief in Support of Federal Student Aid's Final Audit Determination, filed October 28, 2106, nor "evidence," as it involves a suggested legal interpretation rather than facts.

with the existing statutes and regulations, as it does not effectively negate the requirement that loans billed at 9.5 SAP Federal subsidy be funded with tax-exempt bonds. Nor does it lead to an inequitable result, where "if one single dollar of the tax-exempt funds remains, then the 1/2 SAP rate of 9.5 percent is payable for all $458 million." Decision, p.13.

As the above paragraphs make clear, FSA is authorized to supply alternative grounds for upholding the Hearing Official's determination. Far from attempting to inappropriately attribute non-existing findings to the Hearing Official, this argument instead provides alternative grounds for upholding the Hearing Official's determination.

## CONCLUSION

For these reasons, and for those highlighted in FSA's Response Brief, the Hearing Official's Decision must be affirmed.

Date: May 31, 2018

Respectfully Submitted,

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
natasha. varnovitsky@ed.gov

*Attorney for  FSA*

## STATEMENT OF SERVICE

I, the undersigned, hereby state that on May 31, 2018 a true and correct copy of the foregoing <u>SUR-REPLY BRIEF IN RESPONSE TO REPLY BRIEF IN SUPPORT OF NAVIENT CORPORATION'S APPEAL OF HEARING OFFICIAL'S INITIAL DECISION</u> was served on the following counsel by electronic mail and overnight courier:

Jil Simon
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
jsimon@debevoise.com
(Electronic mail)

Ada Fernandez Johnson
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
afjohnson@debevoise.com
(Electronic mail)

Colby A. Smith
801 Pennsylvania Ave., N.W.
Suite 500
Washington, DC 20004
casmith@debevoise.com
(Electronic mail)

Joshua N. Cohen
919 Third Avenue
New York, NY 10022
(212) 909-6000
jncohen@debevoise.com

Natasha Varnovitsky
Office of the General Counsel
U.S. Department of Education
Washington, D.C. 20202
(202)205-3529
natasha.varnovitsky@ed.gov

*Attorney for FSA*