UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DEPARTMENT OF EDUCATION and ) <br> DR. MIGUEL CARDONA, ) <br> ) <br> Defendants. ) <br> ) | Case No.: 1:21-cv-324-TSE-MSN |

MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY

Defendants the Department of Education and Dr. Miguel Cardona (collectively the "Department"), by and through their undersigned counsel, respectfully submit this memorandum in opposition to Plaintiff Navient Solutions, LLC's ("Navient") Motion to Compel Discovery.[1]

INTRODUCTION

In this challenge under the Administrative Procedure Act ("APA"), Navient seeks discovery from the Department to expand the administrative record, but fails to demonstrate that this is the extraordinary case in which such extra-record discovery is appropriate. If the Court were to accept Navient's arguments, discovery in APA cases would be the norm, not the exception; nearly any litigant could make similar arguments. That would turn the strong presumption against extra-record discovery on its head.

This APA case arises from the Department's January 15, 2021 Decision ("Decision") finding that it overpaid Navient approximately $22.3 million in subsidies on student loans held

---

[1] In this brief, "Navient" generally refers to Navient and its corporate predecessors unless noted.

by Navient. The subsidies at issue, called "half-SAP" subsidies, were specific to student loans financed by tax-exempt debt, but Navient was claiming the half-SAP subsidies on an entire pools of student loans that—as Navient acknowledges—were only partly funded by qualifying tax-exempt debt. As justification, Navient pointed not to a statutory provision or Department regulation, but to five words buried in a 14-page informal guidance document. In the Decision, the Department concluded that Navient's reliance on this document could not overcome the clear language of the governing statute and regulations. It therefore ordered Navient to return the overpayments. This is no punishment—Navient simply has to return funds to which it was never entitled under the law.

Navient now challenges the Decision. But it seeks to have this Court review the Decision not on the basis of the record before the Department, but on a larger record that Navient intends to make now by demanding documents and testimony from the Department. The APA strictly limits judicial review of agency action, and review beyond the scope of the administrative record is permissible only in exceptional circumstances—all the more so when a party seeks not merely to add evidence to the record, but to take discovery on internal agency processes. Navient fails to show that this is the rare case in which such discovery is proper. The administrative record already contains everything the Court needs to determine whether the Decision comports with the APA, and the Court should therefore deny Navient's motion to compel.

I.   **BACKGROUND**

    A.   **Legal Framework**

The Federal Family Education Loan Program ("FFELP") is one of several student loan programs the Department administers. *See generally* 20 U.S.C. §§ 1071 *et seq.*[2] Under FFELP,

---

[2] No new loans have been issued pursuant to FFELP since 2010, *see* 20 U.S.C. § 1071(d), but

2

private lenders originated student loans, which were insured by state government or non-profit entities and, in turn, reinsured by the Department. *Id.* § 1078. Under certain circumstances, the Department pays the holders of FFELP loans subsidies called "special allowances," "special allowance payments," or "SAP." *See id.* § 1087-1.

At issue here are the special allowances paid on loans funded with tax-exempt financing obtained before October 1, 1993.[3] When lenders issued such tax-exempt bonds to finance student loans made pursuant to FFELP, the Department paid (and pays) to the holder of those loans a subsidy that differs from the ordinary SAP.[4] First, this subsidy is one-half the rate of the usual SAP for loans financed with non-tax-exempt obligations, 20 U.S.C. § 1087-1(b)(2)(B)(i)—hence the term "half-SAP." Second, and critically, this subsidy is subject to a floor, such that the interest rate on the half-SAP loans can never fall below a 9.5% annualized interest rate. *Id.* § 1087-1(b)(2)(B)(ii). When interest rates are low, this floor is a substantial benefit to any loan-holder that can claim half-SAP subsidies from the Department.

The Department has adopted several regulations and issued a number of guidance letters related to the half-SAP subsidies. In 1985, the Department promulgated an initial SAP regulation

---

many loans remain outstanding and the Department therefore continues to pay subsidies as appropriate.

[3] Different rules apply to loans funded with tax-exempt obligations issued in October 1993 or later. *See* 20 U.S.C. § 1087-1(b)(2)(B)(vi). There is no dispute here that the initial tax-exempt bonds were issued before October 1993.

[4] As defined by the statute, "loans which were made or purchased with funds obtained by the holder from the issuance of obligations, the income from which is exempt from taxation under Title 26." 20 U.S.C.A. § 1087-1(b)(2)(B)(i). The half-SAP rate also applies to loans funded by "collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds." *Id.*

3

that, as a general matter, provided that the half-SAP rate would apply to loans financed by tax-exempt obligations, collections or other payments on half-SAP loans, and interest or subsidy payments on half-SAP loans. *See* 34 C.F.R. § 682.302(c)(2)(i) (1985). The Department subsequently amended this subsection in 1992 to more closely track the statutory requirements for a loan to qualify for the half-SAP rate. *See* 34 C.F.R. § 682.302(c)(3)(i) (1993).[5]

The 1985 regulation also dealt with refinancing, and, in particular, with lenders refinancing half-SAP loans with non-tax-exempt funds. It provided that the half-SAP rate would *not* apply

> after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than a tax-exempt obligation, and
>> (i) The prior tax-exempt obligation is retired; or
>> (ii) The prior tax-exempt obligation is defeased . . . .

*Id.* § 682.302(e)(3) (1985). The substance of this rule has not changed, so the Department's regulations have provided at all relevant times that a loan no longer qualifies for half-SAP subsidies if (1) it has been refinanced with non-tax-exempt funds, and (2) the original, tax-exempt obligation has been retired.

In its brief (at 5), Navient discusses several Dear Colleague Letters (or "DCLs") that it contends are important to this case.[6] The first of these is Dear Colleague Letter 93-L-161 ("1993

---

[5] In particular, the 1992 amendment clarified that the half-SAP rate applied to loans financed by tax-exempt obligations, and to loans financed by collections, payments, interest, sales, etc. derived from the first category of loans (*i.e.*, those financed by tax-exempt obligations in the first place). *See* 34 C.F.R. § 682.302(c)(3)(i) (1993). However, this regulation (like the statute) did *not* extend the half-SAP rate to loans financed recursively by issuing multiple generations of loans financed by collections on prior generations.

[6] In general, a "Dear Colleague Letter is a guidance document issued by a government agency providing insight into that agency's interpretation or application of a particular statute, regulation or rule." *C.C. v. Paradise High Sch.*, No. 16-cv-02210, 2019 WL 6130439, at *5 (E.D. Cal. Nov. 19, 2019). In its brief, Navient also references a 1996 Dear Colleague Letter, DCL 96-L-186, but

DCL"), which the Department issued in November 1993 to explain a large number of changes Congress made to federal student loan programs in the Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312. The 1993 DCL "provide[d] the student loan community with information on major program changes mandated by the new law." AR 92. The letter explained 35 amendments to sections and subsections of the governing statutes, including the amendment ending half-SAP subsidies related to new issuances of tax-exempt debt (beginning on October 1, 1993). *See* AR 107. In summarizing this change, the DCL explained that "[t]he minimum special allowance rate floor [*i.e.*, the 9.5% floor] on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed." *Id.* Navient rests heavily on the modifying phrase "in whole or in part," which the letter uses in reference to the repealed half-SAP regulatory framework.

The second Dear Colleague Letter Navient discusses (at 5–6) is a 2007 DCL (FP-07-01) regarding lenders' then-prevalent practice of refinancing multiple "generations" of loans. As noted (*supra* note 5), under the statute and the 1992 regulations, the half-SAP rate applied to loans financed with tax-exempt obligations (what the DCL calls "first-generation loans," AR 144) and those financed with money derived from those first-generation loans or from investment of the original tax-exempt funds (what the DCL calls "second-generation loans," *id.*). *See generally* 20 U.S.C. § 1087-1(b)(2)(B) (2006); 34 C.F.R. § 682.302(c)(3)(i) (1993). However, the half-SAP rate did *not* apply to what the DCL terms "third-generation" loans— those funded with money derived from second-generation loans. The 2007 DCL established no new law; to the contrary, this distinction is evident on the face of the statute and the 1992

---

that DCL is not pertinent here.

5

regulations. The Department issued this DCL because it had "reason to believe that some lenders" were nevertheless claiming half-SAP subsidies on third-generation or successive loans. *See* AR 145. Because of this apparently widespread practice, the Department declared that it would not pay further half-SAP claims unless a lender agreed to certain conditions, including an audit. In the exercise of its enforcement discretion, however, the Department also declared that if a lender accepted these conditions, it would "not seek to recoup" half-SAP payments it had already made "for loans that were neither first-generation loans nor second-generation loans," for the period ending on September 30, 2006. AR 146. Rather than agree to the conditions, Navient simply informed the Department that it would no longer claim half-SAP subsidies at all, reserving certain rights. AR 229.

    **B.**    **The Loans at Issue**

The basic facts about the loans at issue are not in dispute. In 1993, Navient issued five "series" of tax-exempt bonds (the "1993 Bonds"), designated 1993A through 1993H, to fund student loans. *See* AR 74. The bonds had maturity dates ranging from June 1, 1998 (1993B), through July 1, 2005 (1993A). *Id.*[7] Navient pooled the funds from these bonds into two "sub-pools," one constituting the funds from the 1993A bonds, and the other comprising the funds from the other bond issuances. *See* AR 1481. Navient did not collateralize the bonds with particular loans, so all of the bonds were unsecured. AR 1480. As a consequence of this and the pool structure, the loan sub-pools did not distinguish between loans funded by particular bonds

---

[7] The 1993 Bonds were designated "A" through "H" chronologically by issuance date, not maturity date. There is some confusion over terminology in the record. Although the bonds have eight separate names, Navient issued them on five separate dates, leading to some confusion over whether there are five or eight "series." The total issuances also comprise 13 individual "bonds" with different maturity dates. Despite this terminology confusion, there is no dispute about the substance of the bond issuances.

and, once collections on the bonds began to be deposited into the pools, did not distinguish between loans funded by the original bonds and loans funded by those collections. AR 1373–75.

As Navient acknowledges in its brief, that means that all of the loans in each sub-pool were funded "in part" with the original 1993 bonds that funded the sub-pool. Navient took the position that it could therefore claim the half-SAP rate on *all* of the loans within each sub-pool until the final 1993 Bond used to fund part of that pool was retired. Navient therefore continued to claim half-SAP subsidies from the Department on all of the loans within the 1993B-1993H sub-pool even after some of the bonds were retired and the pool was partly refinanced with ineligible funding sources. AR 12; *see also* Plaintiff's Memorandum of Law in Support of Motion to Compel Discovery ("Pl.'s Br.") 5.

### C.  Procedural History

In 2007, the Department's Office of the Inspector General ("OIG") initiated an audit into Navient's billing for half-SAP subsidies on these loans. In 2009, OIG concluded, as relevant here, that Navient should not have been claiming half-SAP subsidies on all of the loans once the underlying tax-exempt obligations began to be retired. OIG estimated that Navient was therefore liable for $22.3 million in overpayments made by the Department. AR 12.[8] Federal Student Aid, a Department component, reviewed OIG's report and agreed with its conclusion that Navient had overcharged the Department by approximately $22.3 million by charging half-SAP rates after some of the underlying tax-exempt bonds were retired. AR 90–91.

Navient challenged this determination before a Department hearing officer. As relevant here, Navient defended its treatment of the pooled loans as all eligible for half-SAP subsidies,

---

[8] OIG's report also raised other issues that are not before the Court because the Secretary's Decision did not rely on them.

arguing that the language of the 1993 DCL justified its treatment of the pooled loans. AR 1750–63. Alternatively, Navient contended that all of the 1993 Bonds constituted a *single* tax-exempt obligation that was only "retired" when the final bond matured. AR 1763–68. And Navient also alleged that the Department was improperly pursuing Navient while not attempting to recoup half-SAP payments from its competitors. AR 1779–81.

The hearing officer rejected these arguments. Most importantly, the hearing officer found that the language of the DCL, if it meant what Navient argued, was inconsistent with the governing statute and regulations. AR 1317. The statute and promulgated regulations, the officer concluded, unambiguously did not allow Navient to claim the half-SAP subsidies as it had, and Navient's attempt to seek a "windfall" by pulling "five words" from the 1993 DCL would "violate[] the statute's language." AR 1317–18. The officer also rejected Navient's selective-enforcement argument, finding that Navient had not identified "other similarly situated industry participants who received different treatment." AR 1320. In fact, as the hearing officer wrote, Navient repeatedly described the 1993 Bond pooling structure as "unique"—making it difficult, if not impossible, to show that any other entity faced a similar enforcement action.

Navient appealed to the Secretary of Education. Navient again argued that it was entitled to rely on the 1993 DCL. It characterized the hearing officer's decision as "invalidat[ing]" the 1993 DCL, and claimed that it "reasonably relied" on the DCL. AR 2158–67. And it repeated its alternative contention that all of the 1993 bonds constituted a single tax-exempt "obligation." AR 2167–71. Navient also claimed that the 2007 DCL and Navient's response together constituted a "binding settlement agreement" that precluded the Department's entire enforcement action. AR 2171–75. In conjunction with this argument, Navient repeated its argument that the Department's action was inconsistent with the treatment of other industry participants. AR 2174. Lastly,

8

Navient argued that the catchall statute of limitations for the United States to initiate a proceeding seeking a "civil fine, penalty, or forfeiture," 28 U.S.C. § 2462, barred the enforcement proceeding. AR 2183–88.

The Secretary rejected Navient's contentions.[9] In the Decision, the Secretary noted that a DCL is not binding and cannot overcome "laws established by Congress or regulations enacted through the rulemaking process." AR 1337. Further, the Secretary was "unpersuaded that the Department had any intention of hiding a new legal interpretation in a clause in the middle of an otherwise innocuous sentence on the thirteenth page of DCL 93-L-161." AR 1338. Focusing on the statutory and regulatory language, the Secretary rejected Navient's reliance on the 1993 DCL. The Secretary likewise rejected Navient's contention that the thirteen bonds it issued during 1993 constituted a single "obligation." AR 1339. He found that the 2007 DCL did not bar the action against Navient because it neither constituted a binding contract nor related to the loans at issue—the 2007 DCL concerned third-generation and successive loans, not the partial-funding issue created by Navient's loan pools. AR 1340. And the Secretary rejected Navient's statute-of-limitations argument, concluding that the repayment of excessive subsidies is not the kind of punitive action to which 28 U.S.C. § 2462 applies. AR 1341.

This action followed. Navient filed its Complaint on March 16, 2021. The Department filed its Answer, and an administrative record in 11 volumes, on May 21, 2021. On agreement between the parties, the Department filed eight supplemental volumes on June 23, 2021, to complete the administrative record. Navient now seeks discovery from the Department so that it

---

[9] At the time, Acting Secretary of Education Mitchell M. Zais.

can expand this Court's review under the APA beyond the administrative record that was before the Department when it issued the Decision.

## II. ARGUMENT

Discovery is proper in an APA case only in extraordinary circumstances, none of which is present. Navient focuses on two theories for overcoming the strong presumption against discovery: first, that discovery is appropriate when a record is so bare that a court has no basis to determine whether the agency's action violated the APA; and second, that discovery is proper on a selective enforcement claim (effectively, discovery into whether the agency acted in bad faith).

Navient does not show that the record is so devoid of facts that this Court lacks a basis to review the Decision. On the contrary, the record is voluminous and contains all the documents necessary to understand the Department's extensive explanations for its actions—OIG's 59-page audit report, Federal Student Aid's resulting 24-page Final Audit Determination, the initial hearing officer's 19-page decision upholding that determination, and the Secretary's 18-page final Decision. *See* AR 1–91, 1305–44. Further, the record already contains many documents and affidavits proffered by Navient in the administrative proceedings. To the extent the Court needs *any* factual record to decide the central legal question, Navient has already had the opportunity to support its view of the context and history of the relevant statute, regulations, and agency guidance. The record is more than full enough for this Court to understand and assess the Department's Decision under the standards of the APA.

Nor does Navient come close to showing that its allegation of selective enforcement justifies discovery. A mere claim of selective enforcement will not suffice; even to obtain discovery, a party must provide a strong reason to suspect that bad faith or an improper motive caused the agency to treat the party differently. Navient cannot even point to a similarly situated

10

entity that the Department treated differently, let alone to any evidence that an improper motive drove the Department's treatment of Navient.

### A.     Legal Standards

"Judicial review of administrative action is generally confined to the administrative record." *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995). Under the APA, the court reviews agency action on the basis of "the whole record or those parts of it cited by a party," 5 U.S.C. § 706, which means "the administrative record already in existence, not some new record made initially in the reviewing court," *Fayetteville Area Chamber of Com. v. Volpe*, 515 F.2d 1021, 1024 (4th Cir. 1975) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). There is a "strong presumption against discovery into administrative proceedings," which is "born out of the objective of preserving the integrity and independence of the administrative process." *NVE, Inc. v. Dep't of Health & Hum. Servs.*, 436 F.3d 182, 195 (3d Cir. 2006).

The circumstances justifying a departure from this presumption are "very limited." *Brandon v. Nat'l Credit Union Ass'n*, 115 F. Supp. 3d 678, 684 (E.D. Va. 2015). As this Court has explained, a plaintiff could "justify extra-record discovery" with "a strong showing of bad faith or a deficient record." *Hyatt v. U.S. Pat. & Trademark Off.*, No. 1:18-cv-546, 2020 WL 4820709, at *17 (E.D. Va. Aug. 19, 2020) (Ellis, J.) (citing *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010)); *see also Am. Canoe Ass'n v. EPA*, 46 F. Supp. 2d 473, 477 (E.D. Va. 1999) (Ellis, J.). But mere allegations of bad faith will not "overcome the presumption that government officials have acted properly and in good faith." *SourceAmerica v. U.S. Dep't of Educ.*, No. 1:17-cv-893, 2018 WL 10436584, at *2 (E.D. Va. July 5, 2018) (quoting *Tafas v. Dudas*, 530 F. Supp. 2d 786, 797 (E.D. Va. 2008)). This rule is consistent with the more general doctrine that a plaintiff cannot obtain discovery to prove

improper selective enforcement without first making "a colorable showing that this enforcement action was in fact selective" by pointing to a similarly situated entity whose "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions." *United States v. AT&T Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018) (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000)).

With respect to a "deficient record," *Hyatt*, 2020 WL 4820709, at *17, this Court has explained that the plaintiff must demonstrate "such a failure in the record to explain administrative action as to frustrate judicial review." *Am. Canoe Ass'n*, 46 F. Supp. 2d at 477. A party's mere desire to add context to an agency decision does not constitute such a grave "failure" as to justify discovery. The party must instead show that the record is "so bare that it prevents effective judicial review." *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).

The burden on the plaintiff is even higher when it seeks documents protected by the deliberative process privilege. That privilege "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery," and protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (quoting *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). There is a "high bar that must be overcome to obtain discovery regarding an agency's deliberative process," *Hyatt*, 2020 WL 4820709, at *17, which is not properly part of the administrative record in the first place, *see Tafas*, 530 F. Supp. 2d at 801, in addition to being independently privileged.

### B. Navient Cannot Meet the High Bar for Extra-Record Discovery

Navient falls short of demonstrating that this is the extraordinary case in which extra-record discovery is proper in an APA challenge. First, discovery is unnecessary for the Court to review the Department's legal conclusion that the 1993 Dear Colleague Letter did not justify Navient's receiving half-SAP subsidies that were inconsistent with the governing statute and regulations. Second, Navient cannot point to any evidence either that the Department treated a similarly situated competitor differently or that it acted in bad faith, which would be necessary to justify discovery relating to selective enforcement. Lastly, the discovery Navient seeks appears to consist largely of privileged information that has no place in APA review.

#### 1. Determining the "Legal Effect" of the Applicable Statute, Regulations, and Guidance Letters Does Not Require Extra-Record Factual Discovery

The Court can resolve the central question in this case—the "legal effect" of the Department's 1993 DCL, as Navient puts it, *see* Pl.'s Br. 10—on the administrative record, without expanding the scope of review to include extra-record discovery.

As an initial matter, determining the meaning and legal effect of statutes, regulations, and agency guidance is ordinarily a matter of law, not a fact-intensive inquiry. *Cf. Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (determining that EPA guidance had no "legal consequences" "[a]s a matter of law"). There is a wealth of case law regarding how to read statutes and regulations, as well as how to determine whether an agency guidance document is binding. *See, e.g.*, *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020). There are general federal regulations that describe good practices for agency guidance, including admonitions against "improperly treating a guidance document as a binding requirement." Final Bulletin for Agency Good Guidance Practices, 72 Fed. Reg. 3432, 3438 (Jan. 25, 2007). And there are Department precedents concerning the effect of Dear Colleague

Letters, including when such a document conflicts with promulgated regulations. *See, e.g., MBTI Bus. Training Inst. of Puerto Rico*, U.S. Dep't of Educ., No. 93-147-SA (Apr. 15, 1994). Given this wealth of authority, the Court does not need fact discovery "to determine whether the DCLs were issued in accordance with the law and required procedure, and to evaluate their legal effect," Pl.'s Br. 11.

To the extent resolution of these issues does require fact-finding, however, Navient does not explain why the record is "so bare" that the Court is incapable of reviewing the Decision. The record before the Department already includes a variety of documents, including correspondence between the Department and Navient concerning the half-SAP subsidy and primary documents such as the Trust Agreement governing the 1993 Bonds. *E.g.*, AR 132–40, 1486–517. And the record includes dozens of pages of affidavits on a variety of subjects, which Navient presumably proffered to shed light on the meaning and effect of the Department regulations and DCLs at issue here. *E.g.*, AR 1372–476. It is hardly the case that the Department had no relevant documentation before it when it issued the Decision.

Navient misapprehends the standard for obtaining discovery in an APA case when it suggests that it needs to obtain "Department guidance, memoranda, handbooks, and communications regarding the process for issuing Dear Colleague Letters; [the Department's] views as to their legal effect; and materials related to the 1993, 1996, and 2007 DCLs." Pl.'s Br. 11. Leaving privilege issues aside, such documents might conceivably be discoverable under Rule 26 in ordinary federal litigation. But the question here is not whether these and similar documents would be discoverable, whether they are relevant to the case, or even whether they could be helpful to the Court. The question is whether their absence "prevents effective judicial review." *Com. Drapery Contractors, Inc.*, 133 F.3d at 7. Considering that the 2335-page record

already contains substantial factual material, including about the history of the SAP regulations and the DCLs, the Court has more than sufficient information to determine whether the Decision satisfied the APA.

Navient's cases do not suggest otherwise. The primary case on which Navient relies, *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 3 (D.D.C. 2017), did not involve discovery at all. There, the court merely allowed the plaintiff to offer extra-record affidavits concerning industry practice, and industry reliance on prior agency conduct, to resolve a facial challenge to the validity of a Dear Colleague Letter. *Id.* at 5–6. Here, Navient has already had the opportunity to offer exactly this type of evidence—indeed, it did so, and such affidavits are already part of the record. *E.g.*, AR 1382–89 (affidavit describing industry input into Department regulatory guidance). Further, the central issue in *United Student Aid Funds* was the procedural validity of how the Department issued a particular DCL, a point on which the court had already found there was a "serious question." 237 F. Supp. 3d at 6. Evidence about Department procedure was therefore critical—and the court still did not allow *discovery* of testimony or documents from the Department, only supplementation of the record. Here, the internal discussions that led to the regulations and guidance are at most tangentially relevant to the central question, which is whether, as a matter of law, the 1993 DCL justified Navient's claims for half-SAP subsidies despite the statute and regulations. Extra-record discovery into Department procedures and deliberations is therefore not necessary or appropriate.

    **2.  Navient Has Not Justified Extra-Record Discovery on Its Selective Enforcement Argument**

Navient has not come close to meeting the high bar for obtaining discovery on its theory that the Department has improperly treated Navient differently than similarly situated industry

participants. Navient has never pointed to any similarly situated industry participant, let alone to evidence that the Department's treatment of Navient was improper.

The only supposed comparator to which Navient has pointed with any specificity is not comparable. Navient has repeatedly cited the Department's settlement of a dispute with Nelnet, another loan holder, as the basis for its selective enforcement argument. *See* Pl.'s Br. 11–12. But while the Nelnet dispute did relate to half-SAP subsidies, it arose out of the issue discussed in the 2007 DCL—the fact that some lenders were claiming half-SAP subsidies on loans that went beyond the "first-generation" and "second-generation" loans permitted under the statute and regulations. *See supra* at 4–5; AR 141–46. Navient cannot claim that the Department treated it differently with respect to the issue highlighted in the 2007 DCL: the Department declined to attempt to recoup half-SAP subsidies it paid to Navient on third-generation loans, just as it declined to do so for other lenders. *See* AR 28 n.10 (noting that OIG did not rely on any determination of whether the loans at issue were third-generation or successive loans).

Navient has never pointed to any industry participants that face Navient's particular problem: whether it is permissible to claim half-SAP subsidies on all the loans in a pool that is partly funded with tax-exempt obligations. This is unsurprising. Navient has described the pool structure giving rise to this problem as "unique." AR 1744 (briefing before initial hearing officer); AR 2167 (explaining to the Secretary that "the 1993 Bond structure was unique"). Thus, there are no other industry participants to which Navient can fairly compare itself when it complains about how the Department is treating this "unique" structure. Navient cannot make any showing, let alone the requisite "strong showing," *Hyatt*, 2020 WL 4820709, at *17, that the Department has selectively enforced its regulations against Navient on an improper basis.

### 3. Navient Appears To Seek Primarily Privileged Information

The Court should also deny Navient's motion because much, if not all, of the information Navient seeks would be protected by the deliberative process privilege.[10]

As discussed, the deliberative process privilege protects "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Klamath Water Users Protective Ass'n*, 532 U.S. at 9 (quoting *Sears, Roebuck & Co.*, 421 U.S. at 150); *see also U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021). There are two requirements for asserting the privilege: a document must be both "predecisional and deliberative." *City of Va. Beach v. U.S. Dep't of Com.*, 995 F.2d 1247, 1253 (4th Cir. 1993). "Predecisional documents are prepared in order to assist an agency decisionmaker in arriving at his decision," while a document is "deliberative" if it "reflects the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes. *Id.* (internal quotation marks and citation omitted). "The privilege thus protects recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Solers, Inc. v. Internal Revenue Serv.*, 827 F.3d 323, 329 (4th Cir. 2016) (internal quotation marks omitted) (emphasis omitted).

While Navient has not issued *specific* discovery requests, the discovery it appears to seek would encompass a substantial amount of protected information. In its brief, Navient points to "materials that reflect the Department's positions as to the binding nature of DCLs, internal

---

[10] To be clear, deliberative documents are not part of the administrative record itself. *See Tafas*, 530 F. Supp. at 801 ("internal emails, correspondence, summaries, and drafts . . . are not properly part of the administrative record in the first place"). The record here is complete; Navient argues instead for *extra*-record discovery of deliberative documents.

17

Department communications regarding the intent of the DCLs at issue here, and information regarding the Department's settlement agreements and treatment of other industry participants billing at the 1/2 SAP rate." Pl.'s Br. 8. Many documents of the first type—decisions and regulatory guidance reflecting the *Department's* positions—are already public, as are many documents in the third category. And Navient already had the opportunity to put such public documents into the administrative record.

The more substantial discovery Navient seeks, however, is "internal Department communications regarding the intent of the DCLs at issue here." *Id.* Such documents would very likely be protected as predecisional and deliberative documents. Communications between Department personnel about whether the Department should include particular language in a DCL, for example, would nearly always be the kind of "recommendations, draft documents, proposals, suggestions, and other subjective documents," *Solers*, 827 F.3d at 329 (emphasis omitted), that the privilege protects. To the extent such information is the core of the discovery Navient seeks, it will be seeking substantial volumes of privileged internal documents. Such discovery has no place in an APA challenge.

## CONCLUSION

The Court should deny Navient's motion and direct the parties to agree on a schedule for filing motions for summary judgment.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

 /s/ 
HUGHAM CHAN
Assistant United States Attorney
Office of the United States Attorney

Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Tel: (703) 299-3743
Fax: (703) 299-3983
Email: hugham.chan@usdoj.gov

BRIAN M. BOYNTON
ACTING ASSISTANT ATTORNEY GENERAL

RUTH A. HARVEY
DIRECTOR

T. DIETRICH HILL (*pro hac vice*)
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
Corporate/Financial Litigation Section
Box 875
Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0243
Email: Thomas.Dietrich.Hill@usdoj.gov

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

Ada Fernandez Johnson
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, NW, Suite 500
Washington, DC 20004
Tel: (202) 383-8000
Email: afjohnson@debevoise.com

*Counsel for Plaintiff*

/s/
HUGHAM CHAN
Assistant United States Attorney
Office of the United States Attorney
Justin S. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3743
Fax:         (703) 299-3983
Email:  Hugham.Chan@usdoj.gov

Date: July 28, 2021                           *Counsel for Defendants*