UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No.: 1:21-cv-324-TSE-IDD |
| DEPARTMENT OF EDUCATION and DR. MIGUEL CARDONA, | ) ) ) ) |
| Defendants. | ) ) ) |

## JOINT STIPULATION OF FACTS AND DOCUMENTS

Pursuant to this Court's January 13, 2022 Order, Plaintiff Navient Solutions, LLC ("**Navient**") and Defendants Department of Education and Dr. Miguel Cardona, Secretary of Education (collectively, the "**Department**"), jointly submit the following Stipulation of Facts and Stipulation of Documents.

### STIPULATION OF FACTS

**The Parties**

1. Navient is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business located in Herndon, Virginia.

2. Navient is the successor to Sallie Mae, Inc., which, prior to 2004, operated as part of a government-sponsored enterprise (known as "**Sallie Mae**") established to provide a secondary market for student loans.

3. The Department is an agency of the executive branch of the United States government headquartered in Washington, D.C. Secretary of Education Dr. Miguel Cardona is the official who currently oversees the Department.

**The Federal Family Education Loan Program and Special Allowance Payments**

4. The Department oversees the administration of federal student loans, including the Federal Family Education Loan ("**FFEL**") program, which was originally prescribed in the Higher Education Act of 1965 (the "**HEA**"). *See* AR 1311.

5. Through its administration of the FFEL program, the Department has worked with private entities as lenders and secondary-market purchasers to make it possible for students to achieve their higher education goals. *See* AR 158, 1311.

6. Because the HEA imposes limitations on the maximum interest rates that can be charged to student borrowers, the HEA provides, in some instances, special allowance payments ("**SAP**") to lenders to foster liquidity in the student loan marketplace, when the yield on a student loan under the FFEL program ("**FFELP Loan**") is less than the rate prescribed by statute. *See* AR 325, 329.

7. SAP thus mitigates the risk FFEL program lenders would otherwise face from fluctuations in interest rates. *See* 2206.

8. The HEA also generally guarantees FFELP Loans to mitigate the risk of default. AR 159.

9. Over the past several decades, Congress and the Department have instituted several statutory and regulatory changes that impacted the FFEL program and SAP.

10. The Department also has issued various Dear Colleague Letters ("**DCLs**") to provide guidance on applicable laws and regulations. *See, e.g.*, AR 92, 109, 2082.

11. In 1976, Congress amended the HEA to subsidize interest rates for secondary-market lenders, allowing holders of FFELP Loans to receive a return that was comparable to the return lenders could earn on the open market. AR 1311.

12. Because lenders can issue tax-exempt debt at more favorable interest rates, Congress amended the HEA in 1980 to create a unique SAP rate for entities that used tax-exempt financing. *See* AR 9, 329-30, 1311.

13. These amendments provided for payment at a reduced SAP rate to holders of loans originated or purchased with tax-exempt funds—specifically, a rate of one-half the rate paid to lenders, with a minimum yield, or "floor." *See* AR 1311.

14. When the financing at issue in this dispute was created, loans originated or purchased with tax-exempt debt were subject to this "1/2 SAP" Rate, with a minimum yield, or floor, of 9.5%. *See* AR 1311.

15. In 1985, the Department issued regulations on the 1/2 SAP Rate, including 1/2 SAP for FFELP Loan holders who issued tax-exempt debt obligations. *See* AR 1313-14.

16. The 1985 regulations provided, as pertinent here, that the Department would cease to pay the 1/2 SAP Rate on "a loan made or acquired with the proceeds of a tax-exempt obligation after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than a tax-exempt obligation and- (i) The prior tax-exempt obligation is retired; or (ii) The prior tax-exempt obligation is defeased . . . ." AR 171.

17. On December 18, 1992, the Department issued new regulations (the "**1992 Regulations**") amending 34 C.F.R. § 682.302(e), providing that: "The Secretary pays a special allowance to an Authority at the [full SAP Rate] on a loan [made or purchased with funds obtained from the issuance of tax-exempt obligations] (i) After the loan is pledged or otherwise

3

transferred in consideration of funds derived from sources other than [tax-exempt obligations] and (ii) If the authority retains a legal or equitable interest in the loan – (A) The prior tax-exempt obligation is retired; or (B) The prior tax-exempt obligation is defeased . . . ."  AR 192.

18. On August 10, 1993, Congress enacted the Omnibus Budget Reconciliation Act of 1993, which included the Student Loan Reform Act of 1993 (the "**SLRA**").  *See generally* AR 577.

19. As relevant here, the SLRA eliminated the 1/2 SAP Rate on loans made or purchased with newly issued tax-exempt obligations—specifically, tax-exempt obligations issued on or after October 1, 1993.  *See* AR 9, 600.

**The Nellie Mae Trust and the 1993 Bonds**

20. In 1993, around the same time statutory and regulatory changes to the 1/2 SAP Rate were being implemented, Nellie Mae (a student loan provider that was acquired along with certain of its affiliates by Sallie Mae in 1999) was in the process of refunding previously issued tax-exempt bonds and acquiring additional student loans with tax-exempt financing.  *See* AR 73-75.

21. Beginning in March 1993, a Nellie Mae affiliate, the New England Education Loan Marketing Corporation ("**NEELMC**") issued tax-exempt bonds totaling over $458 million under a master trust indenture ("**1993 Indenture**") entered into between NEELMC and the First National Bank of Boston, which created the Nellie Mae Trust (the "**1993 Trust**").  *See* AR 74; *see also* AR 1309, 1490, 1524-25.

22. The tax-exempt bonds issued under the 1993 Indenture (the "**1993 Bonds**") refunded previously issued tax-exempt bonds, and the proceeds from the bonds were put into a common funding pool (the "**1993 Bond Pool**") to continue to finance existing student loans and,

4

as permitted by the transaction documents and applicable rules and regulations, to acquire additional student loans, all held by the 1993 Trust.  AR 74-75, 1330-31.

| Series | | Issue Date | Maturity Date | Amount |
|---|---|---|---|---|
| #1 Original Indenture | 1993A | March 18, 1993 | July 1, 2005 | $103,300,000 |
| #2 First Supplement | 1993B | June 9, 1993 | June 1, 1998 | $5,800,000 |
| | | | June 1, 2000 | $32,405,000 |
| | | | June 1, 2002 | $10,700,000 |
| #3 Second Supplement | 1993C | July 1, 1993 | July 1, 1998 | $26,100,000 |
| #3 Second Supplement | 1993D | July 1, 1993 | July 1, 1998 | $10,160,000 |
| #3 Second Supplement | 1993E | July 1, 1993 | July 1, 1999 | $58,340,000 |
| #3 Second Supplement | 1993F | July 1, 1993 | July 1, 2004 | $32,500,000 |
| #4 Third Supplement | 1993G | August 24, 1993 | August 1, 1998 | $31,500,000 |
| | | | August 1, 2000 | $28,100,000 |
| | | | August 1, 2002 | $47,400,000 |
| #5 Fourth Supplement | 1993H | November 15, 1993 | December 1, 1999 | $57,420,000 |
| | | | December 1, 2002 | $14,370,000 |

23.     The loans acquired with the bond proceeds were not pledged as collateral for any of the 1993 Bonds.  AR 1309.

24.     Nellie Mae maintained two sub-pools within the 1993 Bond Pool, comprised of proceeds from Bond 1993A ("**Sub-pool 1**") and Bonds 1993B through 1993H ("**Sub-pool 2**"). *See* AR 74-75, 1330-31, 1373-74.

25.     Nellie Mae deposited principal and interest payments, guarantor payments, interest benefits and special allowance, and other income from the loans from the 1993 Bonds into accounts related to the respective sub-pools.  AR 1374.

26.     Deposits made into sub-pools of the 1993 Bond Pool were fungible within the respective sub-pools, and new student loans were acquired with commingled funds.  AR 1374.

27.     Because the funds within the sub-pools of the 1993 Bond Pool were commingled, Nellie Mae did not track which specific bond was used to acquire a given loan.  AR 1374.

5

28. All loans held by the 1993 Trust were financed or acquired at least in part with proceeds from tax-exempt bonds. *See* AR 1374-75.

29. Each of the 1993 Bonds "was treated collectively and on a parity basis with other bonds in terms of the bondholders' right to payments, default provisions and remedies." AR 41; *see also* AR 41-42, 75.

30. At the time of issuance, all loans associated with the 1993 Trust were eligible for SAP at the 1/2 SAP Rate. AR 1307-08.

**The 1993 Dear Colleague Letter**

31. In 1992 and 1993, the Department held meetings with student loan lenders and servicers, including with the National Council of Higher Education Loan Programs ("**NCHELP**") Regulations Committee. *See* AR 1382-88, 1477.

32. Sheila Ryan-Macie was Nellie Mae's delegate to NCHELP and interacted with the Department throughout 1992 and 1993. AR 1379-80.

33. These meetings included extensive discussions regarding the 1992 Regulations and the SLRA, and included the exchange of comments and questions between student loan lenders and servicers, and the Department. *See* AR 1382-87; *see generally* 1392, 1394-441, 1445-74.

34. Ms. Ryan-Macie recalls asking Robert Evans, then an official at the Department, to clarify, in a forthcoming DCL containing guidance on the 1993 SLRA, how the special allowance rules would apply to the 1993 Trust, in which specific loans were not pledged as collateral for specific bonds and where instead all bonds and loan proceeds were pooled and used to acquire loans. *See* AR 1387-88, 1478.

35. In November 1993, the Department issued a DCL (the "**1993 DCL**") that "contain[ed] information about the major changes" made to the FFEL program by the SLRA. The "purpose" of the 1993 DCL was "to provide the student loan community with information on the major program changes mandated by the new law." AR 92.

36. The 1993 DCL listed 35 "major provisions" of the SLRA and provided brief explanations of each one for the benefit of the relevant members of the student loan community, such as guaranty agencies. AR 95, 95-107.

37. The 1993 DCL listed SLRA § 438(b)(2) as one of the "major provisions" of the SLRA. The DCL explained: "The minimum special allowance rate 'floor' on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed. Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations *originally* issued **on or after October 1, 1993**, or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to receive the minimum special allowance. Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance." AR 107.

38. According to Ms. Ryan-Macie, the original draft of the 1993 DCL did not include the "in whole or in part" language; that language was added after Ms. Ryan-Macie's discussions with Mr. Evans about the 1993 Trust. AR 1388.

39. According to Mr. Evans, it was "highly probable" that the "in whole or in part" language was included "to address a specific question or activity the Department was seeking to

7

address," and inclusion of this language was "consistent with the policy direction being taken at the time by the Department to expand" the 1/2 SAP Rate limitations. AR 1478.

40. One other industry participant recalls that the "in whole or in part" language was added to the 1993 DCL following Ms. Ryan-Macie's conversations with Mr. Evans. AR 1602-03.

41. The Department issued a second DCL in December 1993 (98-L-163(LD)) that "contain[ed] information and provide[d] guidance on the changes made by [the SLRA] that affect[ed]" reporting requirements. AR 109.

42. Section IV of the December 1993 DCL repeated the language noted in the 1993 DCL above. AR 110.

43. In 1996, the Department issued a DCL concerning the 1992 Regulations, which explained that 34 C.F.R. § 682.302(e) "was revised to reflect a shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations." AR 2086.

**1/2 SAP Billing on the Loans at Issue**

44. Nellie Mae established its procedure of billing at the 1/2 SAP Rate for loans financed by the 1993 Trust based on its understanding of the guidance in the 1993 DCL. *See* AR 1480.

45. Accordingly, Sallie Mae treated all loans associated with the 1993 Trust as eligible for 1/2 SAP until the last bond issued under the 1993 Trust was retired on July 1, 2005. AR 72, 1310-11; *supra* ¶ 22.

46. In June, August and December 2002, the 1993B bond, the 1993G bond, and the 1993H bond, respectively, matured and were retired. AR 78; *supra* ¶ 22.

47. Upon the retirement of these bonds, certain loans that had been associated with the bonds were transferred to Sallie Mae affiliates and funded with non-tax-exempt obligations,

and Sallie Mae continued to bill for these loans using the 1/2 SAP Rate on the basis that tax-exempt bonds issued under the 1993 Indenture remained outstanding. AR 78, 1310-11.

48. The Department paid the 1/2 SAP Rate on each of these payments through June 30, 2005. *See* AR 20.

49. The loans associated with the 1993F bonds were refinanced through various corporate entities as a result of a series of corporate restructurings and transactions. *See* AR 78-79.

50. On April 13, 1998, NEELMC (which issued the 1993 Bonds) incorporated a new subsidiary as a for-profit corporation and shortly thereafter made an election under Internal Revenue Code § 150(d)(3) to cease status as a qualified scholarship funding corporation. AR 1309.

51. In the underlying proceedings, Navient disagreed with the Department's analysis of the corporate structure relevant to the transfer of certain loans associated with the 1993 Trust to the SLM Education Credit Finance Corporation ("**ECFC**") in 2004. *See* AR 2208-09.

52. On July 1, 2004, the 1993F bond matured and was retired. AR 1310.

53. After a July 2004 transfer of loans associated with the 1993F bond series to ECFC, Sallie Mae stopped billing at the 1/2 SAP Rate and it reclassified the loans as eligible for full SAP. AR 16, 1310.

54. In February 2005, Sallie Mae resumed billing at the 1/2 SAP Rate for quarters ending March 31, 2005 and June 30, 2005, and it adjusted billings for quarters ending September 30, 2004 and December 31, 2004 to reflect the 1/2 SAP Rate. AR 16, 1310.

55. The Department paid the 1/2 SAP Rate on these loans through June 30, 2005. AR 16.

**The 2007 Dear Colleague Letter**

56. On January 23, 2007, the Department issued DCL FP-07-01 ("**2007 DCL**") to "restate[] the applicable requirements of the HEA and regulations that control whether FFELP Loans acquired with funds derived from tax-exempt financing sources acquire eligibility for special allowance payments at the 9.5 percent minimum return rate." AR 141.

57. The "purpose" of the 2007 DCL was to "provide guidance . . . on the requirements applicable to claims for SAP at the 9.5 minimum return rate." AR 143.

58. The Department quoted 34 C.F.R. § 682.302(c)(3)(i)(2006) and noted that these "requirements" of the statute and regulations that it was restating had "been in effect since 1993." AR 144.

59. The 2007 DCL provided that "[o]nly the loans described in these statutory and regulatory provisions are eligible for" 1/2 SAP. AR 144.

60. The 2007 DCL explained that "[l]oans acquired from" the sources described in the 1992 Regulations "can be divided into two categories," "first-generation loans" or "second-generation loans," in terms of their tax-exempt financing. *See* AR 142, 1328.

61. The 2007 DCL defined "first-generation loans" as "loans acquired using proceeds of the tax-exempt obligation" and "second-generation loans" as "loans acquired using funds obtained directly from first-generation loans." *See* AR 144, 1328.

62. As the DCL further explained, the Department had "reason to believe that some lenders may be claiming [1/2 SAP] on loans which are neither first-generation nor second-generation loans." AR 145.

63. The Department explained that it was "committed to resolving without protracted dispute any potential objections both to the meaning and application of the statutory and regulatory requirements" and stated that it would "not seek to recoup SAP already received in

10

excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the [1/2 SAP] rate for loans that were neither first-generation loans nor second-generation loans for those lenders that promptly compl[ied] with or accept[ed]" certain requirements.  AR 146, 1611.

64.   On February 15, 2007, Sallie Mae responded to explain that it "respectfully disagree[d] with the [Department's] interpretation" concerning eligibility for and applicability of 1/2 SAP payments, but "agree[d]" to make no further claims for 1/2 SAP and to accept payment in the fourth quarter of 2006 at the standard SAP rate.  AR 229.

65.   Sallie Mae's letter explained that it understood its response would "mark our closing correspondence with respect to the [1/2 SAP] issue."  AR 229.

**OIG Audit**

66.   On September 11, 2007, OIG informed Sallie Mae that it would undertake an audit with respect to the 1/2 SAP issue.

67.   On August 3, 2009, OIG issued a Final Audit Report (the "**FAR**").  *See generally* AR 3.

68.   The FAR covered an audit period of October 1, 2003 through September 30, 2006.  AR 6.

69.   The FAR found that Sallie Mae had "continued to bill loans under the 9.5 percent floor after the eligible tax-exempt bonds, from which the loans derived their eligibility for the 9.5 percent floor, had matured and been retired, and after the loans were refinanced with funds derived from ineligible sources."  AR 6.

70.   The FAR estimated Sallie Mae's liability to be $22.3 million, an amount that Sallie Mae disputed.  AR 12, 38.

71. Sallie Mae filed a response to the FAR on October 2, 2009 and replied to questions from the Department's Office of Federal Student Aid ("**FSA**") in March 2010 and March 2011. *See* AR 65.

72. On September 25, 2013, FSA issued a Final Audit Determination (the "**FAD**") that concluded that Nellie Mae had improperly received payments on certain loans that had allegedly lost eligibility for 1/2 SAP when the bonds with which the loans were supposedly associated—specifically, the 1993B, 1993G and 1993H bonds—had been retired. *See* AR 65, 86.

73. The FAD also found that certain loans were ineligible for 1/2 SAP payments after they had been transferred to ECFC and after the 1993F bond had matured. *See* AR 86, 89-90.

**Further Proceedings Before the Department of Education**

74. On July 27, 2016, Navient Corporation requested a review of the FAD on behalf of its subsidiary entities, on the grounds (among others) that the 1/2 SAP Rate applied to all loans originally funded by the 1993 Bonds until the last bond associated with the 1993 Trust matured, and that FSA treated it unfairly as compared to other industry participants. *See* AR 1676-91.

75. Navient claimed that it had taken a conservative approach to the 1/2 SAP Rate in contrast to its industry peers and that it had been unfairly singled out by FSA. *See* AR 1319-20, 1733-36, 1778-81.

76. On March 7, 2019, a hearing official issued an initial decision affirming the FAD. Among its findings, the official held that (*i*) the 1993 DCL's "in whole or in part" language contradicted the language of the governing statute, was "inconsistent with the purpose for the legislation," and declined to interpret the 1993 DCL's language "in a way that violates the statute's language"; (*ii*) ECFC did not meet the relevant criteria to retain qualification for tax-

exempt bond purposes under IRC § 150(d)(3)(A-B); and (*iii*) Navient did not show that it had been singled out by FSA. *See* AR 1317-20.

77. The official recognized that the FSA would issue a separate determination on liability. AR 1323.

78. On April 8, 2019, Navient Corporation, on behalf of its subsidiary entities, appealed. *See generally* AR 2139.

79. Acting Secretary of Education Mitchell M. Zais issued a final Decision on January 15, 2021 affirming the hearing official's decision. *See generally* AR 1326, 1342-43.

80. The Secretary rejected Navient's argument with respect to the legal effects of the 1993 DCL and the 2007 DCL, declined to treat the 1993 Bonds as a single obligation, determined that ECFC loans could not bill at the 1/2 SAP Rate based on the maturity date of the 1993F bond, found no due process violation due to the length of time that had passed since the alleged overpayments, and found that bifurcation of the proceedings was proper. AR 1336-42.

81. On March 16, 2021, Navient filed a Complaint initiating the present proceeding.

## STIPULATION OF DOCUMENTS

1. OIG Final Audit Report.  AR 1-64.

2. FSA Final Audit Determination.  AR 65-91.

3. 1993 DCL (DCL 93-L-161).  AR 92-108.

4. Letter from Sheila Ryan-Macie to Robert Evans.  AR 132-137.

5. Letter from Robert Evans to Sheila Ryan-Macie.  AR 138-140.

6. 1997 DCL (DCL FP 07-01).  AR 141-146.

7. Fax Transmission from Sheila Ryan-Macie to Pamela Moran.  AR 196-200.

8. DCL FP 06-15 with Attachment.  AR 218-223.

9. Sallie Mae Letter Responding to 2007 DCL.  AR 229.

10. Hearing Official's Initial Decision.  AR 1305-1324.

11. Decision of the Secretary.  AR 1325-1344.

12. Affidavit of Jason Wheeler.  AR 1372-1378.

13. Affidavit of Sheila M. Ryan-Macie.  AR 1379-1476.

14. Letter from Robert Evans, former Director of Policy and Development, U.S. Department of Education, to Sheila Ryan-Macie.  AR 1477-1478.

15. Affidavit of John (Jack) Remondi.  AR 1479-1481.

16. NCHER Website Interest & Special Allowance Rate Information, Historic 91-Day T-Bill Rates.  AR 1482-1485.

17. Affidavit of Mark L. Heleen.  AR 1595-1597.

18. Navient Responses to OIG Questions of December 14, 2007.  AR 1598-1600.

19. Affidavit of Jane Roig.  AR 1602-1603.

20. Emails concerning Freedom of Information Act dated April 26, 2017 and May 15, 2017.  AR 1604-1607.

21. Letter from Theresa Shaw to Thomas J. Fitzpatrick.  AR 1608-1611.

22. 1993 DCL (Reporting) (DCL 39-L-163).  AR 2078-2081.

23. 1996 DCL (DCL 96-L-186).  AR 2082-2087.

24. DCL FP-07-06.  AR 2100-2138.

25. Navient Visuals from Oral Argument before the Department of Education Office of Hearings and Appeals.  AR 2202-2209.


Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

| /s/ | /s/ |
|---|---|
| HUGHAM CHAN | Carter Burwell |
| Assistant United States Attorney | Katherine R. Seifert (*pro hac vice*) |
| Office of the United States Attorney | Debevoise & Plimpton LLP |
| Justin W. Williams U.S. Attorney's Building | 801 Pennsylvania Avenue, NW, Suite 500 |
| 2100 Jamieson Avenue | Washington, DC 20004 |
| Alexandria, VA 22314 | Tel: (202) 383-8000 |
| Tel:   (703) 299-3743 | Email: cburwell@debevoise.com |
| Fax:   (703) 299-3983 | |
| Email: hugham.chan@usdoj.gov | Matthew Specht (*pro hac vice*) |
| | Debevoise & Plimpton LLP |
| BRIAN M. BOYNTON | 919 Third Avenue |
| PRINCIPAL DEPUTY ASSISTANT | New York, NY 10022 |
| ATTORNEY GENERAL | |
| | *Counsel for Plaintiff* |
| RUTH A. HARVEY | |
| DIRECTOR | Dated: March 11, 2022 |

T. DIETRICH HILL (*pro hac vice*)
Trial Attorney
United States Department of Justice
Civil Division, Commercial Litigation Branch
Corporate/Financial Litigation Section
Box 875

15

Ben Franklin Station
Washington, DC 20044
Tel: (202) 307-0243
Email: Thomas.Dietrich.Hill@usdoj.gov

*Counsel for Defendants*