**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| NAVIENT SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:21-cv-324-TSE-IDD |
| | ) | |
| DEPARTMENT OF EDUCATION and | ) | |
| DR. MIGUEL CARDONA, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

# EXHIBIT 10
# Hearing Official's Initial Decision
# AR 1305-1324



## UNITED STATES DEPARTMENT OF EDUCATION
WASHINGTON, D.C. 20202

In the Matter of

_____

**NAVIENT CORPORATION**

**Docket No. 16-42-SA**

Federal Student
Aid Proceeding

ACN: ED-OIG/A0310006

Respondent.

_____

Appearances: Colby A. Smith, Esq., Ada Fernandez-Johnson, Esq., Jil Simon, Esq., Debevoise & Plimpton LLP, Washington, D.C., for Navient Corporation.

Natasha Varnovitsky, Esq., Brian P. Siegel, Esq., Office of the General Counsel, U. S. Department of Education, Washington, D. C., for Federal Student Aid.

Before: Judge Robert G. Layton

### <u>DECISION</u>

### <u>BACKGROUND</u>

The Student Loan Marketing Association ("SLMA"), commonly known as Sallie Mae, was originally formed as a government entity to service federal education loans. Its loans originated under the Federal Family Education Loan Program ("FFELP"), where it provided servicing for the U.S. Department of Education ("Department") and collected federal student loan debt on the Department's behalf. Sallie Mae dissolved its charter in 2004, terminated its corporate ties to the federal government, and later became part of Navient Corporation ("Navient"), the Respondent in this matter. Navient is the parent corporation for Sallie Mae and several related companies, including all of the Nellie Mae[1] entities and the SLM Education Credit Finance Corporation ("ECFC").

On April 13, 1998, the New England Education Loan Marketing Corporation

---

[1] "Nellie Mae" in this appeal refers collectively to Nellie Mae Holdings LLC (formerly known as Nellie Mae Corporation, then Nellie Mae Holdings Corporation), Nellie Mae Education Loan LLC (formerly known as Nellie Mae Education Loan Corporation), and Nellie Mae Loan Finance, LLC.

("NEELMC") incorporated Nellie Mae Corp.as a for-profit Delaware subsidiary corporation. On June 30, 1998, NEELMC transferred its assets and liabilities to Nellie Mae Corp., which included liability on the 1993 F bond, one of several bonds originally issued by NEELMC. Nellie Mae Corp. then transferred its beneficial interest to Nellie Mae Education Loan Corp., its subsidiary. After the 1998 transactions, FSA concluded that Nellie Mae Corp. and Nellie Mae Education Loan Corp. were the only entities liable on the 1993 series bond.

Nellie Mae Corp. established a second subsidiary on July 27, 1999. This subsidiary was renamed SLM Education Credit Finance Corp. on November 12, 2003. For operational reasons, various affiliates maintained "holding tanks" that loans were transferred into during the course of their refinancing at the 9.5 percent minimum return rate. Sallie Mae states that these holding tanks can consist of another accounting unit within the same corporate entity that owned the loans, a direct or indirect subsidiary, or parent of the obligor on related tax-exempt obligations. The corporate entity that owned the holding tanks is not named, but is described in association with Nellie Mae Education Loan Corp.

The Department's Office of Inspector General (OIG) issued an audit report on August 3, 2009. In this audit, OIG found the subsidiary of Nellie Mae, which was the for-profit subsidiary of NEELMC, collected overpayments of Special Allowance Payments (SAP) on loans funded by tax-exempt obligations that had matured. OIG recommended that FSA direct Navient to collect on the overpayment (estimated to be approximately $22 million, from two separate loan bond funds), and that those funds be returned to the Department. OIG also recommended that FSA require Navient to disclose any other past instances where Navient's subsidiaries may have billed at the 9.5 percent floor calculation after the tax-exempt bond issue matured and the other loans were refinanced with funds from ineligible fund sourcing.

In 2013, four years after the 2009 OIG audit report, FSA issued a final audit determination, and then granted Navient numerous extensions to respond to that audit. In 2016, the Department ended the extensions of time for Navient to appeal the Department's final audit determination. On July 27, 2016, the Department received a written Request for Review from the attorneys for Navient.

The limited and unusually bifurcated nature of this appeal must be clearly identified. The Department stated its audit report was bifurcated, with the dollar amount of potential liability carved out and excepted as subject to a subsequent appeal. The issue that the September 25, 2013, final audit determination letter sets out as subject to appeal is the question of liability identified in the letter.

The FSA letter states:

"FSA will issue a separate determination solely on the amount of overpayments and the adequacy of any other actions taken to implement the directions in this letter. At that time, Sallie Mae may appeal to the Secretary of Education for a review of its contentions that these FSA determinations are erroneous. To do so, Sallie Mae must file a request for a hearing in accordance with the steps described above for the liability determination, and the Department will provide a hearing

2

under the procedures stated there.[2] The Scope of the hearing and administrative appeal will be limited solely to challenges to these determinations, and not to the adequacy or legality of the findings on which liability rests, as those findings may have been modified through an administrative appeal as described above for the liability determination. ... If Sallie Mae (Navient) timely files a request for a hearing, the decision of the hearing official, or, if appealed, the decision of the Secretary will constitute the final decision of the Department on these determinations.

The final decision of the Department on this audit determination will therefore consist of two parts: the final decision of the Department on the adequacy of the findings as to liability, and the final decision of the Department on the amount of overpayments and the adequacy of other actions." *September 25, 2013 Final Audit Determination Letter.*

Although Navient vigorously opposes the liability determination in this matter, Navient does not contest the unusual bifurcated nature of this appeal.

The Department seeks return of funds due to what it contends is Navient's (through Nellie Mae) collection of overpayment from SAPs at the 9.5 percent rate floor beyond the time the Department contends Navient was eligible to collect SAPs at that rate. The SAPs at issue were established during a time of high interest rates as a way to guarantee a modest minimum interest rate for non-profit lenders. As interest rates fell over time, those previous minimum interest rates actually became higher than market rates. The Department contends Navient received those higher rate payments erroneously after it was no longer eligible to do so.

As a result, the Department's Federal Student Aid office (FSA) issued a Final Audit Determination, dated September 25, 2013, ordering the repayment of an undetermined amount of SAP proceeds. Navient challenged these findings pursuant to 34 C.P.R. § 668.113(a). The appeal procedures for these proceedings are set forth in 34 C.F.R. Part 668, Subpart H.

On March 1, 1993, refunding bonds were issued between First National Bank of Boston and the Nellie Mae. Under the 1993 Trust Agreement between the two parties, eight series of bonds were created. Nellie Mae was a qualified scholarship funding corporation authorized to issue tax-exempt student loan bonds by the Internal Revenue Code (IRC). The bonds issued between First National Bank and Nellie Mae were general unsecured obligations.

There are two sources of loans that, under the Higher Education Act of 1965, qualify for a 9.5 percent minimum (SAP). U.S.C. § 1087-1(b)(20(B)(i) (2006). The two sources are: (1) funds obtained from the issuance of a tax-exempt obligation originally issued prior to October 1, 1993, or from investment earnings on the proceeds of such an obligation; and (2) funds obtained as collections on, interest benefits or special allowance payments on, or income on, loans made or purchased from the proceeds of that tax-exempt obligation. *Id.* At the time of issuance, all

---

[2] Although the amount of the liability has been specifically excluded from this appeal proceeding by FSA, the Office of Inspector General estimated the overpayments at issue are approximately $22.3 million. *Office of Inspector General Final Audit Report, August 3, 2009.* That is only an estimate.

3

loans associated with 1993 bond series were eligible for SAP at a 9.5 percent minimum return rate.

Navient has the burden of proof in this proceeding. *See* 34 C.F.R. § 668.116(d). If it fails to establish the correctness of the expenditure of federal education funds under the Title IV criteria of the statutes and regulations, the Respondent must return the funds to the Department. *Id.*

## ISSUES

The issues to be resolved in this bifurcated proceeding are:

1. **Was Navient's financing, with loans acquired in whole or in part with tax-exempt funds, entitled to receive payments at the 1/2 SAP rate during the periods of the audit?**[3]

2. **Was Navient's treatment by FSA notably inconsistent with other industry participants?**

3. **Is Navient liable in this proceeding for other potentially similar overbillings pertaining to 1/2 SAP rate claims for the period before June 1, 2002?**

## SUMMARY OF DECISION

Navient must repay FSA for overpayments Navient received for improperly claimed special allowance payments on loans that were not eligible for the 9.5 percent minimum return rate applicable for 1/2 SAP eligible loans. Although FSA may have the authority to determine that Navient faces liability for earlier potentially similar overbillings to the Department, earlier liability has not been established as part of the audit process leading to this appeal proceeding. Assuming FSA has the authority to proceed to determine if Navient faces liability for potentially similar overbillings to the Department, the hearing process has authority to examine only the liability specifically addressed by the OIG audit report that was specifically identified by the subsequent Final Audit Determination and which is challenged in this proceeding. While FSA and the Department may have broad authority concerning other potential liability not set forth in the Final Audit Determination, any such potential liability outside that timeframe is outside the scope of the Subpart H hearing and may not be addressed. The portions of the final audit determination of FSA pertaining to FAD liability specifically established during the time period audited by OIG are **AFFIRMED.**

## FINDING OF FACTS

While Navient disputes the legal findings in the OIG report and the Final Audit Determination, the material facts[4] are not in dispute, based on Navient's responses and filings of

---

[3] The term "1/2 SAP" is a statutory term further detailed beginning in page 7 of this decision.
[4] Navient explicitly disputes the Department's description of the corporate structure of the corporation and its

the transactions at issue. The findings of fact set forth are from the FSA's September 2013 Final Audit Determination (p.6-12), and from the OIG Final Audit Report.

### Nellie Mae's Original 1993 Tax-Exempt Bond Agreement

The bonds in this appeal were issued by the New England Education Loan Marketing Corp. ("NEELMC"). NEELMC was a non-profit Massachusetts corporation authorized under §150(d) of the Internal Revenue Code as a qualified scholarship funding corporation to issue tax-exempt student loan bonds. The original agreement was for the issuance of bonds in eight series under a 1993 Trust Agreement between NEELMC and First National Bank of Boston. The agreement continued under succeeding supplemental trust agreements. The bonds were refunding bonds, and were not secured by any specific collateral. The bonds totaled over $450 million, and were unsecured obligations of NEELMC.

In the transactions, NEELMC agreed it would spend an amount equal to virtually the full amount of the newly-issued bonds to acquire student loans. However, the agreement did not give the bondholders any rights to the loans NEELMC acquired with the bond proceeds, and the bondholders were not entitled to any security in the collections on those loans. The loans acquired with the bond proceeds were not pledged as collateral for any of the bonds.

### Conversion of Nellie Mae's Bond Agreements

On April 13, 1998, NEELMC incorporated Nellie Mae Corp. as a for-profit corporation. Then, on June 3, 1998, Nellie Mae Corp. established a for-profit subsidiary named Nellie Mae Education Loan Corp. That subsidiary in turn created another subsidiary, the Nellie Mae Loan Finance LLC.[5]

Then, on June 30, 1998, NEELMC made an election as authorized under Section 150(d)(3) of the Internal Revenue Code to cease status as a qualified scholarship funding corporation. The same day, NEELMC transferred its assets and liabilities to its new for-profit subsidiary, Nellie Mae Corp. On the same day, that subsidiary, Nellie Mae Corp., transferred the assets and liabilities for the bond agreements to its subsidiary, the Nellie Mae Education Loan Corp.

### Sallie Mae Buys Nellie Mae, Reorganizes

On July 12, 1999, the Student Loan Marketing Association (Sallie Mae), which was a government sponsored enterprise (GSE), purchased the NEELMC subsidiary Nellie Mae Corp. from NEELMC. Shortly after, the newly-purchased subsidiary, Nellie Mae Corp, created a

---

subsidiaries. As indicated below, however, this distinction is not determinative to the question of liability.

[5] While this decision generally uses the name Navient interchangeably with its various subsidiaries and precursors, the exact identification and nature of the named entities must be distinguished to accurately describe the facts around the conversion of the bond agreements.

second subsidiary; NM Education Loan Corp.[6] NM Education Loan Corp. was a for-profit corporation. There is nothing to establish that any of the bond agreements that were transferred to Nellie Mae Corp. were transferred to its newly-created subsidiary, NM Education Loan Corp.

On July 22, 2002, NM Education Loan Corp. was renamed SLM Education Credit Management Corp. and then, on November 12, 2003, was again renamed to SLM Education Credit Finance Corp ("ECFC"). By 2002, this entity was a wholly-owned subsidiary of SLM Corporation, with Sallie Mae having no ownership interest. After buying Nellie Mae, Sallie Mae separated Nellie Mae's loan origination activity to outside of Sallie Mae, and into a subsidiary (SLM Education Credit Management Corp) of the holding company SLM Corp. This separation was done at the insistence of the Treasury Department's oversight office to separate the loan origination activities from the GSE.

### Refinancing Transactions in 2004 (Bond 93F)

In July 2004, Sallie Mae sold loans worth $688.6 million from its Nellie Mae subsidiary to its ECFC subsidiary. In that transaction, the Nellie Mae subsidiary was paid by the ECFC subsidiary with funds derived from ineligible sources. Before the transaction, the loans had been eligible for the 1/2 SAP 9.5 percent floor interest rate based on the 1993 bonds which remained outstanding in 2004. After Nellie Mae sold the loans, it stopped seeking the 9.5 percent floor rate, reclassifying the loans as eligible for the full special allowance rates, which did not have the 9.5 percent floor. Sallie Mae (through Navient) says the sale was an erroneous early liquidation of the 1993 bonds.

Sallie Mae determined that the loans financed or eligible through the 1993 bonds were ineligible for the 9.5 percent rate after the bonds matured on July 1, 2004. After it matured, the 1993 bond (Bond 93F) was repaid and retired. When the loans were sold to ECFC, the loans were classified as being financed by holding tanks associated with ECFC, with the financing coming from short-term borrowings and long-term notes, and not eligible tax-exempt obligations. As such, Sallie Mae realized the loans lost their eligibility for the 9.5 percent floor calculation.

Despite that, in February 2005, Sallie Mae recoded the loans then held by ECFC and resumed billing at the 9.5 percent floor for the quarters ending March 31, 2005, and June 30, 2005. Sallie Mae also adjusted prior billings for the quarters ending September 30, 2004, and December 31, 2004, to also bill the loans for that period under the 9.5 percent floor calculation. While amounts of liability were carved out by FSA in its final audit determination and not at issue in this hearing, the estimated overpayment for this item is approximately $12.3 million.

### Refinancing Transactions in 2005 (Bonds 93B, 93G, and 93H)

Bonds 93B, 93G and 93H matured in June, August and December of 2002 (respectively).

---

[6] Although extremely similarly named, NM Education Loan Corp. is not the same entity as the Nellie Mae Education Loan Corp. mentioned in the conversion of the bond agreements.

Those loans, nevertheless, continued to be billed at the 9.5 percent floor calculation until July 1, 2005, the maturity date of the last 1993 bond (Bond 93A). During that time, the loans for those bonds were transferred to and maintained in holding tanks associated with Nellie Mae after reaching maturity. These holding tanks were funded with obligations that were not tax-exempt. These loans were also commingled with loans associated with other eligible bonds. The four holding tanks commingled both eligible and ineligible loans funded by the bonds under the 93A bond, and nonetheless billed at the 9.5 percent interest rate. The estimated overpayment for this item is approximately $10 million.

## PRINCIPLES OF LAW

### *Statutes*

The Guaranteed Student Loan (GSL), now known as the Federal Family Education Loan Program (FFELP), was established by Title IV-B of the Higher Education Act of 1965 (HEA) and is one of many student loans programs administered by the U.S. Department of Education ("Department"). See 20 U.S.C. §§1071 et. seq., and the accompanying regulations at 34 C.F.R. Part 682. FFELP loan funds could come from many sources, including banks, state and non-profit student loan authorities, and the federally-chartered Student Loan Marketing Association (Sallie Mae). See 20 U.S.C §1085(d).

Banks' funds for loans came through its depositors, loans, notes, bonds, and reselling existing loans into a secondary market. Funds for loans for state agencies and qualifying non-profit corporations (known as student loan authorities) were authorized under IRC § 150(d) as tax-exempt bonds known as qualified scholarship funding bonds. Those tax-exempt bonds were able to secure funding at lower rates than for banks and other commercial lenders.

In an environment of hyper-inflation and high interest rates, Congress saw the need to subsidize interest rates, allowing for holders of FFELP loans to get returns comparable to the open market. To achieve this goal, special allowance payments (SAP) were set forth in Section 438 of the HEA. 20 U.S.C. §1087-1. Setting the appropriate SAP compensation rates required accurately reflecting the varying costs of securing capital for lending. Pub. L. 94-482, §127(a), 90 Stat. 2135 (Oct. 12, 1976).

In order to accurately reflect the lower cost of securing funds for lenders using tax-exempt financing, the Education Amendments of 1980 created a unique SAP rate for such loans. Pub. L. 96-374, §420, 90 Stat. 1425 (Oct. 3, 1980). Entities using tax-exempt financing were to receive SAP rates of one-half the SAP rate payable to other lenders, but with a floor to insure the lender would receive a total interest rate of at least 9.5 percent. This 9.5 percent or higher rate was the "half-SAP", or "1/2 SAP". 20 U.S.C. §1087-1.

The half-SAP rate was created by the 1980 statutory language which said:

"The quarterly rate of the special allowance for holders of loans which were made or purchased with funds obtained by the holder from the issuance of obligations,

the income from which is exempt from taxation under the Internal Revenue Code of 1954 shall be one-half the quarterly rate of the special allowance established under subparagraph (A),(B), or (C). Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interests or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds." 20 U.S.C. §1087-1(b)2(D)(i).[7]

The circumstances of this appeal require application of the statutory authority for the SAP rates. The statute included Findings on the purpose of the legislation: to assure that the Department's payments for loans insured will provide equitable rates of return, taking into account the relative costs and money market conditions for such payments, stating:

FINDINGS.—In order to assure (1) that the limitation on interest payments or other conditions (or both) on loans made or insured under this part, do not impede or threaten to impede the carrying out of the purposes of this part or do not cause the return to holders of loans to be less than equitable, (2) that incentive payments on such loans are paid promptly to eligible lenders, and (3) that appropriate consideration of relative administrative costs and money market conditions is made in setting the quarterly rate of such payments, the Congress finds it necessary to establish an improved method for the determination of the quarterly rate of the special allowances on such loans, and to provide for a thorough, expeditious, and objective examination of alternative methods for the determination of the quarterly rate of such allowances. 20 U.S.C. §1087-1(a).

The stated purpose for passing the 1/2 SAP rate was to "prevent this windfall" of the standard rate which would give tax-exempt bond issuers "a return far in excess of the cost of administration or the cost of obtaining the capital." Sen. Rep. No. 96-733, 96th Cong. 2d Sess. 36 (May 25, 1980).

However, as interest rates fell, the 1/2 SAP, which had been an equitable floor for tax-exempt interest rate payments, became an above-market windfall. In 1993, the statute was amended to eliminate the 1/2 SAP floor moving forward. 20 U.S.C. 1087-1(b)(2(now B) had the following language added:

(iv) Notwithstanding clauses (i) and (ii), the quarterly rate of the special allowance for holders of loans which are financed with funds obtained by the holder from the issuance of obligations originally issued on or after October 1, 1993, the income from which is excluded from gross income under the Internal Revenue Code of 1986, shall be the quarterly rate of the special allowance established under subparagraph (A), (E), or (F), as the case may be. Such rate shall also apply to holders of loans which were made or purchased with funds obtained by the holder from collections or default reimbursements on, or interest

---

[7] The actual 9.5 percent or ½ SAP minimum interest rate is set for any such loans in 20 U.S.C. §1087-1(b)2(D)(ii).

or other income pertaining to, eligible loans made or purchased with funds described in the preceding sentence of this subparagraph or from income on the investment of such funds." Section 4105. ELIMINATION OF TAX-EXEMPT FLOOR.

Both of the above statutes specify that they apply only to bonds that are tax-exempt under the Internal Revenue Code. There are very specific requirements for continuing tax-exempt status for transferred bonds found in IRC §150(d)(3)(A-B). The relevant part of the IRC states:

(3) Election to cease status as qualified scholarship funding corporation

(A) In general
Any qualified scholarship funding bond, and qualified student loan bond, outstanding on the date of the issuer's election under this paragraph (and any bond (or series of bonds) issued to refund such a bond) shall not fail to be a tax-exempt bond solely because the issuer ceases to be described in subparagraphs (A) and (B) of paragraph (2) if the issuer meets the requirements of subparagraphs (B) and (C) of this paragraph.
(B) Assets and liabilities of issuer transferred to taxable subsidiary
The requirements of this subparagraph are met by an issuer if—
   (i) all of the student loan notes of the issuer and other assets pledged to secure the repayment of qualified scholarship funding bond indebtedness of the issuer are transferred to another corporation within a reasonable period after the election is made under this paragraph;
   (ii) such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer within a reasonable period after the election is made under this paragraph;
   (iii) to the extent permitted by law, such transferee corporation assumes all of the responsibilities, and succeeds to all of the rights, of the issuer under the issuer's agreements with the Secretary of Education in respect of student loans;

*Regulations*

## 1985 Version of 34 CFR 682

The first 9.5 percent payment rule regulations were issued in 1985. Subpart H was also amended to require the lenders to demonstrate to the Department that an unmet need in their region for student loan credit required tax-exempt financing in order for the need to be met. Under Subpart H, in 34 C.F.R. §682.801 (1985), the Department defined Authority and Obligation:

*Authority* means any entity, public or private non-profit, which may issue tax-exempt obligations in order to obtain funds to be used for the making or

9

purchasing of GSL or PLUS loans. The term "Authority" includes any agency, including a State postsecondary institution or any other instrumentality of a State or local governmental unit, regardless of the designation or primary purpose of that agency, which may issue tax-exempt obligations. The term also includes any party authorized to issue such obligations on behalf of a governmental agency, and any non-profit organization that issues qualified scholarship funding bonds under 26 U.S.C. 103(e).

*Obligation* means any interest-bearing debt or original issue discount debt incurred by an Authority pursuant to its borrowing powers. As used in this subpart, this term means only an obligation issued to acquire funds for financing or refinancing the making or purchasing of student loans.

Also in 1985, 34 C.F.R. §682.302(c)(2) addresses the 1/2 SAP for holders of tax-exempt obligations and proceeds, stating:

(c)(2)(i)...the percentage rate for the special allowance is one-half the rate determined under paragraph (c)(1) for a loan disbursed on or after October 1, 1980 and made or purchased with funds obtained by the holder from

(A) Issuance of obligations, the income from which is exempt from taxation under the Internal Revenue Code;
(B) Funds obtained from collections or payments by a guarantor on a loan described in paragraph (c)(2)(i); and
(C) Interest or special allowance payments on a loan described in paragraph (c)(2)(i).

34 C.F.R. §682.302(e)(3) provides more details. The 1/2 SAP rate ends:

...after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than a tax-exempt obligation and
(i) The prior tax-exempt obligation is retired; or
(ii) The prior tax-exempt obligation is defeased.

Consistent with the statutory language creating the 1/2 SAP floor, the 1985 regulation provided that once the funding source in no longer matched to the SAP rate for the loans purchased, the 1/2 SAP rate ends.

## **1993 Version of 34 CFR 682**

The 1993 version of 34 CFR 682 added reference to "an Authority" in setting forth 1/2 SAP rules. 34 C.F.R. §682.302(e)(2) stated:

(e) *Special allowance payments for loans financed by proceeds of tax-exempt obligations.*

10

...
(2) The Secretary pays a special allowance to an Authority at the rate prescribed in paragraph (c)(1)[8] of this section on a loan described in paragraph (c)(3)(i) of this section--[9]

    (i) After the loan is pledged or otherwise transferred in consideration of funds derived from sources other than those described in paragraph (c)(3)(i) of this section; and

    (ii) If the authority retains a legal or equitable interest in the loan—

        (A) The prior tax-exempt obligation is retired; or

        (B) The prior tax-exempt obligation is defeased...

*Dear Colleague Letters*

## Dear Colleague Letter 93-L-161

After the 1993 statutory revisions became law, the Department issued a guidance document known as a Dear Colleague Letter (DCL 93-L-161). The letter's stated purpose was to "provide the student loan community with information on the major program changes mandated by the new law."

The relevant part of the letter said:

The minimum special allowance rate "floor" on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed. Accordingly, loans made or purchased with funds obtained by the holder from the issuance of obligations *originally* issued *on or after October 1, 1993,* or with funds derived from default reimbursements, collections, interest, or other income related to eligible loans made or purchased with such tax-exempt funds, no longer qualify to receive the minimum special allowance. Refinancing of obligations which were originally issued prior to October 1, 1993, does not alter the eligibility of loans made or purchased with funds obtained from the proceeds of the original financing to receive the minimum special allowance."

## Dear Colleague Letter 93-L-163

The next month, in December 1993, the Department issued Dear Colleague Letter 93-L-163. DCL 93-L-163 contained the identical relevant part of DCL 93-L-163, along with additional two-letter coding keys for how to insure changes would be properly entered in the reporting system. DCL 93-L-163 did not add any additional language pertaining to the issue of "in whole

---

[8] (c)(1) provides for the regular SAP rate.
[9] "(c)(3)(i)" contains the 1/2 SAP rate language, and is unchanged language from the 1985's 34 C.F.R. §682.302(c)(2) referred to above.

11

or in part" that was mentioned in DCL 93-L-161.

## Dear Colleague Letter 96-L-186

In 1996, the Department issued Dear Colleague Letter 96-L-186. The relevant part of which stated:

> The Department's prior guidance stated that the current funding sourced defined the applicable special allowance provisions – if a loan was financed with the proceeds of a tax-exempt obligation, the tax-exempt special allowance rule applied. If the loan was financed with the proceeds of a taxable obligation, the taxable special allowance rules applied.
>
> In the December 18, 1992 regulations, the Department changed this policy. Under the regulations, if a loan made or acquired with the proceeds of a tax-exempt obligation is refinanced with the proceeds of a taxable obligation, the loan remains subject to the tax-exempt special allowance provisions if the authority retains legal interest in the loan. If, however, the original tax-exempt obligation is retired or defeased, special allowance is paid based on the rules applicable to the new funding source (taxable or tax-exempt). *DCL 96-L-186, at 30.*

## ANALYSIS

*1. Availability of the 1/2 SAP 9.5 percent Interest Rate for Loans Acquired in Whole or in Part with Tax-Exempt Funds*

Navient argues that it was mandatory for Navient to claim the 9.5 percent interest under 1/2 SAP. According to Navient, that claim was mandatory because of the authority of the 1993 Dear Colleague Letter's first sentence on the subject that stated "The minimum special allowance rate "floor" on new loans made or purchased, in whole or in part, with funds derived from tax-exempt obligations has been repealed." DCL 93-L-161. That backward-directed language was used to introduce the language which addressed the elimination of the 9.5 percent rate for loans issued after October 1, 1993.

FSA states that DCL 93-L-161's stated purpose was "to provide the student loan community with information on the major program mandated by the new law," and that it was not mean to summarize existing law. FSA also argues that the language "assumes a regulatory requirement that is contrary to express Congressional intent and could not have been supported if the Department had ever adopted such a view."

Legal authority for Navient's argument in favor of its "in whole or in part" stems solely from DCL 93-L-161. Navient has not cited any statutes, regulations, other DCL's or case decisions as legal authority to justify its receipt of the 9.5 percent1/2 SAP rate.

Navient acknowledges that it commingled the loans acquired with other bond proceeds, and contends that under DCL 93-L-161 guidance, it was required to apply for the 1/2 SAP rate. It contends that all the 1993 bond series combined are a single obligation entitled to 1/2 SAP. It also asserts that the last bond, 1993 bond, to mature in any sub-pool is a "prior tax-exempt obligation" under 34 C.F.R. §682.302(e) for all loans in both sub-pools. The 1993F bond was last bond to mature, and constituted approximately 9 percent of the funds used to buy the loan.

The Dear Colleague Letter is a policy guidance statement, and very clearly includes the language "in whole or in part" as language describing what it says is the law being repealed. It is not clear why that describing language was included in the DCL. The other legal authority on the 1/2 SAP rate are the statutes and regulations. The statutory language is clear and unambiguous, and does not contain any qualifier or detailing descriptions for loans made with funds from tax-exempt obligations.

Although it is unnecessary to restate it in promulgated fashion, 34 C.F.R. § 668.117(d) does state that in this administrative proceeding, "[t]he hearing official is bound by all applicable statutes and regulations. The hearing official may not [w]aive applicable statutes and regulations; or [r]ule them invalid." Agency policy like that found in the Dear Colleague Letters cannot contradict the statute or regulation. This hearing requires interpreting and applying the statutes, regulations and guidance documents to the facts of this appeal, and in the event of potentially inconsistent legal authority, requires the hearing official to identify the controlling authority to be applied.

The Dear Colleague Letter certainly says that the 1/2 SAP rate being eliminated had previously applied to loans funded "in whole or in part" with tax-exempt bonds. But nowhere in the original 1980 statute creating 1/2 SAP payments, or in the 1993 statute ending the floor of 1/2 SAP as a 9.5 percent interest rate is there any language to support the idea that the 1/2 SAP was ever intended to apply to anything other than tax-exempt bonds, or that the 1/2 SAP rate was modified to include money that came "in whole or in part" from such bonds and proceeds.

The language in DCL 93-L-161 is inconsistent with the governing statutes. It is also inconsistent with the purpose for the legislation. The statute creating the 1/2 SAP was passed in order to assure that limits on interest rate payments "do not cause the return to holders of loans to be less than equitable." 20 U.S.C. §1087-1(a).

Under the nearly unlimited exception created by "in whole or in part", the purpose of the 1/2 SAP payments is turned upside down. Under this inconsistent interpretation, a program that, by its terms, is meant to apply to tax-exempt bonds is expanded to apply the 1/2 SAP rate to essentially any bonds. In the case of Navient, whose 93A Indenture involved $458 million in tax-exempt bonds, if one single dollar of the tax-exempt funds remains, then the 1/2 SAP rate of 9.5 percent is payable for all $458 million.

Such a windfall through five words in a letter negates the entire statute, and allows for a 99.999 percent taxable bond fund to receive interest rates that are far beyond equitable, and that are in direct contradiction to the limits imposed for 1/2 SAP payment rates. In reconciling the statute and the Dear Colleague Letter, the letter's term "in whole or in part" cannot be applied in

13

this appeal in a way that violates the statute's language. The 1/2 SAP payments are not qualified in that manner, and are available only for loans funded with tax-exempt bonds.

### 2. ECFC as a Successor Corporation to NEELMC for purposes of Tax-Exempt Bonds

All the successor corporation arguments are also contingent upon the above analysis of the "in whole or in part" requirement. The loans were financed with the 1993F bond, which was matured and retired in July of 2004, terminating the 1/2 SAP rate for the 1993F bond in the series.

Navient contends that it was justified in seeking 1/2 SAP for loans transferred to ECFC from NMELC in 2004. Navient argues that ECFC, as the direct second-level parent of NMELC, should receive the rate. Navient says that "because of this corporate structure, ECFC did in fact enjoy the tax-exempt cost of funds while 1993 Bonds were outstanding . . . ."

Navient also cites broader principles of U.S. federal income tax that disregard any transfer of assets between NMELC and the related LLC, Nellie Mae, referring to 26 C.F.R. §301.7701-2(c)(2). Finally, Navient cites Generally Accepted Accounting Principles for consolidation of the entities, stating "these accounting principles reflect the fact that the various entities, though they may be legally distinct, are not financially or economically distinct for 1/2 SAP Rate purposes."

The determinative statutory requirements for a successor entity to retain qualification for tax-exempt bond purposes are in IRC §150(d)(3)(A-B). IRC §150(d)(3)(B)(i-iii) have very specific requirements for continuing tax-exempt status for transferred bonds. They are all directed at requiring the transferee corporation to take the same roles and liabilities on the loans and bonds.

> (i) all of the student loan notes of the issuer and other assets pledged to secure the repayment of qualified scholarship funding bond indebtedness of the issuer are transferred to another corporation within a reasonable period after the election is made under this paragraph;
> (ii) such transferee corporation assumes or otherwise provides for the payment of all of the qualified scholarship funding bond indebtedness of the issuer within a reasonable period after the election is made under this paragraph;
> (iii) to the extent permitted by law, such transferee corporation assumes all of the responsibilities, and succeeds to all of the rights, of the issuer under the issuer's agreements with the Secretary of Education in respect of student loans;

Under (i), ECFC was required to have all the student loan notes of NMELC transferred to ECFC, and under (ii), the transferee corporation (here, ECFC), had to assume the bond indebtedness of the issuer. Neither of these requirements occurred.

14

Under IRC §150(d)(3)(B), the original issuer of the 1993 bonds, NEELMC, did meet the requirements and transferred its loans and liabilities to the new for-profit subsidiary, Nellie Mae Corp. (which were immediately transferred to NMELC). After that, only NMELC was liable on the 1993 bonds. Then, in 2004, NMELC was transferred to ECFC. ECFC did not assume bond indebtedness on the 1993F bond. In fact, the 1993F bond was retired when the loans were transferred to ECFC. Since there was no bond indebtedness of the issuer to assume, ECFC is not a qualifying transferee corporation.

Further, even if there had been bond indebtedness in existence, NMELC was previously converted into a limited liability company. The legal obligations of the limited liability company are solely those of the limited liability company, and are not a liability of ECFC, and ECFC did not meet the statutory requirements for a successor entity to retain qualification for tax-exempt bond purposes under IRC §150(d)(3)(A-B).

### 3. Treatment of Other Industry Participants

Despite the "in whole or in part" application it seeks to have applied for the 1/2 SAP rate payments, Navient argues that it was conservative, electing not to exploit the 1/2 SAP rate loopholes it says were created in 1992. Navient says the recovery of funds sought by FSA is simply FSA seeking to punish Navient "in clear contrast to its history of non-enforcement against Navient's competitors." *Brief in Support of Navient's Appeal, P. 38.*

Navient also refers to a 2007 Dear Colleague Letter on the 1/2 SAP rate that tied FSA foregoing enforcement action with entities adopting a new policy on a prospective basis. Navient states "FSA's determinations seek to apply retroactively a new interpretation of the 1/2 SAP rate provisions to bonds issued over 20 years ago that were fully repaid and retired in 2005."

Navient states that in 2007 it told FSA it would voluntarily cease all prospective billing for special allowance payments at the 1/2 SAP rate in exchange for FSA's offer to purportedly forego enforcement of the existing statutory language. Navient also argues that the terms of the purported offer were deficient as being outside the federal rule-making process, and included an interpretation in the audit guide of a new provision for "first generation" or "second generation" of the bond issue.

FSA distinguishes this appeal's application - when a "prior tax-exempt obligation" that financed the loans was retired - pointing out the 1/2 SAP doesn't apply to any such retired obligations. To refute the idea that Navient has been unfairly treated or denied the opportunity to settle, FSA also points out that it granted Navient several years of continuous extensions. While not required to do so, FSA also identified and introduced evidence of other industry participants that were treated similarly to Navient.

The argument of not being treated in the same manner as other similarly situated industry participants in the context of FSA-imposed liability has been previously addressed. In *The Matter of Microcomputer Technology Institute* (on remand), Docket No. 94-88-SA, the

15

institution argued it was not allowed to calculate an attendance cost in the same way that other similarly situated institutions were, leading to additional liabilities.

In the decision, this tribunal stated:

> To prevail on a claim of selective prosecution or to show that an institution has been singled out by FSA in some illicit manner, [the institution] must, first, make a threshold showing that FSA declined to enforce the HEA against other similarly situated institutions. This is a rigorous threshold standard. A lower threshold standard would run the risk of imposing a significant barrier to the effectiveness of law enforcement by forcing the government to litigate unsubstantiated or entirely baseless claims of selective enforcement. When a regulatory body or law enforcement official exercises discretion to enforce the law, a presumption of regularity arises that, in the absence of clear evidence to the contrary, the regulatory body has acted properly in discharging its official duties. In this light, the institution has not demonstrated that the law has been enforced against it in any unique or unusual manner, much less against a class of similarly situated institutions. Indeed, [the institution] fails to present a footprint of evidence pertinent to its claim. . . . To find that mere allegations are sufficient to rebut the presumption of regularity would not only create administrative burdens and inefficiencies for FSA in this case, but would risk imposing serious disruption to FSA's ability to meet its regulatory enforcement obligations in any of its cases. (Citations omitted).

Similarly to *Microcomputer,* here, Navient has not shown other similarly-situated industry participants who received different treatment. FSA has identified other participants who faced similar liability. The assertion also is weakened because Navient cannot point to other similarly-situated industry participants. Navient is unique in its many structures. Unlike any other industry participant, Navient funds originated without bonding funds that were each secured by individual loans as collateral. Nellie Mae was the only nonprofit tax-exempt student loan issuer to issue bonds on an unsecured basis. *Ex. R-09, Navient Brief at page 24.* Even if Navient were not structurally unique, Navient has not met its threshold showing that FSA singled it out, or that FSA declined to enforce the HEA against other similarly-situated industry participants. Nor can Navient claim to have relied on this theory when it has not had any 1/2 SAP benefits since 2005.

### 4.  *FSA's Determination that Navient is Liable for Pre-June 1, 2002 1/2 SAP Rates*

Navient argues that FSA is incorrect in its final audit determination that Navient is liable for pre-June 1, 2002 1/2 SAP rate claims. Navient cites *In re Phillips Colls., Inc., ,* Dkt. No 92-64-SA, U.S. Dep't of Educ. (July 13, 1995), holding that "any dispute regarding excess funds outside the scope of the OIG's audit and the record in this case is clearly beyond [The Agency's] means to impose a liability in this proceeding").

Navient asserts that FSA cannot hold Navient liable for repayment of 1/2 SAP rate payments for pre-June, 2002. Navient also argues the audit findings establish the limitations of

liability which can be addressed in this appeal hearing.

FSA's Final Audit Determination (FAD) begins by stating that:

This letter conveys the final audit determination of the U.S. Department of Education (Department), Federal Student Aid (FSA), concerning the finding in the above-referenced final audit report issued by the Department's Office of Inspector General (OIG) on August 3, 2009. *Cover Letter of FSA September 25, 2013 Final Audit Determination.*

In the last paragraph of its Factual Determinations of its FAD, FSA states:

Thus, special allowance was claimed at the 9.5 percent minimum return rate and received for the periods from June 1, 2002 on all loans associated with the 1993 B, 1993G, 1993F, and 1993H bonds after the bond with which they were associated was retired, as well as on those loans associated with the 1993A bond, until the 1993A bond was retired on or about July 1, 2005. *FSA September 25, 2013 Final Audit Determination, at p. 12.*

The cover letter for this appeal's FAD also states that the subject of this appeal is solely to address the adequacy of FSA's liability findings, and specifically provides that Navient is to have a second appeal process for the final decision on the amount of overpayments and the adequacy of other actions.

FSA responds that the legislative and regulatory framework gives the Department of Education and FSA full authority to meet their duty to administer student aid financial programs, citing 20 U.S.C. §1082(a) and an accompanying regulation, 34 C.F.R. §682.413(a)(1) as authority for management of the program. The regulation provides specific requirements that a lender repay special allowance or other compensation for any period which violates the requirements of subpart C, which specifically deals with Special Allowance Payments. FSA argues it is not constrained by the scope of a particular OIG recommendation.

These competing arguments for reaching back to impose further liability must be evaluated in the specific context of this particular administrative hearing proceeding. 34 C.F.R. 338, Subpart H, provides the appeal procedures for audit determinations and program review determinations. It establishes rules governing the appeal from a final audit determination from participation in any Title IV, HEA program. 34 C.F.R §668.111. A final audit determination is "the written notice of a determination issued by a designated department official based on an audit of an institutions participation in any or all of the Title IV, HEA programs; or a third-party servicer's administration of any aspect of an institution's participation in any or all of the Title IV, HEA programs." 34 C.F.R §668.112(a).

This hearing process is further defined in 34 C.F.R §668.116. It imposes the burden of proof on Navient to show that expenditures questioned or disallowed were proper, or that the institution or servicer complied with program requirements. 34 C.F.R §668.116(d).

17

Absent a clear showing of probative value, the regulation requires excluding evidence relating to a period of time other than the period of time covered by the audit or program review. Such evidence "shall be deemed irrelevant and immaterial" and 34 C.F.R §668.117(b) sets out further limits. It specifically states the hearing official is not authorized to issue subpoenas or compel discovery as provided for in the Federal Rules of Civil Procedure.

Finally, the subject matter of this decision has specifically established parameters: "The hearing official's decision states and explains whether the final audit determination ... issued by the designated [Department] official was supportable, in whole or in part." 34 C.F.R §668.118(b).

In the broad context of the Department and FSA's oversight authority, FSA is correct with reference to the authorizing statutes and regulations. FSA's enumerated Title IV oversight authority is not limited by statute or by regulation to the material found in the OIG report.

FSA is also correct that there is no successful statute of limitations challenge to final audit determinations. Although there is a statute of limitations for actions where the Department seeks money damages under Subpart G, it does not apply to Subpart H matters, where the Department "seeks only to recoup Title IV funds which were improperly disbursed." *In re Interactive Learning Systems*, Dkt. No. 04-08-SP, U.S. Dep't of Educ. (March 8, 2005) at 6, *see also In re Belzer Veshiva*, Dk. No. 95-55-SP, U.S. Dep't of Educ. (June 19, 1996) at n.3 (further citation omitted) ("This tribunal has held that the statutes of limitation set forth under 28 U.S.C. § 2415 and 20 U.S.C. § 1091a are inapplicable to a Subpart H student financial assistance proceeding.").

While FSA does have such broad and ongoing authority, in the context of what may be determined in this decision, the regulations for this appeal limit the proceeding to the issues from the Final Audit Determination. The regulations have been recognized to require that "a Subpart H proceeding is a necessarily limited administrative forum wherein an institution may challenge a final audit or program review determination that finds that an institution fails to meet a statutory and regulatory requirement and, as a result, owes a liability to the federal government." *In re International Junior College*, Dkt. No. 07-52-SA, U.S. Dep't of Educ. (Dec. of the Secretary Nov. 19, 2010) – citing *In re Microcomputer Technology Institute*, Dkt. No. 94-88-SA, U.S. Dep't of Educ. (May 20, 2002).

FSA in the context of this appeal hearing has expressly limited the issues to the two questions of liability (for estimates of $10 and $12.3 million, respectively).[10] The FAD introduction states the scope of the audit is the findings of the final audit report of the OIG dated August 3, 2009. That FAD introductory language ties directly to the later summary of the FAD's Factual Determinations which again identified the two questions of liability.

While FSA may have the authority to audit, review and require repayment for the period

---

[10] The OIG report and FAD also had sought to require Navient to disclose other other instances of similar inappropriate 9.5 1/2 SAP rate billing within Sallie Mae or any of its subsidiaries. Navient provided assurances to FSA that there were no such instances, and FSA withdrew its request that Navient be required to provide further disclosure.

before June 1, 2002, it may not do so in the context of the appeal of its FAD for this proceeding. This decision's necessarily limited scope may not be extended to the period before June 1, 2002.

## CONCLUSIONS OF LAW

1. **Navient's financing, with loans acquired in whole or in part with tax-exempt funds, was not entitled to receive payments at the 1/2 SAP rate during the periods of the audit.**

2. **Navient's treatment by FSA was not notably inconsistent with other industry participants.**

3. **Navient is not liable in this proceeding for other potentially similar overbillings pertaining to 1/2 SAP rate claims for the period before June 1, 2002.**

## ORDER

The final audit determination of FSA is **AFFIRMED.** Navient is liable to repay FSA for overpayments for the two liabilities found above, in which Navient improperly received special allowance payments on loans that were not eligible for the 9.5 percent minimum return rate. Navient is not liable in this proceeding for other potentially similar overbillings pertaining to the 1/2 SAP rate claims for the period before June 1, 2002.

Consistent with the FAD's direction, Navient may appeal to the Secretary of Education the determinations of the decision requiring it to repay FSA for the two liabilities found above. Consistent with the FAD's direction, FSA will issue a separate determination solely on the amount of overpayments for these two liabilities and the adequacy of any other actions taken to implement the directions in this letter. At that time, Navient may appeal to the Secretary of Education for a review of its contentions that these FSA determinations are erroneous.

**Date of Decision: March 7, 2019**

Robert Layton   Digitally signed by Robert Layton
Date: 2019.03.07 10:49:18 -05'00'

_____
Robert G. Layton
Administrative Judge

## SERVICE

This decision has been sent by certified mail return receipt requested and has been uploaded to OES with an automatic generated notice to counsel of record to:

Ada Fernandez-Johnson, Esq.,           CMRRR #: 7018 0680 0000 5064 6256
Colby A. Smith, Esq.,
Jil Simon, Esq.,
Debevoise & Plimpton LLP
801 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20004

Natasha Varnovitsky, Esq.,             CMRRR #: 7006 2150 0003 2505 5953
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, DC 20202

20