**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 1:21-cv-324-TSE-IDD |
| ) | |
| DEPARTMENT OF EDUCATION and ) | |
| DR. MIGUEL CARDONA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

# EXHIBIT 12
# Affidavit of Jason Wheeler
# AR 1372-1378

*In re Audit Control No. ED-OIG/A03I0006*

*Special Allowance Payments to Navient's Subsidiary,
Nellie Mae, for Loans Funded by Tax Exempt Obligations*

### AFFIDAVIT OF JASON WHEELER

JASON WHEELER, being duly sworn, deposes and says:

1. I am Jason Wheeler, Vice President and Assistant Controller, of Navient Corporation (formerly, Sallie Mae, "Navient"). I am submitting this Affidavit in connection with Navient's request for review of the final audit determination ("FAD") dated as of September 25, 2013, of the U.S. Department of Education ("Department"), Federal Student Aid ("FSA"), concerning the final audit report issued to Sallie Mae, Inc. by the Department's Office of Inspector General ("OIG") on August 3, 2009 ("FAR").

2. I certify that, based on my personal knowledge of and participation in the activities detailed below, the below statements are true and accurate to the best of my recollection. Further, I am prepared to make such statements and certification if called upon to do so in a court of law or other administrative proceeding.

#### Relevant Work History at Sallie Mae, now Navient

3. From 1996 through the present, I have been employed by Sallie Mae, now known as Navient, first in the position of Manager, Financial Planning within the Financial Planning and

Analysis group. Then, in the same group, I was promoted to Director and then Managing Director. In 2003, I transferred to the Loan Accounting Department and my title was Managing Director, Loan Reporting and Analysis.

4. In 2006, I was named Vice President for Loan Accounting, in which position I was and continue to be responsible for oversight of all Loan Accounting operations.

5. In September 2007, I was assigned as the primary contact and supervisor for the work being done in connection with the OIG audit that was the subject of the FAR and the FAD.

6. During the course of the audit, in order to gain a full understanding of the matters that were the subject of the audit, I spoke with the Sallie Mae employees who were involved in the transition of the loan management of Nellie Mae financings from Nellie Mae's staff to Sallie Mae after Sallie Mae's acquisition of Nellie Mae in 1999. I have also had discussions with employees who have been responsible for the management of the 1993 Trust following the acquisition. I have also reviewed records remaining from the period of time during which Nellie Mae managed the 1993 Trust (1993 through 2001) and other of the companies' books and records that pertain to the 1993 Trust. All of the following statements are based on my understanding of those discussions and review.

7. The proceeds from the various bonds (the "Bond Proceeds") issued under the 1993 Trust were used to acquire a pool of student loans.

8. Within the 1993 Trust, Nellie Mae maintained two loan pools, the first of which related to Bond 1993A ("Sub-pool 1") and the second of which related to all the other 1993 Bonds ("Sub-pool 2"). The Bond Proceeds from Bond 1993A were deposited into Sub-pool 1 and the Bond Proceeds from Bond 1993B through Bond 1993H were deposited into Sub-pool 2.

9. In addition, each month Nellie Mae would deposit into the respective sub-pools the principal and interest payments, guarantor payments, interest benefits and special allowance, and other income from the loans (the "Receipts"); specifically, Receipts on the loans financed with by Bond 1993A were deposited into Sub-pool 1 and Receipts on all other loans financed by the 1993 Bonds were deposited into Sub-pool 2. On an ongoing basis, typically every month, loans were acquired with all or a portion of the cash available in Sub-pool 1 and Sub-pool 2. Given that no specific pool of loans secured a specific series of 1993 Bonds, funds held in Sub-pool 1 were fungible with all other amounts on deposit in Sub-pool 1; the same was true for Sub-pool 2. On any given date, Sub-pool 2 contained (i) Bond Proceeds from Bond 1993B through Bond 1993H, such as had been issued by such date, and (ii) Receipts on all loans financed by such Bonds. Therefore, all new loans were acquired in part with all such commingled funds in Sub-pool 2 in on a pro rata basis.

10. Due to the unique nature of the 1993 Trust, Nellie Mae did not track loans acquired with the Bond Proceeds in Sub-pool 2 to a specific series of Bonds or otherwise assign them any identifier that would tie them to a specific series of Bonds. Therefore, it appears that Nellie Mae had no system by which to identify specific loans in order to change SAP billing codes upon the maturity a particular series of 1993 Bonds, other than Bond 1993A which maintained its own Sub-pool.

11. In early 2002, the administration of the 1993 Trust was transferred from former-Nellie Mae employees to Sallie Mae. For ease of trust administration, Sallie Mae began a process of allocating portions of the loans in Sub-pool 2 to those series of Bond 1993B through Bond 1993H as remained outstanding at the time. Because the loans had been acquired with Bond Proceeds and Receipts of Bond 1993B through Bond 1993H and remained commingled

within Sub-pool 2 since the time of their acquisition and, because the loans were therefore funded in part with the Bond Proceeds and Receipts of Bond 1993B through Bond 1993H, the allocation could not and did not identify specific loans as having been funded by a specific bond. Rather, loans and cash were simply allocated by principal amount such that the account created for each 1993 Bond would hold sufficient resources to meet debt service for that particular Bond. In other words, the loans previously recorded for Sub-pool 2 and associated with Bond 1993B through Bond 1993H were allocated from an accounting perspective to particular bonds but that allocation was not based on the source of the original funds originally used to acquire the loans. After such allocations had been made, any new loan acquisitions for the 1993 Trust were made with amounts on deposit within the accounts created for each outstanding series of 1993 Bonds. Because any cash within those accounts derived from the commingled Receipts of Bond 1993B through Bond 1993H, the loans purchased with such cash were also funded in part by all such 1993 Bonds.

12. Based on my review of the corporate records, Exhibit 1 attached hereto details the dates on which each of Sallie Mae's acquired subsidiaries resumed billing at the standard SAP Rate (full-SAP without 9.5% floor limitation) for each of such subsidiaries' bond issuances.

13. As of June 30, 2004, Navient was billing for special allowance at the 1/2 SAP Rate on only 2.4% of its FFEL portfolio.

14. The alleged liability of $12.3 million ascribed by OIG in the FAR to its finding relating to special allowance billing following the transfer of certain loans to the subsidiary known as ECFC (the "ECFC Loans") is incorrect. Without conceding that Navient billed for the correct amount of special allowance with respect to the ECFC Loans, the difference between (a) the amount of special allowance paid to Navient for the ECFC Loans during the period in

question and (b) the amount of special allowance that would have been paid during the same period for the same loans at the standard or "full" SAP rate is $11.1 million. In order to make this calculation, I used the actual special allowance billing data for the period in question to isolate the line items billed at 9.5% minimum yield rate that are in dispute. I used the average daily loan balance from each line item from the special allowance bill and its associated special allowance code to determine the appropriate borrower effective rate. I then applied the standard "full" SAP rate for that category to the applicable Tbill rate(s) in effect during the period in question to calculate the level at which SAP would have been paid at the full SAP rate. Using these data elements, I recalculated the full SAP using the formula prescribed in the Higher Education Act.

FURTHER AFFIANT SAYETH NOT.

_____
Jason Wheeler

Sworn to before me this 24th day of November, 2015:

# Exhibit 1

| Entity Name | Issue Ref. | Issue Date | Scheduled Issue Maturity Date | Amount | Date Standard SAP Resumed |
|---|---|---|---|---|---|
| SLFR | 1986 | 12/1/1986 | 12/1/2001 | $51,500,000 | December 2001 |
| | 1988 | 12/1/1998 | 12/1/2005 | $125,000,000 | November 2005 |
| | 1991 | 8/15/1991 | 8/1/2008 | $201,000,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 1992 | 7/15/1992 | 1/1/2007 | $23,950,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 1992 | 10/15/1992 | 7/1/2005 | $48,395,000 | June 2005 |
| | 1994 | 6/1/1994 | 12/1/2004 | $100,000,000 | November 2004 |
| | 1998 | 5/22/1998 | 8/1/2010 | $152,900,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| Nellie Mae | 1985/1992 | 8/15/1992 and 9/1/1992 | 3/1/2002 | $216,000,000 | February 2002 |
| | 1992 | 4/15/1992 | 9/1/2002 | $130,970,000 | August 2002 |
| | 1992 | 6/1/1992 | 9/1/2002 | $75,950,000 | August 2002 |
| | 1992 | 11/19/1992 | 11/1/2009 | 24,000,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 1993 Trust | Refer to Appeal | | | |
| SLFA | 2004 | 3/23/2004 | 12/1/2038 | $45,000,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| SWSS | 1997 | 12/1/1997 | 6/1/2006 | $11,800,000 | June 2006 |
| | 1998 | 9/1/1998 | 9/1/2033 | $26,050,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2000 | 2/1/2000 | 3/1/2006 | $32,850,000 | March 2006 |
| | 2000 | 2/1/2000 | 3/1/2009 | $4,050,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2001 | 5/2/2001 | 3/1/2036 | $69,950,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2003 | 2/1/2003 | 3/1/2009 | $18,800,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 1992 | 9/15/1992 | 9/1/2005 | $52,750,000 | September 2005 |
| | 1993 | 9/1/1993 | 12/1/2008 | $13,700,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 1995 | 11/30/1995 | 6/1/2006 | $3,900,000 | June 2006 |
| | 2003 | 8/15/2003 | 3/1/2038 | $22,475,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2003 | 8/15/2003 | 3/1/2038 | $38,800,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2004 | 2/1/2004 | 12/1/2038 | $40,000,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2002 | 2/1/2002 | 12/1/2036 | $15,300,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2003 | 1/1/2003 | 12/1/2036 | $30,750,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |
| | 2003 | 12/1/2003 | 12/1/2038 | $50,000,000 | Q3 2006 (date Sallie Mae ceased billing for 9.5% SAP entirely) |