## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| NAVIENT SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 1:21-cv-324-TSE-IDD |
| | ) | |
| DEPARTMENT OF EDUCATION and | ) | |
| DR. MIGUEL CARDONA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# EXHIBIT 13
# Affidavit of Sheila M. Ryan-Macie
# AR 1379-1476

*In re Audit Control No. ED-OIG/A03I0006*

*Special Allowance Payments to Navient's Subsidiary,
Nellie Mae, for Loans Funded by Tax Exempt Obligations*

## AFFIDAVIT OF SHEILA M. RYAN-MACIE

SHEILA M. RYAN-MACIE, being duly sworn, deposes and says:

1.      I am Chief of Staff, of Navient Corporation (formerly, Sallie Mae "Navient").  I am submitting this Affidavit in connection with Navient's request for review of the final audit determination ("FAD") dated as of September 25, 2013, of the U.S. Department of Education ("Department"), Federal Student Aid ("FSA"), concerning the final audit report issued to Navient by the Department's Office of Inspector General ("OIG") on August 3, 2009.

2.      I certify that, based on my personal knowledge of and participation in the activities detailed below, the below statements are true and accurate to the best of my recollection.  Further, I am prepared to make such statements and certification if called upon to do so in a court of law or other administrative proceeding.

<u>Relevant Work History at Nellie Mae and Navient</u>

3.      From 1987 to 2001, I was employed by Nellie Mae, Inc., initially as an Account Executive.  In 1990, I became Director of Strategy and Development, and then Vice President,

Strategy and Development, in each case reporting to Nellie Mae's Chief Executive Officer, Lawrence O'Toole.

4.     During most of my tenure at Nellie Mae, I was responsible for federal regulatory matters and for communications with the Department of Education staff regarding proposed and pending regulatory changes.

5.     During most of my tenure at Nellie Mae, I was Nellie Mae's delegate to the regulations committees of various industry groups and committees, including the National Council of Higher Education Loan Programs (NCHELP, now known as NCHER), an organization that represents education loan guarantors, secondary markets, nonprofit lenders and authorities, commercial lenders and loan servicers.

6.     From approximately 1990 through 1999, I served as Chairperson or Co-Chair of the NCHELP Program Regulations Committee, as well as Chairperson of several other task forces established by NCHELP (Co-Chair of Master Promissory Note Task Force, Consolidation Forms Task Force, and Reauthorization Task Force).

7.     In my capacity as Chairperson or Co-Chair of the Regulations Committee, I led the Committee's efforts to analyze and comment on Department Notices of Proposed Rules, and also developed analysis and guidance to support NCHELP members' implementation of the final rules and other administrative guidance issued by the Department.

8.     I also served as Committee Chairperson for several committees of the Education Finance Council, an organization that represents nonprofit entities that issue taxable and tax-exempt bonds.

9.      I also served as an industry representative on multiple negotiated rulemaking committees convened by the Department of Education, including the committee convened in 1993.

10.     During the period from 1992-1993, the period of time in which the Department was: i) finalizing the rules that would be promulgated in December of 1992, which codified provisions of the Higher Education Amendments of 1986 and other amendments to the Higher Education Act made thereafter ("1992 Regulations"); ii) developing administrative guidance on the Higher Education Amendments of 1992 enacted in July of 1992 ("1992 Amendments"); iii) convening representatives of the community to review potential conflicts between the 1992 Regulations and the 1992 Amendments; iv) convening committees to negotiate regulations pertaining to the 1992 Amendments; and v) developing guidance on changes in law enacted in August of 1993 (for which NCHELP was consulted), I participated in numerous discussions with the Department as a representative of NCHELP, EFC, and Nellie Mae on matters pertaining to special allowance including those changes made in the 1992 Regulations and OBRA 1993 (defined below).

11.     Further, I led numerous efforts to submit questions both formally and informally (e.g. as part of NCHELP Regulations Committee meetings) to the Department; these questions often served as the foundation for guidance issued by the Department, including (i) the Dear Colleague Letter (DCL) 93-L-161 issued in November, 1993 with administrative guidance pertaining to the Omnibus Budget Reconciliation Act of 1993 (Pub. L. 103-66) ("OBRA 1993") and (ii) the DCL 96-L-186 issued in March, 1996 with administrative guidance pertaining to the 1992 Regulations.

12.     In May, 2011, after the OIG Audit of Navient and OIG's issuance of its Draft and Final Audit Reports, I became employed by Navient (then known as Sallie Mae) in the position of Chief of Staff and Senior Vice President, Operations Administration, reporting to Jack Remondi, Chief Executive Officer. I am still employed by Navient as Chief of Staff, reporting to Mr. Remondi.

<u>Matters Relating to the Final Determination Letter</u>

13.     The 1992 Regulations issued by the Department in December of 1992 were generally effective February 1, 1993. Included in those regulations were changes that impacted the calculation of special allowance payments for certain loans financed with tax-exempt obligations. Neither the Notice of Proposed Rule in November of 1990, nor the Final Rule issued on December 18, 1992, included commentary or other discussion regarding the change in special allowance calculations. In general, prior to these changes, loans financed with tax-exempt obligations were entitled to special allowance at half the rate of special allowance that would otherwise have been payable, with a minimum "floor" yield of 9.5% (the "1/2 SAP Rate"). The 1/2 SAP Rate would apply for so long as the loan continued to be financed by that tax-exempt obligation. If the loan was refinanced with a taxable source of funds, then the standard or "full" SAP rate would apply. The 1992 Regulations, at Section 682.302(e)(2), appeared to change this historical rule; the loan holder would be required to continue to bill at the 1/2 SAP Rate for any loan funded by the tax-exempt obligation even after the loan was refinanced with a taxable source of funding.

14.     In February, 1992, the NCHELP Program Regulations Committee was asked to review the second round clearance draft of the 1992 Regulations (Department of Education Fed. Reg. 48353, Nov. 20, 1990 (34 CFR 302(e)(2)). In its comments, NCHELP raised concern about

the regulatory change relating to special allowance. Unaware that the Department intended to change its historical policy, NCHELP commented that the change in regulation must be an error. Attached as Exhibit 1 is the excerpt from the NCHELP Program Regulations Committee, Analysis of Second Clearance Draft, 11/20/90 NPRM, dated February 14, 1992 addressing NCHELP's concerns with the proposed Section 682.302(e).

15.     In January of 1993, the Department convened the panel for Negotiated Rulemaking. As part of the agenda setting process for the panel, I requested that the 1/2 SAP Rate provisions be a subject of the discussions.  Mr. Robert Evans, the Department's then-Policy Division Director and representative to the Committee, suggested that, since the change made by the 1992 Regulations to the special allowance provisions were not part of the 1992 Amendments and thus likely outside the scope of the Committee, I speak with Mr. Brian Seigal of the Department's General Counsel's office about NCHELP's concerns.

16.     Although the 1992 Regulations became effective on February 1, 1993, then-Secretary of Education Riley issued a letter to Senator Kennedy and Senator Pell stating that the Department of Education would delay the enforcement of the regulations until the Department issued clarifying guidance (which guidance ultimately was delivered in March, 1996).  Secretary Riley delayed the enforcement of the regulations because the Higher Education Act had been reauthorized in July, 1992 and provisions of the new law superseded or conflicted with aspects of the newly published 1992 Regulations.

17.     As Chair of the Regulations Committee, I led NCHELP's effort to review the 1992 Regulations and provide questions and comments to the Department as requested by the Secretary; in these written comments submitted in February 1993, NCHELP once again raised concerns about the changes in special allowance commenting that the regulation was in error.

Attached as <u>Exhibit 2</u> are (i) a letter to William Moran, Acting Deputy Assistant Secretary of FSA from Jean Frohlicher, President of NCHELP dated January 29, 1993, containing NCHELP's written comments addressing the 1992 Regulations and (ii) an excerpt from those written comments with my handwritten notes from the subsequent meetings written in the margin.  NCHELP's position was that the current funding source of a loan should determine whether a loan was to be billed at the 1/2 SAP Rate or the standard SAP rate.

18.     In February of 1993, during the Negotiated Rulemaking session, I met with Mr. Brian Seigal of the Department's General Counsel's office and reviewed NCHELP's concerns regarding the 1992 Regulations.  As noted above, NCHELP believed the regulatory change with respect to the 1/2 SAP Rate was in error. NCHELP recognized that depending on an entity's flexibility within its financings to move loans amongst financing and depending on interest rates, the change could result in significant cost for the federal government due to the expansion in the pool of loans that would be entitled to the 9.5% minimum yield.  Mr. Seigal acknowledged that the change made by the 1992 Regulation was not in the Department's best interest and stated that the Department would consider changing the regulation.

19.     In March and April of 1993, the Department held public meetings to solicit public input on potential areas of conflict between the 1992 Amendments and the 1992 Regulations and to identify where additional guidance would be useful to support implementation of the 1992 Regulations.  At the beginning of the public meetings, the Department provided handouts that included responses to the questions submitted by the public, including those submitted on January 29, 1993 by NCHELP.  In its response to NCHELP's comment that Section 682.302(e)(2) was in error, the Department confirmed that it did in fact intend to make the change and that it continued to hold that position set forth in the 1992 Regulations.  Attached as

Exhibit 3 to this Affidavit are (i) the Department's response to the NCHELP Comments, dated March 26, 1993, which was handed out to participants at the March public meetings and (ii) an excerpt from the Department's handout addressing Section 682.302(e), with my handwritten notes from the meetings written in the margin.  Over the course of several days in March and several days in April, the questions and answers were discussed, including NCHELP questions on the changes made in the special allowance calculations.   It was during those public meetings that I confirmed that the change in language in the 1992 Regulations was in fact intended to change the Department's historical policy for loans financed with tax-exempt obligations.

20.     At these meetings, the Department articulated that the 1992 Regulations extended the special allowance restriction (1/2 the special allowance paid on other loans, with a floor of 9.5%) to loans refinanced with a taxable source of financing, if the entity retained interest in the loan and the prior tax-exempt obligation remained outstanding.

21.     Ralph Madden, a policy expert for the Department who was in attendance at the meetings, stated that the policy change was intended to impose the 1/2 SAP restrictions to discourage entities from moving loans among financings to minimize the impact of the 1/2 SAP provisions. Ms. Pamela Moran, Chief of the Loan Policy Branch for the Department confirmed Mr. Madden's statements. (At the time of the November 1990 NPRM for such regulations, interest rates were high and therefore the standard special allowance rate was high; loans financed by tax-exempt loans were earning the half the standard special allowance rate and lenders would therefore be motivated to refinance loans with taxable sources of financing in order to earn the full SAP rate; by the time of the final rule in December of 1992, however, interest rates had dropped such that the 9.5% minimum yield provision applied to loans earning SAP at the 1/2 SAP Rate.)

22.     At the public meetings, I pointed out that the policy change could allow an entity, depending on the flexibility of its financings and whether it was permitted to move loans among its various sources of financings, as was the case with Nellie Mae's financings, to extend the 9.5% SAP provisions to its entire portfolio.  Others in the student loan community and I explained that in low interest rate environments, the minimum 9.5% yield in the 1/2 SAP Rate provision would be triggered and therefore loans billing at the 1/2 SAP Rate would actually be earning more special allowance than loans billing at the full SAP rate.  The change in the 1992 Regulations would allow lenders to earn the 1/2 SAP Rate (and 9.5% minimum yield) across their whole portfolio by  basically passing loans through a tax-exempt source for a short period of time before moving them back to their taxable source of financing.  We questioned whether the Department really intended this result which would be based entirely on the movement of interest rates.  Mr. Madden commented that an entity could "voluntarily" forgo the 9.5% SAP in low interest rate environments by billing only for 1/2 SAP without regard to the minimum yield (as it would in high interest rate environments) -- an option that was resoundingly rejected by meeting attendees, because it was contrary to the requirements of the 1992 Regulation as written. Dr. Dallas Martin, the then-President of the National Student Financial Aid Administrators, along with other participants encouraged the Department to carefully consider the concerns being raised during the meetings regarding the potential negative impacts of its final rule.  In the margins of the NCHELP Comments (see Exhibit 2), I made notes during the meeting that the Department acknowledged that the change could result in a "huge windfall" for lenders.

23.     Given that the community was unable to persuade the Department to change its position with respect the 1992 Regulations, NCHELP and Nellie Mae moved their attention to understanding the operational aspects of implementing the change in policy.

24.     In March of 1993, shortly after the February effective date of the 1992 Regulations and during the same time period in which the public meetings discussed above took place, Nellie Mae issued the 1993 Trust; I believe this was the first unsecured tax-exempt financing by a non-profit student loan lender.

25.     Throughout the spring of 1993 (as I recall through June of 1993), the Negotiated Rulemaking Committee continued to meet. During those meetings, I continued to meet with Mr. Evans to review NCHELP's concerns with respect to the 1992 Regulations policy changes, and sought guidance on the operational requirements for SAP billing, including requirements associated with the 1993 Trust.

26.     Over the course of that same period, Congress was debating significant policy changes, including whether to replace the Federal Family Education Loan Program (lender based program) with the Direct Loan Program (government based program).  The dialogue also included potential changes to the unique special allowance provisions applicable to loans financed with tax-exempt obligations.

27.     On August 10, 1993, OBRA 1993 was enacted, which included a change to eliminate the unique special allowance provisions (versus reducing the minimum yield to 8.5% as initially proposed by the Senate) for loans financed with newly issued tax-exempt obligations.

28.     The Department was expected to and did in fact issue guidance on the change in law in the form of a Dear Colleague Letter.  During the development of this guidance, Mr. Evans, provided me a draft of the Dear Colleague Letter for review with several members of the NCHELP Regulation Committee.

29.     Because it was a time-period with so much activity in student loan law and regulations and so many discussions regarding the changes and because the Department had

committed to issue a comprehensive Dear Colleague Letter addressing all questions relating to the 1992 Regulations (which we assumed would likely take several months to complete; the guidance was not issued until three years later in 1996), I took the opportunity to ask Mr. Evans to clarify in the OBRA 1993 Dear Colleague Letter how the special allowance rules would apply to Nellie Mae's newly-issued 1993 Trust. Because the Department's prior guidance only addressed loans that were "pledged" as collateral for a particular trust indenture, I asked that the Department address the SAP billing rules for loans financed on an unsecured basis, such as the 1993 Trust, where specific loans were not pledged as collateral for specific bonds and where instead all bond and loan proceeds were pooled and used to acquire loans.

30.     I am confident that the phrase "in whole or part" was included in the final Dear Colleague Letter for OBRA 1993 in direct response to my inquiries to and discussions with Mr. Evans about the 1993 Trust. The original draft Dear Colleague Letter for OBRA 1993 provided to me and members of NCHELP for comment by Mr. Evans did not include the phrase "in whole or part," and the phrase was added only after my discussions with Mr. Evans about the 1993 Trust.

31.     At no time during public meetings held in March and April of 1993 among the Department and the student loan industry participants, or subsequent meetings held with the Department to discuss the specific questions and answers that would eventually be included in the guidance on the 1992 Regulations (DCL 96-L-1996 issued in March of 1996), did the Department discuss or otherwise suggest the policy interpretation articulated by the Office of the Inspector General in its 2006 audit guide relating to "first and second generation loans." To the contrary, ED acknowledged at the March and April 1993 meetings that a lender could in fact manage its financings so as to qualify 100% of its portfolio for the 9.5% SAP minimum yield

and admitted that the financial impact to the government or lender would be based on the rise and fall of interest rates.

32.     Because I left Nellie Mae in 2001 (after its acquisition by Sallie Mae) and only became re-employed by Navient (then known as Sallie Mae) in 2011, I was not involved in Navient's responses to OIG's draft and final audit reports or in its responses to FSA's inquiries prior to its issuance of its September 25, 2013 FAD.  At Jack Remondi's request, I am leading Navients's review of and response to the FAD.


FURTHER AFFIANT SAYETH NOT.


_____
                              Sheila M. Ryan-Macie


Sworn to before me this 24st day of March, 2015:

**KIMBERLY TAYLOR PAGE**
Notary Public
State of Delaware
My Commission Expires on Feb 6, 2016

App. 3, Ex. 1

# NCHELP PROGRAM REGULATIONS COMMITTEE

## ANALYSIS OF SECOND CLEARANCE DRAFT

## 11/20/90 NPRM

## FEBRUARY 14, 1992

*ED didn't respond to comment in final rule

Page 216. For Section 682.302(d)(1)(vi)(A) - see comment for Section 682.300(b)(2)(ii)(A) which pertains to "negotiated" checks. Comment listed for page 211.

For Section 682.302(d)(1)(vi)(B) - see comment for Section 682.300(b)(2)(ii)(B) which pertains to interest benefits and EFT. If implemented, it will require a 120 day delayed implementation period.

Section 682.302(d)(1)(vii) would terminate special allowance if a lender fails to resubmit a returned claim with the guaranty agency within 30 days. As stated in our comments, we view this as an issue for lender reviews, however, if the Secretary determines it is necessary to regulate this, 60 days is a more reasonable timeframe to refile returned claims. Returned claims are often complex and require information be secured from another party. In addition, lenders should not incur losses due to guarantors inappropriately returning claims nor should lenders be placed in an adversarial position with guarantors in order to recover such inappropriate losses.

In addition to the timeframe concern, the regulation is unclear if special allowance payment is reinstated upon refiling of the claim with the guarantor. If any timeframe is included in the final regulation, a 120 day implementation period will be necessary to make the required changes to systems.



Section 682.302(e)(2)(ii) should be deleted. Subparagraph 682.302(e)(2)(i) describes the conditions under which a loan previously funded from tax-exempt sources and receiving 1/2 special allowance payments can be subsequently funded with taxable sources and be eligible for full special allowance payments. Subparagraph (ii) is unnecessary and incorrect as it is permissible to receive full special allowance payments on a loan which was "originally" funded with tax-exempt sources, is currently funded with taxable sources, and the tax-exempt debt may not necessarily be retired or null and void.

## .304 Methods for Computing Interest Benefits

Page 217. Section 682.304(b)(1) describes the average daily balance method for calculating interest benefits. The Secretary permits use of 365.25 days for the actual accrual method described in 682.304(c)(1). The reason identified in the Comment/Response section for restricting this calculation to one method is unclear. Lenders who use a leap year divisor will have to make system changes in order to accommodate this change. These changes will be significant and require a delayed implementation timeframe.

## .305 Procedures for Payment of Interest Benefits and Special Allowance

Page 219. Section 682.305(a)(4)(ii) reviews the liability of lenders and subsequent holders for payment of the origination fees. The Comment/Response indicates that the regulation "codifies" the Secretary's "long-standing view" on this matter. The only previous binding issuance was paragraph (iii) that stipulated joint liability for loans sold or transferred during the disbursement quarter. This regulation will require purchasers

16

# Exhibit 2

App. 5, Ex. 2

Council of Higher Education Loan Programs, Inc.　　　Washington, DC 20003 • (202)547-1571
　　　　　　　　　　　　　　　　　　　　　　　　　FAX (202)546-8745

January 29, 1993

Mr. William Moran
Acting Deputy Assistant Secretary for
　　Student Financial Assistance
U.S. Department of Education
400 Maryland Avenue, S.W.
Room 5102, ROB # 3
Washington, D.C. 20202

Dear Mr. Moran:

Attached is a preliminary analysis regarding the December 18, 1992, final regulations, as
discussed during our meeting earlier this week. The document is a draft discussion piece and
is subject to change following further analysis of the final regulations.

Throughout our review, we have identified the following general types of concerns:

　1.　The effective date of the regulations violates the Master Calendar provisions
　　　found in Section 484 of the Act.

　2.　The regulations and HEA 1992 are in conflict thus creating confusion among the
　　　participants and will require vast ED resources to resolve these issues.

　3.　Section of the regulations conflict with HEA 1992 standardization and
　　　simplification initiatives and therefore should be subject to negotiated
　　　rulemaking.

　4.　Changes have been made to the regulations without affording the community the
　　　opportunity for public review and comment. Many of the HEA 1992 changes are
　　　in error and will require further amendments by ED.

　5.　There are several provisions within the regulation that are inconsistent, causing
　　　ambiguity and confusion.

We would be happy to meet with you to discuss the document. Please let me know of any
questions you may have on the details of the document.

　　　　　　　　　　　　　　　　　Sincerely yours,

　　　　　　　　　　　　　　　　　Jean S. Frohlicher
　　　　　　　　　　　　　　　　　President

Analysis of December 18, 1992
Final FFELP Regulations
682.100-682.103

**General Comment:** This section of the regulation provides a general overview of the FFELP and does not include major policy initiatives. Our concerns, therefore, are limited and are technical in nature.

**SECTION 682.100**

**682.100(a)(1) - (a)(4):** The final regulations incorporate the HEA 1992 program name changes of FFELP, Federal Stafford, Federal PLUS, Federal SLS, and Federal Consolidation.

    **Issues:**

    1. The program name changes are part of HEA 1992 thus are subject to negotiated rulemaking.

    2. The changes have been incorporated without the opportunity for public review or comment.

**682.100(a)(1):** The regulation describes the Federal Stafford Loan.

    **Issue:**

    1. The partial inclusion of HEA 1992 changes to this section adds unnecessary confusion to the regulation. HEA 1992 includes the Unsubsidized Federal Stafford Loan Program. The regulation fails to clarify the applicability of the regulations for this program. This section should be amended through negotiated rulemaking.

**682.100(a)(3):** The regulation describes the Federal PLUS program.

    **Issue:**

    1. The partial inclusion of HEA 1992 changes to this section adds unnecessary confusion to this process. HEA 1992 changed the definition of independent student to include all graduate and professional students, therefore, for clarity purposes the regulation should be revised to state that PLUS loans are limited to dependent undergraduate students. This section should be amended through negotiated rulemaking.

**682.100(a)(4):** The regulation incorporates the HEA 1992 inclusion of PLUS loans for eligibility for Loan Consolidation.

    **Issues:**

    1. The change is part of HEA 1992 thus is subject to negotiated rulemaking.

    2. The change has been incorporated without the opportunity for public review or comment.

Page two
682.100
2/1/93

3. The change is in error. HEA 1992 provides for eligibility for PLUS consolidation for PLUS loans made on or after 10/17/86 -- the regulation reads "loans made after 10/17/86".

## SECTION 682.101

682.101(b): The regulation includes correspondence school eligibility in the FFELP.

Issue:

1. This conflicts with HEA 1992 and the promulgation of the regulation after HEA 1992 will create confusion. HEA 1992 eliminates correspondence school eligibility for institutions that offer more than 50% of its courses through correspondence thus this section of the regulation must be amended through negotiated rulemaking.

682.101(c): The regulation describes student participation in the Stafford Loan Program.

Issue:

1. The partial inclusion of changes to this section adds confusion to the regulations. HEA 1992 includes the Unsubsidized Federal Stafford Loan Program. The regulation fails to clarify the applicability of the regulations for this program. This section should be amended through negotiated rulemaking.

682.101(c): The regulations have been amended to describe the 1992 HEA consolidation changes.

Issues:

1. The changes are part of HEA 1992 thus are subject to negotiated rulemaking.

2. The changes have been made without the opportunity for public comment or review.

3. The regulation does not address married couple eligibility for loan consolidation.

4. The regulation states PLUS loans made after 10/16/86 are eligible for consolidation. This statement is accurate yet conflicts with section 682.100(a)(4).

Case 1:21-cv-00924-TSE-MSN Document 63-1 Filed 06/28/21 Page 20 of 99 PageID# 2942

Analysis of December 18, 1992
Final FFELP Regulations
682.200-682.214

SECTION 682.200

Definitions of eligible program, eligible student, and institution of higher
education: These definitions are listed in the final regulations as being
included in the general provision regulations.

    Issue:

    1. HEA 1992 changes the above definitions thus the general provision
       regulations conflict with HEA 1992. These definitions should be
       amended through negotiated rulemaking.

Definition of Co-maker: The regulation defines co-maker in the context of the
PLUS program.

    Issue:

    1. The regulation conflicts with HEA 1992. HEA 1992 authorizes co-makers
       under the consolidation program. This definition should be amended
       through negotiated rulemaking.

Definition of Default: The regulation describes default as the failure of a
borrower or joint borrowers on a PLUS loan to repay the loan.

    Issue:

    1. The regulation conflicts with HEA 1992. HEA 1992 authorizes co-makers
       under the consolidation program thus the definition of default should
       be expanded to include default of co-consolidated borrowers. The
       regulations should be amended through negotiated rulemaking.

Definition of Endorser: The regulations provide a new definition of endorser.

    Issue:

    1. Insufficient implementation time has been provided to implement this
       change. To the extent that promissory notes include a definition of
       endorser, changes must be made to these notes. Given the effort to
       develop the common application and cosigner addendum, the change in
       definition should have a delayed implementation date. In addition, the
       common application process uses the term cosigner whereas the
       regulation refers to endorser. The use of different terms adds
       unnecessary confusion.

Page two
682.200
2/1/93

**Definition of Estimated Cost of Attendance:** The regulation has been amended to provide for a revised definition.

  Issues:

  1. This definition conflicts with the HEA 1992 definition which takes effect on 7/1/93. The definition should be amended through negotiated rulemaking.

  2. The revised definition goes into effect on 2/1/93. Applications which are in process may be affected by the change.

**Definition of Estimated Financial Assistance:** A revised definition of estimated financial assistance has been incorporated into the regulations.

  Issues:

  1. The definition of estimated financial assistance is being revised through negotiated rulemaking therefore the definition included in the final regulation is temporary.

  2. The final regulation conflicts with HEA 1992 definition which is effective on July 1, 1993.

  3. The amended regulation takes effect on 2/1/93 thus applications in process may be affected by this change.

**Definition of Grace Period:** The definition of grace period has been revised to be day versus month specific.

  Issues:

  1. The change incorporates HEA 1992 thus is subject to negotiated rulemaking.

  2. The change was made without the opportunity for review or comment by the public.

  3. The regulation does not clarify the effective date for the provision. Is this effective date for loans made on/after 7/23/92, new borrowers on/after 7/23/92, or loans entering repayment on/after 7/23/92?

  4. The definition conflicts with HEA 1992. Clarification needs to be provided as to the special six month period offered to SLS borrowers to bridge the repayment start dates of SLS and Stafford loans for borrowers with six and nine month grace periods. This definition should be amended through negotiated rulemaking.

(4)

682.200
2/1/93

5.  To comply with this provision, schools must provide the lender with the date in which the student left the institution. The standard SSCR which requires that data element for the first time is not, however, effective until 120 days following the publication of the regulation.

**Definition of Lender:** A revised definition of lender is included in the regulation.

**Issues:**

1. The definition conflicts with the HEA 1992 definition of lender.

2. The definition is included in the draft regulations for negotiated rulemaking thus is subject to change. The definition in the regulation would be implemented on a temporary basis thus adds further confusion.

3. Insufficient implementation time has been provided for ED to determine and advise guaranty agencies of lenders now ineligible for FFELP participation.

**Definition of National Credit Bureau:** A change in the definition has been made.

**Issues:**

1. Insufficient implementation time has been provided. Lenders reporting to regional credit bureaus will need to establish reporting relationships with national bureaus.

**Definition of Origination Fee:** A new definition of origination fee has been included in the regulations.

**Issues:**

1. The regulation conflicts with HEA 1992 as it does not include the application of this fee for PLUS or SLS loans. The regulation should be amended through negotiated rulemaking.

2. The regulation does not include a definition of the origination fee/insurance premium authorized for the Unsubsidized Stafford Loan Program. The regulation should be amended through negotiated rulemaking.

**Definition of Origination Relationship:** The definition needs to be expanded.

**Issue:**

1. Include elements in the Preamble for Section 682.215.



Page four
682.200
2/1/93

**Definition of Period of Enrollment**: A new definition of period of enrollment has been included in the regulations.

Issues:

1. The definition conflicts with the definition included in section 682.603. In addition, this term is defined in the general provision and need analysis sections of the regulations. A single definition should be used in the regulation.

2. The change in definition is effective on 2/1/93 yet applications which are in process may be impacted by this change in definition.

**Definition of Repayment Period**: A definition of repayment period has been added to the regulations.

Issues:

1. Clarification needs to be provided as to the repayment period on an Unsubsidized Stafford Loan. The definition should be amended through negotiated rulemaking.

2. The regulation conflicts with ED's recent guidance which states that PLUS loans cannot be multiply disbursed.

3. The definition of repayment period under the consolidation program was amended to reflect the HEA 1992 repayment term yet all HEA 1992 program changes are subject to negotiated rulemaking.

**Definition of School** (5): The definition has been revised to permit eligible, non-participating schools to certify loan applications.

Issues:

1. Insufficient implementation time has been provided as ED will need to publish a list of eligible non-participating institutions to support deferment processing.

2. With the development of the standard deferment form as required by HEA, consideration should be provided as to whether implementation of this provision should be deferred until following ED approval of the form.



Page three
682.100
2/1/93

SECTION 682.102

**682.102(a):** The regulation describes the application process for Stafford Loans.

Issue:

1. The regulation fails to address the application process for Unsubsidized Stafford Loans. The regulations must be amended through negotiated rulemaking.

**682.102(d):** The regulation describes the application process for loan consolidation.

Issue:

1. The regulation conflicts with HEA 1992. The loan application process for married couples only requires that one of the applicants seek a loan from the current holder(s). This section should be amended through negotiated rulemaking.

**682.102(e)(1):** This section generally describes cancellation provisions for the FFELP.

Issue:

1. The regulation conflicts with HEA 1992 as it does not include the cancellation provisions available for students enrolled in institutions that close or whose loan has been falsely certified. In addition, the regulation does not include the HEA 1992 provision for cancellation of a PLUS loan if the student dies. This section of the regulation must be amended through negotiated rulemaking.

**682.102(e)(2):** This section describes the repayment requirements for Stafford Loans.

Issue:

1. This section conflicts with HEA 1992. The regulation does not address the Unsubsidized Stafford Loan Repayment provisions. This section should be amended through negotiated rulemaking.

**682.102(e)(3):** The regulation has been amended to include the option for a SLS borrower to begin repayment on a SLS loan at the same time the borrower begins repayment on his/her Stafford Loan.



**Page four**
**682.100**
**2/1/93**

**Issues:**

1. The change is part of HEA 1992 thus is subject to negotiated rulemaking.

2. The change has been made without the opportunity for public comment or review.

3. The regulation does not clarify the effective date for this provision.

**682.102(e)(4):** This section states that the first payment of principal and interest is due on a PLUS loan 60 days following full disbursement.

**Issues:**

1. This section conflicts with HEA 1992. HEA 1992 states that the repayment period for PLUS begins on the date of disbursement. The regulation should be amended to clarify the first payment due date on PLUS loans.

2. This section conflicts with ED's recent guidance which states PLUS loans may not be disbursed in more than one installment.

Page five
682.200
2/1/93

**Definition of Stafford Loan Program:** A definition of the Stafford Loan Program has been added to the regulations.

Issue:

1. The definition is inconsistent as it describes the Stafford Loan Program and the unsubsidized Stafford loan. A definition of subsidized Stafford or nonsubsidized Stafford is not, however, included in the regulation. This definition should be amended through regulation.

SECTION 682.201

**682.201(a)(2):** The regulation states that a student applying for an SLS who is determined to have need in excess of $200, must apply for a Stafford loan.

Issue:

1. Clarification needs to be provided as to the applicability of the $200 tolerance on the unsubsidized Stafford loan program. This definition should be amended through regulation.

**682.201(a)(4):** The regulations require a borrower to reaffirm an FFELP loan that previously was canceled due to disability or bankruptcy.

Issues:

1. Insufficient implementation time was provided as guaranty systems must be amended to track this provision.

2. Clarification must be provided as to the 2/1/93 effective date. Does this apply to loans made on/after 2/1/93, loans guaranteed on/after 2/1/93, or loans certified on/after 2/1/93?

3. We continue to believe that the bankruptcy reaffirmation conflicts with the bankruptcy code and subjects the guaranty agency and the Secretary to litigation.

**682.201(b):** The regulation defines borrower eligibility under the PLUS program.

Issues:

1. HEA 1992 changes this section and limits eligibility for borrowing to dependent undergraduate students. This section should be amended through negotiated rulemaking.

(9)

Page six
682.200
2/1/93

2. This section is part of the negotiated rulemaking process to incorporate the HEA 1992 changes; thus the section will change. The temporary nature of the final regulation will add further unnecessary confusion.

3. This section conflicts with HEA 1992 as defaulted borrowers are now eligible for PLUS if the borrower has made six payments to the holder.

**682.201(c):** Several changes have been made to the consolidation borrower eligibility requirements.

Issues:

1. The section incorporates HEA 1992 thus is subject to negotiated rulemaking.

2. The section was changed without the opportunity for public review or comment.

3. The section is in error thus creates enormous confusion. Section 682.201(c)(1) should include the requirement for (i) the borrower to seek a loan from his/her current lender; (ii) for the borrower to notify his/her lender of a change in address; (iii) for the borrower to certify that he/she does not have another application pending; and (iv) the borrower can only consolidate new loans made on/after the date the consolidation loan is made except that loans may be added on within 180 days.

Married couples must also (i) have a combined debt of at least $7500, (ii) be in grace or repayment; (iii) have made satisfactory repayment arrangements on a defaulted loan; (iv) one spouse needs to have sought a loan from his/her current lender; and (v) the 180 day add-on provisions outlined above.

**SECTION 682.202**

**682.202(a):** Changes have been made to this section to reflect the 1986 and 1992 HEA changes.

Issues:

1. Section 682.202(a)(1)(i)(C) is in error. The fixed 8% loans should have an end date.



2. The HEA 1992 interest rate changes have been incorporated into the regulation, however, should be subject to negotiated rulemaking.

3. Section 682.202(a)(1)(iii) and (iv) conflict with existing ED guidance. In addition, these sections are subject to negotiated rulemaking and may change.

4. The section has been amended without the opportunity for public review and comment.

**682.202(b):** The section defines capitalization of interest.

**Issues:**

1. This section conflicts with HEA 1992 which states that all payments shall be suspended and interest capitalized during deferment or forbearance.

2. Clarification needs to be provided as to the treatment of interest which accrues on an unsubsidized Stafford loan. This section should be amended through negotiated rulemaking.

3. Clarification needs to be provided as to the applicability of (b)(5) for the 20% debt-to-income ratio mandatory forbearance. This section should be amended through negotiated rulemaking.

4. This section refers to "nonsubsidized loans." This term is not defined in 682.200.

**682.202(c):** The section states that the lender may, except in the case of an unsubsidized Stafford loan, charge an origination fee and may deduct it from the borrower's loan proceeds.

**Issues:**

1. The HEA changes have been incorporated without public review or comment.

2. The regulation is in error. The regulations state that a lender _may_ deduct the origination fee whereas HEA 1992 states the lender must deduct the origination fee for PLUS and SLS loans.

3. The regulation does not describe the mandatory 6.5% origination/insurance fee for unsubsidized loans. This section should be amended through negotiated rulemaking.

(11)

Page eight
682.200
2/1/93

4. Regulation and preamble conflict. Regulation requires refund of
   origination fee for partial cancellation yet preamble states that this
   is not required.

5. Section .202(c)(5)(iii) states the lender must refund the origination
   fee if the check is not delivered within 120 days of disbursement.
   Lenders do not know the delivery date thus cannot implement this
   provision.

**682.202(d):** This section describes the payment of insurance premiums.

Issue:

1. This section conflicts with HEA 1992. Guaranty agencies cannot charge
   an insurance premium on an unsubsidized Stafford loan -- the
   regulation does not state this exception. The regulation should be
   amended through negotiated rulemaking.

**682.202(g):** This section describes a pre-emption of state law in the area of
late fees.

Issues:

1. The regulation and the preamble conflict. The preamble lists specific
   areas of the regulation that pre-empt state law. This section is not
   included as part of that discussion calling into question whether the
   Secretary fully intends to pre-empt state law in this area.

2. Promissory notes changes will be required to comply with this section.
   Given the development of the common application, note revisions are
   not practicable at this time.

SECTION 682.204

**682.204:** The regulations have been amended to include to HEA 1992 pro-rated
Stafford loan limits.

Issues:

1. The change is subject to negotiated rulemaking.

2. The change was made without public review or comment.

3. Proration of loan limits has caused significant confusion -- the
   inclusion of year one limits and not the limits to years 2-5 adds
   further to this confusion.

⑫

**Page nine**
**682.200**
**2/1/93**

    4. Clarification needs to be provided as to the applicability of the HEA 1992 definition of academic year within the context of this discussion.

    5. This section conflicts with HEA 1992 and will change through the negotiated rulemaking effort.

## SECTION 682.205

**682.205(a)(2)(i) and (a)(2)(xiii):** This section requires the lender to disclose additional information in the initial disclosure regarding the consequences of default.

    **Issues:**

    1. Insufficient time has been provided to implement the changes as forms must be revised to implement the provision; changes will impact applications in process.

    2. Changes to the initial disclosure are also included in the draft HEA regulation (negotiated rulemaking) which will result in lenders making several changes to this form over a short period.

    3. These changes conflict with the initiative to develop common forms as it will require temporary revisions to agency forms rather than the industry focusing its attention on the development of national forms.

**682.205(c)&(d):** Changes have been made to the disclosure prior to repayment.

    **Issues:**

    1. The regulation incorporates HEA 1992 changes which are subject to negotiated rulemaking.

    2. The regulation was amended without public review or comment.

## SECTION 682.206

**682.206(c)(3):** This section states that the lender may not approve a loan more than the unmet need.

    **Issue:**

    1. This section conflicts with the HEA which authorizes a borrower to use an SLS, unsubsidized Stafford or PLUS loan to pay the EFC.

Page ten
682.200
2/1/93

**682.206(f)(6):** This section incorporates the HEA 1986 changes regarding loan consolidation.

Issue:

1. The regulations are internally inconsistent. In this section, the lender may rely in good faith on the certification provided by the holder of a consolidation loan whereas in section .413(c)(6) reinsurance is at risk if the certification in this section is in error.

**SECTION 682.207**

**682.207(b)(1)(v)(B):** This section of the regulation has been amended to include the HEA 1992 requirement for co-payable PLUS checks or EFT to the institution.

Issues:

1. This change is part of HEA 1992 thus is subject to negotiated rulemaking.

2. This section was revised without public review or comment.

3. This regulation conflicts with ED Dear Colleague guidance which requires that the loan check be sent to the institution. Given that the regulation was published after the DCL guidance, it may be assumed that the ED guidance was rescinded.

**682.207(b)(1)(v)(C):** This section includes the HEA 1992 provision for checks for students enrolled in a program of study abroad to be sent to the student or signed via power of attorney.

Issues:

1. This change is part of HEA 1992, thus the change is subject to negotiated rulemaking.

2. The restriction regarding power of attorney (not associated with the institution) goes beyond the scope of HEA 1992 and is an ED policy decision subject to an NPRM process.

14

Page eleven
682.200
2/1/93

<u>682.207(d):</u> This section describes the late disbursement procedures.

Issues:

1. This section was changed in response to the burden reduction
   initiatives. While the community provided input to this process, the
   community was not afforded the opportunity to respond to a proposed
   regulation on this issue. Had we been provided the opportunity to
   respond, we would have conveyed our concern with the 60 day limitation
   and the impact this limitation will have on students.

2. This section conflicts with 682.604. Section 682.207 states a lender
   may disburse a late disbursement within 60 days whereas .604 states a
   school may process a disbursement received within 60 days. A lender
   making a late disbursement on or near the 60th day would have the
   check returned as the school could not process the loan.

3. Insufficient time has been provided to implement the change.

4. Clarification needs to be provided on the effective date. Does this
   provision apply to late disbursements made on/after 2/1/93 or late
   disbursements received on/after 2/1/93?

SECTION 682.208

<u>682.208(b)(1)&(2):</u> This section outlines new requirements for reporting to a
credit bureau.

Issues:

1. Insufficient implementation time has been provided.

2. Clarification needs to be provided on the effective date. Does this
   apply to loans made on/after 2/1/93 or reports made on/after 2/1/93?

<u>682.208(c)(2):</u> This section requires lenders to set repayment dates for
borrowers no longer enrolled at eligible institutions (was participating).

Issue:

1. Insufficient implementation time as ED must publish a list of eligible
   nonparticipating schools. In addition, the SSCR process must be
   updated to permit tracking of enrollment at eligible non-participating
   institutions.



2. Currently guaranty agencies have agreements with schools which require the processing of an SSCR within a specified period of time. If a school is eligible but not participating, there is not a mechanism in place today to ensure timely reporting of this data. This issue should be addressed through negotiated rulemaking.

**682.208(e):** This section describes the borrower notification process for loan sales.

Issues:

1. Some aspects of HEA 1992 have been incorporated into the regulation although should be subject to negotiated rulemaking.

2. The inclusion of only part of HEA 1992 makes this section very confusing.

SECTION 682.209

**682.209(a)(1):** This section describes repayment periods for PLUS loans.

Issue:

1. This section conflicts with ED's recent guidance regarding PLUS disbursement.

**682.209(a)(2)(iii):** This section describes the option available to SLS borrowers to postpone repayment until the date the repayment of the Stafford loan begins.

Issues:

1. The changes are part of HEA 1992 which are subject to negotiated rulemaking.

2. Clarification needs to be provided as to the applicability of this provision for borrowers with nine month grace periods.

**682.209(a)(3)(i)(B):** Repayment dates on Stafford loans. See comments for grace period.

**682.209(a)(5):** This section requires the borrower to request a waiver of his/her grace period in writing.

(16)

Page thirteen
682.200
2/1/93

Issues:

1. The change was made without public review or comment.

2. The changes frustrate HEA 1992 initiatives to simplify the conversion to repayment process.

3. Insufficient implementation time has been provided.

4. Clarification needs to be provided on the effective date. Does this apply to loans made on/after, repayment beginning on/after, or waivers made on/after 2/1/93.

**682.209(a)(7)(iv):** The regulation requires the borrower to request in writing a term of less than five years.

Issues: See issues for 682.209(a)(5).

**682.209(b):** This section describes the lender's responsibilities for prepayments.

Issues:

1. Insufficient implementation time has been provided.

2. Clarification on the effective date must be provided.

3. The regulation is in error. The regulation states that if the borrower requests the lender to apply a prepayment to future installments, the lender may not credit the payment first to prior late charges then prior accrued interest or prior collection costs. Whether or not a borrower makes a prepayment, a lender's application of the payment should not change.

**682.209(f)(3), .209(g)(2), .209(h)(6) and .209(i):** These sections require (i) the lender to apply the refinance payment within five days and to send the refinanced lender the borrower's promissory note; (ii) requires holders to complete the refinance or consolidation certification within 10 days.

Issues:

1. Insufficient implementation time has been provided to permit lenders to comply with these procedures.

2. The provisions conflict with HEA 1992 simplification provisions.

(17)

Page fourteen
682.200
2/1/93

682.209(h): Several changes impacting consolidation loans have been made to this section.

Issues:

1. Provisions of HEA have been incorporated without negotiated rulemaking or public comment.

2. 682.209(h)(4)(ii) is inconsistent with HEA 1992. The statute does not address the status of the 'other' student loans for purposes of consolidation.

3. The regulation does not address the special provisions for married couples.

SECTION 682.210

General Comments: This section makes substantial changes to the certification and documentation requirements for existing deferments. Given the changes to deferments in HEA 1992, these deferments will begin to phase-out over time. Changing the requirements for these deferments seems unnecessarily burdensome, as the community implemented the prior guidance in 1986. Implementation of these changes frustrates the simplification of deferment mandate of HEA 1992, and will make it more difficult for borrowers to obtain the deferments for which they are entitled.

682.210(a)(3)(ii): The eligibility for subsidized consolidation deferments has been added to this section.

Issues:

1. The provision is part of HEA 1992 thus is subject to Negotiated Rulemaking.

2. The regulation is in error. The eligibility for benefits is tied to consolidation applications received on or after January 1, 1993.

682.210(a)(5): The section states that an authorized deferment period begins on the date the condition entitling the borrower to the deferment first exists, but not more than six months before the date the lender receives a request and the information and documentation required for the deferment. .402(k) applicable suspension of the repayment period (with respect to bankruptcies), states that the suspension of the repayment period for deferments begins on the date on which the borrower qualifies for the requested deferment, but does not include the restrictions for the six month backdate or the receipt of the request and documentation.



1412

Page fifteen
682.200
2/1/93

Issues:

1. The deferment period for computing the applicable suspension of the repayment period will not be the actual deferment begin date indicated in the borrower's record.

2. The change to .402(k) was not in the NPRM and did not receive public comment.

3. The inconsistencies in the regulations frustrate the HEA 92 mandate for simplification of deferments.

4. The six month backdate restriction frustrates the concept of deferments as entitlement as authorized by statute.

5. There is no guidance for the transition to the ability to backdate unemployment deferments for six months. For example, as written, unemployment deferments granted on 1/31/93 may only be backdated 60 days, but unemployment deferments granted the following day may be backdated six months.

**682.210(a)(6)(iv):** This section states that lenders may use the anticipated graduation date on the loan application for deferment purposes if the guaranty agency includes student deferments on its student status confirmation report. The regulation also indicates that this is permissible for PLUS and Stafford Loans, but may only be used in the case of an SLS loan made to a borrower for a period of enrollment that commences at the same time as the deferment. However, the preamble suggests that Stafford, SLS and PLUS are all treated the same (without the SLS restriction). Further, 682.210(c)(3) states that in the case of an SLS or PLUS borrower (but not Stafford), the lender shall treat the certified loan application as sufficient documentation for a student deferment for any outstanding SLS or PLUS loan previously made to the borrower that is held by the lender. The HEA 92 amended Section 485 C of the Act to require that eligible lenders must consider any deferment on one such loan as a deferment on the total amount of all such loans. The Department's Dear Colleague Letter (page 28) uses the term "a lender" rather than "eligible lenders."

Issues:

1. The regulation is confusing and inconsistent. 682.210(a)(6)(iv), the preamble, 682.210(c)(3), and the Dear Colleague Letter are inconsistent with the language in the Act on the same issue, and each has different meaning.

2. Applicability of deferments is part of HEA 1992 and is subject to negotiated rulemaking. These regulations would be temporary at best.



Page sixteen
682.200
2/1/93

3. The regulation is not simplified in accordance with HEA 1992 and would
   work to the detriment of the borrower by creating unnecessary
   defaults.

**682.210(a)(8):**  This section states that a borrower whose loan is in default
is not eligible for a deferment as to that loan, unless the borrower has made
satisfactory repayment arrangements with the holder of the loan. While this
language is the same as current regulation, a recent private letter argued
that the Department's long standing policy was that the applicability of
deferment eligibility related to the borrower rather than the loan or type of
loan.

**Issues:**

1. Does this regulation supersede this policy since the Department has
   again, by regulation, specified that the deferment applicability is by
   loan?

2. The Department needs to clarify the confusion resulting from the use
   of the term "after default." Does this include periods after the
   180th day of delinquency but prior to claim payment, periods after
   claim payment or both?

**General Comment:** The following ED policy initiatives necessitate changes to
existing deferment forms, systems and procedures by February 1.

**682.210(d):**  This section expands the graduate fellowship certification
requirements to include that the borrower holds at least a baccalaureate
degree, is accepted or recommended by an institution of higher education for
acceptance on a full-time basis into an eligible program, and requires the
anticipated program completion date. It also expands the definition of an
eligible graduate fellowship program to require that, in the case of study at
a foreign university, the program accepts the course of study for completion
of the fellowship program.

**682.210(e):**  This section restricts the rehabilitation training deferment by
expanding the definition of full-time employment to be expected to last at
least three months.

**682.210(f):**  This section imposes a new restriction on temporary total
disability deferments prohibiting the granting of a deferment based on a
single certification beyond six months after the date of certification.
Re-certification would be required beyond the six months.

<u>682.210(g)</u>: This section adds additional certification requirements for dependent temporary disability that the physician's statement must substantiate the fact that the spouse or dependent requires continuous care for at least 90 days, changes the definition of full-time employment and restricts granting the deferment for more than six months after the date of the certification.

<u>682.210(h)</u>: This section changes the frequency of recertification for unemployment deferments from three to six months and requires documentation of six conscientious searches for full-time employment (formerly three). Current forms and systems cannot immediately accommodate these changes.

<u>682.210(i)</u>: This section expands the documentation necessary to grant a military deferment.

<u>682.210(j), (k) and (l)</u>: This section for Public Health Service, Peace Corp., and ACTION Programs deferments changes the certification requirements from borrower certified to certified by an official.

<u>682.210(m)</u>: This section changes the compensation standards for eligibility for full-time service in a tax-exempt organization.

<u>682.210(n)</u>: This section changes the certification requirements for internship/residency deferments.

<u>682.210(o)</u>: This section substantially expands the certification and documentation requirements for parental leave deferments from formally self-certified by the borrower to required certifications from the school, borrower and a physician's statement or a statement from an adoption agency official.

<u>682.210(p)</u>: This section requires a change in certification procedures for NOAA deferments.

<u>682.210(r)</u>: This section changes the eligibility requirements (now requires full-time employment) for working mother deferments, and requires additional documentation such as birth certificates and pay stubs. The regulation also imposes a definition of full time employment.

    Issues:

    1. HEA 1992 created new deferment categories which will phase out the existing deferments. Changes to existing documentation and certification requirements for these deferments is unnecessarily burdensome.



Page eighteen
682.200
2/1/93

2. The documentation requirement in this section (birth certificate)
   verifies the age of the child whereas the deferment applies to a child
   who has not yet enrolled in first grade.

3. The magnitude of these changes frustrate the simplification and
   standardization efforts mandated by HEA 92.

4. Immediate implementation of these provisions may result in the
   inadvertent delay or denial of deferment benefits to students who are
   otherwise entitled to these benefits due to the inability of the
   community to comply with the February 1 implementation date.

5. The Secretary was advised by NCHELP in its 2/14/92 comments on the
   second clearance draft that this section would necessitate a delayed
   implementation date.

**SECTION 682.211**

**682.211:** The provisions in 682.211 permit forbearances to endorsers, require
a new signed repayment obligation if forbearance is granted after default,
change the file documentation necessary for a lender to document the approval
rationale for the forbearance and define periods of 'administrative
forbearance', but require notice to the borrower.

Issues:

1. The requirement for a signed repayment obligation was not in the NPRM
   and did not receive public review and comment. What is a 'repayment
   obligation?'

2. The Department needs to clarify the use of the term 'after default' in
   682.211(d). Does this include periods after the 180th day of
   delinquency but prior to claim payment, periods after claim payment or
   both?

3. 682.211(h) is part of HEA 1992 and is subject to negotiated
   rulemaking.

(22)

Analysis of December 18, 1992
Final FFELP Regulations
682.300 - 682.305

**SECTION 682.300**

**682.300:** This section describes changes in the eligibility for interest benefits on Stafford loans.

**Issue:**

1. HEA 1992 changes this section. Effective for applications made on/after January 1, 1993, consolidation loans are eligible for interest benefits during deferment periods. In addition, HEA changes the interest billing requirements with respect to unconsummated loans and restricts a lender's authority to bill for interest prior to disbursement. The regulation should be amended to address these changes through negotiated rulemaking.

**682.300(b)(2):** The section states that a lender must terminate interest billing if the loan check has not been negotiated (was cashed) within 120 days.

**Issues:**

1. The change was made without the opportunity for review and comment.

2. Lenders do not know if the loan check is negotiated by the 120th day thus cannot implement this change.

3. This section conflicts with section .406(a)(2) which states "cashed" for purposes of reinsurance.

**SECTION 682.301**

**682.301:** This section describes the borrower eligibility for interest benefits.

**Issue:**

1. Significant confusion exits within the community regarding the treatment of an Unsubsidized Stafford loan within the context of the EFC. The final regulations do not address this issue. The regulations should be amended through negotiated rulemaking.

**682.301(a)(2):** Section 682.301(a)(2) states that a borrower may not receive subsidy if the student is serving in a religious order.



Page two
682.300
2/1/93

1. Clarification needs to be provided on the effective date of this provision. Does this apply to loans certified on/after 2/1/93, loans made on/after 2/1/93, new borrowers on/after 2/1/93.

2. The introduction of the Unsubsidized Stafford Loan complicates this change. ED has not indicated how the financial aid officer is to certify the loan application if the borrower is ineligible for a subsidized Stafford Loan. This section should be amended through negotiated rulemaking.

**682.301(c):** This section refers to the nonsubsidized Stafford Loan.

Issues:

1. A definition of nonsubsidized Stafford loan is not included in the regulation.

2. The use of this undefined term is complex given the HEA introduction of the Unsubsidized Stafford Loan.

**SECTION 682.302**

**682.302:** Several significant changes have been made to this section regarding a lender's billing for special allowance including (i) special allowance ceases 60 days after default unless a claim has been filed with the guarantor and (ii) special allowance ceases on a returned claim unless the claim is refiled with the agency within 30 days.

Issues:

1. These changes represent major system changes. While a delayed implementation date of 4/17/93 has been provided, this delay is insufficient. The mechanism for billing for special allowance is the 799 report. This report is going through a major revision due to HEA 1992. ED has yet to issue a revised report for lenders to begin programming the changes in reporting requirements. We strongly encourage all issues regarding the 799 be deferred until a revised report has been developed by ED.

2. There are details about these provisions included in the preamble that have not been incorporated into the regulations. For example, the preamble states that if the lender files after the 60th day, SAP is not reinstated. If the details of the preamble are binding, these provisions should be incorporated into the body of the regulation.



3. The regulation conflicts with HEA 1992. Many changes have been made in the area of special allowance including changes in the rates and new provisions for loans funded with tax-exempt debt. These changes should be amended through negotiated rulemaking.

4. The inclusion of the new filing deadlines has a significant impact on lender risk. Section 682.406 does not provide for a cure for violations of these deadlines.

**682.302(e):** The regulation states that the 1/2 special allowance provision for loans funded with tax-exempt debt applies to a loan unless the debt is retired or defeased.

Issue:

1. The regulation is in error. A loan funded with tax-exempt debt may be transferred and pledged to a taxable financing. Given, ED interpretation on this issue, a loan is always at 1/2 SAP and therefore at the 9.5% floor regardless of the current financing used to fund the loan.

## SECTION 682.304

**682.304:** Two key changes have been made to this section which impact lender billing for SAP including the removal of the 365.25 leap year option for billing for SAP for the average daily method and to require rounding to the nearest whole dollar. These changes are effective on 2/1/93.

Issues:

1. The 365.25 will require major system changes and no delay has been provided. The mechanism for billing for interest benefits is the 799 report. This report is going through a major revision due to HEA 1992. ED has yet to issue a revised report for lenders to begin programming the changes in reporting requirements. We strongly encourage all issues regarding the 799 be deferred until a revised report has been developed by ED.

2. The effective date needs clarification. Does this apply to government billing submitted on/after 2/1/93 or reports due on/after 2/1/93.

## SECTION 682.305

**682.305(a)(4):** The regulations change the liability structure for the payment of origination fees.



Page four
682.300
2/1/93

Issues:

1. The preamble includes comments regarding this section that are rather critical and impact holder liability. These comments have not been incorporated into the body of the regulation.

2. Clarification needs to be provided on the effective date. Does this provision take place for loans made on/after 2/1//93, loans transferred on/after 2/1/93, or billings filed with ED on/after 2/1/93.

682.305(c): The HEA 1992 annual lender audit has been incorporated into the regulation.

Issues:

1. The change is subject to negotiated rulemaking.

2. The change was made without the opportunity for public review and comment.

3. HEA 1992 requires the Secretary to consider alternatives for this requirement. No alternatives (i.e. guaranty agency review) have been incorporated and as such this requirement is particularly burdensome for small lenders.

4. The provisions of OMB Circular A-133 require that a single audit be provided for nonprofit entities. Within the context of the regulation, ED requires the .305(c) audit, lender reviews in .410, and an audit in .830. In addition, periodic audits are performed by ED and the various reviewing entities. These audits conflict with A-133 thus clarification should be addressed within the context of the regulation.



Analysis of December 18, 1992
Final FFELP Regulations
682.400-682.414

## SECTION 682.400

**682.400:** Regulations reflect 1986 changes to the agreement between a guaranty agency and the Secretary.

Issues:

1. This section is the subject of negotiated rulemaking because of Reauthorization changes requiring an additional agreement (Rehabilitation) with the Secretary.

2. Prior to the publication of the 1992 Regulations, the Department issued a Dear Colleague Letter requiring guaranty agencies to sign and return a Rehabilitation Agreement attached as Appendix B to the Dear Colleague Letter. Then the 1992 Regulations were published without mention of the Rehabilitation Agreement causing unnecessary confusion as to implementation (Final Regulations are binding on program participants, Dear Colleague Letters in conflict with regulations are not).

## SECTION 682.401

**682.401:** Outlines Contents of Insurance Program Agreement.

Issue:

1. HEA 1992 requires additional terms for Agreement, some of which have been added in this regulation. Negotiated rulemaking required for this section.

**682.401(b)(2)(ii):** Establishes parameters for guaranty agency loan limit policies (minimum seven month academic year all loan types; grade level progression not an exception to the 7 month loan period).

Issues:

1. Use of term 'academic year' in this section is affected by HEA 1992 and therefore subject to negotiated rulemaking.

2. This is a major shift in guarantor policy that requires additional time to implement (training, system changes, etc.).

3. 2/1/93 implementation will affect applications in process.

27

Page two
682.400
2/1/93

**682.401(b)(4)(i):** Borrower must indicate preferred lender.

Issue:

1. HEA 1992 requirement for one lender/one holder/one guaranty agency/one servicer potentially conflicts and should be addressed as part of negotiated rulemaking.

**682.401(b)(4)(iv)(A):** Borrower shall notify holder or guaranty agency of any changes in employer or employer's address.

Issues:

1. Subject to negotiated rulemaking because HEA 1992 added requirement that schools must collect this data and forward it to guaranty agency.

2. Need additional time to change reporting format and system.

3. What is the effective date – first report after 2/1/93, first change in address, etc?

4. This regulation conflicts with .610 which applies to "enrolled student" only.

5. Confusion arises because Dear Colleague prior to Final Regulation has different requirements than final regulations.

**682.401(b)(5):** Adds criteria which allows guaranty agency to limit or deny participation with an eligible school.

Issues:

1. HEA 1992 changes require this to be subject to negotiated rulemaking. ED has submitted proposed changes to negotiators.

2. Partial incorporation of HEA 1992 is confusing and misleading.

**682.401(b)(7-8):** Adds area of service regulations reflecting policy stated in DCL 88-G-153.

Issue:

1. Error in citation: 682.404(1)(2) should be .404(h)(2). This was pointed out to ED in previous comments on regulations but continues to be ignored.



Page three
682.400
2/1/93

**682.401(b)(9):** Insurance fee may be charged on each Stafford, PLUS, SLS loan.

Issue:

1. HEA 1992 changes add unsubsidized loan program and precludes insurance fee on unsubsidized loans. This section is therefore wrong and should be subject to negotiated rulemaking.

**682.401(b)(15)(i):** Restricts loan assignment to loans 'fully disbursed'.

Issue:

1. This is a partial incorporation of HEA 1992 without allowing exceptions outlined in statute. Provision subject to negotiated rulemaking.

**682.401(b)(16):** Requires approval of Secretary for guaranty agency to transfer guarantee.

Issue:

1. This important restriction in guaranty agency management of its portfolio was not included in NPRM and therefore there has been no opportunity for comment by public.

**682.401(b)(17):** Outlines areas requiring guaranty agency standards and procedures.

Issues:

1. 'Eligible Lender' in (A) changed in HEA 1992 and therefore is subject to negotiated rulemaking.

2. Subsection (A) is delayed here by 120 days; definition in 682.200 is not delayed causing confusion in implementation.

2. Section 401(b)(17)(i)(F) affected by HEA 1992 and subject to negotiated rulemaking (closed school, etc.).

**682.401(b)(18):** Requires guaranty agency to track enrollment status through SSCR process by means of Appendix B (format and data elements). The use of Appendix B is delayed but the requirement for gathering information is not.

Issues:

1. Confusion in implementation because of split effective dates.

29

1423

Page four
682.400
2/1/93

    2. Deferment provisions in 682.210 do not recognize use of SSCR for
       deferment justification.

    3. Standard SSCR is being developed — why not wait of its use instead of
       forcing a temporary fix?

**682.401(b)(22):** Outlines information guaranty agency must supply to schools
concerning defaulted borrower.

    Issues:

    1. This section is subject to negotiated rulemaking because of HEA 1992
       changes.

    2. There has been partial incorporation of HEA 1992 changes which result
       in confusion as to requirements.

**682.401(c):** Regulates lender of last resort.

    Issues:

    1. Section obsolete because of HEA 1992 changes.

    2. The section has been provided to negotiators as part of negotiated
       rulemaking process.

**682.401(d)(2):** Allows guaranty agency to use own regulations, agreements,
etc. prior to ED approval, requires guaranty agency use of common application,
promissory note and other common forms.

    Issues:

    1. Confused regulation because it is, in part, the product of Burden
       Reduction Initiative last year that is now folded into final
       regulation without public comment.

    2. HEA 1992 changes incorporated without public comment.

    3. Negotiated rulemaking required to outline schedule and procedures for
       using common forms required by HEA 1992.

**682.401(e):** Outlines prohibited inducements.



Page five
682.400
2/1/93

Issues:

1. HEA 1992 conflicts with this section and it is therefore subject to negotiated rulemaking.

2. Dear Colleague implementing HEA 1992 was published 11/92 prior to the 12/18/92 Final Regulations publication and conflicts with section. This causes confusion about implementation.

SECTION 682.402

682.402(b): Outlines treatment of death benefits.

Issue:

1. HEA 1992 changes this section (PLUS and Consolidation death benefits) and therefore it is subject to negotiated rulemaking.

682.402(c): Outlines total and permanent disability benefits.

Issue:

1. Includes requirement for tracking borrower medical condition of underlying loans in conflict with HEA 1992 which allows tracking only for aggregate loan limits.

682.402(d) and (g): Set new procedures for bankruptcy claim filing and treatment of loans in bankruptcy by lender and guaranty agency.

Issues:

1. Direct conflict with HEA 1992 - subject to negotiated rulemaking.

2. This section is extremely confusing as written. Contemplates guaranty agency as servicer on loan without describing how this is to be accomplished.

3. Department has stated publicly that this section would not be put into effect because of conflict with HEA 1992 and yet the implementation date has not been delayed.

4. Errors in reference in 682.401(g)(3). The reference should be to paragraph (g)(2) not (h)(2).



Page six
682.400
2/1/93

**682.402(e)(2)(iii)(B):** Establishes 15 day limit for lenders filing bankruptcy claims with guaranty agency after being served with complaint or motion to have loan determined to be dischargeable (undue hardship).

Issues:

1. Tracking, system changes and claim forms required to change filing deadlines and therefore additional time is needed to implement.

2. What is the effective date -- loans with first day of delinquency on or after 2/1/93? Bankruptcies filed on or after 2/1/93, etc.?

**682.402(h):** Requires mandatory repurchase of loan by lender at conclusion of bankruptcy proceeding if loan is not discharged.

Issue:

1. What is the statutory basis for requiring repurchase?

**682.401(i)(2)(iii):** Outlines requirements for reimbursement by Secretary to guaranty agency for total and permanent disability of consolidation loan borrower. Guaranty agency must determine that borrower became totally and permanently disabled "since applying for the consolidation loan."

Issue:

1. This section conflicts with 682.402(c) which states that the condition must not have existed prior to the time the borrower applied for each of the underlying loans.

**682.402(k):** Defines suspension of repayment period for purposes of bankruptcy proceedings and for interpreting loan cancellation provisions in 682.402.

Issue:

1. This section conflicts with 682.210 in that there is no allowance for six month backdating.

**SECTION 682.403**

**682.403:** Regulates federal advance to guaranty agencies.

Issue:

1. HEA 1992 added certain adjustments therefore this section is subject to negotiated rulemaking.

(32)

Page seven
682.400
2/1/93


682.403(f):  Requires guaranty agency to return advances to Secretary.

Issue:

1. As we have pointed out in previous comments on these regulations, there is no statutory basis for this regulation.

SECTION 682.404

682.404(a)(2)(ii):  Codifies for first time the required activities for guaranty agency preclaims assistance.

Issue:

1. Guaranty agencies need time to make the system changes and training required to implement this section but no delay was allowed.

2. Which loans are affected? Those for which requests for preclaims assistance were filed on or after 2/1/93? First date of delinquency on or after 2/1/93?

3. Dear Colleague advice differs from regulation. Was this intentional?

682.404(a)(2)(iii):  Requires for first time two collection activities in supplemental preclaims.

Issue:

1. Guaranty agencies need adequate time to change system and training to implement this section.

682.404(a)(3)(i):  Restricts $50 payment for supplemental preclaims work to an "account," not loan.

Issue:

1. This interpretation conflicts with 1990 Omnibus Budget Act.

2. This change has not been subject to public comment.

682.404(a)(5):  Requires guaranty agency to notify school of preclaims request.

Issue:

1. This is a partial incorporation of HEA 92 change and is subject to negotiated rulemaking.  (HEA 1992 requires notification only if requested by school.)

Page eight
682.400
2/1/93

SECTION 682.406

682.406: Establishes conditions of reinsurance coverage. Specifically outlines loss of reinsurance on loan for failure to meet substantive and minor ED requirements. Very punitive. Read together with 682.411 and Appendix D, 682.406 changes represent a major shift in policy regarding claims documentation and examination, as well as increased risk for lenders and guaranty agencies. It is also very confusing since 406, 411 and Appendix D are cross referenced but do not share common definitions, etc.

Issues:

1. Subject to negotiated rulemaking because of Reauthorization changes in reinsurance based on completion of skiptracing.

2. Confusing section since waiver policy is not in regulation but tacked on in an appendix as restatement of existing Dear Colleague advice.

3. ED continues to require unreasonable penalty for minor errors.

4. The shift in position on claims examination beyond the most recent 180 day period was adopted without public review or comment. This change requires further clarification to be implemented.

5. The waiver policy is restricted to relief for violations of (a)(3) (payment and collection history demonstrating .411 compliance) and (a)(5) (90 day default filing deadline) only. We believe that this is a mistake.

6. HEA 1992 requires standard claims procedures and forms. This section conflicts with that requirement.

7. Section 682.406(a)(2)(i) conflicts with 682.302 ("cashed" vs. "negotiated") causing confusion as to intent.

8. Section 682.406(a)(12) requires as a condition of reinsurance that the lender has paid the origination fees. The Preamble allows a "cure" by a subsequent holder but .406 does not. Why not? This is confusing.

9. The applicability of the Appendix D waiver does not incorporate all of the sections in .406 that prescribe due diligence and timely filing requirements.

34

Page nine
682.400
2/1/93


SECTION 682.408

<u>682.408:</u> Outlines loan disbursement through an escrow agent.

Issue:

1. HEA 1992 requires standardization of escrow processing and therefore this section is subject to negotiated rulemaking.

SECTION 682.409

<u>682.409:</u> Modifies mandatory assignment of defaulted loans to Secretary; significant administrative burden, penalties for noncompliance (as determined by ED) and outlining documentation required.

Issue:

1. HEA 1992 amendments made significant changes, this entire section is therefore subject to negotiated rulemaking.

SECTION 682.410

<u>682.410(b)(1)(ii):</u> Requires compliance with A-133.

Issues:

1. HEA 1992 has changed audit requirements and therefore this section is subject to negotiated rulemaking.

2. There is confusion regarding single audit requirement of A-133 and its application to this section.

<u>682.410(b)(2):</u> Collection charges - This section requires a guaranty agency to charge a borrower collection costs on a loan in which default or bankruptcy claim is paid. The amount to be charged is the lesser of the costs determined using the formula 34CFR 30.60 or the rate charged by USDE in collecting loans.

Issues:

1. The Department has refused to provide the official rate charged by the Department, therefore making implementation impossible.

2. This regulation frustrates purpose of Rehabilitation program that is subject to negotiated rulemaking.



Page ten
682.400
2/1/93

3. What is effective date - claims paid on or after 2/1/93, etc.?

4. This is a major implementation problem but insufficient time has been given.

<u>682.410(b)(4)</u>: Requires guaranty agency to capitalize any unpaid interest.

Issue:

1. This is a major implementation problem because of required system changes, training, etc. Community has consistently argued for at least 180 days to implement.

<u>682.410(b)(5)</u>: Requires a new due process cycle for every default claim paid and prior to reporting default to credit bureau. This is a major, new policy initiative with substantial system changes required although only 45 days was given for implementation.

Issues:

1. The Preamble discusses community objection to this new initiative by pointing out that guaranty agencies already do similar cycles prior to IRS offset. However, the new additional due process cycle must be offered to every defaulted borrower, not just to the approximately 20%-40% of the default portfolio subject to IRS offset.

2. The requirements force the guaranty agency into a dilemma. The agency has just paid the claim by determining, among other requirements in 682.406, that the loan is legally enforceable, and yet must supply to the borrower in the subsequent 682.410(b)(5) notice the grounds upon which the borrower may argue that the loan is not legally enforceable.

3. The 45 day implementation period was rigorously opposed throughout comment period and a six month period was requested. Examples of the extensive programming changes required include:

A. Requires new fields for maintaining information relative to requests for information and administrative review in order to accurately document timely requests, responses, completion of activities and timely credit reporting.

B. The timing of due diligence activities must be redesigned to allow for delays in activities pending requests for records and administrative review not currently built into a guaranty agency's due diligence program.

1430



Page eleven
682.400
2/1/93

C. Potential programming changes in order to perform timely due diligence on the borrower while the endorser is in an administrative review status and vice versa if only one party has requested a review.

D. New tracking programs to verify that accounts are reported timely after completion of 410(b)(5) since initial reporting will occur at various times rather than on a set date after default as is the current practice.

E. Loss of program standardization by allowing arrangements to be made to avoid credit reporting and loss or program integrity by not accurately reporting a default status.

4. We continue to contest the legal necessity of imposing this onerous cycle.

5. Requires new forms which many agencies must purchase through competitive procurement process. Need additional time to implement.

682.410(b)(6): Outlines guaranty agency post-default due diligence.

Issues:

1. This codifies for first time the requirement for at least two unsuccessful attempts to reach borrower as a diligent effort for telephone contact. Training and system changes require longer than 45 days to implement.

2. What is implementation criteria: loans defaulting on or after 2/1/93? default claims paid on or after 2/1/93?

682.410(b)(8): Permits guaranty agency to establish policy for payment of closed school claim to lender and subsequent collection on the loan.

Issues:

1. Direct conflict with HEA 1992 closed school provisions. This section no longer applies and is subject to negotiated rulemaking.

2. Confusing as written: Is this the closed school policy set previously by Dear Colleague? What about the new teachout regulations?

Page twelve
682.400
2/1/93

3. This section, published after Reauthorization and its initial implementation by the Secretary through Dear Colleague letters, could be read to allow additional options for borrowers in closed school situations who do not meet total discharge requirements of statute. This is very confusing as written.

4. What is the implementation date - school closed on or after 2/1/93, etc.?

682.410(b)(9): Mandates certain Federal pre-emption of state law in collection of post-default collections.

Issue:

1. This limited pre-emption conflicts with Reauthorization requirements of standardization and simplification. (See also Preamble to Final Regulation p. 5 RE 682.215 where Secretary refuses to regulate pre-emption necessary to standardize the loan program.)

682.410(c): Sets new procedures for guaranty agency enforcement, liability assessment, etc.

Issue:

1. Regulation deleted prior guidance of review of lenders and schools with highest volume and raises confusion regarding how reviews are to be prioritized.

2. What is implementation date? Could affect reviews in program or current fiscal year review cycle.

SECTION 682.411

682.411: Due diligence by lenders in the collection of guaranty agency loans.

General Comments: The preamble discussion of 682.411, due diligence by lenders, states that lenders and servicers that made substantial investments in systems to meet existing collection requirements should be able to meet the new requirements without making substantial modifications to their systems. We strongly disagree with this assessment. This section requires a new notice in the 1-10 day category, implements a requirement that no more than 45 days may occur between collection activities, significantly increases skip tracing requirements by increasing the number of steps and implementing "diligent effort" requirements for skiptracing (which means at least two attempts or one contact for each activity), and imposes requirements for due diligence for endorsers, including skiptracing endorsers. Overall, this section has substantially increased lender risk by imposing additional prescriptive requirements.

Page thirteen
682.400
2/1/93

Issues:

1. Although the regulations provide a delayed implementation date for loans on which the first day of delinquency is on or after April 17, 1993, additional system development time will be necessary to implement these procedures.

2. Several changes to this section were not in the NPRM and did not provide opportunity for public review and comment.

3. The community has continuing concerns with the retroactive regulatory changes resulting in unanticipated lender liabilities.

4. This entire section conflicts with HEA simplification concepts.

**682.411:** The definition of gap in 682.411(i) is significantly different than the definition of gap in Appendix D (cure procedures). Both are different than the current definition of gap as defined in Bulletin 88-G-138.

Issues:

1. Immediate clarification will be necessary to avoid confusion and implementation errors.

2. The definition of gap in the 682.411 final regulations has been changed since the NPRM, but was not identified as a change in response to comments. Therefore, it must be assumed that the Secretary initiated this change without public review and comment.

**682.411(f):** The reference in 682.411(f) to paragraph (f)(1) is an error. Paragraph (f)(1) does not exist. Further, the reference in 682.411(g)(4) to paragraphs (1)(1)(A) or (B) is an error. These paragraphs do not exist.

Issue:

1. Immediate clarification is necessary.

**682.411(m):** See comments for 682.410(b)(9).

**SECTION 682.412**

**682.412:** This section implements new standards for identifying borrowers in this category and requires lenders to charge borrowers for special allowance paid by the Secretary.



1433

Page fourteen
682.400
2/1/93

Issues:

1. This is not identified in 682.202 as a permissible charge.

2. Charges to this section were initiated by the Department in negotiated rulemaking. Temporary implementation of this section is unnecessarily burdensome.

SECTION 682.413

682.413: This section increases financial risks for violations.

Issues:

1. 682.413(c)(6) is inconsistent with .207(f). The statute permits lenders to rely on certification. There is no statutory authority to impose liability on the guaranty agency.

2. New remedial actions should not apply to outstanding obligations.

3. 682.413(d)(2) refers to changes in HEA 1992 which are subject to negotiated rulemaking.

SECTION 682.414

682.414: Records, reports and inspection requirements for guaranty agency programs.

General Comment: Describes recordkeeping requirements.

Issue:

1. Standardization and simplification of documentation requirements is part of HEA 1992 and subject to negotiated rulemaking.



Analysis of December 18, 1992
Final FFELP Regulations
682.600-682.610

SECTION 682.601

682.601: Deletes the 50% rule for school lenders.

Issue:

1. The 50% rule is statutory.

SECTION 682.603

682.603: This section sets minimum and maximum periods of enrollment for which a school may certify an application.

Issues:

1. Certification requirements were part of HEA 1992 and subject to negotiated rulemaking.

2. 682.603(f)(2) is inconsistent with .401(b)(2)(ii).

3. The change in 682.413(d)(2) refers to changes which are subject to negotiated rulemaking.

SECTION 682.604

682.604(c)(2): Fails to address PLUS co-payable disbursement requirements.

Issue:

1. The changes made to this section are impacted by HEA 1992 and are subject to negotiated rulemaking.

682.604(c)(3)(ii): This section requires schools to notify the student or parent borrower in writing that the student's account has been credited with loan proceeds through electronic funds transfer.

Issues:

1. Procedural change in the middle of an academic year causes complexity.

2. Provisions affecting PLUS borrowers are part of HEA 1992 and subject to negotiated rulemaking.

41

Page two
682.600
2/1/93

**682.604(d)(1)(B):** This section requires schools to deposit additional loan proceeds retained by the school, after written authorization from the student, in a designated trust account and prohibits commingling these funds with other funds.

    Issues:

    1. The concept of weekly/monthly disbursements is part of HEA 1992 and subject to negotiated rulemaking.

    2. This is a major change to operating procedures in the middle of an academic year.

**682.604(d)(4):** This section requires schools to notify the lender and return funds within 30 days of a date that is not clear.

    Issue:

    1. Ambiguity will result in differing interpretations and will detract from ED resources resulting from clarification requests.

**682.604(e)(4):** This section defines a disbursement as late if it is received by the school after the end of the period of enrollment or after the date the student ceased to be enrolled at least half time and sets forth specific guidelines under which late disbursements may be made. This conflicts with .207, which defines a disbursement as late if the lender disburses after the period of enrollment or after the date the student ceased to be enrolled at least half time.

    Issues:

    1. Conflicting regulations create confusion.

    2. Conflicting regulations require ED clarification and detract from ED resources. Participants are left to guess implementation procedures until guidance is provided.

**682.604(h):** This section implements new procedures for the treatment of excess loan proceeds.

    Issues:

    1. The section excludes students attending foreign schools from overawards but does not address students in study abroad programs.

    2. The use of term non-subsidized does not reflect unsubsidized loans.



Page three
682.600
2/1/93


SECTION 682.605


682.605(b)(4):   This section requires new timelines  for the determination of
the  student's date of withdrawal.   Schools must report the  student's day of
withdrawal.

    Issues:

    1. This  is a major change for many institutions which typically maintain
       and  report only the month  and year only.  Additional  implementation
       time will be necessary.

    2. This  change is also included in the model  SSCR format in Appendix B.
       Appendix B is not effective until April 17, 1993.  The effective dates
       are inconsistent.

    3. This  change will increase the  frequency of data exchanges  resulting
       from  incremental (i.e. June 5th  to June 6th) changes  in dates which
       have no significant impact.


SECTION 682.606

682.606:   This section prescribes refund  policies and imposes a  10% minimum
for prorata refunds.

    Issues:

    1. This  conflicts with the HEA 1992 pro-rata and allocation requirements
       in 484B of the Act and is subject to negotiated rulemaking.

    2. Appendix A reflects refund policy  standards developed by a  national
       association  of post-secondary institutions and  approved by the
       Secretary, but is not referenced within the regulations.


SECTION 682.610

General Comments:  This entire section is subject to negotiated rulemaking due
to the changes in HEA 1992 relating to simplification of document retention.

682.610(b)(5):  This section expands the loan record requirements for schools.

682.610(b)(9)(iv):   This section requires schools  to maintain a copy  of the
Borrower's  Authorization  Statement  for  electronic  fund  transfers.
.207(b)(1)(ii)(B) requires  the  school  to  secure  and  retain  the  Borrower
Authorization Statement.  This suggests the original copy.



Page four
682.600
2/1/93

Issue:

1. The regulations are inconsistent. Clarification must be provided.

682.610(c)(2): This section requires schools to report student withdrawals to the lender within 30 days of its discovery unless the school expects to submit its next student status confirmation report within the next 60 days.

Issue:

1. Insufficient implementation time has been provided given the new reporting requirements.

682.610(d): This section requires the school to keep required records for five years following the last day of attendance.

Issue:

1. Section 432(1)(3) of HEA 1992 requires standardization of documentation of records.

682.610(f): This section requires schools to report a change of permanent address for enrolled students who received a Stafford or SLS loan to holder or guaranty agencies within 30 days.

Issue:

1. Insufficient implementation time has been provided.

(44)

Analysis of December 18, 1992
Final FFELP Regulations
682.800-682.840

**General Comment:** The HEA of 1986 transferred the authority for approval of the plan for doing business from the Secretary to the Governor of each state. Congress took this action because of its displeasure with ED's activity in this area. Despite this action by Congress, the final regulations continue to involve the Secretary in virtually all aspects of the plan for doing business. Such intrusion by the Secretary is entirely inconsistent with the statute and congressional intent.

In addition, ED continues to hold tax-exempt entities bound by the specific provisions of the plan for doing business for all program activities. Authorities issue taxable and tax-exempt debt thus the provisions of the plan should only apply to loans funded with tax-exempt sources of financing.

**SECTION 682.801**

**682.801(c):** The final regulation incorporates the HEA 1992 provision that removed the discount restriction for loans funded with tax-exempt debt.

   Issues:

   1. The change is part of HEA 1992 thus subject to negotiated rulemaking.

   2. The change was made without the opportunity for public review or comment.

   3. The change is in error. HEA 1992 removed the 1% discount restriction. ED, however, deleted the discount as well as the 1% premium limitation.

**SECTION 682.830**

**682.830(b)(1):** See comment and issues for 682.305(c).

**SECTION 682.840**

**682.840(b):** This section of the regulation has been amended to hold an authority responsible (thus loss of all special allowance) if the authority does business with a guaranty agency that discriminates.

   Issues:

   1. The inclusion of the provision conflicts with statute and is entirely beyond the scope of ED authority. The statute does include nondiscrimination language for lenders, authorities, Sallie Mae, and guaranty agencies. ED has only elected, however, to regulate authorities. To make an authority responsible for agency action will have serious implications in the capital markets and would, if enforced, impose a huge and bankrupting penalty on an authority which itself violated no rule or principal.

(45)

1439

Analysis of December 18, 1992
Final FFELP Regulations

**APPENDICES**

**APPENDIX A:** Standards for acceptable refund policies are set forth in this section.

   Issues:

   1. Refund policies are part of HEA 1992 and subject to negotiated rulemaking.

**APPENDIX B:** In this section ED sets for the model format and data elements for the Student Status Confirmation Report Process. Agencies must use this unless the Secretary approves a revised format or other data elements.

   Issues:

   1. The delayed implementation date of April 17, 1993 is insufficient for system changes of this magnitude.

   2. Section 485B of the Act requires standardization in consultation with guaranty agencies, lenders, institutions of higher education and other organizations. Therefore, this Appendix is subject to negotiated rulemaking.

**APPENDIX C:** This appendix outlines procedures for curing violations of the due diligence in collection and timely filing of claims requirements applicable to FISLP and Federal PLUS program loans. The revised document requires changes to be made on ED 799.

   Issue:

   1. Insufficient Implementation time has been provided.

**APPENDIX D:** This appendix formerly 88-G-138 (cure procedures), contains a number of errors which need immediate correction.

   Issues:

   1. The introduction refers to .413(b)(1) which does not exist.

   2. Provides a 45 day filing deadline for default claims found in .406(a)(4) which is a 90 day filing deadline and is not included in .406(a)(4) but is referenced elsewhere in .406.

   3. This section contains references to .406(a)(5) and (6) which do not make sense in its current context. It is believed that many of these errors were made as a result of changes made to the regulations but not the Appendix.

Page two
Appendices
2/1/93

4. A new definition of gap includes the period between the last collection activity and default. The definition is inconsistent with the definition identified in .411.

5. A major change to the waiver policy was imposed which states that reinsurance terminates if a gap of more than 45 days occurs during the delinquency period. Under current regulations, it is possible for a lender to satisfy all due diligence requirements within each 30 day bucket and have more than 45 days expire between activities. The new requirement requires additional system changes.

6. Appendix D suggests that an examination of the activity that occurred with respect to the account before it began the 180-day delinquency period may be necessary to verify the repayment status of the loan at the beginning of the delinquency period. This is a major shift from current policy.

7. The excuse of timely filing violations section for cures commenced prior to May 1, 1988, was changed from a 90 day filing deadline to a 45 day filing deadline. These timeframes have expired; what is the purpose of changing the filing deadlines retrospectively?

8. The beginning dates for limited interest and special allowance in the event of at least three violations have been changed. This is additional system and procedural changes for lenders and guaranty agencies.

9. The dates for deeming borrowers current or in default under certain cure circumstances have been expanded. This represents system and procedural changes for lenders and guaranty agencies.

10. The timeframe for the postal receipt requirement for acceptable evidence of location was narrowed from 25 days to 15 days prior to the date on which the lender sent the new repayment agreement.

11. The effective date of the changes to Appendix D is unclear and needs clarification. Additional implementation time may be necessary for system changes.

12. A number of changes were made to this Appendix without the opportunity for public review or comment.



Case 1:21-cv-00324-TSE-MSN   Document 35-1   Filed 06/23/21   Page 54 of 96 PageID# 1620

*No change. ED now states once ½ SAP always ½ SAP therefore always 9.5%.*

3. The regulation conflicts with HEA 1992. Many changes have been made in the area of special allowance including changes in the rates and new provisions for loans funded with tax-exempt debt. These changes should be amended through negotiated rulemaking.

*will attempt to clarify*

4. The inclusion of the new filing deadlines has a significant impact on lender risk. Section 682.406 does not provide for a cure for violations of these deadlines.

*✗*

682.302(e): The regulation states that the 1/2 special allowance provision for loans funded with tax-exempt debt applies to a loan unless the debt is retired or defeased.

Issue:

*ED basically agrees this results in huge windfalls in low int. rate periods.*

1. The regulation is in error. A loan funded with tax-exempt debt may be transferred and pledged to a taxable financing. Given, ED interpretation on this issue, a loan is always at 1/2 SAP and therefore at the 9.5% floor regardless of the current financing used to fund the loan.

SECTION 682.304

682.304: Two key changes have been made to this section which impact lender billing for SAP including the removal of the 365.25 leap year option for billing for SAP for the average daily method and to require rounding to the nearest whole dollar. These changes are effective on 2/1/93.

*1443*

Issues:

*DCL to clarify if this is a system change or ED payment change.*

1. The 365.25 will require major system changes and no delay has been provided. The mechanism for billing for interest benefits is the 799 report. This report is going through a major revision due to HEA 1992. ED has yet to issue a revised report for lenders to begin programming the changes in reporting requirements. We strongly encourage all issues regarding the 799 be deferred until a revised report has been developed by ED.

2. The effective date needs clarification. Does this apply to government billing submitted on/after 2/1/93 or reports due on/after 2/1/93.

SECTION 682.305

682.305(a)(4): The regulations change the liability structure for the payment of origination fees.

*NCHELP Comments provided to ED in 2/93 in response to Riley letter requesting list of issues.*

*✗ The handwritten notes are my notes from meeting*

# Exhibit 3

SENT BY:NCHELP          ; 3-26-93 ;11:35AM ;          2025469745→          211 705 5047;#10

## Response to Comments of NCHELP Regulations Committee

**SECTION 682.100**

**682.100(a)(1)-(a)(4)**

1.& 2.  The Secretary considers the program name changes to be self-implementing.  *DCL to provide for uniform style.*

**682.100(a)(1)**

1. The Secretary did not incorporate the unsubsidized Stafford program authorized under section 428H of the HEA. — *no provision for 428H*

✓TC 2.  A technical correction will be made inserting "undergraduate" after dependent.  *7/1/93*

**682.100(a)(4)**

1.& 2.  The Secretary considers this change to be self-implementing.

✓TC 3.  Will make technical change to read "made on or after 10/17/86."

**682.101**

DCL-1.  This area of the regulations has been superseded by the '92 Amendments.  This will be explained in the "Dear Colleague" letter.

**682.101(c)** See comment on 682.100(a)1-4.

**682.101(c)**

1.& 2. Self-implementing provision of the '92 Amendments.

✓TC 3. A technical change will be made to mention married couples borrowing jointly to correspond to changes made in 682.201.

✓TC 4. Technical change will be made to correspond to change in 682.100(a)(4).

**682.102(a)**

1.  The Department did not intend to incorporate the Unsubsidized Stafford Loan program authorized under section 428H of the HEA.

**682.102(d)**

**682.102(a)(1)**

1.  The Department did not intend to include these cancellation

1445

provisions from the '92 Amendments because they are not self-implementing.  This was not listed in the preamble as a change.

682.102(e)(2)

1.   The Department did not intend to incorporate section 428H of the HEA into these regulations.

682.102(e)(3)

1.& 2. The Department considers this to be a self-implementing change.

TC 3. A change will be made in the regulations or the preamble to specify the borrowers to which this applies. (Effective upon enactment of the '92 Amendments (July 23, 1992) but applies to borrowers who, at the time of their request, had not yet entered payment on their Stafford Loan on/after July 23, 1992.

682.102(e)(4)

TC 1. Technical change will be made to clarify the first payment due date for PLUS.

TC 2. Technical change will be made to correct this.   The Department's recent guidance in this area stands.

682.200

## DEFINITIONS OF ELIGIBLE PROGRAM, ELIGIBLE STUDENT, AND INSTITUTION OF HIGHER EDUCATION

DCL-1. Will mention in the DCL how these definitions may have changed and refer to GEN 92-21 (October 1992).  These definitions will be revised as part of negotiated rulemaking in Part G.

## DEFINITION OF CO-MAKER

TC 1. Since §682.201 has been revised to reflect Consolidation Loan changes, we will make a technical correction to include reference to Consolidation borrowers.

## DEFINITION OF DEFAULT

TC 1. Will revise to include reference to Consolidation co-makers.
## DEFINITION OF ENDORSER

1.   There is no change.   The term has been revised but is not defined differently. The term "secondary liability," a somewhat confusing and nonlegal term has been replaced with a clearer explanation of the common understanding of that term ...i.e., that it is someone who has a legal responsibility to pay in the event the borrower does not. (See Comment and Discussion p. 60285.)   An endorser is the same as a co-signer and is the term used

historically in the FFEL program.

## DEFINITION OF ESTIMATED COST OF ATTENDANCE

DCL 1. The regulations were not revised to incorporate any changes made by the '92 Amendments. The regulations will be revised through negotiated rulemaking and the DCL will clarify the effective date for the new definition. Guidance was provided on the changes made by the '92 Amendments on page 92 of GEN-92-21.

2. The regulatory definition in the December 18 regulations merely reflects the cost of attendance definition that has been in effect since the 1986 Amendments and will be in effect until the new statutory definition becomes effective on July 1, 1993. It is likely that we will say this is effective for loans certified on/after July 1, 1993 because the school is responsible for determining the cost of attendance and the lender can rely on the information the school has provided.

## DEFINITION OF ESTIMATED FINANCIAL ASSISTANCE

TC 1. The definition is final regulation and in effect, except for the statutory change to the treatment of veterans' benefits which has a later effective date. Any proposed changes to the definition beyond the mandated statutory change are at the option of the Secretary and are not subject to negotiated rulemaking. Through TC or DCL interpretative guidance we will clarify that estimated campus based aid in (1)(v) is to be included to the degree those funds are available and based on the school's award packaging policy because that has been the intent all along. The only other issue presented in negotiated rulemaking discussions related to the certification of PLUS applications. The Department is considering whether it is will propose a change in determining estimated financial assistance for purposes of PLUS loan certification.

2. GEN-92-21 and the Comment and Discussion in the regulations explains how the Secretary proposes to implement the statutorily mandated change in the treatment of veterans benefits.

3. To the extent this definition differs from the earlier regulatory definition or the guidance provided to schools to implement the 1986 Amendments to the HEA, (and we don't believe it does), the definition would apply to loans certified on/after 2/1/93 because it is a school loan certification responsibility.

## DEFINITION OF GRACE PERIOD

1.& 2. The Department views this as a self-implementing change required by the statutory definition of repayment.

3. See attached letter for Department's implementation plan for day specificity. Technically, the six-month "grace period" for SLS

3

borrowers applies to all SLS borrowers whose Stafford loans had not
yet entered repayment on/after July 23, 1992.   We may need to
discuss whether that is realistic.


4.   The Department had not considered this concurrent period to be
a grace period because of the implication that the Secretary would
pay interest.  Therefore the definition was not revised to include
reference to it.  However, we have decided to revise the definition
in the Reauthorization NPRM because we now believe that is the only
practical term to use.   The eligibility of an SLS borrower for
the six-month period is reflected in §682.209(a)(2)(ii) & (iii) in
the final regulations.  The regulations say that this period is
"consistent with the grace period."  We think this language does
not prevent the lender from recognizing any applicable grace period
the a Stafford borrower may have.

PDI 5.   The SSCR implementation process is provided a delayed
effective date in the regulations that would make use of the SSCR
format not required until June 19, 1993.  However, for status
changes  outside  of  the  SSCR  process,  required  under  34CFR
682.610(c)(2),  the  school  would  be  expected  to  report
month/day/year. We do not believe schools should have difficulty
doing that.

## DEFINITION OF LENDER

1. The definition was not revised in any way to reflect the '92
Amendments changes.  Those changes, however, were effective upon
enactment and the guidance in GEN-92-21 should be followed.

DCL-2.  The changes made to the definition by the '92 Amendments
are minor.   The DCL will clarify how the definition has been
changed by the Amendments and refer them to the applicable DCL
guidance.

DCL-3.  The DCL will clarify when it will implement the cohort
default rate provisions.  The other changes to the definition were
minor and effective upon enactment.

## DEFINITION OF NATIONAL CREDIT BUREAU

PDI 1.  The Department does not believe that this is at all
complicated and merits additional implementation time.   The
reporting requirement involving national credit bureaus came out of
the '86 Amendments, so isn't everyone already doing this?

## DEFINITION OF ORIGINATION FEE

TC 1.   The regulations contain this requirement in 34CFR
682.202(c).  Therefore, we will add this to the definition through
a technical correction.

4

2.  This is correct.  The Unsubsidized Stafford Loan program under section 428H was not incorporated into the regulations.

## DEFINITION OF ORIGINATION RELATIONSHIP

1.  No.  The Department made it clear in the preamble that it was not going to regulate in this area at this time.

## DEFINITION OF PERIOD OF ENROLLMENT

1.   34CFR  682.603(f)(1)  specifies  the  _minimum_  period  for certification and does not conflict with the definition.  We will consider whether one definition is possible for all Title IV, and if it is, make the change as part of the '92 Amendments NPRMs under development.

2.  The change included in the definition merely codifies existing policy.

## DEFINITION OF REPAYMENT PERIOD

1.  The Unsubsidized Stafford Loan Program was not included in the regulations.  The definition will be amended through negotiated rulemaking.

TC 2.   A technical correction will be made.   ED's guidance continues to apply.

3.   The Department considers these statutory changes self-implementing.

## DEFINITION OF SCHOOL

DCL 1. We do not think that this is a problem as it relates to the large majority of schools. This is a statutory as well as a regulatory provision and was effective upon enactment. ED determines a school's eligibility as part of the application process.   If the lender can verify through ED (Division of Eligibility and Certification) or documentation that the school provides that the school has been determined previously by ED to be an eligible institution, has not been terminated by ED (which is information already provided to lenders and guaranty agencies), and is simply not participating in the FFEL program currently, the lender should already be approving deferments for students at the school.  However, we do agree that there needs to be a change to our application/reporting system to include schools that wish to have a determination of eligibility made but do not want to sign a participation agreement with the Secretary.  Currently you can't do one of these without doing the other.  ED anticipates that this would include a small number of schools.

2.  We do not see what the development of standard deferment forms

5

has to do with implementing this provision.

## DEFINITION OF STAFFORD LOAN PROGRAM

TC-DCL 1. A technical correction will be made to change the reference in the definition from "unsubsidized" to "nonsubsidized" because there was no intent to include the new section 428H program. With that change, we believe the definition coupled with an explanation in the DCL will suffice.

### SECTION 682.201

#### 682.201(a)(2)

DCL 1. We will explain the use of the tolerance and the certification process (post '92 Amendments) in the DCL. The $200 tolerance applies only to subsidized Stafford.

#### 682.201(a)(4)

PDI 1. What systems changes are involved in this regulatory requirement??

2. Since this will be borrower initiated and the agency will have records on the prior loan's discharge, the Department believes it should apply to loans guaranteed on/after 2/1/93.

3. The Department's OGC does not agree.

#### 682.201(b)

TC 1. Technical correction will be made to insert "undergraduate" after dependent to limit PLUS eligibility to parents of undergraduate dependent students.

2. This is a self-implementing provision of the '92 Amendments.

3. There is nothing inaccurate about this provision because 668.7 would indicate that a defaulted borrower can regain eligibility if they make satisfactory payment arrangements to repay. GEN-92-21 provides guidance on the fact that those arrangements in the FFEL program now constitute 6 consecutive reasonable and affordable monthly payments.

#### 682.201(c) *loan consolidation*

1.& 2. The Department believes this is self-implementing.

TC 3. We do not see any statutory requirement that requires the borrower to first approach the current lender. (iii) requires a technical correction ...will be redesignated (D)... because it applies to individual and married borrowers. The reference to

6

Case 1:21-cv-00324-TSE-MSN Document 53-1 Filed 06/28/21 Page 74 of 99 PageID# 2906
Case 1:21-cv-00324-TSE-MSN Document 53-1 Filed 06/28/21 Page 74 of 99 PageID# 1828
SENT BY:XEROX

inclusion of additional eligible loans within 180 days is in 682.209(h)(4)(iii).

TC4. Will insert reference that the eligibility criteria for the individual borrower in (c)(1) also applies to the married couple borrower situation and that the $7,500 is combined indebtedness in the case of a married couple.

## SECTION 682.202

### 682.202(a)

TC 1. The end date was removed in this provision because of the cross-reference from (a)(1)(v). However, there are technical changes to be in this section.

2. The Department views interest rate changes in the program as self-implementing changes and as such, do not require further regulations.

3. We will make whatever technical corrections that are necessary.

4. See response to 2. above.

### 682.202(b)

DCL- 1. The Department will clarify in the DCL what the mandated terms of capitalization must be and how this section must be modified to reflect post-'92 Amendments reality. The Department believes the statutory provisions governing the terms of capitalization as self-implementing but did not include it in these regulations.

2. Unsubsidized Stafford Loans will be handled in the negotiated rulemaking NPRMs.

3. This piece of the new statutory provisions will require to be implemented through regulations and therefore is subject to negotiated rulemaking.

TC 4. Technical correction that must be made to the definition of Stafford Loan program previously noted.

### 682.202(c)

1. Self-implementing provision of the statute.

2. Department does not believe there is an error and that the regulatory language tracks the statute accurately. 682.202(c)(2) related to PLUS and SLS says "shall."

7

SENT BY:NCHELP          ; 3-26-93 ;11:39AM ;                2025460745→           2↑↑ Page ID# 1629
Case 1:21-cv-00324-TSE-MSN Document 56-31 Filed 06/11/22  Page 75 of 99 PageID# 2997
Case 1:21-cv-00324-TSE-MSN Document 56-31 Filed 06/11/22  Page 63 of 90 PageID# 1629

3.  The regulations do not reflect any of section 428H of the HEA.

TC 4.  (c)(5) needs technical correction. (c)(5)(i) will be deleted and (ii) and (iii) will be renumbered.

5.  See Comment and Response on this issue.

682.202(d)

1.  Section 428H of the HEA not reflected in the regulations.

682.202(g)

1.  The Department does not agree that there is a conflict.  The preamble discussion indicates that the Secretary has decided not to prescribe in regulations a uniform federal rule on borrower defenses to repayment of a loan and thereby preempt state laws in the borrower defense area.  This has nothing to do with preemption provided in the collections area, specifically in .202(g) and in .411(n).

2.  Changes will be made in the development of the common application as necessary.

SECTION 682.204

1.& 2.  The Department considers changes in annual loan limits self-implementing statutory changes.

DCL 3.  The Department believes that inclusion of two sets of annual loan limits...those in effect at the time the regulation became effective and those that become effective in the future for levels 2-5 ... would have been even more confusing.  The DCL will clarify what is included in the regulations and where to go for guidance on limits that become effective in July, 1993 and for periods of enrollment beginning on/after October 1, 1993.

DCL 4. This will be clarified in the DCL.

5.  Don't understand the comment.. what are the conflicts?

SECTION 682.205

PDI 1.  These additional disclosures will be included as various addenda and common applications are developed.

PDI 2.  Same response as 1. above.

PDI 3. Same response as 1. above.

682.205(c)&(d)

8

**1.& 2.  Self-implementing statutory change.  The information to be disclosed has not changed appreciably.  The change is a statutory one that mandates timeframes for providing the required disclosures.**

**682.206(c)(3)**

1.  There is no conflict.  The aid administrator determines whether a student is borrowing to meet EFC and adjusts the loan certification accordingly (by documenting this in the student's file and reducing the amount of estimated financial aid or the EFC by the amount being offset).  The lender follows the school's certification and is not involved in this decision... nor would the lender be aware that such an offset is in effect.

**682.206(f) -- there is no (f)(6)**

DCL 1.  682.413(c)(6) cross references this provision.  We are saying that the failure to secure the certification(s) may result in a loss of reinsurance.  It does not mean that the consolidating lender cannot rely upon the certifications received

**682.207(b)(1)(v)(B)**

1.& 2.  The Department incorporated only the self-implementing pieces of the co-payable PLUS statutory change.  We did not address where co-payable PLUS checks should go.  We will clarify in the DCL that the interim guidance in GEN-92-21 will apply until this area in regulated through negotiated rulemaking.

3.  There is no conflict.  We do not address where co-payable PLUS checks go in the regulation. The DCL guidance continues to apply.

**682.207(b)(1)(v)(C)**

1.  Self-implementing statutory change.

2.  Department disagrees.  This reflects the statutory change.

**682.207(d)**

1.  The public comment on the NPRM proposal from all sectors was that it was too complex.  In preparing the final, we greatly streamlined the process that had been proposed and accepted lenders' comments on automatic late disbursement through day 60.  (See comments and discussion for this provision.)  The identification of this item as a burden reduction provision came after the drafting of this provision.

TC 2.  Technical correction will be made to reconcile the conflicting provisions.

9

PDI 3. The Department does not understand the comment. Other than informing schools and lenders of the new procedures and timeframe (once the Department has resolved the conflict), what else is involved in implementing this regulatory change.

PDI-DCL 4. We will clarify this in the DCL. How we resolve the technical conflict will determine the effective date.

## SECTION 682.208

### 682.208(b)(1)&(2)

PDI 1. The reporting requirements have been in effect since the 1986 Amendments. The new piece is the time frame for accomplishing this. We don't believe this should involve extensive implementation time.

2. Effective loans made on/after 2/1/93.

### 682.208(c)(2)

1. The comment has no bearing on converting borrowers to repayment. The use of eligible rather than participating in this context makes no difference to conversion procedures.

2. The eligibility of a student to receive a deferment at an eligible, non-participating school is now statutory and self-implementing in our view. This was a major concern of the Department (when discussing doing this through regulation before the '92 Amendments) and the reason that we maintained the "participation" requirement for so long. However, as a result of the default initiative and concern over default rates, schools wanted to withdraw from the FFEL program but not lose this benefit for their students (current and incoming). We did not want to discourage this. Further, the Department retains leverage over schools that continue to participate in the other Title IV programs even if they voluntarily withdraw from FFEL. We also decided that totally non-participating schools would view this as a benefit to their students and would be more than willing to provide status information. If we find that this is not the case, we may want to recommend a technical amendment to revoke this privilege if the school does not provide this information on a timely basis. We can discuss developing procedures to require such a totally nonparticipating school to sign a letter of understanding in which we would outline the reporting requirements they are under.

### 682.208(e)

1.& 2. The only change made to the regulation to incorporate this self-implementing statutory change was to require both parties to the transaction to provide the required notice.

10

DCL 3. The Department believes that the statutory changes made in section 428G(g) and the remaining changes in section 428(b)(2)(F) should be regulated through negotiated rulemaking.

SECTION 682.209

682.209(a)(1)

TC 1. A technical correction will be made. ED's most recent guidance on this subject continues to apply.

682.209(a)(2)(iii)

1. The Department believes this statutory change to be self-implementing.

2. The regulations reads "consistent with the grace period." It does not specify that the period is 6 months.

682.209(a)(5)

1. The provision to waive the grace period was in the 11/20/90 NPRM. This change to the NPRM proposal was in response to public comment that said an important decision like waiving the grace period should be in writing. This also codifies existing policy as it relates to the parental leave deferment, the only situation in which we are aware borrowers have waived a portion of their grace period.

2. The Department believes that protecting the borrower's is what should be of paramount interest here. They are waiving a statutory benefit.

PDI 3. We do not see that there is anything to implement. It simply involves a change in procedure.

4. It would seem logical that it would be requests for waiver made on or after 2/1/93.

682.209(a)(7)(iv)

This is identical to the proposal in the NPRM of 11/20/90 with the exception of the cross reference.

682.209(b)

PDI 1. What requires additional time?

DCL 2. The Department believes it should apply to prepayments made on/after 2/19/20.

TC 3. This affect was not intended. To clarify, we will delete

11

SENT BY: XEROX

the phrase "Except as provided in paragraph (b)(2) of this
section.." in 682.209 (b)(1) and in (b)(2) insert after
"prepayment" the phrase "as specified in (b)(1)" and delete the
phrase "to future installments." In the next sentence, after the
phrase "to future installment," insert the phrase" by advancing the
next payment due date..." The regulations presume that if a
significant payment was received from the borrower with no
instructions and the borrower had outstanding late/collection
charges when the funds were applied, the lender would cover those
charges when applying the first payment before determining how far
in the future it could extend the due date.


## 682.209(f)(3), .209(g)(2), .209(h)(6), and .209(i)

PDI 1. Other than providing lenders instruction as to the new
timeframes for accomplishing these activities, what is there to
do??? The certification process and application of payment remain
unchanged.

2. The Department does not agree. Also, this benefits the
borrower by expediting the process.

## 682.209(h)

1. Department believes these changes are self-implementing.

2. For establishing the borrower's repayment schedule, it does.
See section 428(c)(2).

3. There are special provisions for married couples as it relates
to establishing the repayment schedule. Special provisions related
to borrower eligibility are in 682.201(c).

## SECTION 682.210

The Department believes these are reasonable documentation
standards for a borrower's receipt of federal benefits and reflect
the 11/20/90 NPRM proposals. Lenders and agencies were operating
on the Department's "interim guidance" in advance of regulations
for the past few years. These deferments will apply to old
borrowers for the life of their loans and will be with us for many
years to come.

## 682.210(a)(3)(ii)

1. Department believes this is self-implementing.

TC 2. Technical correction inserting "for which the application
was received by an eligible lender on or after January 1, 1993"
will be made.

## 682.210(a)(5)

TC 1.  This was unintended.  We can add a reference in .406(k) to .210(b)(5).

2.  It was proposed in the 11/20/90 NPRM in much more general language.   An Departmental commenter recommended that the regulations be more specific regarding beginning and ending dates. The language is consistent with that in the deferment/forbearance sections and addresses the period between end of grace and first payment due.

3.  See response to 1. above.

4.  The time frames for retroactivity were in the November 10, 1986.  NCHELP comments for this proposed provision were "NCHELP commends the Secretary for standardizing the time frames for backdating the deferments."

5.  This is correct and is the inevitable result of such a regulatory change.

## 682.210(a)(6)(iv)

The intent of the presentation was to underscore the necessity of the SSCR process to granting the deferments in two of these programs.  It does not mean that the lender can't use anticipated graduation date for all three programs.  The Stafford borrower deferment (which must be a prior loan) and a PLUS parent borrower deferment (granted on the basis of a dependent's status) are reliant upon the SSCR process to verify eligibility for the deferment.  In Stafford, you are not deferring the loan that you are processing but all prior loans that might be in repayment.  In PLUS, you are deferring based on the dependent's status....and the dependent's status must be reflected on the SSCR (which may not be the case unless the dependent is also a borrower for attendance at that school).  Only in the case of the SLS are you using the application to actively defer the loan you are processing as well as any prior loans held by the same lender.  The presentation was not intended as a restriction... it was intended to underscore distinctions.  TC for 682.210(c)(3) to include Stafford.  With regard to section 485C of the Act, any eligible lender holding one or more loans of the borrower can defer all the loans it holds provided the borrower meets the eligibility criteria.

1.  See discussion above.

2.  These regulations will be in effect for years to come. The new borrower deferments will be regulated under negotiated rulemaking.

3.  The process for granting in-school deferments, the most frequently used deferment category, has been simplified to a great

1457

extent.  The Department believes that the documentation and certification requirements for the other deferment categories are reasonable and necessary to protect the integrity of the process. The Department and OMB will not approve a self-certification approach on a long-term basis for the receipt of a substantial federal benefit.

682.210(a)(8)

TC 1.  We will delete "as to that loan."  No, the regulations do not change the policy.

DCL 2.  The Department does not agree that clarification is needed. The definition of default is clear and applies to a period post-180 days in which the lender may still hold the loan.

General Comments on Individual Deferments

682.210(d) through 682.210(r)

PDI - The Department understands that existing deferment forms outlining eligibility and documentation requirements must be developed.  The Department will work with the NCHELP Servicing Committee to develop the forms needed to implement these regulations and the new borrower deferments on an interim basis in advance of the negotiated rulemaking final regulations.

SECTION 682.211

TC 1.  The requirement for a "signed" acknowledgement of the debt was in response to public comment.  A technical correction will be made to delete "repayment obligation" and insert in its place "a new signed agreement to repay the debt."

DCL 2.  The Department does not believe that clarification in the regulations is necessary.  Given the definition of default, it would seem to be clear that it applies to the post-180 day period prior to default claim payment.

3.  The Department considers this provision of the statute to be self-implementing.

SECTION  682.300

682.300

TC.  A technical correction is necessary to include a reference to Consolidation borrowers.

DCL - The Department understands that other important changes were made by the '92 Amendments in the area of restricting lenders' interest on first disbursements and unconsummated loans.  However,

14

they require regulations to be developed through negotiated
rulemaking to be implemented on other than an interim basis. The
guidance in GEN-92-21 will apply until these areas are regulated.

## 682.300(b)(2)

TC 1.  This change in the regulations was in the NPRM. The change
from cashed to negotiated was based on public comment. A technical
correction will be made to delete "negotiated" and replace it with
the term use in the NPRM, "cashed" to eliminate the conflict with
.406(a)(2).

2.  See comment and discussion to this item in the regulations.
The Secretary's view remains unchanged.

TC 3.  We will make a technical correction to clean up conflict.

## 682.301

1.  The comment is unclear and may be a '92 Amendment issue that
will be addressed in the second DCL on the Amendments.  Section
428H of the Act is not included in the regulations.

## 682.301(a)(2)

DCL - 1.  Since this is an eligibility made by the school, it would
apply to loans certified on/after 2/1/93.

2.  Section 428H of the HEA was not introduced in these
regulations.  The order of loan certification post-92' Amendments
will be covered in the second DCL on '92 Amendments.  It will also
be clear from the format and instructions of the common app/note.

## 682.301(c)

1.  A definition was intended in 682.200.  However, a technical
correction in 682.200 is necessary because it currently mentions
unsubsidized rather than nonsubsidized.

2.  See response above.  The '92 Amendment NPRM will define all
three types of Stafford loans.

## Section 682.302

## 682.302

PDI 1.  The revised form 799 has been completed and is being
mailed.  The Department is aware that systems changes will be
required.

TC 2.  A technical correction will be made.  (d)(1)(vii) will be
revised ... after the word claim we will insert "submitted by the

15

deadline specified in (v) of this section."

DCL 3. The interim guidance provided on the '92 Amendments in GEN-92-21 will be used in conjunction with the final regulations. The DCL will provide additional guidance on the use of this section in light of the statutory changes. The '92 Amendment changes will be regulated as part of negotiated rulemaking NPRM.

### 682.302(e)(2)

1. That is correct and it remains the Department's position on this issue.

### SECTION 682.304

PDI 1. Form 799 has been completed and is being mailed. The Department understands that systems must be revised to comply with the provision.

DCL 2. The DCL will clarify that this will apply to bills submitted to the Department on/after 2/1/93 unless a further delay in implementation is decided upon.

### Section 682.305

1. Unclear what the commenter is referring to. The comment and discussion do not appear to add anything not included in the regulations except to discuss some of the operational implications.

DCL 2. The Department would consider this to be effective for loans transferred on/after 2/19/93.

### 682.305(c)

PDI 1.& 2. The Department considers the statutory audit requirement to be self-implementing and plans to implement the audit requirement when the audit guide under development is available. The regulatory requirement, which was subjected to public comment and revised as a result, was also revised to remove any conflicts between the regulatory and statutory requirement.

3. The provisions of the statutory requirement will be addressed in developing the negotiated rulemaking NPRM. The Department does not interpret "an audit for other purposes" to mean an alternative to the audit.

4. Lender reviews are different than audits in the same way that school reviews are different than independent audits for schools. We believe that .305(c) acknowledges the ability of nonprofits to do a single audit and the applicability of 31 U.S.C. 7502 and OMB Circular A-133. See the last comment and discussion under .305(c).

16

SENT BY:NCHELP          ; 3-26-93 ;11:44AM ;          2025468745→          217 785 5647;#34

## SECTION 682.400

### 682.400

1. Regulations governing the mandated loan rehabilitation program will be developed under negotiated rulemaking.

2. The DCL and the regulations do not conflict. The fact that provisions governing the rehabilitation program were not included in the regulations does not negate the DCL guidance to implement the '92 Amendments.

### SECTION 682.401

The Department did not incorporate '92 Amendment provisions into 682.401. The provision in 682.401(d)(3) was a regulatory, burden reduction item before the common application/promissory note and other forms was required in statute.

### SECTION 682.401(b)(2)(ii)

1. Although academic year is a term defined and subject to revision in the General Provisions regulations, guaranty agencies do not have anything to do with defining the term and must use the definition provided in statute and resulting regulations.

PDI 2. The Department understands that guaranty systems must be revised to track borrowers against a new 7-month standard for Stafford. However, the Department does not believe it is a major shift since agencies have been dealing with the 7-month standard in the SLS program.

3. This will apply to loans certified on/after February 1, 1993.

### 682.401(b)(4)(i)

Section 485C(b) reads "to the extent practicable, and with the cooperation of the borrower...." It is clearly not a requirement. Additionally, the requirement that the borrower have a choice of lender is also statutory. <u>See</u> .......

### 682.401(b)(4)(iv)(A)

1. The comment is not applicable because this area of the regulations governs borrower responsibility. The school responsibility in section 485(b) is subject to negotiated rulemaking, but that does not include this provision governing a borrower's responsibility.

2. - 5. The comments reflect the view that the provision is a

17

school reporting responsibility, which it is not.

## 682.401(b)(5)

TC 1.& 2.  The new limitation provisions of the '92 Amendments are not reflected in the regulations.  The reference to section 432(h)(3) [which should be 432(h)(2)] was implemented as a result of earlier legislation that provided for default sanctions.  The newest legislation allowing guaranty agencies to limit the participation of schools will be regulated through negotiated rulemaking.

## 682.401(b)(7-8)

TC 1.  The Department agrees the correct citation is 682.404(h)(2).

## 682.401(b)(9)

1.  The comment is not correct.  Section 428H permits lenders to charge combined insurance premium/origination fee, but the agency is prohibited from charging one.  However, it is irrelevant to this discussion because section 428H is not reflected in the regulations.

## 682.401(b)(15)(i)

DCL-1.  No.  This does not represent an incorporation of the '92 Amendments.   It was a regulatory initiative in response to particular situations that predated the statutory change.  That is why there is no reference to the exceptions provided in the '92 Amendments.  We will clarify in the DCL that the regulations apply with the addition of the exceptions now provided in statute until the provision can be revised under negotiated rulemaking.

## 682.401(b)(16)

1.  This restriction was added in response to the HEAF situation after the Secretary of Education, in testimony before the Congress, stated that transfers of guarantees would not take place without the Department's approval.   OMB requested that we modify the provision to allow for routine borrower requests for transfer to consolidate their loans with one guarantor.

## 682.401 (b)(17)

1.   No.  Referencing the statutory provision does not make it subject to negotiated rulemaking.

2.   The Department does not agree there is a problem.  One is simply the definition; the other is a requirement to have an agreement with the entity defined in the definition.

18

SENT BY:NCHELP      ; 3-26-93 ;11:45AM ;              2025468745→        217 785 5647;#36

3.    This is just inclusion in a list and is not subject to negotiated rulemaking.

682.401(b)(18)

1.  The requirement to track borrower status through the use of an SSCR was a requirement long before 12/92.  There is no conflict between this requirement and the later implementation of a new SSCR format.

2.    The SSCR is used to update status, not to report "justification."

3.  Appendix B is a standardized SSCR and the Department intends to use it until revisions are necessary.


682.401(b)(22)

1.& 2.  The Department disagrees.  Section 428K was not changed by the '92 Amendments.

682.401(c)

DCL 1.& 2. The Department disagrees.  The requirement to provide lender-of-last-resort services is still applicable.  The DCL will clarify that the '92 Amendments have changed the section and refer them to the interim guidance on the amendments in GEN-92-21.

682.401(d)(3)

1.& 2. & 3.

The Department considers the requirement to develop a common application/note to be self-implementing.  The regulation simply says it must be used.

682.401(e)

1.  The HEA added a new restriction to the ones already present. The new restriction (lender inducements) is subject to negotiated rulemaking but doesn't mean the old ones will confuse people.

2.  There is no conflict.

SECTION 682.402

1.    There is no Consolidation Loan death benefit.  HEA added something for PLUS, but nothing specific for Consolidation. The new benefit will be regulated under negotiated rulemaking.


19

SENT BY:NCHELP          : 3-26-93 :11:45AM :          2025468745→          217 785 5847:#37

### 682.402(c)

1.  We do not understand the comment.

### 682.402(d) and (g)

DCL 1.,2, & 3.    The DCL will clarify which portions of the
regulations have been superseded.  In review of the regulations for
the purpose of revising them for negotiated rulemaking, it was
determined that most of the provisions have not been superseded by
the changes made in the HEA.

TC 4.    The Department agrees that the reference should be to
(g)(2), not (h)(2).

### 682.402(e)(2)(ii)(B)

PDI 1.  The Department does not believe the changes required by the
15-day deadline are major and that they could be handled manually
until system changes are made.

2.  Effective date is 2/19/93 for any instance in which the lender
"is served" with a complaint or motion.

### 682.402(h)

1.  If the loan is not discharged, what is "the basis" of claim
payment and the agency remaining the holder?  Also, the agencies
are not in a position to provide pre-default loan servicing.

### 682.402(i)(2)(iii)

- ASKI GEORGE ABOUT HIS COMMENT HERE.

### 682.402(k)

1. We disagree that this section conflicts with 682.210.  The date
on which the borrower qualifies for a deferment can be a back-dated
date.

### SECTION 682.403

### 682.403(f)

1.    The Department obviously disagrees.    There is no basis to
believe that an agency can keep an "advance" forever.    There
doesn't seem to be the same objection to 682.410(a)(2)(v).

### SECTION 682.404

PDI 1. The Department doesn't understand the necessity of delaying
for something that we presume agencies are doing on an ongoing

20

SENT BY:NCHELP    ; 3-26-93 ;11:46AM ;    2025488745→    217 785 5647;#38

basis.    This isn't like training with schools where outreach activities are involved.

2.    The requirement is to provide preclaims assistance to lenders who request it on or after 2/19/93.

3.    We do not understand the comment.    There is no reference in the DCL to 682.404(a)(2)(ii).

682.404(a)(3)(i)

1.    This codifies the Department's interpretation of the statute.

682.404(a)(5)

TC 2.    The Department believes that the change in section 428(c)(2)(H) replacing the lender with the guaranty agency as the entity that reports to the school is self-implementing.    The provision of the statute that allows the guaranty agency to charge a reasonable fee for this service will be regulated under negotiated rulemaking.    The commenter is correct that this reporting requirement is contingent upon the request of the school and a technical correction will be made to the regulations to reflect this.

## SECTION 682.406

1. The additional requirement required by the '92 Amendments will be regulated under negotiated rulemaking.    That change does not invalidate the regulations as published.

2.    We do not agree this is confusing.

3.    No comment.

4.    Proposed 682.406(a)(2) in the 11/20/90 NPRM provided for the submission of the payment and collection history to ensure that the lender serviced the loan properly pursuant to 682.411.    Implicit in this is that the claims examination process extends beyond the most recent 180 day.    The Department does not believe that the agency can determine whether the loan is enforceable.    We do not see that this requires further clarification for the purposes of implementation.

5.    The Department disagrees that this is a mistake.    Waivers provided under the Appendix D cure policy only apply to violations of .411 and the timely filing requirement.

6.    There is no conflict.    The requirement for standardized forms and procedures will be regulated under negotiated rulemaking. Until that time, these regulations will continue to govern.

21

TC~7.  See earlier comment to 682.302.  We will use consistent terms in both places.

8.  We do not agree that the preamble provides any "cure" for a failure to pay required origination fees.

9.  Appendix D is for .406(a)(3) and (a)(5) only.  The possibility of any other waivers is covered in .406(b).

## SECTION 682.408

1. The Department does not find anything in sections 428(i) or 432(1) that requires "standardization of escrow processing."  If NCHELP is referring to the general requirement for standardization of forms and procedure, this will be handled under negotiated rulemaking.  Until final regulations are published as part of that process, these regulatory requirements will apply.

## SECTION 682.409

DCL 1.  The final regulations apply until such time as revised final regulations reflecting the '92 Amendment changes are published and in effect.  However, during this interim period for purposes of this process, the aged loans the Department will require guarantors to assign will be the unresolved loans with claims paid to lenders prior to April 15, 1989.  The loans considered "unresolved" are those loans without judgments and with no payments in the last year.

## SECTION 682.410

## SECTION 682.410(b)(1)(ii)

1.   The regulatory requirement for guaranty agency audits is applicable with the statutory change made in the frequency of the audit self-implementing.

2.  We don't understand the comment.  The provisions addresses the applicability of A-133.

## SECTION 682.410(b)(2)

1.   This is untrue.   Please see response to inquiry on this subject.

2.   This provision is the result of a statutory requirement. See section 484A(b) of the Act.  Besides, a borrower's rehabilitation payment must be reasonable and affordable.  So, even if the charges include collection charges, the payment amount that the borrower is expected to make to rehabilitate the loan cannot exceed what is reasonable and affordable.

22

SENT BY:NCHELP                    ; 3-26-93 ;11:47AM ;                 2025468745→              ZIT 705 5047;#40

3.   The effective date is claims paid on or after February 19, 1993.

PDI 4.   The Department does not understand why this is a major implementation item.   This is an additional charge that can be passed along to the borrower and against which payments can be applied.

### Section 682.410(b)(4)

PDI 1.   It appears that everything is a major implementation problem...which calls into questions some of these comments.  What is major about adding interest to principal and billing the debtor for what he or she owes the agency.  We are not inclined toward providing 180 days to implement this.

### SECTION 682.410(b)(5)

1.  Correct, it must be offered to every borrower.

2.   The Department does not understand what the dilemma is. Presumably, the agency paid the claim in good faith based on the information provided by the lender and the agency's own records. Perhaps the lender provided incorrect information.  Wouldn't the guaranty agency want to provide the borrower the opportunity to correct the information before his life is significantly damaged?

PDI 3. The Department does not view this as a reasonable delayed implementation period.

4.  The Department doesn't consider this a topic of further discussion because the Department considered and responded to comments in developing the final regulations.

5. What new forms are necessary to implement this?  The Department believes it only involves a written notice advising the debtor of hid or her options as outlined in this provision.  This could be a word processed letter to the debtor.  Department would be happy to assist in drafting the notice.

### SECTION 682.410(b)(5)

PDI 1. Prior regulations required the agency to diligently attempt to call the borrower.  Additionally, this has been the Department's long-standing policy on what constitutes diligent telephone attempts.   Therefore, despite the fact that this is codified in regulations for the first time, the Department sees no reason to provide an extended implementation period.

2.  Claims paid on or after 2/19/93.

### 682.410(b)(8)

23

SENT BY:NCHELP           ; 3-26-93 ;11:47AM ;           2025400145→           211 103 3041;#41

DCL 1. - 4. This provision refers to the optional guaranty agency
closed school policy in existence prior to the '92 Amendments. The
Department views this provision as having been superseded by the
'92 Amendments and expects lenders and guaranty agencies to follow
the guidance that will be provided shortly in a Dear Colleague
letter to implement the closed school statutory provision on an
interim basis in advance of final regulations.

### 682.410(b)(9)

1. There is no conflict. The regulatory provision is narrowly
drawn and is not intended to include everything. You are correct.
The Department, in the preamble to the regulations, indicated it
was declining to issue a regulations preempting state law in
instances in which borrowers could raise school-related defenses to
repaying loans.

### 682.410(c)

DCL 1. Please note that the dollar volume criterion for lender
reviews has not been deleted. The school volume criterion was
proposed for deletion in the 11/20/90 NPRM to refocus such reviews
on high default institutions and preclude a repetitive cycle of
review of the same schools. Agencies are free to submit their
proposed alternative review plan to the Secretary for approval.

2. The effective date is 2/19/93, but the review requirement is a
biennial one.

### SECTION 682.411

### 682.411

PDI 1. The Department understands there will be some additional
systems development necessitated by the changes to this section.

2. There was significant consultation with the community of the
development of the final regulations in this section.

3. So noted.

4. The Department believes the collection requirements are
necessary to prevent defaults and maintain the integrity of the
FFEL program. Those lenders and servicers doing an exceptional job
will be recognized through the regulations being developed as a
result of the '92 Amendments. This mechanism should decrease the
potential for lender liability.

### 682.411(i)

TC 1.& 2. We will make a technical correction in the definition of

24

SENT BY:NCHELP                    ; 3-20-93 ;11:40AM ;                  2020400140

gap in Appendix D to clarify that the term gap, as it appears in Appendix D, applies to a loan for which the first day of delinquency occurred on or before the effective date of the new .411 due diligence provisions, which is 120 days after the date of publication of the regulations.    The definition of gap in .411 states that it is "for purposes of this section" and is effective for loans on which the first day of delinquency is on or after 120 days after the date of publication of the regulations.

### 682.411(f)

TC 1.  Agree. Technical corrections are necessary. The reference to (f)(1) should be to .411 (1)(1).  The reference in 682.411(g)(4) to (1)(1)(A) and (B) should be to (1)(1)(ii) and (iii).

### 682.411(m)

See response to 682.410(b)(9).

### SECTION 682.412

TC 1.  Agree that special allowance charges to the borrower under the requirements of 682.412 should be included in the list of permissible charges in 682.202.

2.    We believe that the commenter is confusing the loan cancellation provisions for false certification <u>by a school</u> included in the '92 Amendments with 682.412, which addresses false information provided by the <u>borrower and/or his parents</u> on which eligibility was based.

### SECTION 682.413

1.  682.413(c) talks about liability against a guaranty agency that makes an incomplete or incorrect statement ...or violates federal requirements.    Liabilities seem appropriate but rare for these types of transgressions.

2.  The Department disagrees.  If an agency owes a liability for a violation in 1990, we should use any available remedial action to resolve it.

3.    The regulations merely cross-reference the statute, which is applicable.

### SECTION 682.414

1.    The statutory provisions do no prevent the Department from implementing these regulatory requirements.  Any revisions to this section as a result of the '92 Amendments will be proposed in the negotiated rulemaking NPRM.

SENT BY:NCHELP        ; 3-26-93 ;11:48AM ;        2025468745→        217 785 5647;#43

SECTION 682.600

682.601

1. 682.601(A)(3) contains 50% restriction for school lenders.

SECTION 682.603

1.  This codifies existing policy.  The Department understands that there have been changes in the certification process as a result of the '92 Amendments.  This regulatory provision does not conflict with the statutory changes which will be regulated through negotiated rulemaking.

2.  We do not see the conflict.  The period of enrollment does not have to directly correspond to the period selected by the agency for annual loan limits.

3.  The change in 682.413(d)(2) had nothing to do with the '92 Amendments.  The provision was proposed in the NPRM and modified to include lenders because 432(g) of the Act applies equally to lenders.

SECTION 682.604

682.604(c)(2)

DCL 1.  The regulations reflect the self-implementing aspects of the co-payable PLUS provisions.  The disbursement provisions for EFT are covered in 682.604(c)(3).  The handling of checks was not included because it must be regulated as' under negotiated rulemaking.  The interim guidance in GEN-92-21 on the handling of checks will continue to apply until final regulations are published.

682.604(c)(3)(ii)

PDI 1.  The common application/promissory note will contain this requirement.  Therefore, we will phase this requirement in as we phase in the use of the application.

2.  Except for the disbursement of co-payable PLUS checks, the Department views the PLUS changes as self-implementing.

682.604(d)(1)(B)

1.  The regulatory provisions regarding the school's retention of excess loan proceeds predates the statute and has not been superseded.  Further, the manner in which the proceeds are maintained has nothing to do with the frequency of delivery to the borrower.

26

SENT BY:NCHELP          ; 3-26-93 ;11:49AM ;          2025466745→          21Ⅴ 765 5647;#44

2.   The Department does not agree that the changes made in this area are major changes.

## 682.604(d)(4)

TC 1.   A technical correction is required to clarify the timeframes.   (4)(a) should be within 30 days of the period of enrollment for a registered student who withdraws or is expelled before the first day of the period of enrollment.  (4)(b) should be according to the refund deadlines in 682.607 based on a withdrawal date determined under 682.605.

DCL 2. Clarification will be provided in the DCL.

## 682.604(e)(4)

1.& 2.  See comments to 682.207(d).

## 682.604(h)

DCL 1.   The statute does not address students in study-abroad programs.    However,   for consistency of interpretation,   the Department will consider it as applying if the loan proceeds are delivered directly to the borrower.  If disbursed to the school and delivered using a power-of-attorney, overaward provisions would apply.

2. Correct.   There was no intention to include unsubsidized Stafford.

## 682.605(b)(4)

PDI 1. Schools have this information even if some of the SSCR formats don't request it.   The Department does not believe this should involve delayed implementation.  Status changes reported on the SSCR will be implemented when the SSCR is implemented.  Status changes   reported   outside   the   scope   of   the   SSCR   should   be implemented according to the effective date of the regulations.

2.   The Department doesn't believe the effective dates need to be consistent.

3.  Do not understand the comment.

## SECTION 682.606

DCL 1. The regulatory provisions of 682.606 have been superseded by the Part G statutory requirements.

2.   This relates to the requirement in .606 that a school have a "fair and equitable refund policy."  This provides for developing

27

such a policy is there is not an accrediting agency standard to
follow, which is rare. This is still considered interim guidance
until it can be revised and moved to General Provisions regulations
under negotiated rulemaking.

## SECTION 682.610

### 682.610(B)(5)

The section now includes what was missing through oversight
previously in this section and is not subject to negotiated
rulemaking. Previously, schools were required to retain
documentation that supported need determination/loan certification.
However, estimated financial assistance was not included. The
change in retention time was based on public comment.

### 682.610(b)(9)(iv)

TC-DCL 1. The Department agrees that 682.207(b)(1)(ii)(B) suggests
that the school retains the original while .610 says copy. As a
matter of policy guidance, we have said the original/copy could be
maintained by either party.

### 682.610(c)(2)

PDI 1. We do not understand what requires additional time for
implementation.

### 682.610(d)

1. This change was made in response to public comment
(specifically from guaranty agencies) and is consistent with what
is done in the Perkins Loan Program. The statutory provision
addresses the standardization of documentation, not the retention
period.

### 682.610(f)

PDI 1. The Department does not believe this requires additional
time to implement and is important to default reduction.

## SECTION 682.800

### GENERAL COMMENTS

These comments are a reiteration of the comment received on the
NPRM. See the comments and discussion.

### SECTION 682.801

1. & 2. The Department views this as a self-implementing statutory
change.

28

TC 3. Correct. A change will be made to include the deleted provision correctly reflecting the statutory change.

## SECTION 682.830

### 682.830(b)(1)

See comments on 682.305(c).

## SECTION 682.840

### 682.840(b)

See comment and response to the regulations.

## APPENDICES

### APPENDIX A

Appendix A remains in effect as interim guidance for the development of a "fair and equitable" refund policy if the school does not have an accrediting agency mandated standard under which to develop such a policy. This Appendix will be revised and moved into the General Provisions regulations as part of the Part G negotiated rulemaking.

### APPENDIX B

PDI 1. The current delayed effective date would require use of the new SSCR format by June 19, 1993. What must be done in addition to revising forms and screen formats, revising accompanying instructions, and modifying systems to accept day-specific data.

2. The Department followed the recommendations of the community, particularly NCHELP, in the development of the SSCR format and identification of required data. The Department intends to implement APPENDIX B and will monitor its use for possible future revision.

### APPENDIX C

No changes were made to Appendix C, which is Bulletin L-77a first printed in January 1983 as the cure policy for FISL loans. It remains in effect for FISL loans.

### Appendix D

TC - 1. (1) of 682.413(b)(1) will be deleted.

TC - 2. Technical correction to replace 45 days with 90 days.

29

TC - 3.  Technical correction to revise references to (a)(5) and (a)(6) to (a)(6) and (a)(7).

4.  See earlier response to question 682.411 on the definition of gap.

PDI-5.  The opinion of the lending community, as expressed to the Department during a meeting on .411 after their review of the second clearance draft, was that revised .411 would allow a lender to continue to use the 30-day standard of the old regulations and comply with the new regulations.  We find it difficult to believe that any organization would set up its system to purposely have a 45-day period between required activities.... routinely walking on the edge of violation.  We don't believe this is a responsible position for a program participant to take in setting up their system, and if they do, it calls into question their administrative capability.  However, the Department does understand that the new timeframe for the first delinquency notice, endorser due diligence, and additional skiptracing requirements will involve systems changes.

6.  This is correct.  See comment and discussion to 682.406(a)(2).  The Department disagrees that this represents a major shift from policy.  Policy guidance has consistently indicated that an agency must check conversion date and repayment status of a loan to ensure the delinquency status of the loan is correct.  This has been a major issue in implementing the default initiative with schools.

7.  There has never been an excusal of timely filing violations.  They have always led to abbreviated cures.

8.  Please clarify.  C.2.c.& d. are the same.

9.  What type of systems and procedural changes?

10.  The Department disagrees.  The NPRM contained 15 days, we received no comments on this item, and we believe this codifies policy that predates even the NPRM.

11.  The effective date would appear to parallel the effective date for changes to 682.411, which is 120 days after the publication date of the regulations.

12.  The changes made were necessitated by changes made to 682.411. and following a meeting with the lending/guaranty agency/servicing industry after their review of the second clearance draft of the final regulations.

30

deadline specified in (v) of this section."

DCL 3. The interim guidance provided on the '92 Amendments in GEN-92-21 will be used in conjunction with the final regulations. The DCL will provide additional guidance on the use of this section in light of the statutory changes. The '92 Amendment changes will be regulated as part of negotiated rulemaking NPRM.

682.302(e)(2)

1. That is correct and it remains the Department's position on this issue.

↳ ED passed out comments at March 1993 on NCHELP's

SECTION 682.304  Position-unofficial comments --no date.

PDI 1. Form 799 has been completed and is being mailed. The Department understands that systems must be revised to comply with the provision.

DCL 2. The DCL will clarify that this will apply to bills submitted to the Department on/after 2/1/93 unless a further delay in implementation is decided upon.

Section 682.305

1. Unclear what the commenter is referring to. The comment and discussion do not appear to add anything not included in the regulations except to discuss some of the operational implications.

DCL 2. The Department would consider this to be effective for loans transferred on/after 2/19/93.

682.305(c)

PDI 1.& 2.The Department considers the statutory audit requirement to be self-implementing and plans to implement the audit requirement when the audit guide under development is available. The regulatory requirement, which was subjected to public comment and revised as a result, was also revised to remove any conflicts between the regulatory and statutory requirement.

3. The provisions of the statutory requirement will be addressed in developing the negotiated rulemaking NPRM. The Department does not interpret "an audit for other purposes" to mean an alternative to the audit.

4. Lender reviews are different than audits in the same way that school reviews are different than independent audits for schools. We believe that .305(c) acknowledges the ability of nonprofits to do a single audit and the applicability of 31 U.S.C. 7502 and OMB Circular A-133. See the last comment and discussion under .305(c).

16



Assumed Date 3/93