IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| NAVIENT SOLUTIONS, LLC, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:21-cv-324 |
| | ) | |
| DEPARTMENT OF EDUCATION | ) | |
| and | ) | |
| DR. MIGUEL CARDONA, *Secretary of* | ) | |
| *Education, in his Official Capacity*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

At issue in this Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq.*, dispute are the parties' cross motions for summary judgment (Dkts. 58, 63). Simply put, Plaintiff Navient Solutions, LLC ("Navient") alleges that the Department of Education (the "Department") acted arbitrarily and capriciously in violation of the APA when the Department determined that Navient erroneously claimed over $22 million in student loan-related subsidies from 2002 to 2005. Navient contends that in claiming those subsidies, Navient reasonably relied on two 1993 Dear Colleague Letters ("DCLs") issued by the Department authorizing Navient to collect subsidies for student loans funded in whole or in part by tax-exempt obligations. According to Navient, the Department issued a new DCL in 2007 which disavowed the guidance in the Department's two 1993 DCLs, but nonetheless stated that the Department would not collect past erroneous subsidies if Navient prospectively followed the Department's revised interpretation set forth in the 2007 DCL.

Despite the Department's statement in the 2007 DCL that the Department would not collect past erroneous subsidies if Navient prospectively followed the Department's new guidance, the Department initiated administrative proceedings seeking over $22 million in past

1

subsidies collected by Navient pursuant to the 1993 DCLs. Specifically, the Department's Office of the Inspector General initiated an audit of Navient's billing practices in 2007, the results of which Navient appealed to an administrative law judge and finally to the Department's Acting Secretary of Education. After nearly 15 years of litigation in the administrative process, the Acting Secretary issued a final decision in January 2021 concluding that Navient had wrongfully claimed subsidies between 2002 and 2005. Navient contends that the Department's conclusion in the January 2021 final decision is arbitrary and capricious because (i) the Department failed to consider Navient's reliance interests, (ii) the Department improperly concluded that the bonds at issue constituted a singular "obligation," and (iii) the Department unfairly prejudiced Navient by bifurcating the proceedings. In response, the Department argues that Navient's reliance on the 1993 and 2007 DCLs was unreasonable and that the Department properly found through its administrative process that Navient unlawfully collected the student loan subsidies. The parties have filed cross motions for summary judgment, which have been fully briefed and argued at a hearing on October 5, 2022. Accordingly, the matter is now ripe for disposition.

## I.

Summary judgment is appropriate where there are no genuine disputes of material fact and the moving party "is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Rule 56, Fed. R. Civ. P. When faced with cross-motions for summary judgment, "the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). When a court reviews at the summary judgment stage the decision of an administrative agency under the APA, the administrative record provides the complete factual predicate for the court's review. *See Kan. by and through Kan. Dep't for Children and Families*

*v. Source Am.*, 826 F. App'x 272, 282 (4th Cir. 2020) (explaining that in APA actions, "the focal point for judicial review should be the administrative record already in existence"). In other words, because inquiry into material outside of the administrative record is inconsistent with applying the arbitrary and capricious standard, summary judgment in an APA case "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA." *Hyatt v. U.S. Patent & Trademark Office*, 146 F. Supp. 3d 771, 780 (E.D. Va. 2015) (quoting *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006)).

Here, because the administrative record in this case is voluminous—several thousands of pages—an Order issued on January 12, 2022 directing Navient and the Department to submit a Joint Stipulation of Facts and Documents. *See* Dkt. 54. The parties complied and filed a Joint Stipulation of Facts and Documents on March 11, 2022. *See* Dkt. 56. A statement of facts based on the parties' stipulations and the record as a whole is set forth in the enumerated paragraphs below.

Although the facts in this case are not without some complexity, the parties' principal dispute is quite straightforward. In essence, Navient's predecessor, Nellie Mae, created a trust in March 1993, which Nellie Mae used to purchase and fund student loans with tax-exempt bonds. Because the trust had a unique structure, Nellie Mae asked the Department to clarify in a forthcoming DCL whether the loans funded by the trust were entitled to certain government subsidies. In November and December 1993, the Department issued two DCLs which stated that the regulations applicable to the 1993 Trust allowed subsidies for "loans made or purchased, *in whole or in part*, with funds derived from tax-exempt obligations."[1] All the loans held by Nellie

---

[1] Joint Statement of Facts and Documents ("JSFD"), Dkt. 56, at ¶¶ 37, 41–42 (emphasis added).

Mae's trust were financed at least *in part* with funds from tax-exempt bonds, so Nellie Mae relied on the two DCLs' "in whole or in part" language and collected subsidies on the loans. The Department now contends, however, that Nellie Mae's billing practices violated both the Department's regulations and the relevant statutory scheme, despite the language in the two 1993 DCLs.

The relevant facts as jointly stipulated by the parties and included in the administrative record are stated in further detail below.

## A. Parties

1. Plaintiff Navient Solutions, LLC is a student loan servicer that services both private and federal student loans. Navient is the successor to Sallie Mae, Inc., which prior to 2004 was part of a government-sponsored enterprise established to provide a secondary market for student loans. Navient is also the successor to Nellie Mae, Inc., which was a student loan lender and servicer acquired by Sallie Mae in 1999.[2] JSFD ¶¶ 2, 4–5, 20, 44–45.

2. Defendant, the Department of Education, administers and oversees the federal government's student loan programs, including the Federal Family Education Loan Program ("FFELP"). The Department also issues regulations and guidance regarding the Higher Education Act of 1965, the primary statute governing federal student loans. *Id.* ¶¶ 4–5, 9–10.

3. Defendant Dr. Miguel Cardona is the Secretary of Education, in which capacity he oversees the Department. *Id.* ¶ 3.

## B. The Federal Family Education Loan Program and Special Allowance Payments

4. In administering the FFELP, the Department works with private entities, including Navient, that serve as lenders and secondary-market purchasers of student loans. FFELP loans are generally guaranteed by the federal government to mitigate the risk of default. *Id.* ¶¶ 5, 8.

5. The Higher Education Act imposes limits on the maximum interest rates that lenders can charge to student borrowers. Because of this, the Higher Education Act also provides that in some circumstances, lenders can receive subsidies called Special Allowance Payments ("SAPs") when the yield on an FFELP loan is less than a statutorily prescribed rate. In this respect, SAPs mitigate the risk that FFELP lenders would otherwise face from fluctuations in interest rates. SAPs also encourage liquidity in the student loan

---

[2] Throughout this Memorandum Opinion, "Navient" is used to refer collectively to Navient Solutions, LLC and its predecessors, Sallie Mae and Nellie Mae.

marketplace by ensuring that lenders will receive a return on FFELP loans comparable to market returns. *Id.* ¶¶ 6–7.

6. Congress amended the Higher Education Act in 1980 to create a unique SAP rate for entities that use tax-exempt financing to fund student loans. This rate, known as a "half-SAP rate," differs from the ordinary SAP rate in two pertinent respects. First, the subsidy is one-half the rate of the usual SAP rate—hence the term "half-SAP." Second, the subsidy is subject to a minimum rate or "floor," which means that the interest rate on the loans can never fall below a 9.5% annualized rate. Because of this, half-SAP subsidies are particularly beneficial when interest rates are low, as the floor in those circumstances guarantees a higher interest rate than lenders would otherwise receive in the market. *Id.* ¶¶ 12–14; Administrative Record ("AR") 6, 1312.

7. During the 1980s and 1990s, the Department issued shifting regulations regarding the half-SAP subsidy. First, in 1985, the Department issued regulations providing that the Department would cease to pay the half-SAP rate on FFELP loans made or acquired with the proceeds of tax-exempt obligations "after the loan is pledged or otherwise transferred in consideration of funds derived from sources other than a tax-exempt obligation" and the prior tax-exempt obligation is either retired or defeased. This meant that whether a loan was eligible for the half-SAP rate depended on the current source of financing for that loan. 34 C.F.R. § 682.302(e)(3); *see also* JSFD ¶ 16; AR 1314.

8. In 1992, the Department issued new half-SAP regulations amending the 1985 regulations set forth in 34 C.F.R. § 682.302(e) and expanding the category of tax-exempt loans eligible for the half-SAP rate. The 1992 Regulations provided that, if the lender maintained an interest in a loan originally funded with tax-exempt financing, the loan could continue to be billed at the half-SAP rate even if it was later refinanced through a non-tax-exempt source. *Id.* ¶ 17. In 1996, the Department issued a DCL[3] addressing the 1992 regulations and explaining that those regulations reflected a "shift in the Department's policy regarding loans made or acquired with the proceeds of tax-exempt obligations." JSFD ¶ 43.

### C. The Nellie Mae Trust and the 1993 Bonds

9. In 1993, Nellie Mae, a student loan provider later acquired by Sallie Mae and subsequently by Navient, was in the process of refinancing previously issued tax-exempt bonds and acquiring additional student loans with tax-exempt financing. *Id.* ¶ 20.

---

[3] A Dear Colleague Letter is a guidance document used by a government agency to explain the agency's interpretation or application of a particular statute, regulation, or rule. The Department's official Federal Student Aid website states that "Dear Colleague Letter resources are one of the primary communication types used to convey guidance" regarding federal student aid programs. *Dear Colleague Letters*, Office of Federal Student Aid, https://fsapartners.ed.gov/knowledge-center/library/resource-type/Dear%20Colleague%20Letters (last visited Dec. 14, 2022). The Department of Justice has recently stated that guidance documents like Dear Colleague Letters serve "many valuable functions" including "explain[ing] an agency's programs and policies or communicat[ing] other important information to regulated entities and the public." Memorandum from Merrick Garland, Attorney General, to Heads of All Department Components, re: Issuance and Use of Guidance Documents by the Department of Justice (July 1, 2021), at 2, *available at* https://www.justice.gov/opa/page/file/1408606/download.

10. Beginning in March 1993, a Nellie Mae affiliate issued eight series of tax-exempt bonds totaling over $458 million under a master trust indenture (the "1993 Indenture"), which created the Nellie Mae Trust (the "1993 Trust"). *Id.* ¶ 21; AR 73. The rights of the bondholders under the 1993 Indenture were all identical to one another, and each bond was treated "collectively and on a parity basis with other bonds in terms of the bondholders' right to payments, default provisions and remedies." JSFD ¶ 29.

11. The tax-exempt bonds issued under the 1993 Indenture refinanced previously issued tax-exempt bonds. Nellie Mae then put the proceeds from the bonds into a common funding pool to continue to finance existing student loans and to acquire additional student loans, all of which were held by the 1993 Trust. The loans that the 1993 Trust financed and acquired are the loans at issue in this case. *Id.* ¶ 22.

12. Nellie Mae also deposited income from the loans that the 1993 Trust financed and acquired—including principal and interest payments, guarantor payments, and interest benefits—into the common funding pool. That common funding pool was divided into two sub-pools, and deposits made into the sub-pools were fungible within the respective sub-pools. *Id.* ¶¶ 24–26.

13. Because Nellie Mae deposited income from the bonds into a common funding pool which had commingled funds, Nellie Mae did not track which specific bond was used to acquire any given loan. Furthermore, unlike the structure of a typical student loan bond financing at the time, the loans purchased with the proceeds of the 1993 bonds were not pledged as collateral in support of the repayment of that bond or series. *Id.* ¶¶ 23, 27–29.

14. Because of the common funding pools, all of the loans held by the 1993 Trust were financed or acquired at least in part with proceeds from tax-exempt bonds. Thus, at the time of issuance, all loans associated with the 1993 Trust were eligible for subsidies from the Department at the half-SAP rate. *Id.* ¶¶ 28–30.

**D. The 1993 Student Loan Reform Act and the 1993 Dear Colleague Letters**

15. In August 1993, Congress enacted the Student Loan Reform Act of 1993 ("SLRA"). The SLRA eliminated the half-SAP rate for loans made or purchased with tax-exempt obligations issued on or after October 1, 1993. The SLRA did not impact loans made or purchased with tax-exempt obligations issued *before* that date, and therefore did not impact the loans previously financed and acquired by the 1993 Trust. *Id.* ¶¶ 18–19.

16. In the year or so leading up to the passage of the SLRA, the Department held meetings with student loan lenders and servicers, including meetings with the National Council of Higher Education Loan Programs. Those meetings included extensive discussions regarding the 1992 regulations and the SLRA and included the exchange of comments and questions between the Department and student loan lenders and servicers. Sheila Ryan-Macie was Nellie Mae's delegate to the National Council of Higher Education Loan Programs and interacted with representatives of the Department throughout 1992 and 1993 during the meetings. *Id.* ¶¶ 31–33.

17. Ms. Ryan-Macie recalls that in the course of meeting with Department officials, she asked Robert Evans—then an official at the Department—to clarify in a forthcoming DCL how the half-SAP rules would apply to the unique structure of the 1993 Trust, given that specific loans were not pledged as collateral for specific bonds and loan proceeds were pooled and used to acquire loans. *Id.* ¶ 34.

18. In November 1993, the Department issued a DCL that "contain[ed] information about the major changes" made by the SLRA (hereinafter the "1993 DCL I"). *Id.* ¶ 35. With respect to the SLRA's elimination of the half-SAP rate for loans made or purchased with tax-exempt obligations issued on or after October 1, 1993, the 1993 DCL I explained that the "minimum special allowance rate 'floor' on new loans made or purchased, ***in whole or in part***, with funds derived from tax-exempt obligations has been repealed." *Id.* ¶ 37 (emphasis added).

19. According to Ms. Ryan-Macie, the original draft of the 1993 DCL I did not include the "in whole or in part" language, which was added after Ms. Ryan-Macie's discussions with the Department about the 1993 Trust. *Id.* ¶ 38.

20. Mr. Evans, the Department official who spoke with Ms. Ryan-Macie, said that it was "highly probable" that the 1993 DCL I's "in whole or in part" language was included to "address a specific question or activity the Department was seeking to address," and that inclusion of the "in whole or in part" language was "consistent with the policy direction being taken at the time by the Department to expand" the half-SAP limitations. *Id.* ¶ 39.

21. Jane Roig, another industry participant and member of the National Council of Higher Education Loan Programs in 1992 and 1993, also recalls that "the phrase 'in whole or in part' was added to the draft language of the 1993 DCL . . . based on conversations that Sheila Ryan-Macie, from Nellie Mae, had with Robert Evans, who was at that time the Department of Education's Policy Division Director." AR 1602–03.

22. In December 1993, the Department issued a second Dear Colleague Letter addressing the SLRA (hereinafter the "1993 DCL II"). Section IV of the 1993 DCL II repeated the "in whole or in part" language from the 1993 DCL I. JSFD ¶¶ 41–42.

### E. Nellie Mae's Half-SAP Billing on the Loans at Issue

23.  Nellie Mae understood the two 1993 DCLs' "in whole or in part" language to mean that loans issued *before* October 1, 1993 which were financed "in part" with tax-exempt obligations or funded "in part" with the proceeds of loans financed through tax-exempt debt were eligible to bill at the half-SAP rate until the original tax-exempt obligations were retired or defeased in their entirety. *Id.* ¶ 44–45.

24. Based on Nellie Mae's understanding of the 1993 DCL I and 1993 DCL II's "in whole or in part" language, Nellie Mae billed at the half-SAP rate for loans financed by the 1993 Trust. Nellie Mae treated all loans associated with the 1993 Trust that were originated prior to October 1, 1993, as well as loans financed at least in part with the proceeds of

loans financed through the 1993 Trust, as eligible for the half-SAP rate until the last bond issued under the 1993 Trust was retired on July 1, 2005. *Id.* ¶ 45.

25. In June, August, and December 2002, three bonds associated with the 1993 Trust matured and were retired. Upon the retirement of these bonds, certain loans that had been associated with the bonds were funded with non-tax-exempt obligations. Despite this, Navient continued to bill for these loans using the half-SAP rate on the basis that the loans were funded "in part" by tax-exempt obligations, given that other tax-exempt bonds issued under the 1993 Indenture remained outstanding. *Id.* ¶¶ 46–47.

26. The Department paid the half-SAP rate for loans associated with the 1993 Trust through June 30, 2005. *Id.* ¶ 48. Thus, the parties agree that the relevant timeframe for this dispute is June 2002 through June 2005, because during that period Navient collected half-SAP payments from the Department for loans funded only "in part" by tax-exempt obligations. *Id.* ¶¶ 47–48, 55; *see also* Oct. 5, 2022 Tr. at 36:18–19 ("[F]rom 1993 through the middle of 2002, there's no dispute that the loans that are at issue here qualified for [half-SAP] . . . [T]he only period that's in dispute here begins in the middle of 2002[.]").

**F. The 2007 Dear Colleague Letter**

27. On January 23, 2007, the Department issued another DCL (hereinafter the "2007 DCL"). The purpose of the 2007 DCL was to "restate[] the applicable . . . regulations that control whether FFELP Loans acquired with funds derived from tax-exempt financing sources acquire eligibility for special allowance payments at the 9.5 percent minimum rate." JSFD ¶¶ 56–57.

28. The 2007 DCL noted that the "requirements" for half-SAP subsidies that it was restating had "been in effect since 1993." *Id.* ¶ 58. The 2007 DCL also stated that "[o]nly the loans described in these statutory and regulatory provisions are eligible for" half-SAP payments. *Id.* ¶ 59.

29. The 2007 DCL divided loans into two categories in terms of their tax-exempt financing: "first-generation loans" and "second-generation loans." In the 2007 DCL, the Department defined "first-generation loans" as "only those loans acquired using proceeds of the tax-exempt obligation," and "second-generation loans" as "only those loans acquired using funds obtained directly from first-generation loans." 2007 DCL, AR 142. The Department explained that only first- and second-generation loans were eligible for the half-SAP rate. JSFD ¶¶ 60–61.

30. The 2007 DCL also stated that the Department had "reason to believe that some lenders may be claiming [half-SAP payments] on loans which are neither first-generation nor second-generation loans." *Id.* ¶ 62.

31. In the 2007 DCL, the Department explained that in the interest of resolving without dispute potential objections to the "meaning and application of the statutory and regulatory requirements," the Department would not "seek to recoup" excess half-SAP payments already received on loans that were "neither first-generation loans nor second

generation loans," for lenders that "promptly compl[ied] with or accept[ed]" certain requirements. JSFD ¶ 63.

32. In addition to the 2007 DCL promulgated to the regulated community, the Department wrote a separate letter to Navient repeating its statement in the 2007 DCL that the Department would not "seek to recoup" excess half-SAP payments already received on loans that were "neither first-generation loans nor second generation loans," for lenders that "promptly compl[ied] with or accept[ed]" certain requirements. AR 1608–11.

33. Navient responded to the Department's individual letter and stated that Navient "respectfully disagree[d] with the [Department's] interpretation" concerning eligibility for half-SAP payments, but agreed to comply with the Department's revised guidance in the 2007 DCL and make no further claims for half-SAP subsidies. JSFD ¶ 64.

**G. The Office of Inspector General's Audit and Subsequent Administrative Proceedings**

34. Despite the Department's 2007 DCL and the Department's 2007 letter to Navient stating that the Department would not "seek to recoup" excess half-SAP payments received on loans that were "neither first-generation loans nor second generation loans" if Navient complied with the 2007 guidance going forward, *id.* ¶ 63, the Department's Office of Inspector General ("OIG") initiated an audit of Navient's half-SAP billing practices in September 2007. The audit covered a period from October 1, 2003 through September 30, 2006. *Id.* ¶¶ 66–68.

35. The OIG issued a Final Audit Report in August 2009, which found that Navient had billed for half-SAP subsidies "after the eligible tax-exempt bonds, from which the loans derived their eligibility for the 9.5 percent floor, had matured and been retired, and after the loans were refinanced with funds derived from ineligible sources." *Id.* ¶¶ 69–70; AR 6.

36. Although the Final Audit Report estimated Navient's liability to be $22.3 million in half-SAP overpayments, the Report did not determine a final calculation of Navient's overpayments, because doing so, the administrative record reflects, would depend on Navient completing a full audit of its records. AR 1342.

37. In September 2013, the Department issued a Final Audit Determination affirming the findings of the Final Audit Report and concluding that Nellie Mae had improperly received half-SAP payments. In July 2016, Navient requested a review of the Final Audit Determination, arguing, *inter alia*, that the half-SAP rate applied to all of the loans originally funded by the 1993 bonds until the last bond associated with the 1993 Trust matured. JSFD ¶¶ 72, 74.

38. In March 2019, an administrative law judge (the "ALJ") issued a decision affirming the Final Audit Determination. The ALJ held, among other things, that Navient unreasonably relied on the 1993 DCL I because the letter's "in whole or in part" language contradicted the language of the governing statute. *Id.* ¶ 76.

39. On April 8, 2019, Navient appealed the ALJ's decision to the Acting Secretary of Education, Mitchell M. Zais. *Id.* ¶ 78; AR 2139.

40. On January 15, 2021, the Acting Secretary of Education issued a final decision, which affirmed the ALJ's decision that Navient improperly collected half-SAP payments on loans associated with the 1993 Trust. The Acting Secretary's decision did not affirm any specific judgment against Navient, however, because although the Final Audit Report estimated the total amount to be $22.3 million, Navient's ultimate liability has not yet been finally determined because the Department chose to bifurcate the proceedings. JSFD ¶¶ 79–80; AR 1336–42.

41. The Acting Secretary also concluded in his final decision that the Department did not act improperly in choosing to bifurcate the proceedings. The Acting Secretary stated that "[s]eparating the legal question [of whether Navient over-collected half-SAP payments] from the calculation of liability, which would not be necessary if Navient were to prevail, is a valid reason for bifurcation of these proceedings." AR 1342.

42. On March 16, 2021, Navient filed a complaint initiating the present proceeding. In its Complaint, Navient seeks that judgment be entered in Navient's favor, a declaration that the Acting Secretary's decision was arbitrary, capricious, or otherwise unlawful in violation of the APA, and an award of reasonably fees, costs, and expenses, including attorneys' fees. In the alternative, Navient seeks an order vacating and remanding the Acting Secretary's decision to the Department for further proceedings. JSFD ¶ 81; Compl. for Declaratory and Inj. Relief, Dkt. 1 at 15; Pl.'s Mot. for Summ. J., Dkt. 58 at 1.

## II.

The APA provides that a reviewing court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Judicial review under this standard is "highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). But judicial review under the APA, though deferential, does not "reduce judicial review to a 'rubber stamp' of agency action." *Id.* Indeed, the Supreme Court has provided a summary of agency failings that warrant a reviewing court to conclude that the agency acted arbitrarily and capriciously. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Specifically, the Supreme Court noted that an agency acts arbitrarily and capriciously if:

(i) the agency "has relied on factors which Congress has not intended it to consider";

(ii) the agency "entirely failed to consider an important aspect of the problem";

(iii) the agency "offered an explanation for its decision that runs counter to the evidence before the agency"; or

(iv) the agency's conclusion "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Id.* The Supreme Court teaches that where it appears that one of these failures has occurred, the reviewing court should hold that the agency violated the APA. Importantly, the reviewing court should not attempt to make up for the agency's deficiencies, as courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Here, Navient argues that the Department violated the APA for two principal reasons. First, according to Navient, the Department wholly failed to consider or evaluate Navient's reliance interests stemming from the 1993 DCL I, 1993 DCL II, and 2007 DCL, thereby rendering the Acting Secretary's decision arbitrary and capricious. More specifically, Navient argues that the Department ignored Navient's reliance on clear guidance provided by the Department in the 1993 DCL I and 1993 DCL II, and ignored Navient's promise to comply prospectively with the new interpretation announced in the 2007 DCL. Second, Navient argues that the Acting Secretary's decision fails to meet the standard of "reasoned decisionmaking" required by the APA, because the decision failed to consider, *inter alia*, the unique structure of the 1993 Trust, the factual underpinnings of Navient's argument that all of the bonds associated with the 1993 Trust constituted a singular "obligation," and the prejudicial effects of bifurcating the proceedings.

In response, the Department argues that the Acting Secretary correctly determined that Navient must repay the half-SAP subsidies because the controlling statute and regulations do not

entitle Navient to the subsidies at issue. The Department also argues that Navient's reliance arguments fail because even reasonable reliance cannot justify the retention of improperly paid government funds, and Navient has failed to identify any serious reliance interests. Finally, the Department argues that the Acting Secretary acted within his discretion and did not violate the APA when he bifurcated the proceedings and determined that the 1993 bonds constituted different "obligations." These arguments that the Department makes in support of its Cross Motion for Summary Judgment are the same as the arguments it makes in opposition to Navient's Motion for Summary Judgment.[4] None of these arguments justifies granting summary judgment in favor of the Department.

Each of Navient's arguments in favor of summary judgment, as well as the Department's responses, are analyzed in detail below. In short, Navient correctly argues that the Department acted arbitrarily and capriciously when it failed to account for and evaluate Navient's reliance on the 1993 DCL I, 1993 DCL II, and 2007 DCL. The Department has failed to provide any persuasive reason for its failure to evaluate, recognize, and weigh Navient's reliance interests in making its decision. Supreme Court and Fourth Circuit precedent make clear that an agency acts arbitrarily and capriciously when the agency changes longstanding policy without considering, weighing, and taking into account the reliance interests of regulated parties. Thus, this matter must be appropriately remanded to the Department for careful reconsideration and evaluation of Navient's reliance interests in view of the Department's 180-degree reversal of its guidance on half-SAP subsidies.

---

[4] *See* Order dated Jan. 13, 2022 (Dkt. 54) (directing Defendant to file a combined brief in support of Defendant's Cross Motion for Summary Judgment and response in opposition to Plaintiff's Motion for Summary Judgment).

# III.

Navient persuasively argues that the ALJ and the Acting Secretary violated the APA in determining that Navient improperly collected half-SAP subsidies without first considering Navient's reliance on the Department's 1993 and 2007 Dear Colleague Letters. The Supreme Court and the Fourth Circuit have made clear that, although agencies are free to change course and alter existing policies, in doing so agencies must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)); *see also Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 705 (4th Cir. 2019). When an agency is not "writing on a blank slate," it is required to assess "whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891, 1915 (2020). If the agency neglects to do so in making its determination, that "failure [is] arbitrary and capricious in violation of the APA." *Id.*

Here, the Acting Secretary failed to consider Navient's reliance interests when he made his final decision affirming the ALJ's determination that Navient improperly collected half-SAP subsidies. Navient raised its reliance on the Department's 1993 DCL I, 1993 DCL II, and 2007 DCL before both the ALJ and the Acting Secretary. In doing so, Navient explained that Navient structured its billing practices for over a decade in reliance on the Department's 1993 DCL I and 1993 DCL II, and that Navient stopped billing on its FFELP loan portfolio in reliance on the Department's 2007 DCL.[5]  And neither the ALJ nor the Acting Secretary disputed that the plain

---

[5] *See, e.g.*, Request for Final Audit Determination Review, AR 1681, 1710–11, 1735–36; Final Audit Determination Appeal Brief, AR 1780–81; Final Audit Determination Appeal Reply Brief, AR 1796–98, 1801–02; 2017 Tr., AR 1833–34, 1854; 2017 Suppl. Brief, AR 2037–38; ALJ Dec. Appeal, AR 2144, 2158–59, 2162, 2165–66, 2171; ALJ Dec. Appeal Reply, AR 2196, 2198–99.

meaning of the two 1993 DCLs authorized Navient's half-SAP billing practices. Indeed, as the ALJ concluded, "[t]he Dear Colleague Letter certainly says that the 1/2 SAP rate being eliminated had previously applied to loans funded 'in whole or in part' with tax-exempt bonds." ALJ Dec., AR 1317; *see also* Sec. Dec., AR 1338 (failing to dispute the meaning of the 1993 DCL I but discounting it because the text conflicts with the "statutory language"). There is therefore no doubt that the 1993 DCL I and 1993 DCL II authorized Navient to collect half-SAP on the loans associated with the 1993 Trust. Despite this, neither decision contains any analysis of Navient's reliance on the Department's "in whole or in part" language in the 1993 DCL I and 1993 DCL II, or Navient's reliance on the Department's promise not to enforce retroactively its new half-SAP interpretation in the 2007 DCL as long as parties followed the 2007 guidance prospectively. Clear Supreme Court precedent teaches that an agency must consider regulated parties' reliance on prior agency policy when the agency makes a policy change and that it is "arbitrary or capricious to ignore such matters." *Fox Television Stations*, 556 U.S. at 515. The Department therefore violated the APA by failing to analyze, or even consider, Navient's reliance interests here.

The Department also failed to consider testimonial and documentary evidence submitted by Navient which underscores Navient's reliance on the 1993 DCL I and 1993 DCL II. In support of Navient's interpretation of the "in whole or in part" language in the two 1993 DCLs, Navient submitted evidence regarding discussions that Ms. Ryan-Macie—Navient's delegate to the National Council of Higher Education Loan Programs—had with the Department in the months leading up to the issuance of the 1993 DCL I. *See* JSFD ¶¶ 31–34; 37–40. According to Ms. Ryan-Macie, she asked Robert Evans, then an official at the Department, to clarify in a forthcoming DCL how the half-SAP rules would apply to Navient's uniquely structured 1993

14

Trust. JSFD ¶ 34; AR 1387–88, 1478. Ms. Ryan-Macie recalls that only after these discussions that she had with Mr. Evans did the Department add the "in whole or in part" language to the 1993 DCL I; the language did not exist in the earlier draft. JSFD ¶ 38; AR 1388. And Mr. Evans stated that it was "highly probable" that the "in whole or in part" language was included "to address a specific question or activity the Department was seeking to address[.]" JSFD ¶ 39; AR 1478. Also pertinent here is that Navient submitted an affidavit in the administrative process from Jane Roig, another industry participant and member of the National Council of Higher Education Loan Programs in 1992 and 1993, who recalls that "the phrase 'in whole or in part' was added to the draft language of the 1993 DCL . . . based on conversations that Sheila Ryan-Macie, from Nellie Mae, had with Robert Evans, who was at that time the Department of Education's Policy Division Director." AR 1602–03.

Neither the ALJ nor the Acting Secretary addressed this evidence in making their determinations that Navient improperly billed for half-SAP subsidies on loans associated with the 1993 Trust. The ALJ and Secretary failed to address this evidence even though the affidavits Navient submitted make clear that the "in whole or in part" language was added to the 1993 DCL I in order to provide guidance regarding Navient's collection of half-SAP subsidies on the 1993 Trust. Evidence from Ms. Ryan-Macie, Mr. Evans, and Ms. Roig explains why Navient thought it was reasonable to rely on the "in whole or in part" language in the 1993 DCL I and 1993 DCL II. Despite this explanation, the administrative record does not contain any evidence that the ALJ or the Acting Secretary ever considered these affidavits. And the Supreme Court has made clear that ALJs cannot "refus[e] to credit probative circumstantial evidence," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 368 (1998), and that an agency violates the APA if it "entirely fail[s] to consider an important aspect of the problem" or "offer[s] an

explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.

In sum, the ALJ and Acting Secretary's failure to consider and assess Navient's reliance on the "in whole or in part" language in the 1993 DCL I and 1993 DCL II, the 2007 DCL's promise not to enforce retroactively the Department's 2007 interpretation of the half-SAP regulations, and Navient's affidavit evidence providing context regarding Navient's reliance on the 1993 DCL I and 1993 DCL II was arbitrary and capricious in violation of the APA. Seeking to avoid this conclusion, the Department makes four counterarguments in opposition. Specifically, the Department contends that Navient's reliance argument fails because:

1. The controlling statute and regulations do not entitle Navient to the half-SAP subsidies at issue;

2. Even reasonable reliance cannot estop the government from recouping improperly paid government funds;

3. Navient failed to identify any serious reliance interests other than Navient's pecuniary interest in the funds; and

4. Navient's reliance on the 1993 and 2007 DCLs was unreasonable.

For the reasons that follow, the Department's arguments fail to persuade.

**A.**

The Department first argues that the Acting Secretary and the ALJ did not act arbitrarily and capriciously in determining that Navient must repay the half-SAP subsidies because the controlling statute and regulations do not entitle Navient to the half-SAP subsidies at issue here. According to the Department, the Acting Secretary conducted a statutory analysis and determined that the language of the Higher Education Act and its corresponding regulations does not entitle Navient to the subsidies at issue here. Simply put, because the Higher Education Act states that the half-SAP rate applies to loans which were "made or purchased" with tax-exempt

funds, 20 U.S.C. § 1087-1(b)(2)(B)(i), the Department contends that the statute allows half-SAP subsidies only if loans are *fully* funded by tax exempt obligations, without any provision for loans to be funded *in part* by tax exempt obligations. The Department argues that a contrary rule would allow student loan holders to manipulate the subsidy by commingling tax-exempt funds with other funds when advantageous, even to the point of obtaining half-SAP subsidies for loans that were 99% funded with non-eligible bonds as long as 1% of the financing came from tax-exempt obligations. The Department also notes that Navient did not contest the Acting Secretary's conclusion that under the statute and regulations, "funded" meant *fully* funded, which means that under the plain language of the statute, Navient would not have been entitled to half-SAP subsidies on the loans at issue which were only *partly* funded with the proceeds of tax-exempt bonds.

The Department's argument fails; the Department's argument that it did not act arbitrarily and capriciously given the clear meaning of the Higher Education Act is unpersuasive and runs contrary to binding Supreme Court precedent. The Supreme Court recently considered this same issue and held that an agency cannot claim illegality of a prior agency guidance document in order to excuse the agency's failure meaningfully to consider regulated parties' reliance interests on the prior guidance. The Supreme Court's ruling in *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), is instructive here. In that case, the Supreme Court considered the Department of Homeland Security's rescission of the Deferred Action for Childhood Arrivals ("DACA") program after the Attorney General determined that DACA was illegal. The Court explained that even when an agency is considering how to respond to the potential illegality of its own prior policy, "deciding how best to address a finding of illegality moving forward can involve important policy choices," and when making those policy

17

decisions, the agency is required to engage in reasoned decision making under the APA, including "assess[ing] whether there were reliance interests, determin[ing] whether they were significant, and weigh[ing] any such interests against competing policy concerns." *Id.* at 1910, 1915; *see also MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416, 457 (D.D.C. 2020) ("Even in withdrawing a non-enforcement program that arguably conflicts with statutory directives, an agency must explain its 'policy choices.'").  In light of the Supreme Court's holding in *Regents of the University of California*, an agency's failure to consider reliance interests on agency guidance renders a decision arbitrary and capricious *even if*, as here, the agency determines that the prior guidance was contrary to law. In sum, Supreme Court precedent makes clear that the Department cannot escape its obligation to consider, weigh, and assess Navient's reliance on the 1993 DCL I, 1993 DCL II, and 2007 DCL simply by noting that the Department later concluded that its 1993 guidance was contrary to law.

## B.

The Department also argues that Navient's reliance argument fails because even reasonable reliance cannot justify the retention of improperly paid government funds. In support of this argument, the Department cites Supreme Court cases holding that when a party is not entitled to government funds, even the party's reliance on "express authorization of a responsible Government agent" cannot estop the government from recovering those funds when it later becomes apparent that the payments were improper. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 53 (1984); *see also Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). According to the Department, these Supreme Court cases mean that despite Navient's reliance, Navient must return the excess half-SAP subsidies at issue in this proceeding.

This argument misinterprets the relevant precedent and must be rejected. The Department

chiefly relies on *Heckler*, a case where the plaintiff relied on equitable estoppel as a basis for recovery. But Navient has neither pled nor argued estoppel here. Instead, Navient's request is procedural in nature and requires review of the Department's conduct for compliance with the APA. In other words, Navient's suit is a typical request for judicial review under the APA and not a demand for the equitable remedy of estoppel. And the Supreme Court has made clear that agencies may not convert APA cases into claims of equitable estoppel in order to avoid arbitrary and capricious review. In this regard, the Supreme Court in *Lyng v. Payne*, 476 U.S. 926 (1986), explained that where regulated parties "never sought to rely on estoppel as a basis for recovery," and instead brought suit for administrative relief under the APA, the parties were not required to "satisfy the requirements of proving an equitable estoppel to obtain the relief specifically available under the APA." *Id.* at 936–7. Indeed, if agencies could avoid APA review by invoking equitable estoppel cases, it would have the effect of "divesting the courts of the remedial authority specifically envisioned by Congress under the APA." *Id.* at 936. The second case the Department relies on in support of its estoppel argument, *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), is also inapposite here because, like *Heckler*, it involved an equitable estoppel claim rather than a request for judicial review under the APA. Thus, the Department's argument that Navient's reliance cannot justify the retention of improperly paid funds fails, as it improperly characterizes Navient's request for APA review as a claim for equitable estoppel.

**C.**

The Department next argues that it was not arbitrary and capricious in neglecting to consider Navient's reliance on the Department's prior guidance because Navient failed to identify any "serious" reliance interests. Def.'s Opp. to Pl.'s Mot. for Summ. J., Dkt. 64 at 18.

According to the Department, Navient has not pointed to any interests beyond Navient's pecuniary interest in not repaying the government, which is not comparable to the "serious reliance interests" that the Supreme Court has required agencies to consider when making decisions. *Id.* at 19. The Department contends that Navient must cite evidence that the Department's decision would "necessitate systematic, significant changes" in its business structure or have an effect comparable to uprooting the lives of regulated parties. *Id.* According to the Department, Navient cannot do so here.

This argument clearly fails in light of the Supreme Court's recent decision in *Department of Homeland Security v. Regents of the University of California*. There, the Supreme Court explained that the agency acted arbitrarily and capriciously when it failed to assess whether there was "legitimate reliance" on DACA before rescinding the program. 140 S. Ct. at 1913 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)). The government in *Regents of the University of California* argued that it was not required to consider reliance interests at all in making its decision because the DACA recipients had no legally cognizable reliance interests given that the DACA program did not confer any substantive rights. *Id.* The Supreme Court flatly rejected this argument, explaining that although such factors may be important in considering the "strength of any reliance interests," an assessment of the regulated party's reliance interests must be undertaken by the agency "in the first instance, subject to normal APA review." *Id.* at 1913–14. Because there was no such consideration of the strength of reliance interests by the agency, the agency acted arbitrarily and capriciously. *Id.* at 1914; *see also MediNatura*, 496 F. Supp. 3d at 456 ("When an agency changes policy, it must consider any alleged reliance interests, even if it ultimately finds that the asserted reliance interests are weak or outweighed by other factors.").

20

Like the Department of Homeland Security in *Regents of the University of California*, the Department here failed to consider and evaluate the strength of Navient's reliance interests during the administrative process and therefore violated the APA. Navient asserts that it structured its billing practices and made business decisions for over a decade based on the 1993 DCL I, 1993 DCL II, and 2007 DCL. The Department was free to consider and reject these reliance interests as weak or outweighed by other policy considerations, but it must have done so *during* the administrative process—which the Department neglected to do. Whether or not the Department agrees with Navient's views about the strength of Navient's reliance interests, the Department was at least obligated to *consider* Navient's reliance during the administrative process. Weighing the alleged reliance interests and determining whether they were "serious" was and is "the agency's job," and "the agency failed to do it." *Regents of the University of California*, 140 S. Ct. at 1914.

## D.

The Department also argues that it did not act arbitrarily and capriciously in failing to consider Navient's reliance interests because Navient unreasonably relied on the Department's DCLs. According to the Department, Navient ignored the "larger context" of the 1993 DCLs, which was to "summarize dozens of provisions of a new law, not to provide backward-looking guidance on the soon-to-be-obsolete half-SAP regulations." Def.'s Opp. to Pl.'s Mot. for Summ. J., Dkt. 64 at 20. According to the Department, it was reasonable for the Acting Secretary to be "unpersuaded that the Department had any intention of hiding a new legal interpretation in a clause in the middle of an otherwise innocuous sentence on the thirteenth page" of a DCL. *Id.*; AR 1338. The Department also contends that Navient, as a sophisticated party, should have known that the two 1993 DCLs contradicted the plain meaning of the Higher Education Act in

21

stating that the half-SAP subsidy applied to loans financed "in whole or in part" by tax-exempt obligations, and that Navient should have sought "formal guidance" from the Department that directly answered the partial-funding question. Finally, the Department argues that Navient's reliance on the 2007 DCL was unreasonable because that letter is unrelated to Navient's billing practices on the loans associated with the 1993 Trust.

These arguments all fail; the administrative record reflects that Navient submitted substantial evidence that its reliance on the Department's guidance contained in three DCLs was reasonable, and the Department wholly failed to consider and evaluate this evidence. Navient submitted the following evidence, which Navient asserts supports Navient's reliance on the 1993 DCL I, 1993 DCL II, and 2007 DCL:

- Navient asserts that it relied on the plain, undisputed meaning of the 1993 DCL I when it structured its billing practices for half-SAP subsidies for loans associated with the 1993 Trust. The parties both agree that the 1993 DCL I condoned Navient's practice of billing for half-SAP subsidies. Indeed, in the original decision which was affirmed by the Acting Secretary, the ALJ stated that the 1993 DCL I "certainly says that the [half-SAP] rate being eliminated had previously applied to loans funded 'in whole or in part' with tax-exempt bonds." ALJ Dec., AR 1317.

- The "in whole or in part" language was issued not once, but twice, in agency guidance, as the Department repeated the language from the 1993 DCL I in the 1993 DCL II. JSFD ¶ 42, AR 109–10.

- Although the "in whole or in part" language was, according to the Department, "[b]uried" within 14 pages of the 1993 DCL I, the language was repeated on the four-page 1993 DCL II, which was issued specifically to provide guidance on the reporting process for, among other items, the half-SAP subsidy. JSFD ¶ 42; AR 109–10.

- Navient also asserts that its reliance on the 1993 DCL I and 1993 DCL II was supported by Navient's own communications with the Department, as demonstrated by declaratory evidence that Navient introduced into the administrative record. Navient's representative, Ms. Ryan-Macie, attended sessions with the Department to discuss the impact of regulatory changes to billing for half-SAP subsidies, which included a review of a draft of the 1993 DCL I. Ms. Ryan-Macie recalls asking the Department to clarify in the 1993 DCL I how the half-SAP rules would apply to Navient's 1993 Trust, and after these discussions, both the 1993 DCL I and 1993 DCL II included new "in whole or in part" language. JSFD ¶¶ 31–34, 38–42; AR 1387–88.

22

- In 2007, the Department issued another DCL to lenders, which introduced a new categorization of loans and stated that the Department would refrain from recouping half-SAP subsidies "for loans that were neither first-generation loans nor second-generation loans" so long as lenders complied with the 2007 guidance prospectively. JSFD ¶ 63, AR 146. The Department also sent a separate letter to Navient repeating the Department's statement in the 2007 DCL that the Department would not "seek to recoup" excess half-SAP payments already received on loans that were "neither first-generation loans nor second generation loans," for lenders that "promptly compl[ied] with or accept[ed]" certain requirements. AR 1608–11. Loans associated with the 1993 Trust did not fit neatly into the first- or second-generation categories as defined in the 2007 DCL, so Navient asserts that it interpreted the letter as an offer of settlement sufficiently broad to cover the 1993 Trust. Navient notified the Department that it had ceased billing for half-SAP subsidies in reliance on the 2007 DCL. JSFD ¶ 56–65.

This evidence purports to support Navient's claim that Navient reasonably relied on the Department's guidance in structuring its billing practices for the half-SAP subsidies affiliated with the 1993 Trust, and thus reasonably relied on the 2007 DCL when it changed its billing practices to eliminate the half-SAP for the 1993 Trust loans. The Department cannot now hold Navient to account without considering the fact that Navient relied on the Department's *own* guidance. *Regents of the University of California*, 140 S. Ct. at 1914 (explaining that a consideration of reliance interests "must be undertaken by the agency in the first instance").[6] The Acting Secretary failed to consider and assess Navient's reliance on the language of the 1993 DCL I, 1993 DCL II, and 2007 DCL when he issued his opinion, and that failure renders the Department's determination arbitrary and capricious.

Seeking to avoid this conclusion, the Department argues that courts treat DCLs as "not binding" and that DCLs "lack[] any force of law." Def.'s Opp. to Pl.'s Mot. for Summ. J., Dkt. 64 at 17. This argument must be rejected. The Department cites but one case for this argument,

---

[6] *Cf. Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158–59 (2012) ("It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable . . .").

*Csutoras v. Paradise High Sch.*, 12 F. 4th 960 (9th Cir. 2021), and that case is inapposite and unpersuasive here. In *Csutoras*, the Ninth Circuit held that DCLs "lack any force of law" in civil tort suits for money damages under the Americans with Disabilities Act or the Rehabilitation Act, but recognized that the letters applied to "administrative enforcement actions." *Id.* at 968. Nowhere in *Csutoras* did the Ninth Circuit hold that regulated parties should not rely on the agency guidance promulgated in DCLs or that agencies need not consider such reliance during the administrative process. Indeed, current Department of Justice guidance provides that guidance documents such as DCLs serve "valuable functions" including explaining how the agency is likely to apply its binding statutes and "convey[ing] important information to the public in language that is clearer and more accessible than the underlying statutes and regulations."[7] To accept the Department's argument that its own DCLs cannot be relied on would force regulated parties like Navient into a Hobson's choice of either following guidance directly issued by an agency (only to be punished years later) or ignoring the guidance and acting contrary to the government's directives. Pertinent here is a Tenth Circuit decision by then-Judge Gorsuch explaining that, although agencies are free to change their interpretations of regulations, in doing so they are obligated to "cogently explain" their decisions and refrain from imposing penalties based on their revised interpretations without "fair notice." *United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1144 (10th Cir. 2010). Then-Judge Gorsuch noted that "[i]f an agency could punish a regulated party for following the agency's own interpretation of its own ambiguous regulations, after all, the practice of administrative law would come to resemble

---

[7] Memorandum from Merrick Garland, Attorney General, to Heads of All Department Components, re: Issuance and Use of Guidance Documents by the Department of Justice (July 1, 2021), at 2, *available at* https://www.justice.gov/opa/page/file/1408606/download.

'Russian Roulette.'" *Id.* (citation and internal quotation marks omitted).[8]

The Department also argues that Navient should have sought formal guidance from the Department directly answering the partial funding question when Navient structured its billing practices for the 1993 Trust, instead of relying on the 1993 DCL I and 1993 DCL II. This argument is unpersuasive. Navient introduced evidence into the administrative record indicating that Navient *did* seek guidance on the partial funding issue through Sheila Ryan-Macie, Navient's representative to the National Council of Higher Education Loan Programs Regulations Committee. JSFD ¶¶ 31–34, 38–42. During the administrative proceedings, Navient submitted a declaration from Ms. Ryan-Macie stating that, in 1993, Ms. Ryan-Macie asked a representative of the Department to clarify in a forthcoming DCL how the half-SAP rules applied to the 1993 Trust. JSFD ¶ 34. The Secretary avoided any discussion of Ms. Ryan-Macie's declaration altogether, even though this evidence supports Navient's reliance on the 1993 DCL I and 1993 DCL II.

Finally, the Department contends that Navient's reliance on the 2007 DCL was unjustified because that letter did not address the half-SAP billing at issue here. According to the Department, the 2007 DCL did not address the "partial funding" issue at the heart of this dispute, but rather concerned a separate "generational" issue. Def.'s Opp. to Pl.'s Mot. for Summ. J., Dkt.

---

[8] The Department's argument that DCLs are legally irrelevant is also belied by the Department's continued and ongoing use of such letters to establish agency priorities and threaten enforcement actions for regulated parties that do not meet expectations. For example, in 2021, the Department issued a DCL related to the Department's Public Service Loan Forgiveness waivers. *See* Guidance for FFEL and Perkins Loan Program Participants on the Limited Public Service Loan Forgiveness Waiver, GEN-21-09 (Dec. 7, 2021, *last updated* Mar. 30, 2022), https://fsapartners.ed.gov/knowledge-center/library/dear-colleague-letters/2021-12-07/guidance-ffel-and-perkins-loan-program-participants-limited-public-service-loan-forgiveness-waiver. The letter provided "information about [the Department's] expectations for [lenders]" and expressly warned lenders that the Department "will work with its enforcement partners on a joint approach to evaluating whether [lenders] are meeting" the Department's expectations. *Id.* Thus, although the Department here argues that DCLs are legally irrelevant, in other instances the Department has threatened enforcement for regulated parties who refuse to comply with guidance in the letters. The Department simply cannot have it both ways. Either DCLs have important significance or they do not. And if DCLs do not have significance to the Department, the Department should not issue them.

64 at 21. The Department argues that half-SAP subsidies are available only for (1) loans financed with tax-exempt bonds, and (2) loans financed with the collections on category (1) loans. *See id.* at 21 (citing 20 U.S.C. § 1087-1(b)(2)(B)(i)). The 2007 DCL used new terminology, which referred to category (1) loans as "first-generation" and category (2) loans as "second-generation," and stated that the Department had "reason to believe that some lenders may be claiming [half-SAP payments] on loans which are neither first-generation nor second-generation loans." JSFD ¶ 62; AR 145.  The 2007 DCL further stated that in the interest of resolving without dispute potential objections to the "meaning and application of the statutory and regulatory requirements," the Department would not "seek to recoup" excess half-SAP payments already received on loans that were "neither first-generation loans nor second generation loans," for lenders that "promptly compl[ied] with or accept[ed]" certain requirements. JSFD ¶ 63; AR 146. According to the Department, the 2007 DCL therefore only promised that the Department would not seek to recoup subsidies on what might be called *third* generation loans, was specific to the "generational" issue, and had nothing to do with the issue of loans, like Navient's, that were funded *in part* by tax exempt obligations. Thus, the Department contends that Navient improperly assumed the 2007 DCL addressed a question relevant to this case: whether the Department would seek to recoup payments for loans only partly financed by tax-exempt funding.

The Department's argument that Navient unreasonably relied on the 2007 DCL because the letter did not address the partial funding issue is unpersuasive. First, Navient's loans associated with the 1993 Trust did not fit neatly into either the first-generation or second-generation categories as defined in the 2007 DCL, given that the 1993 loans were funded with blended sources rather than "only" one of the specified sources in the letter. When Navient

received the 2007 DCL, Navient interpreted the letter to apply to every loan billed at the half-SAP rate other than those specifically called out in the 2007 DCL. Indeed, the letter stated that the Department would refrain from recouping "SAP already received in excess of that payable at the standard rate for quarters ending on or before September 30, 2006 at the [half-SAP] rate for loans that were *neither first-generation loans nor second-generation loans*[.]" JSFD ¶ 63 (emphasis added). The term "third generation loans"—which the Department now argues is the only category of loans excused by the 2007 DCL—*never* appears in the terms of the 2007 DCL. Thus, Navient could have reasonably concluded in 2007 that although the Department had previously allowed the use of blended funding sources for loans—that is, allowing half-SAP on loans funded "in part" by tax-exempt obligations—the 2007 DCL represented that the Department was reversing course. Because the loans in question did not fit into either the first-generation or second-generation definitions provided in the 2007 DCL, Navient ceased billing on half-SAP to benefit from the letter's offer of non-enforcement. Thus, Navient could have reasonably relied on the 2007 DCL, and the Department's failure to consider that reliance was arbitrary and capricious.[9]

In conclusion, it was arbitrary and capricious for the Department to fail to consider Navient's reliance interests, and the Department's arguments to the contrary must be rejected. Navient presented evidence supporting its assertion that it reasonably relied on the Department's 1993 DCL I, 1993 DCL II, and 2007 DCL, and during the administrative proceedings, the Department entirely neglected to consider this reliance. As the Supreme Court made clear as recently as 2020, although the Department may ultimately reject Navient's reliance interests as

---

[9] Furthermore, even if the Department were correct that the 2007 DCL had no import to this dispute, it would not change the outcome here, because the Acting Secretary also failed to consider Navient's reliance on the 1993 DCL I and 1993 DCL II.

outweighed by competing policy interests, "[m]aking that difficult decision was the agency's job, but the agency failed to do it." *Regents of the University of California*, 140 S. Ct. at 1914.  The APA requires that an agency at least *consider* the reliance interests of regulated parties before instituting a fundamental change in the regulatory environment. And before taking adverse action against a regulated party as a result of a policy change, the agency must assess the regulated party's reliance on the agency's prior guidance—*regardless* of the legality or wisdom of that prior guidance. In doing so, the agency must actually weigh the strength of those reliance interests and cannot merely ignore or dismiss them. The Department has plainly failed to do so here.

## IV.

In addition to reliance, Navient also argues that the Department acted in violation of the APA in two other ways: (1) by failing to engage in "reasoned decisionmaking" regarding whether the loans associated with the 1993 Trust constituted a singular "obligation"; and (2) by bifurcating the proceedings and postponing a final determination of the amount of Navient's reimbursement obligations, which Navient argues results in an inequitable outcome.[10] Each of these arguments and the Department's responses are analyzed below. In short, because of the "highly deferential" standard of review in APA cases, *Ohio Valley Envtl. Coal.*, 556 F.3d at 192, Navient's additional arguments for summary judgment fail.

---

[10] Navient also "reserve[d] the right to reargue" an additional point "should the Department raise it as a basis for Navient's liability": whether the Acting Secretary improperly "disregarded Navient's argument with respect to Navient's affiliate, ECFC, and the continued eligibility of certain loans . . . to bill for [half-SAP] following the transfer to ECFC." Pl.'s Mot. for Summ. J., Dkt. 58-1 at 37. The Department has not raised this issue in its cross motion for summary judgment, nor did the Department raise the issue at oral argument. For that reason, this argument is neither addressed nor resolved in this Memorandum Opinion.

**A.**

First, Navient argues that the Department acted arbitrarily and capriciously in rejecting Navient's characterization of the bonds associated with the 1993 Trust as a single "obligation." According to Navient, due to the unique structure of the 1993 Trust, Navient treated the bonds collectively and on a "parity basis," and a default of any one of the 1993 bonds would result in a collective default of all of them. JSFD ¶¶ 22–23. For that reason, Navient considered all the bonds associated with the 1993 Trust as a single "obligation" for purposes of the half-SAP regulatory scheme. The Acting Secretary concluded that Navient's treatment of the 1993 Trust bonds as a singular "obligation" was erroneous under the Higher Education Act because each of the bonds constituted its own individual "obligation." JSFD ¶ 80; AR 1336–42. Navient contends that the Department acted arbitrarily and capriciously in failing to engage meaningfully with Navient's arguments with respect to the unique structure of the 1993 Trust.

Navient's argument that the Acting Secretary's analysis regarding the "obligation" issue must be vacated as arbitrary and capricious is unpersuasive. Supreme Court precedent makes clear that even if a reviewing court disagrees with an agency's finding, the reviewing court is not "empowered to substitute its judgment for that of the agency," *Ohio Valley Envtl. Coal.*, 556 F.3d at 192. This is especially so in cases like this one where the facts implicate "substantial agency expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989). Thus, given the standard of review in APA cases, as long as the Acting Secretary articulated a "rational connection between the facts found and the choice made," *State Farm*, 463 U.S. at 43, his determination that Navient's bonds did not constitute a singular "obligation" must stand. Here, the Acting Secretary provided a rational explanation—albeit a brief one—for his determination that the loans at issue did not constitute a single "obligation." The Acting Secretary explained

that because a "bond" and "obligation" are "effectively synonymous under the law," and because "[t]he 1993 Bond Pool is an aggregate of multiple bonds," Navient's treatment of the bonds as a single obligation was improper. AR 1339. Navient's argument therefore shows, at most, that the Department *could* have justified an unusual definition of "obligation" that comprised all of the bonds. But this falls short of Navient's burden under the APA to prove that the Department's reading was "so implausible that it could not be ascribed to a difference in view." *State Farm*, 463 U.S. at 43. Thus, the Acting Secretary's decision that the bonds did not constitute a single "obligation" did not run afoul of the procedural requirements of the APA.

**B.**

Finally, Navient argues that the Department acted arbitrarily and capriciously by bifurcating the proceeding and thereby postponing any final evaluation of Navient's reimbursement obligations. According to Navient, because the Department's enforcement took place more than five years following the conduct at issue, the enforcement would be barred by the applicable five-year statute of limitations if the Department decided to impose a "fine, penalty, or forfeiture." *Kokesh v. S.E.C.*, 137 S. Ct. 1635, 1642 (2017) (quoting 28 U.S.C. § 2462) (internal quotation marks omitted). Navient contends that it must know the exact sum that the Department demands in order to determine whether the Department is truly limited to seeking reimbursement of overpayment of half-SAP subsidies, or whether the Department is in reality seeking a "fine, penalty, or forfeiture" that is subject to a five-year statute of limitations. Thus, according to Navient, the Department improperly bifurcated the proceedings because in doing so, the Department prevented Navient from ascertaining the exact amount of half-SAP overpayments that Navient allegedly must return to the Department.

In response, the Department makes three arguments:

(1) Navient waived this argument when it failed to raise bifurcation in its Complaint;

(2) The Department was not arbitrary and capricious when it bifurcated the proceedings because bifurcation has several benefits, including for Navient; and

(3) The record makes clear that the Department is only seeking repayment of excess subsidies—which is purely compensatory in nature—and not a fine, penalty, or forfeiture.

The Department's first contention that Navient waived its bifurcation argument fails. The Department's second and third arguments, however, are persuasive and lead to the conclusion that the Department did not act arbitrarily and capriciously by bifurcating the administrative proceedings.

The Department wrongly contends that Navient waived its bifurcation argument by not raising bifurcation in its Complaint. Although it is true that a "new claim [that] is neither stated nor forecasted" in the Complaint is "not properly a subject for summary judgment," *Len Stoler, Inc. v. Volkswagen Grp. of Am.*, 232 F. Supp. 3d 813, 823 (E.D. Va. 2017), the Complaint here adequately "forecasted" Navient's bifurcation arguments. *Id.* The Complaint raises Navient's statute of limitations concerns, which Navient also raised before the Department in the administrative proceedings. *See* Compl. for Declaratory and Inj. Relief, Dkt. 1 ¶ 30; 2017 Suppl. Brief, AR 2026–29. The required level of detail in the complaint must be sufficient to "provide defendant and the court with a fair idea of the basis of the complaint and the legal grounds claimed for recovery," and Navient clearly met that standard here by raising its statute of limitations concerns in the Complaint. *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1227 (4th Cir. 1998) (quoting *Self Directed Placement Corp. v. Control Data Corp.*, 908 F.2d 462, 466 (9th Cir. 1990)); *see also Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."). Thus, the Department's

argument that Navient waived its objection to the bifurcation of the proceedings must be rejected.

The Department correctly argues, however, that it did not act arbitrarily or capriciously in bifurcating the proceedings because doing so had several benefits, including for Navient, and the record makes clear that the Department is not seeking a fine, penalty, or forfeiture to which a five-year statute of limitations would apply. The Acting Secretary's decision explained that bifurcation allowed Navient to avoid the audit of Navient's records that would be necessary to determine the precise scope of liability—an audit that would not be necessary if Navient prevailed in challenging the Acting Secretary's decision. *See* AR 1342. Furthermore, Navient's argument that it cannot determine whether the Department seeks an amount constituting a "fine, penalty, or forfeiture" lacks a basis in the record. The record makes clear that the Department seeks only the "amount received in excess of" the ordinary SAP subsidies to which Navient was entitled. AR 90–91. Although the exact amount of that excess—which the Department estimates to be around $22 million—remains undetermined, the Department has never indicated that it seeks anything more than repayment, and not a "fine, penalty, or forfeiture." *Kokesh*, 137 S. Ct. 1642.[11] Thus, the Acting Secretary's balancing of the costs and benefits of bifurcation in the decision was reasonable, within his discretion, and not, as required for an arbitrary and capricious determination under the APA, "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Navient's arguments that the Department acted arbitrarily and capriciously in bifurcating the proceeding therefore fail.

---

[11] Additionally, at oral argument, counsel for the Department again reiterated that the Department would not seek any fines or penalties. *See* Oct. 5, 2022 Tr. at 33:25, 34:1 ("[T]here's no fine here. All that is being requested is the reimbursement of the overpayments.").

**V.**

In conclusion, Navient has persuasively shown that the Department acted arbitrarily and capriciously in violation of the APA by failing to consider Navient's reliance on the 1993 DCL I, 1993 DCL II, and 2007 DCL. The Department also impermissibly neglected to consider, when making its final decision, Navient's testimonial and documentary evidence that provides context about Navient's asserted reliance on the 1993 DCL I and 1993 DCL II. Navient is therefore entitled to summary judgment on the basis of the Department's failure to consider its reliance. All of Navient's other arguments in favor of summary judgment, however, fail.

In Navient's Motion for Summary Judgment, Navient seeks an entry of judgment in its favor and an award of attorneys' fees, or, in the alternative, an order vacating and remanding the Acting Secretary's decision to the Department. Here, Supreme Court and Fourth Circuit precedent make clear that the proper remedy is to vacate the Acting Secretary's decision and remand to the Department for reconsideration, during which the Department must consider and address Navient's asserted reliance upon the Dear Colleague Letters and Navient's corresponding testimonial and documentary evidence.[12]

The modern administrative state depends on the ability of regulated entitles—including Navient—to rely on guidance provided by regulators like the Department. When regulators instead punish an entity for reasonably relying on such guidance without ever considering the reliance interests at stake, the APA demands a judicial remedy. This is precisely what occurred here. Although the Department is free to change its position from that expressed in the two 1993

---

[12] *See Fla. Power & Light Co. v Lorion*, 470 U.S. 729, 744 (1985) ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."); *Mountain Valley Pipeline, LLC v. N.C. Dep't of Envtl. Quality*, 990 F.3d 818, 833 (4th Cir. 2021) (vacating agency action and remanding to the Department to address and explain additional factors due to the agency's inadequate explanation of decision in light of the administrative record).

DCLs and the 2007 DCL, before doing so, the Department must assess and weigh regulated parties' reliance interests. This the Department plainly failed to do. Thus, for the foregoing reasons, Navient's Motion for Summary Judgment is granted, and the Department's Cross Motion for Summary Judgment is denied. The result required is a remand to the Department to fulfill its obligation to assess and weigh Navient's asserted reliance interests and issue a new final determination that evaluates and accounts for those reliance interests.

The Acting Secretary's Final Decision is vacated and remanded to the Department for further proceedings consistent with this Memorandum Opinion. An appropriate Order will issue.

The Clerk of the Court is directed to provide copies of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
December 16, 2022

/s/

T. S. Ellis, III
United States District Judge

34